**[ORAL ARGUMENT NOT YET SCHEDULED]**

**Nos. 25-5097, 25-5098**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

GLOBAL HEALTH COUNCIL, et al.,
                        *Plaintiffs-Appellees,*
v.
DONALD J. TRUMP, et al.,
                        *Defendants-Appellants.*

---

AIDS VACCINE ADVOCACY COALITION, et al.,
                        *Plaintiffs-Appellees,*
v.
UNITED STATES DEPARTMENT OF STATE, et al.,
                        *Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Columbia

---

**BRIEF FOR APPELLANTS**

---

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**A.      Parties and Amici**

Plaintiffs-appellees in No. 25-5097 are Global Health Council; Small Business Association for International Companies; HIAS; Management Sciences for Health, Inc.; Chemonics International, Inc.; DAI Global LLC; Democracy International, Inc.; and American Bar Association.

Plaintiffs-appellees in No. 25-5098 are AIDS Vaccine Advocacy Coalition and Journalism Development Network, Inc.

Defendants-appellants in No. 25-5097 are Donald J. Trump; the Secretary of State; the Acting Administrator of the U.S. Agency for International Development; the Acting Deputy Administrator for Policy and Planning of the U.S. Agency for International Development; the Acting Deputy Administrator for Management and Resources of the U.S. Agency for International Development; the Director of Foreign Assistance for the U.S. Department of State; the Director of the Office of Management and Budget; the U.S. Department of State; the U.S. Agency for International Development; and the Office of Management and Budget.

Defendants-appellants in No. 25-5098 are the U.S. Department of State; the U.S. Agency for International Development; the Secretary of State; the Acting Administrator of the U.S. Agency for International Development; the Office of Management and Budget; the Director of the Office of Management and Budget; and Donald J. Trump.

The Constitutional Accountability Center was amicus in district court. There are no amici in this Court as of this filing.

### B.    Rulings Under Review

The rulings under review were entered in *AIDS Vaccine Advocacy Coalition v. U.S. Department of State*, No. 25-cv-400 (D.D.C.), and *Global Health Council v. Trump*, No. 25-cv-402 (D.D.C.), by the Honorable Amir H. Ali.  They are the Memorandum Opinion and Order entered on March 10, 2025, in each case at Docket Number 60 granting in part plaintiffs' motions for a preliminary injunction.  *See AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*, --- F. Supp. 3d ---, 2025 WL 752378 (D.D.C. Mar. 10, 2025).

### C.    Related Cases

Previous appeals were taken from each of these district court cases. Those appeals were consolidated before being dismissed by this Court for lack of jurisdiction.  *See* Order, *AIDS Vaccine Advocacy Coal. v. U.S. Dep't*

*of State*, Nos. 25-5046, 25-5047 (D.C. Cir. Feb. 26, 2025).  The government

then sought emergency relief in the Supreme Court.  *See Department of*

*State v. AIDS Vaccine Advocacy Coal.*, No. 24A831 (U.S. filed Feb. 26, 2025).

With the exception of that appeal, these cases have not been in any court

other than the district court from which they originated.  The undersigned

counsel is unaware of any related cases currently pending in this Court or

any other court.

> */s/ Sean R. Janda*
> Sean R. Janda

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ................................................................................. 1

STATEMENT OF JURISDICTION ....................................................... 3

STATEMENT OF THE ISSUE ............................................................. 3

PERTINENT STATUTES AND REGULATIONS ................................. 3

STATEMENT OF THE CASE ............................................................... 3

    A.    Legal Background ................................................................ 3

    B.    Factual and Procedural Background ................................ 11

SUMMARY OF ARGUMENT .............................................................. 18

STANDARD OF REVIEW ................................................................... 24

ARGUMENT ....................................................................................... 25

I.    Plaintiffs Are Unlikely to Succeed on the Merits of Their
Appropriations Claim ................................................................ 25

    A.    Plaintiffs May Not Enforce the Relevant Statutes ....... 27

    B.    The Relevant Statutes Do Not Support the District Court's
Preliminary Injunction .................................................. 35

    C.    Any Construction of the Relevant Statutes as Negating the
Executive Branch's Discretion Over Specific Foreign
Assistance Funds Would Raise Serious Constitutional
Questions ........................................................................ 47

II.    The Equitable Considerations Do Not Support the District
Court's Preliminary Injunction ................................................ 57

iv

    A.    Plaintiffs Have Not Demonstrated the Requisite
           Irreparable Harm ...................................................................57

    B.    The Balance of Harms and the Public Interest Weigh
           Against a Preliminary Injunction ....................................60

    C.    The Preliminary Injunction Is Overbroad ....................................62

CONCLUSION.........................................................................................65

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                               **Page(s)**

*Air Courier Conference of Am. v. American Postal Workers Union,*
    498 U.S. 517 (1991)..................................................................28

*American Ins. Ass'n v. Garamendi,*
    539 U.S. 396 (2003)................................................5, 47, 48, 55

*Block v. Community Nutrition Inst.,*
    467 U.S. 340 (1984)..........................................28, 31, 33, 34

*Califano v. Yamasaki,*
    442 U.S. 682 (1979)..................................................................63

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006)...............................................59

*Cheney v. U.S. Dist. Court for D.C.,*
    542 U.S. 367 (2004)..................................................................48

*Chicago & S. Air Lines v. Waterman S.S. Corp.,*
    333 U.S. 103 (1948)...........................................................48, 61

*Cincinnati Soap Co. v. United States,*
    301 U.S. 308 (1937)..................................................................50

*City of New Haven v. United States,*
    809 F.2d 900 (D.C. Cir. 1987)........................................32, 44

*Clarke v. Securities Indus. Ass'n,*
    479 U.S. 388 (1987)..................................................................29

*Consumer Fin. Prot. Bureau v. Community Fin. Servs. Ass'n of Am., Ltd.,*
    601 U.S. 416 (2024)..................................................................51

*Department of Educ. v. California,*
    145 S. Ct. 966 (2025) (per curiam)...............................18, 58

*Gill v. Whitford*,
　585 U.S. 48 (2018)........................................................................18, 62, 63

*Hanson v. District of Columbia*,
　120 F.4th 223 (D.C. Cir. 2024) (per curiam) ..................................24

*Jennings v. Rodriguez*,
　583 U.S. 281 (2018)........................................................................47

*Johnson v. Eisentrager*,
　339 U.S. 763 (1950)........................................................................48

*Jones v. United States*,
　526 U.S. 227 (1999)........................................................................47

*Lewis v. Casey*,
　518 U.S. 343 (1996)........................................................................63

*Madsen v. Women's Health Ctr., Inc.*,
　512 U.S. 753 (1994)........................................................................63

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
　567 U.S. 209 (2012)........................................................................29

*Nken v. Holder*,
　556 U.S. 418 (2009)....................................................................25, 60

*Norton v. Southwestern Utah Wilderness All.*,
　542 U.S. 55 (2004)..........................................................................36

*Perfect 10, Inc. v. Google, Inc.*,
　653 F.3d 976 (9th Cir. 2011)..........................................................60

*Qassim v. Trump*,
　927 F.3d 522 (D.C. Cir. 2019).......................................................49

*Sherley v. Sebelius*,
　610 F.3d 69 (D.C. Cir. 2010) .........................................................63

*Spectrum Leasing Corp. v. United States*,
    764 F.2d 891 (D.C. Cir. 1985)......................................................... 58-59

*Thompson v. North Am. Stainless, LP*,
    562 U.S. 170 (2011)......................................................................28

*Train v. City of New York*,
    420 U.S. 35 (1975)........................................................................37

*Trump v. Mazars USA, LLP*,
    591 U.S. 848 (2020)...............................................................33, 49

*Trump v. Sierra Club*,
    140 S. Ct. 1 (2019) .......................................................................27

*United States v. Hansen*,
    599 U.S. 762 (2023).....................................................................47

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)...................................................................25, 60

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015).........................................................................56

**Constitutions:**

U.S. Const.:
    Art. I, § 8, cl. 3.............................................................................56
    Art. I, § 8, cl. 11...........................................................................56
    Art. I, § 9, cl. 7.......................................................................6, 50

Articles of Confederation of 1781, art. IX, para. 5............................52

Pa. Const. of 1776, § 20............................................................. 51-52

S.C. Const. of 1778, art. XVI ..........................................................52

**Statutes:**

Administrative Procedure Act:
  5 U.S.C. § 701(a)(1)................................................................28
  5 U.S.C. § 706(1) ...................................................................35

Foreign Assistance Act of 1961,
  Pub. L. No. 87-195, 75 Stat. 424.............................................4
    22 U.S.C. § 2151(a)............................................................5
    22 U.S.C. § 2151b(c)(1) ...............................................4, 55
    22 U.S.C. § 2291(a)(4) .......................................................4
    22 U.S.C. § 2346(a).............................................................4
    22 U.S.C. § 2346(b).............................................................5
    22 U.S.C. § 2347(a).............................................................4
    22 U.S.C. § 2348 .................................................................4
    22 U.S.C. § 2349aa .............................................................4
    22 U.S.C. § 2382(a).............................................................5
    22 U.S.C. § 2382(c).................................................5, 38, 57
    22 U.S.C. § 2395(a).................................................4, 38, 56

Further Consolidated Appropriations Act of 2024,
  Pub. L. No. 118-47, div. F, 138 Stat. 460, 729.......................6
    138 Stat. at 739-40.........................................................8, 63
    138 Stat. at 740..........................................................7, 37, 55
    138 Stat. at 740-41..........................................................7, 37
    138 Stat. at 742.......................................6, 8, 36, 37, 55, 64
    138 Stat. at 744..........................................7, 36, 55, 64

Impoundment Control Act of 1974,
  Pub. L. No. 93-344, tit. X, 88 Stat. 297, 332.........................8
    2 U.S.C. § 681 .............................................................33, 55
    2 U.S.C. § 682(3)................................................................39
    2 U.S.C. § 683(a)..........................................9, 29, 39, 41
    2 U.S.C. § 683(b)..........................................9, 39, 40
    2 U.S.C. § 684(a)..........................................................10, 29
    2 U.S.C. § 684(b)...............................................................10
    2 U.S.C. § 686(a)..........................................10, 39, 40, 42
    2 U.S.C. § 687 ...........................................................10, 11, 30

2 U.S.C. § 688 ............................................................................9, 30

28 U.S.C. § 1292(a)(1) .................................................................3

28 U.S.C. § 1331 ..........................................................................3

28 U.S.C. § 1361 ..........................................................................3

31 U.S.C. § 1341(a)(1) ...............................................................44

31 U.S.C. § 1350 ........................................................................44

Bill of Rights Act 1689,
    1 W. & M. 2, c. 2 (Eng.) ......................................................51


**Regulatory Material:**

Exec. Order No. 14,169,
    90 Fed. Reg. 8619 (Jan. 30, 2025) ....................................11, 12, 56, 61


**Rule:**

Fed. R. App. P. 4(a)(1)(B) ..........................................................3


**Legislative Materials:**

4 Cong. Rec. 5628 (1876) ..........................................................52

H.R. Rep. No. 81-1797 (1950) ...................................................53


**Other Authorities:**

Appropriation—Contracts,
    21 Op. Att'y Gen. 414 (1896) .............................................53

x

*Department of Homeland Sec.—Border Barrier Const. & Obligations*,
   B-335747, 2024 WL 1740422 (Comp. Gen. Apr. 22, 2024) .............................43

GAO, *Search Decisions* (last visited May 9, 2025),
   https://www.gao.gov/legal/appropriations-law/search ...................................42

*Impoundment Control Act—Withholding of Funds through
   Their Date of Expiration*,
   B-330330.1, 2018 WL 6445177 (Comp. Gen. Dec. 10, 2018) ...........................45

*James R. Jones, House of Representatives*,
   B-203057 L/M, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981) .......................43

Thomas Jefferson, *Third Annual Message to Congress* (Oct. 17, 1803).........52

Emily M. Morgenstern & Nick M. Brown, Cong. Research Serv.,
   R40213, *Foreign Assistance: An Introduction to U.S. Programs
   and Policy* (2022)................................................................................................4

Presidential Authority to Impound Funds Appropriated for
   Assistance to Federally Impacted Schools,
   1 Op. O.L.C. Supp. 303 (1969) ...................................................................37, 54

Nile Stanton, *History and Practice of Executive Impoundment
   of Appropriated Funds*,
   53 Neb. L. Rev. 1 (1974)..............................................................................53, 55

The President's Veto Power,
   12 Op. O.L.C. 128 (1988) ................................................................................55

U.S. Dep't of State, *Emergency Humanitarian Waiver to
   Foreign Assistance Pause* (Jan. 28, 2025),
   https://perma.cc/J7EV-ESPG.........................................................................12

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| GAO | Government Accountability Office |
| J.A. | Joint Appendix |
| USAID | U.S. Agency for International Development |

## INTRODUCTION

Although the injunction in this case purports to protect the separation of powers by preserving Congress's prerogatives, it actually constitutes improper judicial intrusion into matters left to the political branches.  In particular, the district court was concerned that the Executive Branch might not expend funds that had been appropriated, and the court issued an order requiring the Executive Branch to obligate those funds.  But if the Executive Branch determines that specific appropriated funds should not be obligated—a determination that has not occurred—the relevant statute establishes a process for notifying Congress and then resolving the matter between the political branches.

The district court improperly inserted itself into that process. Plaintiffs—organizations who have received, or whose members have received, foreign assistance funds—asserted that the Executive Branch does not intend to expend all of the foreign assistance funds appropriated by the Further Consolidated Appropriations Act of 2024.  In making that assertion, plaintiffs did not identify any specific provision of the appropriations act—or of the underlying statutes governing foreign assistance funds—that confers on any plaintiff the right to receive particular funds.  Instead, plaintiffs

asserted generally that the failure to obligate all of the appropriated funds would violate the Impoundment Control Act.  The district court agreed and entered a preliminary injunction requiring the Executive Branch to make available for obligation all of the foreign assistance funds appropriated in the appropriations act.

That injunction was erroneous on all levels.  The Impoundment Control Act provides a framework for guiding inter-Branch engagement on certain decisions regarding the obligation of appropriated funds; it does not confer any judicially enforceable rights on third parties.  Worse, the district court's injunction pretermits the engagement contemplated by the statute, requiring the Executive Branch to make funds available for obligation—a requirement that the statute does not impose on its own terms until the end of the inter-Branch process—even though the inter-Branch process has not yet begun. And it does so in the particularly sensitive area of foreign relations, where the President has substantial constitutional authority and where any disagreements are best worked out between the political branches.  The injunction should be reversed or vacated in relevant part.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court under 28 U.S.C. §§ 1331, 1361.  *See* J.A. 86, 368.  The district court entered a single memorandum opinion and order in both cases, granting in part plaintiffs' motions for a preliminary injunction on March 10, 2025.  *See* J.A. 35-82.  The government filed timely notices of appeal in both district court cases on April 1, 2025.  J.A. 232-33, 406-07; *see* Fed. R. App. P. 4(a)(1)(B).  This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

The issue presented is whether the district court properly entered a preliminary injunction requiring the Executive Branch to make available for obligation certain foreign assistance funds.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Legal Background

1.  This case involves the implementation of the statutory scheme for organizing and implementing the United States' foreign assistance programs.  Today, the "primary legislative basis" for such programs is the

3

Foreign Assistance Act of 1961, Pub. L. No. 87-195, 75 Stat. 424.  *See* Emily

M. Morgenstern & Nick M. Brown, Cong. Research Serv., R40213, *Foreign*

*Assistance: An Introduction to U.S. Programs and Policy* 1 (2022).  That

statute generally confers on the President and his subordinates broad

discretion to manage foreign aid.

Thus, for many programs, Congress has expressly directed that any

aid should be subject to the President's discretionary terms and conditions.

For instance, Congress permitted assistance for health programs "on such

terms and conditions as [the President] may determine."  22 U.S.C.

§ 2151b(c)(1); *see also, e.g.*, *id.* § 2291(a)(4) (antinarcotic and other anticrime

programs); *id.* § 2346(a) (economic and political stability assistance); *id.*

§ 2347(a) (military education and training assistance); *id.* § 2348

(peacekeeping operations); *id.* § 2349aa (antiterrorism assistance).

Similarly, Congress has generally sought to ensure that the President

and his subordinates have programmatic flexibility to align foreign

assistance programs with the President's foreign policy.  Thus, Congress has

provided generally that foreign assistance "may be furnished" on "such

terms" as "may be determined to be best suited to the achievement of the

purposes" of the Foreign Assistance Act.  22 U.S.C. § 2395(a).  And Congress

has tasked the Secretary of State, "[u]nder the direction of the President," with the responsibility for the "continuous supervision and general direction of economic assistance," to ensure that "the foreign policy of the United States is best served thereby." *Id.* § 2382(c); *see also, e.g.*, *id.* § 2382(a) ("Nothing contained in this chapter shall be construed to infringe upon the powers or functions of the Secretary of State."); *id.* § 2346(b) ("The Secretary of State shall be responsible for policy decisions and justifications for economic support programs under this part . . . .").

In short, while Congress has articulated various "goals" to guide the President's administration of foreign aid, 22 U.S.C. § 2151(a), Congress has generally deferred to the President regarding how best to implement foreign assistance programs consistent with the President's broader foreign policy goals and statutory requirements. This deference reflects the longstanding broad authority of the Executive Branch in the conduct of foreign affairs. *See American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (observing that the "historical gloss on the 'executive Power'" in the clause vesting executive authority in the President "has recognized the President's vast share of responsibility for the conduct of our foreign relations" (quotation omitted)).

5

2.  Since establishing the general statutory framework governing foreign assistance programs, Congress has regularly appropriated funds to allow the Executive Branch to implement those programs.  *Cf.* U.S. Const. art. I, § 9, cl. 7.  Most recently, Congress appropriated substantial foreign assistance funds in Division F of the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, 138 Stat. 460, 729.

In appropriating funds in that statute, Congress took various approaches and addressed various operational needs of the government's foreign assistance programs.  In some circumstances, Congress appropriated large sums for carrying out types of foreign assistance programs, without substantially constraining the Executive Branch's discretion in how to use those funds.  Thus, for example, Congress appropriated nearly $4 billion "[f]or necessary expenses to carry out the provisions of sections 103, 105, 106, 214, and sections 251 through 255, and chapter 10 of part I of the Foreign Assistance Act"—sections that generally relate to "development assistance." 138 Stat. at 742.  Similarly, Congress appropriated nearly $5 billion for "necessary expenses to carry out the provisions of section 491 of the Foreign Assistance Act of 1961 for international disaster relief, rehabilitation, and

6

reconstruction assistance," *id.*, and nearly $4 billion for various activities "to meet refugee and migration needs," 138 Stat. at 744.

In other cases, Congress appropriated large sums for certain programs while also imposing substantial restrictions on how those funds could be used. For example, Congress appropriated nearly $4 billion for global health programs—that is, for "such activities as" "child survival and maternal health programs," "immunization and oral rehydration programs," "family planning/reproductive health," and others. 138 Stat. at 740. But in appropriating those funds, Congress also included a number of provisos restricting how those funds could be spent. For example, Congress prohibited the use of funds "to pay for the performance of abortion as a method of family planning" or "to lobby for or against abortion" and directed that any "voluntary family planning project" funded with the appropriation "shall meet" various requirements. 138 Stat. at 740-41.

And sometimes, Congress earmarked funds for more specific purposes—or, in some limited cases, for specific recipients. Thus, for example, Congress appropriated more than $6 billion for expenses related to "the prevention, treatment, and control of, and research on, HIV/AIDS,"

including $1.65 billion "for a United States contribution to the Global Fund to Fight AIDS, Tuberculosis and Malaria."  138 Stat. at 742.

Beyond those appropriations for foreign assistance programming, Congress also appropriated funds to support the administration of foreign assistance programs.  For example, Congress appropriated funds to allow the President to finance the Executive Branch's operating expenses and capital expenditures necessary to implement foreign assistance programs. 138 Stat. at 739-40.

Some of the funds appropriated in the Further Consolidated Appropriations Act of 2024 remain available until September 30, 2025, whereas other funds remain available until later dates or until expended. *See, e.g.*, 138 Stat. at 742 (containing four appropriations, two of which "remain available until expended"; one of which remains "available until September 30, 2028"; and one of which remains "available until September 30, 2025").

3.  Congress has sought to impose certain requirements on the Executive's decisions whether to obligate and expend appropriated funds through the Impoundment Control Act of 1974, Pub. L. No. 93-344, tit. X, 88 Stat. 297, 332.  The current version of that statute provides that the

8

President is required to "transmit to both Houses of Congress a special message" whenever he "determines that all or part of any budget authority will not be required to carry out the full objectives or scope of programs for which it is provided or that such budget authority should be rescinded for fiscal policy or other reasons" or "whenever all or part of budget authority provided for only one fiscal year is to be reserved from obligation for such fiscal year." 2 U.S.C. § 683(a). That special message is required to contain various information about the proposed rescission, such as "the amount of budget authority" involved and "the reasons why the budget authority should be rescinded." *Id.*

Once Congress receives a special message, it may proceed to consider a rescission bill to rescind some or all of the funds covered by the special message. The statute provides particular procedures to ensure timely consideration of any such rescission bill. *See* 2 U.S.C. § 688. But if Congress has not "completed action on a rescission bill rescinding all or part of the amount proposed to be rescinded" within 45 days, then the statute states that the amount proposed to be rescinded "shall be made available for obligation." *Id.* § 683(b).

9

In addition, the statute provides that the President should transmit a special message to Congress whenever the Executive Branch "proposes to defer any budget authority provided for a specific purpose or project." 2 U.S.C. § 684(a). The statute states that such deferrals are "permissible only" for certain specified reasons. *Id.* § 684(b).

Finally, the statute provides for various enforcement mechanisms by the Comptroller General, an official within the Legislative Branch. Thus, if the Comptroller General concludes that the "President has failed to transmit a special message with respect to" a particular deferral or decision to establish a reserve, the Comptroller General is directed to "make a report on such reserve or deferral and any available information concerning it to both Houses of Congress," which report "shall be considered a special message." 2 U.S.C. § 686(a). And if "budget authority is required to be made available for obligation and such budget authority is not made available for obligation," the statute provides that the Comptroller General may "bring a civil action" in district court. *Id.* § 687. Such a suit may be brought, however, only after "the expiration of 25 calendar days of continuous session of the Congress following the date on which an explanatory statement by the Comptroller General of the circumstances giving rise to the action contemplated has been

10

filed with the Speaker of the House of Representatives and the President of the Senate." *Id.*

## B.    Factual and Procedural Background

1.  On January 20, 2025, the President issued Executive Order No. 14,169, titled *Reevaluating and Realigning United States Foreign Aid. See* 90 Fed. Reg. 8619 (Jan. 30, 2025) (publishing Executive Order).  That Executive Order stated that certain foreign assistance funds "are not aligned with American interests and in many cases antithetical to American values" in ways that "serve to destabilize world peace." *Id.* § 1, 90 Fed. Reg. at 8619. The Executive Order declared that "[i]t is the policy of United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President." *Id.* § 2, 90 Fed. Reg. at 8619.

To provide time to review foreign assistance programs "for programmatic efficiency and consistency with United States foreign policy," the Executive Order directed agencies to "immediately pause new obligations and disbursements of development assistance funds to foreign countries" and implementing organizations and contractors.  Exec. Order No. 14,169, § 3(a), 90 Fed. Reg. at 8619.  "[W]ithin 90 days," agencies would

conduct a review and determine "whether to continue, modify, or cease each
foreign assistance program" in consultation with the Director of the Office of
Management and Budget and with the concurrence of the Secretary of State.
*Id.* § 3(b), (c), 90 Fed. Reg. at 8619.  The Secretary of State had authority to
waive the pause "for specific programs" and to approve new obligations or
resume disbursements during the 90-day review period if review was
completed sooner.  *Id.* § 3(d), (e), 90 Fed. Reg. at 8619.

Consistent with that Executive Order, the Secretary of State directed a
pause on foreign assistance programs funded by or through the State
Department and the U.S. Agency for International Development (USAID).
*See* J.A. 132-36.  The Secretary initially approved various waivers pending
review, including for foreign military financing for Israel and Egypt,
emergency food expenses, and life-saving humanitarian assistance.  J.A. 135;
U.S. Dep't of State, Emergency Humanitarian Waiver to Foreign Assistance
Pause (Jan. 28, 2025), https://perma.cc/J7EV-ESPG.  The Secretary also
approved a waiver for legitimate expenses incurred before the pause went
into effect and legitimate expenses associated with stop-work orders.  *See*
J.A. 135.

Following that memorandum, the agencies completed a review of USAID and State Department foreign assistance awards. The agencies ultimately determined to retain hundreds of preexisting USAID awards and thousands of preexisting State Department awards; the rest of the preexisting awards were terminated. *See* J.A. 43.

The agency defendants have also engaged in a broader review of the agencies' organization and their implementation of foreign assistance programs. As a result of this broader review, the State Department and USAID notified Congress on March 28, 2025, "of their intent to (1) undertake a reorganization that would involve realigning certain USAID functions to State by July 1, 2025, and (2) discontinue the remaining USAID functions that do not align with Administration priorities." J.A. 236. The State Department also "informed Congress of its intent to restructure certain State bureaus and offices that would implement programs and functions realigned from USAID." *Id.* The State Department has now completed a "programmatic review of all foreign assistance programs to ensure those programs are aligned with the President's foreign policy agenda." J.A. 240.

2. Meanwhile, plaintiffs—organizations that receive, or have members who receive, federal funds for foreign assistance work—brought this suit. As

13

originally framed, the suit challenged the Executive Branch's decision to pause foreign assistance funds pending further review as a violation of the Administrative Procedure Act (APA) and the Constitution.  J.A. 83-103, 364-405.

Plaintiffs moved for temporary restraining orders.  The district court granted those motions and enjoined defendants from "enforcing or giving effect to" any directive implementing the President's Executive Order No. 14,169, including the State Department's memorandum.  J.A. 156.  The court, however, allowed the agency defendants to "tak[e] action to enforce the terms of particular contracts, including with respect to expirations, modifications, or terminations pursuant to contractual provisions."  *Id.*

Following entry of the temporary restraining order, the parties engaged in various disputes regarding compliance with that order, including one dispute that reached this Court regarding an order requiring the immediate payment of funds.  *See* J.A. 42-44 (recounting this history).  Then, on March 10, 2025, the district court granted in part plaintiffs' motions for a preliminary injunction.

As relevant here, the district court initially rejected plaintiffs' request to enjoin the agencies' terminations of funding instruments, explaining that

14

plaintiffs had not shown that those terminations arose "from the same agency action challenged in this case."  J.A. 58-63.  Thus, the court declined to order the agencies to revoke terminations and suspensions of previous funding instruments and to resume funding those instruments.  J.A. 62.

Nonetheless, the district court concluded that plaintiffs were likely to succeed on their claims that, by not expending appropriated funds, the agency defendants "are acting in violation of the separation of powers" and "the expression of those powers through statutes that constrain the Executive's authority in relation to foreign aid spending and the impoundment of appropriated funds."  J.A. 63.  In reaching that conclusion, the court first explained that Congress had "appropriated foreign aid funds for specified purposes"—including funding various programs implemented through the funding instruments that the agencies had paused and then terminated—in the Further Consolidated Appropriations Act of 2024.  J.A. 64; *see also supra* pp. 6-8.  And, the court explained, the Impoundment Control Act "explicitly prohibits the President from impounding appropriated funds without following certain procedures."  J.A. 65; *see also supra* pp. 8-11.

Next, the district court concluded—based on "public statements in which the President and other senior officials have said" that the agencies' actions were "being undertaken to end foreign aid funding"—that "the record here shows" that the agencies "are acting to rescind or defer the funds Congress has appropriated and have no intent to spend them." J.A. 65-66. And, the court continued, the agencies had "not undertaken the procedures required for the impoundment of congressionally appropriated aid" as specified in the Impoundment Control Act. J.A. 66.

The district court next concluded that the President's Article II powers did not allow the President to "disregard a statutory mandate to spend funds" based on "policy objections." J.A. 67 (quotation omitted). Although the court recognized that the Constitution confers an "important role in foreign affairs" on the President, the court emphasized that the Constitution also provides Congress with a "role in foreign affairs" and with the legislative power to "make law and control spending." J.A. 66-68 (quotation omitted). The court thus concluded that plaintiffs "are likely to succeed on their separation of powers claims" and, for the same reasons, their ultra vires claims. J.A. 71, 72 n.18.

16

Turning to the equitable factors, the district court next concluded that plaintiffs would suffer irreparable harm in the absence of a preliminary injunction.  In reaching that conclusion, the court emphasized that plaintiffs had demonstrated that the loss of federal funding had caused certain plaintiffs "immense financial harm" and had, "in many cases, forced them to significantly cut down on staff or otherwise reduce core operations."  J.A. 72-76.  And the court concluded that the balance of the equities and the public interest tipped in plaintiffs' favor, particularly given the court's conclusion on the scope of plaintiffs' irreparable harm.  Although the court recognized the Executive Branch's countervailing legitimate interest in "review[ing] foreign aid programs" for consistency with the President's policy priorities, the court explained that the preliminary injunction would not prohibit the Executive Branch from conducting such a review.  J.A. 77.  And the court stated that the public interest weighs in favor of "ensuring" that the Executive Branch's actions "are carried out in accordance with law."  *Id.*

Finally, the district court turned to the appropriate scope of relief, rejecting plaintiffs' requested relief "insofar as it would specifically order Defendants to continue to contract with" plaintiffs.  J.A. 80.  The court explained that the violation it had found stemmed from the decision "to

17

unlawfully impound funds appropriated by Congress for specific foreign aid purposes" but that nothing required defendants to contract with plaintiffs specifically.  J.A. 80-81.  To the contrary, "the Constitution and Congress's laws have traditionally afforded the Executive discretion on how to spend within the constraints set by Congress."  J.A. 81.  The district court therefore ordered defendants to "make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024."  J.A. 82.[1]

## SUMMARY OF ARGUMENT

Congress and the President share constitutional responsibility for enacting federal law, and the President has responsibility for implementing it, including when it comes to obligating and expending funds.  Congress has

---

[1] The district court also concluded that the agencies' initial directives to pause foreign assistance funding were arbitrary and capricious, J.A. 54-58, and enjoined the agencies from enforcing various parts of those directives or withholding payments for certain prior completed work, J.A. 81-82.  The government believes that the district court's conclusions in this respect were incorrect and that the court's universal, money-mandating relief was improper.  *Cf. Department of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam); *Gill v. Whitford*, 585 U.S. 48, 66 (2018).  Nonetheless, because the government agrees that it is contractually obligated to pay legitimate costs incurred on funding instruments before they were terminated, the government does not further challenge this portion of the district court's injunction in this appeal.

enacted a statutory framework, including through the Impoundment Control Act, to govern inter-Branch relations in this sensitive area. That framework generally requires the President to notify Congress when he determines that appropriated funds should be deferred or rescinded, and it prescribes a set of remedies for the Legislative Branch when it disagrees with the Executive Branch's determination in a particular case.

In this case, the district court impermissibly interfered in the inter-Branch dialogue, requiring—at the behest of private parties—that the Executive Branch make a set of appropriated funds available for obligation. That injunction is wrong on all levels. Plaintiffs have no judicially enforceable right to require the Executive Branch to obligate funds. The injunction pretermits the political processes contemplated by the Impoundment Control Act, requiring the Executive Branch to make funds available for obligation even though those processes have not yet played out. And it forces resolution of difficult constitutional questions in a posture, and at a juncture, where those questions may be avoided rather than confronted. In any event, the equities do not support the court's intrusive and overbroad relief. This Court should vacate the preliminary injunction in relevant part.

19

**I.** On the merits, the district court erred in requiring the government to make appropriated funds available for obligation independent of the statutory process for addressing such issues.

**A.** The Impoundment Control Act and the Further Consolidated Appropriations Act of 2024 do not confer any rights on plaintiffs that may be enforced through the APA. In general, two related limitations ensure that the APA's cause of action is only available in circumstances where Congress wished for a substantive statute to be judicially enforced. First, the APA does not apply if other statutes preclude review. Second, only a plaintiff whose asserted injuries fall within the zone of interests of the underlying substantive statute may pursue APA review.

For related reasons, both of those limitations bar plaintiffs' appropriations-related claims in this case. The Impoundment Control Act reflects a reticulated scheme that governs the relationship between the President and Congress in a sensitive area where their constitutional authorities overlap. Consistent with that context, the statute contemplates an inter-Branch dialogue to work out any disagreements and does not provide for judicial enforcement by private parties. Plaintiffs' appropriations-related claims are implicitly precluded by that scheme, and

20

plaintiffs' interests in competing for monetary awards are unrelated to the structural constitutional interests protected by the statute.

**B.** Even if plaintiffs could enforce the relevant statutes, those statutes would not provide a basis for the district court's affirmative injunction, which requires the government to make available for obligation all foreign assistance funds appropriated in the Further Consolidated Appropriations Act of 2024. To justify such an affirmative injunction, the district court had to identify a specific, unambiguous statutory command requiring such action.

The court failed to do so. The appropriations statutes and the Impoundment Control Act, together, as a general matter contemplate that the Executive Branch will either obligate funds or go through a specified procedure to engage Congress on the question whether certain funds should not be obligated.

The appropriations statutes, on their own, make funds available but do not unequivocally require the Executive Branch to expend all of the available funds. And both the appropriations statute and the underlying statutes authorizing foreign assistance programs reflect Congress's determination that the President should—consistent with his constitutional responsibility

21

for foreign affairs—have significant discretion in how to implement foreign assistance.

Nor does the Impoundment Control Act contain any such requirement that applies at this juncture. That statute requires the President to notify Congress when he determines that budget authority should be rescinded. And it states that if Congress has not rescinded the relevant authority within 45 days after that notification, then—and only then—those funds must be made available for obligation. But here, that process has not even begun. By entering its injunction at this point, the district court pretermitted the processes laid out in the statute.

C.  The district court's injunction also improperly construes the relevant statutes to generate, rather than avoid, significant constitutional concerns. Appropriations statutes on their own terms generally authorize, but do not require, the expenditure of funds, and the Impoundment Control Act provides a mechanism for inter-Branch consultation if the President concludes that certain funds should not be obligated. The preservation of the President's discretion to make determinations about how best to implement the laws is particularly important in this context, where any attempt by Congress to require the President to expend specific foreign assistance funds

22

would run into the President's constitutional responsibility over the conduct of foreign relations.

The district court's injunction fails to respect these constitutional prerogatives and fails to properly understand the statutory scheme in light of those principles. To make matters worse, the district court injected itself into this ongoing inter-Branch process at the behest of private parties and without providing the President and Congress the opportunity to follow ordinary procedures to resolve any disagreement between themselves. There was no proper basis for the court to reach out in this posture and at this juncture to manufacture a constitutional dispute.

**II.** Even setting the merits aside, plaintiffs have also not demonstrated that the relevant equitable considerations support the challenged portion of the preliminary injunction. For one, plaintiffs cannot show that the preliminary injunction is necessary to avoid irreparable harm. The injunction requires the Executive Branch to make funds available for obligation generally but (properly) does not require that any funds actually be provided to plaintiffs or their members—much less that funds be made available immediately. It is thus impossible for plaintiffs to demonstrate that the injunction will avoid the immediate irreparable harms that they have

asserted, all of which stem from their not receiving federal funds in the short term.  Conversely, the injunction harms the government and the public by frustrating the President's ability to effectuate his foreign policy objectives, interfering in the relevant statutory scheme, and infringing on the authority granted the President by Article II.

In any event, the preliminary injunction is overbroad and should be vacated on that basis alone.  The injunction requires the Executive Branch to make available for obligation all of the covered foreign assistance funds.  But even if plaintiffs would have standing to seek an injunction requiring the Executive Branch to make available specific funds for which they are willing and able to compete, they plainly lack standing to seek the injunction entered by the district court, which applies to many appropriations that plaintiffs will not receive.

## STANDARD OF REVIEW

This Court reviews "the district court's decision whether to grant" a preliminary injunction "for abuse of discretion," with the district court's legal conclusions reviewed de novo and its factual findings reviewed for clear error.  *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (per curiam) (quotation omitted).

24

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To justify that relief, a plaintiff must show that it is "likely to succeed on the merits," that it "is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20. The government's interest and the public interest "merge" when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs fail to meet that burden at each step.

## I.  Plaintiffs Are Unlikely to Succeed on the Merits of Their Appropriations Claim

The district court erred in entering a preliminary injunction at the behest of private parties requiring the Executive Branch to make appropriated funds available for obligation. The primary flaw in plaintiffs' claim and the court's injunction is that they fail to respect the sensitive context in which this suit arises. Congress and the President share responsibility for enacting the law, including appropriations statutes, and the President has constitutional authority to implement the law. The Impoundment Control Act reflects Congress's attempt to engage with the Executive Branch regarding implementation of appropriations statutes,

25

which fund programs across the federal government—all of which implicate different inter-Branch considerations.  The statute thus establishes a reticulated notification and enforcement regime between the political branches, which allows Congress and the Executive Branch to negotiate over the expenditure of appropriated funds; the statute does not direct the Executive Branch to make funds available for obligation until after it has notified Congress of a proposed rescission and Congress has failed to act.

Plaintiffs and the district court have now improperly inserted themselves into this inter-Branch dialogue, and the court's preliminary injunction requires the Executive Branch to make funds available for obligation—without any of the flexibility or back-and-forth that the Impoundment Control Act contemplates.  That is erroneous.  At the outset, plaintiffs have no cause of action to enforce the Impoundment Control Act's asserted requirements, which are intended to govern the relationship between the Executive Branch and Congress and not to provide judicially enforceable rights to private parties.  Regardless, the district court's injunction is unjustified by the statute because it directs the Executive Branch to engage in conduct that the statute does not require at this point. And plaintiffs' and the court's improper attempt to hijack the dialogue that

should play out between the political branches under the Impoundment Control Act is particularly unwarranted in the foreign affairs context in which this case arises, where the President has substantial constitutional and statutory discretion to ensure that foreign assistance spending is aligned with his foreign policy priorities.

### A.    Plaintiffs May Not Enforce the Relevant Statutes

1.  As explained, the basis for the relevant portion of the district court's preliminary injunction was its conclusion that the Impoundment Control Act requires the Executive Branch to make available for obligation all funds appropriated in the Further Consolidated Appropriations Act of 2024.  But the district court erred in even entertaining plaintiffs' claims to that effect because those statutes do not confer any rights on plaintiffs that may be enforced through an APA suit.  *Cf. Trump v. Sierra Club*, 140 S. Ct. 1 (2019) (granting stay of injunction pending appeal, including because "the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with" a statute governing the transfer of funds among appropriation accounts).

27

Two related limitations restrict plaintiffs from using the APA's cause of action to enforce a statute where Congress did not intend such enforcement.  First, a plaintiff may not seek review under the APA if "statutes preclude judicial review."  5 U.S.C. § 701(a)(1).  The Supreme Court has accordingly recognized that, by providing a detailed scheme for administrative and judicial review, Congress can displace the APA's default cause of action.  *See, e.g.*, *Block v. Community Nutrition Inst.*, 467 U.S. 340, 345 (1984).  Preclusion of review is determined "not only from [the statute's] express language, but also from the structure of the statutory scheme."  *Id.*

Second, to invoke the APA, a "plaintiff must establish that the injury" it complains of "falls within the zone of interests sought to be protected by the statutory provision" at issue.  *Air Courier Conference of Am. v. American Postal Workers Union*, 498 U.S. 517, 523 (1991) (quotation omitted).  That limitation reflects the common-sense intuition that Congress does not intend to extend a cause of action to "plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions" they seek to enforce.  *Thompson v. North Am. Stainless, LP*, 562 U.S. 170, 178 (2011).

28

Thus, where, as here, the plaintiff is not the object of a challenged regulatory action, the plaintiff has no right of review if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399 (1987).  And when a plaintiff attempts to use the APA's cause of action to challenge the government's compliance with a different statute, the "interest he asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quotation omitted).

2.  As the Impoundment Control Act reflects, Congress has constructed a reticulated scheme to govern the relationship between the Legislative and Executive Branches when it comes to spending appropriated funds.  That statute is built around give-and-take between the political branches.  Thus, the statute directs the President to notify Congress when he proposes to defer or rescind appropriated funds, *see* 2 U.S.C. §§ 683(a), 684(a), which allows Congress to determine how to respond given the particular circumstances of a specific proposal.  And the statute specifies

29

particular forms of legislative action that Congress may undertake to address proposed rescissions.  *See id.* § 688.

Moreover, to the extent that the Impoundment Control Act contemplates litigation to enforce any obligation to spend appropriate funds, it provides for suits brought by the Comptroller General, an official within the Legislative Branch.  2 U.S.C. § 687.  And the statute imposes limitations on the bringing of any such suit that reinforce Congress's desire to control any response to the Executive's actions:  no such suit may be brought until the Comptroller General files "an explanatory statement" of "the circumstances giving rise to the" contemplated suit "with the Speaker of the House of Representatives and the President of the Senate" and then "25 calendar days of continuous session of the Congress" elapse.  *Id.*  Regardless whether such a suit would be cognizable under Article III and the separation of powers, the statute does not contemplate enforcement at the behest of private parties.  And the statute certainly does not contemplate that private parties would be entitled to bring enforcement actions without regard to the procedural limitations that Congress imposed for the Comptroller General.

As the Supreme Court has recognized, Congress may impliedly preclude some parties from seeking judicial review of administrative action

30

by constructing a detailed scheme that provides for review only by other parties.  For example, in *Block*, Congress provided for dairy "[h]andlers and producers—but not consumers"—to "participate in the adoption and retention of" certain agency orders related to milk prices and for handlers, at least, to pursue administrative remedies and obtain judicial review of agency orders with which they disagreed.  467 U.S. at 346.  In holding that the statutory structure precluded consumers' attempt to challenge those orders through the APA, the Supreme Court explained that there was no "express provision for participation by consumers in any" administrative or judicial proceeding related to the orders and that, "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* at 347.

So too here.  The Impoundment Control Act provides a variety of mechanisms for legislative responses to any proposal by the Executive Branch to defer or rescind appropriated funds and, to the extent it contemplates litigation at all, it contemplates only suits brought by a Legislative Branch official and only after Congress has first had the opportunity to act.

31

That scheme provides no role for third parties like plaintiffs to play in either the legislative or judicial enforcement processes.  In so doing, the scheme preserves the political branches' accountability for enacting and implementing the appropriations laws.  And it accounts for the possibility that the Executive Branch may decide to withhold funds in a wide variety of contexts for a wide variety of reasons—some of which may implicate the Executive's own constitutional prerogatives, some of which may give Congress no concern at all, and some of which may draw a response from Congress affirmatively acquiescing in or rejecting the Executive's proposal. *Cf. City of New Haven v. United States,* 809 F.2d 900, 901 (D.C. Cir. 1987) (explaining how Congress has previously acknowledged that "the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year" and such delays may result from "the normal and orderly operation of the government" (quotation omitted)).

Given the many different contexts and justifications that may accompany such proposals—and given the sensitive nature of the dual authority that Congress and the President share in this sphere—it makes sense that the scheme provides Congress itself with the ability to determine how best to respond (if at all) to any particular proposal.  And any disputes

between the President and Congress in this sphere may be "hashed out in the hurly-burly, the give-and-take of the political process between the legislative and the executive." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 859 (2020) (quotation omitted).  In that process, Congress has ample political tools to address any perceived problem itself, including by altering existing or future appropriations or engaging in its traditional oversight functions. And in determining whether and how to enlist these political tools in any particular dispute, Congress may properly calibrate any response depending on the specific context and Congress's particular views.

Moreover, emphasizing the point, the Impoundment Control Act expressly provides that "[n]othing contained in this Act, or in any amendments made by this Act, shall be construed" as "affecting in any way the claims or defenses of any party to litigation concerning any impoundment." 2 U.S.C. § 681.  That provision makes clear Congress's intent that third parties not rely on the statute's provisions to generate a judicially enforceable right to compel spending that did not otherwise exist.

In short, permitting plaintiffs to challenge the Executive Branch's spending decisions through an APA suit would "severely disrupt" the statute's "complex and delicate" enforcement scheme.  *Block*, 467 U.S. at 348.

33

It is thus "clear that Congress intended that" any response to the Executive's actions in this sphere should "be confined to" the Legislative Branch-directed responses undertaken "in accordance with" the statute's scheme. *Id.*

For similar reasons, plaintiffs are not within the zone of interests of the Impoundment Control Act. As explained, the Act is directed at regulating the relationship between Congress and the Executive Branch. Nothing in the statute suggests that Congress intended to permit enforcement by third parties like plaintiffs, who hope to be awarded some of the appropriated funds. Rather, it is directed at the relationship between the Executive Branch and Congress. When applied to foreign assistance appropriations in particular, the statute ensures that judgments about foreign policy are reserved to the political branches.

As discussed below, neither the particular claims at issue here nor the relief awarded can be properly seen to flow from the appropriations statutes themselves, isolated from the Impoundment Control Act. And even those statutes themselves, as a general matter, do not suggest that they give rise to an enforcement action by private parties. As discussed, they confer significant discretion on the Executive Branch in the conduct of foreign

policy.  When read together with the Impoundment Control Act, they contemplate inter-Branch dialogue when the President deems it inappropriate to obligate funds.  Lawsuits by private parties would interfere with, rather than bolster, the congressional interests advanced by the appropriations statutes.

### B.    The Relevant Statutes Do Not Support the District Court's Preliminary Injunction

Even if plaintiffs had a basis to seek judicial enforcement of the relevant provisions of the Impoundment Control Act, the district court's mandatory preliminary injunction is unsupported by that statute.  Rather, the Act contemplates inter-Branch dialogue that has not even begun, much less been allowed to play out.  The injunction's requirement that defendants make all appropriated funds available for obligation improperly pretermits that dialogue and thus interferes with, rather than enforces, the Impoundment Control Act.  And the appropriations statutes do not, of their own force, compel the Executive Branch to obligate every last dollar of appropriated funds.

In order to compel a federal agency to take a specific action—whether under the APA's provision permitting courts to "compel agency action unlawfully withheld," 5 U.S.C. § 706(1), or under traditional equitable

35

principles—a court must first conclude that "an agency failed to take a discrete agency action that it is required to take." *Norton v. Southwestern Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphases omitted).  Under traditional mandamus principles that have been carried forward into the APA, such an affirmative injunction remedy is "normally limited to enforcement of a specific, unequivocal command"—that is, "the ordering of a precise, definite act about which an official had no discretion whatever." *Id.* at 63 (quotation and alterations omitted).

1.  As an initial matter, the district court properly did not conclude that the Further Consolidated Appropriations Act of 2024 itself or the underlying substantive statutes governing the administration of foreign aid supplied the necessary specific command.

As explained, in many instances, the appropriations statute simply provides that Congress is appropriating large undifferentiated sums for various activities, such as "to carry out" specified provisions of the Foreign Assistance Act, 138 Stat. at 742, or "to meet refugee and migration needs," 138 Stat. at 744.  And even where Congress included more specific directions in the appropriations statute, those directions often restrict the manner in which, or the purposes for which, the funds could be spent.  *See, e.g.*, 138

Stat. at 740-41, 742.  In general, they do not provide affirmative, unequivocal commands to provide specific funds on a specific timetable for specific recipients.  And although the district court noted one instance where the appropriations act specifies that the covered funds "shall be made available for" specific purposes, 138 Stat. at 740, *cited at* J.A. 64, that specification appears in a list of provisos restricting the manner and purposes of expending the funds.  In that context, it is best understood as a direction regarding the specific purposes and activities for which those funds may be used—not as a command (and certainly not an unequivocal one) to make all of the appropriated sums available, much less to do so on any particular timeline.  And the district court did not rest its injunction on any more specific provision earmarking funds for particular recipients.

Thus, taken on their own, many of the appropriations provisions covered by the district court's injunction simply "permit[] but do[] not require the Executive Branch to spend funds."  Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools, 1 Op. O.L.C. Supp. 303, 309 (1969); *cf. Train v. City of New York*, 420 U.S. 35, 43-44 (1975) (similarly recognizing that an appropriations provision may permit, but not require, expenditure "of the entire amounts authorized").  It

37

is the Impoundment Control Act, in most cases, that governs circumstances in which the President makes a policy determination not to expend funds. And although some provisions of the appropriations statute contain more specific commands regarding obligating funds to particular recipients or for particular purposes, the district court did not identify any such provisions that direct money to plaintiffs and those limited provisions could not in any event justify the district court's broad injunction.

Nor have plaintiffs or the district court identified any unequivocal command in the underlying statutes authorizing foreign assistance programs that could support the district court's injunction.  As explained, those statutes generally authorize the Executive Branch to provide foreign assistance through particular programs, but they do not generally require the provision of specific funds to specific recipients.  Indeed, to the contrary, Congress has generally provided that the President and the Secretary of State have significant latitude to determine how best to provide foreign assistance to ensure that those programs best achieve foreign aid goals and align with the President's foreign policy.  *See, e.g.*, 22 U.S.C. §§ 2382(c), 2395(a).  And for many specific programs, Congress has expressly given the

President discretion to provide assistance on such terms and conditions as the President determines.  *See supra* p. 4 (collecting provisions).

2.  Failing to find any unequivocal command in the text of the appropriations statutes or the underlying foreign assistance statutes, the district court primarily justified its mandatory injunction by reference to the Impoundment Control Act.  *See* J.A. 65.  But that statute cannot serve as a proper basis for the injunction either because it does not contain any applicable provision that even purports to require the agencies to make funds available for obligation at this point.

As explained, the Impoundment Control Act establishes a structure to allow the President and Congress to engage in an inter-Branch dialogue when the President determines not to obligate appropriated funds.  At a high level, the President is directed to transmit a special message to Congress when he "determines" that "budget authority should be rescinded for fiscal policy or other reasons."  2 U.S.C. § 683(a); *see also id.* § 686(a).  After that message is sent, Congress may consider whether to rescind the budget authority in question.  And if Congress has not rescinded "all or part of the amount proposed to be rescinded" within "45 calendar days of continuous session of the Congress" after receipt of the message, *id.* §§ 682(3), 683(b),

39

then the amount proposed to be rescinded "shall be made available for obligation," *id.* § 683(b).  That final provision requiring the covered appropriations to be made available for obligation thus takes effect only following Congress's receipt of the contemplated message and the elapsing of 45 days.

But in this case, there is no dispute that the President has not yet sent a special message to Congress proposing to rescind any budgetary authority. Nor has the Comptroller General found that the President has improperly failed to send a special message and made a report in lieu of the special message.  *Cf.* 2 U.S.C. § 686(a) (providing that if the Comptroller General finds that the President "proposes to defer budget authority" but "has failed to transmit a special message," the "Comptroller General shall make a report" to Congress that "shall be considered a special message").  Thus, at this point, the inter-Branch process contemplated by the statute has not even begun, much less concluded.  As a result, the statute's provision requiring certain appropriations to be made available has no applicability to this case and cannot support the district court's injunction.

3.  Indeed, the district court itself seemed to recognize this feature of the statute, explaining that the Impoundment Control Act only "prohibits the

40

President from impounding appropriated funds" if he fails to "follow[] certain procedures." J.A. 65. And the court located its asserted violation of the statute in those procedural requirements, explaining that the agencies "have not undertaken the procedures required for the impoundment of congressionally appropriated aid." J.A. 66. But as explained, any affirmative injunction must be limited to directing the government to comply with the specific, unambiguous statutory directive that the court believes was violated. Here, the district court did not merely require defendants to comply with any applicable procedural requirements; instead, it skipped over the procedural mechanisms laid out in the statute to broadly require the Executive Branch to make funds available for obligation.

Regardless, the court's apparent conclusion that the government was required, but has failed, to send the requisite special message to Congress is unsupported on its own terms. That statutory obligation only attaches once the President "determines" that "budget authority should be rescinded for fiscal policy or other reasons," 2 U.S.C. § 683(a), and the district court pointed to nothing in the record indicating that the President or his subordinates have made any such determination with respect to specific budget authority at this time. Instead, the court relied only on various

41

statements in which the President and other officials have generally

suggested that they wish to reduce foreign aid spending.  J.A. 65-66.  But a

general intent to reduce spending is not the same as a final determination

that specific budget authority should be rescinded.  The record reflects that

agencies are currently engaged in the process of making more particularized

determinations regarding how to approach specific budget authority.  *See*

J.A. 246-47.  Consistent with the conclusion that the agencies have not failed

to comply with any special-message obligation, the Comptroller General—

who is directed by statute to transmit a report to Congress if he finds that

the President has improperly failed to send a special message, *see* 2 U.S.C.

§ 686(a)—has not sent any such report about the funds at issue in this case.

*Cf.* GAO, *Search Decisions* (last visited May 9, 2025),

https://www.gao.gov/legal/appropriations-law/search (not including any

reports related to the funds at issue here).

    4.  The district court's decision to pretermit through its mandatory

injunction the processes laid out in the Impoundment Control Act has

improperly curtailed the discretion given by that statute to the Executive.  In

particular, by ordering the government to "make available for obligation the

full amount of funds that Congress appropriated for foreign assistance

42

programs in the Further Consolidated Appropriations Act of 2024," J.A. 82,

the district court has significantly interfered with the Executive Branch's

ability to take lawful actions in at least three ways.

First, the district court's injunction requires the Executive Branch to

make available for obligation all of the funds in the covered appropriations.

But the Impoundment Control Act has never required the Executive Branch

to obligate all of the funds in an appropriation. To the contrary, temporary

pauses and ultimate failures to obligate are commonplace and accepted by

the Legislative Branch. The Government Accountability Office has approved

of agencies "taking the steps it reasonably believes are necessary to

implement a program efficiently and equitably, even if the result is that

funds temporarily go unobligated." *James R. Jones, House of*

*Representatives*, B-203057 L/M, 1981 WL 23385, at *4 (Comp. Gen. Sept. 15,

1981). And GAO has further explained that agencies will often have "small

remaining unobligated balances," which are "consistent with sound

administrative funds control practices." *Department of Homeland Sec.—*

*Border Barrier Const. & Obligations*, B-335747, 2024 WL 1740422, at *1 n.8

(Comp. Gen. Apr. 22, 2024).

43

To be clear, the government does not understand the district court's injunction to prohibit the defendants from such commonplace practices or to require that appropriations be obligated down to the penny—a reading that would be particularly implausible given that government officials face a competing obligation, enforced by criminal penalties, not to expend more funds than have been appropriated, *see* 31 U.S.C. §§ 1341(a)(1), 1350.  But the line between a permissible delay or withholding and a deferral or impoundment subject to the Impoundment Control Act's procedures is not always clear—indeed, Congress and the Executive Branch may disagree about how to categorize particular actions in this space.  And the question arises with some regularity; as this Court has explained, the Executive Branch "necessarily withholds funds on hundreds of occasions during the course of a fiscal year," *City of New Haven*, 809 F.2d at 907 (quotation omitted).  Rather than properly leaving any such disputes to the inter-Branch process contemplated by the statute, the court's injunction threatens judicial superintending of the agencies' many funding decisions and requires that the agencies correctly predict how the district court will view each specific decision, on pain of contempt—with the criminal penalties of the

44

Anti-Deficiency Act on the other side.  That places agencies in an untenable position.

Second, even if the President were to propose that funds be rescinded, the district court's injunction may require defendants to make those funds available for obligation, at least if Congress had not enacted a rescission bill before the funds lapsed.  But as GAO explained shortly after the enactment of the Impoundment Control Act, if the President transmits a special message "concerning amounts that [a]re near their date of expiration," the "President may withhold the budget authority from obligation for the duration of the 45-day period" contemplated in the statute, even if that means that the funds expire during that period.  *Impoundment Control Act—Withholding of Funds through Their Date of Expiration*, B-330330.1, 2018 WL 6445177, at *9 (Comp. Gen. Dec. 10, 2018) (recounting various GAO opinions from 1975 and 1976).  If Congress wishes for the funds to remain available, it "must take affirmative action to prevent the withheld funds from expiring."  *Id.*  Although GAO has more recently retreated from its contemporaneous understanding of the Impoundment Control Act and overruled those opinions, *id.*, any lingering dispute about the proper

45

disposition of funds in that scenario should be left to the political branches rather than prejudged by the court.

Third, as explained, the Impoundment Control Act regulates the interaction between Congress and the President in an area of substantive overlap between the constitutional authorities of the Legislative and Executive Branches.  Consistent with that context, the statute provides for an inter-Branch process to work out any disputes between those two Branches.  But the district court has now stepped into the middle of that process.  Although the government does not understand the court's injunction to apply to any funds for which a rescission bill is enacted, the injunction may continue to apply even if Congress were to receive a special message regarding a proposed rescission and were to acquiesce in the Executive's conduct by means short of a rescission bill.  Particularly in the foreign affairs context, where Congress may recognize that the Executive Branch has a greater degree of constitutionally conferred discretion regarding how to implement appropriations statutes, *see infra* pp. 54-57, precluding resort to that informal political resolution is improper.

C.    **Any Construction of the Relevant Statutes as Negating the Executive Branch's Discretion Over Specific Foreign Assistance Funds Would Raise Serious Constitutional Questions**

As discussed above, the district court's order in this case did not identify any plausible violation of the Impoundment Control Act or any other statute.  But even if there were a plausible interpretation of that statute, or any other, that would call the government's conduct here into question, any ambiguity should be read to preserve Executive Branch discretion in the sphere of foreign affairs because a contrary interpretation would present "grave and doubtful constitutional questions."  *Jones v. United States*, 526 U.S. 227, 239 (1999) (quotation omitted); *see also United States v. Hansen*, 599 U.S. 762, 781 (2023) (even if an interpretation is "not the best one," if "the interpretation is at least 'fairly possible'" then "the canon of constitutional avoidance would still counsel [this Court] to adopt it" (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018))).

1.  The Supreme Court has long recognized that "the President's vast share of responsibility for the conduct of our foreign relations" derives from Article II of the Constitution, which vests all of the "executive Power" in the President.  *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (quotation omitted).  The President thus possesses his own powers "as the

47

Nation's organ in foreign affairs," *Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 109 (1948), to "decide what [the nation's foreign] policy should be," *Garamendi*, 539 U.S. at 414; *see also Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) (explaining that "the President is exclusively responsible" for the "conduct of diplomatic and foreign affairs"). The statutes at issue in this case must be read in light of that longstanding constitutional principle. *See also Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 385 (2004) (explaining that the President's special constitutional role requires both "restraint" and "respect" from Congress and the courts (quotation omitted)).

In addition, the district court's preliminary injunction creates significant separation-of-powers issues regarding the relationship between the judiciary and the political branches. The district court injected itself at the behest of private parties into the middle of an ongoing conversation between the political branches. Although the Executive Branch has not sent a special message to Congress regarding a deferral or a proposal to rescind appropriated funds, the court got ahead of these procedures and created a judicially enforceable requirement that the Executive Branch obligate funds.

48

The court's injunction could interfere with a political solution to any issues of foreign policy and federal expenditures.

The court also ignored related principles of constitutional avoidance in the sense of deciding cases without resolving unnecessary constitutional questions.  If the Executive Branch submits a recission package to Congress, and Congress approves legislation to rescind funds, it would obviate the need to address whether those funds must be made available for obligation.  *See Mazars*, 591 U.S. at 869 ("Occasions for constitutional confrontation between the two branches should be avoided whenever possible." (quotation and alterations omitted)).  Thus, any dispute about the constitutionality of the Impoundment Control Act was not ripe.

In addition, no such dispute was directly presented by the parties.  *See* J.A. 69 n.16 (noting that the government has "not raised any challenge to the constitutionality of the governing statutes, as applied or otherwise, including the appropriations act and Impoundment Control Act").  The court's efforts to nonetheless enforce the statute conflict with the court's duty to "avoid the premature adjudication of constitutional questions and not pass on questions of constitutionality unless such adjudication is unavoidable." *Qassim v. Trump*, 927 F.3d 522, 530 (D.C. Cir. 2019) (quotation and alterations omitted).

49

2.  Although the President has significant authority in the area of foreign affairs, the Constitution provides a role for Congress as well, which the Executive Branch continues to honor.  The principal limitation on the President's constitutional power to conduct foreign affairs in the context of the expenditure of federal funds arises, of course, from the Constitution's provision that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7. But that provision is not at issue here, as there has been no argument that the Executive Branch is attempting to expend funds that Congress has not appropriated.  Rather, the issue here concerns the converse situation in which appropriated funds may not be expended.

Although Congress has acted in that area, chiefly through the Impoundment Control Act, as a constitutional matter there is no presumption that the Executive Branch must expend all funds that Congress appropriates.  It was no accident that the Appropriations Clause was written as a negative constraint, not as an affirmative command.  *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937) (describing the Appropriations Clause "as a restriction upon the disbursing authority of the Executive department").  The concept of appropriations grew out of a concern by the

50

English Parliament in the 17th century about overspending by the King.  As
the King came to depend on revenue "financed through various forms of
taxation" that "required parliamentary authorization," rather than on other
sources of income, Parliament enacted measures placing limits on the King's
spending.  *Consumer Fin. Prot. Bureau v. Community Fin. Servs. Ass'n of
Am., Ltd.*, 601 U.S. 416, 427-28 (2024); *see also id.* at 439 (explaining that
"Parliament secured fiscal supremacy and wielded that power to superintend
the King").  For example, the English Bill of Rights and implementing
legislation prohibited the King from spending money not granted by
Parliament.  *See* Bill of Rights Act 1689, 1 W. & M. 2, c. 2 (Eng.) (declaring
that "levying money for or to the use of the crown, by pretence of
prerogative, without grant of parliament, for longer time, or in other manner
than the same is or shall be granted, is illegal").

     That practice also carried over to the American colonies.  Before the
ratification of the Constitution, "[m]any early state constitutions vested the
legislative body with power over appropriations" to constrain executive
spending.  *Consumer Fin. Prot. Bureau*, 601 U.S. at 430.  For example, the
Pennsylvania Constitution allowed the Executive to "draw upon the treasury
for such sums as shall be appropriated by the house."  Pa. Const. of 1776,

§ 20.  Similarly, the South Carolina Constitution directed that "no money be drawn out of the public treasury but by the legislative authority of the State."  S.C. Const. of 1778, art. XVI.  Under the Articles of Confederation, the Confederation Congress likewise served in the role of specifying through appropriations "the necessary sums of Money to be raised for the service of the united states."  Articles of Confederation of 1781, art. IX, para. 5.

Thus, at least in the absence of more specific legislation, there is no basis for presuming that the mere appropriation of funds compels the President to expend them.  Dating back to at least the early 1800s, there are numerous instances where the Executive Branch has declined to spend the full amount of funds appropriated by Congress, especially (although not only) in the context of foreign affairs.  In 1803, President Jefferson explained that $50,000 that had been "appropriated by Congress for providing gun-boats[] remain[ed] unexpended" because changed circumstances "rendered an immediate execution of that law unnecessary."  Thomas Jefferson, *Third Annual Message to Congress* (Oct. 17, 1803).  In 1876, President Grant refused to expend more than half of the total $5 million in funds appropriated for harbor and river improvements because some of the works would not adequately advance the national interest.  *See* 4 Cong. Rec. 5628 (1876).

52

Other notable examples include that Presidents Hoover and Roosevelt withheld large sums of appropriated funds during the Great Depression and World War II, and that Presidents Truman, Eisenhower, and Kennedy declined to spend congressionally appropriated funds for various defense projects. *See* Nile Stanton, *History and Practice of Executive Impoundment of Appropriated Funds*, 53 Neb. L. Rev. 1, 10-13 (1974).

This history suggests a prevailing understanding that appropriations statutes confer implicit authority for the Executive Branch to forgo spending across a range of circumstances. Late nineteenth-century Attorney General opinions indicated that, even when an appropriation contained language providing that the funds "shall be expended" on a program, the appropriation should not be considered mandatory "to the extent that [executive officials] are bound to expend the full amount if the work can be done for less." Appropriation—Contracts, 21 Op. Att'y Gen. 414, 414-15 (1896). A House report in 1950 similarly recognized that "[a]ppropriation of a given amount for a particular activity constitutes only a ceiling upon the amount which should be expended for that activity." H.R. Rep. No. 81-1797, at 9 (1950). This approach of preserving the Executive Branch's flexibility and optionality avoids encroaching on the Executive Branch's constitutional

53

responsibilities and prerogatives in executing the laws. That historical and
constitutional backdrop highlights the need to read the Impoundment
Control Act as it is written, giving rise to a dialogue between the political
branches regarding the need to expend appropriated funds rather than an
enforceable right by private parties to compel expenditures that may or may
not be warranted.

3.  The constitutional concerns are especially acute in this context,
where the district court's order to the Executive Branch involves funds that
touch on sensitive matters of foreign policy. It should come as no surprise
that the Executive Branch's discretion in determining how and whether to
expend appropriated funds is particularly broad in the arena of foreign
affairs. The Office of Legal Counsel has repeatedly noted the distinct
constitutional problems that would arise if "a congressional directive to
spend were to interfere with the President's authority in an area confided by
the Constitution to his substantive direction and control, such as . . . his
authority over foreign affairs." Presidential Authority to Impound Funds
Appropriated for Assistance to Federally Impacted Schools, 1 Op. O.L.C.
Supp. at 310-11. Congressional enactments must be understood to respect
the principle that "Congress does not have the power to compel the spending

of funds" so as to infringe the President's "duties in the area of foreign affairs." The President's Veto Power, 12 Op. O.L.C. 128, 168 n.56 (1988). The enactment of the Impoundment Control Act does not suggest that Congress was seeking to infringe on the President's foreign policy power, much less to allow private parties to do so; rather, the Act was primarily a response to President Nixon's impoundment of funds in the context of domestic programs. *See* Stanton, *supra*, at 27-28. Indeed, the Act itself makes clear that it "shall" not "be construed" as "asserting or conceding the constitutional powers or limitations of either the Congress or the President." 2 U.S.C. § 681.

Core foreign policy judgments are implicated here. The statutes at issue appropriate foreign assistance funds for causes like "refugee and migration needs," 138 Stat. at 744; international disaster relief, 138 Stat. at 742; and global health, 138 Stat. at 740. Deciding how much money to devote to these causes can affect another country's perception of and rapport with the United States. That delicate weighing of interests is at the heart of the President's "responsibility to maintain the Nation's relationships with other countries." *Garamendi*, 539 U.S. at 420. Here, the President made a judgment that certain foreign assistance awards may not be "aligned with

American interests" and that continued payment of the awards could "serve
to destabilize world peace." Exec. Order No. 14,169, § 1, 90 Fed. Reg. at
8619. As discussed above, that determination does not, in and of itself,
constitute a conclusion that particular appropriated funds should not be
expended. But the President's role in any future assessment of that
possibility should not be undermined by the district court's injunction.

While the Legislative Branch also plays an important role in the
foreign policy sphere, the relevant authority at issue in this case belongs to
the Executive Branch. Neither the Impoundment Control Act nor the
various appropriations of foreign assistance funds constitute exercises of
Congress's power to "regulate Commerce with foreign Nations," U.S. Const.
art. I, § 8, cl. 3, or to "declare War," U.S. Const. art. I, § 8, cl. 11.
Furthermore, it is both commonplace and lawful for Congress to "grant the
President substantial authority and discretion in the field of foreign affairs."
*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 20 (2015). Here, the
President is statutorily empowered to set "such terms and conditions as he
may determine," 22 U.S.C. § 2151b(c)(1), to best accomplish the general
purposes of the Foreign Assistance Act, *id.* § 2395(a), and the Secretary of
State is charged with overseeing implementation to best serve "the foreign

56

policy of the United States," *id.* § 2382(c). These statutory provisions
authorizing the country's foreign assistance programs confirm the Executive
Branch's broad authority to manage foreign aid.

## II.   The Equitable Considerations Do Not Support the District Court's Preliminary Injunction

The challenged portion of the preliminary injunction does not require
that funds be made available to any of the plaintiffs here, much less prevent
any of the financial and related harms that plaintiffs assert. And neither
plaintiffs nor the district court identified any irreparable injury that would
justify extinguishing authority and discretion committed to the Executive
Branch by the Constitution. The equitable factors dictate that the
injunction's directive to make funds available for obligation must be reversed
or, at a minimum, vacated.

### A.   Plaintiffs Have Not Demonstrated the Requisite Irreparable Harm

The district court's preliminary injunction directs that "the full amount
of funds that Congress appropriated for foreign assistance programs" under
the Further Consolidated Appropriations Act of 2024 be made available for
obligation to someone, but not necessarily to plaintiffs. J.A. 82. The
Executive Branch could make all of the foreign assistance funds at issue

57

available to entities that have no connection to any of the plaintiffs or their members without running afoul of the court's order. This aspect of the injunction is thus not necessary for—or even effective at—avoiding plaintiffs' alleged injuries.

The injunction that plaintiff requested in district court would have "order[ed] [the agencies] to continue to contract with them," J.A. 80, but that relief was unavailable several times over. Plaintiffs do not contend that any of the various appropriations at issue mandate that the agencies give money to plaintiffs specifically, and such an order would conflict with the Executive Branch's conceded "discretion on how to spend" appropriated funds. J.A. 81. Furthermore, as the district court concluded, plaintiffs "are unlikely to succeed" on their challenge to the terminations of their individual awards. J.A. 62-63. And the court lacked jurisdiction to enter that relief in any event because this type of claim "to enforce a contractual obligation to pay money" must be brought in the Court of Federal Claims under the Tucker Act. *Department of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam) (quotation omitted); *see Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (holding that district courts lack jurisdiction to enter "an injunction requiring the government to pay monies owed" where

58

"[t]he right to these payments is created in the first instance by [a] contract").

The harms that plaintiffs asserted in support of their desired injunctive relief only underscore the impropriety of the injunction that the court entered.  Plaintiffs contended that they were due to be paid money and that they would face other consequences if they did not receive the money.  *See* J.A. 72-75.  A separate portion of the district court's injunction addressed payments for past work already completed, *see* J.A. 80 (providing benchmark for processing "outstanding payments"), and the government has processed nearly all of plaintiffs' invoices, *see* J.A. 242-43.  To the extent that plaintiffs claim a prospective financial injury, it is hard to see how requiring the government to make funds available to someone else provides any remedy.  Indeed, plaintiffs would be in no materially different position if the government selects a different recipient for the funds.

The timeline associated with the district court's preliminary injunction is similarly incompatible with plaintiffs' supposed "clear and present need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quotation omitted). Multiple plaintiffs suggested that they would be forced to lay off employees

59

or shut down operations absent an immediate outflow of money. *See* J.A. 75.

Even apart from the fact that providing the funds to others does not resolve

that issue, the preliminary injunction properly does not require action on

such an expedited timeframe. The injunction allows the agencies to follow

their ordinary practice, under which it is not uncommon for funds to remain

unobligated until closer to the date of expiration. The mismatch between the

harm alleged and the relief granted dooms plaintiffs' argument that they are

likely to suffer irreparable injury "in the absence of" the preliminary

injunction. *Winter*, 555 U.S. at 22; *see Perfect 10, Inc. v. Google, Inc.*, 653

F.3d 976, 982 (9th Cir. 2011) (explaining that there must be "a sufficient

causal connection" between the alleged irreparable harm and the activity to

be enjoined).

### B.  The Balance of Harms and the Public Interest Weigh Against a Preliminary Injunction

None of plaintiffs' asserted harms outweigh the significant harm to the

government and the public occasioned by the preliminary injunction. *See*

*Nken*, 556 U.S. at 435 (noting that the balance of the equities and the public

interest merge in cases involving the government). As the district court

recognized, "the public no doubt has an interest in the Executive carrying

out his important role in foreign affairs." J.A. 77. Yet the court's

60

preliminary injunction singles out funds with a specific connection to foreign affairs—foreign assistance funds—and frustrates the President's ability to effectuate his foreign policy objectives by cabining authority granted to him under Article II.

The injunction also truncates the procedures spelled out in the Impoundment Control Act. The political branches are best positioned to engage in the necessary negotiation and compromise to try to reach an appropriate resolution. Not only did the district court inject itself into that political process where the judiciary lacks comparative expertise, but it did so in the context of foreign policy decisions that have "long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Chicago & S. Air Lines*, 333 U.S. at 111. Indeed, the injunction threatens to override the public interest in ensuring that tax dollars are not spent towards foreign aid projects that "are not aligned with American interests and in many cases [are] antithetical to American values" and have "serve[d] to destabilize world peace." Exec. Order No. 14,169, § 1, 90 Fed. Reg. at 8619. It was improper for the district court to superintend the Executive Branch's ongoing efforts to faithfully execute both the relevant statutes and the President's foreign policy.

61

The harms to the government and the public in the interim likely could not be unwound.  Even apart from the government's sovereign interests, the district court's injunction requires the government to make available for obligation the full amount of foreign assistance funds appropriated under the relevant appropriations statute.  These harms are amplified because the injunction is not limited to programs that plaintiffs participate in.  If the government's position about its available options not to expend funds is later vindicated in the litigation, there would be no guarantee that disbursed funds would be retrievable from the recipients after the fact.  That many contractual counterparties and grant recipients reside overseas adds to the uncertain prospect of recovery.

## C.    The Preliminary Injunction Is Overbroad

In all events, the district court's preliminary injunction must be vacated as overbroad.  As noted, the injunction applies to "the full amount of funds that Congress appropriated for foreign assistance programs" under the Further Consolidated Appropriations Act of 2024.  J.A. 82.  Extending relief to the entirety of foreign assistance funding flouts the axiomatic Article III principle that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury."  *Gill v. Whitford*, 585 U.S. 48, 73 (2018).

62

With respect to future funding obligations, plaintiffs have standing to seek at most an order as to programs or funds for which they are willing and able to compete. *Cf. Sherley v. Sebelius*, 610 F.3d 69, 74 (D.C. Cir. 2010) (discussing competitor standing in the context of applicants for research grants). Plaintiffs have no cognizable interest in forcing the Executive Branch to make available to nonparties funding that plaintiffs have no intention of applying for. In providing such sweeping relief, the court's preliminary injunction exceeds "the inadequacy that produced [plaintiff's] injury in fact," *Gill*, 585 U.S. at 66 (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)), and is "more burdensome to the defendant than necessary" to redress plaintiffs' asserted injury, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

The relevant appropriations statute has myriad appropriations, many of which plaintiffs may not be able to compete for, or even be interested in competing for. For example, some appropriated funds finance the Executive Branch's operating expenses and capital expenditures necessary to implement foreign assistance programs. 138 Stat. at 739-40. Other funds have been earmarked for other specific recipients, like the $1.65 billion "for a United States contribution to the Global Fund to Fight AIDS, Tuberculosis

63

and Malaria." 138 Stat. at 742. On a more granular level, some plaintiffs and their members may not be equipped to run specific types of programs. A plaintiff like AIDS Vaccine Advocacy Coalition that supports "development and delivery of HIV prevention options," J.A. 86, or like Global Health Council whose members "administer global health programs," J.A. 368, would not be obvious candidates for grants involving disaster relief or refugee needs, *see* 138 Stat. at 742, 744.

These examples are merely illustrative, but they reveal the wide-ranging nature of the preliminary injunction. Plaintiffs failed to demonstrate which foreign assistance programs and funds out of the many that appear in the relevant appropriations statute they would be eligible and willing to pursue. They therefore have not shown their entitlement to the preliminary injunction that the district court entered. Without an adequate record, the proper remedy would be to vacate the challenged portion of the preliminary injunction and remand for the district court to conduct additional further proceedings as warranted on this issue.

## CONCLUSION

For the foregoing reasons, the challenged portion of the district court's

preliminary injunction should be reversed or vacated.


Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney*
  *General*
ERIC D. McARTHUR
  *Deputy Assistant Attorney*
  *General*


MARK R. FREEMAN
DANIEL TENNY

 */s/ Sean R. Janda*
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

May 2025

65

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,775 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

 */s/ Sean R. Janda*
Sean R. Janda

**ADDENDUM**

## TABLE OF CONTENTS

2 U.S.C. § 681 ........................................................................A1

2 U.S.C. § 682 ........................................................................A1

2 U.S.C. § 683 ........................................................................A2

2 U.S.C. § 684 ........................................................................A3

2 U.S.C. § 685 ........................................................................A5

2 U.S.C. § 686 ........................................................................A6

2 U.S.C. § 687 ........................................................................A7

2 U.S.C. § 688 ........................................................................A8

**2 U.S.C. § 681**

## § 681. Disclaimer

Nothing contained in this Act, or in any amendments made by this Act, shall be construed as—

(1) asserting or conceding the constitutional powers or limitations of either the Congress or the President;

(2) ratifying or approving any impoundment heretofore or hereafter executed or approved by the President or any other Federal officer or employee, except insofar as pursuant to statutory authorization then in effect;

(3) affecting in any way the claims or defenses of any party to litigation concerning any impoundment; or

(4) superseding any provision of law which requires the obligation of budget authority or the making of outlays thereunder.


**2 U.S.C. § 682**

## § 682. Definitions

For purposes of sections 682 to 688 of this title—

(1) "deferral of budget authority" includes—

(A) withholding or delaying the obligation or expenditure of budget authority (whether by establishing reserves or otherwise) provided for projects or activities; or

(B) any other type of Executive action or inaction which effectively precludes the obligation or expenditure of budget authority, including authority to obligate by contract in advance of appropriations as specifically authorized by law;

(2) "Comptroller General" means the Comptroller General of the United States;

(3) "rescission bill" means a bill or joint resolution which only rescinds, in whole or in part, budget authority proposed to be rescinded in a special message transmitted by the President under section 683 of this title, and upon which the Congress completes action before the end of the first period

of 45 calendar days of continuous session of the Congress after the date on which the President's message is received by the Congress;

(4) "impoundment resolution" means a resolution of the House of Representatives or the Senate which only expresses its disapproval of a proposed deferral of budget authority set forth in a special message transmitted by the President under section 684 of this title; and

(5) continuity of a session of the Congress shall be considered as broken only by an adjournment of the Congress sine die, and the days on which either House is not in session because of an adjournment of more than 3 days to a day certain shall be excluded in the computation of the 45-day period referred to in paragraph (3) of this section and in section 683 of this title, and the 25-day periods referred to in sections 687 and 688(b)(1) of this title. If a special message is transmitted under section 683 of this title during any Congress and the last session of such Congress adjourns sine die before the expiration of 45 calendar days of continuous session (or a special message is so transmitted after the last session of the Congress adjourns sine die), the message shall be deemed to have been retransmitted on the first day of the succeeding Congress and the 45-day period referred to in paragraph (3) of this section and in section 683 of this title (with respect to such message) shall commence on the day after such first day.

## 2 U.S.C. § 683

### § 683. Rescission of budget authority

(a) Transmittal of special message

Whenever the President determines that all or part of any budget authority will not be required to carry out the full objectives or scope of programs for which it is provided or that such budget authority should be rescinded for fiscal policy or other reasons (including the termination of authorized projects or activities for which budget authority has been provided), or whenever all or part of budget authority provided for only one fiscal year is to be reserved from obligation for such fiscal year, the President shall transmit to both Houses of Congress a special message specifying—

(1) the amount of budget authority which he proposes to be rescinded or which is to be so reserved;

(2) any account, department, or establishment of the Government to which such budget authority is available for obligation, and the specific project or governmental functions involved;

(3) the reasons why the budget authority should be rescinded or is to be so reserved;

(4) to the maximum extent practicable, the estimated fiscal, economic, and budgetary effect of the proposed rescission or of the reservation; and

(5) all facts, circumstances, and considerations relating to or bearing upon the proposed rescission or the reservation and the decision to effect the proposed rescission or the reservation, and to the maximum extent practicable, the estimated effect of the proposed rescission or the reservation upon the objects, purposes, and programs for which the budget authority is provided.

(b) Requirement to make available for obligation

Any amount of budget authority proposed to be rescinded or that is to be reserved as set forth in such special message shall be made available for obligation unless, within the prescribed 45-day period, the Congress has completed action on a rescission bill rescinding all or part of the amount proposed to be rescinded or that is to be reserved.  Funds made available for obligation under this procedure may not be proposed for rescission again.


**2 U.S.C. § 684**

**§ 684.  Proposed deferrals of budget authority**

(a) Transmittal of special message

Whenever the President, the Director of the Office of Management and Budget, the head of any department or agency of the United States, or any officer or employee of the United States proposes to defer any budget authority provided for a specific purpose or project, the President shall transmit to the House of Representatives and the Senate a special message specifying—

(1) the amount of the budget authority proposed to be deferred;

(2) any account, department, or establishment of the Government to which such budget authority is available for obligation, and the specific projects or governmental functions involved;

(3) the period of time during which the budget authority is proposed to be deferred;

(4) the reasons for the proposed deferral, including any legal authority invoked to justify the proposed deferral;

(5) to the maximum extent practicable, the estimated fiscal, economic, and budgetary effect of the proposed deferral; and

(6) all facts, circumstances, and considerations relating to or bearing upon the proposed deferral and the decision to effect the proposed deferral, including an analysis of such facts, circumstances, and considerations in terms of their application to any legal authority, including specific elements of legal authority, invoked to justify such proposed deferral, and to the maximum extent practicable, the estimated effect of the proposed deferral upon the objects, purposes, and programs for which the budget authority is provided.

A special message may include one or more proposed deferrals of budget authority.  A deferral may not be proposed for any period of time extending beyond the end of the fiscal year in which the special message proposing the deferral is transmitted to the House and the Senate.

(b) Consistency with legislative policy

Deferrals shall be permissible only—

(1) to provide for contingencies;

(2) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or

(3) as specifically provided by law.

No officer or employee of the United States may defer any budget authority for any other purpose.

(c) Exception

The provisions of this section do not apply to any budget authority proposed to be rescinded or that is to be reserved as set forth in a special message required to be transmitted under section 683 of this title.

A4

**2 U.S.C. § 685**

**§ 685.  Transmission of messages; publication**

(a) Delivery to House and Senate

Each special message transmitted under section 683 or 684 of this title shall be transmitted to the House of Representatives and the Senate on the same day, and shall be delivered to the Clerk of the House of Representatives if the House is not in session, and to the Secretary of the Senate if the Senate is not in session.  Each special message so transmitted shall be referred to the appropriate committee of the House of Representatives and the Senate.  Each such message shall be printed as a document of each House.

(b) Delivery to Comptroller General

A copy of each special message transmitted under section 683 or 684 of this title, shall be transmitted to the Comptroller General on the same day it is transmitted to the House of Representatives and the Senate.  In order to assist the Congress in the exercise of its functions under section 683 or 684 of this title, the Comptroller General shall review each such message and inform the House of Representatives and the Senate as promptly as practicable with respect to—

(1) in the case of a special message transmitted under section 683 of this title, the facts surrounding the proposed rescission or the reservation of budget authority (including the probable effects thereof); and

(2) in the case of a special message transmitted under section 684 of this title, (A) the facts surrounding each proposed deferral of budget authority (including the probable effects thereof) and (B) whether or not (or to what extent), in his judgment, such proposed deferral is in accordance with existing statutory authority.

(c) Transmission of supplementary messages

If any information contained in a special message transmitted under section 683 or 684 of this title is subsequently revised, the President shall transmit to both Houses of Congress and the Comptroller General a supplementary message stating and explaining such revision.  Any such supplementary message shall be delivered, referred, and printed as provided in subsection (a).  The Comptroller General shall promptly notify the House

A5

of Representatives and the Senate of any changes in the information submitted by him under subsection (b) which may be necessitated by such revision.

(d) Printing in Federal Register

Any special message transmitted under section 683 or 684 of this title, and any supplementary message transmitted under subsection (c), shall be printed in the first issue of the Federal Register published after such transmittal.

(e) Cumulative reports of proposed rescissions, reservations, and deferrals of budget authority

(1) The President shall submit a report to the House of Representatives and the Senate, not later than the 10th day of each month during a fiscal year, listing all budget authority for that fiscal year with respect to which, as of the first day of such month—

(A) he has transmitted a special message under section 683 of this title with respect to a proposed rescission or a reservation; and

(B) he has transmitted a special message under section 684 of this title proposing a deferral.

Such report shall also contain, with respect to each such proposed rescission or deferral, or each such reservation, the information required to be submitted in the special message with respect thereto under section 683 or 684 of this title.

(2) Each report submitted under paragraph (1) shall be printed in the first issue of the Federal Register published after its submission.


**2 U.S.C. § 686**

**§ 686.  Reports by Comptroller General**

(a) Failure to transmit special message

If the Comptroller General finds that the President, the Director of the Office of Management and Budget, the head of any department or agency of the United States, or any other officer or employee of the United States—

(1) is to establish a reserve or proposes to defer budget authority with respect to which the President is required to transmit a special message under section 683 or 684 of this title; or

(2) has ordered, permitted, or approved the establishment of such a reserve or a deferral of budget authority;

and that the President has failed to transmit a special message with respect to such reserve or deferral, the Comptroller General shall make a report on such reserve or deferral and any available information concerning it to both Houses of Congress.  The provisions of sections 682 to 688 of this title shall apply with respect to such reserve or deferral in the same manner and with the same effect as if such report of the Comptroller General were a special message transmitted by the President under section 683 or 684 of this title, and, for purposes of sections 682 to 688 of this title, such report shall be considered a special message transmitted under section 683 or 684 of this title.

(b)  Incorrect classification of special message

If the President has transmitted a special message to both Houses of Congress in accordance with section 683 or 684 of this title, and the Comptroller General believes that the President so transmitted the special message in accordance with one of those sections when the special message should have been transmitted in accordance with the other of those sections, the Comptroller General shall make a report to both Houses of the Congress setting forth his reasons.


**2 U.S.C. § 687**

**§ 687.  Suits by Comptroller General**

If, under this chapter, budget authority is required to be made available for obligation and such budget authority is not made available for obligation, the Comptroller General is hereby expressly empowered, through attorneys of his own selection, to bring a civil action in the United States District Court for the District of Columbia to require such budget authority to be made available for obligation, and such court is hereby expressly empowered to enter in such civil action, against any department, agency, officer, or employee of the United States, any decree, judgment, or order which may be necessary or appropriate to make such budget authority available for

A7

obligation.  No civil action shall be brought by the Comptroller General under this section until the expiration of 25 calendar days of continuous session of the Congress following the date on which an explanatory statement by the Comptroller General of the circumstances giving rise to the action contemplated has been filed with the Speaker of the House of Representatives and the President of the Senate.


**2 U.S.C. § 688**

**§ 688.  Procedure in House of Representatives and Senate**

(a) Referral

Any rescission bill introduced with respect to a special message or impoundment resolution introduced with respect to a proposed deferral of budget authority shall be referred to the appropriate committee of the House of Representatives or the Senate, as the case may be.

(b) Discharge of committee

(1) If the committee to which a rescission bill or impoundment resolution has been referred has not reported it at the end of 25 calendar days of continuous session of the Congress after its introduction, it is in order to move either to discharge the committee from further consideration of the bill or resolution or to discharge the committee from further consideration of any other rescission bill with respect to the same special message or impoundment resolution with respect to the same proposed deferral, as the case may be, which has been referred to the committee.

(2) A motion to discharge may be made only by an individual favoring the bill or resolution, may be made only if supported by one-fifth of the Members of the House involved (a quorum being present), and is highly privileged in the House and privileged in the Senate (except that it may not be made after the committee has reported a bill or resolution with respect to the same special message or the same proposed deferral, as the case may be); and debate thereon shall be limited to not more than 1 hour, the time to be divided in the House equally between those favoring and those opposing the bill or resolution, and to be divided in the Senate equally between, and controlled by, the majority leader and the minority leader or their designees. An amendment to the motion is not in order, and it is not in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

A8

(c) Floor consideration in House

(1) When the committee of the House of Representatives has reported, or has been discharged from further consideration of, a rescission bill or impoundment resolution, it shall at any time thereafter be in order (even though a previous motion to the same effect has been disagreed to) to move to proceed to the consideration of the bill or resolution.  The motion shall be highly privileged and not debatable.  An amendment to the motion shall not be in order, nor shall it be in order to move to reconsider the vote by which the motion is agreed to or disagreed to.

(2) Debate on a rescission bill or impoundment resolution shall be limited to not more than 2 hours, which shall be divided equally between those favoring and those opposing the bill or resolution.  A motion further to limit debate shall not be debatable.  In the case of an impoundment resolution, no amendment to, or motion to recommit, the resolution shall be in order.  It shall not be in order to move to reconsider the vote by which a rescission bill or impoundment resolution is agreed to or disagreed to.

(3) Motions to postpone, made with respect to the consideration of a rescission bill or impoundment resolution, and motions to proceed to the consideration of other business, shall be decided without debate.

(4) All appeals from the decisions of the Chair relating to the application of the Rules of the House of Representatives to the procedure relating to any rescission bill or impoundment resolution shall be decided without debate.

(5) Except to the extent specifically provided in the preceding provisions of this subsection, consideration of any rescission bill or impoundment resolution and amendments thereto (or any conference report thereon) shall be governed by the Rules of the House of Representatives applicable to other bills and resolutions, amendments, and conference reports in similar circumstances.

(d) Floor consideration in Senate

(1) Debate in the Senate on any rescission bill or impoundment resolution, and all amendments thereto (in the case of a rescission bill) and debatable motions and appeals in connection therewith, shall be limited to not more than 10 hours.  The time shall be equally divided between, and controlled by, the majority leader and the minority leader or their designees.

A9

(2) Debate in the Senate on any amendment to a rescission bill shall be limited to 2 hours, to be equally divided between, and controlled by, the mover and the manager of the bill.  Debate on any amendment to an amendment, to such a bill, and debate on any debatable motion or appeal in connection with such a bill or an impoundment resolution shall be limited to 1 hour, to be equally divided between, and controlled by, the mover and the manager of the bill or resolution, except that in the event the manager of the bill or resolution is in favor of any such amendment, motion, or appeal, the time in opposition thereto, shall be controlled by the minority leader or his designee.  No amendment that is not germane to the provisions of a rescission bill shall be received.  Such leaders, or either of them, may, from the time under their control on the passage of a rescission bill or impoundment resolution, allot additional time to any Senator during the consideration of any amendment, debatable motion, or appeal.

(3) A motion to further limit debate is not debatable. In the case of a rescission bill, a motion to recommit (except a motion to recommit with instructions to report back within a specified number of days, not to exceed 3, not counting any day on which the Senate is not in session) is not in order. Debate on any such motion to recommit shall be limited to one hour, to be equally divided between, and controlled by, the mover and the manager of the concurrent resolution.  In the case of an impoundment resolution, no amendment or motion to recommit is in order.

(4) The conference report on any rescission bill shall be in order in the Senate at any time after the third day (excluding Saturdays, Sundays, and legal holidays) following the day on which such a conference report is reported and is available to Members of the Senate.  A motion to proceed to the consideration of the conference report may be made even though a previous motion to the same effect has been disagreed to.

(5) During the consideration in the Senate of the conference report on any rescission bill, debate shall be limited to 2 hours to be equally divided between, and controlled by, the majority leader and minority leader or their designees.  Debate on any debatable motion or appeal related to the conference report shall be limited to 30 minutes, to be equally divided between, and controlled by, the mover and the manager of the conference report.

(6) Should the conference report be defeated, debate on any request for a new conference and the appointment of conferees shall be limited to one hour, to be equally divided between, and controlled by, the manager of the conference report and the minority leader or his designee, and should any motion be made to instruct the conferees before the conferees are named, debate on such motion shall be limited to 30 minutes, to be equally divided between, and controlled by, the mover and the manager of the conference report.  Debate on any amendment to any such instructions shall be limited to 20 minutes, to be equally divided between, and controlled by, the mover and the manager of the conference report.  In all cases when the manager of the conference report is in favor of any motion, appeal, or amendment, the time in opposition shall be under the control of the minority leader or his designee.

(7) In any case in which there are amendments in disagreement, time on each amendment shall be limited to 30 minutes, to be equally divided between, and controlled by, the manager of the conference report and the minority leader or his designee.  No amendment that is not germane to the provisions of such amendments shall be received.