IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

GLOBAL HEALTH COUNCIL, et al.,
Plaintiffs-Appellees,
v.
DONALD J. TRUMP, et al.,
Defendants-Appellants.

———————————

AIDS VACCINE ADVOCACY COALITION, et al.,
Plaintiffs-Appellees,
v.
UNITED STATES DEPARTMENT OF STATE, et al.,
Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

## JOINT APPENDIX

———————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*
ERIC D. McARTHUR
  *Deputy Assistant Attorney General*
MARK R. FREEMAN
DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*

# TABLE OF CONTENTS

**Page**

Docket Sheet, *AIDS Vaccine Advocacy Coalition v. Department of State*, No. 1:25-cv-400 (D.D.C.) ............................................................J.A. 1

Docket Sheet, *Global Health Council v. Trump*, No. 1:25-cv-402 (D.D.C.) ....................................................................J.A. 15

Memorandum Opinon and Order (Mar. 10, 2025), Dkt. No. 60, No. 1:25-cv-400 and No. 1:25-cv-402............................J.A. 35


**Additional Docket Entries from No. 1:25-cv-400**

Complaint (Feb. 10, 2025), Dkt. No. 1 .............................................................J.A. 83

Declaration of Mitchell Warren (Feb. 12, 2025), Dkt. No. 13-2 .............J.A. 104

Declaration of Andrew Sullivan (Feb. 12, 2025), Dkt. No. 13-4 .............J.A. 108

Notice and Declaration of Pete Marocco (Feb. 12, 2025), Dkt. Nos. 15 & 15-1 ...........................................................................J.A. 113

District Court Order (Feb. 13, 2025), Dkt. No. 17 ...................................J.A. 143

Declaration of Andrew Sullivan (Feb. 19, 2025), Dkt. No. 26-2 .............J.A. 158

Declaration of Jessica Doe (Feb. 19, 2025), Dkt. No. 26-3......................J.A. 163

District Court Order (Feb. 20, 2025), Dkt. No. 30 ...................................J.A. 176

District Court Order (Feb. 22, 2025), Dkt. No. 34 ...................................J.A. 183

Declaration of Lauren Bateman (Mar. 10, 2025), Dkt. No. 63................J.A. 189

Declaration of Jessica Doe (Mar. 10, 2025), Dkt. No. 64.........................J.A. 226

Notice of Appeal (Apr. 1, 2025), Dkt. No. 72 .............................................J.A. 232

Status Report (Apr. 3, 2025), Dkt. No. 75 ............................................ J.A. 234[1]

Status Report (Apr. 17, 2025), Dkt. No. 80 ...........................................J.A. 239

Status Report (Apr. 24, 2025), Dkt. No. 82 ...........................................J.A. 242

Status Report (May 1, 2025), Dkt. No. 85 ..............................................J.A. 245

**Additional Docket Entries from No. 1:25-cv-402**

Declaration of Elisha Dunn-Georgiou (Feb. 11, 2025), Dkt. No. 7-1 .....J.A. 248

Declaration of Robert Nichols (Feb. 11, 2025), Dkt. No. 7-2 ..................J.A. 252

Declaration of Mark Hetfield and Exhibits (Feb. 11, 2025),
    Dkt. Nos. 7-3 & 7-4 ..........................................................................J.A. 257

Declaration of Marian W. Wentworth (Feb. 11, 2025), Dkt. No. 7-5 .....J.A. 310

Declaration of James Butcher (Feb. 11, 2025), Dkt. No. 7-6 ..................J.A. 321

Declaration of Zan Northrip (Feb. 11, 2025), Dkt. No. 7-7 .....................J.A. 332

Declaration of Eric C. Bjornlund (Feb. 11, 2025), Dkt. No. 7-8 .............J.A. 344

Declaration of Scott Carlson (Feb. 11, 2025), Dkt. No. 7-9 ....................J.A. 353

Corrected Complaint (Feb. 21, 2025), Dkt. No. 30-1 ..............................J.A. 364

Notice of Appeal (Apr. 1, 2025), Dkt. No. 65 ..........................................J.A. 406

---

[1] Plaintiffs in No. 1:25-cv-400 do not regard docket numbers 75, 80, 82, and 85 as part of the record on appeal because they were filed after the notice of appeal.

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25–cv–00400–AHA

AIDS VACCINE ADVOCACY COALITION et al v. UNITED STATES DEPARTMENT OF STATE et al
Assigned to: Judge Amir H. Ali
 Related Case: 1:25–cv–00402–AHA
 Case in other court:  USCA, 25–05046
                       USCA, 25–05098
Cause: 05:551 Administrative Procedure Act

Date Filed: 02/10/2025
Jury Demand: None
Nature of Suit: 360 P.I.: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

| | | |
|---|---|---|
| **AIDS VACCINE ADVOCACY COALITION** | represented by | **Allison Marcy Zieve**<br>PUBLIC CITIZEN LITIGATION GROUP<br>1600 20th Street, NW<br>Washington, DC 20009<br>(202) 588–1000<br>Fax: (202) 588–7795<br>Email: azieve@citizen.org<br>*ATTORNEY TO BE NOTICED* |
| | | **Nicolas Sansone**<br>PUBLIC CITIZEN<br>1600 20th Street NW<br>Washington, DC 20009<br>202–588–1000<br>Email: nsansone@citizen.org<br>*ATTORNEY TO BE NOTICED* |
| | | **Lauren Bateman**<br>PUBLIC CITIZEN<br>Litigation Group<br>1600 20th St NW<br>Washington, DC 20009<br>202–588–7739<br>Email: lbateman@citizen.org<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **JOURNALISM DEVELOPMENT NETWORK, INC.** | represented by | **Allison Marcy Zieve**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Nicolas Sansone**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Lauren Bateman**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **The Center for Victims of Torture**<br>2356 University Ave. West<br>Suite 430<br>St. Paul, MN 55114 | represented by | **Lauren Bateman**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

**UNITED STATES DEPARTMENT OF STATE**  represented by  **Indraneel Sur**
U.S. DEPARTMENT OF JUSTICE
1100 L St. NW
Washington, DC 20530
202–616–8488
Email: Indraneel.Sur@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher D. Edelman**
U.S. DEPARTMENT OF JUSTICE
1100 L Street, NW
Washington, DC 20530
202–305–8659
Email: christopher.edelman@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT**  represented by  **Indraneel Sur**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher D. Edelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARCO A. RUBIO**
*Secretary of State, and Acting Administrator of United States Agency for International Development*  represented by  **Indraneel Sur**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher D. Edelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF MANAGEMENT & BUDGET**  represented by  **Indraneel Sur**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher D. Edelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**RUSSELL VOUGHT**
*Director, Office of Management and Budget*  represented by  **Indraneel Sur**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher D. Edelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DONALD TRUMP**
*President of the United States of America*  represented by  **Indraneel Sur**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher D. Edelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**CONSTITUTIONAL**                    represented by   **Brianne Jenna Gorod**
**ACCOUNTABILITY CENTER**                              CONSTITUTIONAL
                                                       ACCOUNTABILITY CENTER
                                                       1200 18th Street, NW
                                                       Suite 501
                                                       Washington, DC 20036
                                                       (202) 296–6889 ext. 304
                                                       Email: brianne@theusconstitution.org
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Miriam Becker–Cohen**
                                                       CONSTITUTIONAL
                                                       ACCOUNTABILITY CENTER
                                                       1200 18th Street, NW
                                                       Suite 501
                                                       Washington, DC 20036
                                                       202–296–6889
                                                       Email: miriam@theusconstitution.org
                                                       *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/10/2025 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against All Defendants ( Filing fee $ 405 receipt number ADCDC–11470533) filed by JOURNALISM DEVELOPMENT NETWORK, INC., AIDS VACCINE ADVOCACY COALITION. (Attachments: # 1 Civil Cover Sheet, # 2 Summons to Department of State, # 3 Summons to OMB, # 4 Summons to Marco Rubio, # 5 Summons to Donald Trump, # 6 Summons to USAID, # 7 Summons to Russell Vought, # 8 Summons U.S. Attorney's Office, # 9 Summons to Attorney General, # 10 Exhibit State Dep't Memorandum, # 11 Exhibit Declaration of Mitchell Warren, # 12 Exhibit Declaration of Andrew Sullivan)(Bateman, Lauren) (Attachment 1 replaced on 2/11/2025) (znmw). (Entered: 02/10/2025) |
| 02/10/2025 | 2 | NOTICE of Appearance by Nicolas Sansone on behalf of All Plaintiffs (Sansone, Nicolas) (Entered: 02/10/2025) |
| 02/10/2025 | 3 | NOTICE of Appearance by Allison Marcy Zieve on behalf of All Plaintiffs (Zieve, Allison) (Entered: 02/10/2025) |
| 02/10/2025 | 4 | NOTICE OF RELATED CASE by All Plaintiffs. Case related to Case No. 25–239, 25–352. (Zieve, Allison) (Entered: 02/10/2025) |
| 02/10/2025 | 5 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by AIDS VACCINE ADVOCACY COALITION (Zieve, Allison) (Entered: 02/10/2025) |
| 02/10/2025 | 6 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by JOURNALISM DEVELOPMENT NETWORK, INC. (Zieve, Allison) (Entered: 02/10/2025) |
| 02/11/2025 |  | Case Assigned to Judge Loren L. AliKhan. (znmw) (Entered: 02/11/2025) |
| 02/11/2025 | 7 | SUMMONS (8) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(znmw) (Entered: 02/11/2025) |

| 02/11/2025 | | MINUTE ORDER: Plaintiffs are hereby ORDERED to show cause on or before February 11, 2025 at 2:00 p.m. as to why this case should not be randomly assigned. It is not obvious that the instant case, which brings claims related to Executive Order 14169, 90 Fed. Reg. 8619, is related to the Office of Management and Budget memorandum that is at issue in *National Council of Nonprofits, et al. v. Office of Management and Budget, et al.*, No. 25–CV–239. Under Local Civil Rule 40.5(a)(3), cases are properly deemed related when they "(i) relate to common property, or (ii) involve common issues of fact, or (iii) grow out of the same event or transaction or (iv) involve the validity or infringement of the same patent." Given that "the mere presence of overlapping parties is not among the bases for a related–case designation," *Klayman v. Porter*, No. 20–CV–3109, 2021 WL 1668067, at *2 (D.D.C. Apr. 28, 2021) (internal quotation marks and citation omitted), Plaintiffs are ordered to show cause as to why this case fits into the "narrow exception," codified in Local Rule 40.5, to the "foundational principle of random assignment only when the relationship between the [related] cases is certain," *Klayman*, 2021 WL 1668067 at *1. Signed by Judge Loren L. AliKhan on 02/11/2025. (lclla1) (Entered: 02/11/2025) |
| 02/11/2025 | 8 | NOTICE OF RELATED CASE by All Defendants. Case related to Case No. 1:25–cv–352. (Edelman, Christopher) (Entered: 02/11/2025) |
| 02/11/2025 | 9 | RESPONSE TO ORDER TO SHOW CAUSE re Order to Show Cause,,,,, filed by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Sansone, Nicolas) (Entered: 02/11/2025) |
| 02/11/2025 | | NOTICE OF ERROR regarding 9 Response to Order to Show Cause. Please note the following: Invalid attorney signature–signature on document must match PACER login. Do not refile; future non–compliant documents will be entered in error. (znmw) (Entered: 02/11/2025) |
| 02/11/2025 | | MINUTE ORDER: Upon consideration of Plaintiffs' response 9 to the show–cause order, it is hereby ORDERED that Defendants shall file a response to the show–cause order on or before February 11, 2025 at 5:00 p.m. Signed by Judge Loren L. AliKhan on 02/11/2025. (lclla1) (Entered: 02/11/2025) |
| 02/11/2025 | 10 | RESPONSE TO ORDER TO SHOW CAUSE re Order, filed by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (Edelman, Christopher) (Entered: 02/11/2025) |
| 02/11/2025 | 11 | ERRATA re 1 Complaint by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Bateman, Lauren) Modified on 2/12/2025 to add link (mg). (Entered: 02/11/2025) |
| 02/11/2025 | 12 | ORDER directing the Clerk of Court to TRANSFER this matter to the Calendar and Case Management Committee. See order for details. Signed by Judge Loren L. AliKhan on 02/11/2025. (lclla1) (Entered: 02/11/2025) |
| 02/11/2025 | | Case randomly reassigned to Judge Amir H. Ali pursuant to 12 Order dated 2/11/2025. Judge Loren L. AliKhan is no longer assigned to the case. (ztnr) (Entered: 02/12/2025) |
| 02/12/2025 | | MINUTE ORDER. The Court will hold a telephonic motion hearing in No. 25–cv–00400 and No. 25–cv–00402 on February 12, 2025, at 1:30 p.m. The information for the public access line is as follows: the toll–free number is 833–990–9400, and the Meeting ID is 771021014. Signed by Judge Amir H. Ali on 2/12/2025. (lcaha2) Modified on 2/12/2025. (zalh) (Entered: 02/12/2025) |
| 02/12/2025 | 13 | MOTION for Temporary Restraining Order by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Attachments: # 1 Memorandum in Support, # 2 Declaration Declaration of Mitchell Warren, # 3 Exhibit Exhibit A to Warren Declaration, # 4 Declaration Declaration of Andrew Sullivan, # 5 Exhibit Exhibit A to Sullivan Declaration, # 6 Text of Proposed Order)(Sansone, Nicolas) (Entered: 02/12/2025) |
| 02/12/2025 | 14 | NOTICE OF RELATED CASE by All Defendants. Case related to Case No. 1:25cv352. (Edelman, Christopher) (Entered: 02/12/2025) |

| | | |
|---|---|---|
| 02/12/2025 | | Minute Entry for telephonic proceeding held before Judge Amir H. Ali: Motion Hearing held on 2/12/2025 re 13 Plaintiff's Motion for a Temporary Restraining Order. Oral arguments heard. The Court takes the motion under advisement. A written order is forthcoming via Chambers. The Court orders the parties to submit a proposed order by 4:30 PM today. (Court Reporter: William Zaremba) (zalh) (Entered: 02/12/2025) |
| 02/12/2025 | 15 | NOTICE *Related to February 12, 2025 Hearing* by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D – Proposed Order)(Edelman, Christopher) (Entered: 02/12/2025) |
| 02/12/2025 | 16 | NOTICE of Proposed Order by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC. re 13 MOTION for Temporary Restraining Order , Motion Hearing, (Attachments: # 1 Text of Proposed Order)(Sansone, Nicolas) (Entered: 02/12/2025) |
| 02/13/2025 | 17 | ORDER granting in part and denying in part Plaintiffs' 13 motion for a temporary restraining order. See document for details. Signed by Judge Amir H. Ali on 2/13/2025. (lcaha2) (Entered: 02/13/2025) |
| 02/14/2025 | 18 | TRANSCRIPT OF STATUS CONFERENCE – MOTIONS – TEMPORARY RESTRAINING ORDER VIA ZOOM TELECONFERENCE PROCEEDINGS before Judge Amir H. Ali held on February 12, 2025; Page Numbers: 1–74. Court Reporter/Transcriber: William Zaremba; Email: William_Zaremba@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/7/2025. Redacted Transcript Deadline set for 3/17/2025. Release of Transcript Restriction set for 5/15/2025.(Zaremba, William) (Entered: 02/14/2025) |
| 02/14/2025 | 19 | Joint STATUS REPORT by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Bateman, Lauren) (Entered: 02/14/2025) |
| 02/14/2025 | | MINUTE ORDER. The Court is in receipt of the parties' 19 joint status report proposing a briefing schedule. Defendants shall respond to Plaintiffs' 13 motion for preliminary relief by February 21, 2025. Plaintiffs shall reply by 12:00 p.m. on February 27, 2025. Signed by Judge Amir H. Ali on 2/14/2025. (lcaha2) (Entered: 02/14/2025) |
| 02/16/2025 | 20 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 2/11/2025. Answer due for ALL FEDERAL DEFENDANTS by 4/12/2025. (Attachments: # 1 Exhibit Acceptance of Summons)(Bateman, Lauren) (Entered: 02/16/2025) |
| 02/18/2025 | 21 | NOTICE of Appearance by Indraneel Sur on behalf of All Defendants (Sur, Indraneel) (Entered: 02/18/2025) |
| 02/18/2025 | 22 | STATUS REPORT *regarding Compliance* by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (Attachments: # 1 Exhibit USAID & State Decl, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit OMB Decl)(Sur, Indraneel) |

| | | |
|---|---|---|
| | | (Entered: 02/18/2025) |
| 02/19/2025 | 23 | Unopposed MOTION for Leave to File *Amicus Curiae Brief* by CONSTITUTIONAL ACCOUNTABILITY CENTER. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(Gorod, Brianne) (Entered: 02/19/2025) |
| 02/19/2025 | 24 | NOTICE of Appearance by Brianne Jenna Gorod on behalf of CONSTITUTIONAL ACCOUNTABILITY CENTER (Gorod, Brianne) (Entered: 02/19/2025) |
| 02/19/2025 | 25 | NOTICE of Appearance by Miriam Becker–Cohen on behalf of CONSTITUTIONAL ACCOUNTABILITY CENTER (Becker–Cohen, Miriam) (Entered: 02/19/2025) |
| 02/19/2025 | 26 | Emergency MOTION for Contempt by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Attachments: # 1 Exhibit Third Declaration of Mitchell Warren, # 2 Exhibit Third Declaration of Andrew Sullivan, # 3 Exhibit Declaration of Jessica Doe, # 4 Text of Proposed Order Proposed Order)(Bateman, Lauren) (Entered: 02/19/2025) |
| 02/19/2025 | | MINUTE ORDER. Defendants are directed to respond to Plaintiffs' 26 emergency motion for contempt by 1:00 p.m. on February 20, 2025. Signed by Judge Amir H. Ali on 2/19/2025. (lcaha2) (Entered: 02/19/2025) |
| 02/20/2025 | 27 | ERRATA *to ECF 26* by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Bateman, Lauren) (Entered: 02/20/2025) |
| 02/20/2025 | 28 | RESPONSE re 26 Emergency MOTION for Contempt filed by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (Sur, Indraneel) (Entered: 02/20/2025) |
| 02/20/2025 | 29 | REPLY to opposition to motion re 26 Motion for Contempt, filed by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Bateman, Lauren) (Entered: 02/20/2025) |
| 02/20/2025 | 30 | ORDER. Plaintiffs' 26 motion for contempt and to enforce the Court's temporary restraining order is granted in part and denied in part. See document for details. Signed by Judge Amir H. Ali on 2/20/2025. (lcaha2) (Entered: 02/20/2025) |
| 02/21/2025 | | MINUTE ORDER. The parties in this case and No. 25–cv–00402 shall meet and confer and file a consolidated joint status report by February 26, 2025, at 12:00 p.m., addressing Defendants' "prompt compliance with the order." Defendants' Br., ECF No. 28 at 8. Signed by Judge Amir H. Ali on 2/21/2025. (lcaha2) (Entered: 02/21/2025) |
| 02/21/2025 | 31 | STANDING ORDER. The parties are ordered to comply with the directives set forth in the attached standing order. See document for details. Signed by Judge Amir H. Ali on 2/21/2025. (lcaha2) (Entered: 02/21/2025) |
| 02/21/2025 | 32 | MOTION to Clarify re 30 Order on Motion for Contempt, 17 Order on Motion for TRO, Set/Reset Deadlines , MOTION to Stay by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (Sur, Indraneel) (Entered: 02/21/2025) |
| 02/21/2025 | 33 | Memorandum in opposition to re 13 Motion for TRO, *combined with opposition in No.402* filed by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (Sur, Indraneel) (Entered: 02/21/2025) |
| 02/22/2025 | 34 | ORDER. To the extent Defendants' 32 motion to clarify is not mooted by the discussion herein, it is denied, and Defendants' motion to stay the Court's TRO pending an emergency appeal is also denied. See document for details. Signed by Judge Amir H. Ali on 2/22/2025. (lcaha3) (Entered: 02/22/2025) |
| 02/24/2025 | | MINUTE ORDER. The Court is in receipt of the emergency motion to enforce filed in No. 25–cv–00402. The Court will hold a telephonic status hearing on February 25, 2025, at 11:00 a.m. The information for the public access line is as follows: the toll–free number is 833–990–9400, and the Meeting ID is 771021014. Signed by |

| | | |
|---|---|---|
| | | Judge Amir H. Ali on 2/24/2025. (lcaha1) Modified on 2/25/2025. (zalh) (Entered: 02/24/2025) |
| 02/25/2025 | | Set/Reset Hearings: Status Conference set for 2/25/2025 at 11:00 AM via teleconference before Judge Amir H. Ali. (zalh) (Entered: 02/25/2025) |
| 02/25/2025 | 35 | TRANSCRIPT OF MOTION HEARING before Judge Amir H. Ali held on February 25, 2025; Page Numbers: 1–60. Date of Issuance: 2/25/2025. Court Reporter: Bryan A. Wayne. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/18/2025. Redacted Transcript Deadline set for 3/28/2025. Release of Transcript Restriction set for 5/26/2025.(Wayne, Bryan) (Main Document 35 replaced on 2/25/2025) (znbn). (Entered: 02/25/2025) |
| 02/25/2025 | | Minute Entry and Order for Proceedings held before Judge Amir H. Ali: Status Conference held via Zoom on 2/25/2025. Oral motion by the Plaintiff for " Emergency MOTION to Enforce Temporary Restraining Order", HEARD and GRANTED for the reasons stated on the record after oral argument. The restrained defendants are ORDERED to comply as discussed by 11:59 p.m. on February 26, 2025. (Court Reporter Bryan Wayne) (znbn) (Entered: 02/25/2025) |
| 02/25/2025 | 36 | NOTICE OF INTERLOCUTORY APPEAL TO DC CIRCUIT COURT as to Status Conference, by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. Fee Status: No Fee Paid. Parties have been notified. (Sur, Indraneel) Modified event on 2/26/2025 (mg). (Entered: 02/25/2025) |
| 02/25/2025 | 37 | MOTION to Stay re Status Conference, by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (Attachments: # 1 Declaration)(Sur, Indraneel) (Entered: 02/25/2025) |
| 02/25/2025 | | USCA Case Number 25–5046 for 36 Notice of Appeal to DC Circuit Court, filed by DONALD TRUMP, RUSSELL VOUGHT, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, UNITED STATES DEPARTMENT OF STATE. (mg) (Entered: 02/26/2025) |
| 02/26/2025 | 38 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 36 Notice of Interlocutory Appeal to DC Circuit Court,. (mg) (Entered: 02/26/2025) |
| 02/26/2025 | 39 | ORDER denying Defendants' 37 motion to stay. See document for details. Defendants shall promptly file notice of this order with the Court of Appeals. Signed by Judge Amir H. Ali on 2/26/2025. (lcaha2) (Entered: 02/26/2025) |
| 02/26/2025 | 40 | Joint STATUS REPORT by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Attachments: # 1 Exhibit Clara Doe Decl., # 2 Exhibit Ellie Doe Decl., # 3 Exhibit Della Doe Decl., # 4 Exhibit Zahra Doe Decl., # 5 Exhibit Sandra Doe Decl.)(Bateman, Lauren) (Entered: 02/26/2025) |

| 02/26/2025 | 41 | LARGE ADDITIONAL ATTACHMENT(S) *Defense Exhibits A and B* by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP 40 Status Report, filed by JOURNALISM DEVELOPMENT NETWORK, INC., AIDS VACCINE ADVOCACY COALITION. (Attachments: # 1 Declaration)(Sur, Indraneel) (Entered: 02/26/2025) |
|---|---|---|
| 02/26/2025 | 42 | LARGE ADDITIONAL ATTACHMENT(S) *Defense Exhibit C* by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP 40 Status Report, filed by JOURNALISM DEVELOPMENT NETWORK, INC., AIDS VACCINE ADVOCACY COALITION. (Sur, Indraneel) (Entered: 02/26/2025) |
| 02/26/2025 | 43 | NOTICE *by Defense in Clarification* by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP re 40 Status Report, (Sur, Indraneel) (Entered: 02/26/2025) |
| 02/27/2025 | 44 | MOTION for Leave to File *Supplement to the Record* by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Attachments: # 1 Text of Proposed Order Proposed Order)(Bateman, Lauren) (Entered: 02/27/2025) |
| 02/27/2025 | 45 | REPLY to opposition to motion re 13 Motion for TRO, filed by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Bateman, Lauren) (Entered: 02/27/2025) |
| 03/03/2025 | 46 | MOTION for Leave to File *Supplement to the Record* by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Attachments: # 1 Exhibit Bateman Declaration, # 2 Text of Proposed Order Proposed Order)(Bateman, Lauren) (Entered: 03/03/2025) |
| 03/03/2025 | | MINUTE ORDER. The Court's hearing on preliminary injunction motions in this case and No. 25–cv–00402, planned for March 4, 2025, will be held on March 6, 2025, at 2:00 p.m. in Courtroom 19– In Person before Judge Amir H. Ali. The Court will consider the parties' arguments and issue an opinion thereafter with full dispatch. The expiration date for the Court's temporary restraining order remains 11:59 p.m. on March 10, 2025, or the date the Court resolves the preliminary injunction motions, whichever is sooner. Signed by Judge Amir H. Ali on 3/3/2025. (lcaha2) Modified on 3/4/2025. (zalh) (Entered: 03/03/2025) |
| 03/03/2025 | 47 | MOTION for Leave to File *Partially Opposed Surreply* by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (Attachments: # 1 Proposed Surreply, # 2 Declaration, # 3 Text of Proposed Order)(Sur, Indraneel) (Entered: 03/03/2025) |
| 03/05/2025 | | MINUTE ORDER. The parties shall meet and confer and file a joint status report by 11:00 a.m. tomorrow proposing a schedule for Defendants to come into compliance with the Court's temporary restraining order ("TRO") and the Court's February 25, 2025, order enforcing the TRO. The joint status report need not address compliance with the February 25, 2025, order for the period that the order was subject to administrative stay; however, it should address steps taken during all other periods up until the filing of the joint status report and include specificity with respect to milestones and timelines for Defendants coming into compliance thereafter. The parties' proposed schedule should account for the length of time that has passed since the TRO was entered and the feasibility of any compliance timelines.<br><br>At the preliminary injunction hearing tomorrow, the parties should be prepared to address the substantive arguments at issue in the preliminary injunction motions. The Court will hear argument from all parties; however, Plaintiffs in the two cases are encouraged to coordinate to avoid duplicative arguments and will be given the opportunity to propose a division of the issues between counsel. The parties should also be prepared to discuss the steps Defendants have taken to come into compliance with the Court's orders, including any further steps that were executed following the |

| | | |
|---|---|---|
| | | parties' joint status report, as well as the parties' proposed schedule for Defendants coming into compliance. Signed by Judge Amir H. Ali on 3/5/2025. (lcaha2) (Entered: 03/05/2025) |
| 03/05/2025 | | MINUTE ORDER. A public access line will be provided for tomorrow's preliminary injunction hearing. The information for the public access line is as follows: the toll–free number is 833–990–9400, and the Meeting ID is 771021014. Persons remotely accessing court proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. *See In re: Prohibition on Photographing, Recording, Broadcasting, and Livestreaming Judicial Proceedings*, Standing Order 24–31 (JEB) (Sept. 18, 2024). Signed by Judge Amir H. Ali on 3/5/2025. (lcaha2) (Entered: 03/05/2025) |
| 03/05/2025 | 48 | Consent MOTION for Leave to File *Response to Plaintiffs' Supplemental Materials* by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (Attachments: # 1 Response to Plaintiffs' Supplemental Materials, # 2 Text of Proposed Order)(Sur, Indraneel) (Entered: 03/05/2025) |
| 03/06/2025 | 49 | Joint STATUS REPORT by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Bateman, Lauren) (Entered: 03/06/2025) |
| 03/06/2025 | 50 | ENTERED IN ERROR.....NOTICE OF SUPPLEMENTAL AUTHORITY by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP (Lowry, Faith) Modified on 3/6/2025; entered in error at the request of counsel (zdp). (Entered: 03/06/2025) |
| 03/06/2025 | 51 | NOTICE OF SUPPLEMENTAL AUTHORITY by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP (Sur, Indraneel) (Entered: 03/06/2025) |
| 03/06/2025 | | Minute Entry for proceedings held before Judge Amir H. Ali: Motion Hearing held on 3/6/2025. Oral arguments on preliminary injunction motions heard. (Court Reporter Sonja Reeves) (znbn) (Entered: 03/06/2025) |
| 03/07/2025 | 52 | NOTICE *regarding Court inquiry of March 6, 2025* by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP re 49 Status Report (Sur, Indraneel) (Entered: 03/07/2025) |
| 03/07/2025 | 53 | NOTICE *as to Outstanding Invoices* by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC. (Bateman, Lauren) (Entered: 03/07/2025) |
| 03/07/2025 | | MINUTE ORDER. As discussed at yesterday's hearing, the Court believes it would be helpful to have additional information to serve as benchmarks in assessing feasibility in reaching compliance with the TRO. These benchmarks will allow the Court to continue to provide clarity as to what is needed for compliance with the TRO, while ensuring that due regard is given to feasibility. As the parties discussed, such benchmarks would also be pertinent to the Court's consideration of any relief to be granted in a preliminary injunction. The Court is in receipt of Defendants' 52 notice stating that they are not currently able to provide information regarding the number of payments processed for Plaintiffs as it relates to Defendants' paragraph 10 in the parties' 49 joint status report, and may need until noon on Monday to provide this information. If Plaintiffs can offer any information or estimate as to how many outstanding invoices were processed in the period described, they should provide that information to the Court as soon as possible.<br><br>Furthermore, in the interest of facilitating the Court's ruling with respect to enabling letter of credit drawdown and reimbursement requests for Plaintiffs and their members, the parties shall confer and file a brief joint status report by 5:00 p.m. today addressing |

| | | whether such requests have been enabled and, if not, the agreed upon timeline for doing so. Signed by Judge Amir H. Ali on 3/7/2025. (lcaha2) (Entered: 03/07/2025) |
|---|---|---|
| 03/07/2025 | 54 | STATUS REPORT *in response to Order of March 7, 2025* by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (Sur, Indraneel) (Entered: 03/07/2025) |
| 03/07/2025 | 55 | Unopposed MOTION for Leave to File *Supplement to the Record* by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Attachments: # 1 Affidavit Second Declaration of Jessica Doe, # 2 Text of Proposed Order)(Bateman, Lauren) (Entered: 03/07/2025) |
| 03/08/2025 | 56 | TRANSCRIPT OF MOTION HEARING, ORAL ARGUMENT ON PRELIMINARY INJUNCTION, before Judge Amir H. Ali held on March 6, 2025; Page Numbers: 1–176. Date of Issuance:March 7, 2025. Court Reporter/Transcriber Sonja L. Reeves, RDR, CRR, Telephone number (202) 354–3246, Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 3/29/2025. Redacted Transcript Deadline set for 4/8/2025. Release of Transcript Restriction set for 6/6/2025.(Reeves, Sonja) (Main Document 56 replaced on 3/10/2025) (ztnr). (Entered: 03/08/2025) |
| 03/09/2025 | 57 | Consent MOTION for Leave to File *response to supplemental matter* by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (Attachments: # 1 Proposed Response, # 2 Text of Proposed Order)(Sur, Indraneel) (Entered: 03/09/2025) |
| 03/09/2025 | 58 | NOTICE *of supplemental material* by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP re 42 Large Additional Attachment(s), (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Sur, Indraneel) (Entered: 03/09/2025) |
| 03/10/2025 | 59 | NOTICE of Supplemental Authority *regarding ruling in 25–cv–469* by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP re 51 NOTICE OF SUPPLEMENTAL AUTHORITY (Attachments: # 1 Exhibit)(Sur, Indraneel) Modified event title on 3/11/2025 (znmw). (Entered: 03/10/2025) |
| 03/10/2025 | | MINUTE ORDER. The Constitutional Accountability Center's 23 motion for leave to file an amicus curiae brief; Plaintiffs' 44 46 55 motions for leave to supplement the record; Defendants' 47 motion for leave to file a sur–reply; and Defendants' 48 57 motions for leave to respond to Plaintiffs' supplemental materials are granted. Signed by Judge Amir H. Ali on 3/10/2025. (lcaha3) (Entered: 03/10/2025) |
| 03/10/2025 | 60 | MEMORANDUM OPINION AND ORDER. Plaintiffs' 13 motion for a preliminary injunction is granted in part and denied in part. See document for details. The parties shall file a joint status report by March 14, 2025, that apprises the Court of Defendants' compliance with this order and proposes a schedule for next steps in this matter. Signed by Judge Amir H. Ali on 3/10/2025. (lcaha2) (Entered: 03/10/2025) |

| | | |
|---|---|---|
| 03/10/2025 | 61 | AMICUS BRIEF by CONSTITUTIONAL ACCOUNTABILITY CENTER. (mg) (Entered: 03/11/2025) |
| 03/10/2025 | 62 | SUPPLEMENTAL DECLARATION of Andrew Sullivan re 40 Status Report, filed by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Attachments: # 1 Exhibit)(mg) Modified docket text on 3/12/2025 (mg). (Entered: 03/11/2025) |
| 03/10/2025 | 63 | SUPPLEMENTAL DECLARATION of Lauren Bateman re 40 Status Report, filed by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (mg) Modified docket text on 3/12/2025 (mg). (Entered: 03/11/2025) |
| 03/10/2025 | 64 | SUPPLEMENTAL DECLARATION of Jessica Doe re 40 Status Report, filed by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (mg) Modified docket text on 3/12/2025 (mg). (Entered: 03/11/2025) |
| 03/10/2025 | 65 | SURREPLY to re 13 MOTION for Temporary Restraining Order filed by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (Attachments: # 1 Exhibit)(mg) (Entered: 03/11/2025) |
| 03/10/2025 | 66 | RESPONSE re 63 Supplemental Memorandum, 62 Supplemental Memorandum, filed by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (mg) Modified docket text on 3/12/2025 (mg). (Entered: 03/11/2025) |
| 03/10/2025 | 67 | RESPONSE re 64 filed by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (mg) Modified link on 3/12/2025 (mg). (Entered: 03/11/2025) |
| 03/11/2025 | | Set/Reset Deadlines: Joint Status Report due by 3/14/2025. (zalh) (Entered: 03/11/2025) |
| 03/14/2025 | 68 | Joint STATUS REPORT *under Order of March 10, 2025* by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (Sur, Indraneel) (Entered: 03/14/2025) |
| 03/17/2025 | | MINUTE ORDER. The Court is in receipt of the parties' 68 joint status report. The Court's March 10, 2025, preliminary injunction adopted a feasibility benchmark of approximately 300 payments per day. By March 19, 2025, Defendants shall submit a status report which includes the updated total number of payments for work completed prior to February 13, 2025 (1) which have been processed since March 10 for Plaintiffs; (2) which have been processed since March 10 for non–Plaintiffs; and (3) which remain to be processed for Plaintiffs and non–Plaintiffs. Defendants' status report shall include a proposed timeline for processing the remaining payments that is consistent with the Court's benchmark. Signed by Judge Amir H. Ali on 3/17/2025. (lcaha2) (Entered: 03/17/2025) |
| 03/19/2025 | 69 | STATUS REPORT *under Order of March 17, 2025* by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (Sur, Indraneel) (Entered: 03/19/2025) |
| 03/24/2025 | | MINUTE ORDER. The Court is in receipt of Defendants' 69 status report. Defendants propose to submit another status report by March 27, 2025. Defendants shall file another status report by March 27, 2025, which includes the same information as directed in the Court's March 17, 2025, minute order, and every seven days thereafter until otherwise ordered by the Court. Signed by Judge Amir H. Ali on 3/24/2025. (lcaha2) (Entered: 03/24/2025) |
| 03/26/2025 | 70 | RESPONSE *to Defendants' Status Report re 69* filed by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. |

| | | (Attachments: # 1 Affidavit Fourth Declaration of Andrew Sullivan, # 2 Affidavit Third Declaration of Mitchell Warren)(Bateman, Lauren) Modified on 3/31/2025 to add link (mg). (Entered: 03/26/2025) |
|---|---|---|
| 03/27/2025 | 71 | STATUS REPORT *respecting Order of March 24, 2025* by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (Sur, Indraneel) (Entered: 03/27/2025) |
| 03/28/2025 | | MINUTE ORDER. The Court is in receipt of Defendants' 71 status report. Defendants' proposed timeline appears consistent with the Court's feasibility benchmark with respect to work completed prior to February 13, 2025. To the extent the parties have outstanding disputes regarding Defendants' compliance, or further information required from Plaintiffs in order for Defendants to meaningfully comply, as it relates to terminations, suspensions, or stop–work orders issued between January 20, 2025, and February 13, 2025, the parties shall meet and confer and attempt to resolve such issues.<br><br>In their next status report, Defendants shall also include (1) the steps they have taken to date to comply with the preliminary injunction's directive that Defendants "are enjoined from unlawfully impounding congressionally appropriated foreign aid funds and shall make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024," and (2) any next steps necessary to come into compliance with that aspect of the Court's preliminary injunction. Signed by Judge Amir H. Ali on 3/28/2025. (lcaha2) (Entered: 03/28/2025) |
| 04/01/2025 | 72 | NOTICE OF INTERLOCUTORY APPEAL TO DC CIRCUIT COURT as to 60 Memorandum & Opinion, by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO A. RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. Fee Status: No Fee Paid. Parties have been notified. (Sur, Indraneel) Modified event on 4/2/2025 (mg). (Entered: 04/01/2025) |
| 04/02/2025 | 73 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 72 Notice of Appeal to DC Circuit Court,. (mg) (Entered: 04/02/2025) |
| 04/02/2025 | | USCA Case Number 25–5098 for 72 Notice of Appeal to DC Circuit Court, filed by DONALD TRUMP, MARCO A. RUBIO, RUSSELL VOUGHT, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT & BUDGET, UNITED STATES DEPARTMENT OF STATE. (mg) (Entered: 04/02/2025) |
| 04/03/2025 | 74 | STATUS REPORT by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Bateman, Lauren) (Entered: 04/03/2025) |
| 04/03/2025 | 75 | STATUS REPORT *under Order of March 28, 2025* by UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, MARCO A. RUBIO, OFFICE OF MANAGEMENT & BUDGET, RUSSELL VOUGHT, DONALD TRUMP. (Sur, Indraneel) (Entered: 04/03/2025) |
| 04/08/2025 | 76 | Unopposed MOTION for Extension of Time to File Answer re 1 Complaint,, *or to otherwise respond to Complaint* by OFFICE OF MANAGEMENT & BUDGET, MARCO A. RUBIO, DONALD TRUMP, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, RUSSELL VOUGHT. (Attachments: # 1 Text of Proposed Order)(Sur, Indraneel) (Entered: 04/08/2025) |
| 04/09/2025 | | MINUTE ORDER. Defendants' 76 unopposed motion for an extension of time to respond to the complaint is granted. Defendants shall respond to the complaint by May 13, 2025. Signed by Judge Amir H. Ali on 4/9/2025. (lcaha2) (Entered: 04/09/2025) |
| 04/10/2025 | 77 | STATUS REPORT *under Minute Order* by OFFICE OF MANAGEMENT & BUDGET, MARCO A. RUBIO, DONALD TRUMP, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF |

| | | |
|---|---|---|
| | | STATE, RUSSELL VOUGHT. (Sur, Indraneel) (Entered: 04/10/2025) |
| 04/11/2025 | 78 | Unopposed MOTION to Stay re 60 Memorandum & Opinion, *and Opposed Motion for Rule 62.1 Indicative Ruling* by OFFICE OF MANAGEMENT & BUDGET, MARCO A. RUBIO, DONALD TRUMP, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, RUSSELL VOUGHT. (Attachments: # 1 Text of Proposed Order Prp Order re Unopposed Stay Mot Pending Decision on Rule 62.1 Mot)(Sur, Indraneel) (Entered: 04/11/2025) |
| 04/11/2025 | | MINUTE ORDER. Defendants' 78 unopposed motion for a partial administrative stay of this Court's March 10, 2025, preliminary injunction is granted. Pending this Court's ruling on Defendants' 78 motion for an indicative ruling, the preliminary injunction's requirement that "the Restrained Defendants shall not withhold payments or letter of credit drawdowns for work completed prior to February 13, 2025," as to "any grants, cooperative agreements, or contracts for foreign assistance" is stayed except as it relates to Plaintiffs in No. 25–cv–00400 and No. 25–cv–00402. Plaintiffs shall respond to Defendants' motion for an indicative ruling by April 16, 2025. Defendants shall file any reply by April 18, 2025.

Defendants' April 10, 2025, status report states that they expect to be in full compliance with the preliminary injunction as it relates to payments to Plaintiffs by April 25, 2025. Defendants' April 3, 2025, status report also states that they are engaged in a programmatic review of foreign assistance programs related to the obligation of appropriated foreign assistance funds and that the review will be complete by April 19, 2025. Defendants' status reports should continue to provide updates on these topics and any other updates related to compliance with the preliminary injunction. Signed by Judge Amir H. Ali on 4/11/2025. (lcaha2) Modified on 4/16/2025. (zalh) (Entered: 04/11/2025) |
| 04/11/2025 | | MINUTE ORDER. The Court will hold a status conference on May 6, 2025, at 2:30 p.m. in Courtroom 19. Signed by Judge Amir H. Ali on 4/11/2025. (lcaha2) (Entered: 04/11/2025) |
| 04/11/2025 | 79 | Unopposed MOTION for Extension of Time to *Respond to Motion for Indicative Ruling* by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Attachments: # 1 Text of Proposed Order)(Zieve, Allison) (Entered: 04/11/2025) |
| 04/14/2025 | | MINUTE ORDER. Plaintiffs' 79 unopposed motion for an extension of time is granted. Plaintiffs shall respond to Defendants' 78 motion for an indicative ruling by April 25, 2025. Defendants shall file any reply by May 2, 2025. Signed by Judge Amir H. Ali on 4/14/2025. (lcaha2) (Entered: 04/14/2025) |
| 04/17/2025 | 80 | STATUS REPORT *under Minute Order* by OFFICE OF MANAGEMENT & BUDGET, MARCO A. RUBIO, DONALD TRUMP, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, RUSSELL VOUGHT. (Sur, Indraneel) (Entered: 04/17/2025) |
| 04/22/2025 | 81 | MANDATE of USCA as to 36 Notice of Appeal to DC Circuit Court, filed by DONALD TRUMP, MARCO A. RUBIO, RUSSELL VOUGHT, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT & BUDGET, UNITED STATES DEPARTMENT OF STATE ; USCA Case Number 25–5046. (Attachments: # 1 USCA Order 2/26/2025)(mg) (Entered: 04/23/2025) |
| 04/24/2025 | 82 | STATUS REPORT *under Minute Order* by OFFICE OF MANAGEMENT & BUDGET, MARCO A. RUBIO, DONALD TRUMP, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, RUSSELL VOUGHT. (Sur, Indraneel) (Entered: 04/24/2025) |
| 04/25/2025 | 83 | Memorandum in opposition to re 78 Unopposed MOTION to Stay re 60 Memorandum & Opinion, *and Opposed Motion for Rule 62.1 Indicative Ruling* filed by AIDS VACCINE ADVOCACY COALITION, JOURNALISM DEVELOPMENT NETWORK, INC.. (Bateman, Lauren) (Entered: 04/25/2025) |

| | | |
|---|---|---|
| 04/29/2025 | 84 | Unopposed MOTION for Extension of Time to *respond to amended complaint* by OFFICE OF MANAGEMENT & BUDGET, MARCO A. RUBIO, DONALD TRUMP, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, RUSSELL VOUGHT. (Attachments: # 1 Text of Proposed Order)(Sur, Indraneel) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER. Defendants' 84 unopposed motion for an extension of time to respond to the expected amended complaint is granted. Defendants shall respond to the amended complaint by June 3, 2025. Signed by Judge Amir H. Ali on 4/29/2025. (lcaha2) (Entered: 04/29/2025) |
| 05/01/2025 | 85 | STATUS REPORT *under Minute Order* by OFFICE OF MANAGEMENT & BUDGET, MARCO A. RUBIO, DONALD TRUMP, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, RUSSELL VOUGHT. (Sur, Indraneel) (Entered: 05/01/2025) |
| 05/02/2025 | | MINUTE ORDER. The Court has scheduled a status conference for May 6, 2025, at 2:30 p.m. The parties should be prepared to discuss developments in the case since the preliminary injunction was issued. Each party will also be given an opportunity to make submissions on Defendants' 78 motion for an indicative ruling. Signed by Judge Amir H. Ali on 5/2/2025. (lcaha2) (Entered: 05/02/2025) |
| 05/02/2025 | 86 | AMENDED COMPLAINT against All Defendants filed by JOURNALISM DEVELOPMENT NETWORK, INC., AIDS VACCINE ADVOCACY COALITION, The Center for Victims of Torture.(Bateman, Lauren) (Entered: 05/02/2025) |
| 05/02/2025 | 87 | REPLY to opposition to motion re 78 Motion to Stay, filed by OFFICE OF MANAGEMENT & BUDGET, MARCO A. RUBIO, DONALD TRUMP, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, RUSSELL VOUGHT. (Sur, Indraneel) (Entered: 05/02/2025) |
| 05/04/2025 | 88 | NOTICE OF SUPPLEMENTAL AUTHORITY by OFFICE OF MANAGEMENT & BUDGET, MARCO A. RUBIO, DONALD TRUMP, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, RUSSELL VOUGHT (Attachments: # 1 Exhibit CADC No. 25−5144 Order (May 3, 2025))(Sur, Indraneel) (Entered: 05/04/2025) |
| 05/06/2025 | | MINUTE ORDER. A public access line will be provided for today's status conference and motion hearing. The information for the public access line is as follows: the toll−free number is 833−990−9400, and the Meeting ID is 771021014. Persons remotely accessing court proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. *See In re: Prohibition on Photographing, Recording, Broadcasting, and Livestreaming Judicial Proceedings*, Standing Order 24−31 (JEB) (Sept. 18, 2024). Signed by Judge Amir H. Ali on 5/6/2025. (lcaha2) (Entered: 05/06/2025) |
| 05/06/2025 | | Minute Entry for proceedings held before Judge Amir H. Ali: Motion Hearing held on 5/6/2025 re 78 Unopposed MOTION to Stay re 60 Memorandum & Opinion, *and Opposed Motion for Rule 62.1 Indicative Ruling*. Oral arguments heard. The Court takes the motion under advisement. (Court Reporter: Stacy Johns) (zalh) (Entered: 05/07/2025) |

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25–cv–00402–AHA

GLOBAL HEALTH COUNCIL et al v. DONALD J. TRUMP et al
Assigned to: Judge Amir H. Ali
Related Case: 1:25–cv–00400–AHA
Case in other court: USCA, 25–05047
USCA, 25–05097
Cause: 05:0706 Judicial Review of Agency Actions

Date Filed: 02/11/2025
Jury Demand: None
Nature of Suit: 899 Administrative Procedure Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**GLOBAL HEALTH COUNCIL**     represented by **Allison Gardner**
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington D.C., DC 20001–3743
202–942–5000
Email: allison.gardner@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Dana Kagan McGinley**
ARNOLD & PORTER
601 Massachusetts Ave. NW
Washington, DC 20001
202–942–6421
Email: Dana.KaganMcGinley@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Daniel F. Jacobson**
JACOBSON LAWYERS GROUP PLLC
1629 K Street NW
Suite 300
Washington, DC 20006
301–823–1148
Email: dan@jacobsonlawyersgroup.com
*ATTORNEY TO BE NOTICED*

**Daniel Reuben Yablon**
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
202–942–5009
Email: Daniel.Yablon@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**John Robinson**
JACOBSON LAWYERS GROUP
1629 K Street NW, Suite 300
Washington, DC 20006
301–823–1148
Email: john@jacobsonlawyersgroup.com
*ATTORNEY TO BE NOTICED*

**Sally Pei**
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001

(202) 942–5000
Fax: (202) 942–5999
Email: sally.pei@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Samuel M. Witten**
ARNOLD & PORTER
601 Massachusetts Avenue, NW
Washington, DC 20817
202–942–6115
Email: samuel.witten@apks.com
*ATTORNEY TO BE NOTICED*

**William Perdue**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave. NW
Washington, DC 20001
202–942–5685
Email: william.perdue@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave. NW
Washington, DC 20001
202–942–6739
Fax: 202–942–5999
Email: Stephen.Wirth@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES**

represented by

**Allison Gardner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dana Kagan McGinley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel F. Jacobson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Robinson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sally Pei**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel M. Witten**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Perdue**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HIAS**                                    represented by   **Allison Gardner**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Dana Kagan McGinley**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Daniel F. Jacobson**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **John Robinson**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **William Perdue**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Stephen K. Wirth**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**MANAGEMENT SCIENCES FOR**                 represented by   **Allison Gardner**
**HEALTH, INC.**                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Dana Kagan McGinley**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Daniel F. Jacobson**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Daniel Reuben Yablon**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **John Robinson**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Sally Pei**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Samuel M. Witten**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **William Perdue**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Stephen K. Wirth**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHEMONICS INTERNATIONAL, INC.**                 represented by  **Allison Gardner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dana Kagan McGinley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel F. Jacobson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Reuben Yablon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Robinson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sally Pei**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel M. Witten**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Perdue**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DAI GLOBAL LLC**                 represented by  **Allison Gardner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dana Kagan McGinley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel F. Jacobson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Reuben Yablon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Robinson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sally Pei**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel M. Witten**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Perdue**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**DEMOCRACY INTERNATIONAL, INC.**            represented by   **Allison Gardner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dana Kagan McGinley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel F. Jacobson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Reuben Yablon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Robinson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sally Pei**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel M. Witten**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Perdue**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**AMERICAN BAR ASSOCIATION**            represented by   **Allison Gardner**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dana Kagan McGinley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel F. Jacobson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Reuben Yablon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Robinson**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Sally Pei**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel M. Witten**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William Perdue**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DONALD J. TRUMP**
*in his official capacity as President of the United States of America*

represented by **Indraneel Sur**
U.S. DEPARTMENT OF JUSTICE
1100 L St. NW
Washington, DC 20530
202–616–8488
Email: Indraneel.Sur@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARCO RUBIO**
*in his official capacity as Secretary of State and Acting Administrator of the United States Agency for International Development*

represented by **Indraneel Sur**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**PETER MAROCCO**
*in his official capacity as Acting Deputy Administrator for Policy and Planning, Acting Deputy Administrator for Management and Resources of the United States Agency for International Development, and Director of Foreign Assistance at the Department of St*
*TERMINATED: 04/22/2025*

represented by **Indraneel Sur**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**RUSSELL T. VOUGHT**
*in his official capacity as Director of the Office of Management and Budget*

represented by **Indraneel Sur**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES DEPARTMENT OF STATE**

represented by **Indraneel Sur**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES AGENCY FOR**          represented by   **Indraneel Sur**
**INTERNATIONAL DEVELOPMENT**                          (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF MANAGEMENT AND**          represented by   **Indraneel Sur**
**BUDGET**                                             (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**JEREMY LEWIN**                      represented by   **Indraneel Sur**
*in his official capacity as Acting Director*          (See above for address)
*of Foreign Assistance at the United*                  *LEAD ATTORNEY*
*States Department of State and in his*                *ATTORNEY TO BE NOTICED*
*official capacity performing the duties of*
*the Deputy Administrator and Chief*
*Operating Officer of the United States*
*Agency for Int*

**Amicus**

**CONSTITUTIONAL**                    represented by   **Brianne Jenna Gorod**
**ACCOUNTABILITY CENTER**                              CONSTITUTIONAL
                                                       ACCOUNTABILITY CENTER
                                                       1200 18th Street, NW
                                                       Suite 501
                                                       Washington, DC 20036
                                                       (202) 296–6889 ext. 304
                                                       Email: brianne@theusconstitution.org
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Miriam Becker–Cohen**
                                                       CONSTITUTIONAL
                                                       ACCOUNTABILITY CENTER
                                                       1200 18th Street, NW
                                                       Suite 501
                                                       Washington, DC 20036
                                                       202–296–6889
                                                       Email: miriam@theusconstitution.org
                                                       *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/11/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC–11470798) filed by DAI GLOBAL LLC, HIAS, DEMOCRACY INTERNATIONAL, INC., SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, AMERICAN BAR ASSOCIATION, GLOBAL HEALTH COUNCIL, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC.. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons)(Wirth, Stephen) (Entered: 02/11/2025) |
| 02/11/2025 | 2 | NOTICE OF RELATED CASE by All Plaintiffs. Case related to Case No. 25–cv–400. (Wirth, Stephen) (Main Document 2 replaced on 2/11/2025) (znmw). (Entered: 02/11/2025) |
| 02/11/2025 | 3 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, MANAGEMENT SCIENCES FOR |

| | | |
|---|---|---|
| | | HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Wirth, Stephen) (Entered: 02/11/2025) |
| 02/11/2025 | 4 | MOTION for Temporary Restraining Order , MOTION for Preliminary Injunction by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Attachments: # 1 Text of Proposed Order)(Wirth, Stephen) (Entered: 02/11/2025) |
| 02/11/2025 | 5 | NOTICE of Appearance by Daniel Reuben Yablon on behalf of GLOBAL HEALTH COUNCIL, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Yablon, Daniel) (Entered: 02/11/2025) |
| 02/11/2025 | 6 | NOTICE of Appearance by Sally Pei on behalf of GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Pei, Sally) (Entered: 02/11/2025) |
| 02/11/2025 | 7 | DECLARATION by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION re 4 MOTION for Temporary Restraining Order MOTION for Preliminary Injunction . (Attachments: # 1 Declaration of Elisha Dunn–Georgiou, # 2 Declaration of Robert Nichols, # 3 Declaration of Mark Hetfield, # 4 Exhibit to Hetfield Decl., # 5 Declaration Marian Wentworth, # 6 Declaration of James Butcher, # 7 Declaration of Zan Northrip, # 8 Declaration of Eric Bjornlund, # 9 Declaration of Scott Carlson)(Wirth, Stephen) (Entered: 02/11/2025) |
| 02/11/2025 | | Case Assigned to Judge Loren L. AliKhan. (znmw) (Entered: 02/11/2025) |
| 02/11/2025 | 8 | SUMMONS (9) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(znmw) (Entered: 02/11/2025) |
| 02/11/2025 | 9 | NOTICE of Appearance by Samuel M. Witten on behalf of GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Witten, Samuel) (Entered: 02/11/2025) |
| 02/11/2025 | 10 | NOTICE of Appearance by Allison Gardner on behalf of GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Gardner, Allison) (Entered: 02/11/2025) |
| 02/11/2025 | 11 | ENTERED IN ERROR.....NOTICE of Appearance by William Perdue on behalf of GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Perdue, William) Modified on 2/11/2025 (znmw). (Entered: 02/11/2025) |
| 02/11/2025 | 12 | NOTICE of Appearance by Dana Kagan McGinley on behalf of GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Kagan McGinley, Dana) (Entered: 02/11/2025) |

| | | |
|---|---|---|
| 02/11/2025 | | NOTICE OF ERROR regarding 11 Notice of Appearance,. The following error(s) need correction: Attorney William Perdue is not an active member of this Court's bar; a Pro Hac Vice motion has not been filed in this case. (znmw) Modified on 2/11/2025 (znmw). (Entered: 02/11/2025) |
| 02/11/2025 | | RESOLVED.....NOTICE of Provisional Status re 12 NOTICE of Appearance by Dana Kagan McGinley on behalf of All Plaintiffs (Kagan McGinley, Dana). |
| | | Your attorney renewal has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney–renewal. |
| | | Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 2/18/2025. (znmw) Modified on 2/12/2025 (zhcn). (Entered: 02/11/2025) |
| 02/11/2025 | 13 | NOTICE OF RELATED CASE by All Defendants. Case related to Case No. 1:25–cv–352. (Edelman, Christopher) (Entered: 02/11/2025) |
| 02/11/2025 | 14 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– William Perdue, Filing fee $ 100, receipt number ADCDC–11472347. Fee Status: Fee Paid. by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Wirth, Stephen) (Entered: 02/11/2025) |
| 02/11/2025 | 15 | RESPONSE re 13 Notice of Related Case filed by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Wirth, Stephen) (Entered: 02/11/2025) |
| 02/11/2025 | | MINUTE ORDER: For the reasons stated in the court's order in *AIDS Vaccine Advocacy Coalition v. U.S. Department of State*, No. 25–CV–400, ECF No. 12, it is hereby ORDERED that the Clerk of Court shall TRANSFER this related matter to the Calendar and Case Management Committee. Signed by Judge Loren L. AliKhan on 02/11/2025. (lclla1) (Entered: 02/11/2025) |
| 02/11/2025 | | Case directly reassigned to Judge Amir H. Ali, as related, pursuant to Minute Order dated 2/11/2025. Judge Loren L. AliKhan is no longer assigned to the case. (ztnr) (Entered: 02/12/2025) |
| 02/12/2025 | 16 | NOTICE by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION re 4 Motion for TRO,, Motion for Preliminary Injunction, (Wirth, Stephen) (Entered: 02/12/2025) |
| 02/12/2025 | | MINUTE ORDER. The Court will hold a telephonic motion hearing in No. 25–cv–00400 and No. 25–cv–00402 on February 12, 2025, at 1:30 p.m. The information for the public access line is as follows: the toll–free number is 833–990–9400, and the Meeting ID is 771021014. Signed by Judge Amir H. Ali on 2/12/2025. (lcaha2) Modified on 2/12/2025. (zalh) (Entered: 02/12/2025) |
| 02/12/2025 | | Minute Entry for telephonic proceeding held before Judge Amir H. Ali: Motion Hearing held on 2/12/2025 re 4 Motion and Memorandum of Law in Support of Temporary Restraining Order and Preliminary Injunction. Oral arguments heard. The Court takes the motion under advisement. A written order is forthcoming via Chambers. The Court orders the parties to submit a proposed order by 4:30 PM today and the necessary documentation regarding any terminations by 7:00 PM today. (Court Reporter: William Zaremba) (zalh) (Entered: 02/12/2025) |

| 02/12/2025 | 17 | NOTICE *Related to February 12, 2025 Hearing* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D: Proposed Order)(Edelman, Christopher) (Entered: 02/12/2025) |
|---|---|---|
| 02/12/2025 | 18 | NOTICE *of Revised Proposed Order* by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION re Motion Hearing,, 4 Motion for TRO,, Motion for Preliminary Injunction, (Pei, Sally) (Entered: 02/12/2025) |
| 02/12/2025 | 19 | RESPONSE TO ORDER OF THE COURT re 2/12/2025 MINUTE Order by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Wirth, Stephen) Modified event on 2/13/2025 (mg). (Entered: 02/12/2025) |
| 02/12/2025 | 20 | NOTICE *of supplemental information* by UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT re 17 Notice (Other), (Attachments: # 1 Exhibit)(Sur, Indraneel) (Entered: 02/12/2025) |
| 02/13/2025 | 21 | ORDER granting in part and denying in part Plaintiffs' 4 Motion for a Temporary Restraining Order. Defendants shall file a status report by 2/18/2025. The parties shall file a joint status report by 2/14/2025 at 5:00 PM. See document for details. Signed by Judge Amir H. Ali on 2/13/2025. (lcaha2) Modified on 2/14/2025. (zalh) (Entered: 02/13/2025) |
| 02/14/2025 | 22 | TRANSCRIPT OF STATUS CONFERENCE – MOTIONS – TEMPORARY RESTRAINING ORDER VIA ZOOM TELECONFERENCE PROCEEDINGS before Judge Amir H. Ali held on February 12, 2025; Page Numbers: 1–74. Court Reporter/Transcriber: William Zaremba; Email: William_Zaremba@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/7/2025. Redacted Transcript Deadline set for 3/17/2025. Release of Transcript Restriction set for 5/15/2025.(Zaremba, William) (Entered: 02/14/2025) |
| 02/14/2025 | 23 | Joint STATUS REPORT by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Wirth, Stephen) (Entered: 02/14/2025) |
| 02/14/2025 | | MINUTE ORDER. The Court is in receipt of the parties' 23 joint status report proposing a briefing schedule. Defendants shall respond to Plaintiffs' 4 motion for preliminary relief by February 21, 2025. Plaintiffs shall reply by 12:00 p.m. on February 27, 2025. Signed by Judge Amir H. Ali on 2/14/2025. (lcaha2) (Entered: 02/14/2025) |

| Date | No. | Description |
|---|---|---|
| 02/18/2025 | 24 | NOTICE of Appearance by Indraneel Sur on behalf of All Defendants (Sur, Indraneel) (Entered: 02/18/2025) |
| 02/18/2025 | 25 | STATUS REPORT *regarding Compliance* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET. (Attachments: # 1 Exhibit USAID & State Decl, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit OMB Decl)(Sur, Indraneel) (Entered: 02/18/2025) |
| 02/19/2025 | 26 | Unopposed MOTION for Leave to File *Amicus Curiae Brief* by CONSTITUTIONAL ACCOUNTABILITY CENTER. (Attachments: # 1 Proposed Amicus Brief, # 2 Text of Proposed Order)(Gorod, Brianne) (Entered: 02/19/2025) |
| 02/19/2025 | 27 | NOTICE of Appearance by Miriam Becker–Cohen on behalf of CONSTITUTIONAL ACCOUNTABILITY CENTER (Becker–Cohen, Miriam) (Entered: 02/19/2025) |
| 02/20/2025 | 28 | ORDER. Plaintiffs' motion for contempt and to enforce the Court's temporary restraining order in No. 25–cv–00400 is granted in part and denied in part. See document for details. Signed by Judge Amir H. Ali on 2/20/2025. (lcaha2) (Entered: 02/20/2025) |
| 02/20/2025 | 29 | MOTION to Enforce *Temporary Restraining Order* by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Attachments: # 1 Declaration of Elisha Dunn–Georgiou, # 2 Declaration of Robert Nichols, # 3 Declaration of Rachel Levitan, # 4 Declaration of Marian Wentworth, # 5 Declaration James Butcher, # 6 Declaration Zan Northrip, # 7 Declaration Eric Bjornlund, # 8 Declaration Scott Carlson, # 9 Text of Proposed Order)(Wirth, Stephen) (Entered: 02/20/2025) |
| 02/20/2025 | 31 | RESPONSE re 25 Status Report, filed by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (See docket entry 29 to view document)(mg) (Entered: 02/21/2025) |
| 02/21/2025 | 30 | ERRATA by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION re 1 Complaint,.. (Attachments: # 1 Errata (Corrected Complaint))(Wirth, Stephen) (Entered: 02/21/2025) |
| 02/21/2025 | | MINUTE ORDER. The Court is in receipt of Plaintiffs' 29 motion to enforce the Court's temporary restraining order. Plaintiffs request that the Court order "the immediate payment of all funds owed and due to Plaintiffs and other USAID and State Department implementing partners." ECF No. 29 at 1. The motion is denied without prejudice as moot in light of the Court's order yesterday that Defendants are to "immediately cease [the blanket suspension of funds] and to take all necessary steps to honor the terms of contracts, grants, cooperative agreements, loans, and other federal foreign assistance awards that were in existence as of January 19, 2025, including but not limited to disbursing all funds payable under those terms." ECF No. 28 at 5.<br><br>The parties in this case and No. 25–cv–00400 shall meet and confer and file a consolidated joint status report by February 26, 2025, at 12:00 p.m., addressing Defendants' "prompt compliance with the order." Defendants' Br., *AIDS Vaccine*, ECF No. 28 at 8. Signed by Judge Amir H. Ali on 2/21/2025. (lcaha2) (Entered: 02/21/2025) |
| 02/21/2025 | 32 | STANDING ORDER. The parties are ordered to comply with the directives set forth in the attached standing order. See document for details. Signed by Judge Amir H. Ali on 2/21/2025. (lcaha2) (Entered: 02/21/2025) |

| | | |
|---|---|---|
| 02/21/2025 | 33 | MOTION to Clarify re 21 Order on Motion for TRO,, Set/Reset Deadlines, 28 Order , MOTION to Stay by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Sur, Indraneel) (Entered: 02/21/2025) |
| 02/21/2025 | 34 | Memorandum in opposition to re 4 Motion for TRO,, Motion for Preliminary Injunction, *combined with opposition in No.400* filed by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Sur, Indraneel) (Entered: 02/21/2025) |
| 02/22/2025 | 35 | ORDER. To the extent Defendants' 33 motion to clarify is not mooted by the discussion herein, it is denied, and Defendants' motion to stay the Court's TRO pending an emergency appeal is also denied. See document for details. Signed by Judge Amir H. Ali on 2/22/2025. (lcaha3) (Entered: 02/22/2025) |
| 02/24/2025 | 36 | Emergency MOTION to Enforce *Temporary Restraining Order* by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Attachments: # 1 Declaration of Eric Bjornlund, # 2 Declaration of Zan Northrip, # 3 Declaration of Phillip Green, # 4 Declaration of Elisabeth Sigler, # 5 Text of Proposed Order)(Wirth, Stephen) (Entered: 02/24/2025) |
| 02/24/2025 | | MINUTE ORDER. The Court is in receipt of Plaintiffs' 36 emergency motion to enforce. The Court will hold a telephonic motion hearing on February 25, 2025, at 11:00 a.m. The information for the public access line is as follows: the toll–free number is 833–990–9400, and the Meeting ID is 771021014. Signed by Judge Amir H. Ali on 2/24/2025. (lcaha1) Modified on 2/25/2025. (zalh) (Entered: 02/24/2025) |
| 02/25/2025 | 37 | TRANSCRIPT OF MOTION HEARING before Judge Amir H. Ali held on February 25, 2025; Page Numbers: 1–60. Date of Issuance: 2/25/2025. Court Reporter: Bryan A. Wayne. Transcripts may be ordered by submitting the Transcript Order Form <br><br> For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. <br><br> Redaction Request due 3/18/2025. Redacted Transcript Deadline set for 3/28/2025. Release of Transcript Restriction set for 5/26/2025.(Wayne, Bryan) (Entered: 02/25/2025) |
| 02/25/2025 | | Minute Entry and Order for proceedings held via Zoom before Judge Amir H. Ali: Motion Hearing held on 2/25/2025 re 36 Emergency MOTION to Enforce *Temporary Restraining Order* filed by GLOBAL HEALTH COUNCIL, DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, CHEMONICS INTERNATIONAL, INC., MANAGEMENT SCIENCES FOR HEALTH, INC., HIAS. Oral arguments HEARD, motion GRANTED for the reasons stated on the record. The restrained defendants are ordered to comply as discussed by 11:59 p.m. on February 26, 2025. (Court Reporter Bryan Wayne) (znbn) (Entered: 02/25/2025) |

| 02/25/2025 | 38 | NOTICE OF INTERLOCUTORY APPEAL TO DC CIRCUIT COURT as to Order on Motion to Enforce,,, Motion Hearing,, by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. Fee Status: No Fee Paid. Parties have been notified. (Sur, Indraneel) Modified event on 2/26/2025 (mg). (Entered: 02/25/2025) |
|---|---|---|
| 02/25/2025 | 39 | MOTION to Stay re Order on Motion to Enforce,,, Motion Hearing,, by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Attachments: # 1 Declaration)(Sur, Indraneel) (Entered: 02/25/2025) |
| 02/25/2025 | | USCA Case Number 25–5047 for 38 Notice of Appeal to DC Circuit Court, filed by RUSSELL T. VOUGHT, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, PETER MAROCCO, DONALD J. TRUMP, MARCO RUBIO, UNITED STATES DEPARTMENT OF STATE. (mg) (Entered: 02/26/2025) |
| 02/26/2025 | 40 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 38 Notice of Appeal to DC Circuit Court,. (mg) (Entered: 02/26/2025) |
| 02/26/2025 | 41 | ORDER denying Defendants' 39 motion to stay. See document for details. Defendants shall promptly file notice of this order with the Court of Appeals. Signed by Judge Amir H. Ali on 2/26/2025. (lcaha2) (Entered: 02/26/2025) |
| 02/26/2025 | 42 | Joint STATUS REPORT by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Attachments: # 1 Declaration of Zahra Doe, # 2 Declaration of Della Doe, # 3 Declaration of Ellie Doe, # 4 Declaration of Clara Doe, # 5 Declaration of Sandra Doe)(Wirth, Stephen) (Entered: 02/26/2025) |
| 02/26/2025 | 43 | LARGE ADDITIONAL ATTACHMENT(S) *Defense Exhibits A and B* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP 42 Status Report, filed by GLOBAL HEALTH COUNCIL, DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, CHEMONICS INTERNATIONAL, INC., MANAGEMENT SCIENCES FOR HEALTH, INC., HIAS. (Attachments: # 1 Declaration)(Sur, Indraneel) (Entered: 02/26/2025) |
| 02/26/2025 | 44 | LARGE ADDITIONAL ATTACHMENT(S) *Defense Exhibit C* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP 43 Large Additional Attachment(s),, filed by RUSSELL T. VOUGHT, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP, MARCO RUBIO, UNITED STATES DEPARTMENT OF STATE. (Sur, Indraneel) (Entered: 02/26/2025) |
| 02/26/2025 | 45 | NOTICE *by Defense in Clarification* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP re 42 Status Report, (Sur, Indraneel) (Entered: 02/26/2025) |
| 02/27/2025 | 46 | REPLY to opposition to motion re 4 Motion for TRO,, Motion for Preliminary Injunction, filed by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT |

| | | |
|---|---|---|
| | | SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Attachments: # 1 Declaration of Can Varol, # 2 Declaration of James Butcher, # 3 Declaration of Jane Doe, # 4 Declaration of Jessica Doe, # 5 Declaration of Jocelyn Doe, # 6 Text of Proposed Order)(Wirth, Stephen) (Entered: 02/27/2025) |
| 03/03/2025 | 47 | MOTION for Leave to File *Supplement to the Record* by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Attachments: # 1 Declaration of Nicholas Enrich, # 2 Exhibit (OMB Budget Data Request No. 25–08), # 3 Text of Proposed Order)(Wirth, Stephen) (Entered: 03/03/2025) |
| 03/03/2025 | | MINUTE ORDER. The Court's hearing on preliminary injunction motions in this case and No. 25–cv–00400, planned for March 4, 2025, will be held on March 6, 2025, at 2:00 p.m. in Courtroom 19– In Person before Judge Amir H. Ali. The Court will consider the parties' arguments and issue an opinion thereafter with full dispatch. The expiration date for the Court's temporary restraining order remains 11:59 p.m. on March 10, 2025, or the date the Court resolves the preliminary injunction motions, whichever is sooner. Signed by Judge Amir H. Ali on 3/3/2025. (lcaha2) Modified on 3/4/2025. (zalh) (Entered: 03/03/2025) |
| 03/03/2025 | 48 | MOTION for Leave to File *Partially Opposed Surreply* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Attachments: # 1 Proposed Surreply, # 2 Declaration, # 3 Text of Proposed Order)(Sur, Indraneel) (Entered: 03/03/2025) |
| 03/05/2025 | | MINUTE ORDER. The parties shall meet and confer and file a joint status report by 11:00 a.m. tomorrow proposing a schedule for Defendants to come into compliance with the Court's temporary restraining order ("TRO") and the Court's February 25, 2025, order enforcing the TRO. The joint status report need not address compliance with the February 25, 2025, order for the period that the order was subject to administrative stay; however, it should address steps taken during all other periods up until the filing of the joint status report and include specificity with respect to milestones and timelines for Defendants coming into compliance thereafter. The parties' proposed schedule should account for the length of time that has passed since the TRO was entered and the feasibility of any compliance timelines.

At the preliminary injunction hearing tomorrow, the parties should be prepared to address the substantive arguments at issue in the preliminary injunction motions. The Court will hear argument from all parties; however, Plaintiffs in the two cases are encouraged to coordinate to avoid duplicative arguments and will be given the opportunity to propose a division of the issues between counsel. The parties should also be prepared to discuss the steps Defendants have taken to come into compliance with the Court's orders, including any further steps that were executed following the parties' joint status report, as well as the parties' proposed schedule for Defendants coming into compliance. Signed by Judge Amir H. Ali on 3/5/2025. (lcaha2) (Entered: 03/05/2025) |
| 03/05/2025 | | MINUTE ORDER. A public access line will be provided for tomorrow's preliminary injunction hearing. The information for the public access line is as follows: the toll–free number is 833–990–9400, and the Meeting ID is 771021014. Persons remotely accessing court proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. *See In re: Prohibition on Photographing, Recording, Broadcasting, and Livestreaming Judicial Proceedings*, Standing Order 24–31 (JEB) (Sept. 18, 2024). Signed by Judge Amir H. Ali on 3/5/2025. (lcaha2) (Entered: 03/05/2025) |
| 03/05/2025 | 49 | Consent MOTION for Leave to File *Response to Plaintiffs' Supplemental Materials* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. |

| | | |
|---|---|---|
| | | TRUMP. (Attachments: # 1 Response to Plaintiffs' Supplemental Materials, # 2 Text of Proposed Order)(Sur, Indraneel) (Entered: 03/05/2025) |
| 03/06/2025 | 50 | Joint STATUS REPORT by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Wirth, Stephen) (Entered: 03/06/2025) |
| 03/06/2025 | 51 | NOTICE OF SUPPLEMENTAL AUTHORITY by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP (Sur, Indraneel) (Entered: 03/06/2025) |
| 03/06/2025 | | Minute Entry for proceedings held before Judge Amir H. Ali: Motion Hearing held on 3/6/2025. Oral arguments on preliminary injunction motions heard. (Court Reporter Sonja Reeves) (znbn) (Entered: 03/06/2025) |
| 03/07/2025 | 52 | NOTICE *regarding Court inquiry of March 6, 2025* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP re 50 Status Report, (Sur, Indraneel) (Entered: 03/07/2025) |
| 03/07/2025 | 53 | NOTICE *responding to Court's request for information regarding Plaintiffs' and Plaintiffs' members' invoices* by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION re Status Conference (Pei, Sally) (Entered: 03/07/2025) |
| 03/07/2025 | | MINUTE ORDER. As discussed at yesterday's hearing, the Court believes it would be helpful to have additional information to serve as benchmarks in assessing feasibility in reaching compliance with the TRO. These benchmarks will allow the Court to continue to provide clarity as to what is needed for compliance with the TRO, while ensuring that due regard is given to feasibility. As the parties discussed, such benchmarks would also be pertinent to the Court's consideration of any relief to be granted in a preliminary injunction. The Court is in receipt of Defendants' 52 notice stating that they are not currently able to provide information regarding the number of payments processed for Plaintiffs as it relates to Defendants' paragraph 10 in the parties' 50 joint status report, and may need until noon on Monday to provide this information. If Plaintiffs can offer any information or estimate as to how many outstanding invoices were processed in the period described, they should provide that information to the Court as soon as possible.<br><br>Furthermore, in the interest of facilitating the Court's ruling with respect to enabling letter of credit drawdown and reimbursement requests for Plaintiffs and their members, the parties shall confer and file a brief joint status report by 5:00 p.m. today addressing whether such requests have been enabled and, if not, the agreed upon timeline for doing so. Signed by Judge Amir H. Ali on 3/7/2025. (lcaha2) (Entered: 03/07/2025) |
| 03/07/2025 | 54 | STATUS REPORT *in response to Order of March 7, 2025* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Sur, Indraneel) (Entered: 03/07/2025) |
| 03/08/2025 | 55 | Unopposed MOTION for Leave to File *Supplemental Declaration* by GLOBAL HEALTH COUNCIL, SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., AMERICAN BAR ASSOCIATION. (Attachments: # 1 Declaration of Vladimir Gurin, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10)(Wirth, Stephen) (Entered: 03/08/2025) |

| 03/09/2025 | 56 | Consent MOTION for Leave to File *response to supplemental matter* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Attachments: # 1 Proposed Response, # 2 Text of Proposed Order)(Sur, Indraneel) (Entered: 03/09/2025) |
|---|---|---|
| 03/09/2025 | 57 | NOTICE *of supplemental material* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP re 44 Large Additional Attachment(s),, (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Sur, Indraneel) (Entered: 03/09/2025) |
| 03/10/2025 | 58 | TRANSCRIPT OF MOTION HEARING, ORAL ARGUMENT ON PRELIMINARY INJUNCTION, before Judge Amir H. Ali held on March 6, 2025; Page Numbers: 1–176. Date of Issuance:March 7, 2025. Court Reporter/Transcriber Sonja L. Reeves, RDR, CRR, Telephone number (202) 354–3246, Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 3/31/2025. Redacted Transcript Deadline set for 4/10/2025. Release of Transcript Restriction set for 6/8/2025.(Reeves, Sonja) (Entered: 03/10/2025) |
| 03/10/2025 | 59 | NOTICE of Supplemental Authority *regarding ruling in 25–cv–469* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP re 51 NOTICE OF SUPPLEMENTAL AUTHORITY (Attachments: # 1 Exhibit)(Sur, Indraneel) Modified event title on 3/11/2025 (znmw). (Entered: 03/10/2025) |
| 03/10/2025 | | MINUTE ORDER. The Constitutional Accountability Center's 26 motion for leave to file an amicus curiae brief; Plaintiffs' 47 55 motions for leave to supplement the record; Defendants' 48 motion for leave to file a sur–reply; and Defendants' 49 56 motions for leave to respond to Plaintiffs' supplemental materials are granted. Signed by Judge Amir H. Ali on 3/10/2025. (lcaha3) (Entered: 03/10/2025) |
| 03/10/2025 | 60 | MEMORANDUM OPINION AND ORDER. Plaintiffs' 4 motion for a preliminary injunction is granted in part and denied in part. See document for details. The parties shall file a joint status report by March 14, 2025, that apprises the Court of Defendants' compliance with this order and proposes a schedule for next steps in this matter. Signed by Judge Amir H. Ali on 3/10/2025. (lcaha2) (Entered: 03/10/2025) |
| 03/11/2025 | | Set/Reset Deadlines: Joint Status Report due by 3/14/2025. (zalh) (Entered: 03/11/2025) |
| 03/14/2025 | 61 | Joint STATUS REPORT *under Order of March 10, 2025* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Sur, Indraneel) (Entered: 03/14/2025) |
| 03/17/2025 | 62 | LEAVE TO FILE DENIED– Robert Heghmann's Petition. This document is unavailable as the Court denied its filing. Pro Se party has been notified by first class |

| | | |
|---|---|---|
| | | mail. "LEAVE TO FILE DENIED." Signed by Judge Amir H. Ali on 3/17/2025. (mg) (Entered: 03/17/2025) |
| 03/17/2025 | | MINUTE ORDER. The Court is in receipt of the parties' 61 joint status report. The Court's March 10, 2025, preliminary injunction adopted a feasibility benchmark of approximately 300 payments per day. By March 19, 2025, Defendants shall submit a status report which includes the updated total number of payments for work completed prior to February 13, 2025 (1) which have been processed since March 10 for Plaintiffs; (2) which have been processed since March 10 for non–Plaintiffs; and (3) which remain to be processed for Plaintiffs and non–Plaintiffs. Defendants' status report shall include a proposed timeline for processing the remaining payments that is consistent with the Court's benchmark. Signed by Judge Amir H. Ali on 3/17/2025. (lcaha2) (Entered: 03/17/2025) |
| 03/19/2025 | 63 | STATUS REPORT *under Order of March 17, 2025* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Sur, Indraneel) (Entered: 03/19/2025) |
| 03/24/2025 | | MINUTE ORDER. The Court is in receipt of Defendants' 63 status report. Defendants propose to submit another status report by March 27, 2025. Defendants shall file another status report by March 27, 2025, which includes the same information as directed in the Court's March 17, 2025, minute order, and every seven days thereafter until otherwise ordered by the Court. Signed by Judge Amir H. Ali on 3/24/2025. (lcaha2) (Entered: 03/24/2025) |
| 03/27/2025 | 64 | STATUS REPORT *respecting Order of March 24, 2025* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Sur, Indraneel) (Entered: 03/27/2025) |
| 03/28/2025 | | MINUTE ORDER. The Court is in receipt of Defendants' 64 status report. Defendants' proposed timeline appears consistent with the Court's feasibility benchmark with respect to work completed prior to February 13, 2025. To the extent the parties have outstanding disputes regarding Defendants' compliance, or further information required from Plaintiffs in order for Defendants to meaningfully comply, as it relates to terminations, suspensions, or stop–work orders issued between January 20, 2025, and February 13, 2025, the parties shall meet and confer and attempt to resolve such issues.

In their next status report, Defendants shall also include (1) the steps they have taken to date to comply with the preliminary injunction's directive that Defendants "are enjoined from unlawfully impounding congressionally appropriated foreign aid funds and shall make available the full amount of funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024," and (2) any next steps necessary to come into compliance with that aspect of the Court's preliminary injunction. Signed by Judge Amir H. Ali on 3/28/2025. (lcaha2) (Entered: 03/28/2025) |
| 04/01/2025 | 65 | NOTICE OF INTERLOCUTORY APPEAL TO DC CIRCUIT COURT as to 60 Memorandum & Opinion, by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. Fee Status: No Fee Paid. Parties have been notified. (Sur, Indraneel) Modified event on 4/2/2025 (mg). (Entered: 04/01/2025) |
| 04/02/2025 | 66 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 65 Notice of Appeal to DC Circuit Court,. (mg) (Entered: 04/02/2025) |
| 04/02/2025 | | USCA Case Number 25–5097 for 65 Notice of Appeal to DC Circuit Court, filed by RUSSELL T. VOUGHT, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, PETER |

| | | |
|---|---|---|
| | | MAROCCO, DONALD J. TRUMP, MARCO RUBIO, UNITED STATES DEPARTMENT OF STATE. (mg) (Entered: 04/02/2025) |
| 04/03/2025 | 67 | STATUS REPORT *under Order of March 28, 2025* by MARCO RUBIO, PETER MAROCCO, RUSSELL T. VOUGHT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, DONALD J. TRUMP. (Sur, Indraneel) (Entered: 04/03/2025) |
| 04/05/2025 | 68 | NOTICE of Appearance by Daniel F. Jacobson on behalf of All Plaintiffs (Jacobson, Daniel) (Entered: 04/05/2025) |
| 04/10/2025 | 69 | STATUS REPORT *under Minute Order* by DONALD J. TRUMP, MARCO RUBIO, PETER MAROCCO, OFFICE OF MANAGEMENT AND BUDGET, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, RUSSELL T. VOUGHT. (Sur, Indraneel) (Entered: 04/10/2025) |
| 04/11/2025 | 70 | Unopposed MOTION to Stay re 60 Memorandum & Opinion, *and Opposed Motion for Rule 62.1 Indicative Ruling* by DONALD J. TRUMP, MARCO RUBIO, PETER MAROCCO, OFFICE OF MANAGEMENT AND BUDGET, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, RUSSELL T. VOUGHT. (Attachments: # 1 Text of Proposed Order Prp Order re Unopposed Stay Mot Pending Decision on Rule 62.1 Mot)(Sur, Indraneel) (Entered: 04/11/2025) |
| 04/11/2025 | | MINUTE ORDER. Defendants' 70 unopposed motion for a partial administrative stay of this Court's March 10, 2025, preliminary injunction is granted. Pending this Court's ruling on Defendants' 70 motion for an indicative ruling, the preliminary injunction's requirement that "the Restrained Defendants shall not withhold payments or letter of credit drawdowns for work completed prior to February 13, 2025," as to "any grants, cooperative agreements, or contracts for foreign assistance" is stayed except as it relates to Plaintiffs in No. 25–cv–00400 and No. 25–cv–00402. Plaintiffs shall respond to Defendants' motion for an indicative ruling by April 16, 2025. Defendants shall file any reply by April 18, 2025.<br><br>Defendants' April 10, 2025, status report states that they expect to be in full compliance with the preliminary injunction as it relates to payments to Plaintiffs by April 25, 2025. Defendants' April 3, 2025, status report also states that they are engaged in a programmatic review of foreign assistance programs related to the obligation of appropriated foreign assistance funds and that the review will be complete by April 19, 2025. Defendants' status reports should continue to provide updates on these topics and any other updates related to compliance with the preliminary injunction. Signed by Judge Amir H. Ali on 4/11/2025. (lcaha2) Modified on 4/16/2025. (zalh) (Entered: 04/11/2025) |
| 04/11/2025 | | MINUTE ORDER. The Court will hold a status conference on May 6, 2025, at 2:30 p.m. in Courtroom 19. Signed by Judge Amir H. Ali on 4/11/2025. (lcaha2) (Entered: 04/11/2025) |
| 04/14/2025 | | MINUTE ORDER. The briefing schedule for Defendants' 70 motion for an indicative ruling is amended as follows: Plaintiffs shall respond to Defendants' motion by April 25, 2025. Defendants shall file any reply by May 2, 2025. Signed by Judge Amir H. Ali on 4/14/2025. (lcaha2) (Entered: 04/14/2025) |
| 04/17/2025 | 71 | NOTICE of Appearance by John Robinson on behalf of All Plaintiffs (Robinson, John) (Entered: 04/17/2025) |
| 04/17/2025 | 72 | STATUS REPORT *under Minute Order* by DONALD J. TRUMP, MARCO RUBIO, PETER MAROCCO, OFFICE OF MANAGEMENT AND BUDGET, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, RUSSELL T. VOUGHT. (Sur, Indraneel) (Entered: 04/17/2025) |
| 04/22/2025 | 73 | AMENDED COMPLAINT *OF GLOBAL HEALTH COUNCIL PLAINTIFFS* against All Defendants filed by DEMOCRACY INTERNATIONAL, INC., SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES, GLOBAL |

| | | |
|---|---|---|
| | | HEALTH COUNCIL, CONSTITUTIONAL ACCOUNTABILITY CENTER, DAI GLOBAL LLC, HIAS, AMERICAN BAR ASSOCIATION, MANAGEMENT SCIENCES FOR HEALTH, INC., CHEMONICS INTERNATIONAL, INC..(Jacobson, Daniel) (Entered: 04/22/2025) |
| 04/22/2025 | 74 | MANDATE of USCA as to 38 Notice of Appeal to DC Circuit Court, filed by RUSSELL T. VOUGHT, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF MANAGEMENT AND BUDGET, PETER MAROCCO, DONALD J. TRUMP, MARCO RUBIO, UNITED STATES DEPARTMENT OF STATE ; USCA Case Number 25–5047. (Attachments: # 1 USCA Order 2/26/2025)(mg) (Entered: 04/23/2025) |
| 04/24/2025 | 75 | STATUS REPORT *under Minute Order* by DONALD J. TRUMP, JEREMY LEWIN, MARCO RUBIO, OFFICE OF MANAGEMENT AND BUDGET, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, RUSSELL T. VOUGHT. (Sur, Indraneel) (Entered: 04/24/2025) |
| 04/25/2025 | 76 | ENTERED IN ERROR.....Memorandum in opposition to re 70 Unopposed MOTION to Stay re 60 Memorandum & Opinion, *and Opposed Motion for Rule 62.1 Indicative Ruling* filed by AMERICAN BAR ASSOCIATION, CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., GLOBAL HEALTH COUNCIL, MANAGEMENT SCIENCES FOR HEALTH, INC., SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES. (Jacobson, Daniel) Modified on 4/29/2025, refiled at docket entry 77 (mg). (Entered: 04/25/2025) |
| 04/25/2025 | 77 | Memorandum in opposition to re 70 Unopposed MOTION to Stay re 60 Memorandum & Opinion, *and Opposed Motion for Rule 62.1 Indicative Ruling* filed by AMERICAN BAR ASSOCIATION, CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., GLOBAL HEALTH COUNCIL, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES. (Jacobson, Daniel) (Entered: 04/25/2025) |
| 04/29/2025 | 78 | Unopposed MOTION for Extension of Time to *respond to amended complaint* by DONALD J. TRUMP, JEREMY LEWIN, MARCO RUBIO, PETER MAROCCO, OFFICE OF MANAGEMENT AND BUDGET, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, RUSSELL T. VOUGHT. (Attachments: # 1 Text of Proposed Order)(Sur, Indraneel) (Entered: 04/29/2025) |
| 04/29/2025 | | MINUTE ORDER. Defendants' 78 unopposed motion for an extension of time to respond to the amended complaint is granted. Defendants shall respond to the amended complaint by June 3, 2025. Signed by Judge Amir H. Ali on 4/29/2025. (lcaha2) (Entered: 04/29/2025) |
| 05/01/2025 | 79 | STATUS REPORT *under Minute Order* by DONALD J. TRUMP, JEREMY LEWIN, MARCO RUBIO, OFFICE OF MANAGEMENT AND BUDGET, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, RUSSELL T. VOUGHT. (Sur, Indraneel) (Entered: 05/01/2025) |
| 05/02/2025 | | MINUTE ORDER. The Court has scheduled a status conference for May 6, 2025, at 2:30 p.m. The parties should be prepared to discuss developments in the case since the preliminary injunction was issued. Each party will also be given an opportunity to make submissions on Defendants' 70 motion for an indicative ruling. Signed by Judge Amir H. Ali on 5/2/2025. (lcaha2) (Entered: 05/02/2025) |
| 05/02/2025 | 80 | REPLY to opposition to motion re 70 Motion to Stay, filed by DONALD J. TRUMP, JEREMY LEWIN, MARCO RUBIO, PETER MAROCCO, OFFICE OF MANAGEMENT AND BUDGET, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, RUSSELL T. VOUGHT. (Sur, Indraneel) (Entered: 05/02/2025) |
| 05/04/2025 | 81 | NOTICE OF SUPPLEMENTAL AUTHORITY by DONALD J. TRUMP, JEREMY LEWIN, MARCO RUBIO, OFFICE OF MANAGEMENT AND BUDGET, UNITED |

| | | |
|---|---|---|
| | | STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, RUSSELL T. VOUGHT (Attachments: # 1 Exhibit CADC No. 25–5144 Order (May 3, 2025))(Sur, Indraneel) (Entered: 05/04/2025) |
| 05/05/2025 | 82 | RESPONSE re 79 Status Report filed by AMERICAN BAR ASSOCIATION, CHEMONICS INTERNATIONAL, INC., DAI GLOBAL LLC, DEMOCRACY INTERNATIONAL, INC., GLOBAL HEALTH COUNCIL, HIAS, MANAGEMENT SCIENCES FOR HEALTH, INC., SMALL BUSINESS ASSOCIATION FOR INTERNATIONAL COMPANIES. (Attachments: # 1 Exhibit A – Email Chain, # 2 Exhibit B – DOGE, # 3 Exhibit C – USAID KEA Transition Guidance)(Jacobson, Daniel) (Entered: 05/05/2025) |
| 05/06/2025 | | MINUTE ORDER. A public access line will be provided for today's status conference and motion hearing. The information for the public access line is as follows: the toll–free number is 833–990–9400, and the Meeting ID is 771021014. Persons remotely accessing court proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. *See In re: Prohibition on Photographing, Recording, Broadcasting, and Livestreaming Judicial Proceedings*, Standing Order 24–31 (JEB) (Sept. 18, 2024). Signed by Judge Amir H. Ali on 5/6/2025. (lcaha2) (Entered: 05/06/2025) |
| 05/06/2025 | | Minute Entry for proceedings held before Judge Amir H. Ali: Motion Hearing held on 5/6/2025 re 70 Unopposed MOTION to Stay re 60 Memorandum & Opinion, *and Opposed Motion for Rule 62.1 Indicative Ruling*. Oral arguments heard. The Court takes the motion under advisement. (Court Reporter: Stacy Johns) (zalh) (Entered: 05/07/2025) |
| 05/07/2025 | 83 | NOTICE of Appearance by William Perdue on behalf of All Plaintiffs (Perdue, William) (Entered: 05/07/2025) |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

AIDS VACCINE ADVOCACY
COALITION, *et al.*,

        *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
STATE, *et al.*,

        *Defendants*.

Civil Action No. 25-00400 (AHA)

---

GLOBAL HEALTH COUNCIL, *et al.*,

        *Plaintiffs*,

    v.

DONALD J. TRUMP, *et al.*,

        *Defendants*.

Civil Action No. 25-00402 (AHA)

---

### Memorandum Opinion and Order

      The provision and administration of foreign aid has been a joint enterprise between our two

political branches. That partnership is built not out of convenience, but of constitutional necessity.

It reflects Congress and the Executive's "firmly established," shared constitutional responsibilities

over foreign policy, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 62 (2015) (Roberts, C.J.,

dissenting), and it reflects the division of authorities dictated by the Constitution as it relates to the

appropriation of funds and executing on those appropriations. Congress, exercising its exclusive

Article I power of the purse, appropriates funds to be spent toward specific foreign policy aims.

The President, exercising a more general Article II power, decides how to spend those funds in

faithful execution of the law. And so foreign aid has proceeded over the years.

This case involves a departure from that firmly established constitutional partnership. Here, the Executive has unilaterally deemed that funds Congress appropriated for foreign aid will not be spent. The Executive not only claims his constitutional authority to determine *how* to spend appropriated funds, but usurps Congress's exclusive authority to dictate *whether* the funds should be spent in the first place. In advancing this position, Defendants offer an unbridled view of Executive power that the Supreme Court has consistently rejected—a view that flouts multiple statutes whose constitutionality is not in question, as well as the standards of the Administrative Procedure Act ("APA"). Asserting this "vast and generally unreviewable" Executive power and diminution of Congressional power, Defendants do not cite any provision of Article I or Article II of the Constitution. *See generally Glob. Health*, ECF No. 34.

When courts have confronted Executive overreach of the foreign policy power in the past, they have stood prepared to reaffirm Congress's role. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–89 (1952); *Zivotofsky*, 576 U.S. at 62 (Roberts, C.J., dissenting) ("For our first 225 years, no President prevailed when contradicting a statute in the field of foreign affairs."). So too they have stood firm when the Executive treads on Congress's spending power. *See In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.) (granting mandamus). Three Justices aptly captured the import to our nation's founding: "Before this country declared independence, the law of England entrusted the King with the exclusive care of his kingdom's foreign affairs." *Zivotofsky*, 576 U.S. at 67 (Scalia, J., joined by Roberts, C.J., and Alito, J., dissenting). But "[t]he People of the United States had other ideas." *Id.* The People "considered a sound structure of balanced powers essential to the preservation of just government, and international relations formed no exception to that principle." *Id.* They "adopted a Constitution that divides responsibility for the Nation's foreign concerns between the legislative and executive departments." *Id.*

Today, this Court reaffirms these firmly established principles of our Constitution. At the same time, however, the Court is mindful of limitations on its own authority. While Congress has directed courts to "hold unlawful and set aside" certain agency action, 5 U.S.C. § 706(2), and the Supreme Court has admonished that the "duty of the judicial department to say what the law is" includes resolving disputes between Congress and the President over foreign policy power, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)), courts remain constrained in the relief they can offer. The Court must be careful that any relief it grants does not itself intrude on the prerogative of a coordinate branch. The Court accordingly denies Plaintiffs' proposed relief that would unnecessarily entangle the Court in supervision of discrete or ongoing Executive decisions, as well as relief that goes beyond what their claims allow. For the reasons herein, the Court grants in part and denies in part Plaintiffs' motions for a preliminary injunction.

## I.  Background

### A.  The Political Branches' Joint Framework For The Provision And Administration Of Foreign Aid

The general framework for foreign aid relevant here began with Congress's enactment of the Foreign Assistance Act of 1961 ("FAA"), Pub. L. No. 87-195, 75 Stat. 424 (codified as amended at 22 U.S.C. § 2151 *et seq.*). In the FAA, Congress sets forth principles to guide U.S. foreign policy as it relates to foreign aid. Congress "reaffirms the traditional humanitarian ideals of the American people and renews its commitment to assist people in developing countries to eliminate hunger, poverty, illness, and ignorance." 22 U.S.C. § 2151(a). The act further declares that "a principal objective of the foreign policy of the United States is the encouragement and sustained support of the people of developing countries in their efforts to acquire the knowledge and resources essential to development and to build the economic, political, and social institutions

which will improve the quality of their lives." *Id.* Congress also sets forth specific priorities for such foreign assistance: "(1) the alleviation of the worst physical manifestations of poverty among the world's poor majority; (2) the promotion of conditions enabling developing countries to achieve self-sustaining economic growth with equitable distribution of benefits; (3) the encouragement of development processes in which individual civil and economic rights are respected and enhanced; (4) the integration of the developing countries into an open and equitable international economic system; and (5) the promotion of good governance through combating corruption and improving transparency and accountability." *Id.* Congress declares that "pursuit of these goals requires that development concerns be fully reflected in United States foreign policy and that United States development resources be effectively and efficiently utilized." *Id.*

In addition to setting forth these principles and priorities, the FAA explicitly recognizes and authorizes the President's role in administering aid allocated toward those ends. With respect to various areas in which aid is to be targeted, such as health programs, economic development, anticrime efforts, military education, and peacekeeping, Congress authorizes the President "to furnish assistance" "on such terms and conditions as he may determine." *See, e.g.*, *id.* §§ 2151b(c)(1), 2291(a)(1)(G)(4), 2346(a), 2347(a), 2348.

The FAA led to the creation of the United States Agency for International Development ("USAID"), first by executive order, *see* Exec. Order No. 10973, 26 Fed. Reg. 10469 (Nov. 3, 1961), and more than thirty years later enshrined by legislation in the Foreign Affairs Reform and Restructuring Act of 1998, *see* 22 U.S.C. § 6563. In the years since, Congress has regularly appropriated foreign assistance funds to USAID for specific purposes, including "[f]or necessary expenses to enable the President to carry out the provisions of the Foreign Assistance Act of 1961." Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 740. For

example, the appropriations act provides: "For necessary expenses to carry out the provisions of chapters 1 and 10 of part I of the Foreign Assistance Act of 1961, for global health activities, in addition to funds otherwise available for such purposes, $3,985,450,000, to remain available until September 30, 2025, and which shall be apportioned directly to the United States Agency for International Development," and it further specifies the global health issues that amount is to be spent on. *Id.* The act appropriates other funds "directly to the Department of State" to be spent on specific issues, such as "the prevention, treatment, and control of, and research on, HIV/AIDS." *Id.* at 742; *see also, e.g.*, *id.* at 743 (appropriating funds to the State Department "[f]or necessary expenses to carry out the provisions of the Foreign Assistance Act of 1961 for the promotion of democracy globally").

### B.  The Issuance And Implementation Of Executive Order No. 14169

On January 20, 2025, the President issued an executive order entitled "Reevaluating and Realigning United States Foreign Aid." Exec. Order No. 14169, 90 Fed. Reg. 8619 (Jan. 20, 2025). The order directed an immediate pause in "United States foreign development assistance." *Id.* § 3(a). It also directed responsible department and agency heads to review each foreign assistance program and to determine within ninety days of the order "whether to continue, modify, or cease each foreign assistance program," in consultation with the Director of the Office of Management and Budget ("OMB") and with the concurrence of the Secretary of State. *Id.* §§ 3(b), (c). The order directed that the Secretary of State would have authority to waive the pause "for specific programs" and separately allowed for new obligations or the resumption of disbursements during the ninety-day review period, if a review was conducted sooner and the Secretary of State, in consultation with the Director of OMB, approved. *Id.* §§ 3(d), (e).

In the days that followed, agency officials took actions to institute an immediate suspension of all congressionally appropriated foreign aid. On January 24, the Secretary of State issued a

memorandum suspending all new funding obligations, pending a review, for foreign assistance programs funded by or through the State Department and USAID. *Glob. Health*, ECF No. 43 at 14. USAID officials also issued instructions to immediately pause all new programs, issue stop-work orders, and develop appropriate review standards. *Glob. Health*, ECF Nos. 58-1 to 58-4. OMB issued a memorandum ordering a temporary pause of all federal financial assistance, including assistance for foreign aid and nongovernmental organizations. *Glob. Health*, ECF No. 1 ¶ 47. Plaintiffs provide numerous letters terminating or suspending their awards following these actions. *See, e.g.*, *Glob. Health*, ECF No. 7-4 at 2, 5, 7, 13. The record shows that within a few weeks, the State Department suspended more than 7,000 awards and terminated more than 700. *See Glob. Health*, ECF No. 25-1 ¶¶ 25–28. USAID proceeded at a similar pace, suspending and terminating 230 awards in a two-day span and, in total, terminating almost 500 awards and suspending thousands of others in just weeks. *Glob. Health*, ECF Nos. 20, 20-1, 25-1 ¶ 12.

### C.  The Present Litigation

Plaintiffs, who are all recipients of or have members who receive foreign assistance funding, filed these actions and sought temporary restraining orders ("TROs") enjoining Defendants from giving effect to Executive Order No. 14169 and the subsequent implementations.[1] The Court held a hearing in both cases, and Plaintiffs thereafter submitted revised proposed orders that narrowed the scope of their requested relief. *AIDS Vaccine*, ECF No. 16-1; *Glob. Health*, ECF No. 18. The Court granted Plaintiffs' motions in part and issued a temporary restraining order on still narrower terms. *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of*

---

[1] The parties filed notices of related cases that included *National Council of Nonprofits v. Office of Management and Budget*, No. 25-cv-00239-LLA (D.D.C.), and *American Federation of Government Employees v. Trump*, No. 25-cv-00352-CJN (D.D.C.). The judges assigned to those cases determined that the present cases were not sufficiently related, and the cases were submitted for random assignment. *See AIDS Vaccine*, ECF No. 12; *Am. Fed'n*, ECF No. 32.

*State*, __ F. Supp. 3d __, No. 25-cv-00400, 2025 WL 485324 (D.D.C. Feb. 13, 2025). The Court

found that Plaintiffs had made a strong preliminary showing of irreparable harm. *Id.* at *2–4.

Among other things, Plaintiffs provided evidence that they had been and would continue to be

forced to shut down program offices, to furlough or terminate staff, and in some cases to shutter

their businesses entirely. *Id.* They further adduced evidence that Defendants' actions had and

would continue to have a catastrophic effect on the humanitarian missions of several Plaintiffs and

their members. *Id.* The Court also concluded that Plaintiffs were likely to succeed on the merits of

their claim that the challenged agency action was arbitrary and capricious in violation of the APA,

particularly given Defendants' failure to consider enormous reliance interests. *Id.* at *4–5. Finally,

the Court held that the equities and the public interest favored Plaintiffs in light of the existential

threats they faced and the lack of any compelling countervailing harms identified by Defendants.

*Id.* at *6.

Although the Court determined that temporary injunctive relief was warranted, it found

that Plaintiffs' requested injunctions were overbroad and narrowed the relief in multiple ways. *Id.*

Specifically, the Court rejected Plaintiffs' request to enjoin the President or the Executive Order

itself; limited its temporary relief only to the implementation of specific sections of the Executive

Order; and rejected language that would have dictated personnel decisions or operational details

in complying with the injunction. *Id.* The Court also declined to enjoin Defendants from taking

action to enforce the terms of individual contracts, including expirations, modifications, or

terminations pursuant to contractual provisions. *Id.* With those limitations, the Court temporarily

enjoined Defendants (excluding the President) from implementing directives "suspending,

pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance

funds" or "issuing, implementing, enforcing, or otherwise giving effect to terminations,

suspensions, or stop-work orders" in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance awards in existence as of January 19, 2025. *Id.* at \*6–7.

In the two weeks that followed, Plaintiffs moved multiple times to enforce the Court's TRO and hold Defendants in contempt, providing evidence that Defendants continued their freeze and further evidence of irreparable harm to businesses and organizations across the country. *AIDS Vaccine*, ECF No. 26; *Glob. Health*, ECF No. 29; *see Glob. Health*, ECF No. 29-1 (discussing February 18 internal email stating that Secretary of State "has implemented a 15-day disbursement pause on all $15.9B worth of grants at the State Department" and directing recipients to "review the President's executive orders and recommend termination of grants that do not comply with those orders" (emphasis omitted)). The Court declined to hold Defendants in contempt and reaffirmed certain flexibility and authority Defendants reserved, consistent with the TRO. *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, __ F. Supp. 3d __, No. 25-cv-00400, 2025 WL 569381, at \*1–2 (D.D.C. Feb. 20, 2025); *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, __ F. Supp. 3d __, No. 25-cv-00400, 2025 WL 577516, at \*1–2 (D.D.C. Feb. 22, 2025). However, the Court also reiterated: "[T]o the extent Defendants have continued the blanket suspension, they are ordered to immediately cease it and to take all necessary steps to honor the terms of contracts, grants, cooperative agreements, loans, and other federal foreign assistance awards that were in existence as of January 19, 2025, including but not limited to disbursing all funds payable under those terms." *AIDS Vaccine*, 2025 WL 569381, at \*3; *AIDS Vaccine*, 2025 WL 577516, at \*3.

Within a few days, Plaintiffs in both cases had renewed their motions to enforce. *Glob. Health*, ECF No. 36; *Glob. Health*, ECF No. 37 at 25. Plaintiffs explained that, despite the Court's orders, they were still owed millions of dollars on due and overdue invoices and reimbursement

requests; they still lacked access to letter of credit facilities and other payment management systems; and their contracts and awards terminated pursuant to the Executive Order remained terminated. *Glob. Health*, ECF No. 36 at 2. In addition, several plaintiffs were facing "new and mounting irreparable harms that threaten their very existence and which require emergency relief prior to the Court's hearing on the preliminary injunction motion." *Id.*

The Court held a motions hearing on February 25. At the hearing, Defendants' counsel acknowledged that the TRO foreclosed them from giving effect to suspensions or terminations that were issued before February 13. *Glob. Health*, ECF No. 37 at 33–34. The Court asked Defendants' counsel if he was "aware of steps taken to actually release those funds" over the prior two weeks, consistent with the TRO and later orders. *Id.* at 35. Counsel responded that he was "not in a position to answer that." *Id.* For that and other reasons set forth on the record, the Court orally granted Plaintiffs' second set of motions to enforce the TRO. The Court ordered Defendants to unfreeze funds for work completed prior to the TRO, giving Defendants an additional thirty-six hours to come into compliance. *Id.* at 57–58.

Defendants appealed and moved to stay the Court's oral ruling, asserting for the first time that it would not be possible to process payments within that time. *Glob. Health*, ECF No. 39. Defendants also provided additional details on suspensions and terminations since the issuance of the TRO. *Glob. Health*, ECF No. 42. In particular, Defendants represented that they had completed an independent, individualized review process for over 13,000 USAID and State Department awards following the Court's TRO, which resulted in the termination of all but 500 USAID awards and all but 2,700 State Department awards. *Id.*

This Court denied Defendants' motion for a stay pending appeal, pointing out that Defendants had not previously raised the issue of feasibility. *AIDS Vaccine Advoc. Coal. v. U.S.*

*Dep't of State*, No. 25-cv-00400, 2025 WL 625755, at *2 (D.D.C. Feb. 26, 2025). The D.C. Circuit

dismissed the appeal for lack of appellate jurisdiction, noting that the February 25 order did not

modify Defendants' obligations under the TRO. *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,

No. 25-5046, 2025 WL 621396, at *1 (D.C. Cir. Feb. 26, 2025). Defendants filed an emergency

application in the Supreme Court, which issued an administrative stay. The Court subsequently

denied Defendants' application to vacate the February 25 order and instructed this Court to "clarify

what obligations the Government must fulfill to ensure compliance with the temporary restraining

order, with due regard for the feasibility of any compliance timelines." *Dep't of State v. AIDS

Vaccine Advoc. Coal.*, 604 U.S. __, No. 24A831, 2025 WL 698083 (U.S. Mar. 5, 2025).

      Upon remand from the Supreme Court, this Court promptly ordered the parties to address

the feasibility of processing payments. *Glob. Health*, Min. Order (Mar. 5, 2025). The Court also

held a lengthy hearing on Plaintiffs' preliminary injunction motions and the issue of feasibility. At

the hearing, the parties agreed that compliance with the February 25 order required Defendants to

make approximately 2,000 USAID payments and to enable drawdowns for awards that proceed on

letters of credit. *Glob. Health*, ECF No. 58 at 131–33; *see Glob. Health*, ECF No. 39-1 ¶ 4. The

Court requested benchmarks to help evaluate the feasibility of processing payments. The parties

identified a declaration from Defendants indicating that USAID and State previously had been

capable of processing several thousand payments each day. *Glob. Health*, ECF No. 58 at 133; *see

Glob. Health*, ECF No. 39-1 ¶ 15. As a more recent benchmark, Defendants explained that they

had been able to release some payments to Plaintiffs; they have since clarified that they processed

approximately 100 payments in an overnight period. *Glob. Health*, ECF No. 58 at 125; *see Glob.

Health*, ECF No. 54 at 2. The Court ordered Defendants to begin by paying Plaintiffs' outstanding

invoices and letter of credit drawdowns within a four-day period, which would be a small

fraction—apparently just 1% to 10%—of the rate at which the agencies previously processed payments and appeared consistent with the rate that Defendants had been able to process payments the night before. *Glob. Health*, ECF No. 58 at 144–46. The Court asked the parties to come back with any further information that would be helpful in assessing feasibility and setting a clear, administrable benchmark. *Id.* at 147–49.

## II.    Discussion

"A preliminary injunction is an extraordinary remedy never awarded as of right" and, to the contrary, "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008). In particular, a plaintiff must establish four factors: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. In granting a TRO, the Court found that Plaintiffs had established these factors. As discussed below, however, the Court finds that the ground has shifted some since that time, both in terms of further actions on the part of the agencies and further development of the parties' arguments.

The Court begins by addressing Article III standing. Upon concluding that Plaintiffs clearly have standing, the Court turns to the *Winter* factors. The Court finds that, although Plaintiffs have shown a likelihood of success under the APA as to the initial agency action they challenged, their challenge to Defendants' subsequent review of awards is a closer call, and Plaintiffs have not satisfied their burden. Plaintiffs' constitutional claims, on the other hand, have a substantial likelihood of success, particularly given Defendants' failure to offer a defensible interpretation of the separation of powers. Because Plaintiffs have shown irreparable harm, which remains largely

uncontested, and the remaining factors favor Plaintiffs, the Court grants preliminary injunctive relief in part, tailored to the scope of claims likely to succeed and the relevant harms.[2]

### A.  Plaintiffs Have Demonstrated Standing

"To establish Article III standing, the plaintiff must have 'suffered an injury in fact' that 'is fairly traceable to the challenged action of the defendant' and it must be 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Banner Health v. Price*, 867 F.3d 1323, 1333–34 (D.C. Cir. 2017) (quoting *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 180–81 (2000)). As the Court detailed in its TRO opinion, Plaintiffs adduced evidence that Defendants' actions had caused them immense harm, including by inflicting massive financial injuries, forcing them to significantly reduce core operations and staff, and jeopardizing their missions. *AIDS Vaccine*, 2025 WL 485324, at *2–4. Those injuries are fairly traceable to the challenged agency action in this case: namely, the blanket suspension of funds. And a determination that the blanket suspension was unlawful, and therefore cannot be given effect, would likely redress at least some of the harms Plaintiffs have suffered.[3]

Defendants did not dispute Plaintiffs' standing at the TRO stage. In their preliminary injunction briefing, however, they now argue Plaintiffs have failed to show Article III standing, and the Court pauses to address that argument. Defendants contend that Plaintiffs allege "no more

---

[2] Some courts have employed a "sliding scale" approach to the preliminary injunction factors, particularly before the Supreme Court's decision in *Winter*. *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, __ F. Supp. 3d __, No. 25-cv-239, 2025 WL 368852, at *9 (D.D.C. Feb. 3, 2025) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). The Court's analysis here does not depend on the sliding scale method and arrives at the same place when each prong is evaluated as "an independent, free-standing requirement." *Sherley*, 644 F.3d at 393 (citation omitted).

[3] In seeking preliminary relief, a plaintiff generally need only show a substantial likelihood of standing. *See, e.g.*, *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019). Here, Plaintiffs' standing is plain.

than" a "pocketbook injury" from the terminations of their awards and are attempting to challenge

"implementing acts that do *not* affect Plaintiffs directly." *Glob. Health*, ECF No. 34 at 18 (quoting

*Collins v. Yellen*, 594 U.S. 220, 243 (2021)). Defendants' argument is difficult to parse and is not

supported by the case law they cite. First, when considering injury in fact, financial injury, or

"pocketbook injury," is generally considered the gold standard or "prototypical form of injury in

fact." *Collins*, 594 U.S. at 243. Indeed, when asked at the preliminary injunction hearing,

Defendants conceded that this is "recognized as an Article III injury." *Glob. Health*, ECF No. 58

at 63. Here, Plaintiffs argue that the injury not only can be traced to, but flows directly from, the

Executive Order and its implementations directing the suspension of congressionally appropriated

foreign aid. Indeed, the Executive Order and its implementations are what caused the agreements'

review and their suspension or termination. Moreover, Defendants' argument overlooks Plaintiffs'

injuries that go beyond their "pocketbook." Plaintiffs have adduced evidence that Defendants'

actions have critically compromised their missions, causing disruption to programs, substantial

layoffs, threats to employees' physical safety, and impending legal action. *See, e.g.*, *AIDS Vaccine*,

ECF Nos. 1-11, 1-12; *Glob. Health*, ECF Nos. 36-1, 46-2; *see also AIDS Vaccine*, 2025 WL

485324, at *2–4 (summarizing evidence of harm).[4]

---

[4] Defendants separately challenge whether two plaintiffs have established associational or organizational standing. *Glob. Health*, ECF No. 34 at 19–21. The Court "need only find one party with standing." *Ams. for Safe Access v. Drug Enf't Admin.*, 706 F.3d 438, 443 (D.C. Cir. 2013). And, in any event, the associations have standing. Their members would likely have standing because they have been harmed by the challenged actions, *see Glob. Health*, ECF Nos. 7-1, 7-2; the interests that the associations seek to protect are "germane" to their organizational purposes, *see Glob. Health*, ECF Nos. 7-1 ¶ 3, 7-2 ¶ 2 (describing organizational purposes of "identifying priority world health problems and reporting on them to the U.S. public, legislators, international and domestic government agencies, academic institutions, and the world health community" and "promot[ing] the meaningful utilization of U.S. small businesses at U.S government agencies providing foreign assistance"); and, because the relief sought is "invalidation of agency action," the claims do not require consideration of individual members' circumstances. *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596–97 (D.C. Cir. 2015) (citation omitted).

At bottom, the relief Plaintiffs seek, an order invalidating Defendants' blanket directive to suspend congressionally appropriated foreign aid, would mean the government must honor its aid agreements for a period greater than it did. That includes obligations directly affecting Plaintiffs' pocketbooks and their ability to fulfill their organizational missions, honor their responsibilities to employees, and meet their commitments to community partners. That is textbook injury, causation, and redress.[5]

### B. Plaintiffs Are Likely To Succeed On The Merits

Plaintiffs challenge Defendants' blanket suspension of foreign aid under the APA as both arbitrary and capricious and contrary to law, and they also assert constitutional claims that Defendants' actions violate the separation of powers. *AIDS Vaccine*, ECF No. 1 ¶¶ 45–73; *Glob. Health*, ECF No. 1 ¶¶ 111–31. The Court need only find that Plaintiffs are likely to succeed on one of these claims for this factor to weigh in favor of a preliminary injunction. That said, any relief should be tailored to the particular claims likely to succeed.

Here, Plaintiffs' claims challenge different Executive actions. Plaintiffs' APA claims challenge the Secretary of State's January 24 memorandum and other contemporaneous directives implementing Executive Order No. 14169 by suspending congressionally apportioned foreign aid, and they seek relief for the consequences that resulted from those directives. Plaintiffs'

---

[5] Defendants have also filed a sur-reply suggesting that the case is moot in light of their subsequent review and decisions to terminate Plaintiffs' contracts and grants. *Glob. Health*, ECF No. 48-1 at 3–5. This argument is not persuasive. Plaintiffs ask the Court to vacate or set aside the agency action that led to the blanket suspension of funds. Granting such vacatur would have the effect of remedying, at least in part, the injuries that give Plaintiffs standing to sue in the first place. While this may not make Plaintiffs whole, it is not a circumstance where it is "impossible for the court to grant any effectual relief." *Id.* at 3 (quoting *Spirit of the Sage Council v. Norton*, 411 F.3d 225, 228 (D.C. Cir. 2005)). As discussed below, however, Defendants' subsequent review and decisions to terminate do constitute distinct agency action, which Plaintiffs have not challenged. *See infra* section II.B.1.c.

constitutional claims challenge Defendants' authority to unilaterally rescind or defer funds that Congress has appropriated in accordance with its spending power. The Court begins with Plaintiffs' statutory claims and then turns to their constitutional claims.

1.  *Plaintiffs Will Likely Prevail, At Least In Part, On Their APA Claims*

The APA permits judicial review of "final agency action" and requires a court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A). Here, the final agency action Plaintiffs challenge is the Secretary of State's January 24 memorandum and other contemporaneous directives implementing Executive Order No. 14169 by suspending congressionally apportioned foreign aid. *Glob. Health*, ECF No. 1 ¶ 113; *AIDS Vaccine*, ECF No. 1 ¶ 61. Plaintiffs claim that these actions were both arbitrary and capricious and contrary to law.

a.  *Plaintiffs' Claims Seeking To Invalidate The Agencies' Implementing Directives Are Properly Asserted Under The APA*

Defendants raise a threshold challenge as to whether the APA is the right home for Plaintiffs' claims. The APA provides for judicial review of claims "seeking relief other than money damages" and does not apply where another statute "grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702; *see also id.* § 704 (final agency action is subject to APA review where "there is no other adequate remedy in a court"). According to Defendants, Plaintiffs' claims might "ripen into" claims under the Contract Disputes Act ("CDA"), which applies to government procurement contracts, including for the "procurement of services," and channels claims to the U.S. Court of Federal Claims or the Civilian Board of Contract Appeals after an exhaustion process. *Glob. Health*, ECF No. 34 at 12; *see* 41 U.S.C. §§ 7102(a)(2), 7104(b), 7105(e)(1)(B). Alternatively, Defendants argue, Plaintiffs' claims must proceed under the Tucker Act, which applies to claims for breach of contract against the federal government over $10,000

and channels those claims to the Court of Federal Claims. *Glob. Health*, ECF No. 34 at 14; *see* 28 U.S.C. § 1491(a)(1). On Defendants' account, Plaintiffs have attempted to package contractual claims for "delayed payments" as ones for injunctive relief under the APA, and therefore they fall under one of these other two acts rather than the APA. *Glob. Health*, ECF No. 34 at 15.[6]

Defendants' argument is unpersuasive for several reasons. First, Plaintiffs' APA claims, by their terms, challenge specific agency actions—here, the implementing policy directives—and ask the Court to "hold them unlawful and set them aside." *Glob. Health*, ECF No. 1 ¶¶ 112–14, 116–17, 122. That's precisely the relief that is afforded—indeed, *required*—by and routinely granted under the APA. *See* 5 U.S.C. § 706(2) (providing that courts "shall . . . hold unlawful and set aside agency action" that violates APA's substantive standards). The complaints do not seek money damages. It is, of course, true that after a court sets aside agency action, a natural consequence may be the release of funds withheld pursuant to that action. The Supreme Court recognized this in *Bowen v. Massachusetts*, 487 U.S. 879 (1988). There, the Court considered whether the APA provided jurisdiction to order the Secretary of Health and Human Services to undo his refusal to reimburse the plaintiff. The Court explained that its cases "have long recognized" that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id.* at 893. The Court concluded: "since the orders are for specific relief (they undo the Secretary's refusal to reimburse the State) rather than for money damages (they do not provide relief that substitutes for that which ought to have been done) they are within the District Court's jurisdiction under § 702's waiver of sovereign immunity." *Id.* at 910.

---

[6] As Defendants acknowledged at the preliminary injunction hearing, this argument applies only to Plaintiffs' APA claims and does not bear on their constitutional claims. *Glob. Health*, ECF No. 58 at 87.

Indeed, even to the extent that payments might result from Plaintiffs' APA claims, they do not resemble a "money damages" claim, for breach of contract or otherwise. Here, as the Supreme Court recognized, Judge Bork's "explanation of the plain meaning of the critical language" in the APA is instructive. *Id.* at 894. In *Maryland Department of Human Resources v. Department of Health & Human Services*, 763 F.2d 1441 (D.C. Cir. 1985), Judge Bork considered the APA's application to "injunctive relief enjoining defendants from reducing funds otherwise due to plaintiffs" and held that this was "not a claim for money damages, although it is a claim that would require the payment of money by the federal government." *Bowen*, 487 U.S. at 894 (alteration and internal quotation marks omitted) (quoting *Maryland*, 763 F.2d at 1446). He explained that any funds that would flow to the plaintiff as the result of agency action being held unlawful under the APA were not "money in compensation for the losses, whatever they may be, that [plaintiff] will suffer or has suffered by virtue of the withholding of those funds." *Id.* at 895 (quoting *Maryland*, 763 F.2d at 1446). The same is true here. Plaintiffs are not seeking compensation for their losses due to the failure to pay them, which, as in any contract case, could be far greater than the amount withheld pursuant to the agency policy; Plaintiffs seek only invalidation of the policy, including the withholding of payment that flowed from it. *See also Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822, 829 (D.C. Cir. 2000) ("[M]oney damages represent compensatory relief, an award given to a plaintiff as a substitute for that which has been lost; specific relief in contrast represents an attempt to restore to the plaintiff that to which it was entitled from the beginning.").

Second, Defendants' argument that Plaintiffs' APA claims are contract claims that must proceed under the CDA or Tucker Act is unpersuasive. The D.C. Circuit has "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act' because to do so would

'deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982)). "Exclusive jurisdiction in Claims Court under the Tucker Act does not lie 'merely because [a plaintiff] hints at some interest in a monetary reward from the federal government or because success on the merits may obligate the United States to pay the complainant.'" *Id.* at 1108 (alteration in original) (quoting *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995)). The question under both the CDA and Tucker Act is whether the action "is *at its essence* a contract claim." *Id.* at 1106 (quoting *Megapulse*, 672 F.2d at 967); *see A&S Council Oil Co. v. Lader*, 56 F.3d 234, 240 (D.C. Cir. 1995). That inquiry turns on (1) "the source of the rights upon which the plaintiff bases its claims," and (2) "the type of relief sought (or appropriate)." *Crowley*, 38 F.4th at 1106 (quoting *Megapulse*, 672 F.2d at 968).

As set forth above, "the face of the complaint" in both cases makes clear that Plaintiffs are asserting a right "to be free from government action beyond [its] congressional authority." *Id.* at 1108 (alteration in original) (citation omitted). The sources of Plaintiffs' claims "are the statutes identified in [their] complaint[s]," *id.*, which include the APA, the Impoundment Control Act, the Anti-Deficiency Act, and the Further Consolidated Appropriations Act of 2024. *AIDS Vaccine*, ECF No. 1 ¶¶ 45–73; *Glob. Health*, ECF No. 1 ¶¶ 79–110. And, consistent with those sources, the remedy Plaintiffs seek is simply to "hold unlawful and set aside agency action." 5 U.S.C. § 706(2); *Glob. Health*, ECF No. 1 ¶¶ 112–14, 116–17, 122; *see also N.J. Conservation Found. v. FERC*, 111 F.4th 42, 63 (D.C. Cir. 2024) ("Vacatur is the normal remedy when we are faced with unsustainable agency action." (internal quotation marks and citation omitted)). Plaintiffs do not seek money damages and, to return to Judge Bork's apt distinction, do not seek the contractual

remedy of "money in compensation for [their] losses, whatever they may be," in relation to any breach of their agreements. *Bowen*, 487 U.S. at 895 (quoting *Maryland*, 763 F.2d at 1446). Indeed, it would be quite extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached—they instead challenge whether the agency action here was unlawful, irrespective of any breach.[7]

To be sure, some Plaintiffs or other parties may have individual claims sounding in contract that could be brought against their respective contracting counterparties. The critical point is that here Plaintiffs assert APA claims to invalidate agency policy directives, regardless of any breach of any agreement or the extent of their losses. *See Kidwell*, 56 F.3d at 284 ("Even where a monetary claim may be waiting on the sidelines, as long as the plaintiff's complaint only requests non-monetary relief that has considerable value independent of any future potential for monetary relief—that is, as long as the sole remedy requested is declaratory or injunctive relief that is not negligible in comparison with the potential monetary recovery—we respect the plaintiff's choice of remedies and treat the complaint as something more than an artfully drafted effort to circumvent

---

[7] As Plaintiffs point out, the record also suggests they have subawards and cooperative agreements that do not fall under the CDA or Tucker Act. *See, e.g.*, *Glob. Health*, ECF Nos. 7-3 ¶ 8, 7-5 ¶¶ 4–5. Defendants seem to concede that not *all* of Plaintiffs' awards are contracts subject to those statutes. *See Glob. Health*, ECF No. 34 at 14 (accepting that "some Plaintiffs may have award documents that are not procurement contracts" and only "some of the claims may proceed under the Tucker Act" (emphasis omitted)); *see also U.S. Enrichment Corp. v. United States*, 117 Fed. Cl. 548, 553 (2014) (recognizing that "[s]ubcontractors and other third parties are generally not permitted to raise claims directly against the government"); *Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 134 (D.D.C. 2023) (rejecting application of Tucker Act to USAID cooperative agreement). Thus, even assuming Plaintiffs have some agreements that qualify as contracts within the CDA or Tucker Act, they also have agreements that would lack those alternative avenues and fall within the APA. *Cf. Ams. for Safe Access*, 706 F.3d at 440 (denying jurisdictional challenge where court found that at least one named petitioner had standing).

the jurisdiction of the Court of Federal Claims." (internal quotation marks and citations omitted)).

Plaintiffs' claims are properly asserted under the APA.[8]

> b. *Plaintiffs Will Likely Prevail In Showing That Defendants' Initial Directives To Freeze Foreign Aid Were Arbitrary And Capricious*

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Rather, the court "must confirm that the agency has fulfilled its duty to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (internal quotation marks omitted) (quoting *State Farm*, 463 U.S. at 43). "[A]n agency rule would be arbitrary and capricious if the agency has relied

---

[8] In opposing a TRO, Defendants contended that because the President is not an "agency" within the meaning of the APA, an agency's actions implementing presidential directives are also free from APA review. The Court rejected that argument, finding that Defendants did not ground their argument in the text of the APA, which specifically defines "agency" to include "each authority of the Government of the United States," 5 U.S.C. § 551(1), and that Defendants failed to meaningfully define the bounds of their argument. *AIDS Vaccine*, 2025 WL 485324, at *5. To the extent Defendants renew that argument at the preliminary injunction stage, they do not develop it any further, and the Court rejects it for the same reasons stated in the TRO. *Glob. Health*, ECF No. 34 at 30–31; *see also Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("[T]hat the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question.").

Defendants also argue in passing that their directives to suspend aid are not sufficiently circumscribed and discrete agency actions to be challenged under the APA, citing cases where plaintiffs sought "wholesale improvement" of an agency's programs. *Glob. Health*, ECF No. 34 at 31–32 (citing *Ala.-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014)). But the agency directives Plaintiffs challenge are precisely the sort of "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy" that the APA explicitly includes and is routinely applied to. 5 U.S.C. § 551(4); *cf. Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893–94 (1990) (noting that while challenges seeking "wholesale correction" of an entire program are not proper under the APA, judicial intervention, where appropriate, still "may ultimately have the effect of requiring a regulation, a series of regulations, or even a whole 'program' to be revised by the agency in order to avoid the unlawful result that the court discerns").

on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (alteration in original) (quoting *State Farm*, 463 U.S. at 43).

In granting a TRO, the Court concluded that Plaintiffs were likely to succeed in showing that Defendants' implementation of a blanket suspension of congressionally appropriated foreign aid pending review was arbitrary and capricious. The Court explained that there was nothing in the record that provided "a rational connection between the facts found and the choice made" to impose an immediate and wholesale suspension of foreign aid in order to review programs. Moreover, nothing in the record suggested that Defendants considered and had a rational reason for disregarding the massive reliance interests of businesses and organizations that would have to shutter programs or close their doors altogether. The blanket suspension thus "entirely failed to consider an important aspect of the problem." *AIDS Vaccine*, 2025 WL 485324, at *5.

This continues to be true with respect to the original implementing directives. Defendants have yet to offer any explanation, let alone one supported by the record, for why a blanket suspension setting off a shockwave and upending reliance interests for thousands of businesses and organizations around the country was a rational precursor to reviewing programs. Instead, Defendants assert that the Executive Order and January 24 implementing memorandum provided "more than enough explanation" given the Executive's "vast" powers over foreign affairs. *Glob. Health*, ECF No. 34 at 37. But the Executive Order simply stated that the purpose of the freeze was to allow the administration to assess programmatic efficiencies and ensure that foreign aid is consistent with U.S. foreign policy. Exec. Order No. 14169 § 3(a). And the implementing memorandum said:

> Across the United States government, it is currently impossible to access sufficient information in one place to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy. The Department needs a centralized repository from which senior Department, USAID officials, Ambassadors, missions and others can draw sufficiently detailed information from which the Secretary can make judgments. Further guidance regarding a new or updated repository and mandatory bureau submissions to it will be forthcoming.

*Glob. Health*, ECF No. 43 at 14.

The desire to review programs for efficiency or consistency, and to access information in one place, does not have a rational connection to the directives to proceed with a sudden, blanket suspension of congressionally appropriated aid. Nor do any of these articulated goals demonstrate consideration of the immense reliance interests among businesses and other organizations across the country. When an agency suddenly changes course, it must recognize "longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)). There is, of course, nothing inherently arbitrary and capricious about agencies conducting a review of aid programs for these purposes or building a centralized repository. But these assertions alone do not provide a rational explanation for why such a review required an immediate and wholesale suspension of all aid—including many longstanding programs taking place pursuant to contractual terms—and do not bear on the failure to consider the reliance interests of small and large businesses that would have to shutter programs or close altogether and furlough or lay off swaths of Americans in the process.[9]

---

[9] Defendants attempt to hollow out arbitrary and capricious review with various arguments. For example, they say that rather than ask whether Defendants considered reliance interests, the Court can merely infer from Defendants' silence that they "exercised their discretion to determine that it

Defendants also insist that the funding freeze was not "comprehensive or undifferentiated" because the Secretary of State approved certain waivers, including for foreign military financing, emergency food assistance, and legitimate expenses incurred before the pause went into effect. *Glob. Health*, ECF No. 34 at 37. But none of those waivers involve or demonstrate consideration of the massive reliance interests of U.S. businesses and organizations. And the record belies the assertion that the waivers provided any meaningful relief from the blanket freeze. At the TRO stage, Plaintiffs proffered specific facts that the availability of a waiver did not meaningfully mitigate the harm described, and Defendants acknowledged "hiccups" in the waiver process. *Glob. Health*, ECF No. 22 at 31; *see AIDS Vaccine*, 2025 WL 485324, at *4. In particular, State Department officials could not provide any information regarding qualification for waivers, while officials in USAID bureaus were unresponsive to similar inquiries. *Glob. Health*, ECF No. 7-3 ¶¶ 11–12, 19–20. Even if an organization received a waiver, moreover, no aid would be disbursed because the government's payout portals were disabled. *Id.* ¶ 11. And one plaintiff received limited waivers lasting for only thirty days, which did little to address the harm due to the uncertainty as to whether the company would have to halt operations again at the end of that period. *Glob. Health*, ECF No. 7-6 ¶ 6.

Despite pointing to the possibility of waivers again in their preliminary injunction briefing, Defendants have not proffered any evidence to rebut the showing Plaintiffs made at the TRO stage. Meanwhile, Plaintiffs offer even more evidence that the waiver process has been largely irrelevant. *See, e.g.*, *Glob. Health*, ECF No. 29-5 ¶ 4 (plaintiff received no payments in week after entry of

---

would not be possible to consider the consequences of various approaches in the absence of a temporary pause." *Glob. Health*, ECF No. 34 at 38. In the alternative, they argue that an agency need not articulate a rationale for its action "beyond simple compliance with the President's directives." *Id.* at 37–38. These arguments conflict with the APA's mandate and, as already noted, would dramatically and impermissibly cabin judicial review under the APA. *See supra* n.8.

TRO, including for programs that had received waivers); *AIDS Vaccine*, ECF No. 26-3 ¶¶ 37–38 (programs receiving waivers were not able to restart due to lack of funding); *AIDS Vaccine*, ECF No. 46-1 at 4 (internal USAID memorandum concluding that successful implementation of waiver process "was not possible due to administrative and bureaucratic challenges, including contradictory and shifting guidance regarding approval for required activities and failure of Agency leadership to process disbursement of funds for activities once approved").

Because the current record does not include "a rational connection between the facts found and the choice made" and indicates Defendants "entirely failed to consider an important aspect of the problem," Plaintiffs are likely to succeed on their APA claims as they relate to the original directives implementing a blanket suspension of aid.

c. *Although A Close Question, Plaintiffs Will Likely Not Prevail In Showing That Defendants' Subsequent Terminations Flow From The Original Directives In Violation Of The APA*

Although Plaintiffs are likely to succeed in showing Defendants' implementing directives violated the APA, the parties disagree on how far that goes—namely, whether the invalidation of the initial implementing directives affects the review of agreements and large-scale terminations that occurred after the Court entered its TRO on February 13, 2025. This is a close question on this record, but the Court finds Plaintiffs have not made an adequate showing that the large-scale terminations resulted from the same agency action they challenge in their complaints. The Court's conclusion is also informed by Plaintiffs' failure to offer a clear and administrable standard for determining when terminations would no longer be tainted by the original implementing directives without entangling the Court in supervision of Executive decisions as to individual agreements.

As described above, the APA requires a plaintiff to identify the "agency action" they seek to set aside, 5 U.S.C. §§ 704, 706(2), and here Plaintiffs challenge the directives implementing the Executive Order. *See Glob. Health*, ECF No. 1 ¶¶ 112–14, 116–17, 122. The effect of the

implementing directives in their immediate wake is plain—they ordered contracting officers and grant officers to "immediately issue stop-work orders" articulated under "the terms of the relevant award" for all existing foreign assistance awards. *Glob. Health*, ECF No. 43 at 16. Agency employees accordingly sent out waves of suspension and termination notices with boilerplate language.[10]

      After the Court's TRO, however, Defendants claim they conducted a new individualized and comprehensive review of awards. In the interest of tailoring its TRO to the reliance interests at stake, the Court did not enjoin Defendants from taking actions based on the particular terms of individual contracts. *AIDS Vaccine*, 2025 WL 485324, at *6–7; *see also AIDS Vaccine*, 2025 WL 569381, at *2 (explaining that "nothing in the TRO limits the agencies from conducting an individualized review of agreements and taking action as to a particular agreement where the agency determines that it has lawful authority to do so"). The Court explained that "[w]hile agency determinations based on wholly independent legal authority and justification such as the terms of particular agreements or sets of agreements, rather than deriving from a general directive to suspend aid, may be subject to some other legal challenge, whether it be under the APA, separation of powers, individual breach of contract cases, or otherwise, such determinations do not violate the present TRO." *AIDS Vaccine*, 2025 WL 577516, at *2. It also cautioned that "of course, the TRO does not permit Defendants to simply search for and invoke new legal authorities as a post-hoc rationalization for the enjoined agency action." *Id.* at *1 (quoting *AIDS Vaccine*, 2025 WL 569381, at *1).

---

[10] Examples of these notices in the record simply state that programs were suspended "[c]onsistent with the President's Executive Order" or terminated because the award "no longer effectuates agency priorities and is terminated in accordance with the U.S. Department of State Standard Terms and Conditions and 2 CFR 200.340." *E.g.*, *Glob. Health*, ECF No. 7-4 at 2, 5.

As described above, in the roughly two weeks following the TRO, Defendants issued thousands of terminations, ultimately canceling roughly 9,900 of 13,100 USAID and State Department awards. *See Glob. Health*, ECF No. 42 at 16. Defendants attest that these terminations were the result of an independent review process based on the terms of the programs and the agencies' independent legal authority to terminate them. They rely principally on a declaration from USAID Deputy Administrator Pete Marocco, which states: "USAID led a rigorous multi-level review process that began with spreadsheets including each contract, grant, or funding instrument where each line of the spreadsheeting reflected one such agreement and included information about the recipient, the amount of the award, the subject matter, and a description of the project that often included the location of the project." *Glob. Health*, ECF No. 39-1 ¶ 5. Marocco further describes a process in which policy staff performed an initial review of whether individual agreements were in line with foreign policy priorities, followed by a senior policy official's review, followed by Marocco's review, followed by the Secretary of State's review. *Id.* The declaration describes a similar process for State Department awards. *Id.* ¶ 6. As of February 26, Defendants indicated that the review process had been completed for both USAID and State. *Glob. Health*, ECF No. 43-1 ¶¶ 1–2. In total, nearly 5,800 USAID awards were terminated, while more than 500 were retained. *Id.* ¶ 1. At State, approximately 4,100 awards were terminated, while roughly 2,700 were retained. *Id.* ¶ 2.

Plaintiffs in both cases opted to rely on their initial TRO motions at the preliminary injunction stage. Accordingly, their opening motions do not address the post-TRO landscape, and their arguments were limited to their reply briefs and oral argument. Their principal argument is that the review process was a sham. *Glob. Health*, ECF No. 46 at 16–17. Plaintiffs assert that Defendants "were terminating and suspending hundreds of millions of dollars in awards based on

a one-line summary, without actually looking at the award documents themselves, without consulting the personnel who manage the project, and, at least in some cases, without even knowing 'the location of the project.'" *Id.* at 17. They highlight, for instance, Marocco's assertion that the first stage of the review process "*often* included the location of the project" as a demonstration of how shallow the review was. *Id.* at 16 (quoting *Glob. Health*, ECF No. 39-1 ¶ 5). Plaintiffs also say it is "implausible" that the Secretary of State or a group of political appointees could have "engaged in a meaningful individualized review of the hundreds of contracts and awards terminated prior to or after the Court's TRO." *Id.* at 17 n.7. They support these arguments with declarations from contracting officers who dispute that any case-by-case review could have plausibly taken place. *Glob. Health*, ECF No. 42-1 ¶ 36; *AIDS Vaccine*, ECF No. 26-3 ¶ 49.

The Court does not reach the merits of these arguments because Plaintiffs have not adequately shown that they arise from the same agency action challenged in this case. Even accepting that the review process described by Marocco took place in a cursory manner, that does not make it the same agency action as the implementing memoranda, as opposed to a distinct, flawed agency action that must be challenged as such.[11]

Plaintiffs come closer in their argument that the subsequent review was pretext to turn the blanket suspension of foreign aid funds into a near-blanket termination of those funds. Relying on *Department of Commerce v. New York*, 588 U.S. 752 (2019), Plaintiffs argue that "[n]ot a shred of evidence suggests that Defendants had the terms and conditions of award agreements in mind when they initiated blanket suspensions and terminations." *AIDS Vaccine*, ECF No. 45 at 4–5. In

---

[11] To be sure, Plaintiffs may be able to formulate some new challenge to Defendants' process leading to these later terminations, whether in an APA claim premised on the relevant action or a contractual challenge based on the terms of individual awards. The Court expresses no view as to the proper forum for such challenges or whether they might have merit; the point is that they are distinct from the challenge Plaintiffs currently advance.

doing so, they cite some evidence that supports their allegation of pretext. For example, Plaintiffs point to terminations following Defendants' review that make no reference to the terms of agreements or legal authority. *See AIDS Vaccine*, ECF No. 44 at 7–10. They also identify several terminations after the review process that continued to assert the termination was "part of" or "in alignment with" the Executive Order. *AIDS Vaccine*, ECF No. 40-4 ¶ 24; *Glob. Health*, ECF Nos. 55-2 to 55-6. And Plaintiffs provide anonymous declarations, including one showing that a senior official instructed contracting officers to follow earlier terminations with expanded termination notices "tailored to the specific award and implementing partner, referencing the relevant clauses or provisions within the award." *AIDS Vaccine*, ECF No. 55-1. While Plaintiffs' showing is sufficient to raise questions, on this record they have not met the high standard of a "strong showing of bad faith or improper behavior." *Dep't of Com.*, 588 U.S. at 781 (citation omitted).

Plaintiffs' proposed relief highlights further difficulty with their argument. They ask for an order requiring Defendants to revoke all terminations and suspensions issued since January 20—a total of roughly 9,900 awards—and to develop plans to restart those programs within ten days. *Glob. Health*, ECF No. 46-6 at 2–3. Plaintiffs also propose that Defendants be required to submit status reports to the Court every two weeks providing "an individualized statement of reasons" for any new termination or suspension. *Id.* at 4. And they do so without articulating a meaningful standard for the Court to distinguish between those terminations that are still affected by the original implementing directives and those that are not. This would devolve into the type of intensive supervision of day-to-day agency activities, as well as inquiry into the terms of individual awards, that the Court has expressly rejected. The Court accordingly finds that Plaintiffs are

unlikely to succeed on their APA challenge as to the large-scale terminations in the process that followed the Court's TRO.[12]

##### 2. *Plaintiffs Will Likely Prevail On Their Constitutional Claims*

Plaintiffs also assert that Defendants are acting in violation of the separation of powers, including Congress's shared power over foreign policy, its exclusive power over spending, and the expression of those powers through statutes that constrain the Executive's authority in relation to foreign aid spending and the impoundment of appropriated funds. These claims are distinct in scope from Plaintiffs' APA claims, in that they are not premised on the initial blanket directive to suspend funds pending review or an alleged policy to mass terminate aid programs. The argument here is that, irrespective of any particular agency action that may be subject to APA review, Defendants are engaging in a unilateral rescission or deferral of congressionally appropriated funds in violation of Congress's spending power, as expressed in multiple statutes whose constitutionality has not been questioned. The Court concludes that Plaintiffs are likely to succeed on these claims as well.

In considering claims related to Executive power, including with respect to foreign affairs, the Supreme Court has applied "Justice Jackson's familiar tripartite framework." *Zivotofsky*, 576 U.S. at 10 (citing *Youngstown*, 343 U.S. at 635–38 (Jackson, J., concurring)). The first category of this framework recognizes that when "the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in

---

[12] Plaintiffs' other APA claims, that Defendants acted contrary to law, must also be premised on "agency action," 5 U.S.C. §§ 704, 706(2), and therefore do not afford any relief distinct from Plaintiffs' arbitrary and capricious claims. The contrary-to-law claims are likely to succeed insofar as they concern Defendants' initial directives and actions implementing the Executive Order, for the same reasons Plaintiffs' separation of powers claims (addressed in the next section) are likely to succeed. The contrary-to-law claims are unlikely to succeed as to the review process and terminations after February 13, 2025, for the same reasons just articulated in this section.

his own right plus all that Congress can delegate." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). The second category recognizes that "in absence of either a congressional grant or denial of authority," there is a "zone of twilight in which [the President] and Congress may have concurrent authority." *Id*. at 637. The third recognizes that when "the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb," and "he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.*

Here, Plaintiffs argue that Defendants are operating in the third category of the tripartite framework, in which they have taken "measures incompatible with the expressed or implied will of Congress." *See AIDS Vaccine*, ECF No. 45 at 8. Plaintiffs observe that, consistent with the purposes outlined in the Foreign Assistance Act of 1961, Congress has explicitly appropriated foreign aid funds for specified purposes. In March of last year, Congress passed the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460. That act provides: "For necessary expenses to carry out the provisions of chapters 1 and 10 of part I of the Foreign Assistance Act of 1961, for global health activities, in addition to funds otherwise available for such purposes, $3,985,450,000, to remain available until September 30, 2025, and which shall be apportioned directly to the United States Agency for International Development." 138 Stat. at 740. It further specifies various purposes for which this appropriation "shall be made available," including "training, equipment, and technical assistance" to build public health institutions; specific health programs like child survival, maternal health, and immunization; and programs for the prevention, treatment, and control of HIV/AIDS, tuberculosis, polio, malaria, and other infectious diseases. *Id.* The act similarly provides for funds that "shall be apportioned directly to the Department of State" for specified purposes. *Id.* at 742; *see also id.* at 743.

Congress has further asserted its spending power in the Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93-344, 88 Stat. 297, which explicitly prohibits the President from impounding appropriated funds without following certain procedures. For permanent impoundments or "rescissions," Congress specified that if the President "determines that all or part of any budget authority will not be required to carry out the full objectives or scope of programs for which it is provided" or "should be rescinded for fiscal policy or other reasons," he must "transmit to both Houses of Congress a special message" addressing the amount, reasons, impact, and other information related to the proposed recission of funds. 2 U.S.C. § 683(a). The act requires that the funds in question be made available for obligation unless Congress rescinds the appropriation within forty-five days. *Id.* § 683(b). The act also imposes procedural requirements, including a special message to Congress, where the President seeks to temporarily impound or "defer" funds. *Id.* §§ 682(1), 684(a).

Defendants do not object to the constitutionality of any of these statutes. They do not, for instance, contend Congress exceeded its authority by mandating that funds be used for specified foreign aid purposes or by mandating the President follow procedures before permanent or temporary impoundment. At the same time, the record here shows that Defendants are acting to rescind or defer the funds Congress has appropriated and have no intent to spend them. Plaintiffs point to multiple public statements in which the President and other senior officials have said Defendants' actions are being undertaken to end foreign aid funding. For example, they cite contemporaneous statements from the State Department that these actions "prevented" foreign aid spending for policy reasons and to save taxpayer money; from a presidential advisor stating that it is "[t]ime for [USAID] to die"; and from the President stating "CLOSE IT DOWN" with respect to USAID. *See AIDS Vaccine*, ECF No. 13-1 at 12–13 (alterations in original); *Glob. Health*, ECF

No. 4 at 14. When given the opportunity in these proceedings, Defendants have not disputed this is their intent. *See also AIDS Vaccine*, ECF No. 46-1 at 35 (internal USAID memorandum indicating that more than $2 billion appropriated to USAID for specific health objectives "has been blocked from obligation to partners").[13] Yet it is uncontested that Defendants have not undertaken the procedures required for the impoundment of congressionally appropriated aid, whether permanent or temporary, by the Impoundment Control Act. *See Glob. Health*, ECF No. 58 at 102–03.[14]

This is accordingly a circumstance in which the Executive's power is "at its lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring). As a result, Defendants' actions must be "scrutinized with caution," and they "can rely only upon [the President's] own constitutional powers minus any constitutional powers of Congress over the matter." *Id.* Here, the President's powers come from his general Article II responsibility to serve as the Executive and take care that the laws be faithfully executed. U.S. Const. art. II, § 3. The powers of Congress involve not only its general shared responsibility over foreign affairs, but its core and "exclusive power over the federal purse." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (Kavanaugh, J.) (citation omitted); *see* U.S. Const. art. I, §§ 8, 9. It is well established that "whether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law," and this includes Congress's core spending power. *Zivotofsky*, 576 U.S. at 21; *see*

---

[13] When asked to identify anything in the record indicating "an intention to spend the amount that's been sidelined by terminating the large majority of agreements," Defendants' counsel stated that he was "not familiar with somewhere in the record that there is." *Glob. Health*, ECF No. 58 at 100–01. Although Defendants requested and were granted the opportunity to "send [the Court] a letter after the hearing," they did not do so. *Id.* at 101.

[14] Defendants also do not respond to Plaintiffs' argument that they have violated the Anti-Deficiency Act, which prohibits officials from establishing a "reserve" except in specific circumstances (which Defendants do not claim are present here). *See* 31 U.S.C. § 1512(c)(1).

*also id.* at 16 (noting that the President "could not build an American Embassy abroad without congressional appropriation of the necessary funds"). Under "settled, bedrock principles of constitutional law," the President "must follow statutory mandates so long as there is appropriated money available and the President has no constitutional objection to the statute." *Aiken County*, 725 F.3d at 259 (emphasis omitted). And if the authority to make law and control spending is to mean anything, it means the President may not disregard a statutory mandate to spend funds "simply because of policy objections." *Id.*; *see also id.* at 261 n.1 (explaining that where a President has policy reasons "for wanting to spend less than the full amount appropriated by Congress for a particular project or program," it remains the case that "even the President does not have unilateral authority to refuse to spend the funds" and must propose a rescission to Congress for its approval).[15]

Here, Defendants do not contest that they are declining to spend appropriated funds based on policy objections—indeed, they have explicitly said so. *See* Exec. Order No. 14169 § 2 ("[N]o further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States."); *Glob. Health*, ECF No. 43 at 15 (January 24 memorandum directing departments and agencies to ensure that all foreign assistance is aligned with the President's foreign policy agenda). Their principal argument, repeatedly asserted throughout their brief, is that the President has "vast and generally unreviewable" powers in the realm of foreign affairs. *Glob. Health*, ECF No. 34 at 2, 10, 24. Defendants do not ground their position in any specific provision of the Constitution or articulate any limits to this expansive

---

[15] Plaintiffs observe that even before the Impoundment Control Act took effect, the Supreme Court recognized that the Executive was not free to override Congress's spending power by making the unilateral decision to allot "less than the entire amounts authorized to be appropriated." *Train v. City of New York*, 420 U.S. 35, 41 (1975).

authority. Nor do they engage in any analysis of how these asserted powers relate to those vested in Congress under Article I of the Constitution; indeed, Defendants never cite Article I or mention Congress's spending power. Defendants instead rely on broad language from *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936), to argue that the President is "the sole organ of the federal government in the field of international relations." *Glob. Health*, ECF No. 34 at 25.

This argument falls short for several reasons. First and foremost, the Supreme Court has explicitly rejected it. The Court has explained that *Curtiss-Wright* does not stand for such "unbounded power." *Zivotofsky*, 576 U.S. at 20; *see also id.* at 66 (Roberts, C.J., dissenting) (explaining that Supreme Court cases "have never accepted such a sweeping understanding of executive power"). To the contrary, the Supreme Court has recognized that, notwithstanding the Executive's important role in foreign affairs, "it is essential the congressional role in foreign affairs be understood and respected." *Id.* at 21 (majority opinion). To repeat, "whether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law." *Id.* Or, as the Chief Justice aptly summarized, the Constitution "allocates some foreign policy powers to the Executive, grants some to the Legislature, and enjoins the President to 'take Care that the Laws be faithfully executed.'" *Id.* at 62 (Roberts, C.J., dissenting) (quoting U.S. Const. art. II, § 3). The Executive is therefore "not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue." *Id.* at 21 (majority opinion); *see also Youngstown*, 343 U.S. at 635 n.2 (Jackson, J., concurring) ("It was intimated [in *Curtiss-Wright*] that the President might act in external affairs without congressional authority, but not that he might act contrary to an Act of Congress.").

Indeed, the claim to "vast and generally unreviewable" power to impound congressionally appropriated aid is weaker here than in past invocations in the foreign affairs context. In *Zivotofsky*, for instance, the Executive pointed to a long line of "judicial precedent and historical practice" showing that the power at issue, recognition, was "for the President alone," and the Court emphasized "the lack of any similar power vested in Congress." 576 U.S. at 14, 21. Defendants do not claim there is *any* precedent or history allowing the President to dictate whether to spend foreign aid for the statutory purposes here. And the Constitution *explicitly* vests in Congress the power to spend, U.S. Const. art. I, § 8, cl. 1, and appropriate funds, *id.* art. I, § 9, cl. 7. This "power over the purse was one of the most important authorities allocated to Congress in the Constitution's 'necessary partition of power among the several departments.'" *Dep't of Navy*, 665 F.3d at 1346–47 (quoting The Federalist No. 51, at 320 (James Madison) (Clinton Rossiter ed., 1961)). In the third *Youngstown* category, the President "can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." 343 U.S. at 637 (Jackson, J., concurring). The constitutional power over whether to spend foreign aid is not the President's own—and it *is* Congress's own.[16]

---

[16] In analyzing the President's authority to impound in the context of domestic spending, some have noted the possibility that unique problems could arise in conflicts between spending mandates and a foreign policy question "confided by the Constitution to [the President's] substantive direction and control." Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, Re: Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools, 1 Supp. Op. O.L.C. 303, 311 (Dec. 1, 1969); *see* John G. Roberts, Jr., Memorandum for Fred F. Fielding Re: Impoundment Authority at 2 (Aug. 15, 1985) ("Roberts Memorandum"). But even in the context of foreign affairs, a problem arises only "if spending would conflict with a constitutional obligation vested in the President." Roberts Memorandum at 2. Defendants have not articulated their argument with remotely sufficient shape to give rise to such a problem—they do not ground the authority to impound here in any particular "constitutional obligation vested in the President"; they do not articulate *any* bounds to the authority; and they have not raised any challenge to the constitutionality of the governing statutes, as applied or otherwise, including the appropriations act and Impoundment Control Act.

Aside from their unbounded view of Executive power in foreign policy, Defendants observe that Congress's "appropriations acts grant the President significant discretion in how to use these funds." *Glob. Health*, ECF No. 34 at 33. They also cite *City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987), to argue that a "pause" in funding does not qualify as an impoundment. *Glob. Health*, ECF No. 34 at 35. These arguments are unavailing. No one does or could doubt that the Executive is afforded significant discretion in administering the funds appropriated or, as Defendants put it, "how to use these funds." *See, e.g.*, 22 U.S.C. § 2151b(c)(1) (authorizing the President "to furnish assistance, on such terms and conditions as he may determine," for certain programs). As described, the constitutional partnership between the political branches has always recognized the Executive's role in determining *how* appropriated funds are spent. The critical point here, which Defendants do not contest, is that Congress's appropriations laws set the amount that is to be spent. That is, the appropriations laws reflect an exercise of Congress's own, core constitutional power to determine *whether and how much* money is spent. Defendants do not argue that Congress's appropriations laws delegate that core authority to the Executive.

Moreover, the notion that the Executive has simply "paused" appropriations does not avoid the problem. As an initial matter, the contention is belied by public statements indicating that this action has been taken to save taxpayer money and end USAID for policy reasons, which Defendants have not disputed when given the opportunity. And the case Defendants cite to authorize a pause of appropriated funds stands for just the opposite proposition. In *City of New Haven*, the D.C. Circuit recognized that the Impoundment Control Act's legislative history indicated that the President might invite little controversy when it comes to "trivial" impoundments relating to the "normal and orderly operation of the government." 809 F.2d at 908. But the Court

explained that other impoundments, those "designed to negate congressional budgetary *policies*," were precisely the kind that Congress "was determined to forestall." *Id.* A blanket suspension of billions of dollars appropriated by Congress for specific purposes can hardly be classified as trivial. And, indeed, the record makes clear that Defendants' impoundment was specifically "designed to negate congressional budgetary policies."[17]

The Court accordingly finds that Plaintiffs are likely to succeed on their separation of powers claims and rejects Defendants' unbridled understanding of the President's foreign policy power, which would put the Executive above Congress in an area where it is "firmly established" that the two branches share power, *Zivotofsky*, 576 U.S. at 62 (Roberts, C.J., dissenting), where

---

[17] Defendants offer some arguments in passing that there is no avenue to relief even if they are in violation of valid statutes expressing Congress's spending power. First, they say this makes Plaintiffs' claims "purely statutory" and therefore not cognizable as constitutional claims, citing *Dalton v. Specter*, 511 U.S. 462 (1994). *Glob. Health*, ECF No. 34 at 23. But *Dalton* "merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available." *Chamber of Com.*, 74 F.3d at 1331. Here, by contrast, Plaintiffs assert that the Executive has attempted to usurp Congress's power over the purse in violation of the separation of powers, and there is no asserted or plausible argument that the President is simply exercising discretionary authority conferred by statute. Nor do Defendants explain how this argument can be squared with then-Judge Kavanaugh's decision issuing mandamus relief in *Aiken County. See* 725 F.3d at 267.

Defendants also claim that violation of the Impoundment Control Act cannot be a basis for finding action contrary to law under the APA because the Impoundment Control Act allows for enforcement by the Comptroller General. *Glob. Health*, ECF No. 34 at 35. This argument is limited to Plaintiffs' contrary-to-law APA claims, *see supra* n.12, and lacks merit. The APA, by its terms, applies unless another statute "preclude[s] judicial review." 5 U.S.C. § 701(a)(1). And as the D.C. Circuit has observed, any such preclusion must have "sufficient clarity to overcome the strong presumption in favor of judicial review." *Confederated Tribes of Chehalis Rsrv. v. Mnuchin*, 976 F.3d 15, 21 (D.C. Cir. 2020) (quoting *Thryv, Inc. v. Click-To-Call Techs., LP*, 590 U.S. 45, 53 (2020)), *rev'd on other grounds sub nom. Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338 (2021).

Finally, Defendants argue that the *AIDS Vaccine* Plaintiffs' separate claim under the Take Care Clause cannot be a basis for affirmative relief. *Glob. Health*, ECF No. 34 at 26. However, the Court need not reach that claim or argument since it concludes that Plaintiffs are likely to succeed on their separation of powers claims.

Congress is exercising one of its core powers, and where there is no constitutional objection to the laws it has made.[18]

### C.  Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Injunctive Relief

The Court's order granting in part Plaintiffs' motions for a TRO described evidence of the immense irreparable harm to businesses and organizations across the country, which has, at least to date, gone unrebutted by Defendants. *AIDS Vaccine*, 2025 WL 485324, at *2–4. As the Court explained, this included immense financial harm to Plaintiffs and, in many cases, forced them to significantly cut down on staff or otherwise reduce core operations. A few examples are illustrative:

- One plaintiff, a large investigative journalism organization, has USAID and State Department grants that constitute 38% of its budget, supporting investigations into corruption, sanction violations, and other wrongdoing. *AIDS Vaccine*, ECF No. 13-4 ¶¶ 2, 6–7, 9. Due to the suspension of appropriated funding and stop-work orders received as a result, the organization has been forced to cut 43 of 199 staff members, with most remaining being moved to a shorter work week. *Id.* ¶ 12. The organization has had to cancel events, cut travel for reporting, and freeze new equipment purchases. *Id.* The organization attests that the disruption will continue absent relief. *Id.* ¶ 13.

- A nonprofit plaintiff focused on protecting refugees and asylum seekers has had to lay off 535 staff members since receiving termination and suspension notices for multiple grants. *Glob. Health*, ECF No. 7-3 ¶¶ 3–4, 13. It has been forced to shutter program offices and defer payments to vendors. *Id.* ¶ 21.

---

[18] The Court notes that, for similar reasons, Plaintiffs would be likely to succeed on their claim that Defendants acted *ultra vires*. *Glob. Health*, ECF No. 1 ¶¶ 129–31. "When an executive acts *ultra vires*"—meaning beyond the scope of his power—"courts are normally available to reestablish the limits on his authority." *Chamber of Com.*, 74 F.3d at 1328 (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)). Defendants do not identify any authority, statutory or otherwise, that would authorize this sort of vast cancelation of congressionally appropriated aid. Even if they did, Defendants do not dispute that they would be in the territory of having to show "clear congressional authorization" based on the "vast economic and political significance" of these actions. *See West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 716, 723 (2022) (citations omitted). Needless to say, canceling billions of dollars in congressionally appropriated funds is "no everyday exercise of federal power." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022) (internal quotation marks and citation omitted).

- A plaintiff representing small businesses across all sectors attests that the suspension included USAID failing to pay its members for months of unpaid invoices. *Glob. Health*, ECF No. 7-2 ¶ 8. This has forced small businesses to furlough "most U.S. national staff in home offices and on contracts, and terminate foreign national staff or risk keeping them and being uncertain of payments under stop work orders." *Id.* ¶ 10.

- Another plaintiff focused on addressing the global HIV/AIDS epidemic has already been forced to lay off seven employees and will lay off ten more over the next month if the suspension of appropriated foreign aid continues. *AIDS Vaccine*, ECF No. 13-2 ¶ 12.

In addition, several plaintiffs had attested to how the blanket suspension of funds undermined their core missions and jeopardized vital services to vulnerable populations. For example:

- One plaintiff asserts that the suspension of appropriated foreign aid has disrupted critical health programs, including maternal and child health programs and infectious disease prevention efforts administered by its member organizations. *Glob. Health*, ECF No. 7-1 ¶ 8. One of those member organizations reports that a $20 million project to support the development of hospital accreditation in Cambodia has been suspended. *Id.* ¶ 8(a). Another reports that a stop-work order has disrupted a total of $4 million in funding for American Schools and Hospitals Abroad grants in Nepal and Vietnam. *Id.* ¶ 8(c). And another reports that the freeze has delayed several time-sensitive antimalaria campaigns that are expected to benefit millions of people in Kenya, Uganda, Ghana, Ethiopia, and Zimbabwe. *Id.* ¶ 8(d). The plaintiff attests that the suspension of appropriated foreign aid funding "is an existential threat to [its] members and their life-saving work." *Id.* ¶ 11.

- Another plaintiff reports that it can no longer fund shelters for minors in Central America trying to escape recruitment into criminal gangs. *Glob. Health*, ECF No. 7-7 ¶ 10.

- A different plaintiff explains that it has abruptly stopped providing medical services for hundreds of adolescents and young students in need in Bangladesh. *Glob. Health*, ECF No. 7-8 ¶ 12(a).

- An additional plaintiff that supports HIV prevention research and the rollout of HIV prevention medication to high-risk communities in various African countries asserts that the funding freeze has disrupted clinical trials and the rollout of life-saving medication. *AIDS Vaccine*, ECF No. 13-2 ¶¶ 3–4, 11.

Based on this evidence, the Court concluded that Plaintiffs had made a sufficient preliminary showing that Defendants' actions "threaten[ed] the very existence of [their] business." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). And they had likewise shown that the "obstacles" created by Defendants' conduct "make it more difficult for the [plaintiffs] to accomplish their primary mission." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).[19]

Over the weeks that have followed, Plaintiffs have continued to produce more evidence of irreparable harm. A supplemental declaration from one plaintiff, for example, explains that the funding freeze has impacted its ability to meet financial obligations, which has in turn placed staff at risk of harassment, intimidation, and potential physical harm. *Glob. Health*, ECF No. 46-2 ¶ 2. Personnel have also been stranded in high-risk environments due to insufficient repatriation funding. *Id.* ¶ 3. And the loss of funding has forced security cutbacks, jeopardizing sensitive equipment and program-related data. *Id.* ¶ 6. As of February 26, the same plaintiff had furloughed around two-thirds of its U.S.-based workforce because of the funding freeze. *Glob. Health*, ECF No. 46-1 ¶ 32. Another plaintiff reiterated that, unless it received the funds owed by USAID, it

---

[19] The Court also noted that Plaintiffs' evidence showed severe harm to their "goodwill, reputation, and relationships with employees, partners, subcontractors, foreign governments, and other stakeholders." *AIDS Vaccine*, 2025 WL 485324, at *3 n.2 (quoting *Glob. Health*, ECF No. 4 at 23). This included concrete examples such as having to violate contractual duties by deferring payments to suppliers, vendors, and landlords, *Glob. Health*, ECF No. 7-6 ¶¶ 10, 15; disruptions to relationships with longstanding partners whose trust had been cultivated over decades, *id.*; and having to go back on previous assurances made to clients and partners in reliance on the agreements that have now been canceled, *Glob. Health*, ECF No. 7-9 ¶ 21. *See Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (holding that irreparable harm was apparent where defendant's conduct "could not fail to damage [plaintiff's] good name"); *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017) ("Injury to reputation can, at least at times, rise to the level necessary to support the issuance of an injunction."); *Xiaomi Corp. v. Dep't of Def.*, No. 21-cv-280, 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021) (collecting cases).

would be forced to make another round of furloughs within about two weeks, reducing a staff of more than 250 to as few as ten. *Glob. Health*, ECF No. 29-4 ¶ 7.

Several declarations from the *Global Health* Plaintiffs further illustrate the ongoing irreparable harm:

- One plaintiff attests that if USAID does not pay outstanding invoices forthwith, the plaintiff will be in serious legal jeopardy in both the United States and other countries. *Glob. Health*, ECF No. 36-1 ¶ 7. The plaintiff will be forced to default on numerous contracts, including for corporate insurance and legal services—all while it is facing threatened legal action from staff members because it does not have funds to pay employees. *Id.* ¶¶ 8–9. And the risks to the plaintiff "are worsening by the day," as it faces an increased likelihood of not being able to repatriate staff members, pay local legal counsel, or meet obligations to local communities. *Id.* ¶¶ 12, 15–17.

- Another plaintiff explains that it has been forced to furlough an additional 124 staff members since the TRO was issued because it still has not received any payments. *Glob. Health*, ECF No. 36-2 ¶¶ 3, 5. Organizational staff and their families "are suffering ongoing financial hardship that worsens with each passing day of reduced or no compensation." *Id.* ¶ 5. The plaintiff is in imminent danger of being forced to suspend thousands of staff members without pay, which could violate labor laws in countries where it operates. *Id.* ¶ 9.

- Still another declaration explains that without imminent payment, a small business focused on energy and infrastructure will be forced to close its doors due to insolvency and to walk away from active federal contracts. *Glob. Health*, ECF No. 36-3 ¶¶ 5–6.

- Likewise, another plaintiff planned to lay off "a substantial number of its workforce" due to the lack of funding and will have to shutter its doors in all but five to seven of its twenty-four country offices. *Glob. Health*, ECF No. 36-4 ¶¶ 4, 6.

Defendants do not rebut these existential threats to the survival and core missions of businesses and organizations around the country. They respond that there is no irreparable harm because there is an ongoing, individualized review process that "could prevent the harm from transpiring at all." *Glob. Health*, ECF No. 34 at 39. And they insist that any damage to Plaintiffs and other enterprises is recoverable. *Id.* at 40–42. Defendants' point is well taken in one respect—

the Court has found that Plaintiffs are not likely to succeed on this record as it relates to terminations resulting from Defendants' subsequent review process. And, as discussed below, the Court's relief must be tailored in that respect.

But Defendants' argument is unpersuasive as it relates to irreparable harm. Defendants have now stated that they have completed their review process and have represented that they will cancel the vast majority of congressionally appropriated foreign aid. While it is true that the relevant Executive action here has the effect of withholding substantial amounts of funds, the harm here goes to the very subsistence of the organizations, many of which are on the brink of shuttering entirely, and poses an existential threat to the viability of their humanitarian missions. In fact, Defendants have not hesitated to cite the threat of insolvency to Plaintiffs as a justification for not making payments. *See Glob. Health*, ECF No. 39-1 ¶ 25 ("[T]he plaintiffs have claimed that many grant recipients and contractual counterparties are insolvent or nearly so, raising the high likelihood that they will immediately spend any funds they receive—making it impossible for the Government to recover those funds as a practical matter."). Defendants' actions are, in effect, the massive disruption of a whole industry or sector, and Plaintiffs have made a strong showing that the harm is "both certain and great," as well as "actual and not theoretical." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citation omitted).

### D.  The Balance Of The Equities And The Public Interest Favor Plaintiffs

The final two factors, balancing the equities and the public interest, generally "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). Here, they also weigh in Plaintiffs' favor.

As the D.C. Circuit has explained, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. "To the

contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (internal quotation marks and citation omitted). Additionally, the harms that Plaintiffs have suffered—and will continue to suffer absent preliminary injunctive relief—are stark. Plaintiffs have adduced ample evidence that the funding freeze has had dire humanitarian consequences and has devastated businesses and programs across the country. Defendants still have made no effort to rebut that showing.

Defendants respond that they are undertaking a thorough review of foreign aid programs to determine which ones "make sense for the American people," and they assert that the public has an interest "in the Executive effectuating foreign affairs." *Glob. Health*, ECF No. 34 at 44–45 (citation omitted). But the Executive's ability to review foreign aid programs is not at issue here. The Court's TRO order explicitly declined to "enjoin any aspect of the Government's ability to conduct a comprehensive internal review of government programs." *AIDS Vaccine*, 2025 WL 485324, at *6. Indeed, the Court has concluded above that Plaintiffs are not likely to succeed in challenging Defendants' review process on this record. *See supra* section II.B.1.c. And while the public no doubt has an interest in the Executive carrying out his important role in foreign affairs, it also has an interest in ensuring those duties are carried out in accordance with law, including the APA, and with the role prescribed to Congress, also a democratically elected branch, under the Constitution. To the extent Defendants' argument seeks more than that, it is merely a repackaging of their unbridled view of Executive foreign affairs power that has been repeatedly rejected by the Supreme Court. *See supra* section II.B.2. In terms of the equities and the public interest, the Executive is equal to, not above, Congress and its laws. However, the scale tips in favor of Plaintiffs on these factors in light of their additional, unrebutted showing of enormous harm.

### E.  Scope Of Relief

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017). The court "need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." *Id.* at 580 (citation omitted). As it did at the preliminary injunction hearing, the Court emphasizes that the scope of the injunctive relief should be tailored to the particular claims that are likely to succeed and the particular showings made as to the other factors.

As described above, the Court finds that Plaintiffs are likely to succeed on their APA claims challenging the agency directives that implemented the blanket suspension of congressionally appropriated aid, but they are not likely to succeed as to the review and large-scale terminations that occurred in the process that took place after February 13, 2025. The Court accordingly finds it proper to preliminarily enjoin the parts of those directives, and the actions taken pursuant to them, to implement the freeze between January 20, 2025, and February 13, 2025. However, the Court denies Plaintiffs' request to preliminarily enjoin or invalidate the subsequent review process or the mass terminations that resulted from it.[20] The Court also finds that Plaintiffs are likely to succeed on their constitutional claims that Defendants' withholding of congressionally

---

[20] The Court notes that Defendants have preserved the government's frequent argument that relief under the APA should apply only to the particular plaintiffs before the Court. As the Court observed at the preliminary injunction hearing, this argument has not been endorsed by the Supreme Court. *Cf. Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 831 (2024) (Kavanaugh, J., concurring) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989))).

appropriated foreign aid funds violates the separation of powers. Again, however, the relief must be properly tailored.

The Court concludes that Plaintiffs' proposed relief is overbroad in two additional respects as to their APA claims and one as to their constitutional claims. First, Plaintiffs propose relief that goes beyond the implementing directives they challenged in their APA claims, such as specifically enjoining Defendants from "terminating, furloughing, or placing personnel on administrative leave" and ordering them to "restore the status quo as it existed before January 20, 2025," including by "restoring technical systems" and restoring prior processes to approve payments. *Glob. Health*, ECF No. 46-6 at 2–4. The Court finds that dictating operational decisions would go beyond the proper relief. While the Court has expressed concern about the length of time before Defendants took action to comply with the TRO, Defendants have since represented that they will adjust staffing levels as needed to comply with the Court's order and have taken at least some steps to do so. *Glob. Health*, ECF No. 58 at 125–26.

Second, and relatedly, the Court cannot adopt Plaintiffs' proposal that Defendants achieve "payment processing rates equivalent to those achieved before January 20, 2025." *Glob. Health*, ECF No. 46-6 at 3. In denying Defendants' application to vacate this Court's order enforcing its TRO, the Supreme Court emphasized the need for "due regard for the feasibility of any compliance timelines." *AIDS Vaccine*, 2025 WL 698083. While that direction was given in the context of the TRO, it applies equally to the preliminary injunction. This Court has since invited both written and oral submissions on the issue of feasibility. During its hearing concerning feasibility, the Court sought the parties' views on creating a clear and feasible benchmark as it relates specifically to the remaining funds to be disbursed at the TRO phase. Given that the parties frequently articulated their respective arguments in terms of the number of payments processed, the Court proposed that

metric and invited the parties' submissions, including requesting data from the parties on what number of payments processed per day would be feasible (or range of payments processed, to the extent not all payments are created equal).

The parties agree that, as of the time of the appeal, there were roughly 2,000 outstanding payments to be processed by USAID, along with additional payments to be processed by State. *Glob. Health*, ECF No. 58 at 131–33. They also agree that both USAID and State could previously "process several thousand payments each day." *Glob. Health*, ECF No. 39-1 ¶ 15. As a benchmark of the current state, Defendants have submitted that after the Supreme Court lifted its administrative stay, they were able to create the capacity to process about 100 payments over one night. *Glob. Health*, ECF No. 54 at 2. In light of these benchmarks, the Court found it feasible for Defendants to process roughly 1,200 payments to Plaintiffs over the course of a four-day period, or roughly 300 payments per day. *See Glob. Health*, ECF No. 53 at 1 (stating that *Global Health* Plaintiffs have around 1,200 outstanding invoices). Although the Court has invited submissions and discussions related to feasibility, there has not been any specific objection to this rate. The Court accordingly finds it appropriate and feasible to order Defendants to continue to process payments at a rate of approximately 300 per day. Although this is a small fraction of the rate at which payments were processed in a single day before January 20, 2025, it nonetheless allows for Defendants to come into compliance within a relatively short period, at a demonstrated level of current capability. The Court may revisit this benchmark if Defendants make a specific showing of legitimate feasibility concerns.

As to the separation of powers claims, Plaintiffs' proposed relief is overbroad insofar as it would specifically order Defendants to continue to contract with them. As discussed, the violation here results from the Executive's decision to unlawfully impound funds appropriated by Congress

for specific foreign aid purposes. To be sure, Plaintiffs observe that they occupy a large share of the sector serving the relevant foreign aid purposes, as demonstrated by the severe harm they have faced as a result of the disruption to the sector, and accordingly it may well be that the only or most practical way for Defendants to carry out their duty to spend the funds is to revive existing partnerships, as Plaintiffs suggest. *See Glob. Health*, ECF No. 58 at 47–48. However, the separation of powers dictates only that the Executive follow Congress's decision to spend funds, and both the Constitution and Congress's laws have traditionally afforded the Executive discretion on how to spend within the constraints set by Congress. The appropriate remedy is accordingly to order Defendants to "make available for obligation the full amount of funds Congress appropriated" under the relevant laws. *See City of New Haven v. United States*, 634 F. Supp. 1449, 1460 (D.D.C. 1986), *aff'd*, 809 F.2d 900 (D.C. Cir. 1987); *cf. Aiken County*, 725 F.3d at 260 (granting mandamus relief and concluding that agency could not "decline to spend previously appropriated funds" toward specified purpose).[21]

## III.    Conclusion

For the reasons above, the Court grants in part and denies in part Plaintiffs' motions for a preliminary injunction. Consistent with this opinion, it is hereby **ORDERED**:

- Defendants Marco Rubio, Peter Marocco, Russell Vought, the U.S. Department of State, the U.S. Agency for International Development, and the Office of Management and Budget (the "Restrained Defendants") and their agents are enjoined from enforcing or giving effect to sections 1, 5, 7, 8, and 9 of the January 24 State Department

---

[21] Defendants request that the Court stay any order issuing a preliminary injunction for a short time while they decide whether to appeal. *Glob. Health*, ECF No. 34 at 45. That request is denied as premature. If, after reviewing this opinion and order, Defendants decide to pursue an appeal, they may move for a stay pending appeal and the Court will consider it in the ordinary course.

memorandum, and any other directives that implement sections 3(a) and 3(c) of Executive Order No. 14169, by giving effect to any terminations, suspensions, or stop-work orders issued between January 20, 2025, and February 13, 2025, for any grants, cooperative agreements, or contracts for foreign assistance. Accordingly, the Restrained Defendants shall not withhold payments or letter of credit drawdowns for work completed prior to February 13, 2025.

- The Restrained Defendants are enjoined from unlawfully impounding congressionally appropriated foreign aid funds and shall make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024.

It is further **ORDERED** that the Restrained Defendants shall take all steps necessary to effectuate this order and shall provide written notice of this order to all recipients of contracts, grants, and cooperative agreements for foreign assistance that were in existence between January 20, 2025, and February 13, 2025. The parties shall file a joint status report by March 14, 2025, that apprises the Court of Defendants' compliance with this order and proposes a schedule for next steps in this matter. The Court is prepared to hold a prompt hearing at the request of the parties to address any feasibility concerns. The February 13 temporary restraining order issued by the Court is hereby dissolved.

   **SO ORDERED.**

            _____

            AMIR H. ALI
            United States District Judge

Date:   March 10, 2025

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

AIDS VACCINE ADVOCACY
COALITION,
      125 Broad Street
      9th Floor
      New York, NY 10004

      and

JOURNALISM DEVELOPMENT
NETWORK, INC.
      7 Saint Paul Street
      Suite 820
      Baltimore, MD 21202

            _Plaintiff,_

      v.

UNITED STATES DEPARTMENT
OF STATE,
      2201 C Street NW
      Washington, DC 20520,

UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT,
      1300 Pennsylvania Ave. NW
      Washington, DC 20004,

MARCO RUBIO, Secretary of State,
      and Acting Administrator of
      United States Agency for
      International Development,
      United States Department of
      State,
      2201 C Street NW
      Washington, DC 20520,

OFFICE OF MANAGEMENT AND
BUDGET,
      725 17th Street NW

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**COMPLAINT FOR**
**DECLARATORY AND**
**INJUNCTIVE RELIEF**

Case No. _____

Washington, DC 20503,     )
     )
RUSSELL VOUGHT, Director,     )
     Office of Management and     )
     Budget,     )
     725 17th Street NW     )
     Washington, DC 20503,     )
     )
and     )
     )
DONALD TRUMP, President of the     )
     United States of America,     )
     1600 Pennsylvania Avenue NW )
     Washington, DC 20050,     )
     )
*Defendants.*     )
_____ )

## INTRODUCTION

1.    This action seeks declaratory and injunctive relief with respect to a series of orders issued by President Donald Trump and his administration that— illegally and unconscionably—froze funding and work related to nearly every United States foreign assistance mission. The Executive Order titled "Reevaluating and Realigning United States Foreign Aid," Exec. Order. No. 14169, 90 Fed. Reg. 8619 (hereafter, Foreign Aid Executive Order), issued on January 20, 2025, exceeds President Trump's constitutional authority and violates his duty under the Take Care Clause of the Constitution, and subsequent orders by federal agencies to implement the Foreign Aid Executive Order's directives have resulted in unlawful actions that are harming and will harm countless individuals and entities, including plaintiffs.

2.    The Foreign Aid Executive Order directs the Office of Management and Budget (OMB) to effectuate a "90-day pause in United States foreign development

assistance for assessment of programmatic efficiencies and consistency with United States foreign policy." *Id.* The funding freeze applied "immediately" to all "obligations and disbursements of development assistance funds." *Id.* After that 90-day period, "[t]he responsible department and agency heads, in consultation with the Director of OMB, will make determinations … whether to continue, modify, or cease each foreign assistance program … with the concurrence of the Secretary of State." *Id.*

3.    Four days after the January 20 Executive Order, the Secretary of State directed his staff to halt "foreign assistance funded by or through" the Department of State and USAID and required the "immediate[ ]" issuance of "stop-work orders" for existing foreign assistance awards.[1]

4.    The Department of State and USAID then issued orders to recipients of foreign assistance funding, including grantees like plaintiffs, requiring them to immediately stop work and to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage.

5.    Congress has neither cancelled appropriated foreign assistance funds nor permitted deferral of grant awards, and it has not authorized blanket stop-work directives to grantees. Moreover, the terms of the grants do not allow arbitrary, unilateral orders to pause or suspend work or funding.

---

[1] Dep't of State, Memo. 25 STATE 6828 (attached as Exhibit A); *see also* U.S. Dep't of State, Office of the Spokesperson (Jan. 29, 2025) https://www.state.gov/prioritizing-americas-national-interests-one-dollar-at-a-time/ (confirming the existence of the January 24 order).

6.    The January 20 Executive Order, the January 24 order of the Secretary of State, and the stop work orders of the Department of State and USAID are unlawful. Implementation and enforcement of these orders should be enjoined.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1361.

8.    Venue is proper in this district because a substantial part of the acts or omissions giving rise to the claim occurred in this judicial district. 28 U.S.C. § 1391(e).

## PARTIES

9.    Plaintiff AIDS Vaccine Advocacy Coalition (AVAC) is a New York-based 501(c)(3) non-profit corporation that works to hasten the end of the global HIV/AIDS epidemic by accelerating development and delivery of HIV prevention options.

10.    Plaintiff Journalism Development Network, Inc. (JDN) is a Maryland-based 501(c)(3) non-profit corporation that supports a global consortium of journalists from more than 70 non-profit investigative centers and regional news organizations across the world. JDN works to help people better understand how organized crime and corruption affect their lives.

11.    Defendant United States Department of State is a federal agency headquartered in Washington, DC, with responsibility for United States foreign relations and foreign policy.

12.    Defendant USAID is a federal agency headquartered in Washington, DC, with responsibility for international development and humanitarian assistance.

13.    Defendant Marco Rubio is the Secretary of State and is the highest-ranking official within the Department of State and the Acting Administrator of USAID and highest-ranking official within USAID. Plaintiffs sue Secretary Rubio in his official capacity. On January 24, 2025, Secretary Rubio issued an order freezing federal funding allocated to plaintiffs and ordering plaintiffs to stop work on their grant projects.

14.    Defendant OMB is a federal agency headquartered in Washington, DC, with responsibility for overseeing the management of federal financial assistance. OMB was directed by Defendant Trump to implement the Foreign Aid Executive Order.

15.    Defendant Russell Vought is the Director of OMB and is the agency's highest-ranking official. Plaintiffs sue Director Vought in his official capacity.

16.    Defendant Donald Trump is the President of the United States and issued the Foreign Aid Executive Order.

## BACKGROUND

**Plaintiffs' Federal Grants**

17.    Through the President's Emergency Plan for Aids Relief (PEPFAR)—a program launched in 2003 to address the global HIV/AIDS epidemic—Plaintiff AVAC has received federal grants for global HIV prevention work for over a decade. In June 2016, USAID entered into a five-year Cooperative Agreement with AVAC to fund the organization's HIV Prevention and Biomedical Prevention Research Project. Through the Cooperative Agreement, AVAC receives federal PEPFAR grant funding to

support a coalition, CASPR, that focuses on accelerating biomedical HIV prevention research. CASPR works in African countries with the highest burden of new HIV infections and performs critical roles in supporting and accelerating prevention research. Among other things, CASPR oversees HIV prevention research projects to ensure that clinical trial participants' rights are protected, and it translates HIV prevention research into accessible resources for policymakers, clinical trial participants, and other community members affected by HIV prevention research. In 2021, USAID extended the agreement for five years—to June 19, 2026—and doubled the amount of funding provided to AVAC under the grant.

18.    AVAC's grant comes from funds appropriated by Congress. In the Further Consolidated Appropriations Act of 2024 (FCAA), Congress appropriated funding to carry out PEPFAR work like AVAC's, including, specifically, to fund "programs for the prevention, treatment, control of, and research on HIV/AIDS … and for assistance to communities severely affected by HIV/AIDS." Pub. L. No. 118-47, Div. F, tit. III, 138 Stat. 740 (2024).

19.    Plaintiff JDN is the recipient of a range of grants from the State Department to help investigative news outlets across the world succeed and serve the public. Among its grant-funded efforts are those that build and sustain local journalist networks in places ranging from the Pacific Islands to Paraguay by providing journalists with access to reporting partners, investigative technology and data, robust editing and fact-checking, digital and physical security support, and

protection against harassment. These grants all have periods of performance that stretch well-beyond the dates JDN received stop work notices.

20.    JDN is also the recipient of State Department grants that support its work through the Global Anti-Corruption Consortium (GACC). GACC exists to bring together journalists, advocates, and anti-corruption stakeholders to tackle transnational corruption and facilitate action by government, law enforcement, and international organizations. It is comprised of over 100 reporting partners, 98 civil society organizations, and two universities across 76 countries. One GACC grant has a period of performance that stretches to September 30, 2025; another stretches to September 30, 2027.

21.    JDN is also the recipient of USAID grant funding for its Strengthening Transparency and Accountability Through Investigative Reporting (STAIR) program. Through that program, JDN supports collaborative investigative journalism networks in Europe and Eurasia. JDN first received a grant for STAIR in 2022; subsequent agreements increased funding and lengthened the period of performance for the program through September 8, 2027.

22.    Funding for JDN grants is appropriated through the FCAA. In that statute, Congress directed that appropriated funds "should be made available for democracy programs," a category that includes "programs that support good governance, credible and competitive elections, freedom of expression, association, assembly, and religion, human rights, labor rights, independent media, and the rule of law, and that otherwise strengthen the capacity of democratic political parties,

governments, nongovernmental organizations and institutions, and citizens to support the development of democratic states and institutions that are responsive and accountable to citizens." *Id.* at Div. F, tit. VII, 138 Stat. 786.

23.    The FCAA also directs that appropriated funds for democracy programs "shall be made available to support and protect civil society activists and journalists who have been threatened, harassed, or attacked[.]" *Id.* at Div. F, tit. VII, 138 Stat. 787.

24.    The FCAA further directs that appropriated funds for democracy programs "shall be made available for programs to protect international freedom of expression and independent media, including through multilateral initiatives." *Id.*

**The Executive Order and the State Department Communiqué**

25.    On January 20, 2025, defendant President Trump signed the Foreign Aid Executive Order.

26.    The Foreign Aid Executive Order directs defendant OMB to effectuate, purportedly through the agency's "apportionment authority," a 90-day freeze on "obligations and disbursements of development assistance funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors."

27.    The Foreign Aid Executive Order further directs "department and agency heads, in consultation with the Director of OMB" to determine "whether to continue, modify, or cease each foreign assistance program."

28.    On January 24, 2025, defendants State Department and Secretary Rubio issued a communiqué to all U.S. diplomatic and consular posts purporting to implement the Foreign Aid Executive Order by directing them to "pause[ ] all new obligations of funding, pending a review, for foreign assistance programs funded by the Department and [USAID]."[2] For existing foreign assistance awards, contracting officers and grant officers were directed to "immediately issue stop-work orders … until such time as the Secretary shall determine, following a review."[3]

29.    Although the communiqué frames the suspension of federal assistance as a temporary "pause," defendants State Department and Rubio have stated that spending on obligated funds has been "prevented" and that many recipients of foreign assistance will not receive the funding to which they are entitled under the terms of the grants.[4] Indeed, reports indicate that, as of Thursday, February 6, about 800 awards and contracts administered through USAID had been canceled.[5]

---

[2] Dep't of State, Memo. 25 STATE 6828.

[3] *Id.*

[4] Office of the Spokesperson, Dep't of State, *Prioritizing America's Interests One Dollar at a Time* (Jan. 29, 2025), https://www.state.gov/prioritizing-americas-national-interests-one-dollar-at-a-time/ ("[E]ven at this early stage, over $1,000,000,000 in spending not aligned with an America First agenda has been prevented.").

[5] Karoun Demirjian and Aishvarya Kavi, *Trump Administration to Lay Off Nearly All of U.S. Aid Agency's Staff*, N.Y. Times (Feb. 6, 2025), https://www.nytimes.com/2025/02/06/us/politics/usaid-job-cuts.html.

J.A. 91

**Agency Orders to Grantees**

30.    Shortly after the issuance of the State Department communiqué, defendants State Department and USAID began to issue stop-work orders to recipients of federal foreign assistance awards.

31.    On January 27, 2025, plaintiff AVAC received a stop-work order from USAID, directing AVAC to "immediately suspend work" and to "cease implementation immediately" of the programs funded by the Cooperating Agreement. AVAC has received no clarification or further communication from USAID.

32.    Beginning on January 24, 2025, plaintiff JDN received a flurry of stop-work orders, often without any indication of what awards they were in reference to. The stop-work orders contained vague and, at times, contradictory statements. One letter terminating an award provided that "all foreign assistance awards are immediately suspended" in one sentence, and in the next indicated that the specific award was suspended on the basis that it "no longer effectuates agency priorities." Other stop-work orders provided that that the suspension was "not due to any actions by your organization" but rather to "give the new administration time to review the use of Foreign Assistance Funds."

**The OMB Memorandum**

33.    On January 27, 2025, defendant OMB and then-OMB Acting Director Matthew Vaeth issued a memorandum titled "Temporary Pause of Agency Grant,

Loan, and Other Financial Assistance Programs."[6]   The memorandum identified

several executive orders issued by defendant Trump, including the Foreign Aid

Executive Order, and directed all federal agencies to "temporarily pause all activities

related to obligation or disbursement of all Federal financial assistance, and other

relevant agency activities that may be implicated by [those] executive orders,

including, but not limited to, financial assistance for foreign aid, nongovernmental

organizations, DEI, woke gender ideology, and the green new deal."

34.    The OMB order was stayed and later enjoined. *See* Minute Entry for

Emergency Hearing Held on 1/28/2025, *National Council of Nonprofits v. Office of

Management and Budget*, 1:25-cv-00239 (D.D.C.); Memorandum Opinion and Order,

Feb. 3, 2025, *National Council of Nonprofits v. Office of Management and Budget*,

1:25-cv-00239 (D.D.C.). On January 29, OMB rescinded the memorandum. *See* OMB

Mem. M25-14, Rescission of M-25-13 (Jan. 29, 2025).

35.    Despite the rescission of the OMB memorandum, White House Press

Secretary Karoline Leavitt has stated that "[t]he President's [executive orders] on

federal funding remain in full force and effect, and will be rigorously implemented."[7]

36.    In separate litigation challenging the OMB memorandum, the United

States District Court for the District of Rhode Island issued a temporary restraining

order directing that OMB and other agency defendants "shall not pause, freeze,

impede, block, cancel, or terminate" obligations to provide federal financial assistance

---

[6]    OMB    Mem-25-13    (Jan.    27,    2025),    *available    at*
https://www.nytimes.com/interactive/2025/01/27/us/omb-memo.html.
[7] @PressSec, X (Jan. 29, 2025), https://x.com/PressSec/status/1884672871944901034/.

to plaintiff states and directing that any effort to review financial assistance programs, as identified in the OMB Memorandum, "shall not affect a pause, freeze, impediment, block, cancellation, or termination of Defendants' compliance with such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms." Temporary Restraining Order, Jan. 31, 2025, *State of New York v. Donald Trump*, 25:cv-00039 (D.R.I.).

37.    Recipients of foreign assistance awards, including plaintiffs, and including, on information and belief, hundreds of other organizations, attempted to draw down State Department and USAID grant funding after the issuance of these temporary restraining orders. They remain to this day unable to access obligated funds pursuant to their grants.

**Consequences of Defendants' Funding Freeze and Stop Work Orders**

38.    In response to defendants' action, U.S. programs ranging from provision of antiretroviral medications to HIV patients to efforts to combat international narcotrafficking to anti-corruption programming ground to an immediate halt. Predictably, chaos ensued. Non-governmental organizations across the world "began shutting doors, sending staff home and turning away their dependents."[8] Thousands

---

[8] Laura Kelly and Nathaniel Weixel, *Chaos and uncertainty swirl around Trump's foreign aid freeze*, The Hill (Jan. 30, 2025), https://thehill.com/homenews/administration/5114561-trump-rubio-foreign-aid-freeze/.

of American employees working for organizations that receive federal grant funding have been furloughed or laid off entirely.[9]

39.    The enormity of Defendants' actions cannot be overstated. Millions across the world are affected. Staff who operate humanitarian operations at refugee camps in Syria were told to stop work, leaving thousands of people vulnerable to instability and violence at the hands of ISIS.[10] Colombian anti-narcotrafficking helicopters were grounded for lack of fuel.[11] Soup kitchens that feed nearly a million people in famine-stricken Khartoum have shut down.[12] Clinical trials that had been underway in Uganda for a potentially lifesaving children's tuberculosis treatment stopped.[13] In the Ivory Coast, a program to collect intelligence on Al Qaeda shut down.[14] Toddlers in Zambia have been deprived of rehydration salts to treat life-

---

[9] Sara Cook, et al., *Rubio foreign aid freeze leads to USAID staff suspensions and contractor terminations*, CBS News (Jan. 28, 2025), https://www.cbsnews.com/news/rubio-foreign-aid-freeze-leads-to-usaid-staff-suspensions-contractor-terminations/.

[10] Tom Bateman, *How a US freeze upended global aid in a matter of days*, BBC (Jan. 29, 2025), https://www.bbc.com/news/articles/c3604r84zjyo.

[11] David Pilling, et al., *Donald Trump's foreign aid freeze sparks global funding crisis*, Financial Times (Jan. 30, 2025), https://www.ft.com/content/59e008d2-ca81-4a31-9e4a-fa10f7497797/.

[12] Sui-Lee Wee, et al., *How the World is Reeling from Trump's Aid Freeze*, N.Y. Times (Jan. 31, 2025), https://www.nytimes.com/2025/01/31/world/asia/trump-usaid-freeze.html.

[13] Stephanie Nolan, *Abandoned in the Middle of Clinical Trials, Because of a Trump Order*, N.Y. Times (Feb. 6, 2025), https://www.nytimes.com/2025/02/06/health/usaid-clinical-trials-funding-trump.html.

[14] *Id.*

threatening diarrhea.[15] Doctors at U.S.-funded medical facilities in Sudan that treat severely malnourished children were forced to choose whether to obey Defendants' orders and "immediately stop their operations or to let up to 100 babies and toddlers die."[16] They continued to administer their life-saving care, but it is "a matter of days, not weeks, before they run out" of funds for supplies like IV bags.[17]

**Injuries to Plaintiffs**

40.     The abrupt cessation of funding and the stop-work order has been disastrous for AVAC. Its grant funding through USAID constitutes forty percent of its total operating budget. As part of its federally supported work, AVAC supports and funds CASPR, a working group of African civil society organizations that conducts research on HIV prevention and translates that research into resources for local communities, including medical research trial participants. The orders freezing funding and requiring AVAC to stop work on federally funded projects are devastating to AVAC's ability to provide these services. As a result of the challenged actions, AVAC was forced to halt all CASPR work, resulting in disruption to HIV prevention research and development and to clinical trials.

---

[15] Stephanie Nolen, *Health Programs Shutter Around The World As Trump Pauses Foreign Aid*, N.Y. Times (Feb. 1, 2025), https://www.nytimes.com/2025/02/01/health/trump-aid-malaria-tuberculosis-hiv.html?smid=nytcore-ios-share&referringSource=articleShare.

[16] Brett Murphy and Anna Maria Barry-Jester, *"People Will Die": The Trump Administration Said it Lifted its Ban on Lifesaving Humanitarian Aid. That's Not True*, ProPublica (Jan. 31, 2025), https://www.propublica.org/article/trump-state-department-usaid-humanitarian-aid-freeze-ukraine-gaza-sudan.

[17] *Id.*

41.    As of today, AVAC has had to lay off seven of its forty-six person staff because of the loss of USAID funding. Without immediate action, it will be forced to lay off ten more people in the next month.

42.    The orders have already caused severe harm to AVAC. With every hour the pause continues, AVAC's ability to do its work and advance its mission to end AIDS and prepare for future pandemics become increasingly more difficult.

43.    The abrupt cessation of funding has likewise devastated JDN's global operations. The organization's budget was abruptly slashed by 29 percent, forcing JDN to lay off 20 percent of its staff and reduce salaries and work time for the majority of the remaining employees.

44.    JDN's mission to support investigative journalists is being harmed in an irreparable and ongoing way.  If funding is not restored, JDN will have no choice but to close programs in a half dozen countries, resulting in the stoppage of investigative journalism operations in Asia, the Pacific, Latin America and Europe.

## FIRST CAUSE OF ACTION

Violation of Separation of Powers (Defendant Trump)

45.    Plaintiffs have a non-statutory right of action to declare unlawful official action that is ultra vires.

46.    The President of the United States has only those powers conferred on him by Article II of the Constitution and federal statutes.

47.    Federal legislation must be passed by both chambers of Congress before it may be presented to the President and, if signed, become law. U.S. Const., art. I.

The President has no authority under the Constitution unilaterally to amend federal statutes.

48.    By requiring agencies to consider and take final action by withholding funding based on factors that are impermissible and arbitrary under the governing statutes, the Executive Order purports to amend Congressional appropriations statutes.

49.    The Foreign Assistance Executive Order exceeds presidential authority and usurps legislative authority conferred by the Constitution on the Congress, in violation of the separation of powers.

50.    Plaintiffs will suffer irreparable injury if the Executive Order is not declared unlawful, and plaintiffs have no adequate remedy at law.

51.    The public interest favors entry of a declaration that the Executive Order is unconstitutional, in violation of the separation of powers, because implementation of the Executive Order has caused and will continue to cause needless death, destruction, and immiseration; will continue to threaten U.S. global security; and will directly result in thousands of Americans losing jobs and income.

## SECOND CAUSE OF ACTION

### Violation of Take Care Clause (Defendant Trump)

52.    Plaintiffs have a non-statutory right of action to declare unlawful official action that is ultra vires.

53.    Under the Constitution, the President has the duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3

54.    The Take Care Clause is judicially enforceable against presidential action that undermines statutes enacted by Congress and signed into law. *See*, *e.g.*, *Angelus Milling Co. v. Comm'r of Internal Revenue*, 325 U.S. 293, 296 (1945) ("Insofar as Congress has made explicit statutory requirements, they must be observed and are beyond the dispensing power of [the Executive Branch]."); *Kendall v. United States ex. Rel. Stokes*, 37 U.S. (12 Pet.) 524, 612–13 (1838).

55.    The Take Care Clause limits the President's power and ensures that he will faithfully execute Congress's laws.

56.    Under the Constitution, the President lacks the authority to direct federal officers or agencies to act in derogation of a federal statute.

57.    Plaintiff will suffer irreparable injury if the Executive Order is not declared unlawful and in violation of the Take Care Clause. Plaintiff has no adequate remedy at law.

58.    The public interest favors entry of a declaration that the Executive Order is contrary to law and unconstitutional, because implementation of the Executive Order will cause needless death, destruction, and immiseration; continue to threaten U.S. global security; and directly result in thousands of Americans losing jobs and income.

59.    Accordingly, the Executive Order is in violation of the Take Care Clause and compliance with or enforcement of the Executive Order violates the Take Care Clause.

## THIRD CAUSE OF ACTION

Violation of the APA—Unlawful Suspension of Grants
and Issuance of Stop-Work Orders
(Defendants Department of State, USAID, Secretary Rubio, OMB, and Director
Vought)

60.    The Administrative Procedure Act (APA) authorizes this Court to hold

unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

61.    Defendants' suspension of plaintiffs' grant funding and issuance of stop-

work orders constitute final agency action under the APA.

62.    Agency defendants suspended plaintiffs' grant funding and ordered

them to stop work without notice, explanation, or reasonable recourse, and in non-

compliance with the terms of the grants.

63.    Defendants' suspension of plaintiffs' grant funding and order to stop

work was arbitrary, capricious, unconstitutional, and not in accordance with law.

## FOURTH CAUSE OF ACTION

Violation of the APA—Unlawful Impoundment of Appropriated Funds
(Defendants Department of State, USAID, Secretary Rubio, OMB, and Acting
Director Vought)

64.    The APA authorizes this Court to hold unlawful and set aside final

agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law" and "compel agency action unlawfully withheld or

unreasonably delayed." 5 U.S.C. § 706(1), (2)(A).

65.    Defendants lack discretion to arbitrarily suspend or terminate existing

grants for which Congress has appropriated funding.

66. Defendants' actions with respect to plaintiffs' grants constitutes the unlawful impoundment of appropriated funds, contrary to the Further Consolidated Appropriations Act of 2024, in violation of the APA.

## FIFTH CAUSE OF ACTION

Violation of the APA—Violation of the Impoundment Control Act
(Defendants Department of State, USAID, Secretary Rubio, OMB, and Acting Director Vought)

67. The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1), (2)(A).

68. The Congressional Budget and Impoundment Control Act of 1974 (the Impoundment Control Act) requires the President to make appropriated funds "available for obligation," unless the President sends a special message to Congress detailing a request to rescind or reserve funds and Congress then passes a rescission bill rescinding the funding. 2 U.S.C. § 683.

69. The President has not transmitted a special message to Congress requesting that foreign assistance funding be rescinded, and Congress has not rescinded appropriations for foreign assistance. The President is thus required by the Impoundment Control Act to expend the appropriated funding.

70. Defendants' suspension of plaintiffs' grant despite the congressional appropriation, and statements that the money will not be spent, is contrary to the Impoundment Control Act, in violation of the APA.

## SIXTH CAUSE OF ACTION

Violation of the APA—Violation of the Anti-Deficiency Act
(Defendants Department of State, USAID, Secretary Rubio, OMB, and Acting
Director Vought)

71.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1), (2)(A).

72.    The Anti-Deficiency Act provides, in relevant part, that "[i]n apportioning or reapportioning an appropriation, a reserve may be established *only*— (A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." 31 U.S.C. § 1512(c)(1) (emphasis added).

73.    Defendants' decision to freeze plaintiffs' grant funding results in an unlawful reserve, contrary to the Anti-Deficiency Act, in violation of the APA.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court:

(A) Declare defendants' suspension of foreign aid assistance unlawful;

(B) Enjoin defendants from enforcing the Executive Order, the January 24 communiqué, and the stop-work orders issued to plaintiffs pertaining to their foreign assistance awards;

(C) Order defendants to immediately reinstate foreign assistance funding and to continue to administer all foreign aid assistance awards to the same extent and in

the same manner as prior to the unlawful suspension, as provided in the terms of the

awards;

    (D) Award plaintiffs their costs and reasonable attorney fees; and

    (E) Grant such other relief as this Court may deem just and proper.

Dated: February 10, 2025        Respectfully submitted,

/s/ Lauren E. Bateman
Lauren E. Bateman (D.C. Bar No. 1047285)
Allison M. Zieve (D.C. Bar No. 424786)
Nicolas A. Sansone (D.C. Bar No.1686810)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Counsel for Plaintiffs*

J.A. 103

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| AIDS VACCINE ADVOCACY ) | |
| COALITION, et al., ) | |
| ) | |
| *Plaintiffs*, ) | Civil Action No. 25-cv-400 |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES DEPARTMENT ) | |
| OF STATE, et al., ) | |
| ) | |
| *Defendants*. ) | |
| _____ ) | |

**DECLARATION OF MITCHELL WARREN**

I, Mitchell Warren, declare the following under penalties of perjury:

1.    I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.    I am the Executive Director of the AIDS Vaccine Advocacy Coalition (AVAC), a New York-based non-profit organization that leverages its independent voice and global partnerships to accelerate the ethical development and equitable delivery of effective HIV prevention options.

3.    AVAC was the recipient of a five-year Cooperative Agreement with USAID in June 2016 to fund our HIV Prevention and Biomedical Research Project. That agreement funded our work on the Coalition to Accelerate & Support Prevention Research (CASPR), a coalition of African civil society organizations that conducts research on HIV prevention and translates that research into resources for local

J.A. 104

communities, including medical research trial participants.

4.    AVAC's work with CASPR has been essential in, among other things, preparing African nations for the rollout of pre-exposure prophylaxis (PrEP), a medication regimen used to prevent HIV infection in people who are at high risk of exposure to the virus.

5.    PrEP is an essential part of the global fight against HIV/AIDS. This lifesaving treatment is highly effective in preventing HIV infection and has drastically reduced the number of new HIV infections and AIDS-related deaths.

6.    In turn, the support of the United States through the President's Emergency Plan for AIDS Relief (PEPFAR) is crucial in supporting PrEP initiations for high-risk populations globally. According to the government's own materials, PEPFAR accounts for more than 90% of PrEP initiation worldwide.[1] And PEPFAR is currently supporting long-acting injectable PrEP with plans to launch in six additional countries by the end of 2024.[2]

7.    This injectable—lenacapavir—is astonishingly effective. One trial found 100% efficacy in preventing HIV in a group of 5,300 people in Uganda and South Africa. Another showed a 96% reduction in HIV incidence.

8.    CASPR is a crucial part of the rollout of lenacapavir. Our experience has shown that even extremely effective medication must be supported by programs,

---

[1]    *See* hiv.gov, *PEPFAR* (Dec. 23, 2024), https://www.hiv.gov/federal-response/pepfar-global-aids/pepfar.

[2] *Id.*

policies, and funding to improve access. Through CASPR, AVAC is working diligently to ensure that rollout of the new, life-saving medication is both swift and ethical.

9.      In 2021, USAID extended the cooperative agreement for five years—until June 19, 2026—and doubled the amount of funding provided to AVAC under the grant.

10.     Grant funding from USAID constitutes 40 percent of AVAC's total operating budget.

11.     As a result, the orders freezing funding and requiring AVAC to stop work on federally funded projects have eviscerated AVAC's ability to provide crucial support to HIV preventive research, development, and rollout. The freeze forced us to halt all CASPR work, resulting in disruption to HIV prevention research and development and to clinical trials.

12.     So far, AVAC has had to lay off 7 people from our 46 person staff as a result of the abrupt halt in federal funding. We will be forced to lay off 10 more people over the next month.

13.     The injuries suffered by AVAC are ongoing and will persist unless the stop-work orders are rescinded.

14.     A true and correct copy of the stop work order AVAC received is attached to this declaration as Exhibit A.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2025.

___/s/_____

Mitchell Warren
Executive Director, AVAC

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| _____ | ) | |
| AIDS VACCINE ADVOCACY | ) | |
| COALITION, et al., | ) | |
| | ) | |
| _Plaintiffs_, | ) | Civil Action No. 25-cv-400 |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF STATE, et al., | ) | |
| | ) | |
| _Defendants._ | ) | |
| _____ | ) | |

**DECLARATION OF ANDREW SULLIVAN**

I, Andrew Sullivan, declare the following under penalties of perjury:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I am the co-founder and publisher of the Journalism Development Network (JDN), a Baltimore, Maryland based non-profit. JDN is one of the largest investigative journalism organizations in the world. It publishes as the Organized Crime and Corruption Reporting Project (OCCRP).

3.      JDN is a mission-driven newsroom that partners with other media outlets to publish stories that lead to real-world action. JDN reports on topics that few other news organizations cover in depth, including how crime and corruption are fueling the crises of our time: war, climate change, inequality, and threats to democracy.

4.     At the same time, our media development arm helps investigative outlets around the world succeed and serve the public. Through this work, JDN helps build and sustain news organizations by providing journalists in our global network with critical services such as access to reporting partners, investigative technology and data, robust editing and fact-checking, digital and physical security support, protection against legal harassment. Our reporting partners share data, expertise, and local knowledge—which, in turn, strengthens the entire network, helping us uncover more crime and corruption.

5.     JDN has received a great deal of recognition for its work. In 2024 alone, JDN received EPPY Awards for excellence in digital journalism, the Inter-American Press Association's In-Depth Journalism Award for our project on Latin American organized crime, and a DIG Award for our joint investigation with BBC Eye that uncovered links between the multi-billion dollar Captagon drug trade and senior members of President Bashar al-Assad's family, as well as several other awards for our individual journalists and media partners. In 2023, JDN was nominated for a Nobel Peace Price for our work contributing to peace by unmasking political corruption and organized crime.

6.     State Department and USAID grants constitute 38% of JDN's budget.

7.     USAID's grant enabled JDN to launch the Strengthening Transparency and Accountability Through Investigative Reporting (STAIR) program. Through that program, JDN supported collaborative investigative journalism networks in Europe and Eurasia. When USAID initially announced the grant, it issued a press release

describing the importance of the program, stating:

> Investigative journalism is an essential element in addressing the endemic corruption that continues to act as a barrier to the economic and democratic aspirations of the citizens of Europe and Eurasia. Over the past decade, increased awareness of crime and corruption have helped unite citizens across ethnic, age, and geographic divides who seek greater accountability and transparency from political and financial elites.
>
> Investigative journalists, often at great risk to themselves, invest months and sometimes years to conduct complex, transnational investigations that expose how the powerful manipulate financial, regulatory, and legal systems to enrich themselves, corrode democratic institutions, and open the door to foreign manipulation of economies and political processes. Investigative journalism requires a substantial investment of time, effort, and financial resources beyond the reach of most news organizations, many of which already struggle to turn a profit.
>
> USAID's support, through STAIR, aims to make that investment financially viable, enable cross-border collaboration, and ensure journalists have the tools they need to protect themselves from retaliation.[1]

8.    Without USAID funding, STAIR cannot continue at its current capacity. We will be forced to make severe cuts to our programming across the world.

9.    State Department grants helped JDN launch and sustain the Global Anti-Corruption Consortium (GACC). GACC accelerates the fight against corruption by connecting hard-hitting investigative journalism to skillful civil society advocacy. Its work has demonstrable impact: In 2022 and 2023, GACC's work contributed to 26 official investigations into corruption, sanction violations, environmental crimes,

---

[1] The USAID.gov website is no longer functional. However, a copy of the press release is available through the Internet Archive at https://web.archive.org/web/20241108225737/https://www.usaid.gov/news-information/press-releases/nov-02-2022-usaid-launches-new-program-bolster-investigative-journalism-europe-eurasia.

3

J.A. 110

election interference, and other wrongdoing and led to 89 official government actions, including policy changes, legislative actions, and sanctions.

10.    The abrupt freeze of GACC grant funding has impeded JDN's work, by eliminating a critical tool in exposing global organized crime and corruption.

11.    State Department grants also support our work building capacity and support for journalists doing essential anti-corruption reporting in places like Cambodia, Cyprus, Malta, the Pacific Islands, Paraguay, and Russia. Without State Department funding, JDN cannot continue to serve all of these locations.  Mature programs in the Pacific, Latin America, Europe and Asia have been ended and most staff laid off.  JDN has significant new holes in its global network making it difficult to effectively do collaborative, cross border investigations.

12.    Already, JDN cut 43 of its 199 staff because of the uncertainty of the current situation. Most of the rest of the staff has had their work week shortened to 4 days with a corresponding 20 percent cut in pay.  We have cancelled events including our annual meeting, cut travel for investigative reporting and frozen the purchase of new equipment. The current situation hampers our journalism, reduces our impact and creates uncertainty and fear amongst staff.

13.    The injuries suffered by JDN are ongoing and will persist unless the stop-work orders are rescinded.

14.    True and correct copies of the stop work orders we received are attached as Exhibit A.

I declare under penalty of perjury that the foregoing is true and correct.

4

J.A. 111

Executed on February 12, 2025.

_____/s/_____

Andrew Sullivan
Publisher, Journalism Defense Network

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*,<br><br>     Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF STATE, *et al.*,<br><br>     Defendants. | Civil Action No. 1:25-cv-00400 |

**DEFENDANTS' NOTICE RELATED TO FEBRUARY 12, 2025 HEARING**

On the morning of February 12, 2025, Plaintiffs filed a motion for a temporary restraining order ("TRO"), attaching multiple declarations. ECF No. 13. The Court scheduled a telephonic hearing for approximately three hours thereafter. During that hearing, counsel for the Government referenced a declaration of Peter Marocco, Deputy Administrator of U.S. Agency for International Development ("USAID"), which it had already filed in opposition to a motion for preliminary relief already filed in the related case of *American Foreign Service Association et al. v. Trump et al.*, 1:25-cv-352. The Court ordered the Government to file that declaration in this case within an hour of the conclusion of the hearing, and it is attached to this notice as Exhibit A. The Court further ordered the Government to file a list of the authorities on which it most directly relied in *American Foreign Service Association* in support of its arguments there, which is attached as Exhibit B.

Additionally, to further assist the Court's evaluation of the Plaintiffs' TRO motions to which Defendants have not yet had an opportunity to respond in writing, the Government also

attaches to this notice as Exhibit C the full memorandum in opposition to the plaintiffs' motion for a temporary restraining order that it filed in *American Foreign Service Association*. While there is not perfect overlap on all issues or parties, the Government respectfully requests that this Court consider the Government's arguments contained therein as they relate to the pending motion for a temporary restraining order in this case.

Finally, the Government submits a proposed order, as requested by the Court, attached as Exhibit D.

Dated: February 12, 2025                    Respectfully submitted,

                                             BRETT A. SHUMATE
                                             Acting Assistant Attorney General
                                             Civil Division

                                             ERIC J. HAMILTON
                                             Deputy Assistant Attorney General
                                             Federal Programs Branch

                                             ALEXANDER K. HAAS
                                             Director
                                             Federal Programs Branch

                                             LAUREN A. WETZLER
                                             Deputy Director
                                             Federal Programs Branch

                                             CHRISTOPHER R. HALL
                                             Assistant Branch Director

                                             */s/ Christopher D. Edelman*
                                             CHRISTOPHER D. EDELMAN
                                             Trial Attorney
                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             1100 L St. NW
                                             Washington, DC 20005
                                             Phone: (202) 305-8659
                                             Email: christopher.edelman@usdoj.gov

                                             *Counsel for Defendants*

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FOREIGN SERVICE
ASSOCIATION, *et al.*,

      Plaintiffs,

v.

PRESIDENT DONALD TRUMP, *et al.*,

      Defendants.

Civil Action No. 1:25-cv-00352-CJN

## DECLARATION OF PETE MAROCCO

I, Pete Marocco, pursuant to 28 U.S.C. 1746, hereby declare as follows:

      1.      I am over 18 years of age, of sound mind, and otherwise competent to make this declaration. This declaration is based on my personal knowledge and information provided to me in my official capacity by others.

      2.      Since Thursday, January 30, 2025, I have performed the duties and functions of both Deputy Administrators of the United States Agency for International Development ("USAID" or the "Agency"). I manage the day-to-day operations at USAID including personnel matters and operations. Since January 20, 2025, I have also served as the Director of Foreign Assistance at the Department of State. Previously, I served as a United States Marine and as a Deputy Assistant Secretary at both the Department of State and the Department of Defense. Additionally, I served on a special assignment as the Senior Advisor for Intelligence and Security to the Secretary of Commerce and served as the Assistant to the Administrator at USAID, overseeing the Bureau for Conflict Prevention and Stabilization.

1

3.      On January 20, 2025, President Trump issued an Executive Order—"Reevaluating and Realigning United States Foreign Aid"—directing a 90-day pause in foreign development assistance, to allow for an "assessment of programmatic efficiencies and consistency with United States foreign policy." *See* Executive Order, *Reevaluating and Realigning United States Foreign Aid* (Jan. 20, 2025), attached as Exhibit A.  Further, on January 24, 2025, Secretary of State Rubio, consistent with that Executive Order, directed a "pause[]" on "all new obligations of funding, pending a review, for foreign assistance programs funded by or through the [State] Department and USAID." *See* Secretary of State ALDAC re *Executive Order on Review of Foreign Assistance Programs*, 25 STATE 6528 (Jan. 24, 2025), attached as Exhibit B.

4.      In both my role as the Director of Foreign Assistance, which oversees USAID's delivery of foreign aid, and now in my role managing USAID's operations, my primary focus has been to develop a tracking system to achieve greater accountability of USAID's human resources and capital outlays across its global footprint.  Accountability and effective controls are essential to ensuring that the aforementioned directives of the President and Secretary are fully and faithfully followed across USAID's operations and that USAID's programs further, rather than undermine, the foreign policy and national interests of the United States.

5.      To that end, beginning shortly after the President's Executive Order directed the 90-day foreign assistance pause on January 20, 2025, I made numerous requests for information about USAID's operations, programs, and compliance with the President's directives.  In both of my roles, I have consistently found USAID's senior staff were unwilling or unable to provide basic compliance and oversight information.  For example, senior professionals in the Agency's Bureaus and finance, legal, and human capital groups were not able to identify who, when, and why dozens of specific multi-million-dollar payments were approved or disbursed in the days following the

2

President's and Secretary's directives to pause most USAID disbursements and programs. Agency senior staff were not able to explain whether the Agency's payments system contained any controls to ensure compliance with these directives and, if so, how those processes worked. After the Secretary approved waivers to permit specific programs or activities to continue, Agency staff have been consistently unable to identify which specific payments were affected by the waivers and should be released for disbursement. Last week, it took more than two days for Agency senior staff to produce a list of overseas personnel and their physical location despite repeated and direct requests.

6.      This lack of clear or timely information sharing caused grave concern about whether USAID was faithfully following the President's and Secretary's directives. Those concerns were amplified when, in the days just before and following Secretary Rubio's directive, Agency leadership became aware that a group of USAID employees were not complying with the President's Executive Order and Secretary's order and continued to permit new funding obligations paused by those directives. In the days following the Secretary's order, USAID leadership conducted a review of Agency operations and identified certain employees who were responsible, directly or indirectly, for permitting the unauthorized flow of funds in violation of these Presidential and Secretarial directives.

7.      Moreover, the noncompliance identified by Agency leadership raised serious, systemic concerns about the management and processes governing USAID. As articulated by Secretary Rubio, and consistent with the views of the President, USAID's foreign assistance processes reflected signs of severe inefficiency, and a substantial number of the programs funded by USAID neither substantially benefited the American people, nor reflected the priorities of the President and Secretary. Many of USAID's programs substantially overlap, conflict, or duplicate

3

J.A. 118

functions at the Department of State, which often leads to discord in the President's ability to carry out foreign relations with one voice. Furthermore, many of USAID's pre-existing programs were in conflict with the directives and priorities of the President and Secretary, and therefore were inconsistent with the public interest and foreign policy judgments of the Executive Branch. Given the scale of these programs, an *ad hoc* review of these conflicting programs would unduly burden the execution of the President's other foreign policy priorities. A blanket pause with a waive-in process was the more efficient and effective path.

8.    In light of these problems, on January 30, President Trump directed Secretary of State Rubio to perform the functions and duties of the Administrator of USAID in an acting capacity; the prior Acting Administrator returned to his prior position as Chief Information Officer. Several days later, Secretary Rubio sent a letter to Congress, formally notifying them consistent with applicable law, including sections 7063 and 7015 of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024 (Div. K, P.L. 118-47), as carried forward by the Continuing Appropriations Act, 2025 (Div. A, P.L. 118-83), of "our intent to initiate consultations with you regarding the manner in which foreign aid is distributed around the world through [USAID]," including the review and potential reorganization of USAID and the potential absorption by the Department of State of certain bureaus, offices, and missions of USAID. *See* February 3, 2025 Letter to the Chairs and Ranking Members of the House Committee on Foreign Affairs, the Senate Committee on Foreign Relations, and the House and Senate Committees on Appropriations, attached at Exhibit C. The letter further stated that Secretary Rubio had delegated to me the duties of Deputy Administrator of USAID, "to begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest." *Id.*

4

J.A. 119

9.    The first step of this review, in essence, involved the majority of USAID pausing a substantial portion of its ongoing work—going "pencils down"—so that the Secretary and USAID leadership could gain control of an organization that included some employees who had refused to comply with lawful directives by the President and Secretary, directives designed to identify wasteful or fraudulent programs or those contrary to the foreign policy interests of the United States.  The pause of ongoing work and use of paid administrative leave have enabled Agency leadership to begin a thorough review of USAID's operations and align its functions to the President's and Secretary's priorities, without continued noncompliance by former Agency leadership and management undermining those priorities.  Pausing a majority of USAID's work was, and remains, necessary to continue this thorough review into the noncompliance issues first identified, as well as to continue to examine USAID's processes and the manner by which USAID funds its programs.  Only by engaging in this audit and review, could the Agency leadership and the Secretary ensure that USAID's funding decisions aligned with the foreign policy priorities of the United States.  This audit and review would have been ineffective and would have been inconsistent with the public interest if USAID's then extant operations remained unchecked. Indeed, our experience with widespread noncompliance with initial stop-work directives raised serious doubt about whether Agency leadership would have received necessary information in a timely manner and also whether directives of Agency leadership would be promptly and faithfully complied with.  Instead, the best course was an across-the-board pause, where Agency leadership could then determine on a more targeted basis which programs continued to make sense for the American people, and which did not.

10.    At the time the general pause on foreign aid was issued, Secretary Rubio issued four waivers for: foreign military financing for Israel and Egypt, emergency food assistance,

5

J.A. 120

related administrative expenses, and legitimate expenses incurred before the pause went into effect. In the days following the general pause on foreign aid, Secretary Rubio adopted a waiver process to ensure that important aid programs within the national interest would be able to continue during the period of review. For instance, on January 28, Secretary Rubio issued an emergency humanitarian waiver for life-saving humanitarian assistance programs. Along with this general waiver, the State Department is also issuing case-by-case waivers, based on specific programs. Consistent with this approach to foreign assistance administered by the State Department, a similar pause and waiver process applies to USAID's operations to ensure they too are aligned with the President's and Secretary's priorities. And the humanitarian waiver just noted (among others) applies in full measure to USAID programs.

11.    There are 4,765 direct hire full-time equivalent employees at USAID. The Agency identified an initial set of 58 employees who were placed on paid administrative leave on Monday, January 27, 2025. This group included senior staff who engaged in noncompliance vis-à-vis the funding pause and stop-work orders or other acts of insubordination or questionable contracting practices or who were charged with managing and administering initiatives no longer deemed to be in the national interest (*e.g.*, DEI programs). On Saturday, February 1, 2025, an additional 57 employees were placed on administrative leave, many of whom engaged in similar acts of insubordination, deceit, or non-compliance with Executive Orders or Agency leadership directives.

12.    Agency leadership ultimately determined that the placement of a substantial number of USAID personnel on paid administration leave was the only effective way to pause operations, faithfully implement the pause, and conduct a full and unimpeded audit of USAID's operations and programs, consistent with the President's and Secretary's directives. Accordingly, on Monday, February 3, 2025, USAID placed an additional 606 employees on paid administrative

J.A. 121

leave; on Tuesday, February 4, 2025, another 1,416 employees were placed on paid administrative leave. As of February 7, 2025, before this Court issued the temporary restraining order, approximately 2,140 total USAID U.S. direct hires were on paid administrative leave. To the best of my knowledge, none of these employees were located in high-risk countries, such as Syria.

13.    Approximately 98% of the 2,140 employees on paid administrative leave as of February 7, 2025, were physically located within the Continental United States, with the remaining located in developed countries like the United Kingdom or Hungary where employees face little risk of physical danger and where USAID has little to no mandate. USAID did not intentionally place any employee in a high-risk location on paid administrative leave. Upon being informed that several employees might have temporarily been in high-risk locations, USAID immediately removed these employees from administrative leave and fully restored their preexisting access to all USAID and other government systems.

14.    As is customary, each of the employees placed on administrative leave had their access restricted to USAID digital systems, including their Agency-sponsored email accounts. Given the sensitivity of government information systems, the need to protect sensitive government information, to avoid the risk of data breach, and to maintain the integrity of the ongoing pencils down review, Agency leadership thought it prudent to restrict access for those employees temporarily removed from their regular duties by being placed on paid administrative leave. As noted, these were employees physically located in the United States or other safe, developed nations where restricting their access to USAID systems posed minimal risk of danger. I am unaware of any employee in a dangerous location such as Syria whose access was impacted.

15.    As part of this effort to pause work at USAID, Agency leadership also conducted a review of its employees to identify which employees were essential—*i.e.*, those who are

7

J.A. 122

responsible for mission-critical functions, core leadership, and those who work on specially designated programs—and who should not be placed on administrative leave.

16.     Over the course of the last week, Agency leadership initially determined that approximately 611 employees qualified as essential to perform USAID's required duties and to facilitate orderly contingency and audit operations.  For example, many employees in the travel office were deemed essential because they would be responsible for helping USAID employees abroad come home to the United States, if they wished to do so.  Essential personnel also included subject matter experts from most parts of the Agency such as the regional bureaus; a large contingent of personnel administering and overseeing emergency humanitarian, food, and medical assistance; information systems managers; security officers; legal counsel; the Chief Human Capital Officer and other human resources employees, contracting officers and others.  The process of selection included senior political and career leaders who carefully contemplated an essential staff level.

17.     As part of its efforts to pause work and facilitate an audit of USAID's operations, the Agency had planned to place another approximately 2,014 employees, excluding those it had deemed as essential, on paid administrative leave beginning 11:59 p.m. on Friday, February 7, 2025.

18.     Following this Court's February 7, 2025 Order, however, the Agency has not placed any additional employees on administrative leave, and it reinstated all employees previously placed on any form of administrative leave.  Moreover, the Agency has restored access to email, payment, and security notification systems to those employees whose access was previously limited or shut off. During the pendency of the Court's February 7 Order, should Plaintiffs' counsel

8

J.A. 123

identify specific employees without access these systems, USAID will diligently work to rectify any such inadvertent technical access limitation. *But see infra* ¶ 20.

19.     Before this Court's February 7 Order, USAID's website indicated that all non-essential employees would be placed on administrative leave that evening.  After this Court's Order, however, the Agency removed that message from its website.  Moreover, the Agency sent an email notice of the Order to all USAID employees.

20.     On Sunday, February 9, 2025, the Agency separately placed four individuals on paid investigative leave pending further inquiry into specific and serious acts of deceit, insubordination, and refusal to follow direct and lawful orders.  These acts appeared to be intentional and directly related to the Agency's critical operations.  If permitted to return to active duty, these senior employees present a grave risk to the Agency's ongoing operations, missions, and chain of command.

21.     In order for USAID to conduct the requisite and thorough internal review of its operations, it is imperative that this Court lift its TRO and permit the Agency to go forward with its "pencils down" approach.

22.     USAID has a careful plan to implement a safe and orderly process of repatriating USAID workers stationed abroad, for those who wish to return.

23.     Those employees who are abroad, or "at Post," were given, and will be provided with, a choice to either stay at Post, or return to the United States.  Leadership wanted to provide this option to these employees so that they would not fear being accused of abandoning their assignment by returning to the United States.  But if an employee chooses to stay at Post, he or she will be entitled to all of the benefits previously available, so long as he or she remains on paid

9

J.A. 124

administrative leave. If an employee chooses to return to the United States, the Agency will coordinate and financially cover that return for the employee and his or her family.

24.    As noted, I am not aware of any instance where any USAID employee in a high-risk country has been cut-off from their USAID digital systems while in the field, nor restricted in their access to any embassy or government safe space. Nor have I, or any senior leader I am aware of, issued any type of "evacuation" order to force a USAID employee to leave their post because of the pause and review, as alleged by Plaintiffs.

25.    By requiring that employees make a voluntary decision about their desire to return to the United States within 30 days, that 30-day deadline balances the need to afford employees time to order their affairs and consider their needs, with the Agency's interest in coordinating and managing its staff as well as the Agency's duty to guard against waste, fraud, and abuse. Additionally, I carefully considered, along with the leadership of the Department of State and other USAID leaders, additional circumstances that might warrant special attention, time, resources, an exception, or an extension. Consistent with the choice offered to these employees, there have been no forced or attempted evacuations of any USAID employee at Post related to the subject leave and no directive that they must return to the United States. *See* USAID Website as of February 7, 2025, FAQ 1, attached as Exhibit D.

26.    The Agency also understands that certain employees may not be in a position to leave their Post within 30 days. Accordingly, the Agency has also made clear that it will consider case-by-case exceptions and offer extensions based on personal or family hardship, mobility or safety concerns, or other reasons. For example, the Agency will consider exceptions based on the timing of dependents' school term, personal or familial medical needs, pregnancy, and other reasons. Additionally, the Department of State has initiated a coordination support team (CST) of

at least 40 staff (and growing) to support travel, logistics or other requests inside the Department's operations center to be prepared and available in the event of a large voluntary movement.

27.     When an employee is placed on paid administrative leave, he or she may lose access to certain USAID systems—the rationale for which is to ensure the person is on bonafide leave, to maintain the security of internal systems, and to ensure that the "pause" on Agency operations can truly go into effect. USAID presently has no plan or proposal that an employee would be shut out from access to overseas security resources at a high-risk post. Allowing employees on administrative leave to continue accessing USAID systems would create serious security and foreign policy risks.

28.     As part of pausing existing activities, the Agency has generally paused all expenditures in connection with foreign aid, save for those programs with approved waivers or exceptions. That is so for both new programs (as discussed in Secretary Rubio's directive) as well as existing ones (as later determined by Agency leadership). As for the latter, the United States typically has the right under any grant or contract to terminate assistance in the event that such program is no longer in the national interest. I am personally aware of no instances where an individual employee of USAID would be liable in a personal capacity for the United States terminating a grant, contract, or similar program—as alleged by Plaintiffs.

29.     USAID's pause on funding is also not categorical. Rather, the Agency has engaged in a robust process to grant prompt and warranted clarifications of waivers and exceptions from this pause, where the national interest warrants. For example, the leadership of the U.S. President's Emergency Plan for AIDS Relief (PEPFAR) requested a waiver to prevent a wide spread of HIV and continue life-saving care. We quickly met with their team who thanked us for the pause and review, because as they described, the program suffered from serious lack of reform and oversight

J.A. 126

filled with programs that have nothing to do with HIV. We were able to quickly provide clarification of a limited waiver and per direct reports from the leadership, the necessary program has continued. In contrast to the Plaintiff's allegations regarding essential assistance in Gaza, we were able to identify and quickly clarify a waiver for an authorized program. That limited waiver, which was consistent with the Agency's priorities, is in contrast to an effort by one USAID employee who broke the chain of command, did not communicate with her immediate USAID supervisor, and attempted to obligate or authorize the expenditure of nearly a half a billion dollars in assistance in a manner that was inconsistent with the President's and Secretary's priorities. It is this sort of noncompliance and apparent evasion of Agency processes and policy direction that resulted in placing this employee on administrative leave to permit review of those and other actions.

30.    As noted above, on February 3, Secretary Rubio began a consultative process with the Congress regarding the future of USAID. *See* Exhibit C. Those discussions remain productive and ongoing.

I declare under penalty of perjury under the laws of the United States that the information in this declaration is true and correct.

Peter Marocco

Deputy Administrator, USAID

February 10, 2025

12

J.A. 127

# EXHIBIT A

# Presidential Documents

Executive Order 14169 of January 20, 2025

## Reevaluating and Realigning United States Foreign Aid

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* The United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values. They serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries.

**Sec. 2**. *Policy.* It is the policy of United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States.

**Sec. 3**. (a) *90-day pause in United States foreign development assistance for assessment of programmatic efficiencies and consistency with United States foreign policy.* All department and agency heads with responsibility for United States foreign development assistance programs shall immediately pause new obligations and disbursements of development assistance funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors pending reviews of such programs for programmatic efficiency and consistency with United States foreign policy, to be conducted within 90 days of this order. The Office of Management and Budget (OMB) shall enforce this pause through its apportionment authority.

(b) *Reviews of United States foreign assistance programs.* Reviews of each foreign assistance program shall be ordered by the responsible department and agency heads under guidelines provided by the Secretary of State, in consultation with the Director of OMB.

(c) *Determinations.* The responsible department and agency heads, in consultation with the Director of OMB, will make determinations within 90 days of this order on whether to continue, modify, or cease each foreign assistance program based upon the review recommendations, with the concurrence of the Secretary of State.

(d) *Resumption of paused development assistance funding.* New obligations and disbursements of foreign development assistance funds may resume for a program prior to the end of the 90-day period if a review is conducted, and the Secretary of State or his designee, in consultation with the Director of OMB, decide to continue the program in the same or modified form. Additionally, any other new foreign assistance programs and obligations must be approved by the Secretary of State or his designee, in consultation with the Director of OMB.

(e) *Waiver.* The Secretary of State may waive the pause in Section 3(a) for specific programs.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02091
Filed 1–29–25; 11:15 am]
Billing code 3395–F4–P

# EXHIBIT B

**UNCLASSIFIED**



| | |
|---|---|
| **MRN:** | 25 STATE 6828 |
| **Date/DTG:** | Jan 24, 2025 / 241600Z JAN 25 |
| **From:** | SECSTATE WASHDC |
| **Action:** | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| **E.O:** | 13526 |
| **TAGS:** | PREL, AID, EAID |
| **Subject:** | Executive Order on Review of Foreign Assistance Programs |

1. (U) Consistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid, this ALDAC pauses all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department and USAID.

2. (U) Across the United States government, it is currently impossible to access sufficient information in one place to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy.  The Department needs a centralized repository from which senior Department, USAID officials, Ambassadors, missions and others can draw sufficiently detailed information from which the Secretary can make judgments.  Further guidance regarding a new or updated repository and mandatory bureau submissions to it will be forthcoming.

**ACTIONS TO BE TAKEN**

3. (U) Within thirty (30) days, the Director of the Policy Planning Staff (S/P) or its designate shall develop appropriate review standards and collaborate with the Director of the Office of Foreign Assistance (F), the Office of Budget and Planning (BP), the Office of Management and Budget (OMB), and/or other departments and agencies as appropriate to ensure that all foreign assistance is aligned with President Trump's foreign policy agenda and that data regarding all foreign assistance spending in the future is aggregated and inputted into a comprehensive internal Department repository.

4. (U) Within eighty-five (85) days of this ALDAC, the government-wide comprehensive review of all foreign assistance shall be completed, and a report shall be produced to the Secretary of State for his consideration and recommendation to the President.

5. (U) In keeping with one voice of American foreign policy, the United States government, through any department, agency or entity, shall not provide foreign assistance funded by or through the Department and USAID without the Secretary of State's authorization or the authorization of his designee.

6. (U) All U.S. foreign assistance shall be aligned under the Secretary of State's coordination, direction, and supervision, as appropriate, consistent with section 622(c) of the Foreign Assistance Act of 1961 and section 1523 of the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA) within 180 days.

7. (U) Effective immediately, Assistant Secretaries and Senior Bureau Officials shall ensure that, to the maximum extent permitted by law, no new

obligations shall be made for foreign assistance until such time as the Secretary shall determine, following a review.  For existing foreign assistance awards, contracting officers and grant officers shall immediately issue stop-work orders, consistent with the terms of the relevant award, until such time as the Secretary shall determine, following a review.  Decisions whether to continue, modify, or terminate programs will be made following this review.

8. (U) Effective immediately, pending a review of foreign assistance programs:  no new requests for proposals (RFPs), requests for application (RFAs), notices of funding opportunities (NOFOs), or any other kind of solicitation or request for foreign assistance funding shall be published or processed by the Department, USAID, or other agencies implementing programs funded by the Department or USAID until each has been reviewed and approved by F as consistent with the President's policy; no further technical evaluation committees shall be convened; and there shall be no further funding obligated to awards and contracts or indefinite delivery /indefinite quantity (IDIQ) contracts.

9. (U) Effective immediately, I am suspending the review process for proposals for new foreign assistance grants, subgrants, contracts, or subcontracts.  No new funds shall be obligated for new awards or extensions of existing awards until each proposed new award or extension has been reviewed and approved by F as consistent with the President Trump's agenda.

10. (U) Within thirty (30) days of the issuance of the review standards in paragraph 4, every Bureau, agency office and entity providing any type of

foreign assistance shall produce to F for review a list of all active, pending, or proposed grants, subcontracts, contracts, or subcontracts, and provide a clear and concise statement explaining if and how the current or proposed use of obligated funds advances President Trump's policy.

11. (U) The spokesperson will also release a public statement to this effect.

12. (U) The Secretary of State has approved waivers of the pause under the Executive Order and this ALDAC, subject to further review, with respect to:

(a) foreign military financing for Israel and Egypt and administrative expenses, including salaries, necessary to administer foreign military financing;

(b) emergency food assistance and administrative expenses, including salaries, necessary to administer such assistance;

(c) on a temporary basis, salaries and related administrative expenses, including travel, for U.S. direct hire employees, personal services contractors, and locally employed staff;

(d) legitimate expenses incurred prior to the date of this ALDAC under existing awards or legitimate expenses associated with stop-work orders; and

(e) exceptions to the pause approved by the Director of Foreign Assistance.

DEFINITIONS

13. (U) Only for purposes of this ALDAC, foreign assistance means assistance funded from accounts in titles III and IV and from International

Organizations and Programs in the Department of State, Foreign Operations, and Related Programs Appropriations Acts.

| | |
|---|---|
| **Signature:** | RUBIO |

| | |
|---|---|
| **Drafted By:** | S/TT:Marocco, Peter |
| **Cleared By:** | S/TT:Holler, Daniel |
| | L:Visek, Richard |
| | L:Dorosin, Joshua |
| | S/TT:Anton, Michael |
| | C:Needham, Michael |
| **Approved By:** | S: Rubio, Marco |
| **Released By:** | POEMS_P:Acker, Vanessa G |
| **Info:** | IO COLLECTIVE *Immediate* |
| **XMT:** | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

**UNCLASSIFIED**

DU[ Y ) ˙cZ)

# EXHIBIT C



**THE SECRETARY OF STATE**
WASHINGTON

February 3, 2025

The Honorable James Risch, Chairman
Committee on Foreign Relations
United States Senate
Washington, DC 20510

The Honorable Jeanne Shaheen, Ranking Member
Committee on Foreign Relations
United States Senate
Washington, DC 20510

The Honorable Brian Mast, Chairman
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

The Honorable Gregory Meeks, Ranking Member
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

The Honorable Tom Cole, Chairman
Committee on Appropriations
House of Representatives
Washington, DC 20515

J.A. 138

The Honorable Rosa DeLauro, Ranking Member
Committee on Appropriations
House of Representatives
Washington, DC 20515

The Honorable Susan Collins, Chairwoman
Committee on Appropriations
United States Senate
Washington, DC 20510

The Honorable Patty Murray, Vice Chairwoman
Committee on Appropriations
United States Senate
Washington, DC 20510

Dear Chairman Risch, Mast, Cole, Collins, Ranking Members
Shaheen, Meeks, DeLauro, and Vice Chairwoman Murray:

Consistent with applicable law, including sections 7063 and 7015 of the
Department of State, Foreign Operations, and Related Programs
Appropriations Act, 2024 (Div. K, P.L. 118-47), as carried forward by the
Continuing Appropriations Act, 2025 (Div. A, P.L. 118-83), this letter provides
notice and advises you of our intent to initiate consultations with you
regarding the manner in which foreign aid is distributed around the world
through the United States Agency for International Development ("USAID").
Current foreign assistance processes are severely inefficient and do not
substantially benefit the American people.  USAID has numerous conflicting,
overlapping, and duplicative functions that it shares with the Department of
State.  Additionally, USAID's systems and processes are not well synthesized,
integrated, or coordinated, and often result in discord in the foreign policy
and foreign relations of the United States.  This undermines the President's
ability to carry out foreign relations.

I have authorized Peter W. Marocco, the Director of Foreign Assistance, and the individual to whom I have delegated authority to perform the duties of the Deputy Administrator of USAID, to begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest. This review and potential reorganization will substantially further the foreign relations of the United States, and may include, among other things, the suspension or elimination of programs, projects, or activities; closing or suspending missions or posts; closing, reorganizing, downsizing, or renaming establishments, organizations, bureaus, centers, or offices; reducing the size of the workforce at such entities; and contracting out or privatizing functions or activities performed by Federal employees.

The Department of State and other pertinent entities will be consulting with Congress and the appropriate committees to reorganize and absorb certain bureaus, offices, and missions of USAID. Such consultation shall occur on behalf of the heads of such entities, as directed by the President.
In consultation with Congress, USAID may move, reorganize, and integrate certain missions, bureaus, and offices into the Department of State, and the remainder of the Agency may be abolished consistent with applicable law.

Sincerely,

Marco Rubio
Secretary of State

EXHIBIT D

The Wayback Machine - https://web.archive.org/web/20250207001034/https://www.usaid.gov/



On Friday, February 7, 2025, at 11:59 pm (EST) all USAID direct hire personnel will be placed on administrative leave globally, with the exception of designated personnel responsible for mission-critical functions, core leadership and specially designated programs. Essential personnel expected to continue working will be informed by Agency leadership by Thursday, February 6, at 3:00pm (EST).

For USAID personnel currently posted outside the United States, the Agency, in coordination with missions and the Department of State, is currently preparing a plan, in accordance with all applicable requirements and laws, under which the Agency would arrange and pay for return travel to the United States within 30 days and provide for the termination of PSC and ISC contracts that are not determined to be essential. The Agency will consider case-by-case exceptions and return travel extensions based on personal or family hardship, mobility or safety concerns, or other reasons. For example, the Agency will consider exceptions based on the timing of dependents' school term, personal or familial medical needs, pregnancy, and other reasons. Further guidance on how to request an exception will be forthcoming.

Thank you for your service.

**FAQs**

**1. If I am posted overseas and placed on administrative leave, am I required to return to the United States within the next 30 days?**

No. While USAID and the Department of State are preparing a plan under which USAID personnel posted overseas would be offered optional and fully reimbursed return travel to the United States within 30 days, personnel are not required to accept Agency-sponsored travel or to return to the United States within any specific deadline. Overseas USAID personnel retain the option to remain at their posts, even while placed on administrative leave and not working. Beyond 30 days, however, Agency funded and arranged return travel may not be available unless an individualized exception is sought and granted.

J.A. 142

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, <br><br> *Plaintiffs*, <br><br>    v. <br><br> UNITED STATES DEPARTMENT OF STATE, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-00400 (AHA) |
| GLOBAL HEALTH COUNCIL, *et al.*, <br><br> *Plaintiffs*, <br><br>    v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-00402 (AHA) |

**<u>Order</u>**

Plaintiffs in *Global Health Council v. Trump*, No. 25-cv-00402, are (or represent) small and large businesses, nonprofits, and other organizations across the United States. Plaintiffs in *AIDS Vaccine Advocacy Coalition v. United States Department of State*, No. 25-cv-00400, are health and journalistic nonprofits that receive federal grant money to perform foreign assistance work. In both cases, Plaintiffs have brought claims under the Administrative Procedure Act (APA) and federal Constitution challenging the issuance and implementation of Executive Order 14169, which immediately stopped all congressionally appropriated foreign assistance funding pending future review. *AIDS Vaccine*, ECF No. 1 ¶¶ 45–73; *Glob. Health*, ECF No. 1 ¶¶ 111–31. Plaintiffs

J.A. 143

in both cases have moved for a temporary restraining order, with evidence detailing the devastating effects on American businesses and nonprofits, which have been forced to shut down programs, to furlough or lay off employees, and in some instances to shutter altogether as a result of the challenged action. *See AIDS Vaccine*, ECF No. 13 at 7–8; *Glob. Health*, ECF No. 4 at 15–17. Plaintiffs' proposed temporary restraining orders originally sought to enjoin all Defendants, including the President, from enforcing the Executive Order in its entirety. *AIDS Vaccine*, ECF No. 13-6; *Glob. Health*, ECF No. 4-1. The Court held a prompt hearing, at which the Government rightly highlighted the importance of respecting the President's Article II power, while also recognizing that the harms Plaintiffs described may well be irreparable. During the hearing, the Court questioned the breadth of Plaintiffs' proposed relief, which Plaintiffs have since narrowed. For the reasons below, the Court grants Plaintiffs' motions for a temporary restraining order in part, on narrower terms than Plaintiffs originally and subsequently requested.

## I.    Background

Each year, Congress appropriates billions of dollars of funds for foreign assistance, which are then administered by the U.S. Agency for International Development (USAID) and the U.S. Department of State. *Glob. Health*, ECF No. 1 ¶ 3. USAID "is the lead international humanitarian and development arm of the U.S. government." Cong. Rsch. Serv., IF10261, *U.S. Agency for International Development: An Overview* 1 (Jan. 6, 2025). Among other things, it "provides assistance to strategically important countries and countries in conflict" and "leads U.S. efforts to alleviate poverty, disease, and humanitarian need." *Id.* Most USAID projects are administered through grants, cooperative agreements, or contracts with partner organizations. *Id.*

On January 20, 2025, the President issued an executive order entitled "Reevaluating and Realigning United States Foreign Aid." Exec. Order No. 14169, 90 Fed. Reg. 8619 (Jan. 20, 2025).

The order directed an immediate pause in "United States foreign development assistance" and directed the Office of Management and Budget (OMB) to "enforce this pause through its apportionment authority." *Id.* § 3(a). The order further directs responsible department and agency heads to review each foreign assistance program and to determine within 90 days of the order "whether to continue, modify, or cease each foreign assistance program," in consultation with the Director of OMB and with the concurrence of the Secretary of State. *Id.* §§ 3(b), (c). The order provides that the Secretary of State has authority to waive the pause "for specific programs" and allows for new obligations or the resumption of disbursements during the 90-day review period, if a review is conducted sooner and the Secretary of State, in consultation with the Director of OMB, approves. *Id.* §§ 3(d), (e).

In the days that followed, agency officials took actions to institute an immediate suspension of all congressionally appropriated foreign aid. The Secretary of State issued a memorandum suspending all new funding obligations, pending a review, for foreign assistance programs funded by or through the State Department and USAID. *Glob. Health*, ECF No. 1 ¶ 42. USAID officials also issued instructions to pause new funding, immediately issue stop-work orders, and develop appropriate review standards. *Id.* ¶¶ 41, 44–45. The OMB's acting director issued a memorandum ordering a temporary pause of all federal financial assistance, including assistance for foreign aid and nongovernmental organizations." *Id.* ¶ 47. According to the *Global Health* complaint, Defendants have "halt[ed] the obligation and disbursement of foreign-assistance funding wholesale." *Id.* ¶ 56. Plaintiffs have adduced evidence of numerous letters terminating programs and contracts received as a result of these actions. *See, e.g.*, *Glob. Health*, ECF No. 7-4 at 2, 5, 7, 13. A list Defendants provided to the Court shows that roughly 230 contracts and grants were terminated in just the two days after they were sued, and Defendants say that list does not include

the contracts and grants cancelled by the State Department and may not reflect all the contracts cancelled by USAID in those two days. *Glob. Health*, ECF Nos. 20, 20-1.

Plaintiffs claim that they have suffered and will continue to suffer enormous and concrete harm to their businesses, and that their core missions and existence are in jeopardy as a result of Defendants' actions. Among other things, Plaintiffs have provided evidence that they have been and will continue to be forced to shut down program offices, to furlough or terminate staff, and in some cases to shutter their businesses entirely. *See Glob. Health*, ECF No. 4 at 20–23. They have also provided supporting evidence that Defendants' actions have had and will continue to have a catastrophic effect on the humanitarian missions of several plaintiffs. *See id.* at 15–19.

Plaintiffs seek a temporary restraining order enjoining Defendants from implementing, enforcing, or otherwise giving effect to Executive Order 14169 and subsequent instructions and clarifications issued by the State Department and USAID. The Court held a hearing in both cases on February 12, 2025. Following the hearing, Plaintiffs submitted revised proposed orders that narrowed the scope of their requested relief. *AIDS Vaccine*, ECF No. 16-1; *Glob. Health*, ECF No. 18.

## II.    Legal Standard

The grant of temporary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a temporary restraining order must make the same showing as he would if seeking a preliminary injunction: he must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the

public interest." *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011).[1]

## III.    Discussion

At least at this early stage, the Court finds Plaintiffs have met their burden for temporary,

emergency relief, although not with the breadth they initially or subsequently proposed.

The Court begins with irreparable harm, given the scale of the disruption Plaintiffs have

described. Plaintiffs attest Defendants' blanket suspension of congressionally appropriated funds

has caused them immense financial harm and has, in many cases, forced them to significantly cut

down on staff or otherwise reduce core operations. Plaintiffs do not assert this harm based upon

expectations of receiving future grants or aid; they do so upon expectations set in existing contracts

with the respective agencies. To give just a few examples from the record:

- One plaintiff, a large investigative journalism organization, has agreements with USAID and the State Department that constitute 38% of its budget, which supports investigations into corruption, sanction violations, and other wrongdoing. *AIDS Vaccine*, ECF No. 13-4 ¶¶ 2, 6–7, 9. Due to the suspension of appropriated funding and stop-work orders received as a result, the organization has been forced to cut 43 of 199 staff members, with most remaining being moved to a shorter work week. *Id.* ¶ 12. The organization has had to cancel events, cut travel for reporting, and freeze new equipment purchases. *Id.* The organization attests that the disruption will continue absent relief. *Id.* ¶ 13.

- A nonprofit plaintiff focused on protecting refugees and asylum seekers has had to lay off 535 staff members since receiving termination notices for multiple grants. *Glob. Health*, ECF No. 7-3 ¶¶ 3–4, 13. It has been forced to shutter program offices and defer payments to vendors. *Id.* ¶ 21.

---

[1] At the hearing on these motions, Plaintiffs noted that courts in this Circuit have sometimes employed a "sliding scale" approach to these factors, which was particularly common before the Supreme Court's decision in *Winter*. *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, __ F. Supp. 3d __, No. 25-cv-239, 2025 WL 368852, at *9 (D.D.C. Feb. 3, 2025) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). However, the Court's resolution of these motions does not depend on a sliding scale method and arrives at the same place when each prong is evaluated as "an independent, free-standing requirement." *Sherley*, 644 F.3d at 393 (citation omitted).

- Another plaintiff representing small businesses across all sectors attests that the suspension included USAID failing to pay its member organizations for months of unpaid invoices. *Glob. Health*, ECF No. 7-2 ¶ 8. This has forced small businesses to furlough "most U.S. national staff in home offices and on contracts, and terminate foreign national staff or risk keeping them and being uncertain of payments under stop work orders." *Id.* ¶ 10.

- Another plaintiff focused on addressing the global HIV/AIDS epidemic has already been forced to lay off seven employees and will lay off ten more over the next month if the suspension of appropriated foreign aid continues. *AIDS Vaccine*, ECF No. 13-2 ¶ 12.

Other plaintiffs have described how the blanket suspension of funds has undermined their core missions and jeopardized vital services to vulnerable populations. For example:

- One plaintiff asserts that the suspension of appropriated foreign aid has disrupted critical health programs, including maternal and child health programs and infectious disease prevention efforts administered by its member organizations. *Glob. Health*, ECF No. 7-1 ¶ 8. One of those member organizations reports that a $20 million project to support the development of hospital accreditation in Cambodia has been suspended. *Id.* Another reports that a stop-work order has disrupted a total of $4 million in funding for American Schools and Hospitals Abroad grants in Nepal and Vietnam. *Id.* The plaintiff organization attests that the suspension of appropriated foreign aid funding "is an existential threat to [its] members and their life-saving work." *Id.* ¶ 11.

- Another plaintiff reports that it can no longer fund shelters for minors in Central America trying to escape recruitment into criminal gangs. *Glob. Health*, ECF No. 7-7 ¶ 10.

- A different plaintiff explains that it has abruptly stopped providing medical services for hundreds of adolescents and young students in need in Bangladesh. *Glob. Health*, ECF No. 7-8 ¶ 12(a).

- An additional plaintiff attests that the freeze has delayed several time-sensitive antimalaria campaigns that are expected to benefit millions of people in Kenya, Uganda, Ghana, Ethiopia, and Zimbabwe. *Glob. Health*, ECF No. 7-1 ¶ 8(d).

- Another plaintiff that supports HIV prevention research and the rollout of HIV prevention medication to high-risk communities in various African countries asserts that the funding freeze has disrupted clinical trials and the rollout of life-saving medication. *AIDS Vaccine*, ECF No. 13-2 ¶¶ 3–4, 11.

At the Court's hearing, Defendants acknowledged that the types of harms above affecting Plaintiffs' businesses, as well as the availability of food and medicine, are types of harm that are appropriately considered in the irreparable harm inquiry. Defendants offered that some of the contracts terminated might have included clauses that allowed them to be terminated in certain circumstances, but also acknowledged that the approach taken was blanket and not limited to such contracts.[2]

Plaintiffs have further adduced evidence that this harm has taken place and is likely to continue despite the Secretary of State's authority to waive the suspension of appropriated funds for specific programs. *See Glob. Health*, ECF No. 17-1 at 21. They have proffered specific facts that this has not meaningfully mitigated the harm they have described. One plaintiff, for example, attests to a meeting with the State Department to discuss what activities would qualify for a waiver and thus be exempted from suspension. *Glob. Health*, ECF No. 7-3 ¶ 11. The officer contacted stated that he could not provide any information regarding the application of the waiver. *Id.* ¶¶ 11–12. The plaintiff further attests that even in the event of a waiver, no funds could be disbursed because federal government payout portals are no longer functioning. *Id.* ¶ 11. Another plaintiff

---

[2] While not necessary to the Court's analysis given the extensive and, at least to date, unrebutted evidence of other types of irreparable harm, Plaintiffs have also offered evidence that they will suffer harm to "goodwill, reputation, and relationships with employees, partners, subcontractors, foreign governments, and other stakeholders." *Glob. Health*, ECF No. 4 at 23. This includes concrete examples such as having to violate contractual duties by deferring payments to suppliers, vendors, and landlords, *Glob. Health*, ECF No. 7-6 ¶¶ 10, 15; disruptions to relationships with longstanding partners whose trust had been cultivated over decades, *id.*; and having to go back on previous assurances made to clients and partners in reliance on the agreements that have now been cancelled, *Glob. Health*, ECF No. 7-9 ¶ 21. *See Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (holding that irreparable harm was apparent where defendant's conduct "could not fail to damage [plaintiff's] good name"); *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017) ("Injury to reputation can, at least at times, rise to the level necessary to support the issuance of an injunction."); *Xiaomi Corp. v. Dep't of Def.*, No. CV 21-280, 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021) (collecting cases).

attests that it received a waiver, but was told that the waiver lasted only for a thirty-day period. *Glob. Health*, ECF No. 7-6 ¶ 6. The plaintiff explains that such waivers do not address the problem because a business cannot halt global supply chains midstream and then resume operations with uncertainty as to whether it will have to halt again in thirty days. *Id.* At the hearing, Defendants pointed to the waiver process but did not rebut this evidence, acknowledging that the waiver process may have had "hiccups." At this stage, the record before the Court does not suggest that the waiver process in place has mitigated the irreparable harms Plaintiffs face.

Plaintiffs have made a sufficient preliminary showing that the loss of funding at issue in this litigation "threatens the very existence of [their] business." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). And they have likewise shown that the "obstacles" created by Defendants' conduct "make it more difficult for the [plaintiffs] to accomplish their primary mission." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). The *Global Health* Plaintiffs have also adduced evidence indicating that terminations and resulting harms have continued, and possibly increased, in the two days since this lawsuit was filed. Since the filing of their motion for a temporary restraining order, multiple plaintiffs that had not previously received terminations or stop-work orders have started to receive them. *See Glob. Health*, ECF No. 19 at 3. At the request of the Court, Defendants submitted documentation showing that just in the two days after they were sued, they have cancelled roughly 230 additional contracts, which Defendants say do not include the contracts cancelled by the State Department and may not reflect all the contracts cancelled by USAID in those days. *Glob. Health*, ECF Nos. 20, 20-1. Absent temporary injunctive relief, therefore, the scale of the enormous harm that has already occurred will almost certainly increase. Plaintiffs have made a strong preliminary showing of irreparable harm.

It also appears, at least at this early stage, that Plaintiffs are likely to succeed on the merits. Between the two cases, Plaintiffs challenge the actions at issue as (1) arbitrary and capricious in violation of the APA; (2) contrary to law in violation of the APA; (3) in violation of the separation of powers; (4) in violation of the Constitution's Take Care Clause; and (5) *ultra vires*. *AIDS Vaccine*, ECF No. 1 ¶¶ 45–73; *Glob. Health*, ECF No. 1 ¶¶ 111–31. The Court need only find that Plaintiffs are likely to succeed on one of these claims for this factor to weigh in favor of a temporary restraining order. That said, as the Court emphasized at the hearing and Plaintiffs acknowledged, any relief should also be tailored accordingly.[3]

The APA permits judicial review of "final agency action" and requires a court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Rather, the court "must confirm that the agency has fulfilled its duty to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quotation marks omitted) (quoting *State Farm*, 463 U.S. at 43). "[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,

---

[3] Both parties will, of course, have the opportunity to develop their claims further at the preliminary injunction phase, where the record and therefore the appropriate relief may well evolve, and to develop them further as the case continues.

or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (alteration in original) (quoting *State Farm*, 463 U.S. at 43).

Here, the stated purpose in implementing the suspension of all foreign aid is to provide the opportunity to review programs for their efficiency and consistency with priorities. However, at least to date, Defendants have not offered any explanation for why a blanket suspension of all congressionally appropriated foreign aid, which set off a shockwave and upended reliance interests for thousands of agreements with businesses, nonprofits, and organizations around the country, was a rational precursor to reviewing programs. The most Defendants offer is the possibility that some of the abruptly terminated contracts might have had clauses which allowed termination in certain circumstances; however, as noted, Defendants have acknowledged that they implemented a blanket suspension that was not based on the presence or consideration of such contractual terms. To be sure, there is nothing arbitrary and capricious about executive agencies conducting a review of programs. But there has been no explanation offered in the record, let alone a "satisfactory explanation . . . including a rational connection between the facts found and the choice made," as to why reviewing programs—many longstanding and taking place pursuant to contractual terms— required an immediate and wholesale suspension of appropriated foreign aid.

Plaintiffs have also shown that implementation of the blanket suspension is likely arbitrary and capricious given the apparent failure to consider immense reliance interests, including among businesses and other organizations across the country. No aspect of the implemented policies or submissions offered by Defendants at the hearing suggests they considered and had a rational reason for disregarding the massive reliance interests of the countless small and large businesses that would have to shutter programs or shutter their businesses altogether and furlough or lay off swaths of Americans in the process. In their implementation of the blanket suspension of foreign

aid, Defendants accordingly appear to have "entirely failed to consider an important aspect of the problem."

At the Court's hearing, Defendants' principal argument was that the State Department's and USAID's actions taken to implement a blanket suspension of appropriated foreign aid funds should not be considered "agency action" within the meaning of the APA. Defendants observe that the President's own actions are not reviewable under the APA because the President is not an "agency." *See Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992). It follows, they say, that an agency's actions implementing Presidential directives should not be considered agency action. At least at this juncture, that argument does not appear persuasive. Defendants do not ground their argument in the text of the APA, which specifically defines "agency" to include "each authority of the Government of the United States." 5 U.S.C. § 551(1). While it is true that implementation of the blanket suspension of appropriated funds took place in accordance with Presidential policy and priorities, as agency action routinely does, the relevant directive of the Secretary of State and subsequent determinations of agency heads have immediate effect and constitute the action under review, without any further action by the President. And Defendants' argument, at least as it has been articulated to date, proves too much—it would allow the President and agencies to simply reframe agency action as orders or directives originating from the President to avoid APA review.[4] Defendants will, of course, have an opportunity to more fully develop this argument as it relates

---

[4] Defendants' argument also presupposes that this is an area where the President has exclusive authority and runs into Plaintiffs' contention that the President was acting in violation of the separation of powers because he "does not have unilateral authority to refuse to spend the funds" Congress appropriates. *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). As Plaintiffs point out, even just a 90-day review period would extend past the date that relevant appropriations are due to expire and therefore funds would literally be unspent. The Court expects Defendants will give further shape to this argument as this litigation continues to the preliminary injunction phase.

to the particular actions in this case at the preliminary injunction stage. For now, however, Plaintiffs have shown that they are likely to succeed in their argument that the implementation of the suspension of congressionally appropriated foreign aid violated the APA.

The final two factors—balancing the equities and the public interest—often overlap in the context of an action to enjoin the government. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016); *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020). Here, there are important interests on both sides, but the factors, at least at this stage, again favor Plaintiffs. Defendants have repeatedly, and rightly, emphasized the importance of respecting the President's Article II power as it relates to foreign policy. Plaintiffs, for their part, have emphasized the Constitution's separation of powers, which also demands respect for Congress's Article I role in legislating, including Congress's choice to allow judicial review through the APA and other statutes constraining the Executive Branch, as well as Congress's important role in appropriating funds. Ultimately, Plaintiffs have adduced, and Defendants have not (yet) meaningfully contested, detailed and credible evidence of harm to countless American businesses, ranging from shutting down programs, to furloughing and laying off employees, to shuttering altogether. Plaintiffs also detailed the existential consequence to their missions, which may endanger the health and safety of children and other vulnerable populations. At the Court's hearing, Defendants did not dispute the likelihood of those consequences, although they looked forward to having more time to develop a record in response as the proceedings continue. And on the other side, Defendants did not argue or adduce evidence that any concrete, real-world harm will take place in the event temporary relief is granted. Notwithstanding the important principles on both sides, which will continue to be given careful consideration, Plaintiffs' credible and unrebutted evidence of harm, and the absence of any

such evidence on the other side, tilts both the balance of equities and the public interest in their favor.

### IV.     Conclusion

For the foregoing reasons, Plaintiffs' motions for a temporary restraining order are denied in part and granted in part.

Plaintiffs' initial proposed relief asked the Court to enjoin the President and enforcement or implementation of Executive Order 14169. The Court does not find it appropriate or necessary to enjoin the President or the Executive Order itself. Given the breadth of the relief initially sought by Plaintiffs, the Court also makes clear that it does not enjoin the President's or Secretary of State's statements of purpose or policy, nor does the Court enjoin any aspect of the Government's ability to conduct a comprehensive internal review of government programs. While Plaintiffs have made the showing required for a temporary injunction, such relief would not be adequately tailored to the showing made at this stage.

The Court finds Plaintiffs have satisfied their burden for a narrower injunction concerning the implementation of the blanket suspension of foreign aid funding, as specified below. However, the Court also finds Plaintiffs' proposed injunctions overbroad by including specific directives regarding USAID personnel decisions or operational details. *See Glob. Health*, ECF No. 4-1 (proposed language enjoining Defendants from "terminating, furloughing, or placing personnel on administrative leave" and ordering Defendants to clear "any administrative, operational, human resource, or technical hurdles"); *Glob. Health*, ECF No. 18 (revised proposal, including the same language). Plaintiffs appear to be including such language to ensure meaningful compliance with the Court's order; however, directives as to such specific operational details are overbroad in the

absence of evidence of non-compliance. As specified below, it is sufficient to order Defendants to take all necessary steps to carry out the Court's order.

Finally, at the hearing, Defendants noted that some contracts at issue may include terms that allow them to be modified or terminated in certain circumstances. The Court finds on this record that it would be overbroad to enjoin Defendants from taking action to enforce the terms of particular contracts, including with respect to expirations, modifications, or terminations pursuant to contractual provisions.

Consistent with the reasoning above, it is hereby **ORDERED** that Defendants Marco Rubio, Peter Marocco, Russell Vought, the U.S. Department of State, the U.S. Agency for International Development, and the Office of Management and Budget (the "Restrained Defendants") and their agents are temporarily enjoined from enforcing or giving effect to Sections 1, 5, 7, 8, and 9 of Dep't of State, Memorandum, 25 STATE 6828 (Jan. 24, 2025) and any other directives that implement Sections 3(a) and 3(c) of Executive Order Number 14169, "Reevaluating and Realigning United States Foreign Aid" (Jan. 20, 2025), including by:

- suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025; or

- issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025.

It is further hereby **ORDERED** that nothing in this order shall prohibit the Restrained Defendants from enforcing the terms of contracts or grants.

It is further hereby **ORDERED** that the Restrained Defendants shall take all steps necessary to effectuate this order and shall provide written notice of this order to all recipients of existing contracts, grants, and cooperative agreements for foreign assistance.

It is further hereby **ORDERED** that the Restrained Defendants shall file a status report by February 18, 2025, apprising the Court of the status of their compliance with this order, including by providing a copy of the written notice described above.

The parties shall meet and confer and file a joint status report by February 14, 2025, at 5:00 p.m. proposing an expedited preliminary injunction briefing schedule.

_____
AMIR H. ALI
United States District Judge

Date:   February 13, 2025

EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ———————————————— ) | | |
| AIDS VACCINE ADVOCACY ) | | |
| COALITION, et al., ) | | |
| ) | | |
| *Plaintiffs*, ) | Civil Action No. 25-cv-400 | |
| ) | | |
| v. ) | | |
| ) | | |
| UNITED STATES DEPARTMENT ) | | |
| OF STATE, et al., ) | | |
| ) | | |
| *Defendants*. ) | | |
| ———————————————— ) | | |

**THIRD DECLARATION OF ANDREW SULLIVAN**

I, Andrew Sullivan, declare the following under penalties of perjury:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I am the co-founder and publisher of the Journalism Development Network (JDN), a Baltimore, Maryland based non-profit. JDN is one of the largest investigative journalism organizations in the world. It publishes as the Organized Crime and Corruption Reporting Project (OCCRP).

3.      JDN is the recipient of grants through both the State Department and USAID.

4.      Beginning on January 24, 2025, JDN began to receive stop-work orders for each of its grants.  The declaration I submitted on February 12, 2025 (ECF No. 13-4) details how devastating the funding freeze and stop work orders have been for

JDN as an organization.

5.    Since this Court issued its order on February 13, 2025, JDN has made multiple attempts to communicate with officials within the State Department and USAID to advise them that it intended to resume grant-funded work, consistent with this Court's order, and inquire as to release of the obligated funds.

    a. On Friday, February 14, a grants officer within the State Department advised that "The suspension remains in effect, and new cost should not be incurred unless you receive notification from your Grants Officer that the suspension has been lifted. We are awaiting further guidance from our leadership and will let you know as soon as we receive additional information."

    b. That same day, a contracting officer within USAID advised, "All work must remain suspended until a formal authorization is granted in writing by USAID. At this time, USAID has not issued any directive to rescind the Stop-Work Order. Please hold off until you receive formal notification to continue."

6.    As of the time of this filing, JDN has not received any guidance that it may resume the work authorized pursuant to the cooperative agreement.

7.    JDN has also attempted to access funds for work already completed, including on Wednesday, February 19.  No funds have been disbursed.

8.    Furthermore, JDN has reason to believe that its awards are being targeted for termination on a retaliatory basis.

2

9.    On February 11, 2025, a list of supposedly wasteful projects reportedly appeared on a newly-registered government website, waste.gov. That list included a bullet point that reads: "$20 million for the Strengthening Transparency and Accountability through Investigative Reporting program which used the Organized Crime and Corruption Reporting Project (OCCRP) as its implementing partner. The OCCRP was cited four times in the whistleblower letter that led to the Russiagate impeachment."[1]

10.    JDN's work is apolitical. Its mission is to inform the public by exposing corruption and other forms of wrongdoing, and our stories have helped return more than $11 billion to public coffers through seizures and fines.

11.    The Strengthening Transparency and Accountability Through Investigative Reporting (STAIR) program that appears to have been targeted by Defendants for termination is a USAID-funded project that supports the role of investigative journalism in promoting greater government accountability and transparency in Europe and Eurasia, including building resilience against authoritarian influence, and to improve the sustainability of the investigative journalism sector. It operates in Europe and Eurasia, including in Albania, Armenia, Belarus, Bosnia-Herzegovina, Czech Republic, Hungary, Georgia, Kosovo, Moldova, Montenegro, North Macedonia, Poland, Slovakia, and Ukraine.

12.    USAID's investments in JDN have generated enormous returns on

---

[1] Markus Reuter, *Leak allegedly reveals DOGE list of "wasteful projects,"* Netzpolitik (Feb. 14, 2025), https://netzpolitik.org/2025/u-s-government-leak-allegedly-reveals-doge-list-of-wasteful-projects/.

taxpayer dollars. For example, prior to STAIR, USAID funded JDN's work through the Regional Investigative Journalism Network (RIJN), a project that produced an estimated 30,000 percent return on USAID's investment by generating reporting that helped return money to public coffers through seizures and fines.

13.    Although it will take additional time to calculate the specific return on investment for STAIR, JDN's work under the STAIR grant is substantially similar to its work under the RIJN grant, and I have every reason to believe the return on investment is similar.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 18, 2025

/s/ Andrew Sullivan

Andrew Sullivan
Publisher, Journalism Defense Network

4

EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| AIDS VACCINE ADVOCACY COALITION, et al., | ) ) ) ) | |
| *Plaintiffs*, | ) ) | Civil Action No. 25-cv-400 |
| v. | ) ) | |
| UNITED STATES DEPARTMENT OF STATE, et al., | ) ) ) | |
| *Defendants*. | ) ) ) | |

**DECLARATION OF JESSICA DOE**

I, Jessica Doe, declare the following under penalties of perjury:

1.     I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.     I am a Contracting Officer and Foreign Service Officer at USAID.

3.     On January 20, 2025, the President of the United States issued an Executive Order directing a 90-day "pause" on all U.S. foreign assistance.

4.     On January 20, 2025, the President of the United States issued an Executive Order on "Ending Radical and Wasteful Government DEI Programs and Preferences."

5.     On January 22, 2025, USAID Senior Procurement Executive (SPE) Jami Rodgers emailed the Office of Acquisition and Assistance (OAA) Mail List and all Foreign Service Contracting and Agreement Officers (COs) a DEIA Award Tracker

that "identifies awards with DEIA award titles or descriptions. He specified that, in accordance with "Initial Guidance Regarding DEIA Executive Orders" issued by the Office of Personnel management (OPM), COs must immediately terminate those contracts.

6.      In order to faithfully execute these instructions and work in good faith to implement the Executive Order, COs began reviewing the scopes of all awards to ensure they did not contain DEIA components. It was a difficult exercise as DEIA was never defined by the Agency Front Office and therefore it was unclear whether terms just as "gender" or "sex" should also be removed despite being a federally protected status.

7.      It is evident from SPE Rodger's instructions that this list of terminations was compiled from a search in GLAAS, our contract management system, for titles or descriptions that contained words like "diversity." The list was not compiled from a review of the scope of the awards.

8.      On January 27, 2025, SPE Jami Rodgers wrote in an email to all of OAA and the Foreign Service COs: "We will provide further guidance and templates on specifics for different types of awards and actions that you can take as we administer stop work/suspensions as soon as possible. [Acquisitions and Assistance (A&A)] staff may submit questions and we will make FAQ responses available to all A&A staff."

9.      The FAQs referred to in the January 27 email were not provided to OAA staff until February 6, 2025, when many of the questions about the pause were no longer relevant, such as "how do COs communicate with implementing partners

about what costs are 'legitimate' during the Stop Work Order period to ensure that they will not later be denied payment due to a differing opinion about what costs are allowable during a period of stopped work?".

10.     In a normal review process, such questions would be answered. For example, when USAID implementation in Afghanistan stopped in 2021, the partners were notified that salaries may continue to be paid to maintain operational readiness. None of this guidance was provided to COs or partners in this instance.

11.     On January 28, 2025, SPE Rodgers emailed all Foreign Service COs and stated that, for contracts, if "you have not already, issue a written stop-work order…" and for assistance awards, if "you have not already, issue a written suspension order…."

12.     On January 30, 2025, our contract management system GLAAS was shut down. COs were thereby prevented from modifying any awards, such as to remove DEIA terminology.

13.     On February 5, 2025, OAA/Washington instructed COs to terminate "media contracts/activities/purchase card awards," and that they had to "report back to the front office today on this matter."

14.     When OAA/Washington asked senior USAID management to allow them to review the termination lists in advance, they were told they could not do so.

15.     When OAA/Washington asked for the reasoning behind the specific terminations, they were told "a team" is reviewing "public data" and making these determinations.

3

16.     When OAA/Washington asked that specific awards be removed from the termination list for a justifiable reason, they were told, these awards "Clearly don't fit in the president's agenda" and that "questioning Sectary Rubio and President Trump's decision" constitutes "dissension."

17.     On February 9, 2025, SPE Jami Rodgers sent a tranche of terminations to COs. "Tranche 1" contained instructions to terminate 71 contracts and 66 grants. The list included awards with the terms "consulting," "energy," "elections," and "democracy," to name a few.

18.     COs highlighted that several awards in Tranche 1 were within the scope of the current approved waivers, such as Third Party Monitoring for BHA (Bureau of Humanitarian Assistance) Programs. Had a thorough review of the awards been conducted, these awards would not have been listed for termination since they are within the scope of current waivers.

19.     Other awards were clearly terminated without any actual process or consideration. For instance, Tranche 1 included termination of a contract for preliminary engineering and design for the construction of the U.S. Embassy in Juba. The contracting company was "Green Powered Technology LLC" (named after President and Founder Phillip S. Green and not because it is a "green" company). Eventually, that award was removed from the termination list.

20.     Some of the awards included on the termination list also required Congressional, Government Accountability Office, and the Office of the Inspector General notification, including a contract with an audit firm to meet the oversight

4

requirement specified in GAO Report GAO-06-1052R, titled "Foreign Assistance: Recent Improvements made, but USAID Should Do More to Help Ensure Aid Is Not Provided for Terrorist Activities in West Bank and Gaza," and GAO-21-332, entitled, "Should Funding Resume, Increased Oversight of Subawardee Compliance with USAID's Antiterrorism Policies and Procedures May Reduce Risks." That GAO report stated, "The Administrator of USAID should conduct post-award compliance reviews of prime awardees and their subawards of ESF assistance for the West Bank and Gaza program in time to identify noncompliance and take appropriate action before the awards end, should funding for USAID's West Bank and Gaza program resume."

21.    As the above example shows, while stating that the goal was to find "fraud and corruption" as part of the 90-day review, USAID was terminating contracts that were designed to do exactly that.

22.    COs began to submit questions to SPE Rodgers to ask for clarification on the authority to instruct COs to terminate the awards and the basis for terminations. COs also sought instruction as to what to say to partners who were not being reimbursed for costs incurred prior to January 24.

23.    Responses to these questions were not provided by SPE Jami Rodgers or OAA/Washington.

24.    On February 10, 2025, SPE Jami Rodgers send a second tranche of terminations to COs.  Tranche 2 included "Media Awards" and 58 grants.

25.    Again, numerous awards on the list were found to be within the scope of the approved waivers, such as for PEPFAR and for lifesaving activities to respond to

the Ebola outbreak.

26.    Further, several of the awards were for basic education programs and contained funding appropriated through the READ (Reinforcing Education Accountability in Development) Act of 2017, which was originally signed into law on September 8, 2017 by President Trump, and introduced in 2023 for reauthorization by then Senator Marco Rubio.

27.    When the COs asked the Agency Front Office about these awards, the COs were instructed to terminate them without notification to Congress that funds appropriated through a specific Act of Congress were being terminated.

28.    On February 11, 2025, SPE Jami Rodgers sent a third tranche of terminations, along with instructions to terminate the awards in Tranche 1 and 2 by "close of business, Tuesday, February 11," and Tranche 3 by "Wednesday, February 12 close of business."

29.    SPE Jami Rodgers provided further instruction that the "termination authority is delegated to me as the Senior Procurement Executive from the Acting USAID Administrator, Secretary Rubio, who has instructed USAID to terminate these awards as part of the President's Executive Order on Reevaluating and Realigning United States Foreign Aid. An Action Memorandum for each tranche of awards was reviewed and cleared through the State Department's Director of Foreign Assistance and approved by the Secretary. These action memos will be filed in a shared drive. This documentation along with this email can be used to support the terminations."

6

J.A. 169

30.     These action memos were never shared with the COs.

31.     A copy of an unsigned memo on a State Department letterhead dated February 10, 2025, entitled, "Tasking Memo to USAID Contracting and Agreement Officers," from Kenneth Jackson, Assistant to the Administrator for Management and Resources, drafted by Joel M. Borkert, stated, "The Secretary has approved the cancellation of the attached contracts after determining they do not advantage U.S. interests. These tranches have gone through multiple vetting processes, and should be expeditiously terminated. Let me or the Chief of Staff know immediately if you believe the contract falls within the current waiver guidance or needed modified [sic]."

32.     On February 11, 2025, COs were notified by the GLAAS Helpdesk that Phoenix (the Agency payment system) was closed and that "the Agency has temporarily restricted access to Phoenix until further notice." As a result, no payments were able to proceed for any of my Mission's programs.

33.     On February 12, 2025, SPE Jami Rodgers sent a fourth tranche of terminations. He also COs to, "complete as many termination notifications as possible today."

34.     Again, many awards on the list are removed from termination as they fall within an approved waiver. In addition, many monitoring and evaluation contracts were listed to be terminated. These contracts are relied upon to ensure that there is no fraud, waste, or abuse in the delivery of approved activities, such as food assistance and PEPFAR medication distribution.

35.     When individuals raised the need for an appeal to the termination of

7

monitoring services, OAA/Wahington instructed me to terminate the award on the basis that the State Department had called and said to do it immediately. This termination left critical food assistance and medication distribution without adequate monitoring and oversight and increasing the risk of fraud, waste and abuse.

36.    On February 13, 2025, Mark Lloyd, who performs the duties of Assistant Administrator, Bureau for Global Health, issued a memorandum titled, "Clarifying that Global Health (GH) programming under the lifesaving humanitarian assistance waiver has continued uninterrupted and was never paused." The memorandum stated that its purpose was "to correct a false narrative in the press, and provide clarity for staff on external communications." It went on to say, "[t]he authority to waive lifesaving Global Health activities under Secretary Rubio's January 28, 2025, general waiver for lifesaving humanitarian assistance continues, and was never paused. Staff are reminded to confirm to Agency standards of conduct, and to leadership expectations, by using their chain of command to clarify any questions or misunderstandings; and are reminded that unauthorized engagement externally with the press or others is subject to discipline, including dismissal."

37.    As a CO, I issued a partial lifting of the Stop Work Order for PEPFAR partners to continue life savings activities in accordance with the limited waiver for life-saving HIV service provision approximately 14 days ago.

38.    As of today, the Mission and I continue to raise to Washington leadership including the Agency Front Office that although we have authorized the restarting of the PEPFAR programs, the partners have not been able to restart due

to a lack of funding. For example, since January 24th, for the Mission programs I manage as a CO, over 28,000 orphans and vulnerable children will lose access to treatment and prevention to HIV services per day, and 5,000 living with HIV will lose access to anti-retroviral medication per day.

39.    For non-PEPFAR lifesaving Mission activities that I manage, over 50 mothers suffering from severe bleeding following childbirth who cannot access treatment will have post-partum hemorrhage per day, 30 women will die per day related to childbirth, and over 1,000 newborns will be deprived of life saving newborn health services, including nearly 40 who will be deprived of life saving resuscitation at birth. An additional 250 newborns will die before being a month old.

40.    Despite being authorized to proceed with implementation of lifesaving activities, PEPFAR implementing partners cannot proceed as their programmatic accounts are hundreds of thousands of dollars in debt.

41.    Other PEPFAR partners authorized to restart activities have had to take out private loans to cover programmatic costs, and they also state they are now not following the local law because they do not have enough funding to pay required severance for local staff per local law.

42.    The Mission also sent a request for authorization to the Agency Front Office to authorize other non-PEPFAR lifesaving activities that are within the scope of the waiver, such as tuberculosis treatment, malaria treatment, antenatal care to address emergency complications. That request has not been answered in over two weeks.

9

J.A. 172

43.    On February 17, 2025, SPE Jami Rodgers instructed COs that this Court issued a TRO in the cases titled *AIDS Vaccine Coalition v. U.S. Department of State* and *Global Health Council v. Trump*. SPE Rodgers stated, "Accordingly, until further notice, all Contracting and Agreement Officers should not enforce any Agency directive issued under Executive Order 14169 and the Secretary's implementing memorandum that requires the generalized stop work order, suspension, or pause of Agency contracts, grants or other federal assistance awards. The Front Office is in the process of adopting a comprehensive review process for assuring payment integrity and determining that payments under existing contracts and grants are not subject to fraud or other bases for termination. These new case-by-case review processes will be consistent with the TRO. Further guidance on the new payment integrity and grants and contracts review process is forthcoming."

44.    On February 17, 2025, COs emailed Jami to ask for further clarification, and if OAA/Washington would send a template for COs to reverse Stop Work Orders (SWOs). Further, COs noted ambiguities in his directive: We did not know whether COs were being directed to take any specific actions based on his email. One CO asked in an email whether we are to rescind SWOs and terminations already issued, or just halt SWOs and terminations moving forward. Another asked about the new payment review process, and how to inform partners about the status of outstanding payments for vouchers incurred prior to January 24, 2025.

45.    SPE Jami Rodgers never responded.

46.    On February 18, 2025, COs were notified by USAID/M/OAA/Foreign

10

J.A. 173

Operations that SPE Jami Rodgers would issue templates to reverse SWOs, but they had not been received at the date of this declaration.

47.     Also, starting on February 18, USAID staff began to notice that all emails contained the language, "(SBU) Sensitive But Unclassified," at the bottom of their email and that the language could not be removed, even when not sending SBU information. The SBU disclaimer was not visible when drafting an email and only when an email was received by the intended recipient. Due to this SBU label, COs became hesitant to send out any information to implementing partners without unambiguous prior authorization from SPE Rodgers.

48.     It has become clear that actions taken by Defendants to gut the staff of USAID also prevent compliance with the TRO. Without USAID Foreign Service Officers managing the many steps required, from budget, to contracting, to financial support, none of the Agency's overseas programs will be effectively restarted under the TRO, or as authorized to restart under the applicable waivers.

49.     I have not personally seen any evidence that a thorough, case-by-case analysis has taken place with regard to the suspensions, stop-work orders, and terminations already issued by the Agency.

50.     I will faithfully continue to execute the directives of the President, Courts, and USAID as a civil servant who is proud to serve my country. But I and other COs have been left without guidance or direction to implement this Court's order.

51.     I declare under penalty of perjury that the foregoing is true and

correct.

Executed on February 19, 2025.

　　　　　　　　　　　　　　  /s/ Jessica Doe
　　　　　　　　　　　　　　Jessica Doe

12

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*,<br><br>      *Plaintiffs*,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF STATE, *et al.*,<br><br>      *Defendants*. | Civil Action No. 25-00400 (AHA) |
| GLOBAL HEALTH COUNCIL, *et al.*,<br><br>      *Plaintiffs*,<br><br>   v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>      *Defendants*. | Civil Action No. 25-00402 (AHA) |

## Order

The Court granted in part Plaintiffs' motions for a temporary restraining order ("TRO") in these two related cases on February 13, 2025. *AIDS Vaccine*, ECF No. 17; *see AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-cv-00400, 2025 WL 485324 (D.D.C. Feb. 13, 2025). Defendants have filed a status report in both cases concerning their compliance with the Court's order and have asked the Court to confirm their understanding that the TRO does not restrain Defendants' "exercise of authorities under statutes, regulations, and other legal authorities." *AIDS Vaccine*, ECF No. 22 ¶¶ 14–18; *Glob. Health*, ECF No. 25 ¶¶ 14–18. As discussed below, the TRO is clear, and Defendants are correct that it does not restrain the agencies' exercise of authorities

J.A. 176

under law. At the same time, of course, the TRO does not permit Defendants to simply search for and invoke new legal authorities as a post-hoc rationalization for the enjoined agency action. This is particularly so given that Defendants do not contend that any of the authorities bear on the justifications for granting the TRO—the authorities do not, for instance, have any effect on the Court's finding of irreparable harm or whether the blanket suspension of congressionally appropriated funds pending review was arbitrary or capricious for failing to even consider the immense reliance interests at stake. The *AIDS Vaccine* Plaintiffs have moved to enforce the TRO and to hold Defendants in contempt. *AIDS Vaccine*, ECF No. 26. Defendants oppose the motion, arguing that they have been making good faith efforts to comply with the TRO in limited time. *AIDS Vaccine*, ECF No. 28. As discussed below, Plaintiffs' motion is granted in part, insofar as Defendants have continued their blanket suspension of funds pending review of agreements, the very action that the TRO enjoined pending the parties' requested briefing schedule and the Court's prompt resolution of whether to issue a preliminary injunction. But the Court finds that contempt is not warranted on the current record and given Defendants' explicit recognition that "prompt compliance with the order" is required. *Id.* at 8.

The Court's TRO was clear. It found that Plaintiffs had satisfied their demanding burden for temporary injunctive relief, including by showing that Defendants' blanket suspension of congressionally appropriated foreign aid pending a review had and would continue to cause irreparable harm and that the blanket suspension was likely arbitrary and capricious under the Administrative Procedure Act (APA) for failing to consider the immense reliance interests of businesses and organizations around the country. *AIDS Vaccine*, ECF No. 17 at 5–13. The Court ordered that Defendants and their agents are:

temporarily enjoined from enforcing or giving effect to [certain sections of the Secretary of State's January 24, 2025, memorandum] and any other directives that implement Sections 3(a) and 3(c) of Executive Order Number 14169 . . . , including by:

- suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025; or

- issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025.

*Id.* at 14. The Court explained, however, that while it was enjoining directives to suspend aid, it "would be overbroad to enjoin Defendants from taking action to enforce the terms of particular contracts, including with respect to expirations, modifications, or terminations pursuant to contractual provisions." *Id.* It accordingly ordered that "nothing in this order shall prohibit the Restrained Defendants from enforcing the terms of contracts or grants." *Id.* at 15.[1]

In their status report, Defendants state that they "have begun an analysis of the thousands of contracts, grants, and cooperative agreements on which action was taken" pursuant to the Executive Order and other agency directives. *AIDS Vaccine*, ECF No. 22 ¶ 8. They state that "at least substantially all" of USAID's actions and "a large share" of the State Department's actions to terminate or suspend foreign aid contracts and grants could have been "allowed by the terms of those instruments or terms implicitly incorporated into those instruments." *Id.* ¶¶ 9–10. Defendants also ask the Court to confirm their understanding that the TRO does not enjoin Defendants from

---

[1] The Court also narrowed the scope of the relief granted by declining to enjoin the President or the Executive Order itself; by temporarily enjoining enforcement only of specific sections of the Executive Order, the January 24 memorandum, and other directives concerning the blanket pause of congressionally appropriated funds; and by declining to issue any specific commands to Defendants regarding personnel decisions or operational details. *AIDS Vaccine*, ECF No. 17 at 13–14.

taking actions with respect to agreements based on "exercise of authorities under statutes, regulations, and other legal authorities," consistent with the court's order in *New York v. Trump*, No. 25-cv-00039, ECF No. 107, at 3 (D.R.I. Feb. 12, 2025) (confirming that the court's temporary restraining order did not prevent the defendants from terminating funding "based on actual authority in the applicable statutory, regulatory, or grant terms" (emphasis omitted)). *AIDS Vaccine*, ECF No. 22 ¶ 14. They ask the Court to modify the TRO if necessary or, if the TRO restrains them from making grant decisions based on other legal authorities, to convert the TRO into a preliminary injunction to permit an immediate appeal. *Id.* ¶ 18.

As in the case Defendants point to, *New York v. Trump*, the Court's TRO in this case does not restrain Defendants from taking action with respect to agreements based on their "exercise of authorities under statutes, regulations, and other legal authorities." While the Court made clear that the agencies may take action on particular contracts pursuant to their contractual terms, it did so because Defendants had specifically raised that as a concern and in the interest of ensuring its temporary injunction was as tailored as possible to the irreparable harm and reliance interests that had been shown. However, nothing in the TRO limits the agencies from conducting an individualized review of agreements and taking action as to a particular agreement where the agency determines that it has lawful authority to do so. Having confirmed that the TRO does not restrain the agencies in this respect, the Court denies Defendants' request to convert the TRO into a preliminary injunction as moot.[2]

---

[2] As in *New York v. Trump*, the Court emphasizes that Defendants are not required "to seek 'preclearance' from the Court before acting to terminate funding when that decision is based on actual authority in the applicable statutory, regulatory, or grant terms." *New York*, ECF No. 107, at 3 (emphasis omitted). In that case, for example, the court saw no need for clarification of its order where the defendants represented that they "intend[ed] to provide notice to [a funding recipient] regarding the funding pause and will provide the information and process required by

At the same time, of course, the Court's TRO does not permit Defendants to simply continue their blanket suspension of congressionally appropriated foreign aid pending a review of the agreements for whether they should be continued or terminated. That is the very action that the Court temporarily enjoined because Plaintiffs had shown that blanket suspension pending review would cause irreparable harm and was likely arbitrary and capricious under the APA for failing to consider the massive reliance interests. *AIDS Vaccine*, ECF No. 17 at 5–13. By doing so, and by enjoining Defendants and their agents from implementing any directives to undertake such blanket suspension, the Court was not inviting Defendants to continue the suspension while they reviewed contracts and legal authorities to come up with a new, post-hoc rationalization for the *en masse* suspension. The Court notes that Defendants do not make any argument that the authorities they are examining bear on the Court's analysis of the TRO factors. To date, Defendants have not offered any evidence to rebut the showing of irreparable harm or that Defendants failed to consider the immense reliance interests in undertaking the blanket suspension. The Court stands prepared to consider such arguments and evidence at the preliminary injunction stage, on the briefing schedule the parties requested. In the meantime, however, to the extent Defendants have continued the blanket suspension, they are ordered to immediately cease it and to take all necessary steps to honor the terms of contracts, grants, cooperative agreements, loans, and other federal foreign assistance awards that were in existence as of January 19, 2025, including but not limited to disbursing all funds payable under those terms.

As the TRO states and the Court reiterates, Defendants may not simply replace their earlier implementations with "other directives" to their agencies to "suspend[], paus[e], or otherwise

---

regulation and the terms and conditions of the award." *Id.* (internal quotation marks and citation omitted).

prevent[] the obligation or disbursement of appropriated foreign-assistance funds" or "issu[e],

implement[], enforc[e], or otherwise giv[e] effect to terminations, suspensions, or stop-work

orders" as to programs in existence as of January 19, 2025. *Id.* at 14. The TRO does not preclude

Defendants from undertaking a good-faith, individualized assessment of a contract or grant and,

where the terms or authority under law allows, taking action with respect to that particular

agreement consistent with any procedures required (including, for example, notice to contracting

parties). But a new directive for the agencies to suspend or terminate contracts and grants is not

consistent with the terms of the TRO and is appropriately enjoined for all the same reasons stated

in the TRO.[3]

Plaintiffs' motion to enforce the TRO is therefore granted to the extent Defendants have

not complied with the terms of the TRO, as confirmed above. However, the Court finds contempt

is not warranted on the current record and given Defendants' explicit recognition that "prompt

compliance with the order" is required. *AIDS Vaccine*, ECF No. 28 at 8.

Understandably given the early, emergency posture of these cases, the record and the

parties' arguments have been evolving quickly. The Court held a hearing within one day of being

assigned to the cases and issued an order resolving the motions for a temporary restraining order

the next day. As the Court emphasized throughout its earlier order, the parties' arguments are still

developing, and Defendants in particular have not yet offered refutations of Plaintiffs' evidence or

fully developed their arguments at this early stage. *See, e.g.*, *AIDS Vaccine*, ECF No. 17 at 9 n.3,

---

[3] The Court notes that while case-by-case action taken as to particular agreements based on their
terms or other authorities might not give rise to the same problems under the APA because it would
better account for reliance interests, it may have implications for Plaintiffs' constitutional
arguments, such as the failure to spend congressionally appropriated funds. As the Court explained
in its TRO order, it expects those arguments to be developed further in the parties' forthcoming
preliminary injunction briefing. *AIDS Vaccine*, ECF No. 17 at 11 n.4.

11 n.4. The Court adopted in large part the parties' proposed briefing schedule for the preliminary injunction motions, giving Defendants until February 21, 2025, to brief those motions as they had requested, and shortening Plaintiffs' proposed reply deadline to noon on February 27, 2025, in the interest of proceeding as expeditiously as possible. The Court is prepared to hold a hearing on the preliminary injunction motions in both cases by March 4, 2025, and issue an opinion considering the full record and arguments before it with full dispatch. To facilitate this expedited schedule, and for the reasons stated in the Court's TRO order, the Court will set the expiration date for the TRO at 11:59 p.m. on March 10, 2025, or the date the Court resolves the preliminary injunction motions, whichever is sooner.

      **SO ORDERED.**

                                    _____

                                    AMIR H. ALI
                                    United States District Judge

Date:   February 20, 2025

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AIDS VACCINE ADVOCACY
COALITION, *et al.*,

        *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
STATE, *et al.*,

        *Defendants*.

Civil Action No. 25-00400 (AHA)

GLOBAL HEALTH COUNCIL, *et al.*,

        *Plaintiffs*,

    v.

DONALD J. TRUMP, *et al.*,

        *Defendants*.

Civil Action No. 25-00402 (AHA)

## <u>Order</u>

Defendants have moved for clarification or a stay pending emergency appellate relief of the Court's orders dated February 13 (granting in part Plaintiffs' motion for a temporary restraining order) and February 20, 2025 (granting in part the *AIDS Vaccine* Plaintiffs' motion to enforce that order). *AIDS Vaccine*, ECF No. 32; *Glob. Health*, ECF No. 33. Specifically, Defendants state that they require clarification as to whether the Court's orders "(1) prohibit Defendants from relying on existing statutory or contractual bases for suspending or terminating contracts or grants, under the terms of the award or under other authorities, (2) treat all contractual and grant terms as enforceable by contempt, and/or (3) prohibit Defendants from conducting a payment integrity

review process (including pursuant to statutorily or contractually conferred authority to suspend or terminate contracts or grants)." *Glob. Health*, ECF No. 33 at 1–2.

To begin with, and as the Court has already reiterated once, "to the extent Defendants have continued the blanket suspension [of funds], they are ordered to immediately cease it and to take all necessary steps to honor the terms of contracts, grants, cooperative agreements, loans, and other federal foreign assistance awards that were in existence as of January 19, 2025, including but not limited to disbursing all funds payable under those terms." *Glob. Health*, ECF No. 28 at 5. That temporary emergency relief was to restore the status quo as it existed before Defendants' blanket suspension of congressionally appropriated funds pending a comprehensive review, given Plaintiffs' strong showing of irreparable harm and that Defendants' blanket suspension of funds was likely arbitrary and capricious under the Administrative Procedure Act (APA). *See id.* at 2; *Glob. Health*, ECF No. 21 at 5–13. Defendants' instant motion does not contest or rebut Plaintiffs' irreparable harm showing and does not contest or rebut the Court's finding that the agency action here was arbitrary and capricious under the APA.[1]

The Court has also already reiterated that while "of course, the TRO does not permit Defendants to simply search for and invoke new legal authorities as a post-hoc rationalization for the enjoined agency action," it "does not preclude Defendants from undertaking a good-faith, individualized assessment of a contract or grant and, where the terms or authority under law allows, taking action with respect to that particular agreement consistent with any procedures required." *Glob. Health*, ECF No. 28 at 2, 6. The line here is unambiguous. Defendants cannot continue to

---

[1] Defendants have now filed their brief opposing a preliminary injunction, which appears to offer more developed arguments relating to the issues before the Court. *Glob. Health*, ECF No. 34. As the Court has noted, it has agreed to consider those arguments on the briefing schedule proposed by the parties and will hold a hearing by March 4, 2025, and rule with dispatch thereafter. *See Glob. Health*, ECF No. 28 at 7 (setting forth a schedule).

suspend programs or disbursements based on the blanket suspension that was temporarily enjoined. And Defendants cannot simply come up with a new post-hoc rationalization in an attempt to justify the action that was temporarily enjoined as likely arbitrary and capricious for what it failed to consider. However, if since January 19, 2025, Defendants have suspended or terminated an agreement based on wholly independent legal authority and justification, rather than deriving from a general directive to suspend aid, then they are not acting in violation of the TRO. Under the terms of the TRO, any such agreement that was in effect as of January 19, 2025, must be given effect and promptly receive disbursements only up until a suspension or termination taken pursuant to independent legal authority and justification. If, on the other hand, suspensions or terminations since January 19, 2025, stemmed from a general directive to suspend all aid—the very agency action temporarily enjoined—those terminations would violate the TRO and cannot be given effect. The line here is one that is well-worn and should be familiar in litigation—the line between good faith and pretext to justify otherwise unlawful conduct. *See Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019).

Contrary to Defendants' instant motion, the Court has been clear the TRO does not mean that "all contractual and grant terms [are] enforceable by contempt" or that Defendants must "litigate every arguable breach of contract in a contempt posture." *Glob. Health*, ECF No. 33 at 2, 6. The Court has been explicit that the TRO does not place this Court in the position of supervising Defendants' determinations as to whether to continue or terminate individual grants based on their terms. *See Glob. Health*, ECF No. 28 at 4 & n.2. While agency determinations based on wholly independent legal authority and justification such as the terms of particular agreements or sets of agreements, rather than deriving from a general directive to suspend aid, may be subject to some

other legal challenge, whether it be under the APA, separation of powers, individual breach of contract cases, or otherwise, such determinations do not violate the present TRO.

Defendants' remaining arguments in the instant motion show how quickly the ground is shifting in this matter and the importance of the Court having the opportunity to consider and expeditiously resolve the parties' arguments at the preliminary injunction phase. For example, Defendants assert that an injunction would raise "serious constitutional concerns" given "the Executive Branch's extensive foreign-relations powers." *Glob. Health*, ECF No. 33 at 2. However, they do not explain how this argument bears on likely violation of the APA, the authority on which the TRO was based and whose constitutional validity has not been challenged. Moreover, the argument seems to simply presume that Defendants will prevail on the separation of powers questions that Plaintiffs have raised, without nearly enough analytical depth. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015) ("The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue."); *id.* at 62 (Roberts, C.J., dissenting) (recognizing that "[t]he Constitution allocates some foreign policy powers to the Executive, grants some to the Legislature, and enjoins the President to 'take Care that the Laws be faithfully executed'"). The parties requested a briefing schedule to develop these arguments for the preliminary injunction phase, which the Court has adopted and is still in progress.

Similarly, Defendants argue for the first time that disbursing congressionally appropriated aid pursuant to existing agreements could result in "waste, fraud, abuse, and even illegal payments" and cite the need to "protect the integrity of [their] payment systems." *Glob. Health*, ECF No. 33 at 5 (citation omitted). But the blanket suspension of congressionally appropriated funding that has been challenged and temporarily enjoined was the result of a categorical order, not any specific finding of possible waste, fraud, or abuse. In defending the challenged action at the Court's TRO

hearing, Defendants did not even attempt to argue that the action was or could be justified based on waste, fraud, or abuse. And, to date, Defendants have not adduced any evidence of waste, fraud, or abuse aside from conclusory statements from a declarant who has "serious questions" about these topics. *Glob. Health*, ECF No. 25-1 at 2. Even in asserting the argument now, Defendants do not explain how it would bear on the reasons for granting the TRO, including Plaintiffs' showing of irreparable harm and their likelihood of success in showing that the blanket suspension violated the APA.[2]

For the foregoing reasons, to the extent Defendants' motion to clarify is not mooted by the above, it is denied, and Defendants' motion to stay the Court's TRO pending an emergency appeal is also denied.

The Court reiterates once more:

> [T]he Court's TRO does not permit Defendants to simply continue their blanket suspension of congressionally appropriated foreign aid pending a review of the agreements for whether they should be continued or terminated. That is the very action that the Court temporarily enjoined because Plaintiffs had shown that blanket suspension pending review would cause irreparable harm and was likely arbitrary and capricious under the APA for failing to consider the massive reliance interests. . . . [T]o the extent Defendants have continued the blanket suspension, they are ordered to immediately cease it and to take all necessary steps to honor the terms of contracts, grants, cooperative agreements, loans, and other federal foreign assistance awards that were in existence as of January 19, 2025, including but not limited to disbursing all funds payable under those terms.

*Glob. Health*, ECF No. 28 at 5.

---

[2] To demonstrate the degree to which the ground is shifting: within the past four days, Defendants submitted multiple filings addressing compliance with the TRO. While each filing cited the declaration for other points, none mentioned the statements about waste, fraud, or abuse or "payment integrity." *See Glob. Health*, ECF No. 25; *AIDS Vaccine*, ECF Nos. 22, 28. To the extent the assertion of possible fraud or payment integrity issues is intended to create grounds for an emergency appeal before the Court has had the opportunity to resolve the preliminary injunction motions, it is worth noting that Defendants' preliminary injunction briefing, filed alongside the instant motion, does not appear to even mention fraud or payment integrity in its APA or separation of powers merits analyses. *See Glob. Health*, ECF No. 34.

The parties' joint status report addressing compliance is due on February 26, 2025, at 12:00 p.m. To the extent there is any dispute between the parties as to compliance, the parties shall identify:

1. Agency officials or employees who have personal knowledge to provide sworn, live testimony as to the relevant disputes as to compliance, such as what agency directives have been given and what funds have been disbursed in response to the Court's TRO and order enforcing it.

2. Any expedited discovery that would assist the parties and the Court in assessing compliance with the TRO and order enforcing it.

**SO ORDERED.**

_____
AMIR H. ALI
United States District Judge

Date:   February 22, 2025

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| AIDS VACCINE ADVOCACY ) | |
| COALITION, et al., ) | |
| ) | |
| *Plaintiffs*, ) | Civil Action No. 25-cv-400 |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES DEPARTMENT ) | |
| OF STATE, et al., ) | |
| ) | |
| *Defendants*. ) | |
| _____ ) | |

**DECLARATION OF LAUREN BATEMAN**

I, Lauren Bateman, declare the following under penalties of perjury:

1.    This declaration is based on my personal knowledge, information, and belief.

2.    I am counsel to Plaintiffs AIDS Vaccine Advocacy Coalition and Journalism Development Network in this matter.

3.    On March 2, 2025, I received from a source within USAID a February 28 memorandum signed and approved by Nicolas Enrich, then-Acting Administrator of USAID for Global Health, titled, "Documentation of challenges and impediments to implementing the lifesaving humanitarian assistance waiver for the pause on foreign assistance (Jan 28 – Feb. 28)." That memorandum is attached as Exhibit A.

4.    On March 2, 2025, I also received from a source within USAID a February 28 memorandum signed and approved by then-Acting Administrator Enrich, titled "Documentation of Bureau for Global Health Workforce Reductions." That memorandum is attached as Exhibit B.

5.    Also on March 2, I received a third document—this one in draft form—from

another source. That document is titled, "Risks to U.S. National Security and Public Health: Consequences of Pausing Global Health Funding for Lifesaving Humanitarian Assistance" and bears a future date, March 4, 2025. That draft memorandum is attached as Exhibit C.

6.    *The New York Times* also received and has reported on these documents. *See* Apoorva Mandavilli, *U.S.A.I.D. Memos Detail Human Costs of Cuts to Foreign Aid*, N.Y. Times (Mar. 2, 2025), https://www.nytimes.com/2025/03/02/health/usaid-cuts-deaths-infections.html. According to that article, Mr. Enrich has confirmed that "he released the memos on Sunday afternoon, after an email arrived placing him on leave, to set the record straight on the gutting of U.S.A.I.D. staff and the termination of thousands of lifesaving grants." *Id.*

Executed on March 3, 2025.

/s/ Lauren Bateman
Lauren Bateman

EXHIBIT A


FOR OFFICIAL USE ONLY

**MEMORANDUM TO THE FILE**

**Date:**          **February 28, 2025**

**Subject:**      Documentation of challenges and impediments to implementing the lifesaving
                   humanitarian assistance waiver for the pause on foreign assistance (Jan 28 - Feb. 28)

**Approved:**   Nicholas Enrich, Acting Assistant Administrator for Global Health   *Nicholas Enrich*

**KEY TAKEAWAYS:**

- Successful implementation of Secretary Rubio's temporary waiver to the pause on foreign assistance
  for lifesaving humanitarian assistance was not possible due to administrative and bureaucratic
  challenges, including contradictory and shifting guidance regarding approval for required activities
  and failure of Agency leadership to process disbursement of funds for activities once approved.
- As a result of these challenges, the Bureau for Global Health (GH) has been wholly prevented from
  delivering life-saving activities under the waiver to date.

**BACKGROUND:**

On January 28, 2025, Secretary of State Rubio issued a temporary waiver to the pause on foreign assistance
articulated in the President's Executive Order on Reevaluating and Realigning United States Foreign Aid (EO) for
lifesaving humanitarian assistance (LHA) activities. A subsequent Agency Notice, issued January 29, instructed that
"Implementing partners currently involved in lifesaving humanitarian assistance programs should continue, or
resume activities if they have been halted, in accordance with the following guidelines" and defined the scope of
the waiver to include "...essential medicines, medical services, food, shelter, and subsistence assistance, as well as
necessary supplies and reasonable administrative costs to facilitate the delivery of such assistance."

USAID's failure to implement lifesaving humanitarian assistance under the waiver is the result of political leadership
at USAID, the Department of State, and DOGE, who have created and continue to create intentional and/or
unintentional obstacles that have wholly prevented implementation. These actions include the refusal to pay for
assistance activities conducted or goods and services rendered, the blockage and restriction of access to USAID's
payment systems followed by the creation of new and ineffective processes for payments, the ever-changing
guidance as to what qualifies as "lifesaving" and whose approval is needed in making that decision, and most
recently, the sweeping terminations of the most critical implementing mechanisms necessary for providing
lifesaving services. These actions individually and in combination have resulted in the U.S. Government's failure to
implement critical lifesaving activities. This will no doubt result in preventable death, destabilization, and threats to
national security on a massive scale. This memo serves to document the LHA waiver process and challenges
encountered by the Bureau for Global Health to date, excluding PEPFAR.

**LHA WAIVER IMPLEMENTATION SUMMARY:**

***January 29-31: Initial Waiver Plan and Guidance***
- On January 29th at the Agency Senior Management Meeting, GH Acting Senior Bureau Official Ramona
  Godbole articulated to then Deputy Chief of Staff (DCOS) Joel Borkert that GH would send an info memo
  describing a process and criteria by which GH would approve activities for and implement the waiver for
  qualifying global health activities, and would carefully identify and track activities within awards that fall
  under the waiver. DCOS Borkert indicated his support for this approach.
- Also on January 29th, GH sent stop work orders (SWO) to all GH-managed Public Interest Organizations
  (PIOs), and included the waiver language verbatim at the advice of USAID General Counsel (GC) to indicate

1

J.A. 192

to these partners that there was guidance to continue lifesaving components of their programs[1]. All other GH-managed agreements had already been sent SWOs prior to the issuance of the waiver.

- In addition, on January 29 USAID Executive Secretariat (ES) released a new template for all Foreign Assistance Pause Waiver Requests, indicating that new waiver requests would only be considered for the same day if submitted by 1:00 p.m. ET. This guidance was subsequently revised and an updated version was shared on January 31. As the blanket waiver for LHA had already been issued,  GH interpreted this guidance to apply only to waiver requests outside of the blanket waiver for LHA and/or for LHA activities that required new obligations in addition to disbursements.
- January 29 - February 2: GH identified emergency outbreak response activities needed to respond to the Ebola outbreak in Uganda through PIOs (UNICEF, IFRC, IOM) under the LHA waiver - the first approved global health activities under the waiver.  Approval to move forward was obtained by DCOS.
  - Despite receiving approval to conduct these Ebola response activities approximately 1 month ago, the implementing partners were never able to draw down funds for these life-saving activities, and have not received any funds to date.
- On January 31st, Acting Assistant Administrator for Global Health (A/AA), Nick Enrich, sent an email summary of GH's process to efficiently implement the LHA waiver for GH activities to DCOS Borkert, copying Chief of Staff Matt Hopson and then-Acting Deputy Administrator Ken Jackson, and followed up on February 3rd after no response.

***February 1-7: Initial Waiver Approvals and Requests for Payment***
- On February 4th, A/AA Enrich and DCOS Joel Borkert talked via phone and followed up via email confirming that GH's proposed process should move forward immediately, with GH approving lifesaving humanitarian global health assistance judiciously in accordance with the guidance, and providing regular updates to the FO including a full accounting of activities and budget. In a shift from previous guidance, during this conversation, DCOS Borkert also directed GH to modify the timeline of lifesaving assistance requests to cover 30 days rather than 90 days.  DCOS Borkert also indicated that GH should be "draconian" in what is approved under the waiver.
- On February 4th, GH shared this memo for the Acting Administrator with the DCOS Borkert, who subsequently cleared the memo by email on February 6th.[2]
  - This memo defined Bureau for Global Health LHA programming as including 1) Direct Service Delivery, 2) Emergency Response to Infectious Disease Outbreaks, and 3) Essential Health Commodities & Supply Chain Management.
  - The memo also established that GH A-AA was responsible for approving activities that fall within the waiver, and for sharing updates regularly with the Agency Front Office and coordinating with M/OAA to communicate with implementing partners of GH centrally managed awards to restart approved activities.
- GH developed an internal tracker [Tab 1] to collect award and activity information for LHA activities. GH A-AA reviewed the tracker daily and approved activities that met the definition outlined in the cleared memo. GH collected information only on centrally-managed awards, including field support.  Regional Bureaus led the collection and approval of bilateral awards that met the LHA waiver criteria independently.

---

[1] PIOs that received suspension letters inclusive of waiver language are Food and Agriculture Organization of the United Nations (FAO) Global Health Security Project Agreement (Award # 7200GH22IO00005), Food and Agriculture Organization of the United Nations (FAO) Emerging Pandemic Threats Agreement 2 (Award # GHA-G-00-06-00001), UNOPS Agreement (Award # AID-GH-IO-15-00002), UNOPS Agreement (Award # 7200GH24IO00001), UNICEF Umbrella Agreement-II (Award # 7200GH21IO00004), UNICEF Polio and Immunization Agreement II (Award # 7200GH22IO00001), IFRC Agreement 2 (Award # AID-GH IO 17 00002), Global Financing Facility (GFF) for Women, Children and Adolescents Single-Donor Trust Fund Agreement (Award # 7200GH23IO00003/Bank Trust Fund No. 074019), IOM Agreement (Award # 7200GH25IO00002), Joint United Nations Programme on HIV/AIDS (UNAIDS) UNAIDS Agreement IV (Award # 7200GH22IO00004), and International Federation of the Red Cross and Red Crescent Societies (IFRC) Agreement 3 (Award # 7200GH23IO00002)

[2] By nature, Info Memos do not require explicit approval but are cleared and shared for informational purposes. On Feb. 6, it was unclear who was the Acting Administrator of USAID. While an Agency-wide February 3rd email indicated that Secretary of State Marco Rubio had been appointed as USAID's Acting Administrator, this communication raised a number of legal and practical questions still awaiting resolution. Additionally, previous Agency-wide guidance on the implementation of executive orders (Jan 25 and Jan 26) had placed severe restrictions on communications between USAID and State, indicating that all communication with State must first go through the USAID Front Office. Therefore, GH included Ken Jackson, the highest ranking political official at USAID, in its circulation of the Info Memo.

FOR OFFICIAL USE ONLY

2

- Consistent with the process established in the approved Info Memo, on February 7th, GH sent the first batch of GH-approved waivers for the Agency Front Office's visibility and to request their action to authorize expenditures/disbursements, given that access to Agency financial systems (Phoenix, GLAAS) was severed for GH and other financial management staff across the Agency. GH provided an updated list of GH-approved waivers on February 10 to Paul Seong (detailee to Agency FO), copying DCOS Borkert. At this point, there was no clear pathway to submit waiver requests, and GH personnel (Nida Parks, Ramona Godbole, and Nick Enrich) had been verbally told by DCOS Borkert to email Paul Seong copying the DCOS. Concurrently, M/OAA sent letters to the relevant implementing partners/awards to restart work on specific lifesaving activities, based on GH approval.
    - While the specified partners received letters indicating certain activities could restart as they were approved under the LHA waiver, several indicated that they could not restart these activities without getting paid by USAID for past invoices (prior to January 20th) and/or access to funds for the waived activities. Other partners restarted lifesaving activities using residuals, but even that work was short-lived. With USAID having failed to make payment on past due invoices or to provide access to funds for newly approved activities, and with residual funds fully extinguished, partners had no funding to continue the work, so it stopped. Communications documenting these challenges can be found here.
- Beginning around February 7th, members of GH leadership participated in a Department of State-led "Coordination Support Team," as part of the "Programs Working Group," which was charged with addressing challenges related to implementing the LHA waiver. From the start, the Programs Group alerted Agency leadership that the lack of access to funds for implementing partners was a critical impediment to the ability to implement the waiver, as access to USAID financial systems (GLAAS and Phoenix) had been completely turned off by DOGE, per Bob Kingman and Daniel Gaush from Department of State ICASS Service Center, preventing the flow of any funds to implementing partners who were approved to implement LHA activities.

### February 8-14: Award Terminations and Changing Waiver Activity Approval Guidance

- On February 8th, M/OAA notified GH of the first of several "tranches" of awards that the Secretary of State (S) had identified for termination. The list of awards slated to be terminated included awards that had been approved to implement activities under the LHA waiver. GH immediately alerted both DCOS Borkert and Assistant to the Administrator (AtA) Mark Lloyd both in writing and verbally that terminating the awards that were needed to implement lifesaving activities would undermine the ability of USAID to implement the LHA waiver.
    - OAA shared subsequent tranches of planned award terminations with GH centrally-managed awards - Tranche 2 (on or around February 9th), Tranche 3 (February 10th), and Tranche 5 (February 23), and OAA gave GH the opportunity to highlight awards with LHA before termination. Early in this process, one award with an LHA request (NTD West) was terminated before GH could effectively engage with OAA.
- On February 11th, Mark Lloyd asked A-AA Enrich for additional details on submitted waivers, including descriptions of awards from FACTSInfo and number of lives saved.
- On February 11th, DOGE advisor Jeremy Lewin emailed A-AA Enrich warning him to stop reviewing the awards slated for termination to identify if those awards were needed to implement activities under the waiver. Specifically Lewin stated: "I am hearing that Global Health is conducting supplemental reviews of awards slated for termination by Secretary Rubio and Acting Deputy Administrator Marocco. This is delaying the timely processing of these termination notices and is unacceptable" and specified that "bureaus should not be conducting their own policy and program reviews before acting on these termination instructions." A-AA Enrich responded that GH was flagging for Agency consideration that the awards that were slated for termination included those needed to implement the LHA waiver, but would stop if told to stand down. Lewin did not respond.
- On February 11th, Paul Seong, a detailee to the Agency FO, instructed GH to pause further approvals of activities to be implemented under the LHA waiver. His email stated: "Please hold off on any more approvals until we have a conversation with Joel on this." On February 12, A/AA Enrich shared that the

message with GH leadership and regional bureaus. Despite a growing list of lifesaving activities identified, GH paused on any further approvals.

- On February 13th, A-AA Enrich and Senior Deputy Assistant Administrator (SDAA) Julie Wallace were told by DCOS Borkert that there had been a false narrative spread in the media that GH had been told to pause on approving activities under the LHA waiver. A-AA Enrich stated that the Agency FO had in fact told GH to pause on further approvals, and reminded him of the previous day's email. DCOS Borkert as well as other senior advisors, including AtA Tim Meisburger and Senior FO Advisor Laken Rapier shouted at A-AA Enrich that there had never been a pause, and instructed him to immediately draft another Info Memo to correct the "false narrative in the media that there had ever been a pause."
- On February 13th, GH circulated the memo from AtA Mark Lloyd "performing the duties of Assistant Administrator, Global Health" which among other things, reiterated GH's approach to approval of waivers per the earlier February 4th memo.
  - While agency leadership previously told GH to only include requests for 30 days (articulated in the February 4th memo), GH was subsequently asked to shift to the original 90 days as articulated in the original waiver language. This was updated in the February 13th memo.
- On February 14th, the Agency Front Office and ES circulated a new consolidated Foreign Assistance Pause Blanket Waiver and Exception Guidance which fully contradicted Mark Lloyd's memo from the previous day, and rendered the GH approval process for activities under the LHA waiver obsolete. Starting with the release of the February 14 guidance, GH was never again able to approve activities under the waiver, and from that point forward, zero lifesaving health activities have been approved by the Agency.
  - The February 14th guidance established a new process for approving LHA activities, and centralized the approval process with the Agency FO, and specifically required approval for all activities under the waiver by Ken Jackson as the named "Senior Bureau Official" for USAID. This new guidance contained several process updates, including two new templates (Blanket Waiver Request Sheet and the Obligation or Disbursement under Waiver of Foreign Assistance Pause) and articulated that all waiver requests needed to be sent through the Executive Secretariat (ES).
  - In addition, the guidance articulated that ES would inform the relevant Bureau and cc M/CFO POCs if/when activities were approved for payment, but was not responsible for working with M/CFO on coordinating the disbursement of funds for approved waivers.
- On February 14th, GH re-sent all approved activities under the waiver to date to ES, in the original GH-created format, clarifying that they had already been approved under the previous guidance. All lifesaving activities that had not yet been approved as of the February 14th guidance, were subsequently submitted for approval in accordance with the new guidance. **No global health activities were ever approved under the updated guidance.**
  - GH considered submissions prior to February 14th approved to fall under the waiver, but not approved for payment until the Agency SBO signs the Obligation and Disbursement Form.
  - For submissions on or after February 14th, GH considered those requests as needing approval from the Agency SBO both for qualification under the waiver and for payment.
- On February 14th, a federal judge issued a temporary restraining order (TRO) prohibiting the freezing of foreign aid funds obligated prior to January 19. It was not immediately clear how the TRO pertained to LHA waivers, however, GH decided to continue to submit requests given the uncertainty of interpretation and implementation of the TRO.

### *February 15-21: Unapproved Waiver Activity Requests and Ongoing Lack of Payment*
- On February 18th, A-AA Enrich shared an action memo with Mark Lloyd recommending the utilization of an existing agreement with the WHO to utilize previously obligated funds to access a critical stockpile of PPE and lab supplies to support the Uganda Ebola outbreak response. While the activities would normally be covered in the regular process for the lifesaving humanitarian assistance waiver, this memo was drafted for approval from State/F Director Pete Marocco, given that the implementing partner of the agreement is WHO, the subject of a separate Executive Order. Mark Lloyd cleared the memo on Feb. 19th and it was sent forward for COS Borkert clearance and DFA Pete Marocco signature. COS Borkert specified that DFA Marocco would not sign the memo and would not agree to utilizing the agreement with WHO to access the PPE stockpile, and instead ordered A-AA Enrich to "pick up the PPE and deliver it to the necessary

people and organizations in the region to respond to ongoing infectious disease outbreaks" without utilizing the agreement with WHO. DFA Marocco immediately responded to Borkert's email, threatening to the jobs of GH staff if an alternate plan was not carried out immediately, directing political appointees Borkert, Lloyd and Meisburger to "take all necessary personnel actions in the event this is not completed in the next 12 hours."

- On February 19th, DCOS Borkert sent an email to A-AA Enrich, AtA Lloyd, and A-AA for Africa Bureau Brian Frantz indicating that "life saving things like Marburg do not need a waiver (so there should be no pause). They do need to go through the payment approval process," contradicting the previously established processes described above.
- On February 20th, A-AA Enrich emailed AtA Mark Lloyd to request that he clarify the conflict between the guidance and DCOS email.  It was later confirmed verbally and documented via email that the existing Agency guidance continues to be the active guidance despite comments from DCOS Borkert.
- On February 20th, GH sent all waiver requests that had previously been approved by GH as well as additional waiver requests that had gone through technical review and concurrence at the GH/AA level in the new format to ES and M/CFO, including links to an Obligation / Disbursement Form for each.
  - The  GH Centrally Managed Award Blanket Waver Request Tracker can be found in Tab 2 and provides a running list of all submissions for approval and/or payment to the Agency FO.
- On February 21st, with no response to February 20th email (above), to help provide clarity around unclear and inconsistent guidance, GH again  proposed some minor revisions to ES guidance through Mark Lloyd. These proposed edits included clarification that GH can approve the applicability of the waiver for activities, while the ES guidance was to seek approval for payment. Mark Lloyd subsequently indicated that the proposed edits were not approved and that GH should follow the guidance as laid out by ES.

### February 22-28: No approved waivers, no funding, and widespread mechanism terminations
- On February 21st, Mark Lloyd told GH leadership to update the waiver process by creating an additional layer of technical review for LHA waiver submissions from missions, a process which was previously managed entirely by the Regional Bureaus.
- On February 24, in an effort to move forward approvals and payments, the GH leadership team (A-AA Enrich and DAA Coles) walked through each waiver request with political leadership (Mark Lloyd and Tim Meisburger) in an effort to move forward approvals and payments.  Political leadership provided guidance instructing GH to narrow the focus of its requests and to deprioritize activities related to neglected tropical diseases, Mpox, polio, Ebola, and any monitoring and surveillance activities, as those would not be approved.  AtAs Lloyd and Meisburger stated at the meeting that even activities that had been approved by GH under the previous guidance needed to be re-approved, indicating that the Agency FO does not recognize any previous GH approvals for applicability of the LHA waiver under the Feb 6th info memo. At this meeting, AtA Lloyd and Meisburger informed GH leadership that all submissions would need to be cleared by AtA Lloyd prior to being submitted to SBO Jackson for approval.
- On Tuesday, February 25, GH provided a revised and prioritized list of GH centrally-managed awards/activities (none of which had been approved) to AtA Lloyd requesting approval of 16 urgent activities to support lifesaving commodities and services per the February 24 discussion.  AtA Lloyd never responded or provided clearance or non-clearance. GH had planned to re-submit these prioritized activities for SBO Jackson's formal approval for inclusion under the waiver and payment after receiving Mark Lloyd's concurrence.  To date, despite prompts at each daily meeting with AtA Lloyd, GH has not been given guidance to proceed.
- On Tuesday, February 25, through the Programs Working Group, GH was made aware of Frequently Asked Questions on the waiver developed by State and cleared by Pete Marocco.  Question 20 indicates the following specified the funding accounts that the LHA waiver applies to, and it explicitly excludes non-PEPFAR health funding, meaning that none of the proposed activities could be approved under the LHA waiver.
- On February 26, GH raised the above mentioned FAQ and implications at the Programs Working Group meeting. Political leadership in attendance (Timothy Meisburger) indicated that the FAQ was a mistake. GH subsequently followed up with leadership requesting a revision to FAQ via email, however, the

omission was never corrected before the final FAQs were widely shared later that day via an Agency Notice.

- Also on February 26th, ES released additional updates to waiver guidance including that for awards over $1 million a budget breakdown would be required before approval; GH was also told to include dollar amounts within the disbursement / obligation forms already submitted by ES staff member Jenn Hurley.

- Additionally, on February 26th, over 5,000 USAID awards were terminated globally; GH was not notified of this action before it happened. The terminated awards included almost all of the awards that were needed to implement lifesaving activities. A-AA Enrich informed COS Borkert, SBO Jackson, and AtAs Lloyd and Meisburger immediately of the grave impacts on lifesaving activities related to malaria, tuberculosis, and ebola. In an email following the February 26th terminations, DCOS Borkert indicated that the awards that were terminated should not have been, and had been terminated in error: "Please hold on these life saving programs and let us review in the morning. There is an acknowledgement some may have been sent out in error and we have the ability to rescind. We need to identify what those are."

- As of February 27th, GH has identified over 100 awards (excluding PEPFAR) that had submitted LHA waivers for approval. A-AA Enrich emailed the list of awards and described their lifesaving impact on February 27th; when GH leadership were told that the list needed to be ranked, DAA Coles responded with top priority awards that had been terminated.

- On February 27, GH sent an additional list of awards / activities to ES seeking SBO Jackson's approval to allow the activities to proceed pursuant to the LHA waiver and to allow program payment (see Tab 2)

Finally, significant staffing changes occurred within USAID/GH throughout the timeframe in question - including regularly affecting staff by terminating them without warning, turning on and off access to systems, placing and removing staff from administrative leave, etc. - severely limiting the ability to navigate and respond to the shifting guidance and bureaucratic hurdles outlined above. These staffing disruptions are too numerous and expansive for this memo, and are summarized in a separate memo for the record (Tab 3). In addition to staffing disruptions within GH, there were significant numbers of individuals put on administrative leave both at Missions and at Regional Bureaus, further exacerbating challenges.

**IMPLICATIONS:**
- In total, to date, the GH Bureau has identified 72 activities across 31 awards that entail Lifesaving Humanitarian Assistance, not including bilateral awards with LHA waiver requests. To date, none of these activities have been approved by the Agency FO and no payments have been released, fully preventing their implementation.

- All or nearly all of the awards needed to implement lifesaving humanitarian assistance were terminated on or before February 27th, rendering impossible any efforts to implement activities under the waiver, even if they had been approved.

- The number of deaths attributable to the loss of USAID funding and support is not known at this time. Additional details on the U.S. National Security and Public Health from the Temporary Pause in Foreign Aid and Delays in Approving Lifesaving Humanitarian Assistance can be found in a separate memo for the record (Tab 4)

Attachments:
>    **Tab 1:** 🟩 Global Health Centrally Managed Mechanisms_USAID Lifesaving Exception Request 2/4   [ GH internal submission form for centrally-managed awards with potential LHA components for GH review/clearance prior to submission to Agency FO]
>    **Tab 2:** 🟩 GH Centrally Managed_USAID Blanket Waiver Request Tracker  [submissions of waiver requests for approval to Agency FO]
>    **Tab 3:** 📘 Memo to File: Bureau for Global Health Workforce Reductions
>    **Tab 4:** 📘 Info Memo on Risks to U.S. National Security and Public Health from the Temporary Pause in…

FOR OFFICIAL USE ONLY

**CLEARANCE PAGE**

**Drafter**:  Ramona Godbole, GH/Policy, Programs, and Planning (P3) Deputy Director
**Approved**: Nicholas Enrich, GH/Acting Assistant Administrator

| <u>Bureau Level Clearances</u> | <u>Clearance Status</u> | <u>Date</u> |
|---|---|---|
| GH/P3: AJernigan | Clear | 2/28/2025 |
| GH/PDMS | INFO | |
| GH/ID/TB | INFO | |
| GH/ID/Mal | INFO | |
| GH/ID/ETD | INFO | |
| GH/ID/NTD | INFO/No staff left to clear | |
| GH/MCHN: AThambinayagam | clear | 2/28/2025 |
| GH/PRH: MShort | Clear | 2/28/2025 |
| GH/OHS | No staff left to clear | |
| GH/OHA | INFO | |
| GH/OCS | No staff left to clear | |
| GH/FO: NParks | Clear | 2/28/2025 |

FOR OFFICIAL USE ONLY

J.A. 198

EXHIBIT B



**MEMORANDUM TO THE FILE**

**Date:** February 28, 2025

**Subject:** Documentation of Bureau for Global Health Workforce Reductions

**Approved:** Nicholas Enrich, Acting Assistant Administrator, Bureau for Global Health    *Nicholas Enrich*

**Background**
On January 20, 2025, the Bureau for Global Health (GH) workforce totaled 783 encumbered positions. The GH workforce was made up of multiple staffing mechanisms including civil service (CS), foreign service (FS), and foreign service limited (FSL), personal support contractors (PSC), institutional support contractors (ISCs), Administrative Determined (6), and Other (Fellows, Intergovernmental Personnel Act, and Intermittent PSCs).

The breakdown by staffing mechanisms was the following:

- Civil Service: 291
- Foreign Service: 32
- Foreign Service Limited: 54
- Personal Service Contracts: 10
- Institutional Support Contractors: 374
- Other (Fellows (4), Intergovernmental Personnel Act (5), Intermittent PSCs (13)): 22

**Documentation of GH Workforce Reductions**

**Executive Order 14151**
On January 23, 2025, in accordance with Executive Order 14151 ""Ending Radical And Wasteful Government DEI Programs And Preferencing", GH requested to end the services for diversity, equity, and inclusion (DEI) positions under Global Health Training, Advisory, and Support Contract (GHTASC) (Attachment 1) . This resulted in four positions being removed from the contract, of which 3 were filled and one was vacant.

**Executive Order 14169**
In accordance with Executive Order 14169 "Reevaluating and Realigning United States Foreign Aid" and the All Diplomatic and Consular Posts Collective (ALDAC) issued by State Department on January 25, 2025, USAID issued stop work orders for existing foreign assistance awards.

*Institutional Support Contractors*
On January 27, 2025 pursuant to the FAR 52.242-15 Stop-Work Order clause, GH's institutional support contract, GHTASC (Contract Number 7200AA21N00004) was directed to stop all work

J.A. 200



(Attachment 2). This resulted in the termination of a total of 405 institutional support contractors employed by GHTASC, of which 374 were assigned to GH and 31 were assigned to other USAID Bureaus. Institutional support contractors hired through GHTASC served in various technical and support roles. The GHTASC workforce was composed of senior technical experts, advisors, program analysts, program and special assistants throughout all GH offices.

*Intergovernmental Personnel Act*
On January 28, 2025 GH received a template to suspend Intergovernmental Personnel Act Agreements. These Action Memos were drafted and cleared by GH and HCTM's Human Chief Capital Officer on January 30, 2025 (Attachment 3). This resulted in the suspension of 5 Intergovernmental Personnel Act Agreements with 4 Universities.

*Personal Services Contracts*
GH contracted 10 individuals under personal services contracts (PSCs) to provide services in GH and 23 intermittent PSCs to provide services overseas. To date, 20 PSCs have been terminated. There are 3 remaining PSCs in GH, all are on Administrative Leave.

*Fellowships*
GH hosted 3 Science for Development Fellows and 1 Institute of Electrical and Electronics Engineers USA fellow. These awards were not managed by GH and received stop work orders.

**Administrative Leave**

On January 27, 2025, the GH Front Office members were placed on Administrative Leave. These included five personnel including GH's Senior Deputy Assistant Administrator, Deputy Assistant Administrator, two Acting Deputy Assistant Administrators, and the GH Chief Medical Officer. On January 28, 2025, acting leadership for USAID Bureaus and Independent Offices was appointed via an Agency Notice (Attachment 4).

On January 31, 2025, nineteen GH workforce members were placed on Administrative Leave in relation with Executive Order 14168 "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government". On February 3, 2025 the majority of GH staff lost system access and subsequently regained it between the evening and throughout the following day. On February 4, 2025 the majority of GH received Administrative Leave Notices and lost system access. On February 5, there were 151 workforce members who retained network access. The widespread Administrative Leave resulted in confusion, uncertainty, broken chains of command, and lack of operational staff needed to perform essential roles such as timekeepers and GovTA certifiers. GH's ability to operate was vastly affected between February 4, 2025 and February 10, 2025.

All GH staff that were placed on Administrative Leave returned to active work status on February 10, 2025, pursuant to a temporary restraining order issued by the U.S. District Court for the District of Columbia.



On February 24, 2025, after the Court dissolved its temporary restraining order, the majority of the remaining staff under CS, FS, and FSL staffing mechanisms was put on Administrative Leave. The total number of GH personnel on Administrative Leave before terminations occurred was 314 (Attachment 5).

**Essential Personnel Designation**

On February 4, GH Leadership was asked to make a "draconian" list of essential personnel (Attachment 6). Subsequently, additional requests for lists of essential personnel were requested by Agency Leadership.

On February 23, 2025 a total of 70 GH staff received an Essential Personnel Designation of which 59 are CS, 4 are FS, 7 are FSLs. There are 3 PCSs that have not been terminated and per the Agency Notice on Administrative Leave they have continued to report to work (Attachment 7). There is one individual who is designated essential who lost account access on February 24, 2025 and has not been able to regain account access. There's one CS individual who was terminated.

**Reduction in Force**

On February 24, 2025, 71 personnel assigned to four GH Offices received Reduction in Force (RIF) letters. The offices are 1) GH's Front Office, 2) Office of Policy, Programs, and Planning, 3) Office of Professional Development and Management Support, and 4) Office of Population and Reproductive Health. Five staff out of the 71 that received RIF letters subsequently received termination letters on February 24, 2025. Fifteen staff that received RIF letters had also received an Essential Personnel Designation the previous day.

**Terminations**

On February 24, 2025, termination letters were issued throughout USAID. GH has not been able to verify the total number of terminations due to account inactivations. To date, GH is tracking a total of 46 CS personnel that received termination letters. GH is aware of 20 PSC terminations. Since January 20, 2025 the GH workforce has been reduced by 449 workforce members.

**Current State**

There are 69 GH personnel that received Essential Personnel Designations, of which 15 received RIF letters. In addition to the 69 essential staff, 3 PSCs have not been terminated. The current number of GH staff is 72. Accounting for the 46 terminations that GH is currently tracking, there are 262 GH staff on administrative leave, of which many have lost access to their USAID accounts. These drastic staffing reductions have severely impacted GH's ability to function. GH has outlined the risks by current staffing levels to Agency Leadership (Attachment 8).



*Attachments*

1. Request to stop DEI-related services
   📕 1. USAID Mail - Urgent_ Immediate action needed.pdf
2. Credence Management Solutions Stop Work Order
   📕 7200AA21N00004  Stop-Work Order - Credence Management Solutions.pdf
3. Action Memo for Suspension Letters for GH IPA Agreements
   📕 Action Memo for IPA Suspensions.docx - Google Docs.pdf
4. Agency Notice - Correction_Leadership in USAID Bureaus and Independent Offices
   📕 4. USAID Mail - CORRECTION_ Leadership in USAID Bureaus and Independent …
5. GH Current State Tracker (February 28, 2025)
   📕 5. GH - Feb Current State - Table Data.pdf
6. Essential Personnel Lists  📕 6. USAID Mail - Fwd_ In person meeting tomorrow.pdf
7. Instructions During Administrative Leave
   📕 7. USAID Mail - Instructions During Administrative Leave.pdf
8. Risks posed by staffing levels
   📕 8. USAID Mail - Registering concern re_ risks posed by proposed staffing levels.pdf



**CLEARANCE PAGE**

**Drafter:** Natalia Machuca, Deputy Director, Office of Professional Development and Management Support, Bureau for Global Health

**Approver:** Nicholas Enrich, Acting Assistant Administrator, Bureau for Global Health

| Bureau Level Clearances | Clearance Status |
|---|---|
| GH/FO | INFO |
| GH/P3 | INFO |
| GH/PDMS | INFO |
| GH/ID | INFO |
| GH/MCHN | INFO |
| GH/PRH | INFO |
| GH/OHS | INFO |
| GH/OHA | INFO |
| GH/OCS | INFO |

EXHIBIT C



**INFO MEMO FOR THE USAID ADMINISTRATOR AND DEPUTY ADMINISTRATOR**

**Date:**        March 4, 2025

**To:**          XXX

**From:**        Nicholas Enrich, Acting Assistant Administrator for Global Health

**CC:**          Assistant to the Administrator Mark Lloyd
              Assistant to the Administrator Tim Meisburger
              Assistant to the Administrator Ken Jackson
              Acting Chief of Staff Joel Borkert

              **Subject:**        Risks to U.S. National Security and Public Health: Consequences of
              Pausing Global Health Funding for Lifesaving Humanitarian Assistance

**Key Takeaway:** The temporary pause on foreign aid and delays in approving lifesaving humanitarian assistance (LHA) for global health will lead to increased death and disability, accelerate global disease spread, contribute to destabilizing fragile regions, and heightened security risks—directly endangering American national security, economic stability, and public health.  If the pause leads to permanent contract terminations, the  $7.7B in resources appropriated by Congress are no  longer be  used to support these lifesaving global health programs, which could potentially result  in wasted resources.  The impacts on mortality and morbidity are summarized in the tables below. While the Foreign Assistance Review is set to take place in the coming weeks, it is important to recognize that a mechanism-by-mechanism approach may overlook the broader impact of these programs across global health program areas. This includes missed opportunities to enhance efficiency and cost-effectiveness within LHA program areas.

**Deleted:** being

**Illustrative quantifiable impacts of halting global health programing on the mortality and morbidity of lives can be summarized as follows (see full table here):**

| Program Area | Global Case Increase over one year if Programs are permanently halted |
|---|---|
| Malaria | An additional 12.5-17.9 million cases and an additional |

1

| | 71,000-166,000 deaths (39.1% increase)  annually |
|---|---|
| MDR-TB | 28-32% Increase in estimated incidence globally |
| TB | 28-32% increase in estimated incidence globally |
| EID (Ebola, Marburg, etc.) | Worst Case Scenario: More than 28,000 cases |
| Polio | Additional 200,000 paralytic polio cases/year (and hundreds of millions of infections overall), over next 10 years, if global polio eradication stops |

**Estimated number of people impacted annually in the absence of global health LHA (see full table here):**

| Life-saving health services in 48 countries with most maternal, newborn, and child deaths | Estimated Number of People Affected this Year Through the Halt in Services |
|---|---|
| **Maternal health:** pregnant women not reached through life saving services | 16,800,000 |
| **Newborn health:** critical postnatal care to newborns within two days of childbirth | 11,262,264 |
| **Child health:** Treatment only for pneumonia and diarrhea (among the top causes of preventable deaths in children under 5) | 14,782,398 |
| **Nutrition** | 1 million children not treated annually for severe acute malnutrition |

**Policy Recommendation:** Resume all mechanisms with submitted life-saving waivers to avert crisis-level expenditures, prevent mortality and morbidity, and protect national security. Upholding these programs is not only a legal and humanitarian obligation but also a critical strategic investment to make America safer, more secure, and more prosperous.

**Background**

On January 20, 2025, the President issued an executive order mandating a 90-day pause on most foreign assistance activities to allow for a comprehensive review. Eight days later, on January 28, Secretary of State Rubio issued a temporary waiver to this pause, as outlined in the President's Executive Order on Reevaluating and Realigning United States Foreign Aid (EO),

2

allowing lifesaving humanitarian assistance (LHA) activities to proceed. While this temporary pause is intended to assess and realign foreign aid priorities, delaying approvals for LHA programs presents serious risks to national security, public health, and decades of progress in global health.  Americans consider it a moral strength to not only protect their fellow citizens but to also ensure U.S. medical innovations are made available to those less fortunate, particularly those in extreme poverty. The suspension of essential LHA during this review period is disrupting a range of critical health services, including maternal and child health and nutrition programs, malaria and tuberculosis treatment, and polio eradication efforts. Additionally, the canceling of critical contracts, prevents the ability to respond to the most pressing and urgent life-threatening challenges in the near-term.

As a result of the pause and programming delays, millions of individuals now face heightened risks of preventable diseases such as malaria, HIV/AIDS, TB, and multidrug-resistant tuberculosis (MDR-TB). Furthermore, setbacks in maternal and child health and nutrition initiatives threaten overall health outcomes in affected regions. Beyond the immediate consequences, these disruptions weaken critical disease surveillance and health supply chain systems, increasing the likelihood of unchecked outbreaks of emerging infectious diseases such as avian influenza, Ebola, and mpox—threats that can spread globally and endanger American citizens.

Historical data demonstrate that reductions in funding for global health initiatives and lifesaving health programming correlate with surges in disease incidence, reinforcing the urgency of sustained support for these programs to protect both global stability and domestic security. A failure to contain infectious diseases at their source heightens the risk of transmission to the United States, posing a direct threat to public health and economic stability. The consequences extend beyond human health, impacting American businesses and families by increasing healthcare costs, disrupting international trade, and straining domestic resources.

This memorandum outlines the critical consequences of withholding global health funding for LHA activities, emphasizing how this decision undermines the congressionally mandated efforts of USAID and jeopardizes American security by allowing preventable diseases to spread unchecked. USAID's Congressional legislative mandate per foreign assistance law and current funding status can be found in the Annex 1 of this memorandum.

**Impact of Terminating Lifesaving Humanitarian Aid (LHA) Awards in Global Health**

While we are currently in a 90-day review period regarding lifesaving humanitarian aid (LHA) awards, this section outlines the potential consequences should all LHA activities be permanently suspended. Such a suspension is expected to deteriorate public health outcomes

3

both domestically and globally, burden the U.S. economy and healthcare system, and escalate national security risks, including increased vulnerability to biothreats

***Deterioration of American Public Health and Increased Global Mortality***

**Key Impact 1:** Resurgence of preventable diseases: Domestic and global implications.

- **Halted interventions and treatments fuel the rise of preventable diseases:** The suspension of critical global health funding for lifesaving humanitarian assistance threatens not just global health but also the well-being of American communities. Without essential services—such as antiretroviral treatments, malaria prevention, routine immunization, and tuberculosis control—preventable diseases like HIV/AIDS, malaria, TB/MDR-TB, measles, diphtheria, pertussis and others will surge, undoing years of progress. As outbreaks spread unchecked, the consequences will extend beyond borders, increasing the risk of infections reaching the U.S., straining healthcare systems, and endangering American lives.
  - A systematic review of malaria resurgence events in 61 countries between the 1930s and 2000s, indicated 91% were due to a weakening of malaria control programs of which resource constraints contributed to over half of these[1]. Following the end of the 14-year Global Malaria Eradication Program in 1969, there was a global resurgence of the disease during the 1970s and 1980s[2].
- **Resurgence of MDR-TB: A growing American public health threat:** Tuberculosis programs worldwide keep drug-resistant TB in check. If these efforts collapse, the U.S. will see more cases of hard-to-treat TB arriving at its doorstep. Treating one patient with multidrug-resistant TB (MDR-TB) in the U.S. costs over $154,000 (and an average $494,000 for an extensively drug-resistant TB case)[3]. Without timely and effective treatment, multidrug-resistant tuberculosis (MDR-TB) cases will surge, posing a direct threat to both American and global public health. As international travel and migration increase, uncontrolled MDR-TB outbreaks abroad heighten the risk of transmission to the U.S., where containment efforts would require significant federal and state funding. The escalating burden of MDR-TB will not only drive up healthcare costs but also endanger frontline workers, making prevention and early intervention an urgent national priority.
- **Prevention Is More Cost-Effective Than Emergency Funding of Programs:** The 2014–16 Ebola outbreak cost the U.S. approximately $4.3 billion in response efforts, highlighting

---

[1] Institute for Health Metrics and Evaluation. https://www.healthdata.org/research-analysis/library/malaria-resurgence-systematic-review-and-assessment-its-causes
[2] https://www.ncbi.nlm.nih.gov/books/NBK525190/
[3] https://www.csis.org/analysis/protecting-united-states-health-security-risk-global-tuberculosis#:~:text=Treatment%20of%20a%20typical%20patient,of%20XDR%2DTB%20costs%20$494%2C000.

4

that reactive spending far exceeds proactive prevention costs. The COVID-19 pandemic further underscored how unplanned emergency spending can lead to trillions in economic losses. USAID-funded programs have historically curbed disease spread, saving lives and billions in economic costs. For example, immunization is among the most cost effective interventions in public health, saving an estimated 2-3 million deaths each year; for every dollar invested in immunization, up to $52 ROI is generated from saved costs of treating illnesses[4]. Sustaining these programs is crucial to avoiding costly, reactive crisis management. There is a $94 return in economic growth for every $1 spent on maternal and child health-specific foreign aid due to deaths prevented and improvements in the health status of populations in poor countries.

- **Reduced disease surveillance and undetected outbreaks:** Cuts in humanitarian assistance compromise surveillance systems essential for early detection of emerging infectious diseases. The diminished capacity to monitor and respond swiftly enables the unchecked spread of deadly outbreaks such as avian influenza and mpox. This lack of surveillance risks turning localized outbreaks into widespread public health emergencies, further endangering both local populations and global health security.

**Key Impact 2:** Humanitarian and regional instability fueled by worsening health crises.

- **Increased instability in fragile states through disease outbreaks:** Weak governance and poor infrastructure leave fragile states highly vulnerable to disease outbreaks, which can quickly escalate crises. In the Democratic Republic of Congo (DRC), ongoing violence and an aid cutoff have led to the collapse of health services, worsening malnutrition and cholera and measles outbreaks. Over 400 mpox patients were left stranded after fleeing overwhelmed clinics, while more than one million displaced people around Goma—and another 150,000 near Bukavu—face critical shortages of shelter, clean water, and medical care. In Burkina Faso, where 100% of the 23 million total population is at risk for malaria, "30 percent of health care facilities were either partially or fully non-functional due to frequent attacks on facilities and equipment, medical personnel, and medication shortages, adversely affecting 4 million people[5]." Additionally, in FY2024 over 34 million seasonal malaria chemoprevention doses were procured with PMI/USAID funds to protect children under five in three Sahel countries (Burkina Faso, Mali and Niger); these vulnerable children are now at greater risk with the high transmission malaria season rapidly approaching. In such conditions, the risk of a new pandemic looms large. From the Sahel to South Asia, cutting off health aid in fragile states threatens to turn crises into full-scale humanitarian disasters.

---

[4] https://immunizationevidence.org/immunization_terms/return-on-investment/
[5] https://reliefweb.int/report/burkina-faso/burkina-faso-complex-emergency-fact-sheet-1-fiscal-year-fy-2024

5

- **Amplification of migration pressures and regional destabilization:** Failing public health systems fuel migration crises, forcing people to flee when they can no longer access food, medicine, or basic security. Collapsing healthcare infrastructure not only displaces populations but also spreads disease across borders. This was evident in Venezuela in the late 2010s, where a breakdown of the health system—alongside economic collapse—led to resurgences of measles, diphtheria, and malaria, driving millions to flee and triggering a regional refugee crisis. The spread of Venezuela's measles outbreak into neighboring countries underscored the direct link between public health failures and migration. More recently, the COVID-19 pandemic and its economic fallout intensified migration pressures in Central America, particularly in Guatemala, Honduras, and El Salvador, where overwhelmed healthcare systems and food insecurity forced many to seek refuge in the U.S. Similarly, the ongoing conflict and health crises in Haiti—where gang violence has crippled hospitals and cholera has resurged—have led to a surge in migration to the U.S. and neighboring countries. As public health crises worsen, migration pressures will continue to rise, contributing to regional instability and humanitarian challenges. (citations documented)

**Key Impact 3:** Greater risk of disease spillover to the U.S.

- **A halt to global health aid programs increases the risk of dangerous diseases reaching the U.S.:** In a globally connected world, outbreaks abroad don't stay overseas. When public health systems fail to contain infectious diseases, the chances of U.S. exposure rise—whether through travel, military personnel, or migration. Measles outbreaks in the U.S. in the past decade, for example, have often been traced to imported cases, as the disease was eliminated domestically. In 2023, the U.S. saw its first locally acquired malaria cases in 20 years, likely due to travelers introducing the parasite into mosquito-prone states like Florida and Texas[6]. 76% of US recorded TB cases annually are among foreign born individuals.
- **Uncontrolled epidemics abroad could trigger serious outbreaks in America:** Mathematical models illustrate this risk. For example, if global TB rates and drug resistance reached U.S. levels due to failed international control efforts, the consequences would be severe—over 33,000 TB deaths annually and treatment costs exceeding $11 billion[7].

***Economic and Healthcare System Strain***

**Key Point 1:** Costs of responding to outbreaks far exceed prevention investments.

---

[6] beatmalaria.org
[7] cgdev.org

- **Outbreak response costs dwarf prevention investments:** Historical data underscores that reactive spending on disease outbreaks significantly exceeds the costs of proactive prevention. For example, the U.S. response to the 2014-16 Ebola outbreak reached approximately $4.3 billion[8], covering direct healthcare expenditures and extensive economic disruptions from emergency measures and loss of productivity. If the U.S. elects not to provide aid for future outbreaks abroad, larger and less-contained epidemics may develop, ultimately necessitating even more costly domestic responses. This approach risks disrupting global trade, supply chains, and market stability, ultimately imposing far greater economic burdens on the U.S. than if robust prevention and early intervention measures had been maintained.
- **Unchecked pandemics trigger profound economic fallout:** The COVID-19 crisis vividly illustrated how insufficient preventive measures can precipitate widespread economic damage. Beyond overwhelming healthcare systems, the pandemic disrupted global supply chains, destabilized labor markets, and led to substantial declines in economic output. These impacts highlight the critical need for robust global health investments as a means of averting far greater future costs.

**Key Point 2:** Strain on U.S. healthcare infrastructure due to imported infectious disease cases.

- **Collapse of disease surveillance leads to more importations:** Global health programs fund disease surveillance networks that act as an early warning system for outbreaks. If these networks falter, the U.S. will frequently be flying blind until diseases show up at its own border. That scenario is a recipe for more imported outbreaks on U.S. soil. For instance, the quick detection and containment of Ebola in West Africa is what kept the 2014 outbreak from becoming a larger U.S. crisis. Even so, the few Ebola cases that did reach America illustrated the heavy burden of managing dangerous contagions: a single Ebola patient in New York in 2014 cost the city health department $4.3 million in response measures (contact tracing, specialized treatment, etc.), and no secondary cases occurred[9]. If global surveillance and response capacity erode, the U.S. could face multiple such cases or simultaneous threats (e.g. Ebola, drug-resistant malaria, novel coronaviruses). American hospitals and the public health system would be stretched by needs like isolation units, specialized diagnostics, and round-the-clock epidemiological investigations.
- **Maternal Health Emergencies and Medical Supply Shocks:** USAID programs have been pivotal in supporting maternal and neonatal care in low-income countries – from training midwives to supplying essential medicines (like oxytocin for hemorrhage or

---

[8] yalejournal.org
[9] cdc.gov

magnesium sulfate for eclampsia). A permanent aid halt means many of these supply chains and services will collapse[10]. The ripple effects can reach the U.S. in unexpected ways. For example, global supply disruptions during COVID-19 led to shortages of medical products in America; similarly, a breakdown in the international supply of maternal health commodities could affect availability of critical drugs or equipment domestically. Moreover, when maternal health crises escalate abroad, there can be secondary impacts such as increased medical evacuation cases, migration of high-risk patients, or calls on U.S. humanitarian responders, all of which ultimately put pressure on U.S. hospitals.

**Key Point 3:** Global economic repercussions impacting U.S. trade and markets.

- **Reduced productivity in key trade regions due to heightened disease burdens:** Diseases like malaria, HIV, and TB primarily strike working-age adults or their children, impairing productivity and economic output in Africa, Asia, and beyond. For example, malaria costs Africa an estimated $12 billion per year in lost GDP from worker absenteeism, lower productivity, and healthcare expenses[11]. Every $1 invested in malaria control returns $19 in economic growth.[12] Unchecked high rates of maternal and childhood morbidity or mortality can further exacerbate impacts on productivity. Undernutrition can reduce a nation's GDP by as much as 16.5 percent[13], as malnourished children perform worse in school and experience productivity losses as adults. Maternal and child health and nutrition foreign assistance makes America stronger by creating greater economic and political stability through improved family health, which increases the likelihood that children will attend school and grow into healthy, productive adults, thereby reducing conflicts, poverty, and radicalization of youth. Instability abroad risks affecting Americans - be it on our soil or by destabilizing markets from afar.[14],[15] Lower

---

[10] reuters.com
[11] archive.cdc.gov
[12] https://endmalaria2040.org/assets/Aspiration-to-Action-Dashboard.pdf
[13] Union, A. (2014). The cost of hunger in Africa: Social and economic impact of child undernutrition in Egypt, Ethiopia, Swaziland and Uganda background paper. *Abuja, Nigeria*. https://archive.uneca.org/sites/default/files/uploaded-documents/CoM/com2014/com2014-the_cost_of_hunger-english.pdf
[14] Each additional year of schooling can boost a girl's earnings as an adult by up to 20 per cent - https://www.unwomen.org/sites/default/files/2022-09/Progress-on-the-sustainable-development-goals-the-gender-snapshot-2022-en_0.pdf
**More girls in school = greater GDP:** If 10 percent more adolescent girls attend school, a country's GDP increases by an average of 3 percent.
**More school for girls = greater earnings:** An extra year of secondary school for girls can increase their future earnings by 10-20%.
**Education = more lives saved:** A child whose mother can read is 50 percent more likely to live past age five.
[15] "First, a 10 per cent increase in health expenditures boosts annual average real GDP per capita by 0.24 per cent. This is an economically meaningful result, given the average annual growth rate in the sample period of 2 per cent. Second, this paper also confirms the long-held view that health matters for economic growth. There is a statistically significant and economically

productivity in these regions weakens their economic output and trade capacity, thereby diminishing their ability to import U.S. goods and services. This contraction in trade not only limits market opportunities for U.S. businesses but also undermines the economic resilience of global supply networks that support U.S. markets.

- **Reduced partnerships with American farmers**: Through USAID's humanitarian assistance and nutrition programs, the U.S. engages American farmers and manufacturers in the delivery of commodities as part of food aid for food security and treatment of acute malnutrition in children[16]. Although USAID food aid programs account for less than 1% of current U.S. agricultural exports, they have historically provided American farmers and manufacturers with a stable $2 billion market[17], supporting an estimated 15,000–20,000 jobs. Permanently suspending these programs would likely reduce commodity prices, lower farm incomes, and trigger layoffs across food processing, manufacturing, and transportation sectors—ultimately weakening the global competitiveness of U.S. agriculture.

- **Global supply chain disruptions:** A strong global health system is essential for maintaining stable global trade. The COVID-19 pandemic vividly illustrated how health crises can cripple supply chains—factory shutdowns, travel restrictions, and worker illnesses in one region can quickly trigger shortages and price spikes worldwide. If U.S.-funded health programs that prevent outbreaks and strengthen health systems are halted, developing regions will face greater instability, increasing the risk of production disruptions. Key sectors of the U.S. economy remain vulnerable to such shocks. For example, a significant portion of pharmaceuticals and medical supplies—including generic drugs and personal protective equipment (PPE)—are manufactured in India, China, and other global hubs. A major epidemic in these regions could halt production, causing shortages that directly impact U.S. hospitals and pharmacies. Likewise, global health emergencies threaten agriculture and food supply chains; pandemic lockdowns in 2020 disrupted food processing and shipping worldwide, underscoring the far-reaching economic consequences of health crises[18].

- **Weakened Trade Partners and Global Markets:** Over the longer term, the cumulative impact of widespread disease and reduced human capital in low- and middle-income countries will undermine global economic growth. America's prosperity is deeply intertwined with global markets – U.S. companies invest in and source from these countries, and emerging economies constitute important consumer bases. If those economies are continuously set back by health disasters, the global GDP will be smaller

---

meaningful negative relationship between economic growth on the one hand and maternal and infant/child mortality on the other hand. There is also a positive and significant impact of adult life expectancy on economic growth." Source

[16] How the United States Benefits from Agriculture and Food Security Investments in Developing Countries
[17] Betterworldcampaign.org
[18] pmc.ncbi.nlm.nih.gov

than it otherwise would be, acting as a brake on U.S. growth as well. Moreover, health-driven economic stresses can fuel political instability and conflict, which threaten U.S. interests. Indeed, abrupt surges in unemployment, poverty, food insecurity, and illness can spark unrest or migration waves, destabilizing regions. Such instability often demands U.S. humanitarian, diplomatic, or even military responses, all of which carry significant costs. In contrast, stable and healthy nations make good trade partners and contribute to a stable international system that benefits the U.S. economically. By preventing the collapse of health systems abroad, USAID programs help countries remain stable, keep their economies functioning, and continue trading with the United States.

### *National Security and Biothreat Vulnerabilities*

**Key Point 1:** Increased risk of bioterrorism and pandemic emergence.

- **Diminished surveillance increases vulnerability to undetected pathogen spread:** Weakened disease surveillance doesn't only jeopardize natural outbreak detection – it also creates openings for malicious actors. Global health monitoring systems serve as the "smoke alarm" for unusual disease patterns that could signal a bioterrorism event. If those alarms are switched off or muted due to lack of funding, a deliberate release of a pathogen could spread for weeks under the guise of a normal outbreak. Terrorists or rogue states might exploit surveillance gaps, targeting regions with poor monitoring to launch a biological attack, knowing it would take longer for the world to notice and respond. Indeed, the very technologies to engineer pathogens have become more accessible over time, lowering the bar for would-be bioterrorists (better citation? [citation]).
- **National Security Impacts:** Pandemics and biological threats don't respect borders, and their consequences extend beyond public health – they are national security concerns. An undetected pathogen can undermine military readiness, as disease spreads among troops or across bases before protective measures are in place. Widespread illness can also weaken domestic security forces and first responders, who fall ill in the line of duty. Moreover, adversaries could use a biological event to sow chaos: a sudden epidemic can destabilize economies, foment social unrest, and even be used as cover for disinformation or cyber attacks. The U.S. Department of Defense and intelligence community routinely list pandemic disease among top security threats, alongside bioterrorism, for these reasons. A collapse in global disease surveillance heightens these risks, as threats will be harder to see coming. As a recent analysis by global health experts warned, actions that *"undermine work to detect and contain disease outbreaks"*

10

could quickly **"roll back years of progress"** and *"put lives, the economy, and national security at risk*[19].*"*

**Quantified Impacts of Discontinued Aid by Disease Area - 2025**

| Disease Area | Global Case Increase (%) | Projected US Imported Cases | Estimated US Economic Impact ($) | Assumption/Notes/Data Sources |
|---|---|---|---|---|
| Malaria | An additional 12.5-17.9 million cases and an additional 71,000-166,000 deaths (39.1% increase) annually | 2000 cases/year | Reducing malaria burden could boost malaria endemic countries' economies by $142.73 billion and could generate $1.4 billion in US exports to Africa between 2023-2030; a 10% decrease in malaria incidence was associated with an increase in income per capita of nearly 0.3% | Data Sources: Malaria Atlas Project, Modeling Impact of PMI Funding Freeze Across 2025, February 27. 2025<br><br>Oxford Economics Africa<br><br>cdc/gov/malaria<br><br>The Economic Burden of Malaria: Revisiting the Evidence. Sarma et al., Am J Trop Med Hyg. 2019 Dec;101(6):1405-1415. doi: 10.4269/ajtmh.19-0386. https://pubmed.ncbi.nlm.nih.gov/31628735/ |
| MDR-TB | 28-32% Increase in estimated incidence globally | ~80 MDR cases/year | $40,000,000 only direct diagnosis, treatment and program costs (excludes larger societal, ie loss of productivity, costs) | Data Sources: WHO, CDC, CSIS Assumptions: 40% of global TB efforts are donor funded; 76% of US TB cases are Foreign-Born; costs per case are adjusted for inflation (3% average) |
| TB | 28-32% increase in estimated incidence | ~7,300 additional TB cases per year | $153,600,000 only direct diagnosis, treatment and | Data Sources: WHO, CDC, CSIS Assumptions: 40% of global TB efforts are donor funded; 76% of US TB cases are Foreign-Born; |

---

[19] cgdev.org

11

| | globally | | program costs (excludes larger societal, ie loss of productivity, costs) | costs per case are adjusted for inflation (3% average) |
|---|---|---|---|---|
| Highly Pathogenic Avian Influenza (HPAI) | Worst Case Scenario: 775M cases globally | 105M cases in the USA. | Based on the known impact of the COVID-19 pandemic, a HPAI pandemic is likely to cost the US at least $14 trillion. The economic impact of just animal losses from bird flu in 2022 cost the US economy up to $3 billion. | Based on Global COVID case data and average Assumes current outbreak progresses to human-to-human spread pandemic |
| EID (Ebola, Marburg, etc.) | Worst Case Scenario: More than 28,000 cases | 15 imported cases | >$2B and 10k jobs tied to exports. This was the cost of the WA Ebola Outbreak to the USA | Assumptions: Based on 2014-2016 West Africa Ebola epidemic |
| mpox | More than 127,000 cases | More than 34,000 cases in the US | Based on no intervention: USD 3,699,033 | Assumptions/Data Sources: Modeled off of mpox clade 2 pandemic |
| Immunization | 2-3 million deaths a year<br><br>89% increase in incidence in vaccine-preventable diseases among children alone (best case scenario) | | Every dollar spent on immunization saves America an estimated $54 in social and economic costs. | Data sources: CDC, UNICEF, WHO, USAID annual reports to Congress<br>- Immunization is a best buy: it is one of the most cost-effective ways to support a healthier, safer world for everyone, including Americans.<br>- Immunizing people routinely and when outbreaks strike prevents disease from spreading across borders, including to America. Routine childhood vaccines protect children from highly infectious but preventable diseases like Diphtheria, Haemophilus influenzae type b (Hib), Hepatitis B, Measles, Meningitis, |

12

| | | | | Mumps, Pertussis (whooping cough), Polio, Rubella, and Tetanus. USAID supports countries to immunize against deadly and highly transmissible diseases. |
|---|---|---|---|---|
| Polio | Additional 200,000 paralytic polio cases/year (and hundreds of millions of infections overall), over next 10 years, if global polio eradication stops | ≥1 paralytic case/year over next 10 years, with potential sporadic outbreaks (assuming declining immunization coverage); increasing transmission risks over time | Incurred costs would include disease surveillance, multiple emergency outbreak responses, vaccination catch-up campaign, treatment, long-term disability (including for post-polio treatment), lost economic productivity and quality of life due to disability, reduced life expectancy (early mortality). | Data sources: CDC, Global Polio Eradication Initiative (GPEI) Investment Case 2022-2026<br>- Assumes reduced immunization coverage, termination of Gavi, UNICEF, WHO, and other funding<br>- Impacts include reduced access to quality, real-time data for action<br>- USAID's polio support has included surveillance, risk communication and community engagement, direct vaccination (including cross-border), laboratory testing networks, vaccine supply and cold chain support, and national/regional/global coordination<br>- With declining U.S. vaccination coverage, already millions of vulnerable Americans<br>- Immunity gaps in U.S. put Americans at risk for large outbreaks that can cause paralysis and death (e.g., 1/5 of adults 20-49 years old do not have poliovirus antibodies)<br>- Adults w/paralytic polio are more likely to die from paralysis than children<br>- Polio immunization coverage among U.S. children <2 years old already as low as 37% in some areas<br>- Estimates do not include potential new outbreaks of polio in large countries like India<br>- Up to 1/200 infected people can develop paralysis |

13

**Estimated number of people impacted annually in the absence of global health LHA-2025**

| Life-saving health services in 48 countries with most maternal, newborn, and child deaths | Estimated Number of People Affected this Year Through the Halt in Services | Estimated US Economic & Security Impacts | Assumption/Notes/Data Sources |
|---|---|---|---|
| **Maternal health:** pregnant women not reached through life saving services | 16,800,000 | | Data Sources/ Assumptions: - 2024 USAID reports to Congress - Total number of live births as a proxy for women who benefitted from live saving services |
| **Newborn health:** critical postnatal care to newborns within two days of childbirth | 11,262,264 | Destabilized families and communities; increased migration across borders, including to U.S., due to country destabilization; reduced economic productivity and GDP; weakened trade partners and global economies; takeover of malign foreign actors in countries and regions with high U.S. economic and national security interests; increased danger to Americans at home, and traveling and living abroad; **There is a $94 return in economic growth for every $1 spent on maternal and child health-specific foreign aid** (including immunization but excluding nutrition interventions in this analysis) due to deaths prevented and | - 2024 USAID reports to Congress - National and subnational population estimates |
| **Child health:** Treatment only for pneumonia and diarrhea (among the top causes of preventable deaths in children under 5) | 14,782,398 | | Data sources: 2024 USAID reports to Congress - Population-based country surveys |
| **Nutrition** | 1 million children not treated annually for severe acute malnutrition | | Data Sources: - 2024 USAID reports to Congress - Cost estimates for treating a child for severe acute malnutrition vary depending on context, but range from $100-200/per child - The FY24 budget for GHP nutrition was $165 million |

14



Investment in MCH saves live
fosters eco

**$1 Invested in MCH**

improvements in the
health status of
populations in poor
countries.

**Conclusion and Policy Recommendations**

Any decision to halt or significantly reduce global health funding for lifesaving humanitarian
assistance (LHA)—despite approved waivers—and USAID global health programming, despite
congressional mandates, would have severe domestic and global consequences. Such an action
could lead to a sharp increase in preventable diseases, substantial economic losses, and
heightened security risks. The effects would be felt both in the United States and worldwide, as
rising disease burdens strain healthcare systems, disrupt economies, and contribute to global
instability.

We recommend that the U.S. immediately resume life-saving humanitarian activities to prevent
unnecessary mortality and morbidity, avert costly crisis-level expenditures, and safeguard
national security. These programs are not only a legal and humanitarian obligation but also a
vital strategic investment in America's safety, security, and economic prosperity. Failing to
uphold them would undermine U.S. leadership, weaken global stability, and increase long-term
costs.

15

16

**Annex 1**

**Congressional Legislative Mandate**

USAID operates under a comprehensive legal framework established by Congress to govern its global health assistance programs. This framework consists of both authorization and appropriation legislation, which define the agency's legal authorities, funding allocations, and programmatic requirements. The following sections outline the key legislative mandates shaping USAID's global health initiatives.

**Authorization Legislation:** USAID's global health assistance is primarily authorized under Section 104 of the Foreign Assistance Act of 1961 (FAA), as amended. Key amendments include the 2000 Global AIDS and Tuberculosis Relief Act and the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 (PEPFAR Authorization), with subsequent reauthorizations in 2008, 2013, and 2018. Additionally, the annual State and Foreign Operations Appropriations Act (SFOAA) provides more specific authorizations and requirements for health assistance. Other relevant legislation includes the Global Malnutrition Prevention and Treatment Act of 2021 and various FAA provisions outside Section 104 that address global health programs. Furthermore, the annual SFOAA and select provisions of other legislation, such as the National Defense Authorization Act, define and grant additional legal authorities for USAID's global health efforts.

**Appropriation Legislation:** Funding for USAID's global health programs is appropriated annually through the SFOAA, which imposes specific legal requirements that must be met each fiscal year. USAID is not authorized to deviate from these funding allocations except in rare, exigent circumstances and only with statutory approvals and notifications. Additionally, certain Congressionally mandated disease-specific directives may not be fulfilled due to the termination of awards.

**Congressional Directive Categories**[20]:

- ***HIV/AIDS,*** which includes the following sub-activities identified by Congress: Global
- Fund to Fight AIDS, Tuberculosis and Malaria, Joint United Nations Programme on HIV/AIDS (UNAIDS), and Microbicides. **Associated Program Area: HL.1 HIV/AIDS.** *$330M appropriated for this purpose in FY24 alone.*

- ***Tuberculosis,*** which includes the following activities identified by Congress: Global TB Drug Facility. **Associated Program Area: HL.2 Tuberculosis.** *$394.5M*

---

[20] Congressional directive categories are outlined in the Global Health Programs account table included in the Joint Explanatory Statement accompanying each annual appropriations act. For example, for the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024, P.L.118-47, Division F, the Joint Explanatory Statement is available at https://docs.house.gov/billsthisweek/20240318/Division%20F%20SFOPs.pdf.

J.A. 222

*appropriated for this purpose in FY24 alone.*

- ***Malaria,*** **Associated Program Area: HL.3 Malaria.** *$795M appropriated for this purpose in FY24 alone.*

- ***Global Health Security,*** **Associated Program Area: HL.4 Global Health Security in Development (GHSD)** *$700M appropriated for this purpose in FY24 alone.*

- ***Other Public Health Threats,*** which includes the following sub-activities identified by Congress: Neglected Tropical Diseases, Global Health Workforce, Health Reserve Fund. **Associated Program Area: HL.5 Other Public Health Threats (NTDs).** *$130.5M appropriated for this purpose in FY24 alone.*

- ***Maternal and Child Health*** **(**MCH**),** which includes the following activities identified by Congress: Polio, Gavi, the Vaccine Alliance (Gavi), Water Supply, Sanitation and Hygiene (WASH), and Maternal and Neonatal Tetanus. **Associated Program Area: HL.6 Maternal and Child Health.** *$915M appropriated for this purpose in FY24 alone.*

- ***Family Planning/Reproductive Health.*** **Associated Program Area: HL.7 Family Planning and Reproductive Health (FP/RH).** *$523.95M appropriated for this purpose in FY24 alone.*

- ***Nutrition,*** which includes the following activities identified by Congress: Iodine Deficiency Disorder, Micronutrients (of which, Vitamin A), and Ready-to-Use Therapeutic Foods. **Associated Program Area: HL.9 Nutrition.** *$165M appropriated for this purpose in FY24 alone.*

- ***Vulnerable Children,*** which includes the following activity identified by Congress: Blind Children. **Associated Program Area: ES.4.1 Education & Social Services - Vulnerable Children.** *$31.5M appropriated for this purpose in FY24 alone.*

**Funding Status[21]**

Of the $3.985B in Fiscal Year 2024 resources appropriated directly to USAID for Global Health Programs (GHP-USAID account) for the specific health objectives described above, approximately $2.559B (64%) has been blocked from obligation to partners.

**Estimated Amounts of FY24 GHP-USAID Funding Impacted by Obligation Pause, by Congressionally Directed Program Area**

---

[21] Funding data pulled from Phoenix Viewer/Enterprise Reporting Portal as of 2/27/2025. All figures are estimates based on high level data analysis.

| | Appropriated ($) | Pending Obligation ($) - Obligation Paused by EO | Percent (%) |
|---|---|---|---|
| HL.1 HIV/AIDS | 330,000,000 | 73,843,370 | 22.38% |
| HL.2 Tuberculosis | 394,500,000 | 307,064,905 | 77.84% |
| HL.3 Malaria | 795,000,000 | 669,862,736 | 84.26% |
| HL.4 Global Health Security | 700,000,000 | 675,948,708 | 96.56% |
| HL.5 Other Public Health Threats | 130,500,000 | 90,522,107 | 69.37% |
| HL.6 Maternal and Child Health | 915,000,000 | 514,965,280 | 56.28% |
| HL.7 Family Planning and Reproductive Health | 523,950,000 | 55,633,306 | 10.62% |
| HL.9 Nutrition | 165,000,000 | 144,297,173 | 87.45% |
| ES.4 Vulnerable Children | 31,500,000 | 31,500,000 | 100.00% |
| TOTAL | 3,985,450,000 | 2,563,637,585 | 64.32% |

*Notes: These figures are likely underestimates of the amounts planned but with obligation paused from moving to implementing partners, as they do not account for funds bilaterally obligated into a USAID Mission Development Objective Agreement, which are no longer able to be subobligated to partners. FY24 funds are the most recent year of health resources available to USAID, as no FY25 GHP-USAID resources have yet been appropriated, and the Agency has not sought access to any of these resources under the current Continuing Resolution. All GHP-USAID resources from appropriation years prior to FY24 were 100% obligated in advance of their expiration.*

Of the total GHP-USAID resources appropriated directly to USAID from all fiscal years, at least $5.143B is currently obligated to implementing partners but not yet expended/disbursed – this total (100%) has been suspended as a result of the foreign assistance pause and related terminations from further use towards the specific health objectives mandated by Congress and described above.

**Estimated Amounts of Previously Obligated GHP-USAID Funding (All FYs) Paused from Expenditure/Disbursement, by Congressionally Directed Program Area**

| | Obligated to Implementing Partners and Currently Paused from Expenditure/Disbursement ($) |
|---|---|
| *HL.1 HIV/AIDS* | 1,517,719,650 |
| *HL.2 Tuberculosis* | 432,931,737 |
| *HL.3 Malaria* | 536,862,171 |
| *HL.4 Global Health Security* | 645,082,469 |
| *HL.5 Other Public Health Threats* | 91,529,255 |
| *HL.6 Maternal and Child Health* | 669,510,301 |

19

J.A. 224

| HL.7 Family Planning and Reproductive Health | 727,320,899 |
| HL.9 Nutrition | 229,327,337 |
| ES.4 Vulnerable Children | 37,706,284 |
| Other, inc. Administrative and Program Oversight | 254,755,321 |
| TOTAL | 5,142,745,424 |

Notes: The figures above reflect total amounts of currently unexpended/undisbursed Global Health funding obligated to implementing partners. Virtually all expenditures, disbursements, and payments to partners have been halted due to lack of essential staff, lack of systems access, and foreign assistance review processes superimposed over regular procedures, impacting this full total. The total estimated amount of Global Health funds obligated to implementing partners from all fiscal years according to Phoenix data as of 2/27/2025 is $76,327,410,581. The ~$5.1B pending expenditure/disbursement represents 6.7 percent of these total obligations.

20

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ———————————————— ) | | |
| AIDS VACCINE ADVOCACY ) | | |
| COALITION, et al., ) | | |
| ) | | |
| *Plaintiffs*, ) | Civil Action No. 25-cv-400 | |
| ) | | |
| v. ) | | |
| ) | | |
| UNITED STATES DEPARTMENT ) | | |
| OF STATE, et al., ) | | |
| ) | | |
| *Defendants*. ) | | |
| ———————————————— ) | | |

## SECOND DECLARATION OF JESSICA DOE

I, Jessica Doe, declare the following under penalties of perjury:

1.    I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.    I previously provided a declaration in this matter in my capacity as a Contracting Officer and Foreign Service Officer at USAID (ECF 26-3).

3.    At approximately 1 pm EST on Thursday, March 6, USAID Contracting Officers and Agreement Officers received an email from Senior Procurement Executive (SPE) Jami Rodgers.

4.    Screenshots of that email are attached to this declaration as Exhibit A.

5.    I continue to fear that the Administration will retaliate against me for whistleblowing. As a result, I have redacted the receipt time of the email so as not to reveal the time zone in which I am stationed.

6.    Other than the redaction, the screenshots attached as Exhibit A are true and correct

images of SPE Rodgers's email.

7.     The email directed us to review a list of terminated awards, and to issue an expanded termination notice "tailored to the specific award and implementing partner, referencing the relevant clauses or provisions within the award."

8.     This directive is consistent with my understanding and belief that there was no prior case-by-case review of terminated contracts, awards, and grants.

9.     I believe we are being directed to come up with post-hoc rationalizations for the decision by USAID leadership to issue blanket terminations of thousands of awards.

Executed on March 7, 2025.

<u>/s/ Jessica Doe</u>
Jessica Doe

EXHIBIT A

Jami Rodgers
to Nadeem, Adam, Lyudmila, Stephanie,... ∨

Dear Colleagues,

1. **Applicability:** This Notice is applicable to all USAID foreign-assistance funded acquisition and assistance awards for which a termination notice has been issued. It does not apply to awards for which termination notices have subsequently been rescinded.

2. **Background:** U.S. Secretary of State Marco Rubio, in his capacity as the Acting Administrator for USAID and/or Peter W. Marocco, who is performing the duties and functions of both Deputy Administrators for USAID, directed USAID CO/AOs to issue notices of termination for many USAID awards over the past several weeks. To initiate the termination actions, CO/AOs issued expedited notices and requested partners to confirm receipt. For contracts, this process is aligned with requirements in FAR 49.601-1.

3. **For Immediate Action:** CO/AOs should review this list to confirm that an award has been terminated. If so, in order to provide the needed details and to enable partners to proceed with the applicable termination actions, CO/AOs must issue a detailed, expanded termination notice. We recommend using the termination templates below. CO/AOs may adjust the templates as needed:

Acquisition (Supplies)



needed:

- ○ Acquisition (Supplies)
- ○ Acquisition (Services)
- ○ Assistance (U.S. NGOs, including FAAs)
- ○ Assistance (Non-U.S. NGOs)
- ○ Assistance (FAAs to Non-U.S. NGOs)

These templates are designed to ensure consistent and detailed communication between USAID CO/AOs and implementing partners following terminations. The templates also include Alternate I language that should be used for awards that were the subject of centrally-generated termination notices on February 26, 2025.

Each template must be tailored to the specific award and implementing partner, referencing the relevant clauses or provisions within the award. Note: For assistance awards with standard provisions dated earlier than October 2024, AOs need to adjust the template to include the relevant provisions applicable to the specific award. Previous versions of the provisions are available here.

In addition, to comply with the applicable notification requirements, each notice must be communicated to the partner's address shown in the award (e.g., as shown on the cover page of a contract), or another address specified in the award. For initial, short form termination notices issued not following the previously provided M/OAA template, please adjust the follow up notification notice to provide any outstanding or omitted information from the original notice.

J.A. 230

omitted information from the original notice.

Finally, it is important to note that when a termination occurs, the CO must create a case file for the termination for recordkeeping purposes which includes all records and memoranda relevant to the termination settlement (see FAR 49.105-3). The termination case file may be part of the award file which includes all relevant communications/documentation concerning the award, through to the termination notice.

4. **Questions:** Any other questions regarding this notice may be submitted to policymailbox@usaid.gov.

Sensitive But Unclassified (SBU)

• • •

| SBU – USAID Active and Ter... | Copy of Supply Contract Termi... | Copy of Service Contract Termi... |

J.A. 231

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF STATE, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-00400 (AHA) |
| GLOBAL HEALTH COUNCIL, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-00402 (AHA) |

<u>**DEFENDANTS' NOTICE OF APPEAL**</u>

All Defendants hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the Memorandum Opinion and Order (No. 25-cv-400, Doc. 60; No. 25-cv-402, Doc. 60) issued on March 10, 2025, and from all orders antecedent to such order and opinion and thus incorporated therein.

1

J.A. 232

Dated: April 1, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director

LAUREN A. WETZLER
Deputy Director

CHRISTOPHER R. HALL
Assistant Branch Director

*/s/ Indraneel Sur*
INDRANEEL SUR (D.C. Bar 978017)
CHRISTOPHER D. EDELMAN
Senior Counsels
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 616-8488
Email: indraneel.sur@usdoj.gov

*Counsel for Defendants*

2

J.A. 233

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, | |
| *Plaintiffs,* | |
| v. | Civil Action No. 25-cv-400 (AHA) |
| UNITED STATES DEPARTMENT OF STATE, *et al.*, | |
| *Defendants.* | |
| GLOBAL HEALTH COUNCIL, *et al.*, | |
| *Plaintiffs,* | |
| v. | Civil Action No. 25-cv-402 (AHA) |
| DONALD J. TRUMP, *et al.*, | |
| *Defendants.* | |

**DEFENDANTS' STATUS REPORT UNDER MINUTE ORDER OF MARCH 28, 2025**

1.     Defendants hereby respond to the inquiries in the Court's Minute Order of March 17, 2025, as made applicable through the Minute Order of March 24, 2025, and modified by the Minute Order of March 28, 2025.

2.     As to processing of payments to foreign assistance funding recipients for work completed prior to February 13, 2025:  As of yesterday, the total number of such payments by Defendants to Plaintiffs processed since March 26, 2025 was 43, and the total number of such payments by Defendants to non-Plaintiffs processed since March 26, 2025 was 2,601.  In sum, Defendants have therefore processed 2,644 payments between March 27 and April 2, which

amounts to approximately 528 payments per business day, well above this Court's metric.

3.      The total number of such payments which remain to be processed for Plaintiffs is 317, and the total number of such payments which remain to be processed for non-Plaintiffs is 5,745.  There are therefore over 6,000 payments remaining to be processed.

4.      Defendants note that they continue to receive new requests for payment for work completed prior to February 13, 2025.  Accordingly, and in light of the other practical limitations described in Defendants' previous status reports, Defendants' proposed timeline for processing the remaining payments is as follows: Defendants expect to process the remaining payments to Plaintiffs by April 10, 2025, and the remaining payments by the last week of April 2025.

5.      As to particular payments to Plaintiffs in No. 25-cv-400, JDN and AVAC, after correspondence with Plaintiffs through counsel, Defendants state as follows:  Defendants are not aware of any dispute as to JDN, consistent with Plaintiffs' status report filed today (AVAC Doc. 74).  Defendants are continuing to process documents concerning AVAC and will provide a further update in the next status report.

6.      As to the provisions in this Court's Order of March 10, 2025 requiring that Defendants "shall make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024," Defendants note that via their pending appeals from the Order of March 10, 2025 (docketed in the D.C. Circuit as Nos. 25-5097 and 25-5098) Defendants will seek reversal of the preliminary injunction.   Recognizing, however, that the preliminary injunction applies until or unless Defendants receive appellate relief from it, they further state as follows:

7.      In addition to the individualized review of USAID and Department of State foreign assistance awards described in previous submissions, State has nearly completed a programmatic review of all foreign assistance programs to ensure those programs are aligned with the President's

foreign policy agenda.  State currently expects to complete this review by April 19, 2025. AVAC Doc. 15-1, ¶¶ 3-4.  Moreover, State and USAID on March 28, 2025 notified Congress of their intent to (1) undertake a reorganization that would involve realigning certain USAID functions to State by July 1, 2025, and (2) discontinue the remaining USAID functions that do not align with Administration priorities.  To support that reorganization, State also informed Congress of its intent to restructure certain State bureaus and offices that would implement programs and functions realigned from USAID to ensure continuity of critical operations and that the United States continues to effectively administer life-saving and strategic aid across the globe.

8.     The currently available foreign assistance funds Congress appropriated to USAID and State in the Further Consolidated Appropriations Act of 2024 that are subject to the Court's March 10 Order remain available to be obligated through at least until the end of the current fiscal year, which is September 30, 2025.  *See, e.g.*, Pub. L. 118-47, 138 Stat. 460, 740 (March 23, 2024) (providing that certain funds "to enable the President to carry out the provisions of the Foreign Assistance Act of 1961, and for other purposes," for global health programs, are "to remain available until September 30, 2025").  As a matter of course in all federal agencies, appropriated funds are routinely obligated over the course of the fiscal year, as the year progresses. Based on USAID's and State's historical experience, it is common for funds to remain available to be obligated at this point in the fiscal year, *i.e.*, several months before the end of the period of availability set by Congress in an appropriations statute.  Furthermore, there remains, and will remain for several additional months, time sufficient for USAID and State to obligate any presently unobligated funds, or take other appropriate action consistent with applicable law with respect to those funds, before the end of the current fiscal year.

9.     In consultation with the Office of Management and Budget, and in light of the ongoing programmatic review and the planned reorganization outlined in the notification to

Congress, USAID and State continue to evaluate the appropriate next steps to address the provision in this Court's March 10, 2025, order regarding obligation of funds.  Once the ongoing review described above is completed, the agencies will be better positioned to make additional decisions regarding the appropriate dispositions of the foreign aid funds.

10.    Defendants' evaluation of the appropriate next steps within the time available under the Further Consolidated Appropriations Act of 2024 does not implicate the Impoundment Control Act.  Congress expressly directed the Executive to apportion, or reapportion, appropriated funds to determine when to make them available to agencies to carry out federal law. 31 U.S.C. § 1512. And, for its part, the Government Accountability Office has endorsed an agency "taking the steps it reasonably believes are necessary to implement a program efficiently and equitably, even if the result is that funds temporarily go unobligated." *In re James R. Jones, House of Representatives*, B-203057 L/M, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981).

*       *       *

Dated: April 3, 2025                    Respectfully submitted,

                                       YAAKOV M. ROTH
                                       Acting Assistant Attorney General
                                       Civil Division

                                       ERIC J. HAMILTON
                                       Deputy Assistant Attorney General

                                       ALEXANDER K. HAAS
                                       Director

                                       LAUREN A. WETZLER
                                       Deputy Director

                                       CHRISTOPHER R. HALL
                                       Assistant Branch Director

                                       */s/ Indraneel Sur*
                                       INDRANEEL SUR (D.C. Bar 978017)
                                       CHRISTOPHER D. EDELMAN
                                       Senior Counsels
                                       United States Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L St. NW
                                       Washington, DC 20005
                                       Phone: (202) 616-8488
                                       Email: indraneel.sur@usdoj.gov

                                       *Counsel for Defendants*

5

J.A. 238

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-cv-400 (AHA) |
| UNITED STATES DEPARTMENT OF STATE, *et al.*, | |
| *Defendants*. | |
| GLOBAL HEALTH COUNCIL, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-cv-402 (AHA) |
| DONALD J. TRUMP, *et al.*, | |
| *Defendants*. | |

**DEFENDANTS' STATUS REPORT UNDER MINUTE ORDER OF MARCH 24, 2025**

1.    Defendants hereby respond to the inquiries in the Court's Minute Order of March 17, 2025, as made applicable through the Minute Orders of March 24, 2025 and April 11, 2025.

2.    As to processing of payments to foreign assistance funding recipients for work completed prior to February 13, 2025:  As of yesterday, the total number of such payments by Defendants to Plaintiffs processed since April 9, 2025 was 26, and the total number of such payments by Defendants to non-Plaintiffs processed since April 9, 2025 was 317, until the Court on April 11, 2025 stayed such payments to non-Plaintiffs pending resolution of the motion for an indicative ruling based on *Department of Education v. California*, 145 S. Ct. 966 (2025).  In light

of that stay, Defendants are not reporting as to non-Plaintiffs after April 11, 2025 or as to the Court's metric.

3.      The total number of such payments which remain to be processed for Plaintiffs is 225.

4.      The remaining payments to be processed are more labor intensive than those previously processed because of particular transaction and documentation-specific details. Moreover, Defendants received on April 15, 2025 additional payments request details from Plaintiffs in No. 25-cv-402, which Defendants are continuing to analyze in anticipation of meeting and conferring with Plaintiffs about certain requests.  In light of that and the other practical limitations described in Defendants' previous status reports, Defendants expect to substantially complete the processing of the remaining payments to Plaintiffs by May 5, 2025.

5.      As to the provisions in this Court's Order of March 10, 2025 concerning "funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024":  The Department of State has now completed its programmatic review of all foreign assistance programs to ensure those programs are aligned with the President's foreign policy agenda.  *See* Report of April 3, 2025 ¶¶ 8-9 (*AVAC* Doc. 75).

J.A. 240

Dated: April 17, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director

LAUREN A. WETZLER
Deputy Director

CHRISTOPHER R. HALL
Assistant Branch Director

*/s/ Indraneel Sur*
INDRANEEL SUR (D.C. Bar 978017)
Senior Counsel
United   States   Department   of   Justice
Civil   Division,   Federal   Programs   Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 616-8488
Email: indraneel.sur@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF STATE, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-cv-400 (AHA) |
| GLOBAL HEALTH COUNCIL, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> *Defendants*. | Civil Action No. 25-cv-402 (AHA) |

**DEFENDANTS' STATUS REPORT UNDER MINUTE ORDER OF MARCH 24, 2025**

1.      Defendants hereby respond to the inquiries in the Court's Minute Order of March 17, 2025, as made applicable through the Minute Orders of March 24, 2025 and April 11, 2025.

2.      As to processing of payments to foreign assistance funding recipients for work completed prior to February 13, 2025:  As of yesterday, the total number of such payments by Defendants to Plaintiffs processed since April 16, 2025 was 72.  (In light of the Court's administrative stay of such payments to non-Plaintiffs pending resolution of the motion for an indicative ruling based on *Department of Education v. California*, 145 S. Ct. 966 (2025), Defendants are not reporting as to payments made to non-Plaintiffs after April 11, 2025 or as to

1

J.A. 242

the Court's metric.)

3.      The total number of such payments which remain to be processed for Plaintiffs is 66.

4.      Defendants' count of the remaining number of payments to be processed is reduced after adjustment for several duplicate requests USAID identified.  The remaining payments to be processed are more labor intensive than those previously processed because of particular transaction and documentation-specific details.  Moreover, Defendants received on April 15, 2025 additional payment request details from Plaintiffs in No. 25-cv-402. Defendants provided some information about those payments to Plaintiffs in No. 25-cv-402 on April 23, 2025, with additional information to be provided next week.  In light of that and the other practical limitations described in Defendants' previous status reports, Defendants expect to substantially complete the processing of the remaining payments to Plaintiffs by May 5, 2025.

5.      As to the provisions in this Court's Order of March 10, 2025 concerning "funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024":  In consultation with the Office of Management and Budget, and in light of the results of the programmatic review and the planned reorganization outlined in the notification to Congress, USAID and State continue to evaluate the appropriate next steps to address the provision in this Court's Order of March 10, 2025 regarding appropriated funds.

J.A. 243

Dated: April 24, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director

LAUREN A. WETZLER
Deputy Director

CHRISTOPHER R. HALL
Assistant Branch Director

*/s/ Indraneel Sur*
INDRANEEL SUR (D.C. Bar 978017)
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 616-8488
Email: indraneel.sur@usdoj.gov

*Counsel for Defendants*

3

J.A. 244

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-cv-400 (AHA) |
| UNITED STATES DEPARTMENT OF STATE, *et al.*, | |
| *Defendants*. | |
| GLOBAL HEALTH COUNCIL, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-cv-402 (AHA) |
| DONALD J. TRUMP, *et al.*, | |
| *Defendants*. | |

**DEFENDANTS' STATUS REPORT UNDER MINUTE ORDER OF MARCH 24, 2025**

1.      Defendants hereby respond to the inquiries in the Court's Minute Order of March 17, 2025, as made applicable through the Minute Orders of March 24, 2025 and April 11, 2025.

2.      As to processing of payments to foreign assistance funding recipients for work completed prior to February 13, 2025:  As of yesterday, the total number of such payments by Defendants to Plaintiffs processed since April 23, 2025 was 59.  In light of the Court's administrative stay of such payments to non-Plaintiffs pending resolution of the motion for an indicative ruling based on *Department of Education v. California*, 145 S. Ct. 966 (2025) Defendants are not reporting as to non-Plaintiffs after April 11, 2025 or as to the Court's metric.

1

3.      The total number of such payments which remain to be processed for Plaintiffs is 79.

4.      The remaining payments to be processed are more labor intensive than those previously processed because of particular transaction and documentation-specific details. Moreover, Defendants received on April 15, 2025 additional payments request details from Plaintiffs in No. 25-cv-402, concerning which Defendants provided partial information on April 23, 2025, and provided additional information on April 28, 29, and 30, 2025.  Plaintiffs sent additional questions on May 1, 2025, which Defendants are reviewing.

5.      Additionally, Defendants continue to receive new payments requests, including from Plaintiffs, for work completed prior to February 13, 2025.  For example, USAID received 47 new such requests from Plaintiffs within the period covered by this report.  In light of that and the other practical limitations described in Defendants' previous status reports, Defendants expect to substantially complete the processing of the remaining payments to Plaintiffs by May 5, 2025. Defendants further submit that if the Court were to set a deadline for the submission by Plaintiffs of invoices for payments for work completed prior to February 13, 2025, such as May 15, 2025, Defendants could finish processing all of the payments to Plaintiffs by June 6, 2025.

6.      As to the provisions in this Court's Order of March 10, 2025 concerning "funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024":  In consultation with the Office of Management and Budget, and in light of the results of the programmatic review and the planned reorganization outlined in the notification to Congress, USAID and State continue to evaluate the appropriate next steps to address the provision in this Court's March 10, 2025, order regarding obligation of funds.

7.      Defendants understand that portion of the injunction to require them to make available covered funds before they expire, which will happen as soon as September 30, 2025, for

2

J.A. 246

some of the funds at issue.  To comply with that direction, Defendants will be required to begin

obligating and expending funds, potentially irretrievably, before that deadline. Thus, for

Defendants to receive effective relief if they prevail on appeal from the preliminary injunction,

Defendants have requested, with Plaintiffs' consent, a briefing schedule from the D.C. Circuit that

would enable disposition of the appeal in advance of September 30, 2025.

  Dated: May 1, 2025                          Respectfully submitted,

                                              YAAKOV M. ROTH
                                              Acting Assistant Attorney General
                                              Civil Division

                                              ERIC J. HAMILTON
                                              Deputy Assistant Attorney General

                                              ALEXANDER K. HAAS
                                              Director

                                              LAUREN A. WETZLER
                                              Deputy Director

                                              CHRISTOPHER R. HALL
                                              Assistant Branch Director

                                              */s/ Indraneel Sur*
                                              INDRANEEL SUR (D.C. Bar 978017)
                                              Senior Counsel
                                              United States Department of Justice
                                              Civil Division, Federal Programs Branch
                                              1100 L St. NW
                                              Washington, DC 20005
                                              Phone: (202) 616-8488
                                              Email: indraneel.sur@usdoj.gov

                                              *Counsel for Defendants*

3

J.A. 247

## DECLARATION OF ELISHA DUNN-GEORGIOU

I, Elisha Dunn-Georgiou, declare as follows:

1.      I am the President and CEO at the Global Health Council (GHC). I submit this declaration in support of Plaintiffs' application for a temporary restraining order. The statements made in this declaration are based on my personal knowledge and my understanding of information made available to me pursuant to my duties at Global Health Council.

2.      Plaintiff GLOBAL HEALTH COUNCIL ("GHC") is a private, not-for-profit, membership alliance incorporated in Delaware and enjoying tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. GHC's business address is 2300 N Street NW, Suite 501A, Washington, DC 20037.

3.      GHC was founded in 1972 under the name National Council of International Health as a U.S.-based, nonprofit membership organization with the purpose of identifying priority world health problems and reporting on them to the U.S. public, legislators, international and domestic government agencies, academic institutions, and the world health community.

4.      GHC's 123 member organizations operate in at least 150 countries and include many prominent U.S. non-profit and academic organizations working to alleviate the burden of disease and disability in middle- and low-income countries.  Approximately 25% of GHC member organizations are direct recipients of US foreign aid funding.   Individually and collectively, these organizations work to strengthen the ability of developing nations to address critical public health challenges, including:

   a.  Health Systems Strengthening

   b.  Maternal and Child Health

   c.  Infectious disease prevention and control

   d.  HIV/AIDS prevention, treatment and care

5.      GHC's members include Plaintiffs Chemonics International, Inc. and Management Sciences for Health (MSH).

6.      As a membership organization, GHC provides a platform for members to collectively express concerns about U.S. policies affecting global health. Many GHC members rely on U.S. government funding but are reluctant to publicly criticize government agencies from which they receive support. Through their membership in GHC, organizations can voice objections to policies, propose recommendations, and advocate for changes without direct risk to their funding relationships.

7.      Many of GHC's members administer global health programs and receive funding from USAID and other federal agencies and depend on sustained, uninterrupted funding to continue their work.

8.      The Executive Order freezing U.S. foreign assistance (Executive Order 14169 of January 20, 2025 Reevaluating and Realigning United States Foreign Aid) has caused significant harm to GHC's members, directly impacting their ability to implement life-saving health programs. The funding freeze has disrupted critical health programs, including maternal and child health, infectious disease prevention, and health system strengthening efforts in vulnerable regions. Examples of these disruptions documented by GHC member organizations include:

    a.  A GHC member organization reported that USAID had funded a USD $20 million dollar project in Cambodia to support the development of hospital accreditation.  As a result of the Executive Order and subsequent stop work order the project is suspended.  The same GHC member organization reports that due to a stop work order, a USAID program to support transportation of children to an NGO hospital in Cambodia was suspended.  The impact is also on those working on these projects and they are no longer being paid.

    b.  A second GHC member organization has reported that because of the Executive Order and subsequent stop work orders related to the organizations active USAID programs they estimate up to 1,226 primary care clinics will close and more than 2.6 million patient-provider visits won't be allowed to occur for every month that a pause continues.

    c.  A third GHC member organization has reported that the stop work order has impacted USD $4 million worth of American Schools and Hospitals Abroad (ASHA) grants, $2m for Nepal and $2m for Vietnam.  The stop work order is delaying the delivery of a microscope to Vietnam that would enable microsurgery to take place, which is critical to limb salvage and providing breast reconstruction to women in need. In Nepal, this organization runs the largest burn unit in the country and the equipment is essential to safely providing care.

    d.  A fourth GHC member organization has reported that the stop work order has delayed indoor residual spraying (IRS) and insecticide-treated nets (ITN) campaigns which are critical to preventing malaria cases and saving lives and must be implemented before the rainy season starts and mosquito populations multiply. If the campaigns are delayed, the campaigns will not have the intended impact and may be logistically impossible to implement during the rainy season. Paused programs include:

- Indoor residual spraying campaigns in Kenya, Uganda and Ghana that would reach 1.7 million households and structures, protecting nearly 6 million people

- Scheduled delivery of 1.29 million nets in Ethiopia that will protect 2.6 million people.

- Distribution of Insecticide Treated Nets (ITNs) in Zimbabwe, ongoing procurement of entomology equipment, support for the therapeutic efficacy study and case management strengthening activities which are essential during this peak malaria season.

9.    The uncertainty and financial distress caused by this funding freeze have compromised global health progress and put millions of lives at risk. Without immediate intervention, organizations that provide essential health services—including vaccination programs, HIV/AIDS treatment, malaria prevention, and emergency response efforts—will be forced to shut down operations.

10.    If the funding freeze continues, and if USAID is dismantled, many GHC members may be forced to permanently scale back or cease operations, resulting in:

a.    Long-term damage to global health infrastructure, including the loss of trained healthcare workers and supply chain disruptions.

b.    Failure to meet global health targets, such as reductions in maternal mortality and infectious disease control.

c.    Increased health inequities, as vulnerable populations lose access to critical health services.

11. The USAID funding freeze is an existential threat to GHC's members and their life-saving work.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2025 in Washington, D.C.

*Elisha Dunn-Georgiou*

Elisha Dunn-Georgiou
President and CEO
Global Health Council

# Declaration of Harm - GHC - Dunn-Georgiou

Final Audit Report                                          2025-02-11

| | |
|---|---|
| Created: | 2025-02-11 |
| By: | Allison Gardner (Allison.Gardner@arnoldporter.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAI-OQVyWImXfe_HkQtxW-0xk1qoZy0jZk |

## "Declaration of Harm - GHC - Dunn-Georgiou" History

Document created by Allison Gardner (Allison.Gardner@arnoldporter.com)
2025-02-11 - 4:53:37 AM GMT- IP address: 163.116.146.118

Document emailed to Elisha Dunn-Georgiou (edunngeorgiou@globalhealth.org) for signature
2025-02-11 - 4:53:52 AM GMT

Email viewed by Elisha Dunn-Georgiou (edunngeorgiou@globalhealth.org)
2025-02-11 - 4:53:54 AM GMT- IP address: 66.249.89.97

Document e-signed by Elisha Dunn-Georgiou (edunngeorgiou@globalhealth.org)
Signature Date: 2025-02-11 - 11:27:37 AM GMT - Time Source: server- IP address: 108.31.86.219

Agreement completed.
2025-02-11 - 11:27:37 AM GMT

Arnold&Porter | Powered by Adobe Acrobat Sign

## DECLARATION OF ROBERT NICHOLS

I, Robert Nichols, declare as follows:

1.    I am the General Counsel at the Small Business Association for International Companies (SBAIC). I submit this declaration in support of Plaintiffs' application for a temporary restraining order. The statements made in this declaration are based on my personal knowledge and my understanding of information made available to me pursuant to my duties at SBAIC.

2.    SBAIC is a membership organization established to promote the meaningful utilization of U.S. small businesses at U.S government agencies providing foreign assistance, such as the U.S. Agency for International Development (USAID), Millenium Challenge Corporation (MCC), Overseas Private Investment Corporation (OPIC), and the U.S. Departments of State, Defense, Defense, Health and Human Services and Agriculture.

3.    SBAIC has almost 170 members, including small businesses certified under every Small Business Administration category, such as Veteran-Owned (including Service-Disabled), Women-Owned, HUBZone, Disadvantaged, and 8(a) Businesses.

4.    Democracy International, Inc., another plaintiff in this case, is a member of SBAIC.

5.    SBAIC's members work in all sectors and geographies, including conflict zones. This includes economic growth, agriculture and food security, democracy and governance, water and sanitation, as well as global health and education. Our members also work in humanitarian relief and crisis stabilization. Many also support monitoring and evaluation to ensure that U.S. Government taxpayer funds are evidence-based and achieve the highest return for every dollar expended. SBAIC members work in Africa, Asia, Latin America (including the Caribbean and Central America), Middle East, and Eastern Europe. Typical of American small businesses,

1

J.A. 252

SBAIC members provide innovative solutions to development challenges, leveraging the tradition of American small business values, ingenuity, and flexibility. Our members' size make us especially well suited – or "right-sized"—to quickly and cost effectively work with and strengthen local partners. Like American small businesses generally, which represent the engine of the U.S. economy, SBAIC members are nimble and able to quicky pivot to ensure efficacy and continuing responsivenss to changing circumstances and U.S. Government interests. As a example of our cost effectiveness, most of our project staff and subcontractors are comprised of citizens and organizations of the countries we work in.

6.     SBAIC members are able to carry out both small and large contracts, with current U.S. government contracts ranging from $100,000 to over $70 million. The administration's actions against foreign assistance are therefore directly germane to SBAIC's purpose.

7.     SBAIC provides a variety of services to its members, including advancing meaningful small business participation in foreign aid programs, including new entrants; helping members network with U.S. Government clients and prime partners; carrying out a speaker series with industry leaders,  policymakers, and vendors; providing educational resources; holding matchmaking events; and publishing a newsletter featuring member innovations in foreign aid along with SBAIC activity highlights and success stories.

8.     SBAIC's members are being irreparably harmed by USAID's funding freeze, quickly receiving stop work orders, suspension orders, and termination orders, from both USAID and prime contractors flowing these down from USAID. USAID's small business partners now have months of unpaid invoices, with no respite in sight. Unable to communicate with USAID, small businesses are incurring incalculable risk under stop work orders by observing usual stop work order practices of keeping their work sufficiently intact to restart the work following the foreign aid review, without the usual agreement with USAID on what will be

2

J.A. 253

considered minimum costs. This risk is especially alarming in light of the apparent dismantling of the agency itself.

9.      Our small business members represent companies that have spent years building reputations, capabilities, good will, and trust with USAID and other partners, including international, regional, and local. Loss of this hard-won capability that took years of brick-by-brick effort, would be a grave loss to the businesses, to the US Government, and to the field of foreign aid.

10.      As a result of the recent actions by the Administration, the very existence of our members is uncertain and at grave risk.  SBAIC's members spent tens of millions of dollars in the period before the stop work orders that went into effect starting on January 24, 2025, and USAID's failure to pay for work done as far back as the fourth quarter of 2024 has disrupted cash flow and caused most of SBAIC's members to furlough most U.S. national staff in home offices and on contracts, and terminate foreign national staff or risk keeping them and being uncertain of payments under stop work orders. Our small business members also risk jeopardizing commercial bank lines of credit that are extremely difficult for small businesses to obtain in the first place. Each day that goes by without payments by USAID causes more companies to get closer to bankruptcy, particularly because the business model in working for the U.S. Government relies on timely payment for funds expended in advance, per the Prompt Payment Act, generally 30 days. Often, small businesses are able to receive payments within 15 days. The uncertainty of when USAID might start paying its past due invoices, much less new obligations under stop work orders, is causing our members to explore bankruptcy and consider closing their businesses. Small firms have less access to finance, and creditors are less inclined to work out debts and provide working capital in a catastrophic situation like the one caused by USAID's failure to pay on any invoices.

3

J.A. 254

11.    Many of our members have built businesses up from scratch over many years,
have borrowed along the way from family and friends, and have cashed out retirement savings to
finance their businesses. Many of these businesses represent our members' primary assets, and
therefore our members are facing considerable harm to themselves and their families with
bankruptcy and loss of their life savings.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2025, in Washington, D.C.

*Robert Nichols*

_____
Robert Nichols
General Counsel

4

J.A. 255

# Declaration of Harm - SBAIC - Nichols

Final Audit Report                                                          2025-02-11

| | |
|---|---|
| Created: | 2025-02-11 |
| By: | Allison Gardner (Allison.Gardner@arnoldporter.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAdSJFRh2WOgxhfTiagIGyp7g4kNpb5IdP |

## "Declaration of Harm - SBAIC - Nichols" History

🗋 Document created by Allison Gardner (Allison.Gardner@arnoldporter.com)
   2025-02-11 - 3:51:43 AM GMT- IP address: 163.116.146.118

✉ Document emailed to Robert Nichols (rnichols@nicholsliu.com) for signature
   2025-02-11 - 3:53:08 AM GMT

🗋 Email viewed by Robert Nichols (rnichols@nicholsliu.com)
   2025-02-11 - 12:44:44 PM GMT- IP address: 104.47.64.254

✎ Document e-signed by Robert Nichols (rnichols@nicholsliu.com)
   Signature Date: 2025-02-11 - 12:45:00 PM GMT - Time Source: server- IP address: 50.144.154.34

✅ Agreement completed.
   2025-02-11 - 12:45:00 PM GMT

Arnold & Porter | Powered by Adobe Acrobat Sign

<u>**DECLARATION OF MARK HETFIELD**</u>

I, Mark Hetfield, declare as follows:

1.      I am President of HIAS.  I submit this declaration in support of Plaintiffs'
application for a temporary restraining order.  The statements made in this declaration are based
on my personal knowledge and my understanding of information made available to me pursuant
to my duties at HIAS.

2.      The suspension of all foreign assistance represents an existential threat to HIAS'
mission and funding. In particular, Executive Order 14169, "Reevaluating and Realigning
Foreign Aid," ("EO 14169" or the "EO Freezing Foreign Aid"), and subsequent Stop Work
Orders from the U.S. Agency for International Development ("USAID") and the U.S.
Department of State have already had a devastating impact on the vulnerable and at-risk people
HIAS serves around the globe.

3.      HIAS is a global, faith-based 501(c)(3) nonprofit organization headquartered at
1300 Spring Street, Silver Spring, Maryland, 20910. Working with the organized American
Jewish community, HIAS is dedicated to ensuring that the world's forcibly displaced people find
welcome, safety and freedom.

4.      Our mission is to rescue people whose lives are in danger for being who they are.
To that end, we protect the most vulnerable refugees, asylum seekers, and other forcibly
displaced people, helping them build new lives and reuniting them with their families in safety
and freedom. We also support the communities who host displaced populations around the
world, and advocate for the protection and integration of refugees displaced persons globally.

5.      HIAS was founded in New York City in 1903 as the Hebrew Immigrants Aid
Society to assist Jews who had fled the pogroms of Russia and Eastern Europe. Today known as
"HIAS," it is the international Jewish organization dedicated to assisting forcibly displaced

persons, regardless of their faith or ethnicity, with their protection and resettlement needs.

6.       Today, HIAS operates offices in 21 countries, including the United States, supporting refugees and displaced persons in five key areas:  mental health and psychosocial support, the prevention of and response to violence against women and girls, economic inclusion, legal protection and resettlement, as well as other complementary pathways to protection. To advance protections for refugees and displaced persons worldwide, HIAS also engages in advocacy to positively impact laws and policies.

7.       Approximately 58% of HIAS's funding comes from the U.S. government, including the U.S. Department of State, particularly the Bureau of Population, Refugees, and Migration ("PRM") and the Bureau of Democracy, Human Rights, and Labor ("DRL"), as well as from USAID's Bureau for Humanitarian Assistance ("BHA").

**State Department Funding**

8.       PRM funds HIAS to assist vulnerable and at-risk people in Latin America (Colombia, Costa Rica, Dominican Republic, Ecuador, and Peru), the Caribbean (Aruba, Curacao, and Guyana), and Africa (Chad and Kenya) under nine cooperative agreements totaling $18,945,002, which have end dates in August and September, 2025. The cooperative agreements fund, in whole or in part, over 535 HIAS staff and serve nearly 450,000 direct and indirect program participants.

9.       On January 24, 2025, HIAS received a letter from PRM stating that the nine different grants to HIAS were immediately suspended "pending a Department-wide review of foreign assistance programs," pursuant to EO 14169. *See* January 24, 2025, Letter from Philip Denino, PRM Grants Officer, annexed to this declaration as Exhibit A (hereinafter "HIAS PRM Stop-Work Order"). The PRM Stop-Work Order also ordered HIAS to "cease immediately" any

2

work that "promoted 'diversity, equity and inclusion' (DEI) at any level or in any activity" and to certify that HIAS had done so via email to the State Department. *See* HIAS PRM Stop-Work Order.

10.     HIAS subsequently received termination notices of two of the grants it is implementing for PRM, in both Colombia and the Caribbean (Aruba, Curaçao, and Guyana). The termination notices provided that each award "no longer effectuates agency priorities and is terminated in accordance with the U.S. Department of State Standard Terms and Conditions and 2 CFR 200.340." *See* February 3 and 4, 2025, Letter from Philip Denino, PRM Grants Officer, annexed to this declaration as Exhibits B and C. HIAS informed PRM immediately that we objected to the award terminations because PRM failed to provide any evidence indicating the action was authorized by law or was compliant with the recent court injunctions enjoining federal agencies from taking this action on the basis of the Office of Management and Budget Memorandum M-25-13 or on the basis of the of the President's recent Executive Orders. *See* February 5 and 8, 2025, Emails from Guillermo Birmingham to Philip Denino, annexed to this declaration as Exhibits D & E.

11.     On February 3, 2025, HIAS also received a revised "Notice of Suspension" for its work in Chad from PRM via email stating that HIAS should stop all work under the grant unless exempted from suspension as "existing life-saving humanitarian assistance" defined by the Department as "core life-saving medicine, medical services, food, shelter, and subsistence assistance, as well as supplies and reasonable administrative costs as necessary to deliver such assistance." *See* February 3, 2025, Letter from Philip Denino, PRM Grants Officer, annexed to this declaration as Exhibit F. In his cover email, Mr. Denino stated that "PRM will follow up shortly to set up a meeting to discuss the specific HIAS programming in Chad that falls under

3

the exemption for life-saving humanitarian assistance." *See* February 3, 2025, Email from Philip Denino, annexed to this declaration as Exhibit G. That meeting with PRM took place the next day, February 4, during which HIAS and PRM staff discussed what activities would qualify as "lifesaving humanitarian assistance." PRM asked HIAS to provide an overview of HIAS' activities conducted in Chad pursuant to the award that HIAS deemed exempt from the 90-day suspension. HIAS prepared and sent the requested overview. *See* February 7, 2025, Email from Guillermo Birmingham to Philip Denino, annexed to this declaration as Exhibit H. However, after the meeting, Mr. Denino sent a follow up email indicating they he had been "given guidance that PRM will not be providing any additional information regarding the application of the waivers/exemptions to activities" and that he could only refer us to the revised Suspension Memo to guide us in resuming activities. *See* February 4, 2025, Email from Philip Denino to Guillermo Birmingham, annexed to this declaration as Exhibit I. Nor would we be able to receive funds to continue work under a waiver/exemption since all federal government payment portals were and are not functioning, making the purported waiver/exemption process cited in PRM's revised Notice of Suspension useless.

      12.    On February 10, HIAS' Chief Financial Officer again asked PRM for guidance on what would qualify as an emergency exemption from the indefinite suspension of PRM funds. In response, PRM's Grants Officer stated, "I can't provide guidance. It was determined much higher than me." HIAS' CFO then expressed concern to PRM that the lack of guidance coupled with the inability of aid organizations to access payments is making it impossible for organizations to provide the lifesaving humanitarian services identified by PRM as exempt in their revised Suspension Notice. *See* February 10, 2025, Email exchange between Guillermo Birmingham and Philip Denino, annexed to this declaration as Exhibit J.

4

J.A. 260

13.     The impact of the Stop Work Orders on already-vulnerable populations has been immediate and severe. The result of these suspension and termination letters is that nearly 450,000 program participants are unable to secure lifesaving humanitarian assistance from HIAS. Moreover, over 535 HIAS staff have been laid off and many hundreds more are vulnerable to termination.

14.     The suspended PRM-funded programs in Peru, Venezuela, Kenya and Ecuador provided immediate and life-saving services to displaced and at-risk children. The children in these HIAS programs, including unaccompanied and separated children, are at heightened risk of sexual exploitation, abuse and neglect due to their multiple levels of vulnerability including displacement. HIAS' humanitarian and emergency services, such as case management, support children and caregivers to address urgent protection risks such as trafficking, abuse, exploitation, early marriage, and violence through development of safety plans, direct counseling and care, emergency cash assistance to cover basic necessities, and referral to additional available services. The suspended programs in countries such as Ecuador, Peru, Venezuela, Kenya, Guyana, Aruba, Costa Rica, and Colombia provided intensive mental health and psychosocial support to refugees experiencing high levels of distress, typically related to the persecution they experienced that forced them to flee their countries and/or violence experienced in transit or otherwise during their displacement. The withdrawal of this support has left program participants at serious risk of harm, including self-harm, without this lifesaving support.

**DRL Funding**

15.     The U.S. Department of State, Bureau of Democracy, Human Rights, and Labor ("DRL") funds HIAS in the amount of $1,000,000.00 for work to advance protections for at-risk populations in Greece and Romania. On February 7, DRL similarly terminated its award to

5

J.A. 261

HIAS on the exact same grounds as those described above. *See* February 7, 2025, Letter from

Selina Holt, DRL Grants Officer, annexed to this declaration as Exhibit K. On February 8, 2025,

HIAS notified DRL objected to the termination on the same grounds it objected to PRM's

terminations: DRL failed to provide any evidence indicating the action was authorized by law or

was compliant with the recent court injunctions enjoining federal agencies from taking this

action on the basis of the Office of Management and Budget Memorandum M-25-13 or the

President's recent Executive Orders. *See* February 8, 2025, Letter from HIAS to DRL objecting

to termination, annexed to this declaration as Exhibit L.

16.    As a result of the termination of this program, approximately 800 program

participants will cease receiving critical services from HIAS in the areas of mental health and

psychosocial support and economic inclusion such as skills and employability training. These

services enable beneficiaries to process the trauma they have experienced and assist them in

integrating into their host countries, enabling them to become self-reliant rather than dependent

on services. Without HIAS' services, these at-risk beneficiaries face poverty, mental health

deterioration, and social isolation, limiting their ability to positively contribute to their local host

economies and communities.

**USAID Funding**

17.    USAID funds HIAS' work providing assistance to vulnerable and at-risk people

in Venezuela under a grant of $18,500,000.00 for the period starting October 1, 2024 through

September 30, 2026, entitled, "Multisectoral Assistance and Life-Saving Protection Services for

Most Vulnerable and At-risk Venezuelans Affected by the Crisis in Venezuela." The grant

funds, in whole or in part, over 90 HIAS staff positions in Venezuela which provide a wide

range of lifesaving assistance, including essential health services, water supply and hygiene

6

promotion, food assistance, protection from trafficking and violence against women and girls, and mental health and psychosocial support.

18.    On January 28, 2025, USAID issued a notice to all USAID implementing partners, including HIAS, entitled "USAID's Implementation of the Funding Pause for Foreign Assistance" instructing us to immediately pause "all USAID program-funded activities" and "refrain from further commitment and expenditures of USAID funding, until further notice." The notice applied to all awards and funding at every tier unless the implementing partner had received formal notification from their Agreement Officer that their award is covered in part or in whole by a waiver. Since HIAS had not received such a waiver, and since HIAS' work in Venezuela is entirely funded by and dependent on USAID funding, we were forced to immediately halt all operations in Venezuela and will lay off approximately 100 HIAS staff in the coming days. *See* January 28, 2025 "USAID Implementation of the Funding Pause for Foreign Assistance", annexed to this declaration as Exhibit M (hereinafter "USAID Funding Pause").

19.    On January 31, 2025, HIAS received a partial stop-work order from USAID under its BHA award for Venezuela entitled "Partial Award Suspension and DEIA Activities under USAID/BHA Awards." The notice instructed HIAS to suspend all activities under the award that were not for lifesaving humanitarian assistance which included "essential medicines, medical services, food, shelter, and subsistence assistance, as well as necessary supplies and reasonable administrative costs to facilitate the delivery of such assistance." USAID/BHA stated that it interpreted this lifesaving humanitarian assistance to include "protection services necessary in an insecure environment for the delivery of lifesaving humanitarian assistance" in the exempted emergency sectors of food assistance, health, logistics, nutrition, protection,

7

J.A. 263

shelter and settlements, and water, sanitation, and hygiene.  HIAS was further instructed to

"immediately cease all work related to the award, except as required to comply with [the]

notice" and to "minimize the incurrence of costs allocable to the award during the partial

suspension period."  *See* January 31, 2025, Letter from Christie Candyce Savage, annexed to this

declaration as Exhibit N (hereinafter "HIAS USAID Stop-Work Order").

20.     After receiving this notice, on February, 4, 2025, HIAS sought immediate

clarification from BHA as to whether HIAS' activities, conducted in Venezuela pursuant to

BHA award, "were exempt from the 90-day suspension expressed in President Trump's

executive order, Reevaluating and Realigning U.S. Foreign Aid, which suspended foreign

assistance," and HIAS requested, to the extent not already exempt, an emergency waiver.  HIAS

included a detailed description of all services provided, which HIAS believed qualified as "life-

saving."  *See* February 4, 2025, Letter from Guillermo Birmingham, to Christie Candyce Savage

of BHA, annexed to this declaration as Exhibit O. HIAS has yet to receive clarification or any

further guidance or response from BHA.

21.     As a result of these suspensions and terminations, HIAS has had to shutter

program offices and defer payments to vendors. This, together with the immediate suspension of

services has had a severe and negative impact on HIAS' relationships with partners globally,

including local and national government agencies and offices, private sector partners, faith

partners, community leaders, and more. HIAS' ability to rebuild these relationships, recruit

qualified and committed staff, and support governments around the world with bringing stability

to communities affected by displacement, has been critically and adversely impacted.  Beyond

the immediate impacts on refugees, displaced persons, and other vulnerable people who rely on

HIAS' assistance to meet basic needs, the forced suspension of projects has harmed HIAS'

8

J.A. 264

professional relationships with wide-ranging stakeholders including contractors with whom HIAS partners to deliver specialized services, businesses with whom HIAS partners to provide employment opportunities for refugee clients, and suppliers of good that HIAS provides to program participants.

22.    As a result of the State Department and USAID essentially breaking, without warning or justification, all written cooperative agreements with HIAS, HIAS now faces the real possibility of insolvency after more than 120 years serving the needs of refugees in the US and around the world.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2025, in Silver Spring, Maryland.

*mark hetfield*
_____
Mark Hetfield
President
HIAS

9

J.A. 265

# Declaration of Harms - HIAS - Hetfield

Final Audit Report                                                          2025-02-11

| | |
|---|---|
| Created: | 2025-02-11 |
| By: | Allison Gardner (Allison.Gardner@arnoldporter.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA2X808Ck7wc6vnKt9LEJwhwVemXgAV3PX |

## "Declaration of Harms - HIAS - Hetfield" History

📄 Document created by Allison Gardner (Allison.Gardner@arnoldporter.com)
2025-02-11 - 4:46:19 AM GMT- IP address: 163.116.146.118

📧 Document emailed to mark hetfield (mark.hetfield@hias.org) for signature
2025-02-11 - 4:46:38 AM GMT

📄 Email viewed by mark hetfield (mark.hetfield@hias.org)
2025-02-11 - 4:50:56 AM GMT- IP address: 24.126.127.1

✒ Document e-signed by mark hetfield (mark.hetfield@hias.org)
Signature Date: 2025-02-11 - 4:53:25 AM GMT - Time Source: server- IP address: 24.126.127.1

✅ Agreement completed.
2025-02-11 - 4:53:25 AM GMT

Arnold & Porter | Powered by Adobe Acrobat Sign

# Exhibit A



**United States Department of State**
*Bureau of Population, Refugees, and Migration*
*Washington, D.C.  20520*

January 24, 2025

Mr. Guillermo Birmingham
HIAS Inc.
1300 Spring Street Suite 500
Silver Spring, MD 201910-3634

REF:    SPRMCO24CA0215; SPRMCO24CA0255; SPRMCO24CA0262; SPRMCO24CA0277;
        SPRMCO24CA0278; SPRMCO24CA0292; SPRMCO24CA0328; SPRMCO22CA0311;
        SPRMCO24CA0325; SPRMCO24CA0348; SPRMCO24CA0354; SPRMCO24CA0349

Consistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid, the U.S. Department of State, Bureau of Population, Refugees, and Migration hereby notifies the recipient that, consistent with the terms of the award(s), the referenced award(s) are immediately suspended as of January 24, 2025. Award(s) may no longer effectuate agency priorities and are suspended pending a Department-wide review of foreign assistance programs. Decisions whether to continue, modify, or terminate award(s) will be made following this review.

Effective immediately upon receipt of this Notice of Suspension the Recipient must stop all work under the award(s) and not incur any new costs after the effective date cited above. The Recipient must cancel as many outstanding obligations as possible.

To comply with the Executive Orders on Ending Radical and Wasteful Government DEI Programs and Preferencing and Initial Recissions of Harmful Executive Orders and Actions, Recipients are hereby notified that no U.S. Government funds may be used to promote "diversity, equity, and inclusion" (DEI) at any level or in any activity, regardless of partner or program location.  Any use of PRM funding to promote DEI must cease immediately, including activities that were previously authorized by PRM.  Your certification that all such activities funded by U.S. Government funds have ceased is required immediately by emailing the grants officer for your award and copy PRM-Comp-Mgt@State.gov. We understand that you may be receiving multiple emails from various grantors requesting this certification. Recipients must reply to this letter by email.

Recipients may submit payment requests for legitimate expenses incurred prior to the date of this Notice of Suspension or legitimate expenses associated with this Notice of Suspension.

UNCLASSIFIED

2

Recipients are reminded that any changes to award terms and conditions, as well as costs must be approved by a grants officer. The program officer does not have authority to approve award costs or program changes.

If you have any other questions regarding the suspension, please contact me at DeninoPM@state.gov.

Sincerely,


Philip Denino
Grants Officer

UNCLASSIFIED

# Exhibit B

**Department of State**

---

**Termination Notification**

---

NOTICE OF TERMINATION

February 03, 2025

HIAS
Mr. Guillermo Birmingham
1300 Spring Street Suite 500
Silver Spring, MD 201910-3634

REF:  SPRMCO24CA0334

The U.S. Department of State hereby notifies the recipient that this award is immediately terminated as of February 03, 2025. This award no longer effectuates agency priorities and is terminated in accordance with the U.S. Department of State Standard Terms and Conditions and 2 CFR 200.340.

A modification to your award to codify this termination was processed in MyGrants and countersigned on your behalf to reflect the termination of this award on January 31, 2025.

Effective immediately upon receipt of this Notice of Termination the Recipient must stop all work on the program and not incur any new costs after the effective date cited above. The Recipient must cancel as many outstanding obligations as possible.

This termination is for the entirety of the award. In compliance with 2 CFR 200.343, the grants officer will issue a final modification to the award adjusting for costs that result from financial obligations which were properly incurred by the recipient or subrecipient before the effective date of termination, and not in anticipation of it.

Final performance and financial reports are due 120 days after the termination date.


Sincerely,

Philip Denino
Deputy Comptroller (Grants Officer)

---

# Exhibit C

**Department of State**

---

**Termination Notification**

---

NOTICE OF TERMINATION

February 04, 2025

HIAS
Mr. Guillermo Birmingham
1300 Spring Street Suite 500
Silver Spring, MD 201910-3634

REF: SPRMCO24CA0325

The U.S. Department of State hereby notifies the recipient that this award is immediately terminated as of February 04, 2025. This award no longer effectuates agency priorities and is terminated in accordance with the U.S. Department of State Standard Terms and Conditions and 2 CFR 200.340.

A modification to your award to codify this termination was processed in MyGrants and countersigned on your behalf to reflect the termination of this award on February 04, 2025.

Effective immediately upon receipt of this Notice of Termination the Recipient must stop all work on the program and not incur any new costs after the effective date cited above. The Recipient must cancel as many outstanding obligations as possible.

This termination is for the entirety of the award. In compliance with 2 CFR 200.343, the grants officer will issue a final modification to the award adjusting for costs that result from financial obligations which were properly incurred by the recipient or subrecipient before the effective date of termination, and not in anticipation of it.

Final performance and financial reports are due 120 days after the termination date.

Sincerely,

Philip Denino
Deputy Comptroller (Grants Officer)

# Exhibit D



RESPONSE TO NOTICE OF TERMINATION

February 5, 2025

Philip Denino
Deputy Comptroller (Grants Officer)
Bureau of Population, Refugees, and Migration
The U.S. Department of State

REF: SPRMCO24CA0334

Mr. Denino:

We have received your communication dated February 3, 2025 purporting to terminate award number SPRMCO24CA0334, where you also note that you have countersigned the modification codifying the termination on our behalf.  We respectfully point out that the U.S. Department of State does not have authority to countersign anything on our behalf and we do not consent.

We also object to the award termination given that the U.S. Department of State has failed to provide any evidence indicating that the termination is authorized by law or compliant with recent court injunctions enjoining federal agencies from pausing, freezing, impeding, blocking, canceling, or terminating any awards or obligations on the basis of the Office of Management and Budget Memorandum M-25-13 or on the basis of the President's recently issued Executive Orders. We request that you reconsider the Department's termination action as not in accordance with applicable law.

Please also accept this notice as our intent to appeal the Department's termination decision. To that end, we request that you provide us with internal points of contact to effectuate that appeal.

Respectfully,


GUILLERMO A BIRMINGHAM, CPA
Chief Financial Officer

# Exhibit E

**Kristen Strain**

| | |
|---|---|
| **From:** | Guillermo Birmingham |
| **Sent:** | Wednesday, February 5, 2025 5:15 PM |
| **To:** | DeninoPM@state.gov |
| **Cc:** | David Weiss; Mark Hetfield; Elisabeth Sigler; Kristen Strain |
| **Subject:** | Response to Notice of Termination SPRMCO24CA0334 |
| **Attachments:** | RESPONSE TO NOTICE OF TERMINATION SPRMCO24CA0334.pdf |

Mr. Denino,

We acknowledge receipt of your memorandum dated 4 February 2025 referencing the subject PRM award.

**We do not consent to your countersigning the modification on our behalf.** Additionally we are informing you that we object to the award termination because of a failure to provide any evidence indicating the action is authorized by law or compliant with the recent court injunctions enjoining federal agencies from taking this action on the basis of the Office of Management and Budget Memorandum M-25-13 or on the basis of the President's recently issued Executive Orders.

Given the above, we request you reconsider this termination action.

Respectfully,

Guillermo Birmingham

**Guillermo A Birmingham, CPA**
*Interim Chief Financial Officer*
hias.org | C 202-230-2225

**HIAS** Welcome the stranger. Protect the refugee.

# Exhibit F



**United States Department of State**
*Bureau of Population, Refugees, and Migration*
*Washington, D.C.  20520*

February 03, 2025

Mr. Guillermo Birmingham
HIAS
1300 Spring Street Suite 500
Silver Spring, MD 201910-3634

REF:    SPRMCO24CA0215

Consistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid, the U.S. Department of State, Bureau of Population, Refugees, and Migration hereby notifies the recipient that, consistent with the terms of the award(s), the referenced award(s) are immediately suspended as of January 24, 2025. Award(s) may no longer effectuate agency priorities and are suspended pending a Department-wide review of foreign assistance programs. Decisions whether to continue, modify, or terminate award(s) will be made following this review.

Effective immediately upon receipt of this Notice of Suspension, the Recipient must stop all work under the award(s) and not incur any new costs after the effective date cited above. The following are **exempt** from this Notice of Suspension:

- Emergency food assistance and administrative expenses, including salaries, necessary to administer such assistance already within the scope of the referenced award; and
- Life-saving humanitarian assistance during the period of the review supporting activities in Chad, subject to further limitations conveyed by the PRM grants officer.

    Implementers of existing life-saving humanitarian assistance programs should continue or resume work subject to the following directions. This resumption is temporary in nature, and except by separate waiver or as required to carry out this waiver, no new contracts shall be entered into.

    (a) For purposes of this waiver, life-saving humanitarian assistance applies to core life-saving medicine, medical services, food, shelter, and subsistence assistance, as well as supplies and reasonable administrative costs as necessary to deliver such assistance.

    (b) This waiver does not apply to activities that involve abortions, family planning, conferences, administrative costs other than those covered by (a) above, gender or DEI ideology programs, transgender surgeries, or other non-life saving assistance.

UNCLASSIFIED

(c) Migration and Refugee Assistance (MRA) funding may only be used to support activities under section (a) and for repatriation of third country nationals to their country of origin or safe-third country.

In addition, the Recipient must cancel as many outstanding obligations as possible.

Recipients must limit activities to those allowed under the exemptions listed above. Life-saving humanitarian assistance is assistance which mitigates imminent threats to safety or well-being. During the period of review, payment requests must be submitted on a reimbursable basis and accompanied by a certification that expenses incurred meet an exemption listed in this Notice of Suspension.

To comply with the Executive Orders on Ending Radical and Wasteful Government DEI Programs and Preferencing, Initial Recissions of Harmful Executive Orders and Actions and Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, Recipients are hereby notified that no U.S. Government funds may be used to promote "diversity, equity, and inclusion" (DEI), gender ideology or provide for any medical procedure, treatment, or drug for the purpose of conforming an individual's appearance to that of the opposite sex at any level or in any activity, regardless of partner or program location.  Any use of PRM funding to promote DEI or gender ideology must cease immediately, including activities that were previously authorized by PRM.  Unless previously submitted, your certification that all such activities funded by U.S. Government funds have ceased is required immediately by emailing the grants officer for your award and copy PRM-Comp-Mgt@State.gov. We understand that you may be receiving multiple emails from various grantors requesting this certification. Recipients must reply to this letter by email.

Recipients may submit payment requests for legitimate expenses incurred prior to the date of this Notice of Suspension or legitimate expenses associated with this Notice of Suspension.

Recipients are reminded that any changes to award terms and conditions, as well as costs must be approved by a grants officer. The program officer does not have authority to approve award costs or program changes.

For awards referenced above, this letter supersedes previous letters issued by the PRM grants officer. Additional letters may be sent as updates to Department guidance or exemptions authorized under the Executive Order are approved.

If you have any other questions regarding the suspension, please contact me at DeninoPM@state.gov.

Sincerely,


UNCLASSIFIED

3

Name
Grants Officer

UNCLASSIFIED

# Exhibit G

**Kristen Strain**

| | |
|---|---|
| **From:** | Kristen Strain |
| **Sent:** | Tuesday, February 11, 2025 1:42 AM |
| **To:** | Kristen Strain |
| **Subject:** | FW: Revised Suspension Letter for HIAS Chad SPRMCO24CA0215 |
| **Attachments:** | Suspension Letter for Foreign Assistance-PRM 2025-02-03 - HIAS Chad SPRMCO24CA0215.pdf |

**From:** "Denino, Philip M" <DeninoPM@state.gov>
**Date:** February 3, 2025 at 2:57:44 PM EST
**To:** Guillermo Birmingham <guillermo.birmingham@hias.org>
**Cc:** PRM-Comp-Mgt <PRM-Comp-Mgt@state.gov>, "Manlowe, James S" <ManloweJS@state.gov>, "Meyerzon, Jessica" <MeyerzonJ@state.gov>, "Norris, Amanda V" <NorrisAV@state.gov>, Thuba Roush <thuba.roush@hias.org>, Timothy Bamwita <timothy.bamwita@hias.org>, "Ongwae, Alderin (Nairobi)" <OngwaeA@state.gov>, "Karnes, Ryan D (Quito)" <KarnesRD@state.gov>, "Amador, Molly M" <AmadorMM@state.gov>, "Alavi, Aamir" <AlaviA@state.gov>, Eden Siskind <eden.siskind@hias.org>, Sabrina Lustgarten <sabrina.lustgarten@hias.org>, "Nagy, Emma M (Panama)" <NagyEM@state.gov>, "Geiger, Jeffrey (Guadalajara)" <GeigerJ1@state.gov>, Fatou Jobe <fatou.jobe@hias.org>, Tatyana Rapaport <Tatyana.Rapaport@hias.org>, David Weiss <david.weiss@hias.org>, Mark Hetfield <mark.hetfield@hias.org>, Beth Oppenheim <beth.oppenheim@hias.org>, Alice Robertson <alice.robertson@hias.org>, Alicia Wrenn <alicia.wrenn@hias.org>, Erik Gabriel <erik.gabriel@hias.org>, Lucy Kiama <lucy.kiama@hias.org>
**Subject: Revised Suspension Letter for HIAS Chad SPRMCO24CA0215**


**EXTERNAL EMAIL**

Dear HIAS colleagues,

Please see the revised suspension letter outlining guidance from PRM on compliance with Executive Orders. This letter supersedes previous letters issued by the PRM grants officer. Additional letters may be sent as updates to Department guidance or additional exemptions authorized under the Executive Order are approved.

PRM will follow up shortly to set up a meeting to discuss the specific HIAS programming in Chad that falls under the exemption for life-saving humanitarian assistance.


Philip Denino
Deputy Comptroller
Bureau of Population, Refugees and Migration
U.S. Department of State
(771) 204-4958
DeninoPM@state.gov

# Exhibit H

**Kristen Strain**

| | |
|---|---|
| **From:** | Guillermo Birmingham |
| **Sent:** | Friday, February 7, 2025 2:03 PM |
| **To:** | Denino, Philip M |
| **Cc:** | PRM-Comp-Mgt; Manlowe, James S; Meyerzon, Jessica; Norris, Amanda V; Thuba Roush; Timothy Bamwita; Ongwae, Alderin (Nairobi); Karnes, Ryan D (Quito); Amador, Molly M; Alavi, Aamir; Eden Siskind; Sabrina Lustgarten; Nagy, Emma M (Panama); Geiger, Jeffrey (Guadalajara); Fatou Jobe; Tatyana Rapaport; David Weiss; Mark Hetfield; Beth Oppenheim; Alice Robertson; Alicia Wrenn; Erik Gabriel; Lucy Kiama; Kristen Strain; Lucy Kiama |
| **Subject:** | RE: Revised Suspension Letter for HIAS Chad SPRMCO24CA0215 |

Mr. Denino,

I am writing in response to your Notice of Suspension dated February 3, 2025 (the "Notice"), to provide an overview of HIAS' activities conducted in Chad pursuant to PRM award SPRMCO24CA0215 that are exempt from the 90-day suspension expressed in President Trump's executive order, Reevaluating and Realigning U.S. Foreign Aid, which suspended foreign assistance pending a Department review of foreign assistance.

We understood this Notice to be guidance to our organization that we should stop all work under the grant unless it is exempted from suspension as "existing life-saving humanitarian assistance" defined by the Department as "core life-saving medicine, medical services, food, shelter, and subsistence assistance, as well as supplies and reasonable administrative costs as necessary to deliver such assistance."

**We interpret this PRM Notice to mean that we should NOT stop work that we, in good faith, assess to be lifesaving. We assess the following work in Chad, funded by PRM, to be lifesaving humanitarian assistance, and covered by a self-executing waiver pursuant to the terms of this Notice.**

| Grant Objective | Activity | | |
|---|---|---|---|
| **OBJECTIVE 1 - Improve the safety and wellbeing of vulnerable women and girls by strengthening prevention mechanisms against sexual abuse and exploitation.** | **Activity management.** | **1.2:** | **Provide** |
| | **Activity 1.7: Support to income generating activities (IGAs) for women at risk, including GBV survivors.** <br> **On this component, we will be focusing on lifesaving aspects of it which involve emergency cash assistance** | | |

| | |
|---|---|
| **OBJECTIVE 1 - Improve the safety and wellbeing of vulnerable women and girls by strengthening prevention mechanisms against sexual abuse and exploitation.** | **Activity 1.8:** Support to women and girls at risk, including survivors of abuse and exploitation, through perma gardening initia |
| **OBJECTIVE 2: Prevent and respond to child protection risks and needs by strengthening existing protection systems and providing specialized child protection services in line with child protection minimum standards.** | **Activity 2.2:** Provide child protection case management services for vulnerable and at-risk children. |
| **OBJECTIVE 2: Prevent and respond to child protection risks and needs by strengthening existing protection systems and providing specialized child protection services in line with child protection minimum standards.** | **Activity 2.7:** Provide safe, accessible, child-friendly spaces (CFS). |
| **OBJECTIVES 1 & 2: Cross-cutting Emergency Supplies** | **Other activity costs:** Provide emergency assistance food and non-food items to newly arriving vulnerable refugees. |
| **OBJECTIVE 3: Support Refugees and host communities to meet their immediate needs and access meaningful socioeconomic inclusion opportunities through appropriate livelihoods, financial assistance, and vocational training services.** | **Activity 3.1:** Implement the graduation Model Approach (GMA) in southern Chad. Under this component, we will focus only o |
| | **Activity 3.2:** Food Security and nutrition interventions to improve the availability, access, and consumption of nutritious foo |

Please let me know if you or anyone at PRM has any questions or concerns about this.

Respectfully,

Guillermo Birmingham

**Guillermo A Birmingham, CPA**
*Interim Chief Financial Officer*
hias.org | C 202-230-2225

**HIAS** Welcome the stranger. Protect the refugee.

---

**From:** Denino, Philip M <DeninoPM@state.gov>
**Sent:** Monday, February 3, 2025 2:57 PM
**To:** Guillermo Birmingham <guillermo.birmingham@hias.org>
**Cc:** PRM-Comp-Mgt <PRM-Comp-Mgt@state.gov>; Manlowe, James S <ManloweJS@state.gov>; Meyerzon, Jessica <MeyerzonJ@state.gov>; Norris, Amanda V <NorrisAV@state.gov>; Thuba Roush <thuba.roush@hias.org>; Timothy Bamwita <timothy.bamwita@hias.org>; Ongwae, Alderin (Nairobi) <OngwaeA@state.gov>; Karnes, Ryan D (Quito) <KarnesRD@state.gov>; Amador, Molly M <AmadorMM@state.gov>; Alavi, Aamir <AlaviA@state.gov>; Eden Siskind <eden.siskind@hias.org>; Sabrina Lustgarten <sabrina.lustgarten@hias.org>; Nagy, Emma M (Panama) <NagyEM@state.gov>; Geiger, Jeffrey (Guadalajara) <GeigerJ1@state.gov>; Fatou Jobe <fatou.jobe@hias.org>; Tatyana Rapaport <Tatyana.Rapaport@hias.org>; David Weiss <david.weiss@hias.org>; Mark Hetfield <mark.hetfield@hias.org>; Beth Oppenheim <beth.oppenheim@hias.org>; Alice Robertson <alice.robertson@hias.org>; Alicia Wrenn <alicia.wrenn@hias.org>; Erik Gabriel <erik.gabriel@hias.org>; Lucy Kiama <lucy.kiama@hias.org>
**Subject:** Revised Suspension Letter for HIAS Chad SPRMCO24CA0215

**EXTERNAL EMAIL**

Dear HIAS colleagues,

Please see the revised suspension letter outlining guidance from PRM on compliance with Executive Orders. This letter supersedes previous letters issued by the PRM grants officer. Additional letters may be sent as updates to Department guidance or additional exemptions authorized under the Executive Order are approved.

PRM will follow up shortly to set up a meeting to discuss the specific HIAS programming in Chad that falls under the exemption for life-saving humanitarian assistance.

Philip Denino
Deputy Comptroller
Bureau of Population, Refugees and Migration
U.S. Department of State
(771) 204-4958
DeninoPM@state.gov

# Exhibit I

# Kristen Strain

| | |
|---|---|
| **From:** | Kristen Strain |
| **Sent:** | Tuesday, February 11, 2025 2:23 AM |
| **To:** | Kristen Strain |
| **Subject:** | FW: Follow-up to our call about Chad HIAS 24CA0215 |

---

**From:** Denino, Philip M <DeninoPM@state.gov>
**Sent:** Tuesday, February 4, 2025 2:08 PM
**To:** Guillermo Birmingham <guillermo.birmingham@hias.org>
**Cc:** Lucy Kiama <lucy.kiama@hias.org>; Erik Gabriel <erik.gabriel@hias.org>; Meyerzon, Jessica <MeyerzonJ@state.gov>; Manlowe, James S <ManloweJS@state.gov>; Norris, Amanda V <NorrisAV@state.gov>
**Subject:** Follow-up to our call about Chad HIAS 24CA0215

**EXTERNAL EMAIL**

Hello HIAS Colleagues,
As I mentioned during our call this morning, we are in a fluid situation. At the end of our call we had agreed that HIAS would provide a list of activities and budget believed to be compliant to the Exemption.

We have now been given guidance that PRM will not be providing any additional information regarding the application of the waivers/exemptions to activities. At this time, I can only refer you to the Revised Suspension Memo to guide you in resuming activities. As we received additional guidance, I will send it to you.

I did not have the email address for Sabrina or Kristen. Please forward this message to them.


Philip Denino
Deputy Comptroller
Bureau of Population, Refugees and Migration
U.S. Department of State
(771) 204-4958
DeninoPM@state.gov

# Exhibit J

**Kristen Strain**

| | |
|---|---|
| **From:** | Guillermo Birmingham |
| **Sent:** | Monday, February 10, 2025 11:17 AM |
| **To:** | Philip M Denino |
| **Cc:** | Erik Gabriel; Sabrina Lustgarten; Tatyana Rapaport; Timothy Bamwita; Kristen Strain; Elisabeth Sigler; David Weiss |
| **Subject:** | Re: Payment Processing timelines |

Thanks. As you can imagine this is concerning given the statements of the Secretary of State who publicly questioned the intelligence of organizations who couldn't figure out how to request waivers, etc. The lack of guidance coupled with the payment processing slow down is contributing to the inability of aid organizations to provide the life saving services depicted in the exemptions depicted in the SOS communication. In addition, as I'm sure your agency is aware, tens of thousands of aid workers have been laid off globally and in the United States. Even if an exemption is granted it has no effect until resources are released to provide the services.

Best Regards

Guillermo

**Guillermo A Birmingham, CPA**
*Interim Chief Financial Officer*
hias.org | C 202-230-2225

**HIAS** Welcome the stranger. Protect the refugee.

On Feb 10, 2025, at 10:53 AM, Denino, Philip M <DeninoPM@state.gov> wrote:

**EXTERNAL EMAIL**

I can't provide guidance. It was determined much higher than me.

Phil

**From:** Guillermo Birmingham <guillermo.birmingham@hias.org>
**Sent:** Monday, February 10, 2025 10:51 AM
**To:** Denino, Philip M <DeninoPM@state.gov>
**Cc:** Erik Gabriel <erik.gabriel@hias.org>; Sabrina Lustgarten <sabrina.lustgarten@hias.org>; Tatyana Rapaport <Tatyana.Rapaport@hias.org>; Timothy Bamwita <timothy.bamwita@hias.org>; Kristen Strain <kristen.strain@hias.org>; Elisabeth Sigler <elisabeth.sigler@hias.org>; David Weiss <david.weiss@hias.org>
**Subject:** RE: Payment Processing timelines

OK...I know you may not be able to answer but I will ask regardless: Do you have guidance you can share on what would qualify as "emergency payments"?

Thanks

Guillermo

**Guillermo A Birmingham, CPA**
*Interim Chief Financial Officer*
hias.org | C 202-230-2225

**HIAS** Welcome the stranger. Protect the refugee.

---

**From:** Denino, Philip M <DeninoPM@state.gov>
**Sent:** Monday, February 10, 2025 10:49 AM
**To:** Guillermo Birmingham <guillermo.birmingham@hias.org>
**Cc:** Erik Gabriel <erik.gabriel@hias.org>; Sabrina Lustgarten <sabrina.lustgarten@hias.org>; Tatyana Rapaport <Tatyana.Rapaport@hias.org>; Timothy Bamwita <timothy.bamwita@hias.org>; Kristen Strain <kristen.strain@hias.org>; Elisabeth Sigler <elisabeth.sigler@hias.org>; David Weiss <david.weiss@hias.org>
**Subject:** RE: Payment Processing timelines

**EXTERNAL EMAIL**

Mr. Birmingham,
I don't know anything about USAID issuing payments. We were able to make some emergency payments on Friday which Treasury would have dispersed today.

The timeline for "new normal" payments is still being worked out. As of now, I still do not know all the details of the new process, but there is an understanding at high levels that it needs to be worked out soon.

Phil

---

**From:** Guillermo Birmingham <guillermo.birmingham@hias.org>
**Sent:** Monday, February 10, 2025 10:27 AM
**To:** Denino, Philip M <DeninoPM@state.gov>
**Cc:** Erik Gabriel <erik.gabriel@hias.org>; Sabrina Lustgarten <sabrina.lustgarten@hias.org>; Tatyana Rapaport <Tatyana.Rapaport@hias.org>; Timothy Bamwita <timothy.bamwita@hias.org>; Kristen Strain <kristen.strain@hias.org>; Elisabeth Sigler <elisabeth.sigler@hias.org>; David Weiss <david.weiss@hias.org>
**Subject:** Payment Processing timelines

Philip,

We have been hearing from colleagues across the aid community that they have been receiving payments as of today.  Some from USAID (BHA) and others from DoS.  If this is correct, does that mean you have a better understanding of the timeline required to receive

payment under the new process?  If so, do you have any idea specifically to the invoices we have pending?

Thanks,

Guillermo

**Guillermo A Birmingham, CPA**
*Interim Chief Financial Officer*
hias.org | C 202-230-2225

**HIAS** Welcome the stranger. Protect the refugee.

# Exhibit K



**Department of State**

**Termination Notification**

NOTICE OF SUSPENSION AND/OR TERMINATION

February 7, 2025

HIAS INC
Sabrina Lustgarten
1300 SPRING STREET SUITE 500
SILVER SPRING, MD 20910-3634
UNITED STATES

REF: SAQMIP23GR0213; EMPOWER

Dear Sabrina:

The U.S. Department of State hereby notifies the Recipient that this award is
immediately terminated. Award activities were suspended per the suspension notice
issued on January 24, 2025. This award no longer effectuates agency priorities and is
terminated in accordance with the U.S. Department of State Standard Terms and
Conditions and 2 CFR 200.340.

This termination shall be further codified through an amendment to the award reflecting
the termination date.

Effective January 24, 2025, upon receipt of the Notice of Suspension the Recipient was
directed to stop all work on the program and not incur any new costs after the effective
suspension date cited above. The Recipient must cancel as many outstanding obligations
as possible.

A final performance report and financial report is due 120 days after the issuance of this
termination notice.

Sincerely,

*Selina Holt*

Selina Holt


Grant Officer

# Exhibit L



**Welcome the stranger.
Protect the refugee.**

RESPONSE TO NOTICE OF TERMINATION

February 7, 2025

Selina Holt
Deputy Comptroller (Grants Officer)
Bureau of Democracy, Human Rights, and Labor
The U.S. Department of State

REF: SAQMIP23GR0213; EMPOWER

Ms. Holt:

We have received your communication dated February 7, 2025 purporting to terminate award number
SAQMIP23GR0213; EMPOWER.

We object to the award termination given that the U.S. Department of State has failed to provide any
evidence indicating that the termination is authorized by law or compliant with recent court injunctions
enjoining federal agencies from pausing, freezing, impeding, blocking, canceling, or terminating any
awards or obligations on the basis of the Office of Management and Budget Memorandum M-25-13 or
on the basis of the President's recently issued Executive Orders. We request that you reconsider the
Department's termination action as not in accordance with applicable law.

Please also accept this notice as our intent to appeal the Department's termination decision. To that end,
we request that you provide us with internal points of contact to effectuate that appeal.

Respectfully,

GUILLERMO A. BIRMINGHAM, CPA
Chief Financial Officer

1300 Spring Street, Suite 500, Silver Spring, MD 20910
+1 301.844.7300 • info@hias.org • hias.org

J.A. 297

# Exhibit M



**Subscribe to updates from United States Agency for International Development**

Email Address                                    e.g.
name@example.com

Subscribe

## USAID's Implementation of the Funding Pause for Foreign Assistance Programs

United States Agency for International Development sent this bulletin at 01/28/2025 04:07 PM EST

**Share Bulletin**



View as a webpage.



J.A. 299

2/11/25, 2:19 AM
USAID's Implementation of the Funding Pause for Foreign Assistance Programs
Case 1:25-cv-00402 Document 7-4 Filed 02/11/25 Page 34 of 43

January 28, 2025

## USAID's Implementation of the Funding Pause for Foreign Assistance Programs

Dear USAID Implementing Partners,

In accordance with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid, OMB Memorandum M-25-13 ("Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs"), direction from the Department of State, and the previously issued Notice on Implementation of Executive Order on Reevaluating and Realigning United States Foreign Aid, USAID is working to immediately implement the funding pause for foreign assistance programs, and all Federal financial assistance programs. We recognize that this pause will impact programming, our implementing partners at every tier, and the communities served by foreign assistance-funded activities. To that end, our focus is on ensuring that the funding pause and subsequent reviews are implemented efficiently to ensure full compliance with Presidential direction and policy, and so approved programming can resume as appropriate.

To facilitate this process, USAID has issued additional instructions to all Contracting Officers and Agreement Officers (COs/AOs) on appropriate next steps, timelines, and considerations for implementing the funding pause. This includes guidance on addressing existing awards, pausing or canceling new solicitations and notices of funding opportunity (NOFOs), and refraining from issuing new awards.

### Immediate Actions

To implement the funding pause, this communication from the M/OAA Director in his capacity as the Senior Procurement Executive and Assistance Executive serves as official notice to all implementing partners to:

1. **Take immediate action to pause implementation of USAID program-funded activities and otherwise refrain from further commitments or expenditures of USAID funding, until further notice.**
2. Confirm receipt and acknowledge the requirements of this notice with the cognizant CO/AO for your award, as soon as possible.

Subject to individual award terms, this notice applies to all awards (e.g., contracts, grants, cooperative agreements, and other funding mechanisms) and funding at every tier, unless an implementing partner has received formal notification from their cognizant CO/AO that their award is covered, in whole or in part, by a current waiver. Prime contractors and recipients are responsible for ensuring subcontractors, subrecipients, and all other sub-tier contractors and awardees similarly comply with this notice.

### What to Expect Moving Forward

Current implementing partners should expect to receive formal notifications and instructions from their COs/AOs imminently, if they have not already. Depending on award type, this may be a stop-work order (contracts) or a suspension or request for bilateral amendment (grants and cooperative agreements). These formal notifications will require implementing partners to pause or mitigate further obligations or cost incurrence, consistent with the terms and conditions of their awards.

As directed by the Executive Order and Department of State, a government-wide comprehensive review of all foreign assistance shall be completed within eighty-five days of January 24, 2025. Once reviews are completed, COs/AOs will promptly communicate award decisions and take appropriate next steps to resume, modify/amend, or terminate awards. Because the funding pause will have schedule and cost implications for implementing partners, COs/AOs will negotiate equitable adjustments as a result of stop work orders, suspension notices, or termination settlements, as appropriate. Implementing partners are encouraged to review their specific award terms and conditions.

Prospective implementing partners should expect all solicitations/NOFOs and any pre-award discussions or negotiations to stop immediately. COs/AOs may issue formal amendments to solicitations/NOFOs (publicly available on SAM.gov or Grants.gov) or otherwise communicate this pause to implementing partners that have already submitted a proposal or application in response to a funding opportunity.

Once proposed activities are reviewed, COs/AOs will issue subsequent amendments or communications to announce whether or not the solicitation/NOFO or pre-award process will continue, be modified, or canceled.

### Who to Contact

A copy of this notice has been posted to USAID's Implementing Partner Notices portals. Any questions related to this notice or to actions required for specific awards should be directed to your cognizant CO/AO.

J.A. 300

effects to your cognizant CO/AO.

Sincerely,

Jami J. Rodgers
USAID Senior Procurement Executive and
Director, Bureau for Management, Office of Acquisition & Assistance

Visit WorkwithUSAID.gov today to learn more about how to navigate the
USAID partnership process!
**Take action on WorkwithUSAID.gov**
Register your organization in the Partner Directory
Take the Pre-Engagement Assessment
Stay up-to-date with the latest News & Insights
Explore the Resource Library
Visit the Events Page
Check out the Funding Essentials Page



Manage Subscriptions | Unsubscribe All | Help



Update your subscriptions, modify your password or email address, or stop subscriptions at any time on your Subscriber Preferences Page. You will need to use your email address to log in.
If you have questions or problems with the subscription service, please visit subscriberhelp.govdelivery.com.

This service is provided to you at no charge by United States Agency for International Development.
Powered by



Privacy Policy | Cookie Statement | Help

J.A. 301

# Exhibit N



January 31, 2025

To:              USAID/BHA Implementing Partners

**Subject:**      **Partial Award Suspension and DEIA Activities under USAID/BHA Awards**

Reference:      President Trump's Executive Orders Reevaluating and Realigning United States Foreign
               Aid; Reevaluating and Realigning United States Foreign Aid; and
               DEIA Activities Under Existing USAID Awards

Dear Implementing Partner:

**Partial Award Suspension**
Pursuant to 2 CFR 700.14  or the applicable standard provision (i.e., M.10  Award Suspension and
Termination) of your award,  the Agreement Officer directs the partial suspension of activities under
your award that are not for lifesaving humanitarian assistance, which includes essential medicines,
medical services, food, shelter, and subsistence assistance, as well as necessary supplies and reasonable
administrative costs to facilitate the delivery of such assistance, in accordance with the referenced notice
on Reevaluating and Realigning United States Foreign Aid and in response to direction from the Secretary
of State.  BHA interprets this lifesaving humanitarian assistance to include protection services necessary
in an insecure environment for the delivery of lifesaving humanitarian assistance.  In accordance with the
above, the exempted emergency sectors are listed below:

| Emergency Sectors Exempted |
| --- |
| • Emergency Food Assistance |
| • Emergency Health |
| • Emergency Logistics |
| • Emergency Nutrition |
| • Emergency Protection |
| • Emergency Shelter and Settlements |
| • Emergency Water Sanitation and Hygiene |

The details of the partial suspension are as follows:

U.S. Agency for International
Development
1300 Pennsylvania Avenue, NW
Washington, DC 20523
www.usaid.gov

J.A. 303

**(1) Cease Work:** Immediately cease all work related to the award, except as necessary to comply with this notice.

**(2) Minimizing costs:** The Recipient and subawardee(s) must minimize the incurrence of costs allocable to the award during the partial suspension period. Legitimate programmatic expenses incurred prior to January 24, 2025, under existing awards or expenses associated with suspensions or pause-related amendments will be considered for allowability. The determination of how to best minimize the incurrence of cost falls within your discretion and business judgment.  No additional USAID guidance is forthcoming at this time.

This partial suspension is effective with the date of this letter and will remain in place until you have been otherwise notified in writing by the Agreement Officer.

**Diversity, Equity, Inclusion, and Accessibility (DEIA) Activities under Existing USAID Awards**
Previously via email dated January 24, 2025, you were asked to cease all DEIA activities under all contracts, grants, cooperative agreements, and other awards, including subcontracts and subawards, and programs domestic and abroad, with awards to be modified or terminated in accordance with award terms and conditions. If you have taken action under your award to cease DEIA-related activities, **please submit a certification via Email with the Subject Line: "DEIA Partner Certification" that your DEIA-related activities have completely ceased and submit to your respective Agreement Officer immediately and the AOR, IndustryLiaison@usaid.gov, and BHA.GrantsUnit.Admin@usaid.gov in copy.** The certification should include the name of the activity, the award number, and a clear statement that DEIA-related activities have completely ceased.

Further, please respond with confirmation of receipt of this letter immediately to the Agreement Officer of your award, referencing the award number(s) and activity name(s), with a copy to your AOR and BHA.GrantsUnit.Admin@usaid.gov. Please submit a separate confirmation for each award.

Sincerely,


Christie Savage
Acting Supervisory Agreement Officer


Cc: USAID/BHA AORs

# Exhibit O

From: Guillermo Birmingham <guillermo.birmingham@hias.org>
Sent: Tuesday, February 4, 2025 9:34 AM
To: Christie Savage <chsavage@usaid.gov>
Cc: Mark Hetfield <mark.hetfield@hias.org>; Carrie Brekke <carrie.brekke@hias.org>; Elisabeth Sigler
<elisabeth.sigler@hias.org>; BHA Grants Unit Admin <bha.grantsunit.admin@usaid.gov>; Sabrina Lustgarten
<sabrina.lustgarten@hias.org>; David Weiss <david.weiss@hias.org>; Erik Gabriel <erik.gabriel@hias.org>; James
Hauser
<james.hauser@hias.org>; Beth Oppenheim <beth.oppenheim@hias.org>; Alice Robertson <alice.robertson@hias.org>
Subject: Request for Clarification: Partial Award Suspension (720BHA24GR00159)

Dear Ms. Savage,

HIAS acknowledges receipt of the attached Partial Suspension Notice memorandum.

I am writing to request clarification as to whether HIAS' activities, conducted in Venezuela pursuant to
BHA awards, are exempt from the 90-day suspension expressed in President Trump's executive order,
Reevaluating and Realigning U.S. Foreign Aid, which suspended foreign assistance. To the extent not already
exempt, HIAS requests an emergency waiver.

We are in receipt of USAID's Implementation of the Funding Pause for Foreign Assistance, dated January 28,
2025, which served as "o icial notice to all implementing partners to . . . take immediate action to pause
implementation of USAID program-funded activities and otherwise refrain from further commitments or
expenditures of USAID funding, until further notice."

The notice further stated that it applies to all awards, grants, cooperative agreements, etc., "unless an
implementing partner has received formal notification . . . that their award is covered, in whole or in part, by a
current waiver."

We understood this notice to be guidance to our organization that we should stop all work unless otherwise
notified by USAID that our work qualifies for a waiver. While we have not received explicit notice that our
BHA-funded work in Venezuela qualifies for a waiver, we did receive, on January 31, a notice of "partial award
suspension," in which the Agreement O       icer directed "partial suspension of activities under your award that
are not for lifesaving humanitarian assistance, which includes essential medicines, medical services, food,
shelter, and subsistence assistance, as well as necessary supplies and reasonable administrative costs to facilitate
the delivery of such assistance…."

We interpret this BHA notice to mean that we should NOT stop work that we, in good faith, assess to be
lifesaving. We assess the following work in Venezuela, funded by BHA, to be lifesaving humanitarian aid, and
to the extent not already covered by a self-executing waiver, HIAS hereby requests an immediate waiver that
would allow this work to continue.

The project, "Multisectoral Assistance and Life-saving Protection Services for Most Vulnerable and At-
risk Venezuelans A ected by the Crisis in Venezuela" is designed for the most vulnerable populations in an unstable
environment, including survivors of and people at risk of sexual violence and human tra icking, individuals with
disabilities, children and adolescents, and the elderly. The focus is to provide comprehensive life-saving
protection services and multisectoral assistance to save lives and protect people.

The project includes emergency response in the sectors of protection, water, sanitation and hygiene and health.

The protection sector includes emergency and multisectoral activities in the sub-sector of child protection for children at risk, services for survivors/cases of sexual violence and human tra    icking, and psychosocial support services for the elderly and people with disabilities at risks. These sub-sectors activities include case management services, psychosocial support services, safe spaces for children, information and legal advice, follow up and referrals, food assistance, in-kind assistance and services.

The health sector includes the provision of health services and support to victims of sexual violence and people with disabilities, through the sub-sector essential health services, pharmaceuticals and medical commodities and health systems support. The sub-sector, Essential Health Services, includes the provision of clinical health services to victims of sexual violence, and physical and functional rehabilitation services for people with disabilities. The sub-sector, Pharmaceuticals and Medical Commodities. includes the provision of non-restricted medical equipment and supplies/low-complexity assistive devices and support products to people with disabilities. The sub-sector, Health Systems Support, includes training of health personnel (doctors and nurses) on the clinical management of sexual violence victims and management and care of persons with disabilities.

The WASH sector includes the promotion of healthy water consumption and sanitation and hygiene practices, to mitigate public health risks that could a    ect vulnerable populations and communities. The sub-sector, Water Supply, includes the distribution of ceramic household filters for water treatment at the household level and water quality monitoring. This activity is complemented by the promotion of HWTS methods included in the hygiene promotion activities. The sub-sector, Hygiene Promotion, includes information and sessions for vulnerable households and communities on hygiene promotion, disease prevention, protection risks associated with poor sanitation and hygiene practices, and participatory hygiene promotion initiatives with HWTS methods for safe household (HH) water treatment and storage.

Project: Multisectoral Assistance and Life-saving Protection Services for Most Vulnerable and At-risk Venezuelans A    ected by the Crisis in Venezuela:
The project aims to provide life-saving protection services and multisectoral assistance to vulnerable and at-risk Venezuelan individuals, including survivors and those at risk of sexual exploitation and violence and human tra    icking, children and adolescents, elderly, and the disabled. The project includes emergency response in the sectors of protection, water, sanitation and hygiene and health.  The protection sector includes the following sub-sectors and protection emergency activities:

Child Protection: Implementation of a multi-sector emergency response for children and adolescents at-risk and survivors of child violence, as well as their parents and caregivers. The response includes case management services, psychosocial support services, safe spaces for children, information and legal advice, follow up and referrals, food assistance, and in-kind assistance and services.

Sexual Violence and Exploitation Response:  Implementation of a multi-sector emergency response for people at risk and survivors of domestic violence, sexual violence, sexual exploitation, and human tra    icking. The response includes case management services, psychosocial support services, information and legal advice; follow up and referrals, food assistance and in-kind assistance and services.

Psychosocial Support Services (PSS): Implementation of multi-sectoral emergency response protocols to assist vulnerable people at risk such as the elderly and disabled. The response includes psychosocial support services,

information, and legal advice; follow up and referrals; food assistance; in-kind assistance and services; and strategies to access communities and identify of cases at risk.

The Health Sector includes the provision of health services and support to victims of sexual violence and people with disabilities.
Essential Health Services: Provision of clinical health services to victims of sexual violence and health services for vulnerable and at-risk people with disabilities, contributing to their health care, protection and well-being.
- Provision of clinical care to victims of sexual violence following the standard National Protocol for the Clinical Management of Sexual Violence (2022).
- Provision of physical and functional rehabilitation services for people with disabilities, including physiotherapy, based on an analysis of context and personal needs.

Pharmaceuticals and Medical Commodities:
-Provision of pharmaceutical and medical supplies (not paid for by this project/BHA funds but mentioned in the project) as part of the clinical care of sexual violence and aligned to the National Protocol for the Clinical Management of Sexual Violence;
-Provision of BHA EAG´s non-restricted medical equipment and supplies/low-complexity assistive devices and support products that will be delivered within the framework of rehabilitation processes to people with disabilities.

Health Systems Support: Training of health personnel (doctors and nurses) with a defined curriculum and set learning objectives to achieve knowledge in the Clinical Management of Sexual Violence Protocol and Management and Care of Persons with Disabilities and their Caregivers.

The WASH sector includes the promotion of healthy water consumption, sanitation and hygiene practices through a protection and community-based approach, to mitigate health risks.

Water Supply: Distribution of ceramic household filters for water treatment at HH level and water quality monitoring. This activity is complemented by the promotion of HWTS methods included in the hygiene promotion activities.

Hygiene Promotion: Promotion of appropriate WASH practices and behavior change methodologies.  Training sessions for community leaders on hygiene promotion and its relationship to well-being, including information on disease prevention and protection risks associated with poor sanitation and hygiene practices; participatory hygiene promotion initiatives with HWTS methods for safe household (HH) water treatment and storage.

Given that these activities have real impact and life or death consequences for our clients, we request an immediate response from BHA, making clear which projects are already covered by a standing waiver and which projects BHA will issue waivers for prospectively.


Best Regards,

Guillermo
Guillermo A Birmingham, CPA Interim
Chief Financial O icer hias.org | C 202-
230-2225

HIAS Welcome the stranger. Protect the refugee.

## <u>DECLARATION OF MARIAN W. WENTWORTH</u>

I, Marian W. Wentworth, declare as follows:

1.      I am the President and Chief Executive Officer of Management

Sciences for Health, Inc. ("MSH").  I submit this declaration in support of Plaintiffs'

application for a temporary restraining order in this matter.  The statements made

in this declaration are based on my personal knowledge, materials I have reviewed,

and information made available to me pursuant to my duties at MSH.

2.      MSH is global nonprofit organization that is headquartered at 4201

Wilson Boulevard, Suite 500, Arlington, VA 22203.  Founded in 1971, MSH has

improved health systems and health outcomes in more than 150 countries

worldwide by providing governments, health organizations and the private sector

with the strategies, tools and management support to effectively and efficiently

deliver high-functioning health systems.  Our mission is to work shoulder to

shoulder with countries and communities to save lives and improve the health of

the world's poorest and most vulnerable people by building strong, resilient,

sustainable health systems. Working on behalf of the American people with the

U.S. Agency for International Development ("USAID"), the Centers for Disease

Control ("CDC") and other government and international agencies, we partner with

countries to develop solutions for local health systems challenges to sustain the

delivery of people-centered primary health care. We work in any geography where

there is demand for our services from local partners and the potential to catalyze

greater health impact.

1

3.      Specifically, MSH:

      a.     Strengthens health systems foundations as a means of improving population health on a broad scale;

      b.     Works side-by-side with public, private, and community partners at all levels of the health system to develop the skills they need to prevent, prepare for, respond to, and recover from public health threats that imperil people's lives and wellbeing such as HIV/AIDS, tuberculosis, malaria, pandemic preparedness and response and non-communicable diseases;

      c.     Saves lives and helps achieve U.S. foreign policy goals -- MSH protects Americans from disease outbreaks reaching U.S. shores, making America safer; it helps stabilize economies of our trading partners in Africa and Asia to make America more prosperous; and it builds goodwill with countries around the world, making America stronger.

4.      MSH holds funding agreements with USAID for 19 different projects in 20 countries and with the Centers for Disease Control on one global project. This includes ten cooperative agreements, six contracts, three sub-agreements and one grant as detailed below. Approximately 88% of our funding comes from USAID. The following lists the agreements currently in force between USAID and MSH:

      <u>USAID Cooperative Agreements</u>:

- Madagascar ACCESS;
- Uganda Strong Supply Chain Systems;

2

- Afghanistan Assistance for Families and Indigenous Afghans;

- Ethiopia Eliminate Tuberculosis;

- Ethiopia Health Resilience;

- Rwanda IREME Health Systems Strengthening;

- Indonesia BEBAS-TB;

- Benin Health Systems Strengthening;

- Liberia Local Health Solutions;

- Uganda Health Systems Strengthening.

USAID Contracts

- Ukraine Safe, Affordable and Effective Medicines for Ukrainians;

- Nigeria U.S. President's Malaria Initiative for States IDIQ and Task Order 4;

- Medicines, Technologies and Pharmaceutical Systems (MTaPS) global;

- Health Systems for Tuberculosis (HS4TB) in India and Bangladesh;

- Cameroon NextGen Efficient Supply Chains Advance Patient Engagement (ESCAPE);

- Ethiopia Supply Chain Strengthening.

USAID Sub-Agreements

- Reaching Impact, Saturation, and Epidemic Control (RISE) in Cameroon and Zambia;

- Afghanistan Urban Health Initiative;

- Tuberculosis Reset in Kenya.

3

J.A. 312

5.  Between January 25 and January 28, 2025, MSH received 19 stop

work/suspension orders from USAID (together, "SWOs") and the prime award

holders under which we have sub-agreements.  The SWOs had some differentiation,

but the following is representative.

> Implementation of Executive Order on Reevaluating and Realigning United States
> Foreign Aid. In accordance with the Executive Order on Reevaluating and Realigning
> United States Foreign Aid, dated January 20, 2025 (linked below), and the related
> USAID Notice on Implementation of Executive Order: Reevaluating and Realigning
> United States Foreign Aid, dated January 24, 2025 (Attachment 1), this Notice serves as
> a directive to all USAID/West Africa and USAID/Ghana IPs to immediately stop, cease,
> and/or suspend any work being performed under your respective funding agreement,
> including but not limited to, a contract, task order, grant, cooperative agreement, or
> other acquisition or assistance instrument until further notice[1] (emphasis added).

6.  MSH received no advance notice of the SWOs, which would have

allowed us to prepare and at least partially mitigate the gross waste and losses

incurred because of the immediate shutdown, nor any guidance other than a

promised review to determine if work would be allowed to resume at some point in

the future.  In accordance with these SWOs, MSH immediately ceased all program

activities for all USAID-funded projects, with on-going catastrophic effects to our

projects, people, partners, and organization.

7.  USAID funding represents almost 90% of MSH's total annual revenue.

8.  Since January 24th, 2025, MSH's attempts to draw down funds to pay

for past and ongoing project expenses for its work on grants and cooperative

---

[1] The acronym "IP" or "IPs" refers to Implementing Partners of USAID like MSH.

agreements have been rejected.[2] It has not received payment for work completed on contracts since Tuesday January 28th, 2025.

9.      Faced with on-going financial obligations, but with all revenue cut off from its primary revenue source, MSH has been forced to take extraordinary measures, and will be forced to take further extraordinary measures imminently, to cut expenditures, including:

a. Out of a total of 254 U.S. staff, on February 7, 2025, MSH furloughed 118 employees and reduced the hours of another 109 employees, putting hundreds of families at risk of being unable to pay for rent, mortgages, food, and other essentials for survival. Each additional day we are not able to call those employees back to work or restore them to their full-time positions represents an increase in the risk of irreparable harm to them and their families.

b. MSH is about to have to order the immediate repatriation of 14 expatriate/third country nationals to their homes of record without sufficient advance notice or preparation, causing immediate and irreparable harm to them and their families, as children are uprooted from schools in the middle of the school calendar, leases and other financial commitments are broken, and lives completely upended.

c. More than 58 subawardees/subcontractor's obligations amounting to $43

---

[2] The sole exception is that, on February 2, 2025, MSH was able to draw a limited amount of funds from USAID's PMS system to partially defray costs associated with a limited waiver for certain project activities in Uganda for a limited time.

5

million have been suspended by MSH. Each day that passes without

lifting those suspensions increases the threat of irreparable harm to

those organizations – many of which will quickly be faced with

insolvency – and their employees, contractors and partners. MSH

expects lawsuits to be filed against it in connection with these

suspensions, which reasonably may be expected to carry fines, interest,

and other penalties, including onerous barriers to being able to conduct

business in those countries again, even with funding from sources other

than the United States government.

d.  More than 137 invoices for work already done from more than 200 US

vendors totaling approximately $2 million have been put on hold. Each

day that passes increases the threat of irreparable harm to those

organizations, their employees, contractors and partners. Unless

immediately reversed, MSH also expects lawsuits to be filed against it in

connection with these suspensions, which reasonably may be expected to

carry fines, interest, and other penalties.

e.  In our country offices, more than 100 vendors have invoices amounting

to $721,904 that have been put on hold, risking the same imminent and

irremediable harms described above.

f.  More than 50 consultants with long-standing partnerships valued at

$996,000 were also terminated, raising the same risks of imminent

harms described above.  Most of these consultants were in the middle of

on-going work, and MSH's inability to pay them, as well as the

6

J.A. 315

subawardees, subcontractors, and other partners described throughout this Declaration, contributes to the enormous waste of U.S. taxpayer money that has been caused by the order to immediately stop work. If not reversed, deliverables (including both goods and services) that were almost completed and ready to be delivered will not be finished. Whatever U.S. funding already had been spent will go to waste.

10.    Overseas, MSH is being pushed to the edge of a cliff, as it is confronted with the prospect of having to let go of as many as 1,000 employees around the world. All the same risks of imminent harm that were described above regarding our U.S.-payroll staff apply to them as well, but these employees are even more vulnerable and will be expected to suffer extremely grave harms once they no longer receive any salary. These employees include women and men in poor countries who are the sole bread winners in their families. In countries like Afghanistan, for example, this will literally threaten starvation for them and their families.

11.    Programmatically, the following provides a small sample of the risks of imminent harms that have also been caused by the immediate unplanned halt to all program activities:

- MSH works with local government agencies and partners, including faith-based and local private sector partners, to strengthen countries' ability to manage and run their own efficient and reliable supply chains and pharmaceutical services to provide critical medicines and health care products. This includes avoiding stock-outs of life-saving

7

medicines, building effective information and data systems to drive decision-making, and improving regulatory environments so products can be approved more quickly. By strengthening supply chains, American medicines and supplies can move efficiently cross borders and reach patients. Improving people's health saves lives, allows people to be productive members of the workforce, and increases people's ability to contribute to the global economy.

- Interrupting pharmaceutical and supply chain management prevents medicines and medical supplies that are needed to save lives from reaching the people who need them. This includes medications that are critical to preventing deaths from diseases like HIV, TB and hepatitis; antibiotics that treat life-threatening infections; and medicines and supplies that are vital to saving lives during disasters and conflicts. Interruptions in our efforts to strengthen countries such as Ukraine and Ethiopia in their response against TB and especially multi-drug resistant TB pose acute and massive risks to global health security, as disease strains can easily spread through war-related displacement, migration and international travel.

- With rainy season beginning in March/April, planning has been underway for seasonal malaria chemoprevention campaigns. Interruption of service has detrimental impact on governments' ability to successfully plan and implement campaigns this year. The immediate, unplanned halt in program activities under the MSH PMI-

8

J.A. 317

S project, which coordinates these and other activities vital to controlling malaria in Nigeria, risks undoing valuable progress made to date and threatens our efforts to control the disease in a country with 30% of the world's malaria cases.

- Indonesia has the second highest TB burden in the world, killing one person every four minutes. The USAID BEBAS-TB project works to prevent, detect, and treat TB in four densely populated provinces in Indonesia, serving 143 million people—more than half of the country's population. Treating "common" TB takes about 6 months of daily antibiotics. Treating drug-resistant forms—which are spreading exponentially—requires 18–24 months of intensive treatment with expensive drugs and often involve hospitalization and frequent lab tests. The immediate, unplanned halt on project activities threatens interruption of vital TB services.

12. The immediate, unplanned stoppage of these and other project activities threatens imminent irreparable harm to MSH in another way. Through decades of hard work, MSH has earned trusting relationships with health ministries, hospitals, clinics, and other healthcare actors throughout the world in low and low-middle income countries. It took decades of loyal service to our partners and the people we serve, with constancy and programmatic excellence, to build MSH's goodwill and brand equity, but it was shaken in an instant when we communicated the wholesale, unplanned,

9

J.A. 318

immediate cessation of all project activities. Unless reversed immediately,

the trust and reliance these healthcare actors were willing to place on MSH

will be eroded day after day, until it is completely gone. Even if, at a later

date, MSH were made financially whole, this loss of reputation, of being

viewed as a trustworthy and reliable partner, will be irrevocably harmed -- in

fact, destroyed -- unless we immediately resume our project activities and

meet our financial, legal, programmatic, and moral commitments to our

employees, subcontractors, subawardees, and partners throughout the world.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2025, in Doylestown, Pennsylvania.

*Marian W. Wentworth*
Marian W. Wentworth (Feb 10, 2025 21:43 EST)

Marian W. Wentworth
President and CEO,
MSH

10

J.A. 319

# Declaration of Harm - MSH - Wentworth

Final Audit Report                                    2025-02-11

| | |
|---|---|
| Created: | 2025-02-11 |
| By: | Allison Gardner (Allison.Gardner@arnoldporter.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA6No26VHCYPuGV4Jo7mp1kJhtInbAwddC |

## "Declaration of Harm - MSH - Wentworth" History

Document created by Allison Gardner (Allison.Gardner@arnoldporter.com)
2025-02-11 - 2:39:21 AM GMT- IP address: 163.116.146.118

Document emailed to mwentworth@msh.org for signature
2025-02-11 - 2:39:59 AM GMT

Email viewed by mwentworth@msh.org
2025-02-11 - 2:41:04 AM GMT- IP address: 71.191.77.33

Signer mwentworth@msh.org entered name at signing as Marian W. Wentworth
2025-02-11 - 2:42:58 AM GMT- IP address: 71.191.77.33

Document e-signed by Marian W. Wentworth (mwentworth@msh.org)
Signature Date: 2025-02-11 - 2:43:00 AM GMT - Time Source: server- IP address: 71.191.77.33

Agreement completed.
2025-02-11 - 2:43:00 AM GMT

**Arnold&Porter**  | Powered by
Adobe
Acrobat Sign

## <u>DECLARATION OF JAMES BUTCHER</u>

I, James Butcher, declare as follows:

1.      I am the President and CEO of Chemonics International.  I submit this declaration in support of Plaintiffs' application for a temporary restraining order in this matter.  The statements made in this declaration are based on my personal knowledge and my understanding of information made available to me pursuant to my duties at Chemonics.

2.      Chemonics is a U.S. employee-owned company headquartered at 1275 New Jersey Avenue SE, Washington, DC 20003.  Founded in 1975, Chemonics has worked in more than 100 countries.  As an employee-owned, American company, Chemonics works to safeguard American security, promote economic prosperity, and address global challenges before they reach American shores.  Working on behalf of the U.S. Department of State and the U.S. Agency for International Development ("USAID") and with other partners, we have delivered results across the spectrum of country contexts, from stable societies and high-growth economies to challenging environments embroiled in political or military conflict.

3.      Chemonics works on a range of USAID projects, including:

a.      Promoting collaboration between U.S. agricultural manufacturers, universities, and Ukrainian farmers to drive innovation, efficiency, and resilience in Ukraine's agricultural sector in support of national and global food security;

b.      Working with urban municipalities and communities to counter incentives to join gangs and creating safe public spaces,

1

J.A. 321

addressing the root causes of migration to the U.S. from El
Salvador;

c.    Enabling early identification of food crises that could lead to
conflict, mass migration, and destabilization—issues that
directly affect U.S. national security;

d.    Helping resettle Venezuelan migrants permanently in Colombia
by supporting Colombian visa processes and assisting with job
skills training and placement to prevent migration to the U.S.
southern border;

e.    Delivering health commodities, strengthening national supply
chain systems, and providing global supply chain leadership to
ensure lifesaving health supplies reach those in need, when
they need them;

f.    Working alongside local governments and community groups to
address threats to Iraq's security and stability through
rehabilitation of schools, health facilities, and infrastructure in
districts impacted by the ISIS conflict and returnees to stem
Iranian influence; and

g.    Improving local governance mechanisms in Uzbekistan to spur
economic growth and job creation to reduce the country's
reliance on foreign aid from the United States and counter the
influence of China, its largest trading partner.

4.    Approximately 88% of Chemonics and its subsidiaries' funding comes

2

J.A. 322

from USAID.

5.      As of January 24, 2025, Chemonics was working with USAID on 104 different projects in over 90 countries.  This includes the $12 billion Global Health Supply Chain Program-Procurement and Supply Management (GHSC-PSM) contract, $205 million Ukraine Agriculture Growing Rural Opportunities (AGRO) contract, $200 million Famine Early Warning Systems Network 8 Decision Support contract, $82 million Colombia Venezuela Response and Integration Activity contract, $66 million Iraq Regional Program (IRP) II contract, $43 million El Salvador Communities Working Together contract, and $15 million Uzbekistan Local Governance Activity contract, among numerous other contracts and cooperative agreements.

6.      Chemonics received stop-work orders from USAID for 98 of 104 of Chemonics' projects.  The orders directed Chemonics to cease all award implementation immediately until further notice from Contracting Officers or Agreement Officers.  Limited waivers for Chemonics' Global Health Supply Chain – Procurement and Supply Management project ("GHSC-PSM") related to HIV/AIDS, Malaria and Maternal Child Health programming were received on February 3, 2025, February 6, 2025 and February 10, 2025, respectively, for an initial period of 30 days.  While Chemonics was excited to receive these waivers, it is both challenging and impractical to abruptly halt global supply chains midstream and then resume operations in a short period without reassurances that Chemonics will not have to cease operations again in 30 days. For GHSC-PSM, Chemonics has successfully accessed USAID funds to pay some suppliers and freight forwarders for

3

work performed prior to the stop-work orders, but to date, USAID has been unable to provide clear guidance as it relates to outstanding vendor and supplier obligations at the global and local levels, including for those programs that have received the partial waivers.  Additionally, GHSC-PSM anticipates being able to offer less favorable pricing terms moving forward, as our vendors, suppliers and subcontractors lose confidence in our ability to meet our contractual obligations. Chemonics has received no other waivers to date.

7.    In response to the stop-work orders, Chemonics has made extraordinary and difficult decisions to conserve and spend its cash on hand, prioritizing securing American lives and U.S. property overseas for as long as possible. As of February 10, 2025, Chemonics and its U.S. subsidiaries have furloughed 750 of its US-based staff, which represents 63% of its US-based workforce. As a result, some furloughed employees will struggle to pay for basic necessities, including housing and food.  Of the non-furloughed U.S. employees, 241 have had their hours reduced by 25%, while the remaining 100 employees have had their hours reduced by 66%, in each case with corresponding pay cuts.  Not a single U.S. employee continues to be paid to work full-time.

8.    In addition, both furloughed and non-furloughed employees have lost access to certain key employee benefits, including paid family leave and HSA contributions, and while Chemonics has committed to paying healthcare benefits to all employees through the end of March, it has been forced to increase the employee contribution by 30% both for its furloughed and non-furloughed staff. If Chemonics' current financial situation continues, it will furlough additional employees at the

4

end of this month and will be unable to extend healthcare benefits to furloughed employees beyond March.

9.    In addition to the direct impact of these furloughs on staff, the employee furloughs have severely eroded Chemonics' talent base, on which its reputation relies, and had a devastating impact on Chemonics' ability to resume operations if and when the stop-work orders are lifted. Moreover, although Chemonics relies overwhelmingly on its USAID business, the staff furloughs have impacted other areas of its business because its subsidiaries and business lines who serve other clients, including non-U.S. governmental clients, rely on many of the employees who have been furloughed. In addition, a number of clients of Chemonics' subsidiaries, including foreign governmental clients, have expressed concerns about the impact of the furloughs and stop-work orders on the subsidiaries' ability to perform their contracts. Finally, as a result of the stop-work orders and staff furloughs, Chemonics has been forced to abandon business strategies and corporate priorities, such as its inorganic growth strategy, including mergers and acquisitions and venture capital investments.

10.    To the extent possible, Chemonics has deferred payments due to its suppliers, vendors, and landlord, in some cases in breach of its contractual obligations, which has already eroded reputations built over time and will negatively impact future financial terms when conducting business. As a result of the stop-work orders, Chemonics has had subcontractors and grantees allege breach of contract, damaging Chemonics' reputation.

11.    Chemonics depends heavily on a line of credit it has established with a

5

syndicate of banks since 2022. On Friday, February 9, 2025, Chemonics indicated to the lead lender its desire to draw on its line of credit in order to fund Chemonics' ongoing operations. For the first time in the history of Chemonics' relationship with the lender, it indicated that it could not approve such a draw down immediately and would need to discuss first with the credit partner and the other lender, expressing that Chemonics' current financial situation, driven by external factors related to USAID's dissolution rather than with the company management's decisions, gives rise to a material adverse effect resulting in the syndicate's right to decline the draw down under their contractual arrangements with Chemonics.

12.     The USAID stop-work orders have threatened Chemonics' ability to implement vital programs that advance national security, food security, economic growth, and humanitarian assistance worldwide. The suspension of work will erase years of progress, stir anti-American sentiment, threaten national security, and delay critical health resources, potentially leading to hundreds of thousands of deaths from HIV, AIDS, malaria, and reproductive health conditions. In international development work, trust can take decades to earn, but can be destroyed in an instant. The destruction of that trust has already begun as a direct result of the stop-work orders.

13.     Specific impacts of the stop-work orders include:

   a. In Ukraine, Chemonics procured nearly $2 million in irrigation systems from leading U.S. manufacturers, with $1.3 million due to have payment made on arrival. This equipment has already departed the U.S. and is expected to arrive at customs in February.

6

J.A. 326

Failure to pay will reduce U.S. manufacturers' sales and delay the equipment's entry into Ukraine's market.

b. In Iraq, while rehabilitation work is ongoing, Chemonics (and by extension, the U.S. Government) assumes legal custody of facilities. The severe delays caused by a stop-work order have resulted in additional costs, exposed the government to legal risks and liabilities, and raised questions of mismanagement and corruption. This not only erases years of progress, but also risks stirring anti-American sentiment and threatening national security.

c. In Colombia, 11 one-stop-shops for Venezuelan migrants to obtain temporary visas and nine workforce development centers now lack the resources necessary to operate, leaving migrants without access to social integration services. Agreements that Chemonics had negotiated with four banks to provide bank account registration and other financial services for migrants could not be signed, resulting in reputational harm. Similarly, each day the stop-work order remains in place, we lose the engagement of more than 1,500 private sector companies across different sectors that had agreed to promote job hiring and placement of Venezuelan migrants and connect migrant-led businesses to market opportunities. Chemonics fears that, without access to these services, more Venezuelan migrants will turn to illegal smuggling and human trafficking to on-migrate to the U.S. border.

7

d. Under Chemonics' GHSC-PSM project, Chemonics received USAID approval for and has made contractual commitments to suppliers for $240 million worth of health commodities prior to receipt of the applicable stop-work order. These commodities are at various stages of manufacture. Another $150 million in health commodities remain stranded in warehouses around the world and $88.5 million are currently in transit. As commodities wait to be routed, risks include products being delivered without means for pick up, damage, expiry, temperature excursions, and theft. Not delivering these health commodities on time could potentially lead to as many as 566,000 deaths from HIV/AIDS, malaria, and unmet reproductive health needs, including 215,000 pediatric deaths. Further, Chemonics is already receiving increasingly urgent messages from suppliers, many asking for reasonable assurance of our ability to pay costs previously incurred and instructions, while others are already taking an adversarial posture citing rights under the contract to seize orders. In addition, the project is confronting similar challenges in its management of subcontracts for warehousing and distribution of commodities – the project has been effectively choked of its ability to negotiate with these subcontractors to maximize subcontract terms and take any requisite contractual actions to preserve Chemonics' ability to both pause work under the stop-work order and remobilize under partial

8

or complete lifting thereof.

e.  In El Salvador, each day the stop work order is in effect
    undermines progress made by Chemonics enhancing safety,
    economic opportunities, and safer environments. These work
    stoppages disrupt services designed to prevent organized crime and
    reduce migration, and they impede the development and
    implementation of long-term policies and organizational capacity of
    our government counterparts to sustain these gains.

14.    Even the short-term pause in funding to date has caused significant
harms to Chemonics' reputation, which is exacerbated by the fact that Chemonics
has roughly $103.6 million in outstanding invoices issued to USAID for work
performed in 2024, most of which were submitted prior to the stop-work orders.  Of
these invoices, $18.6 million of them are past due with no visibility into when they
may be paid. If the outstanding invoices remain unpaid, 145 U.S. companies in 23
states and D.C., including 106 large businesses (such as NGOs, universities, and
private companies) and 39 U.S. small businesses, as well as roughly 2,500 local
organizations in more than 50 countries, will not be paid for the work Chemonics
contracted them to do and that has already been performed.  This, in turn, leaves
Chemonics vulnerable to lawsuits.

15.    Chemonics operates in countries that are often distrustful of outside
influence and aid, especially from the United States.  It has taken years, and in
some cases decades, to build relationships, goodwill, reputations, and trust with our
partners—all of which is being damaged now.

9

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2025, in <u>Falls Church, Virginia, USA</u>


James Butcher (Feb 10, 2025 23:05 EST)

James Butcher
President and CEO,
Chemonics International,
Inc.

10

J.A. 330

# Declaration of Harms - Chemonics - Butcher

Final Audit Report                                                    2025-02-11

| | |
|---|---|
| Created: | 2025-02-11 |
| By: | Allison Gardner (Allison.Gardner@arnoldporter.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA8YXGpwsIS7b990Woaf_FwnJTR6q8ZJ79 |

## "Declaration of Harms - Chemonics - Butcher" History

Document created by Allison Gardner (Allison.Gardner@arnoldporter.com)
2025-02-11 - 3:01:46 AM GMT- IP address: 163.116.146.118

Document emailed to James Butcher (jbutcher@chemonics.com) for signature
2025-02-11 - 3:02:08 AM GMT

Email viewed by James Butcher (jbutcher@chemonics.com)
2025-02-11 - 4:04:04 AM GMT- IP address: 153.92.40.38

Document e-signed by James Butcher (jbutcher@chemonics.com)
Signature Date: 2025-02-11 - 4:05:21 AM GMT - Time Source: server- IP address: 153.92.40.38

Agreement completed.
2025-02-11 - 4:05:21 AM GMT

Arnold&Porter | Powered by Adobe Acrobat Sign

## DECLARATION OF ZAN NORTHRIP

I, Zan Northrip, declare as follows:

1.          I am the Executive Vice President for Development Consulting at DAI Global, LLC (DAI). I submit this declaration in support of Plaintiffs' application for a temporary restraining order. The statements made in this declaration are based on my personal knowledge and my understanding of information made available to me pursuant to my duties at DAI.

2.          DAI is an employee-owned global development company headquartered at 7600 Wisconsin Avenue in Bethesda, Maryland. DAI was founded in 1970 and has been a trusted partner of the U.S. government, especially USAID, for more than 50 years, delivering successful projects in more than 150 countries. We perform similar development services for critical U.S. allies, such as the United Kingdom and the European Union, as well as private companies – largely U.S. multinationals in the energy sector, who rely on DAI to make their multibillion-dollar investments more economically impactful in the local economies where they work, both in the United States and around the world. We compete fiercely for our work with all of our clients, including USAID.

3.          DAI projects deliver results on difficult challenges in demanding environments:

   a. Providing innovative post-crisis assistance to support political transition in crisis-stricken countries, ensure short-term stability operations, prevent and counter violent extremism, and lay the foundation for long-term development in fragile states;

   b. Improving health security and systems, clean water and sanitation, and private sector engagement that improves health outcomes;

   c. Fostering trade and investment with U.S. partner countries around the

1

world, providing innovative pathways to broad-based economic growth
that increases sustainability in emerging economies, expands U.S.
markets, and de-risks U.S. investments;

d.     Working with governments, communities, and the private sector to
develop programs and strategies to improve resilience to climate impacts,
thereby decreasing migration and enhancing stability;

e.     Collaborating with educators, policy makers, communities, and
stakeholders to strengthen the provision of high-quality education for
children and youth;

f.     Assisting farmers and their supply chains to enhance agricultural
productivity, thereby enhancing food security, economic growth, and self-
sufficiency, and

g.     Improving the financial independence of U.S. allies by increasing their
revenue raising and public financial management capabilities.

4.     Nearly 80% of DAI's revenue (more than $750 million in 2024) comes from
USAID, including the Millenium Challenge Corporation and its affiliated Millenium Challenge
Accounts in Compact Countries.

5.     DAI is currently working with USAID and Millennium Challenge Accounts on
99 different projects in 45 countries. This includes all of the projects in Attachment A, which
sum to $4.2 billion in total ceiling value and are typically executed over a period of 5 years. All
but one of these projects is currently under a stop-work order (SWO), and we have been told to
expect a SWO on the last project (for the Millenium Challenge Account in Timor Leste) in a
matter of days.

2

J.A. 333

6.     On the evening of January 24, 2025 (Eastern Time), DAI received an initial handful of SWOs from USAID. DAI continued to receive SWOs over a period of several days. The SWOs indicated that the projects were being placed on hold pending a 90-day review, after which the projects would either resume as originally contracted, be modified, or be terminated. Information we have received from knowledgeable USAID staff indicates that many of these contracts will be terminated in the coming days, despite the criteria for the "review process," promised within 30 days of the Executive Order, never having been defined. In addition, USAID has failed to make payment on over $120 million in invoices for work DAI completed between November 1, 2024 and January 24, 2025, some of which are now past due.  Prior to the Executive Order, USAID paid most of DAI's invoices within 10-15 days.  Since the Executive Order, DAI has received no payments from USAID whatsoever.  USAID staff have stated that USAID's payment system is "down" and that it is unknown when payments will resume. In our current banking relationship, our lender is not extending credit for the full value of DAI's U.S. Government invoices.

7.     In response to the SWOs, on each project, DAI is: ceasing current activities; undertaking no further programmatic commitments; in many cases, severely reducing existing long-term project staff via furloughs; and flowing down the SWO to all existing subcontractors and grantees, telling them to suspend work as of the date of the SWO.  In the absence of payments from USAID, DAI is also forced to slow or stop payments to these partners, seriously jeopardizing these necessary relationships for the work we were contracted to do; many of these relationships will be difficult, if not impossible to repair.

8.     In the last 10 days, DAI has furloughed 383 U.S.-based staff, retracted numerous signed offers of employment, reduced salaries for non-furloughed senior staff members by 20%,

3

deferred payments to hundreds of vendors, summarily terminated numerous subcontracts and grants, and violated the terms of hundreds of leases and other contractual arrangements. As a professional services firm, our value-added comes from our people, and we are also acutely aware of the financial pain that these actions have inflicted on thousands of individual staff members and partners around the world. In numerous cases DAI staff members are no longer able to meet their own critical financial obligations for housing, education, and medical care. Pushed to the brink, some have already begun to leave DAI's permanent employ, imposing costly future requirements for recruitment and training – both on DAI's projects and in our headquarters locations.

9.      Further exacerbating the status quo, because DAI is entirely employee owned, much of it through a U.S. Employee Stock Ownership Plan (ESOP), the retirement savings of more than 600 American employees have been placed in jeopardy by USAID's implementation of the President's Executive Order.

10.     SWOs (and suspensions under cooperative agreements) have eliminated DAI's ability to fund any of its partners or grantees in their work to pursue clear and compelling U.S. government interests. Freezing the assistance provided through DAI's portfolio is already having far-ranging, often life-threatening effects, including a freeze on funding for shelter for minors seeking protection from recruitment into criminal gangs in Central America, decreased cybersecurity for the government of Ukraine, the abandonment of civil society organizations contending with brutal authoritarian violence in Burma, and the abdication of efforts to track and contain zoonotic diseases in Bangladesh.

a.      For example, on the Africa Trade and Investment (ATI) project, DAI has furloughed 18 U.S.-based staff members and halted funding to dozens of

4

subcontractors who have previously successfully facilitated $3.2 billion in new investment and trade deals, mostly with American counterparts under the ATI mechanism. ATI's return on investment (ROI) is among the strongest in U.S. foreign assistance programs. To date, ATI has achieved $43 in trade exports for every $1 of U.S. government funding. Large-scale transactions have delivered an exceptional ROI of $637:$1, and trade finance efforts filled critical funding gaps at $278:$1. ATI's current pipeline of deals, which would similarly benefit both African and U.S. companies, is now at risk of failing to close – or being diverted to investors from U.S. adversaries and competitors – with serious implications for both DAI's and the U.S. Government's credibility.

b.  In Ukraine, DAI manages six projects on behalf of the U.S. Government valued at over $650 million and employing over 425 American, other expatriate, and Ukrainian staff. More than half of the U.S. support team for these critical programs have been furloughed during the period of the SWOs. Besides the financial pain suffered by those furloughed staff members, the SWOs and furloughs have severely impacted our ability to support this large portfolio, and left our Ukrainian partners in serious doubt about DAI's reliability.

c.  In Colombia, DAI manages five projects (four contracts and one cooperative agreement) on behalf of the U.S. Government valued at $180 million and employing over 180 American, other expatriate, and Colombian staff. The sudden and abrupt closure of USAID offices, coupled with continued non-

5

J.A. 336

payment, creates an unacceptable level of risk for DAI staff and U.S. Government-purchased and/or leased equipment in project offices. DAI finds itself in an increasingly charged diplomatic environment with significant security risk for DAI staff and resources.

d. DAI has ongoing partnerships with over 240 multinationals, businesses, and small businesses on USAID-funded projects, including the following US multinationals on five or more projects each: Amazon/Amazon Web Services; Cargill; Chevron; Cisco; Coca Cola; ExxonMobil; General Electric; Google; and Microsoft. Many of these partners were brought in on the basis of DAI's assurances that their collaboration on USAID projects would accrue to their benefit and help accomplish their goals. The abrupt and disorderly work stoppage on projects puts current resources and future collaboration from these partners at risk. It also creates direct reputational harm for DAI, which has a portfolio of work with some of these same corporate clients, completely separate from our work on behalf of the U.S. Government.

11.     At the time of the Executive Order, DAI was finalizing negotiations for a larger and more advantageous global working capital facility. Those negotiations are now on hold and may be canceled altogether if our USAID project portfolio does not quickly resume operating. The chaos and uncertainty unleashed by the government's implementation of the Executive Order has thus diminished the essential credibility of U.S. government receivables.

12.     In addition to permanently damaging our reputation as a reliable partner in the United States and in countries around the world, the U.S. government's actions have placed our staff and the legal representatives of our foreign entities at heightened risk. With every day that

goes by, DAI staff placed in service in unstable environments at the behest of the U.S.

government are at higher risk of physical harm, as they confront angry vendors, equipment

providers, and landlords – all of whom have previously operated in good faith partnership with

DAI and the U.S. government.  Our staff are not merely in an "awkward" position; they are at

risk.  Some have been made aware that legal actions are being prepared against them in their

countries of assignment, and they are acutely aware that they, their dependents, and their

belongings could be stranded overseas if USAID continues to repudiate its payment obligations.

DAI currently has more than 240 expatriates and their dependents placed on long-term

assignments in its U.S. government portfolio, including numerous children in the midst of their

school years.  Because none of our expatriates expected an unnecessary, sudden, and forced

return to their homes of record, many have no alternative living arrangements to return to and

may also endure an abrupt discontinuity in required medical treatment.

     13.     Taken together, the financial, business relationship, and reputational impacts on

DAI that have arisen directly from the Executive Order and its implementation by the

Department of State, the MCC, and USAID, pose a critical threat to DAI's ability to continue

operating.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2025, in Bethesda, Maryland

*Zan Northrip*

Zan Northrip (Feb 10, 2025 21:20 EST)

Zan Northrip
Executive Vice President
DAI Global, LLC

7

# Attachment A

**Attachment A**

| | A | B | C | H |
|---|---|---|---|---|
| 1 | **Project Name** | **Country** | **Contract Type** | **Ceiling Price** |
| 2 | Kosovo CIR | Kosovo | CPFF Completion | $12,232,248.00 |
| 3 | Ukraine RevGRO | Ukraine | CPFF Completion | $31,561,135.00 |
| 4 | El Salvador IPP | EL SALVADOR | CPFF Completion | $15,992,643.00 |
| 5 | U.S. AWRAS | UNITED STATES | Cooperative Agreement | $30,000,000.00 |
| 6 | Kenya KPEEAP | KENYA | CPFF Completion | $7,499,678.00 |
| 7 | Afghanistan WAMA | AFGHANISTAN | CPFF Completion | $59,910,649.00 |
| 8 | Georgia PSDP | GEORGIA | CPFF Completion | $21,274,600.00 |
| 9 | AF Continued Assistance MOU | AFGHANISTAN | Cost Plus Fixed Fee | $928,876.00 |
| 10 | Kenya KIPS | KENYA | Cost Plus Award Fee | $24,500,000.00 |
| 11 | West Bank & Gaza ALG | PALESTINIAN TERRITORY,OCCUPIED | CPFF Term | $48,445,638.00 |
| 12 | Ghana FASA | Ghana | CPFF Completion | $14,999,847.10 |
| 13 | N Macedonia ACCELERATE | UNITED STATES | CPFF Completion | $43,659,611.00 |
| 14 | USAID (Thailand) PAGI | THAILAND | CPFF Completion | $15,948,955.00 |
| 15 | El Salvador Water Services Project | EL SALVADOR | CPFF Completion | $11,284,730.00 |
| 16 | Bangladesh SSOH Activities | BANGLADESH | Cooperative Agreement | $28,600,000.00 |
| 17 | USAID Madagascar HARENA Activity | MADAGASCAR | Cooperative Agreement | $46,000,000.00 |
| 18 | Jordan Himaya Activity | JORDAN | CPFF Completion | $34,365,613.00 |
| 19 | ASEAN UPP | INDONESIA | Time & Material | $37,518,234.00 |
| 20 | USAID Haiti Eau | HAITI | CPFF Completion | $32,951,780.00 |
| 21 | Colombia SET | COLOMBIA | CPFF Completion | $58,338,140.00 |
| 22 | Ukraine Pro-Integrity | UKRAINE | CPFF Completion | $58,429,745.50 |
| 23 | GAP SNA | UNITED STATES | CPFF Term | $4,799,570.00 |
| 24 | USAID Fragile Waters | UNITED STATES | CPFF Completion | $24,999,341.00 |
| 25 | UG WFSA | UGANDA | CPFF Completion | $63,186,442.00 |
| 26 | USAID Indonesia SELARAS | INDONESIA | CPFF Completion | $22,121,434.20 |
| 27 | Bosnia and Herzegovina -FRA | BOSNIA AND HERZEGOVINA | Cost Plus Fixed Fee | $11,557,562.00 |
| 28 | West Africa SRPS | GHANA | CPFF Completion | $49,244,792.20 |
| 29 | Somalia PCG | SOMALIA | Cooperative Agreement | $24,997,824.00 |
| 30 | DRC GGA | CONGO, DEMOCRATIC | CPFF Completion | $38,493,974.00 |
| 31 | Liberia LEAD | LIBERIA | CPFF Completion | $17,999,647.00 |
| 32 | El Salvador SEP | EL SALVADOR | Cooperative Agreement | $28,370,446.00 |
| 33 | USAID STAWI | KENYA | CPFF Completion | $39,930,233.00 |
| 34 | USAID (Georgia) National Governance Program | GEORGIA | CPFF Completion | $22,403,867.00 |
| 35 | Forsah TVET | PALESTINIAN TERRITORY,OCCUPIED | Cooperative Agreement | $5,626,257.00 |
| 36 | USAID Mobilizing Investment | SOUTH AFRICA | CPFF Term | $33,812,067.00 |
| 37 | HAITI PPR-Nord | HAITI | CPFF Completion | $22,968,216.00 |
| 38 | USAID DNA | COLOMBIA | CPFF Completion | $39,389,806.00 |
| 39 | USAID Biodiversity | NEPAL | CPFF Completion | $19,439,986.00 |

| | A | B | C | H |
|---|---|---|---|---|
| 1 | **Project Name** | **Country** | **Contract Type** | **Ceiling Price** |
| 40 | Colombia EF | COLOMBIA | CPFF Completion | $28,247,575.00 |
| 41 | MZ LOGOS TO-02 | MOZAMBIQUE | CPFF Completion | $18,898,248.00 |
| 42 | CVECA | KAZAKHSTAN | Cooperative Agreement | $14,996,400.00 |
| 43 | Honduras BCR | HONDURAS | CPFF Completion | $48,277,629.00 |
| 44 | Jordan MSP | JORDAN | CPFF Completion | $42,835,208.00 |
| 45 | YRCVC | SAINT LUCIA | CPFF Completion | $29,602,775.80 |
| 46 | MW Governance for Solutions | MALAWI | Cooperative Agreement | $25,824,929.00 |
| 47 | FtF PREMIER | MOZAMBIQUE | Cost Plus Fixed Fee | $2,109,283.00 |
| 48 | USAID Investment for Business Resilience Activity | UKRAINE | CPFF Term | $93,300,000.00 |
| 49 | Advancing Capacity for the Environment (ACE) | UNITED STATES | CPFF Completion | $42,215,853.00 |
| 50 | Western Kenya Water Project | KENYA | Cooperative Agreement | $24,000,000.00 |
| 51 | Honduras Justicia Efectiva | HONDURAS | CPFF Completion | $43,453,979.00 |
| 52 | IUWASH Tangguh | INDONESIA | CPFF Completion | $44,131,108.00 |
| 53 | Kosovo KMI (Kosovo Municipal Integrity Activity) | KOSOVO | Cost Plus Award Fee | $13,499,833.00 |
| 54 | Addressing Labor Exploitation in Fishing in ASEAN | INDONESIA | Cooperative Agreement | $2,500,000.00 |
| 55 | Business Egypt | EGYPT | Cooperative Agreement | $34,860,664.00 |
| 56 | Liberia Civil Society Activity (CSA) | LIBERIA | CPFF Completion | $14,797,517.00 |
| 57 | YEMP | HONDURAS | CPFF Completion | $34,943,664.00 |
| 58 | HRASA | HAITI | CPFF Completion | $26,922,733.00 |
| 59 | Prosper Africa Trade and Invesment Activity | UNITED STATES | CPFF Term | $520,757,945.00 |
| 60 | South Sudan RASS | SOUTH SUDAN | CPFF Completion | $29,527,500.00 |
| 61 | Palestine SMART | PALESTINIAN TERRITORY,OCCUPIED | Cooperative Agreement | $40,000,000.00 |
| 62 | USAID CIDR | GEORGIA | Cooperative Agreement | $29,997,925.00 |
| 63 | Trade Central Asia | KAZAKHSTAN | CPFF Completion | $34,170,704.00 |
| 64 | Nepal KAWAS | NEPAL | CPFF Completion | $24,790,940.00 |
| 65 | Lebanon WSC | LEBANON | CPFF Completion | $73,525,676.00 |
| 66 | RGN-Jagoranci | NIGER | Cost Plus Fixed Fee | $1,034,107.00 |
| 67 | Pakistan LRMA | PAKISTAN | CPFF Completion | $17,219,987.00 |
| 68 | Ukraine HOVERLA | UKRAINE | CPFF Completion | $150,000,000.00 |
| 69 | USAID MZ SPEED | MOZAMBIQUE | CPFF Term | $39,900,000.00 |
| 70 | Jordan PFMA | JORDAN | CPFF Completion | $47,154,843.00 |
| 71 | Zambia Local Impact Governance | ZAMBIA | CPFF Completion | $27,605,321.00 |

| | A | B | C | H |
|---|---|---|---|---|
| 1 | **Project Name** | **Country** | **Contract Type** | **Ceiling Price** |
| 72 | Strengthening Livelihood and Resilience Activity in DRC | CONGO, DEMOCRATIC REPUBLIC OF THE | CPFF Completion | $18,098,386.00 |
| 73 | USAID Responsive Governance Activity | COLOMBIA | CPFF Completion | $34,662,058.00 |
| 74 | Senegal FtF Policy Systems Services | SENEGAL | Cooperative Agreement | $15,700,000.00 |
| 75 | Tajikistan ALG Activity | TAJIKISTAN | CPFF Completion | $32,656,053.00 |
| 76 | Egypt Economic Governance Activity | EGYPT | CPFF Completion | $38,648,518.00 |
| 77 | Nigeria State2State | NIGERIA | CPFF Completion | $52,000,000.00 |
| 78 | INRM | UNITED STATES | CPFF Completion | $34,976,131.00 |
| 79 | Partners for Transparency | COLOMBIA | Cooperative Agreement | $19,899,819.00 |
| 80 | Mexico Programa para el Fortalecimiento de Instituciones de Justicia Penal Estatal | MEXICO | CPFF Completion | $29,050,089.00 |
| 81 | Lebanon Trade and Investment Facilitation (TIF) | LEBANON | CPFF Completion | $70,212,510.00 |
| 82 | Burma RITA | MYANMAR | Cost Plus Award Fee | $18,730,499.00 |
| 83 | MSP | UNITED STATES | CPFF Completion | $79,985,807.00 |
| 84 | Vietnam Sustainable Forestry Management Activity | VIETNAM | CPFF Completion | $36,274,769.00 |
| 85 | Cybersecurity for Critical Infrastructure in Ukraine | UKRAINE | CPFF Completion | $128,000,000.00 |
| 86 | PFM Maldives Activity | MALDIVES | CPFF Completion | $13,653,345.00 |
| 87 | Afghanistan ACEBA | AFGHANISTAN | CPFF Completion | $105,722,822.00 |
| 88 | Philippines Safe Water Activity | PHILIPPINES | CPFF Completion | $18,440,127.00 |
| 89 | Fiscal and Accounting System of Tunisia (FAST) | TUNISIA | CPFF Completion | $18,906,410.00 |
| 90 | FtF Uganda IAM | UGANDA | CPFF Completion | $35,813,336.00 |
| 91 | FtF Policy LINK | KENYA | Cooperative Agreement | $77,500,000.00 |
| 92 | Libya Local Governance and Civil Society (LGCS) | LIBYA | Cooperative Agreement | $56,470,286.00 |
| 93 | Scaling Up Nutrition Technical Assistance (SUNTA) | ZAMBIA | CPFF Completion | $66,602,774.50 |
| 94 | USAID Economic Resilience Activity (ERA) | UKRAINE | Cost Plus Award Fee | $325,000,000.00 |
| 95 | Afghanistan Value Chains Program | AFGHANISTAN | CPFF Completion | $75,672,170.00 |
| 96 | Honduras LG Activity | HONDURAS | CPFF Completion | $65,582,412.00 |
| 97 | Honduras JHRSS | HONDURAS | CPFF Completion | $54,170,761.00 |

# Declaration of Harm - DAI - Zan Northrip

Final Audit Report                                          2025-02-11

| | |
|---|---|
| Created: | 2025-02-11 |
| By: | Allison Gardner (Allison.Gardner@arnoldporter.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAARCUoPqpceCUPnkaA0roo42wK4mkjhelY |

## "Declaration of Harm - DAI - Zan Northrip" History

📄 Document created by Allison Gardner (Allison.Gardner@arnoldporter.com)
2025-02-11 - 1:57:44 AM GMT- IP address: 163.116.146.118

✉ Document emailed to zan_northrip@dai.com for signature
2025-02-11 - 1:58:06 AM GMT

📄 Email viewed by zan_northrip@dai.com
2025-02-11 - 2:01:28 AM GMT- IP address: 100.15.200.238

✍ Signer zan_northrip@dai.com entered name at signing as Zan Northrip
2025-02-11 - 2:20:11 AM GMT- IP address: 100.15.200.238

✍ Document e-signed by Zan Northrip (zan_northrip@dai.com)
Signature Date: 2025-02-11 - 2:20:13 AM GMT - Time Source: server- IP address: 100.15.200.238

✅ Agreement completed.
2025-02-11 - 2:20:13 AM GMT

# DECLARATION OF ERIC C. BJORNLUND

I, Eric C. Bjornlund, declare as follows:

1.      I am President and CEO of Democracy International, Inc. ("Democracy International" or "DI"). I submit this declaration in support of Plaintiffs' application for a temporary restraining order. The statements made in this declaration are based on my personal knowledge and my understanding of information made available to me pursuant to my duties at DI.

2.      Democracy International is a U.S.-based small business headquartered in Bethesda, Maryland. DI is an international development consulting firm that supports active citizens, responsive governments, and engaged civil society and political organizations to achieve a more peaceful, democratic world. The company provides technical assistance, analytical services, and project implementation for democracy, human rights, governance, peace and resilience, youth empowerment, and other international development programs worldwide. By developing and using new knowledge, tools, and approaches, DI works to change people's lives and improve the effectiveness and efficiency of development assistance.

3.      Democracy International was founded in 2003 to conduct democracy and governance analytical services for the U.S. Agency for International Development ("USAID"). In the 22 years since its founding, DI has conducted more than 200 projects for USAID in more than 80 countries, including some of the world's most challenging environments. It has also conducted projects for the U.S. Department of State and other international development funders.

4.      Democracy International supports political systems around the world to be responsive, inclusive, and competitive. It supports accountable government systems and

1

J.A. 344

institutions that are responsive, effective, and transparent. It promotes peaceful, democratic transitions and political settlements to resolve conflict so that societies are at peace and can repair their own divisions. It works to protect human rights where they are under imminent threat. And it uses innovation and learning to improve international development outcomes, especially for democracy and governance, human rights, rule of law, conflict, and transition programs.

5.      In particular, the Company works in the subfield of international development known as Democracy, Human Rights and Governance (DRG). In DRG, working for USAID Missions and Bureaus, DI offers expertise and practical, field-based experience in elections and political transitions, political parties, civil society building, civic advocacy, political empowerment for women and marginalized groups, rule of law, decentralization and local government, legislative strengthening, anticorruption, and human rights. In Bangladesh, for example, where the country is in the midst of a fragile transition after a popular uprising ousted the country's authoritarian government in August, we are building political party capacity and strengthening relationships between parties and constituents while reducing political violence. In Bosnia and Herzegovina, Guinea, Liberia, and Libya, we are working with election commissions and civil society to strengthen electoral integrity and promote accountable governance. In Malawi, we are advising the parliament on how to engage more effectively with the executive branch, civil society, the media, and their constituents. In Kosovo, we are using insights from social and behavioral science to strengthen the partnership between local governments and the constituents they serve.

6.      In the Peace and Resilience field, DI works on conflict management and mitigation, countering violent extremism, and youth empowerment as well as on transition initiatives in conflict-affected or fragile countries, including for the USAID Office of Transition

2

Initiatives (OTI) and USAID Missions. In Armenia, for example, we are supporting marginalized populations by improving applicable laws, services, and government-civil society cooperation, including providing emergency assistance to refugees forced in 2024 from Nagorno Karabakh. In Jamaica, we are working to prevent at-risk youth from becoming involved in violence. Our global Justice, Rights, and Security—Rapid Response program provides emergency, life-saving assistance to human rights defenders in imminent personal danger.

7. Approximately 96 percent of Democracy International's approximately $41.7 million in revenues in 2024 came from prime cooperative agreements and contracts from USAID and an additional approximately 2 percent came indirectly from USAID through subawards and subcontracts, for a total of approximately 98 percent directly or indirectly from USAID.

8. As of December 31, 2024, DI held prime contracts and cooperative agreements with USAID with a remaining combined obligated amount of $35,859,919; a total combined obligated amount of $107,166,273; and a total ceiling amount of $244,679,239.

9. Between January 24 and 27, 2025, DI received stop work orders for all of its USAID contracts and suspension notices for all of its USAID cooperative agreements. DI immediately complied and sought to minimize subsequent costs. Notwithstanding established rules for agreeing on continuity costs for projects under stop work orders, however, in every case USAID has not responded to DI proposals about how to proceed and which costs will be allowable while stop work orders are pending and until decisions are made whether projects will resume or be terminated.

10. As of the current date, DI has not received payment for a total of $3,376,832 for work completed within the scope of duly authorized USAID programs completed before the issuance of stop work orders and suspension notices began on January 24, 2024. More

specifically, to date, DI has not received payment for contract invoices for work completed before January 24, 2024, within the scope of duly authorized programs within obligated amounts totaling $1,290,266. To reimburse expenses under cooperative agreements, DI draws on a letter of credit with HHS Payment Management System; since January 24, the HHS Payment Management System has been inoperable, has indicated that payment draws are "under review," "rejected," or have otherwise not been paid. To date, DI has not received payment in reimbursement of a total of $2,086,567 of expenses incurred before January 24, 2025, for work within the scope of duly authorized programs under cooperative agreements within obligated amounts.

11.    Because of stop work orders and suspension notices and because DI's invoices and draws for work completed before January 24, 2025, have not been paid, DI had to cease all operations as of January 31, 2025. We have furloughed 100 percent of our 95 U.S.-based home office employees and placed 163 of 176 employees (92.6 percent) working on USAID projects in overseas offices on "administrative leave" pending resolution of stop work/suspension orders; we are not currently able to pay those on administrative leave and will not be able to pay them unless and until USAID pays past invoices and draws and agrees to pay continuity costs. We have cancelled all benefits, including health insurance, for employees and have terminated all consultants. The company has not been able to pay virtually all of its obligations to contractors, vendors (including our mission-critical IT vendor), landlords under existing leases, program partners, grantees, outside advisors (including lawyers, accountants, financial advisors, and human resource experts), insurance contracts, pension plan administrator, and others. We have been unable to pay termination costs for home office or overseas employees, such as accrued vacation time or, in other countries, legally mandated severance benefits. We have shut down and attempted to secure all but one of our overseas offices (which has non-USAID funding) and

4

J.A. 347

downsized our computer systems and licenses.

12.    The orders to cease work have had profoundly negative effects on essentially all DI's overseas programs. Following are some examples.

    a.  DI's Justice, Rights, and Security program provides lifesaving humanitarian assistance, which includes essential medicines, medical services, food, shelter, and subsistence assistance. In Bangladesh, the sudden cessation of activities has left hundreds of adolescents and young students who were seriously injured and traumatized in the violent crackdowns on protesters last July-August without necessary medical services. In Burkina Faso, human rights defenders who are working to track violence by the military junta and terrorist groups that have targeted Christian communities are at risk of being killed because the program can no longer help them relocate to safer locations and provide them with food, shelter, and subsistence support. Likewise, we are no longer providing shelter, medical care, and food in Guatemala to former political prisoners from Nicaragua and their families, including children and victims of torture; to human rights defenders who are victims of state-sanctioned violence in the wake of contested national elections in Mozambique; to critics of extreme government repression in the Philippines; and to individuals defending human rights and democracy who are facing serious threats in Tanzania.

    b.  As a result of this Stop Work Order, more than 500 vulnerable Jamaican youth who have been involved in or are at risk of joining violent gangs have been abruptly cut off from counseling services, apprenticeship opportunities, and vocational skills building trainings. The cessation of these activities will not only have immediate negative effects on the youth we were reaching, it will also severely damage trust that

5

has taken DI's staff and volunteers years to build with these young people, families, and communities.

c.  As a result of the suspension, DI can no longer engage key government agencies in Bangladesh at a critical point in its political and governance transformation. As a result, USAID and the U.S. Government will no longer be able to provide direct inputs and recommendations to Bangladesh leaders on effective strategies for government reform.

d.  As a result of the suspension, local lawyers in Kyrgyzstan are no longer able to help civil society organizations navigate responses to the foreign agents law, widely considered part of Russia's "Authoritarian Playbook" to suppress free speech and democracy in post-Soviet Central Asia.

e.  As a result of the suspension, DI will no longer be providing technical assistance to the Armenian government and civil society organizations in mobilizing external funding to address service gaps for displaced populations. This reduction in funding may contribute to increased instability in the Caucasus region, leading to issues such as increased poverty and irregular migration.

f.  As a result of the suspension, pro-American Libyan officials and civil society leaders suddenly do not have access to the support they expected provided by the U.S. Government through DI, which undermines U.S. national security in the region and which is especially dangerous as Russia is in the process of moving military resources from Syria to Libya.

13.    The damage from suddenly stopping work on programs is profound and incalculable. Stopping the programs has done immense damage to people and organizations who had relied on our assistance. As the examples above show, this includes leaving human rights

6

defenders vulnerable to threats to their physical safety; stopping emergency assistance to refugees and victims of state-sponsored violence; interrupting programs working to prevent at-risk youth from joining gangs and protecting communities from violence; and leaving beneficiaries vulnerable to being recruited into terrorist organizations. It has undermined the credibility and thus the effectiveness of civil society and human rights and democracy advocates and undermined years-long efforts to build trust with local governments, parliaments, and other government institutions that is essential for success. Our sudden withdrawal from these efforts, along with that of others involved in complementary programs, has ceded enormous political influence to Russia and China. Moreover, assets funded by USAID—including vehicles, generators, and other equipment—are now abandoned and unmaintained, depreciating rapidly and unnecessarily, resulting in potential inability to use them or recover losses in the future.

14.    Suddenly freezing programs has destroyed hard-earned trust and relationships with employees, partners, subgrantees, government agencies, and other stakeholders and led to a loss of trust for those organizations with their constituencies. Some of our vendors, partners, and grantees will quickly go out of business. Our employees have lost their health insurance as well as all of their other benefits. The freeze has undermined the credibility of our staff and partners in their communities and with their stakeholders. It has already caused them serious legal and financial problems and the loss of credibility has threatened their ability to make a living; it has even put some in danger of arrest or reprisals due to their inextricable association with these USAID programs that are suddenly not keeping promises or meeting their obligations.

15.    The sudden freeze on programs and failure to pay invoices have put the company, its owners, and some of its employees in potentially serious legal jeopardy in the U.S. and in all the countries in which we work because of our inability to pay legitimate invoices to us for work performed before January 24 and stopping programs and other benefits. If left unpaid, we will

7

J.A. 350

soon be in default on our contracts and have legal problems with landlords and vendors. Our shareholders, because we are Subchapter S corporation, will have to pay taxes on the company's 2024 income for income they never received without being reimbursed by the company. The freeze has left us vulnerable to claims of local labor law violations for failure to pay legally mandated termination and other benefits. We are unable to pay taxes due, including employee withholding taxes, and accordingly will incur serious penalties. Because of these problems, the security of our overseas program leads (chiefs of party) and some senior staff in the countries in which we work could be threatened. Even if the stop work orders are lifted or the company could receive future funding from non-U.S. government clients, the company's ability to be legally registered and to operate in countries in the future is threatened. Relationships cannot be repaired even if past invoices are paid or programs are later resumed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2025, in  Bethesda, Maryland
_____

Eric C. Bjornlund
President and CEO
Democracy International, Inc.

8

J.A. 351

# Declaration of Harm - Democracy Intl - Bjornlund

Final Audit Report                                            2025-02-11

| | |
|---|---|
| Created: | 2025-02-11 |
| By: | Allison Gardner (Allison.Gardner@arnoldporter.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA57_Zfkz21aZIMyruSIE8QP_nA6pzLH63 |

## "Declaration of Harm - Democracy Intl - Bjornlund" History

📄 Document created by Allison Gardner (Allison.Gardner@arnoldporter.com)
2025-02-11 - 1:49:50 AM GMT- IP address: 163.116.146.118

✉ Document emailed to Eric Bjornlund (eric@democracyinternational.com) for signature
2025-02-11 - 1:51:10 AM GMT

📄 Email viewed by Eric Bjornlund (eric@democracyinternational.com)
2025-02-11 - 1:54:15 AM GMT- IP address: 208.58.92.6

✍ Document e-signed by Eric Bjornlund (eric@democracyinternational.com)
Signature Date: 2025-02-11 - 1:55:41 AM GMT - Time Source: server- IP address: 208.58.92.6

✅ Agreement completed.
2025-02-11 - 1:55:41 AM GMT

## DECLARATION OF SCOTT CARLSON

I, Scott Carlson, declare as follows:

1.      I am the Associate Executive Director in charge of the Center for Global

Programs at the American Bar Association (ABA).  I submit this declaration in support of

Plaintiffs' application for a temporary restraining order.  The statements made in this declaration

are based on my personal knowledge and my understanding of information made available to me

pursuant to my duties at the ABA.

2.      The ABA is a non-partisan organization, founded in 1878 with a mission to

defend liberty and pursue justice in the United States. Its Fund for Justice and Education (ABA

FJE), the 501(c)(3) charitable fund of the Association, features many pro bono, public service,

and education programs that improve access to justice in the United States and globally.

3.      The ABA Center for Global Programs (CGP) is an ABA FJE-entity whose

mission serves the ABA's Goal IV: Advance the Rule of Law. For 35 years, and in more than

100 countries, ABA CGP has, at the behest of, and in partnership with, the U.S. Agency for

International Development (USAID), U.S. Department of State, and other U.S. government

agencies, implemented international rule of law and human rights programming that supports

U.S. national interests. ABA believes that a strong rule of law and participatory democracies

around the world result in a safer, more prosperous, and stable planet. Moreover, functioning

and fair justice systems create more favorable environments for U.S. business interests and

enhance the viability of global markets.

4.      ABA CGP employs over 400 staff members in Washington, D.C., and across

twenty-seven (27) field offices, supporting the effective implementation of more than eighty

programs, in every region of the world, through its Rule of Law Initiative (ROLI) and Center for

1

J.A. 353

Human Rights (CHR). These ABA programs involve a network of legal contracts with more than 160 sub-recipients, contractors, and other vendors worldwide.

5.      ABA CGP's programs support U.S. allies to strengthen the rule of law and defend human rights, which often focuses on judicial and law enforcement reform, strengthening commercial law, arbitration, promoting fundamental freedoms, prosecuting trans-national crime, and combatting corruption in foreign governments. Specifically, the ABA strengthens legal institutions, supports legal professionals, and advances public understanding and appreciation for the law and citizen rights, and in the process, our global programs help reduce and prevent illicit activities—such as money laundering and drug and human trafficking—from reaching our shores in support of American interests. ABA's renowned legal experts (often *pro bono*) help countries develop strong commercial law and arbitration systems to protect American businesses. The ABA supports legal professionals to protect brave men and women that speak out against abuse and corruption, even in zones of conflict, using creative methods, such as early warning systems to prevent violence and terrorism in local communities before it escalates beyond borders. In sum, the ABA works closely with governments, businesses, and civil society around the world to protect fundamental freedoms, support rule of law, and promote U.S. interests.

***Current USAID Programs and Impact of the Freeze***

6.      In total, approximately 38% of ABA's FY 2025 international awards funding is derived from USAID, after a competitive procurement process.

7.      Currently, ABA implements nineteen (19) programs funded by Defendant USAID either directly or via subaward. These programs collectively commit USAID to

2

J.A. 354

$109,197,310 in funding over the next five (5) years.  Of the $51,790,772 obligated amount to

ABA from USAID and/or ABA's prime implementing partners, $24,869,777 is currently frozen.

The chart below breaks down the total number of active awards and obligations:

| Country/Project | Obligated Amount | Frozen Funds from the Current Obligations |
|---|---|---|
| BURKINA FASO HUMAN RIGHTS AND ACCESS TO JUSTICE PROGRAM | $5,796,489 | $302,157 |
| GAMBIA PROMOTING RIGHTS AND JUSTICE | $2,976,242 | $135,292 |
| CAR STRENGTHENING HUMAN RIGHTS ACTIVITY IN THE CENTRAL AFRICA REPUBLIC | $900,000 | $283,952 |
| DRC ACTION TO REDUCE AND RESPOND TO EXPLOITATION AND TRAFFICKING | $4,900,000 | $3,626,826 |
| STRONG AND INCLUSIVE MALDIVES DEMOCRACY (SIMD) PROGRAM | $4,411,365 | $720,429 |
| HRSM/RELIGIOUS AND ETHNIC FREEDOM | $210,000 | $66,907 |
| SRI LANKA ASIA REF | $600,000 | $153,034 |
| HRSM/RELIGIOUS AND ETHNIC FREEDOM SOUTHEAST ASIA LEGAL SUPPORT TO INDIGENOUS COMMUNITIES (SEALS) | $350,000 | $56,333 |
| BURMA INCLUSIVE DEMOCRATIC PROCESSES AND GOVERNANCE ASSISTANCE PROGRAM | $750,000 | $261,302 |
| ARMENIA USAID/CHECCHI INTEGRITY PROJECT | $819,296 | $47,004 |
| TAJIKISTAN LEGAL SUPPORT PROGRAM | $1,397,082 | $267,318 |
| GEORGIA RULE OF LAW ACTIVITY | $2,150,000 | $0 |
| LEGAL SUPPORT PROJECT (LSP) | $4,005,639 | $1,563,149 |
| UKRAINE HEALING AND ACCOUNTABILITY THROUGH HUMAN RIGHTRS | $10,202,377 | $8,343,842 |
| ARMENIA CEPPS EPPA PROJECT | $200,000 | $191,743 |
| GUATEMALA HUMAN RIGHTS FOR ALL GUATEMALA | $4,000,000 | $2,426,267 |
| LIBYA RECONCILIATION AND JUSTICE | $4,112,500 | $2,569,303 |
| WESTERN BALKANS EQUALITY SHIELD | $3,929,783 | $3,789,510 |
| CEPPS LEADER AWARD | $80,000 | $65,408 |
| **TOTAL** | **51,790,772** | **24,869,777** |

8.      In reliance on those USAID obligations, ABA has hired staff members in

Washington, D.C., and various countries, established field offices, entered long-term leases,

issued binding subawards and subcontracts, and incurred a host of liabilities related to the

planned expenditure of the obligated funds.

9.      On or about January 25, 2025, and continuing through January 27, 2025, ABA

CGP began receiving notices from Agreement Officers, Grant Officers, and other U.S. officials,

demanding that it "stop-work" or "suspend activity" on its programs, including activities

wherein U.S. Government funds had already been obligated to ABA CGP.  These notices varied

3

J.A. 355

by USAID Mission and region.

10.     The notices received from Defendant USAID specifically note that, "Pursuant to 2 CFR 700.14 (Award Suspension and Termination), or the Mandatory Standard Provisions for Non-U.S. Nongovernmental Organizations, Standard Provisions for Public International Organizations (PIOs) or General PASA Agreements, as appropriate, effective immediately, the Agreement Officer hereby issues as order for the recipient to immediately suspend performance under the agreement your organization was awarded."  The notification also directed ABA CGP's authorized official to "send the below certification that your DEIA-related activities have completely ceased to your cognizant A&A specialist and Agreements Officer with a copy to the USAID Industry Liaison team… The certification must state: [Insert Recipient Name] certifies that DEIA-related activities have completely ceased under award number [insert award number] in accordance with the suspension of work issued by USAID/Ukraine on January 25, 2025."

11.     ABA responded to this correspondence confirming receipt and seeking clarification of the directives included in the letter.  ABA's response asked, "[T]o the extent your notice references "DEIA-related activities", we kindly request that you identify the specific activities that you view as being implicated under that rubric. Given that the current programmatic Scope of Work that you provided focuses on a range of issues and topics, we are unclear what, if any, changes in our agreed upon SOW you may be seeking."

12.     In almost no cases did ABA receive a response to this request, though on at least one occasion, USAID replied, "USAID/Ukraine has no further guidance to give as requested in your response.  If ABA ROLI will not provide the certification by 5:00pm Kyiv time today 01/30/25 please respond to my email indicating ABA Roli will not be submitting the certification."  Accordingly, ABA responded to the best of its ability.

13.     Adding to the confusion, as recently as February 10, 2025, ABA received dozens

4

of emails from the U.S. Government's "My Grants" portal notifying the organization that quarterly reports on the awards were overdue and should be submitted – despite the fact that the due date of the reports fell squarely in the "freeze" time frame and despite the fact that ABA had previously been directed to pause all activities.

14.    The freeze has had direct impacts on ABA programming, causing immediate and irreparable harm to the organization and its stakeholders.  Every program has suffered as a result of the freeze.  Examples include:

### a.  *Religious Freedom Programming in Asia*

With our partners in Indonesia, ABA is actively pursuing six religious freedom cases, including 4 representing Christian churches who were denied necessary permits to hold worship services and 2 representing Shia and Ahmadiyya Muslims who were accused of blasphemy/heresy. And in Sri Lanka, ABA ROLI and our partners were planning to hold a risk management workshop for grassroots faith-based and religious freedom organizations in March. This would have strengthened their operational, physical, and digital security in the face of increasing threats from both governmental and extremist actors who seek to prevent religious minorities from exercising their religious freedom rights. Without this workshop, these small Sri Lankan organizations remain more vulnerable to physical and digital attack, particularly those operating in highly militarized areas. We also provide funding to several faith-based and grassroots organizations through multiple programs for activities involving protection of Freedom of Religious Belief (FoRB) rights and documentation of associated human rights violations. These funds have been cut off with immediate effect. At least one organization, which provides legal representation to persecuted religious minorities, has told us they cannot afford to continue operations.

5

J.A. 357

Also under this program, ABA assembled an expert working group of legal professionals—many with extensive experience in human rights, religious freedom, and indigenous rights—alongside our pro bono legal specialist to create a practical guide designed to equip civil society organizations (CSOs), bar associations, and law schools with the tools necessary to rapidly establish legal clinics to protect religious freedom. ABA and its partners have been piloting this legal clinic toolkit in Indonesia and the Philippines, providing essential legal support to vulnerable communities. These clinics address legal injustices experienced by individuals due to their religious beliefs, including issues such as identity card changes, land registration, birth registration, and access to public education.

### b. Democratic Republic of Congo (DRC) Anti-Trafficking Program

The ABA is building the long-term capacity of the Congolese government, lawyers, and local service providers to combat human trafficking and violence against women, children, and other vulnerable groups around the country. ABA's partners include medical, legal, psychological, shelter, and economic support providers alongside security actors, Congolese government representatives, and judicial personnel who receive training, technical assistance, capacity building, and direct distribution of goods or services for survivors. The project also works with local NGOs to raise public awareness on existing laws, rights, referral pathways, and resources for survivors to collectively improve long-term attitudes toward victims of trafficking and violence against women, children, and other vulnerable groups. This program delivers short-term emergency support to survivors alongside long-term capacity building and training of protection actors to prevent, deter, and respond to trafficking and violence against women, children, and vulnerable groups. Suspension of these activities, particularly without notice or attempt to mitigate the impact of such a rapid withdrawal of support, fractures hard-won trust

6

J.A. 358

that is vital to effective anti-trafficking efforts in addition to the obvious and immediate impact on survivors and advocates.

### c.  *Ukraine Transitional Justice*

In Ukraine, ABA implements a five-year transitional justice program designed to ensure that Ukraine is well positioned to recover from the effects of the Russian invasion. The program seeks to identify and deploy transformative approaches for reconciling divided groups by assessing needs across geographic and sectoral divides, developing communications strategies to assist state agencies effectively connect with the public, and provide a venue for public dialogue on issues needed for healing and resolution of issues. ABA has planned to use its convening power and strong government relationships to reinvigorate conversations on a national level regarding inclusive transitional justice framework, using the 2020 Transitional Justice Policy Proposal as a framework. Significantly, the Ukraine program supports mechanisms to enhance public communication and education about reparations, war crimes documentation, and other transitional justice tools. Among the immediate impacts of the freeze is that ABA will be forced to cease its assistance to the Victim and Witness Coordination Center under the Prosecutor General's Office related to the documentation of war crimes and atrocities resulting from the full-scale invasion.

### d.  *Advancing Democracy in Myanmar*

ABA's Advancing Democracy program is a vital U.S. initiative that enhances national security, strengthens American influence in the Indo-Pacific, and reinforces strategic competition against China by supporting Myanmar's pro-democracy movement. Through direct engagement with subnational and national governance actors, this program 1) advances the rule of law, 2)

7

J.A. 359

strengthens democratic governance structures, and 3) aids human rights defenders in their resistance against military repression and autocracy. In 2024, ABA's experts helped draft parliamentary law and state constitutions by Myanmar's democratic actors, laying the legal and institutional groundwork for a future democratic Myanmar. This effort, not only promotes stability and self-governance, but also aligns with, and is responsive to, the Burma Act, a bipartisan Congressional commitment to supporting democratic resilience and countering authoritarianism in Myanmar. Beyond the financial harm of the abrupt withdrawal of support, there is substantial harm to the perception of the trustworthiness of pro-democracy forces, which undermines the work of partners and explicitly runs counter to the objectives of the Burma Act.

15.     At present, the above-referenced programs, along with 15 other USAID-funded programs, are frozen in place and unable to provide promised, sometimes lifesaving, support to vulnerable communities and colleagues under siege in some of the most difficult rule of law crises around the world. In addition to the ABA, 28 sub-recipients of these funds are unable to continue their work under the freeze of these programs.

16.     Because the ABA customarily pays expenses incurred through its foreign assistance programming in advance, billing and seeking reimbursement afterwards, the ABA utilizes a commercial line of credit to pay these costs as they accrue. Until reimbursement is complete, these paid expenses incur interest charges. With the freeze, ABA access to the U.S. Payment Management System (PMS) has been interrupted, imposing additional interest costs. Moreover, while the ABA has cancelled external activities and new commitments under the freeze, USAID has instructed the ABA to maintain readiness to resume work. For example, in a "Suspension of Work Notice" received on January 27, 2025, the notice reads in pertinent part: "Partners are also expected to maintain staff and operational capacity and only incur reasonable,

8

J.A. 360

allocable and allowable recurrent costs, so long as they do not violate the terms of this suspension of work order."   Consequently, ABA remains contractually obligated to maintain its offices and workforce in place, which, in turn, implies all associated rent, utilities, salary and benefits.  Currently, these costs amount to approximately 2.4 million U.S. Dollars per month.

***Current Department of State Programs and Impact of the Freeze***

17.    In total, approximately 57% of ABA's FY 2025 international awards funding is derived from Defendant US Department of State, after a competitive procurement process.

18.    Currently, ABA implements fifty-nine (59) programs funded by Defendant Department of State, either directly or via subaward. These programs collectively commit the US Department of State to $109,553,515 in funding over the next five (5) years. CGP has already spent $67,729,030. The remaining/frozen amount is $41,824,485, as of December 2024.

19.    On or about January 24, 2025, and continuing through January 27, 2025, ABA CGP began receiving notices from Agreement Officers, Grant Officers, and other U.S. officials, demanding that it "stop-work" or "suspend activity" on its programs, including activities wherein U.S. Government funds had already been obligated to ABA CGP.

20.    The freeze has had direct impacts on ABA programming, causing immediate and irreparable harm to the organization and its stakeholders.  Every program has suffered as a result of the freeze.  Examples include:

    a.  ***Combatting Money Laundering and Terrorism Financing in Argentina, Brazil, and Paraguay***

Under a program, funded by the Department of State, Bureau of Counter Terrorism, ABA provides technical support to the governments, the financial sector, and civil society in Argentina, Brazil, and Paraguay to combat money laundering, transnational crime, and terrorism

9

financing, thereby reducing the capacity of criminals and terrorist organizations to move assets and to conduct illicit activities. Working closely with central and local government agencies, financial institutions, and civil society, we leverage specialized expertise to support these countries in meeting their commitments under the international standards on anti-money laundering (AML) set by the Financial Action Task Force (FATF). As a result of the funding freeze, the ABA will no longer be able to help law enforcement and financial institutions prevent criminals, terrorists, and other bad actors to move assets or conduct other illicit financing activities.

b. ***Combatting Child Trafficking in Colombia***

In Colombia, ABA ROLI is implementing the Child Protection Compact (CPC) Partnership program, which aims to strengthen investigations, prosecutions and adjudications of child and adolescent trafficking cases through institutional strengthening as well as advocacy and increased access to justice. Emphasizing sustainable outcomes, this program adopts highly participatory approaches that increase commitment of the government, ensures sustained technical knowledge, and has developed tools and standard operating procedures, and improved law enforcement's practices to obtain reliable data. As a result of the funding freeze, despite Colombia's efforts to address the worst forms of child labor, children will still remain subjected to commercial sexual exploitation, illicit activities, forced labor, and recruitment by criminal groups.

21.    In addition, in a number of our programs, ABA engages in Memoranda of Understanding (MoUs) or similar arrangements with foreign government entities where the ABA has made commitments on behalf of the U.S. Government to perform trainings and provide other support.  For example, ABA has active MoUs with Ministries of Justice in Argentina, Bahrain, Tunisia, and The Gambia. The U.S. Government's imposition of

10

J.A. 362

"suspensions" and "stop work orders" without notice—and outside any prescribed processes—interrupted this complex network of legal relationships and commitments, causing a wide range of planned events, activities, and related support to be cancelled.  These unforeseeable interruptions directly harm the ABA's global goodwill and reputation across this constellation of actors and entities.  Never before in the ABA's 35-year history of foreign assistance programming has something similar occurred.  The ABA's reputation as a trusted reliable partner in legal programming has been damaged from the freeze, and the damage is becoming increasingly acute during this period of uncertainty because the ABA is unable to provide clarity and assurances to the affected parties.

22.    As the largest voluntary bar association in the world, the ABA and its members engage in global commerce around the world on a day-to-day basis.  The ABA's global brand is a critical asset of its membership.  When the ABA unexpectedly, and without notice, abrogates commitments with governments, organizations, businesses, and individuals in dozens of countries simultaneously, the damage to the ABA's brand is direct, immediate, and foreseeable.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 10, 2025, in Washington, DC.

Scott Carlson
Associate Executive Director
American Bar Association

11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GLOBAL HEALTH COUNCIL,
   2300 N Street NW, Suite 501 A
   Washington, DC 20037,

SMALL BUSINESS ASSOCIATION FOR
INTERNATIONAL COMPANIES,
   655 15th Street NW, Suite 425
   Washington, DC 20005,

HIAS,
   300 Spring Street,
   Silver Spring, MD 20910,

MANAGEMENT SCIENCES FOR HEALTH,
   4201 Wilson Blvd., Suite 500
   Arlington, VA 22203,

CHEMONICS INTERNATIONAL, INC.,
   1275 New Jersey Ave. SE, Suite 200
   Washington, DC 20003,

DAI GLOBAL, LLC,
   7600 Wisconsin Ave., Suite 200
   Bethesda, MD 20814,

DEMOCRACY INTERNATIONAL, INC.,
   7200 Wisconsin Ave., Suite 1000
   Bethesda, MD 20814,

and

AMERICAN BAR ASSOCIATION,
   321 N. Clark Street
   Chicago, IL 60654,

        *Plaintiffs*,

   v.

Civil Action No. 25-cv-402

DONALD J. TRUMP, in his official capacity as
President of the United States of America,
    1600 Pennsylvania Ave NW
    Washington, DC 20050,

MARCO RUBIO, in his official capacity as
Secretary of State and Acting Administrator of the
United States Agency for International
Development,
    2201 C St NW
    Washington, DC 20520,

PETER MAROCCO, in his official capacity as
Acting Deputy Administrator for Policy and
Planning, Acting Deputy Administrator for
Management and Resources of the United States
Agency for International Development, and Director
of Foreign Assistance at the Department of State,
    1300 Pennsylvania Ave NW
    Washington, DC 20004,

RUSSELL VOUGHT, in his official capacity as
Director of the Office of Management and Budget,
    725 17th St NW
    Washington, DC 20503,

UNITED STATES DEPARTMENT OF STATE,
    2201 C St NW
    Washington, DC 20520,

UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT,
    1300 Pennsylvania Ave NW
    Washington, DC 20004,

and

OFFICE OF MANAGEMENT AND BUDGET,
    725 17th St NW
    Washington, DC 20503,

           *Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

2

**INTRODUCTION**

1.     This lawsuit seeks to enjoin an unlawful and unconstitutional exercise of executive power that has created chaos in the funding and administration of the United States Agency for International Development (USAID) and other federal foreign-assistance programs, causing grievous irreparable harm to Plaintiffs and other grantees, contractors, and partners.

2.     In an unprecedented series of actions, the President and other executive-branch officials have sought to dismantle an independent agency established by Congress and withhold billions of dollars in congressionally appropriated foreign-assistance funding. One cannot overstate the impact of that unlawful course of conduct: on businesses large and small forced to shut down their programs and let employees go; on hungry children across the globe who will go without; on populations around the world facing deadly disease; and on our constitutional order.

3.     As directed by federal statute, USAID and the Department of State administer billions of dollars appropriated by Congress each year for foreign assistance. Through grantees, contractors, subcontractors, and other partners—many of whom have worked with USAID for decades—the agency plays a critical role in advancing the United States' interests and standing abroad.

4.     But on the day he took office, President Trump issued an executive order announcing his view that U.S. foreign-assistance programs are "antithetical to American values" and ordered a "pause" on all foreign-assistance funding. Since then, the Department of State, USAID, and the Office of Management and Budget (OMB) have issued a series of vague, unreasoned directives implementing the executive order. The reality on the ground is even more dire than those directives would suggest. With extremely limited exceptions, USAID and the State Department have halted the flow of funding even to existing partners, even for work performed

1

before President Trump took office, plunging those organizations (and the people who depend on them) into turmoil and costing thousands of Americans their jobs. At the same time, the Department of State has apparently undertaken to permanently shutter USAID and discontinue its operations altogether. Officials have gone so far as to pull the USAID sign down from its headquarters.

5.    Defendants have been candid about their motivations. As agency memoranda, guidance, and public statements make clear, the President disagrees with Congress's choice to establish USAID and fund foreign-assistance operations, which have been legislatively mandated for more than a half century. And in implementing his executive order, the government has offered no reasoned justification for its actions other than to effectuate the President's "policy agenda."

6.    Just yesterday, the USAID Office of Inspector General sounded the alarm on the scope and effects of Defendants' actions. The waiver process that supposedly allows certain foreign-assistance programs to resume is opaque and illusory. The freeze has halted not just the obligation of new funding, but the disbursement of funds for work that has already been performed. And far from combating waste, fraud, and abuse in U.S. foreign-assistance programs, Defendants' actions have exacerbated it.

7.    Like other abrupt funding freezes that courts have already enjoined, the actions here violate basic precepts of administrative law, numerous federal statutes, and bedrock separation-of-powers principles. Neither the President nor his subordinates have authority to thwart duly enacted statutes and substitute their own funding preferences for those Congress has expressed through legislation. And the scant explanations offered to justify dismantling USAID's operations utterly fail to grapple with its grave implications for USAID partners, the people who depend on them, and the United States. The Court must hold these actions unlawful and set them aside.

J.A. 367

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action arises under federal law, including the United States Constitution and the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq*. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705-06.

9.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because this action seeks relief against federal agencies and officials acting in their official capacities; at least one defendant is located in this district; and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

10.     Plaintiff Global Health Council (GHC) is a private, not-for-profit, membership alliance incorporated in Delaware, headquartered in Washington, D.C., and enjoying tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. GHC was founded in 1972 under the name National Council of International Health as a U.S.-based, nonprofit membership organization with the purpose of identifying priority world health problems and reporting on them to the U.S. public, legislators, international and domestic government agencies, academic institutions, and the world health community. Many of GHC's members administer global health programs and receive funding from USAID and other federal agencies and depend on sustained, uninterrupted funding to continue their work.

11.     Plaintiff Small Business Association for International Companies (SBAIC) is a membership organization established to promote the meaningful utilization of U.S. small

businesses at U.S government agencies providing foreign assistance, including USAID. SBAIC has almost 170 members, including small businesses under every Small Business Administration category.

12.     Plaintiff HIAS is a global, faith-based 501(c)(3) nonprofit organization headquartered in Silver Spring, Maryland. Working with the organized American Jewish community, HIAS is dedicated to ensuring that the world's forcibly displaced people find welcome, safety, and freedom. Approximately 58% of HIAS's funding comes from the U.S. government, including the Department of State and USAID.

13.     Plaintiff Management Sciences for Health (MSH) is a global nonprofit organization headquartered in Arlington, VA. Founded in 1971, MSH has worked to improve health systems and health outcomes in more than 150 countries worldwide by providing governments, health organizations, and the private sector with the strategies, tools, and management support to effectively and efficiently deliver high-functioning health systems. Approximately 88% of MSH's funding comes from USAID. MSH holds funding agreements with USAID for 19 different projects in 20 countries.

14.     Plaintiff Chemonics International, Inc. (Chemonics) is an employee-owned sustainable development company headquartered in Washington, DC. Founded in 1975, Chemonics has been a trusted partner to the U.S. government for 50 years, having successfully implemented more than 1,000 foreign assistance programs in more than 100 countries on behalf of USAID and other U.S. government clients. Approximately 88% of Chemonics and its subsidiaries' funding comes from USAID. Chemonics is currently working with USAID on 104 different projects in over 90 countries.

4

15.    Plaintiff DAI Global, LLC (DAI) is an employee-owned global development company headquartered in Bethesda, Maryland. DAI was founded in 1970 and has been a trusted partner of the U.S. government, and especially USAID, for more than 50 years, delivering successful projects in more than 150 countries. Nearly 80% of DAI's revenue (more than $750 million in 2024) comes from USAID, including the Millenium Challenge Corporation and its affiliated Millenium Challenge Accounts in Compact Countries. DAI is currently working with USAID and Millennium Challenge Accounts on 99 different projects in 45 countries.

16.    Plaintiff Democracy International, Inc., a small business, is an international development company headquartered in Bethesda, Maryland. Over the past 22 years, it has conducted more than 200 democracy, human rights, governance, peace and resilience, and other projects for USAID in more than 80 countries. Approximately 96 percent of Democracy International's revenues in 2024 came from prime cooperative agreements and contracts from USAID.

17.    Plaintiff the American Bar Association (ABA) is a non-partisan organization, founded in 1878 with a mission to defend liberty and pursue justice in the United States. Its Fund for Justice and Education (ABA FJE), the 501(c)(3) charitable fund of the Association, features many pro bono, public service, and education programs that improve access to justice in the United States and globally. The ABA Center for Global Programs (CGP) is an ABA FJE-entity whose mission serves the ABA's Goal IV: Advance the Rule of Law. For 35 years, and in more than 100 countries, ABA CGP has, at the behest of, and in partnership with, USAID, the Department of State, and other U.S. government agencies, implemented international rule of law and human rights programming that supports U.S. national interests. In total, approximately 38% of ABA's FY 2025

international awards funding is derived from USAID, after a competitive procurement process. Currently, ABA implements nineteen programs funded by USAID either directly or via subaward.

18.    Defendant Donald J. Trump is the President of the United States. He is being sued in his official capacity only.

19.    Defendant United States Department of State is an executive department of the United States government that is responsible for the United States' foreign policy and relations. The Department of State is headquartered in Washington, D.C.

20.    Defendant United States Agency for International Development is an independent agency of the United States government that is responsible for administering civilian foreign aid and assistance. USAID is headquartered in Washington, D.C.

21.    Defendant Office of Management and Budget is a federal agency within the Executive Office of the President that is responsible for producing the President's budget and coordinating interagency policy initiatives. OMB is headquartered in Washington, D.C.

22.    Defendant Marco Rubio is the Secretary of State and Acting Administrator of USAID. He is being sued in his official capacity only. Secretary Rubio maintains an office at 2201 C St NW, Washington, DC 20520.

23.    Defendant Peter Marocco is the Acting Deputy Administrator for Policy and Planning and Acting Deputy Administrator for Management and Resources of USAID and Director of Foreign Assistance at the Department of State. He is being sued in his official capacity only. Deputy Administrator Marocco maintains an office at 1300 Pennsylvania Ave NW, Washington, DC 20004.

24.    Defendant Russell Vought is the Director of OMB. He is being sued in his official capacity only. Director Vought maintains an office at 725 17th St NW, Washington, DC 20503.

6

J.A. 371

**FACTUAL ALLEGATIONS**

*Congress Establishes USAID as an Independent Agency*
*and Appropriates Funding for Foreign Assistance*

25.     For more than a half century, federal law has declared it the policy of the United States to support economic development and foster democratic institutions abroad through foreign assistance. *See* Foreign Assistance Act of 1961 § 102, Pub. L. No. 87-195, 75 Stat. 424, 424 (codified as amended at 22 U.S.C. § 2151). And for more than a half century, USAID has fulfilled that statutory mandate by leading American efforts to alleviate poverty, disease, and humanitarian need; supporting developing countries' economic growth; and building countries' capacity to participate in world trade. Cong. Rsch. Serv., IF10261, U.S. Agency for International Development: An Overview 1 (2025) (CRS Report).

26.     Founded in 1961, USAID was established to counter the influence of the Soviet Union during the Cold War and to run various foreign-assistance programs based on the idea that American security was tied to stability and economic advancements in other nations—the cornerstone of what is now called "soft power." As President Kennedy stated on signing the Foreign Assistance Act, "Our adversaries are intensifying their efforts in the entire under-developed world. Those who oppose their advance look to us and I believe, at this dangerous moment, we must respond." Statement by the President Upon Signing the Foreign Assistance Act, 1 Pub. Papers 588 (Sept. 4, 1961), http://bit.ly/4hwm68U. Or as Sen. Lindsey Graham noted more recently, soft power is a "critical component of defending America and our values." Chantal Da Silva, *What Cutting USAID Could Cost the U.S. — And How China, Russia May Benefit*, NBC News (Feb. 4, 2025), https://bit.ly/3WVDNGy. "If you don't get involved in the world and you don't have programs in Africa where China's trying to buy the whole continent, we're making a mistake," Graham explained. *Id.*

7

27.     Since its establishment, USAID has played a critical role in furthering core U.S. interests by reducing the spread of communicable disease, fighting child poverty, improving access to education, and promoting economic growth, among other functions. In the 1960s, for example, USAID was a key part of the global effort to eradicate smallpox and, years later, a similar effort to fight polio. Today, USAID plays an indispensable role in implementing the President's Emergency Plan for AIDS Relief, a program that, since its inception during the George W. Bush Administration in 2003, has delivered AIDS treatment to tens of millions of people in 54 countries.

28.     USAID's work is essential to addressing the root causes of extremism, terrorism, and international conflict. As then-Acting USAID Administrator John Barsa put it in 2020, "Our aid advances American interests by reducing the vulnerability of populations to extreme ideologies[;] …. [it] cultivates democracies and creates a network of states that advance our common interests and values[;] … [it] restores stability, and prevents disasters from creating the conditions that can give rise to conflict and discord[;] … [and it] can stop wars before they start, reducing the need to put our men and women in uniform in harm's way." John Barsa, Acting Administrator, U.S. Agency for Int'l Dev., Remarks at the Concordia UNGA Summit (Sept. 21, 2020), https://bit.ly/4hwmx32 (Barsa, *Remarks*). In short, USAID has long played a key role in furthering American interests.

29.     But USAID does not do this alone. In fact, USAID generally does not implement foreign-assistance projects itself. Instead, most USAID projects are administered through grants, cooperative agreements, or contracts with partner organizations, including nonprofits and academic institutions. *See* CRS Report at 1. USAID partners, including American companies employing thousands of Americans, thus perform the lion's share of the work necessary to

safeguard American security, promote economic prosperity, and address global challenges before they reach American shores.

30.     In 1998, Congress formally established USAID as an independent agency outside the Department of State. Foreign Affairs Reform and Restructuring Act of 1998 § 1413, Pub. L. No. 105-277, 112 Stat. 2681, 2681-791; *see* 5 U.S.C. § 104. In so doing, Congress carefully circumscribed the President's authority to make changes to the agency's structure or operations, allowing the President only sixty days after its establishment to eliminate the agency or reassign its functions. 22 U.S.C. § 6601(a). President Clinton declined to do so. Instead, he ordered that "USAID will remain a distinct agency with a separate appropriation." Reorganization Plan and Report Submitted by President Clinton to the Congress on December 30, 1998, Pursuant to Section 1601 of the Foreign Affairs Reform and Restructuring Act of 1998.

31.     Since then, Congress has repeatedly appropriated funds for foreign assistance through USAID. The most recent of those appropriations bills, enacted into law March 23, 2024, directs funding to USAID for global health programs, development assistance, disaster assistance, and initiatives to promote and strengthen democracy abroad, among other purposes. *See* Further Consolidated Appropriations Act of 2024 ("2024 Appropriations Act"), Pub. L. No. 118-47, div. F, tits. II-III, 138 Stat. 460, 739-43.

32.     Likewise, Congress has appropriated funds for foreign aid to be administered by the Department of State. Most recently, the 2024 Appropriations Act directs funding to the Department of State for treating and preventing HIV/AIDS, promoting democracy, assisting refugees, preventing the proliferation of nuclear weapons, combatting terrorism, demining conflict zones, and controlling the international flow of narcotics. *Id.*, 138 Stat. 742-49.

33.     The 2024 Appropriations Act speaks in mandatory terms. For example, it directs that funds appropriated for global health programs "shall be apportioned directly to the United States Agency for International Development." *Id.*, 138 Stat. 740. Other provisions similarly provide that specific funding amounts "shall" be apportioned to USAID for specified purposes. *E.g.*, *id.*, 138 Stat. 741-43. The Act generally prohibits deviation from these funding allocations beyond small, defined amounts without congressional consultation and justification based on case-by-case exigencies. *See id.* § 7019(b), 138 Stat. 772.

### *Defendants Abruptly Freeze Foreign Assistance Funding*

34.     Starting two weeks ago, things changed drastically. Defendants have dismantled the federal foreign-assistance system, reducing USAID to a husk of its former self: stripped of funding, devoid of employees, unable to perform basic tasks, and ultimately swallowed by the State Department.

35.     This hollowing out began with Executive Order 14,169. Exec. Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025). In this Order, entitled "Reevaluating and Realigning United States Foreign Aid," President Trump claimed that "[t]he United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values. They serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries." *Id.* § 1. He further asserted that "[i]t is the policy of United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States." *Id.* § 2.

36.     In order to more "fully align[]" foreign assistance programs with President Trump's policy preferences, Executive Order 14,169 directs four actions. *Id.*

10

J.A. 375

37.     First, it directs a "90-day pause in United States foreign development assistance," purportedly "for assessment of programmatic efficiencies and consistency with United States foreign policy." *Id.* § 3(a). It requires all "department and agency heads with responsibility for United States foreign development assistance programs" to "immediately pause new obligations and disbursements of development assistance funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors." *Id.* Under the order, programs are to be paused "pending review[]," and OMB is to "enforce this pause through its apportionment authority." *Id.* This "pause" may be waived for specific programs by the Secretary of State. *Id.* § 3(e).

38.     Second, the Executive Order directs each "responsible department and agency head[]" to initiate those"[r]eviews of each foreign assistance program … under guidelines provided by the Secretary of State, in consultation with the Director of OMB." *Id.* § 3(b).

39.     Third, based upon these reviews, "[t]he responsible department and agency head[], in consultation with the Director of OMB" is ordered to "make determinations within 90 days of this order on whether to continue, modify, or cease each foreign assistance program … with the concurrence of the Secretary of State." *Id.* § 3(c).

40.     Fourth, Executive Order 14,169 purportedly allows "[n]ew obligations and disbursements of foreign development assistance funds [to] resume for a program prior to the end of the 90-day period" only after "a review is conducted, and the Secretary of State or his designee, in consultation with the Director of OMB, decide to continue the program in the same or modified form." *Id.* § 3(d). Any "other new foreign assistance programs and obligations must be approved by the Secretary of State or his designee, in consultation with the Director of OMB." *Id.*

11

41.    Defendants swiftly set to work implementing the President's order. On January 22, 2025, then-USAID Acting Administrator Jason Gray instructed agency employees that, pursuant to the Executive Order, "USAID will immediately pause all new program-funded commitments and new or incremental obligations." USAID, Initial Instructions for Implementing Executive Order Reevaluating and Realigning United States Foreign Aid (Jan. 22, 2025) (Gray Initial Instructions). The instructions further stated that "[t]his directive encompasses every level of programming—including at the obligation (e.g., development objective agreement) and subobligation levels. Any pause on disbursements will be subject to further guidance." *Id.* The instructions permitted waivers only "for emergency humanitarian assistance" with individual approval from "both the Acting Administrator of USAID and the Director of Foreign Assistance at the U.S. Department of State," subject to a waiver process that supposedly was forthcoming. *Id.*

42.    On January 24, 2025, and "[c]onsistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid," Secretary Rubio issued a memorandum "paus[ing] all new obligations of funding, pending a review, for foreign assistance programs funded by or though the Department and USAID." Memorandum from the Secretary of State ¶ 1, 25 STATE 6828 (Jan. 24, 2025) (Rubio Memo).

43.    Secretary Rubio asserted that the funding freeze's purpose was "to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy." *Id.* ¶ 2. To "ensure that all foreign assistance is aligned with President Trump's foreign policy agenda," he ordered a "government-wide comprehensive review of all foreign assistance." *Id.* ¶¶ 3, 4. He further directed that "no new obligations shall be made for foreign assistance until such time as the Secretary shall determine, following a review," and that "contracting officers and grant officers

[must] immediately issue stop-work orders" for any "existing foreign assistance awards." *Id.* ¶ 7. In short, Secretary Rubio mandated that neither the Department of State nor USAID would provide any foreign assistance "without the Secretary of State's authorization or the authorization of his designee." *Id.* ¶ 5.

44. The same day, USAID Senior Procurement Executive Jami Rodgers issued a notice "[i]n accordance with the President's Executive Order" to "paus[e] all new obligations of funding, and sub-obligations of funding under Development Objective Agreements." USAID, Notice on Implementation of Executive Order on *Reevaluating and Realigning United States Foreign Aid* (Jan. 24, 2025) (Rodgers Guidance). The notice directed agency contracting and agreement officers to "<u>immediately</u> issue stop-work orders, amend, or suspend existing awards." *Id.* It also forbid agency personnel to "issue new awards or release any new requests for proposals (RFPs), requests for application (RFAs), notices of funding opportunities (NOFOs), or any other kind of solicitation for foreign assistance funding until each activity has been reviewed and approved as consistent with the President's policy." *Id.*

45. Also the same day, Gray issued follow-up instructions to agency employees for implementing the Executive Order and the Rubio Memo. USAID, Follow-Up Instructions for Implementing Executive Order Reevaluating and Realigning United States Foreign Aid (Jan. 24, 2025) (Gray Follow-Up Instructions). The follow-up instructions directed that, "[p]er the [Rubio Memo], within 30 days, the Director of the Department of State's Policy Planning Staff (S/P) or its designate shall develop appropriate review standards to ensure that all foreign assistance is aligned with President Trump's foreign policy agenda. Information on this review process will be shared as it becomes available." *Id.* The follow-up instructions further stated that, "[c]onsistent with and building on" the Gray Initial Instructions, "all new program-funded obligations and

subobligations are to remain on pause unless exempt." *Id.* Gray also announced that he was "immediately directing all contracting and agreement officers to issue stop-work orders or bilateral amendments, consistent with the terms of the relevant awards or agreements, until determinations are made following the review." *Id.* Finally, Gray summarized the provisions of the Rubio Memo regarding waivers and stated, "[w]e will provide further guidance related to implementation of this direction including the process for waivers as soon as possible. We will also provide subsequent guidance on how USAID will review all programs, to include current and ongoing programs, to ensure they are aligned with the foreign policy of the President of the United States." *Id.*

46.     Two days later, on January 26, 2025, Gray issued a further clarification. USAID, Clarification on Implementing the President's Executive Order on Reevaluating and Realigning United States Foreign Aid (Jan. 26, 2025) (Gray Clarification). As described by the USAID Inspector General, this clarification "also included a directive for staff to refrain from external communications outside of communications necessary to implement the pause." USAID Office of Inspector General, Advisory Notice, *Oversight of USAID-Funded Humanitarian Assistance Programming Impacted by Staffing Reductions and Pause on Foreign Assistance* (OIG Report) at 1 (Feb. 10, 2025) (quotation marks omitted).

47.     The next day, then-Acting OMB Director Matthew J. Vaeth issued a similar directive. On January 27, 2025, he issued a memorandum ordering a "temporary pause of agency grant, loan, and other financial assistance programs." Memorandum For Heads of Executive Departments and Agencies 1, M-25-13 (Jan. 27, 2025) (capitalization modified), https://bit.ly/3WUBPWY. That memorandum directed that, to implement the Executive Order and the President's other policy directives, "each agency must complete a comprehensive analysis of all their Federal financial assistance programs," and, in the interim, "**temporarily pause** all

14

activities related to obligation or disbursement of all Federal financial assistance, and other relevant activities that may be implicated by the executive order[], including, but not limited to, financial assistance for foreign aid. [and] nongovernmental organizations." *Id.* at 2.

48.    Vaeth's memo, while expressly written to implement President Trump's Executive Order 14,169, gave additional reasons for OMB's actions. The memo cited the need "to align Federal spending and action with the will of the American people as expressed through Presidential priorities." *Id.* at 1; *see also id.* at 2 ("This temporary pause will provide the Administration time to review agency programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities."). Director Vaeth also stated that "[f]inancial assistance should be dedicated to advancing Administration priorities, focusing taxpayer dollars to advance a stronger and safer America, eliminating the financial burden of inflation for citizens, unleashing American energy and manufacturing, ending 'wokeness' and the weaponization of government, promoting efficiency in government, and Making America Healthy Again. The use of Federal resources to advance Marxist equity, transgenderism, and green new deal social engineering policies is a waste of taxpayer dollars that does not improve the day-to-day lives of those we serve." *Id.* at 1.

49.    Vaeth's memorandum has since been stayed and rescinded. A court in this District has enjoined the government from "implementing, giving effect to, or reinstating under a different name the directives in OMB Memorandum M-25-13 with respect to the disbursement of Federal funds under all open awards," and ordered it to "to release any disbursements on open awards that were paused due to OMB Memorandum M-25-13." *Nat'l Council of Nonprofits v. OMB*, __ F. Supp. 3d __, 2025 WL 368852, at *14 (D.D.C. Feb. 3, 2025).

15

J.A. 380

50.    Defendants have nonetheless continued to carry out the Executive Order and implementing directives by Rubio, Gray, Rodgers, and Vaeth. USAID issued stop-work orders to contractor and grantee agency partners, requiring them to immediately stop work and to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage. Subject to limited waivers—for which a formal approval process does not exist—Defendants have halted the flow of foreign-assistance funding to USAID partners. In a declaration filed with this Court yesterday, Defendant Morocco admitted that USAID "has generally paused all expenditures in connection with foreign aid," for "both new programs … as well as existing ones." Decl. of Pete Marocco ¶ 28, *Am. Foreign Serv. Ass'n v. Trump* (*AFSA*), No. 25-cv-352 (D.D.C. Feb. 10, 2025), ECF No. 20-1; *see* Notice of Correction, *AFSA*, ECF No. 21 (similar).

51.    Defendants simultaneously began cutting agency employees and contractors. The State Department shut down all overseas USAID missions, immediately recalling thousands of USAID employees. Humeyra Pamuk, *Trump Administration Puts on Leave USAID Staff Globally in Dramatic Aid Overhaul*, Reuters (Feb. 4, 2025), https://bit.ly/3WU13oq. It placed thousands of USAID employees on administrative leave, directing them "not to enter USAID premises, access USAID systems, or attempt to use your position or authority with USAID in any way without [the] prior permission [of Peter Marocco] or prior permission of a supervisor in your chain of command." Alex Marquardt et al., *USAID Employees Around the World Will Be Placed on Leave Friday and Ordered to Return to US*, CNN (Feb. 5, 2025), https://bit.ly/3CNJtM6. Defendants have also caused thousands of institutional support contractors and employees of USAID contractors or grantees to be laid off or furloughed. As the USAID Office of Inspector General observed in a February 10, 2025 report, these "personnel actions … have substantially reduced the [agency's] operational capacity." OIG Report at 1.

52.    On February 3, 2025, Defendants took further action to dismantle USAID, with a press release announcing that Secretary of State Rubio had been appointed as Acting Administrator. Media Note, Office of the Spokesperson (Feb. 3, 2025), https://bit.ly/4hVdBUR. That press release asserted that "it is now abundantly clear that significant portions of USAID funding are not aligned with the core national interests of the United States." *Id.* The next day, Secretary Rubio sent a letter to the Senate Foreign Relations Committee and House Foreign Affairs Committee providing "notice" and advising Congress of the State Department's "intent to initiate consultations … regarding the manner in which foreign aid is distributed around the world." Image of letter available at Brett Murphy (@BrettMurphy), X (Feb. 3, 2025, 3:41 PM), https://bit.ly/3Q9gWDQ. Secretary Rubio further designated Pete Marocco as Deputy Administrator of USAID, and directed him to "begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest." *Id.* Secretary Rubio also stated that "USAID may move, reorganize, and integrate certain missions, bureaus, and offices into the Department of State, and the remainder of the Agency may be abolished consistent with applicable law." *Id.*

53.    Although the Rubio Memo purported to freeze only "new obligations," Defendants have in fact acted to abruptly halt the overwhelming majority of disbursements to USAID and State Department partners even for *existing* grants, cooperative agreements, and contracts. Such partners remain totally cut off from federal funds, including funds appropriated in fiscal year 2023 or earlier and payments for work already performed, even where the Department of State has purported to issue a waiver. As the USAID Inspector General has recognized, "uncertainty about the scope of foreign assistance waivers and permissible communications with implementers, has degraded USAID's ability to distribute and safeguard taxpayer-funded humanitarian assistance."

OIG Report at 5. Plaintiff Democracy International, for instance—a small business—has not received payment for $3,376,832 for work completed within the scope of duly authorized USAID programs concluded before the issuance of stop work orders and suspensions. USAID has also failed to make payment on over $120 million in invoices for work Plaintiff DAI has already completed, some of which are now past due. Plaintiff Chemonics has roughly $103.6 million in outstanding invoices issued to USAID for work performed in 2024, most of which were submitted prior to the stop-work orders. And USAID has failed to pay tens of millions of dollars for work performed by Plaintiff SBAIC's members.

54.    USAID continues to implement the President's executive order and the Rubio Memo by terminating contracts with hundreds of USAID contractors. On information and belief, those terminations are based on hourly targets and not on any substantive or programmatic considerations. The termination notices, for example, give no indication what criteria Defendants have applied in the "review process," if any. And once terminated, it may be impossible to reinstate or restore these contracts without starting the procurement process anew.

55.    The Department of State has also halted disbursement of appropriated foreign-assistance funding through programs administered outside USAID. For example, Plaintiff ABA implements 59 programs funded by the Department of State. They commit the Department of State to more than $109 million in funding over the next five years. The ABA has already spent $67 million, and the remaining frozen amount is approximately $42 million as of December 2024. ABA has received stop-work and suspend-activity orders for its programs. The Department of State has also ordered Plaintiff HIAS to suspend or halt work entirely on more than $20 million in FY25 grants. This is on top of USAID's order that HIAS halt work on a $18.5 million cooperative agreement to assist the most vulnerable populations in Venezuela.

56.    The effect of these actions has been to halt the obligation and disbursement of foreign-assistance funding wholesale. In the words of the USAID Inspector General, "staff reductions, together with a lack of clarity about the scope of the humanitarian assistance waivers and the extent of permissible communications between BHA staff and its implementers, has significantly impacted USAID's capacity to disburse and safeguard its humanitarian assistance programming." OIG Report at 2.

57.    President Trump summed up his view of Defendants' actions in a post on social media: "USAID IS DRIVING THE RADICAL LEFT CRAZY, AND THERE IS NOTHING THEY CAN DO ABOUT IT BECAUSE THE WAY IN WHICH THE MONEY HAS BEEN SPENT, SO MUCH OF IT FRAUDULENTLY, IS TOTALLY UNEXPLAINABLE. THE CORRUPTION IS AT LEVELS RARELY SEEN BEFORE. CLOSE IT DOWN!" @realDonaldTrump, Truth Social (Feb. 7, 2025). In fact, Defendants' efforts to close down USAID have not served to combat waste, fraud, and abuse, but rather have exacerbated it. Defendants' actions have "curtailed USAID's ability to vet humanitarian assistance awards for potential terrorist ties and monitor aid deliveries in high-risk environments." OIG Report at 3 (capitalization omitted). They also have "limited [the agency's] ability to receive and respond to allegations of fraud, waste, abuse, or diversion of humanitarian aid." *Id.* at 4.

### *The Funding Freeze Shutters Longstanding USAID Partners and Imperils Their Employees*

58.    Defendants' actions have devastated USAID's partners.

59.    Most of USAID's programs are implemented—whether by grant, cooperative agreement, or contract—by private-sector partners. CRS Report, *supra*, at 1. USAID has thousands of partners—Plaintiffs among them—including nonprofit organizations, for-profit contractors, universities, international organizations, and foreign governments. *See id.* Their work is critical to

19

USAID's efforts to fight disease, educate children, provide clean water, and support economic and other forms of development in approximately 130 countries around the world. *See id.* And they do their jobs in some of the most needy parts of the world, including throughout conflict zones. *See id.* For example, in recent years, USAID—working with its partners—has "provided significant humanitarian development, and economic support to Ukraine and countries affected by Russia's war in Ukraine, as well as humanitarian assistance in Gaza and elsewhere." *Id.* at 1-2.

60.    Defendants' actions stopped these efforts, with immediate consequences. Half a billion dollars worth of food grown in America's heartland—enough to feed more than 30 million people—is rotting in domestic ports and warehouses, unable to reach starving populations abroad. *See* Tim Carpenter, *Kansas's Moran, Davids Sound Alarm on Delay of USAID Food Aid to Starving Pepple Worldwide*, Kansas Reflector (Feb. 7, 2025), https://bit.ly/40U5KQl; Christopher Vondracek, *Shuttering of USAID Could Mean the End of Millions in Income for Midwest Farm Operations*, Minn. Star Tribune (Feb. 6, 2025), https://bit.ly/4guXYlK. Efforts aimed at preventing and treating disease have stalled out as tens—if not hundreds—of thousands of healthcare workers are let go. Declan Walsh, *"We Are in Disbelief": Africa Reels as U.S. Aid Agency is Dismantled*, N.Y. Times (Feb. 8, 2025), https://bit.ly/40RJpCT. Girls' access to education has been cut off, demining operations have been defunded, and shelter for Ukrainian citizens fleeing Russian bombardment has been jeopardized. Kimberlee Kruesi, *What Is USAID and What Impact Does It Have Across the Globe*, Time (Feb. 6, 2025), https://bit.ly/4hxXhtb.

61.    Plaintiffs are not immune. Plaintiff Democracy International's Justice, Rights, and Security—Rapid Response Activity provides lifesaving humanitarian assistance, which includes essential medicines, medical services, food, shelter, and subsistence assistance. To name just two of many impacted programs: In Bangladesh, Democracy International has had to stop providing

20

medical care to hundreds of adolescents and young students who were seriously injured and traumatized in the violent crackdowns on protesters last summer, leaving them without necessary medical services. And in Burkina Faso, human rights defenders who are working to track violence against Christian communities are at risk of being killed because Democracy International's program can no longer help them relocate and provide them with food, shelter, and subsistence.

62.    Plaintiff DAI's portfolio has been similarly devastated, with far-ranging, often life-threatening effects. Specifically, Defendants' actions have frozen funding for shelter for minors seeking protection from recruitment into criminal gangs in Central America, for cybersecurity for the government of Ukraine, for civil-society organizations contending with brutal authoritarian violence in Burma, and for efforts to track and contain zoonotic diseases in Bangladesh.

63.    Plaintiff Chemonics, under its Global Health Supply Chain Program-Procurement and Supply Management project, has received approval for and has made contractual commitments to suppliers for $240 million worth of medicines and other health supplies that were manufactured prior to receipt of the applicable stop-work order and are in various stages in the supply chain. Another $150 million in health commodities remain stranded in warehouses around the world, and $88.5 million are currently in transit. As commodities wait to be routed, products risk expiring, being damaged, being stolen, or being delivered without means for pick-up. Not delivering these health commodities on time could potentially lead to as many as 566,000 deaths from HIV/AIDS, malaria, and unmet reproductive health needs, including 215,000 pediatric deaths.

64.    Plaintiff ABA has had tens of millions of dollars in USAID and State Department funding frozen. This freeze has decimated ABA's programs, including its efforts to protect religious freedom in Asia, fight human trafficking in the Democratic Republic of Congo and Colombia, prepare Ukraine to recover from Russia's invasion, advance democracy in Myanmar,

21

J.A. 386

and combat money laundering and terrorism in South America.

65.    Plaintiff GHC's members, including Plaintiffs Chemonics and MSH, have also been severely impacted by the freeze. One member has had to suspend a $20 million hospital accreditation program in Cambodia. Another will have to close up to 1,226 primacy care clinics. And a third has had to delay implementation of anti-malarial campaigns in Africa that must take place before the rainy season to be effective.

66.    Plaintiff SBAIC's members—small businesses that provide foreign assistance in all sectors and all geographies, including conflict zones—have also faced ruinous injuries. SBAIC's members, including Plaintiff Democracy International, have had their projects devastated by losing access to vitally necessary appropriated funds.

67.    Plaintiff HIAS has had its work helping refugees across South America and Africa put on hold, including its work helping displaced children who are at high risk of trafficking, sexual exploitation, abuse, and neglect.

68.    These programs cannot simply be restarted on command. USAID's partners are hemorrhaging resources and employees.

69.    Plaintiff Democracy International has furloughed 100 percent of its 95 U.S.-based home office employees and placed 163 of 176 employees (92.6 percent) working on USAID projects in overseas offices on "administrative leave," pending resolution of stop work/suspension orders; Democracy International is not currently able to pay those on administrative leave and will not be able to pay them unless and until USAID pays past invoices and draws, and agrees to pay continuity costs. Democracy International has also cancelled all benefits, including health insurance, for employees; terminated all consultants; shut down all but one of its overseas offices (which has non-USAID funding); and downsized its computer systems and licenses.

J.A. 387

70.     Plaintiff DAI, in the last 10 days alone, has furloughed 383 U.S.-based staff, retracted many signed offers of employment, reduced salaries for senior staff members by 20%, deferred payments to hundreds of vendors, summarily terminated numerous subcontracts and grants, and violated the terms of hundreds of leases and other contractual arrangements. In numerous cases, DAI staff members are no longer able to meet their own critical financial obligations for housing, education, and medical care. Pushed to the brink, some have already begun to leave DAI's permanent employ, imposing costly future requirements for recruitment and training.

71.     Plaintiff GHC's members, including Plaintiffs Chemonics and MSH, are at risk of having to permanently scale back or cease operations.

72.     Plaintiff Chemonics has furloughed 750 of its U.S.-based staff, which represents 63% of its US-based workforce, and reduced the hours of the remaining U.S. employees. As a result, some furloughed employees will struggle to pay for basic necessities, including housing and food. Further, if Chemonics's current financial situation continues, it will furlough additional employees at the end of this month and will be unable to extend healthcare benefits to furloughed employees beyond March.

73.     Plaintiff MSH is being forced to take imminent, extraordinary measures, including furloughing nearly 50% of its U.S.-based staff and reducing hours for the remaining employees, terminating long-standing partnerships with more than 50 consultants, and is facing the prospect of letting go as many as 1,000 employees abroad.

74.     Many of Plaintiff SBAIC's members are already running on thinly stretched lines of credit, each day without USAID payments brings them closer to bankruptcy.

75.     Plaintiff HIAS has had to lay off more than 500 international staff, shutter its

23

J.A. 388

program offices, and defer payments to vendors.

76.    At this rate, many of USAID's and the State Department's partners—including several Plaintiffs—will simply not be around to carry on their projects even if Defendants decide to turn funding for foreign assistance back on.

77.    Some USAID and State Department partners have been placed in the impossible position of having to choose between furloughing their employees or having enough (already obligated) cash on hand to ensure they are able to secure American lives and U.S. property overseas for as long as possible. For example, staff from Plaintiff DAI have been notified that legal actions are being prepared against them in their countries of assignment, and they are acutely aware that they, their dependents, and their belongings could be stranded overseas if USAID continues to repudiate its payment obligations.

78.    Defendants' actions also shred Plaintiffs' and other partners' credibility within the communities that they operate in. These organizations often operate in unstable, conflict-torn environments. The people and governments there are often skeptical of them and their efforts. It takes hard work to build trust in these communities and to prove that they are truly there to help. Once that trust is gained, these communities then rely on these organizations for important, basic services. Defendants have forced Plaintiffs and others to abruptly shut their doors and cease offering those services, destroying the trust and credibility that has been built up over decades.

## LEGAL ALLEGATIONS

### *Neither the President, Secretary of State, nor USAID Administrator Have Authority to Unilaterally Withhold Appropriated Foreign-Assistance Funds*

79.    The Constitution vests Congress, not the Executive, with "exclusive power" over federal spending. *Dep't of Navy v. FLRA*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)). Understood since the founding as

24

J.A. 389

"'the most complete and effectual weapon'" of a representative body, Congress's power of the purse serves as "a bulwark of the Constitution's separation of powers among the three branches of the National Government." *Id.* at 1346-47 (quoting The Federalist No. 58, at 359 (James Madison) (Clinton Rossiter ed., 1961)). To ensure that Congress alone would control the public fisc, the Constitution both grants to Congress the power to direct federal spending and denies that power to the other branches. The spending power is the first listed among Congress's enumerated powers in Article 1, Section 8. And the Appropriations Clause forbids the expenditure of federal funds except "in Consequence of Appropriations made by Law." *Id.*, art. I, § 9, cl. 7.

80.      Consistent with the Constitution's division of legislative and executive powers, the President must "faithfully execute[]" the law as Congress enacts it. U.S. Const., art. II, § 3. Like other statutes enacted by Congress, an appropriations act is "Law." *Id.*, art. I, § 9, cl. 7. The separation of powers forbids the President from revising or ignoring such a law once duly enacted. *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

81.      The President also lacks inherent constitutional power to withhold funds that Congress has lawfully appropriated. Absent statutory authorization, the President possesses only the powers that the Constitution independently confers on the Executive. U.S. Const., art. II, § 1, cl. 2. The power to set federal funding policies is not among those powers. When the President "has policy reasons … for wanting to spend less than the full amount appropriated by Congress for a particular project or program[,] … even the President does not have unilateral authority to refuse to spend the funds." *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

82.      Longstanding historical practice and the reasoned views of every branch of government confirm that the President has no authority to unilaterally revise congressional appropriations. The Comptroller General, the top legislative-branch official charged with oversight

25

of federal expenditures, has explained in opinions going back to 1973 that "[t]he Constitution grants the President no unilateral authority to withhold funds from obligation." *In re Office of Management and Budget—Withholding of Ukraine Security Assistance*, B-331564, 2020 WL 241373 (Comp. Gen. Jan. 16, 2020); *see Report to the Sen. Subcomm. on Separation of Powers*, B-135564, 1973 WL 159460 (Comp. Gen. July 26, 1973). And the Supreme Court, since before the Civil War, has disapproved assertions of executive power to withhold funds required to be disbursed by statute. *See Kendall v. United States*, 37 U.S. (12 Pet.) 524, 610 (1838).

83.    Indeed, since 1969, even the Department of Justice has adhered to that settled understanding of the separation of powers. As later-Chief Justice Rehnquist wrote in an Office of Legal Counsel opinion, "the suggestion that the President has a constitutional power to decline to spend appropriated funds … is supported by neither reason nor precedent." *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Op. O.L.C. Supp. 303, 309 (1969). That "the President disagree[s] with spending priorities established by Congress" cannot "justify his refusal to spend." *Id.* at 311.

84.    Even if the Constitution did not altogether deny the President the power of the purse, Congress has done so through two federal statutes. In this posture, the President's "power is at its lowest ebb," and his attempt to override Congress's funding priorities could be sustained only if Congress had no power over federal expenditures at all, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)—a proposition flatly inconsistent with the Constitution's text and structure.

85.    First, Congress has expressly disabled the President from declining to obligate appropriated funds in the Impoundment Control Act of 1974, Pub. L. No. 93-344, 88 Stat. 333 (codified as amended at 2 U.S.C. §§ 682 *et seq.*). Under the Impoundment Control Act,

26

appropriated funds "shall be made available for obligation" unless the President transmits a special message to Congress and Congress rescinds the appropriation. 2 U.S.C. § 683(b); *see id.* § 684(a). That framework comports with the constitutional mandate that changes to enacted legislation— including appropriations acts—require bicameralism and presentment. *See INS v. Chadha*, 462 U.S. 919, 956 (1983).

86.    The Impoundment Control Act also permits the President to "defer[]" a budget authority—that is, to withhold or delay the obligation or expenditure of appropriated funds—but only for limited purposes, only for a limited time, and only after transmitting a special message to Congress setting forth, among other information, the reasons for the proposed deferral. 2 U.S.C. § 684(a); *see id.* § 682(1). Under that provision, deferral is permissible only "(1) to provide for contingencies; (2) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (3) as specifically provided by law." *Id.* § 684(b). "No officer or employee of the United States may defer any budget authority for any other purpose." *Id.* Neither the President nor any executive officer may defer obligation or expenditure of appropriated funds for policy reasons. *Aiken County*, 725 F.3d at 261 n.1.

87.    Second, the Anti-Deficiency Act Amendments of 1982, Pub. L. No. 97-258, 96 Stat. 929 (codified as amended at scattered sections of Title 31), prohibit executive branch officers from holding appropriated funds in reserve in similar circumstances. Under the Anti-Deficiency Act, "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). "In apportioning or reapportioning an appropriation, a reserve may be established only—(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." *Id.* § 1512(c)(1). Like the Impoundment Control Act, this

27

statute forbids the Executive to decline to spend and hold in reserve appropriated funds for policy reasons or to otherwise redirect funds to purposes other than those Congress prescribed in the appropriation.

88.    No provision of the 2024 Appropriations Act or any other statute authorizes the President, Secretary of State, or USAID Administrator to impose a wholesale freeze or termination of appropriated foreign assistance funding.

### *The Stated Grounds for the Funding Freeze Conflict with Applicable Law and Fail to Consider Important Aspects of the Problem*

89.    The Administrative Procedure Act requires courts to "hold unlawful and set aside" any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

90.    Under that standard, a reviewing court "must confirm that the agency has fulfilled its duty to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (citation omitted). And agency action must be "upheld, if at all, on the same basis articulated in the order by the agency itself." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962).

91.    The reviewing court must also determine whether a challenged agency action is "contrary to law." *Env't Def. Fund v. EPA*, 124 F.4th 1, 11 (D.C. Cir. 2024). In doing so, courts

28

do not defer to an agency's interpretation of a statute, but rather use their "independent legal judgment" and "apply[] all relevant interpretive tools" to find "the best reading," i.e., "the reading the court would have reached if no agency were involved." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400-01 (2024) (citation omitted).

92.    Defendants have failed to "identif[y] and explain[] the reasoned basis" for their sudden, blanket freeze on foreign aid. *Transactive Corp. v. United States*, 91 F.3d 232, 236 (D.C. Cir. 1996).

93.    President Trump's order claimed that "the United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values." Exec. Order No. 14,169 § 1, 90 Fed. Reg. 8619 (Jan. 20, 2025). In the President's view, "[t]hey serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries." *Id.* The Executive Order offered no explanation or justification for this vague and sweeping statement. On the contrary, the government has long taken the position that foreign aid and development promote peace and global security by addressing the root causes of extremism and violence. *See, e.g.*, Barsa, Remarks, *supra*.

94.    The Rubio Memo cited the Executive Order as the basis for the funding freeze, and further claimed that "[i]t is currently impossible to access sufficient information in one place to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy." Rubio Memo ¶ 2. Yet that claim about the need for access to information in one place bears no connection to the direction to "immediately issue stop-work orders" for existing grants and contracts, or to halt the process of reviewing proposals for new grants and contacts. *Id.* ¶¶ 7-9.

J.A. 394

95. No subsequent directive purporting to implement the President's executive order or the Rubio Memo has identified any other ground for freezing foreign-assistance funding.

96. Defendants did not "examine the relevant data" and then articulate a "rational connection between the facts found" and a blanket freeze on foreign aid. *Ark Initiative*, 816 F.3d at 127 (citation omitted). They have offered not one shred of evidence for their "implausible" justifications. *Id.*

97. Nor, in any event, did any Defendant explain why a comprehensive, undifferentiated freeze was necessary to achieve their purported goals. Nor did they explain why they eschewed a more orderly and targeted approach—such as one that aimed only at particular programs Defendants found to be destabilizing or corrupt or one that kept funding in place for the 90 days Defendants claim it will take to identify such problematic programs. *See Allied Loc. & Reg'l Mfrs. Caucus v. U.S. E.P.A.*, 215 F.3d 61, 80 (D.C. Cir. 2000) ("To be regarded as rational, an agency must also consider significant alternatives to the course it ultimately chooses.").

98. Defendants have also "entirely failed to consider … important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. Indeed, Defendants have acknowledged that they are still conducting a "review" of all foreign assistance funding, which necessarily means that they have not yet evaluated "important aspect[s] of the problem." And at the same time they claim that a review is ongoing, Defendants have dismissed the agency personnel with the experience and technical expertise necessary to conduct any "review."

99. Nor did Defendants consider that these programs are not light switches to be turned on and off at will. Damage to these interests is being done now, and that damage cannot be undone. Indeed, by halting foreign-assistance payments that are already due and owing, Defendants are

30

preventing Plaintiffs and other partners from taking the steps necessary to remain ready to resume work (if the freeze is lifted) or to wind down their projects in an orderly manner (if it is not).

100.    Irreparable damage is also being done to the grantees, contractors, and other partners who carry out these programs right now. Without funding, these actors must lay off staff, cut ties with local actors, and essentially terminate their operations. There is a serious risk that they simply will not exist if Defendants ever decide to un-pause their work. And while generally partners who have been ordered to stop work may work with USAID officials to ensure interim funding is available to keep them afloat until work resumes, such interim funding has been halted and such coordination is impossible here when Defendants have recalled and laid off those USAID workers. So when Defendants promise to "decide to continue [some] program[s] in the same or modified form," Exec. Order No. 14,169 § 3(d), 90 Fed. Reg. 8619 (Jan. 20, 2025), it is clear they have not grappled with the reality that those programs may not be able to be revived.

101.    Defendants also failed to account for the substantial reliance interests their actions have eviscerated. "When an agency changes course … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account," and the failure to do so is arbitrary and capricious. *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020) (citation omitted). Yet Defendants did not consider the effect their pause policy would have on grantees, contractors, and other partners—as well as their employees—all of whom have relied on USAID's and the State Department's longstanding policies.

102.    Defendants have also failed to account for how USAID and State Department programs further U.S. interests and how a sudden withdrawal of U.S. assistance will provide opportunities to adversaries of the United States and risk instability in countries around the world. Analysts and experts are warning that China and Russia will quickly step in to fill the void—and

indeed are already doing so. *See, e.g.*, Chantal Da Silva, *What Cutting USAID Could Cost the U.S.—How China, Russia May Benefit*, NBC News, Feb 4, 2025; Kruesi, *supra*.

103.    Defendants' sudden freeze on U.S. foreign aid, on the supposed premise that such aid "destabiliz[es] world peace," Exec. Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025), is also an abrupt reversal of decades of U.S. policy. For years, the United States government has considered foreign aid programs to be an important part of America's foreign policy and national security strategy. *See, e.g.*, Barsa, Remarks, *supra*. Now, however, Defendants have asserted that foreign aid programs are a threat to those same interests. But they have failed to "display awareness that [they are] changing position[s]," never mind articulated "good reasons" for the shift. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quotation marks omitted); *see also State Farm*, 463 U.S. at 43.

104.    Defendants' actions are also contrary to law. *See Env't Def. Fund*, 124 F.4th at 11.

105.    As discussed above, the Impoundment Control Act forbids the Executive to "refuse to spend the funds" Congress has appropriated unless Congress "approve[s] a recission bill." *Aiken County*, 725 F.3d at 261 n.1 (citing 2 U.S.C. § 683). Although that statute permits limited deferrals of a budget authority upon transmission of a special message to Congress, it does not allow any form of impoundment, including deferral, for policy reasons. *Id.*; *see* 2 U.S.C. § 684(b). By refusing to spend appropriated funds in order to "align[]" that spending with President Trump's "policy agenda," Rubio Memo ¶ 3, Defendants have violated the Impoundment Control Act.

106.    The Anti-Deficiency Act imposes similar restrictions. Government officers violate that statute if, among other things, they establish a monetary reserve by withholding appropriated funds from their congressionally assigned program, except for limited purposes. 31 U.S.C. § 1301(a); *id.* § 1512(c)(1). Like the Impoundment Control Act, the Anti-Deficiency Act prohibits

32

repurposing appropriated funds for policy reasons. *See id.* § 1512(c)(1). To the extent Defendants are holding appropriated foreign-assistance funds in reserve to effectuate the President's policy preferences rather than spending them as Congress has directed, Defendants have violated the Anti-Deficiency Act.

107.    Beyond the Impoundment Control Act and the Anti-Deficiency Act, Defendants also have violated the appropriations statutes, including the 2024 Appropriations Act, which direct USAID and the State Department to spend appropriated funds for particular foreign-assistance purposes. When Congress wishes to give the executive branch discretion to spend less than the full amount appropriated, Congress uses specific language—for example, that an agency is appropriated "sums not exceeding" or "up to" an amount for a particular purpose. *See, e.g., CFPB v. Cmty. Fin. Servs. Ass'n,* 601 U.S. 416, 432-33 (2024); *id.* at 442-43 (Kagan, J., concurring). Absent such language, courts properly understand appropriations statutes as commands to obligate and expend the full amount of money appropriated. *See, e.g.*, *Train v. City of New York*, 420 U.S. 35, 41-48 (1975) (prior to enactment of Impoundment Control Act, interpreting statute to require the agency to spend the full amounts specified for a particular program, and rejecting the agency's argument that it had discretion to spend less). The relevant appropriations statutes here confer no discretion to halt foreign-assistance funding wholesale. To the contrary, the 2024 Appropriations Act specifies that the appropriated amounts "shall" be apportioned and used for specified purposes, including USAID's global health programs, development assistance, disaster assistance, and initiatives to promote and strengthen democracy abroad. Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, titles II-III, 138 Stat. 460, 739-43. The 2024 Appropriations Act also appropriates funds to the Department of State for treating and preventing HIV/AIDS, promoting democracy, assisting refugees, preventing the proliferation of nuclear weapons,

33

J.A. 398

combatting terrorism, demining conflict zones, and controlling the international flow of narcotics. *Id.*, 138 Stat. 744-49. By broadly halting obligations and expenditures related to these purposes, Defendants have violated these congressional appropriations.

108.    Defendants identify no statutory authority for the wholesale freeze of foreign-assistance funding. Under the major questions doctrine, agencies must point to "clear congressional authorization" when they claim power to take actions of vast "economic and political significance." *West Virginia v. Environmental Protection Agency*, 142 S. Ct. 2587, 2609 (2022). In *West Virginia*, for example, the Supreme Court held that the EPA lacked the authority to devise certain emissions caps that would have "billions of dollars of impact," because the Clean Air Act did not provide a clear statement to allow the agency to make such a drastic change from the existing standards. *Id.* at 2605. Similarly, in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), the Court held that the Biden administration's student loan forgiveness program exceeded the authority of the Department of Education because there was no clear statement authorizing the agency to forgive billions in loans on this matter of economic and political significance. Here, Defendants' unilateral, overnight freeze of billions of dollars a year in congressionally appropriated funding to American nonprofits, academic institutions, and businesses implicates at least as serious economic and political questions. Defendants' actions lack any congressional authorization, much less the clear authorization Supreme Court precedent requires.

109.    Defendants' conduct also contravenes numerous constitutional guarantees designed to protect liberty through the separation of governmental powers. The Constitution gives Congress, not the President, the power to spend money, U.S. Const. art. I, § 8, and forbids expenditures it does not authorize, *id.* art. I, § 9, cl. 7. The Constitution then requires the President to "faithfully execute[]" those authorized expenditures. *Id.*, art. II, § 3. These articles work together to separate

the duties of the legislative branch and the executive branch such that only the legislative branch can control federal spending. *Dep't of Navy*, 665 F.3d at 1346. Defendants have breached this separation, usurping for the executive branch the legislature's exclusive powers. By unilaterally refusing to spend what Congress has ordered, Defendants have unlawfully wrested control over the federal fisc from Congress and violated the Constitution.

110.    Because Defendants' actions are arbitrary, capricious, and not in accordance with law, the Court must hold those actions unlawful and set them aside. *See* 5 U.S.C. § 706(2).

## CLAIMS FOR RELIEF

### *FIRST CLAIM FOR RELIEF*

**Violation of the Administrative Procedure Act—Arbitrary and Capricious**
**(Against Defendants Rubio, Marocco, Vought, Department of State, USAID, and OMB)**

111.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

112.    A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

113.    The Rubio Memo, Rodgers Guidance, Gray Initial Instructions, Gray Follow-Up Instructions, Gray Clarification, and Defendants' other actions to implement the Executive Order are final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

114.    Defendants' actions are arbitrary and capricious. Defendants have failed to adequately justify their actions; have failed to consider key aspects of the problem, reasonable alternatives, and the substantial reliance interests at stake; have relied on factors Congress did not authorize them to consider; and have failed to acknowledge or justify their change of position.

### SECOND CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act—
Contrary to Statutory and Constitutional Law
(Against Defendants Rubio, Marocco, Vought, Department of State, USAID, and OMB)**

115.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

116.    A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

117.    The Rubio Memo, Rodgers Guidance, Gray Initial Instructions, Gray Follow-Up Instructions, Gray Clarification, and Defendants' other actions to implement the Executive Order are final agency actions reviewable under 5 U.S.C. §§ 702 and 706.

118.    Both the Impoundment Control Act and the Anti-Deficiency Act generally obligate the executive branch to spend funds that Congress has appropriated, and to spend it on the programs for which Congress has made appropriations. *See* 2 U.S.C. §§ 683, 684; 31 U.S.C. §§ 1301(a), 1512(c)(1). If the executive branch wishes not to spend funds that has been lawfully appropriated, it must follow a set procedural path and rely on specific types of reasons. *See* 2 U.S.C. §§ 683, 684; 31 U.S.C. §§ 1301(a), 1512(c)(1).

119.    Relevant appropriations statutes, including the 2024 Appropriations Act, direct that appropriated funds shall be obligated and disbursed for specified foreign-assistance purposes.

120.    By refusing to spend funds that Congress has allocated for foreign assistance programs, without following the procedural paths set by Congress, Defendants have violated the Impoundment Control Act, the Anti-Deficiency Act, and relevant appropriations statutes, including the 2024 Appropriations Act.

121.    The Constitution vests exclusive power over federal spending in Congress. The executive branch lacks inherent constitutional power to decline to spend funds that Congress has appropriated. By refusing to spend funds that Congress has allocated for foreign-assistance programs, Defendants have violated the constitutional separation of powers.

122.    Defendants' actions are contrary to law, and the Court must hold them unlawful and set them aside.

### THIRD CLAIM FOR RELIEF

**Violation of the Separation of Powers**
**(Against All Defendants)**

123.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

124.    The Constitution vests exclusive power over federal spending in Congress.

125.    Under Article II, the President must take care to faithfully execute the laws, including appropriations acts. Consistent with the constitutional division of legislative and executive powers and the requirements of bicameralism and presentment, the President has no unilateral authority to amend or ignore congressional appropriations. Nor may the President direct federal officers or agencies to act in derogation of a federal statute.

126.    The President also lacks inherent constitutional power to decline to spend funds that Congress has appropriated. Although the President would lack that power even in the absence of any statutory prohibition, the Impoundment Control Act and Anti-Deficiency Act forbid executive-branch officers from declining to spend appropriated funds in these circumstances, foreclosing any claim of concurrent presidential power.

127.    By withholding foreign-assistance funds that Congress has appropriated, Defendants have violated the separation of powers.

128.    Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' unconstitutional actions.

## FOURTH CLAIM FOR RELIEF

### Ultra Vires
### (Against All Defendants)

129.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

130.    No statute, constitutional provision, or other source of law authorizes Defendants to withhold foreign-assistance funds that Congress has appropriated. Defendants' actions doing so exceed their lawful authority.

131.    Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' ultra vires actions.

## PRAYER FOR RELIEF

**NOW, THEREFORE,** Plaintiffs request judgment in their favor against Defendants as follows:

1.    Declare that Executive Order 14169 is unconstitutional and unlawful;

2.    Vacate and set aside the Rubio Memo, Rodgers Guidance, Gray Initial Instructions, Gray Follow-Up Instructions, Gray Clarification, and Defendants' other actions to implement Executive Order 14169 and declare that those actions are contrary to law and arbitrary and capricious;

3.    Temporarily restrain and preliminarily and permanently enjoin Defendants from implementing or giving effect to Executive Order 14169, the Rubio Memo, the Rodgers Guidance, the Gray Initial Instructions, Gray Follow-Up Instructions, Gray Clarification, and any other actions by Defendants or their agents to implement Executive Order 14169 or other otherwise freeze the obligation and disbursement of appropriated foreign-assistance funds;

J.A. 403

4.      Temporarily restrain and preliminarily and permanently enjoin Defendants from dismantling USAID or taking any other action that prevents Defendants from fulfilling their statutory duty to obligate and disburse appropriated foreign-assistance funds;

5.      Postpone the effective date of the Rubio Memo, the Rodgers Guidance, the Gray Initial Instructions, Gray Follow-Up Instructions, Gray Clarification, and any other actions by Defendants or their agents to implement Executive Order 14169 or other otherwise freeze the obligation and disbursement of appropriated foreign-assistance funds;

6.      Award Plaintiffs reasonable attorneys' fees and costs; and

7.      Grant such other and further relief as the Court may deem appropriate.

Dated: February 11, 2025                              Respectfully submitted,

                                                    /s/ Stephen K. Wirth
                                                    William C. Perdue (D.C. Bar 995365)*
                                                    Sally L. Pei (D.C. Bar 1030194)
                                                    Samuel M. Witten (D.C. Bar 378008)
                                                    Stephen K. Wirth (D.C. Bar 1034038)
                                                    Dana Kagan McGinley (D.C. Bar 1781561)
                                                    Allison Gardner (D.C. Bar 888303942)
                                                    Daniel Yablon (D.C. Bar 90022490)
                                                    ARNOLD & PORTER
                                                        KAYE SCHOLER LLP
                                                    601 Massachusetts Ave., NW
                                                    Washington, DC 20001-3743
                                                    Tel: (202) 942-5000
                                                    stephen.wirth@arnoldporter.com

                                                    *application for admission pending

                                                    Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

    I hereby certify that this document will be served on Defendants in accordance with Fed.

R. Civ. P. 4.

                                            */s/ Stephen K. Wirth*
                                            Stephen K. Wirth

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AIDS VACCINE ADVOCACY COALITION, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-00400 (AHA) |
| UNITED STATES DEPARTMENT OF STATE, *et al.*, | |
| *Defendants*. | |
| GLOBAL HEALTH COUNCIL, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-00402 (AHA) |
| DONALD J. TRUMP, *et al.*, | |
| *Defendants*. | |

<u>**DEFENDANTS' NOTICE OF APPEAL**</u>

All Defendants hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the Memorandum Opinion and Order (No. 25-cv-400, Doc. 60; No. 25-cv-402, Doc. 60) issued on March 10, 2025, and from all orders antecedent to such order and opinion and thus incorporated therein.

1

J.A. 406

Dated: April 1, 2025                    Respectfully submitted,

                                        YAAKOV M. ROTH
                                        Acting Assistant Attorney General
                                        Civil Division

                                        ERIC J. HAMILTON
                                        Deputy Assistant Attorney General

                                        ALEXANDER K. HAAS
                                        Director

                                        LAUREN A. WETZLER
                                        Deputy Director

                                        CHRISTOPHER R. HALL
                                        Assistant Branch Director

                                        */s/ Indraneel Sur*
                                        INDRANEEL SUR (D.C. Bar 978017)
                                        CHRISTOPHER D. EDELMAN
                                        Senior Counsels
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L St. NW
                                        Washington, DC 20005
                                        Phone: (202) 616-8488
                                        Email: indraneel.sur@usdoj.gov

                                        *Counsel for Defendants*

2

J.A. 407