ORAL ARGUMENT NOT YET SCHEDULED
No. 25-5097 (consolidated with 25-5098)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Global Health Council, et al.,
*Appellees,*

v.

Donald J. Trump, in his official capacity as
President of the United States of America, et al.
*Appellants.*

On Appeal from the United States District Court for the District of Columbia

## BRIEF OF *AMICI CURIAE* STATES OF OHIO,
## SOUTH CAROLINA, AND 18 OTHER STATES
## IN SUPPORT OF APPELLANTS

| | |
|---|---|
| ALAN WILSON | DAVE YOST |
| Attorney General of South Carolina | Attorney General of Ohio |
| | |
| ROBERT COOK | T. ELLIOT GAISER* |
| Solicitor General | Ohio Solicitor General |
| J. EMORY SMITH, JR. | *Counsel of Record* |
| Deputy Solicitor General | MATHURA J. SRIDHARAN |
| BEN MCGREY* | KATIE ROSE TALLEY |
| THOMAS T. HYDRICK | Deputy Solicitors General |
| JOSEPH D. SPATE | 30 East Broad Street, 17th Floor |
| Asst. Dep. Solicitors General | Columbus, Ohio 43215 |
| *Counsel of Record* | 614.466.8980 |
| State of South Carolina | thomas.gaiser@ohioago.gov |
| Office of the Attorney General | |
| 1000 Assembly St. | |
| Columbia, SC 29201 | |
| 803.734.3371 | |
| benmcgrey@scag.gov | |

*(Additional counsel listed after signature block)*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES ..............vii

GLOSSARY ....................................................................................viii

INTRODUCTION AND STATEMENT OF *AMICI* INTERESTS ....................1

ARGUMENT....................................................................................3

I.    The President has broad discretion over the administration of foreign aid. .......................................................................................5

    A.    The Foreign Assistance Act grants the President authority to determine the terms and conditions of foreign aid...............................5

    B.    The Foreign Assistance Act complements the Constitution, which vests the President with substantial power over foreign affairs. .......... 9

II.    The Constitution vests the President with authority to execute the laws, including appropriations laws. ...................................... 13

    A.    Under the constitutional division of power over the public fisc, Congress appropriates and the President expends............................ 13

    B.    The President's duty to "faithfully execute" the laws entails discretion to disburse less than the full funds appropriated by Congress. .......................................................................... 16

    C.    The President's enforcement discretion is at its height when executive discretion is statutorily authorized and an appropriation implicates the core executive power over foreign affairs................... 24

CONCLUSION.................................................................................29

ADDITIONAL COUNSEL ................................................................ 31

CERTIFICATE OF COMPLIANCE ...................................................32

CERTIFICATE OF SERVICE...........................................................33

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Aids Vaccine Advocacy Coal. v. U.S. Dep't of State*,
No. CV 25-00400 (AHA), 2025 WL 752378 (D.D.C. Mar. 10,
2025) ................................................................................................ 5, 6

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024) .................................................................... 2, 26

*Chi. & S. Air Lines v. Waterman S. S. Corp.*,
333 U.S. 103 (1948) ......................................................................... 13

*Clinton v. City of New York*,
524 U.S. 417 (1998) ......................................................................... 22

*CREW v. FEC*,
993 F.3d 880 (D.C. Cir. 2021) ......................................................... 16

*DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*,
887 F.2d 275 (D.C. Cir. 1989) ........................................................... 7

*Edmond v. United States*,
520 U.S. 651 (1997) ........................................................................... 9

*Epic Systs. Corp. v. Lewis*,
584 U.S. 497 (2018) ........................................................................... 6

*First Nat'l City Bank v. Banco Nacional de Cuba*,
406 U.S. 759 (1972) .................................................................. 1, 9, 10

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) .................................................................... 15, 16

*Jama v. Immigr. & Customs Enf't*,
543 U.S. 335 (2005) ......................................................................... 12

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
478 U.S. 221 (1986) ........................................................................... 7

\* Authorities chiefly relied upon are marked with an asterisk.

*Marbury v. Madison*,
   5 U.S. 137 (1803) ................................................................ 9

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982) ........................................................ 1, 10

*Planned Parenthood Fed'n of Am., Inc. v. Agency for Int'l Dev.*,
   838 F.2d 649 (2d Cir. 1988) ................................................ 7

*Rucho v. Common Cause*,
   588 U.S. 684 (2019) ..........................................................24

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) ........................................... 2, 16

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ......................................................... 17

*\*Trump v. United States*,
   603 U.S. 593 (2024) .............................................3, 8, 10, 15, 16, 17

*United States v. Curtiss-Wright Exp. Corp.*,
   299 U.S. 304 (1936) ........................................................ 4, 10

*United States v. Fausto*,
   484 U.S. 439 (1988) ............................................................ 6

*United States v. Nixon*,
   418 U.S. 683 (1974) ......................................................... 17

*United States v. Texas*,
   599 U.S. 670 (2023) ...................................................... 24, 25

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ..................................................... 8, 9, 24

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
   576 U.S. 1 (2015) ....................................................... 10, 15

\* Authorities chiefly relied upon are marked with an asterisk.

## Statutes and Constitutional Provisions

U.S. Const. art. I, §8 ................................................................. 9, 14

U.S. Const. art. I, §9 .................................................................... 14

U.S. Const. art. I, §10 ................................................................... 9

U.S. Const. art II ........................................................................ 10

U.S. Const. art. II, §3 .................................................................. 15

2 U.S.C. §683 ........................................................................ 18, 22

2 U.S.C. §684 ............................................................................. 18

2 U.S.C. §685 ............................................................................. 22

2 U.S.C. §688 ............................................................................. 22

22 U.S.C. §2151 ..................................................................... 1, 4, 5

22 U.S.C. §2291 ...................................................................... 4, 5

22 U.S.C. §2346 ...................................................................... 4, 5

22 U.S.C. §2347 ...................................................................... 4, 5

22 U.S.C. §2348 ...................................................................... 4, 5

31 U.S.C. §1341 .......................................................................... 18

31 U.S.C. §1512 .......................................................................... 18

31 U.S.C. §1513 .......................................................................... 18

## Other Authorities

95 Cong. Rec. 12388 (1949) ......................................................... 21

An Act Making Further Provision for the Support of Public Credit and
    for the Redemption of the Public Debt, 1 Stat. 433 §16 (1795) .......................... 27

\* Authorities chiefly relied upon are marked with an asterisk.

Andrew S. Natsios, *Foreign Aid in an Era of Great Power Competition*, 8 PRISM 101 (2020) ..................................................................... 11, 12

Annals of Cong. (1798) (Gallatin)................................................ 14, 17, 18

Annals of Cong. (1803) ........................................................................ 27

Annals of Cong. (Madison) ................................................................... 15

Christian I. Bale, Note, *Checking the Purse: The President's Limited Impoundment Power*, 70 Duke L.J. 607 (2020).................................... 21

*The Complete Annals of Thomas Jefferson* (Franklin Sawvel, ed. 1903) ...................26

David J. Barron & Martin S. Lederman, *The Commander in Chief at the Lowest Ebb—Framing the Problem, Doctrine, and Original Understanding*, 121 Harv. L. Rev. 689 (2008) ..................................... 19

Edward S. Corwin, *The President: Office and Powers 1787–1957* (4th ed. 1957) ....................................................................................... 25

Eloise Pasachoff, *Modernizing the Power of the Purse Statutes*, 92 Geo. Wash. L. Rev. 359, 394–96 (2024)....................................................24

Federalist No. 23 (Hamilton) ............................................................... 11

Federalist No. 70 (Hamilton)............................................................... 10

Frank H. Easterbrook, *Presidential Review*, 40 Case W. Res. L. Rev. 905 (1989) .................................................................................... 19

From James Madison to Congress (May 23, 1809)................................28

Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460 ........................................................................... 4, 6

Kenneth W. Dam, *The American Fiscal Constitution*, 44 U. Chi. L. R. 271 (1977)....................................................................................20

Louis Fischer, *Funds Impounded by the President: The Constitutional Issue*, 38 Geo. L. Rev. 124 (1969) ......................................................21

\* Authorities chiefly relied upon are marked with an asterisk.

v

Mark Paoletta, Daniel Shapiro & Brandon Stras, *The History of Impoundments Before the Impoundment Control Act of 1974*, Ctr. for Renewing Am. ................................................................. 26, 27, 28

Mark Paoletta & Daniel Shapiro, *The President's Constitutional Power of Impoundment*, Ctr. for Renewing Am. (Sept. 10, 2024) ...................... 18, 21, 26

Nile Stanton, *History and Practice of Executive Impoundment of Appropriated Funds*, 53 Neb. L. Rev. 1 (1974) ..................................... 23

O.L.C. Mem. Op. to the Gen. Counsel for Bureau of the Budget (Dec. 1, 1969) ................................................................................. 2, 29

S. REP. 87-612 (1961) ....................................................................... 5, 11

Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to Execute the Laws*, 104 Yale L.J. 541 (1994) ......................................... 15

Thomas Jefferson's First Inaugural Address (Mar. 4, 1801) ................................. 22

U.S. Gov't Accountability Off., GAO-16-464SP, Principles of Federal Appropriations Law (4th ed. 2016) ................................................... 23

U.S. H. Comm. on Oversight, *Examining 'Backdoor' Spending by Federal Agencies* (Dec. 11, 2018) ........................................................ 20

U.S. Treasury, *How much has the U.S. government spent this year?* .......................... 20

*USAID and PL-480, 1961-1969*, U.S. Office of the Historian ................................. 12

William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1 (2019) ..................... 29

Zachary Price, *A Primer on the Impoundment Control Act*, Lawfare (Jan. 28, 2025) ................................................................. 19, 23, 24, 26

\* Authorities chiefly relied upon are marked with an asterisk.

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), counsel for the *amici* States certifies as follows:

### A. Parties

All parties and *amici* appearing before the district court and in this court are listed in the Brief for Appellants with the exception of the *amici* States and potential other *amici* in support of Appellants.

### B. Rulings Under Review

References to the rulings at issue appear in the Appellants' Opening Brief.

### C. Related Cases

Related cases are listed in the Appellants' Opening Brief.

\* Authorities chiefly relied upon are marked with an asterisk.

# GLOSSARY

| | |
|---|---|
| ICA | Impoundment Control Act |
| USAID | U.S. Agency for International Development |

## INTRODUCTION AND STATEMENT OF *AMICI* INTERESTS

This case stands at the crossroads of two fonts of executive power: foreign policy and executive enforcement discretion.  Congress's broad grant of discretion to the President to set the "terms and conditions" for "furnish[ing]" foreign aid reflects its respect for the executive powers in the backdrop.  22 U.S.C. §§2151, *et seq*.  The district court erred when it failed to account for both the statutory and constitutional authority undergirding the President's discretion over foreign-aid disbursements.

Article II entrusts the Executive with "supervisory and policy responsibilities of utmost discretion and sensitivity"—including "the conduct of foreign affairs." *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982).  The Supreme Court has long recognized that the President occupies a uniquely powerful role in directing foreign policy; Article II entails "primacy" in "the conduct of foreign relations." *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 767 (1972).  Policy judgments regarding foreign-aid disbursements—when, to whom, and how much (within the appropriations ceiling set by Congress)—fall well within the sphere of executive discretion over foreign affairs.

Similarly, both constitutional text and longstanding historical practice support a role for the Executive Branch in restraining overspending.  While Congress has exclusive authority under Article I to raise taxes and appropriate federal funds for

1

specific purposes, that power does not extend to micromanaging the President's expenditures of the funds Congress appropriates. The inherent power (and related discretion) to enforce federal laws—including appropriations acts—rests with the Executive Branch. Congressional appropriations thus act as a hard budgetary *ceiling*, not a *floor*. That interpretation aligns with centuries of English history developing the appropriations power as a check on executive excess. *See CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 427–29 (2024). And it is supported by roughly 170 years of American presidential history.

To be sure, the President's discretion over expenditures is not unlimited. Discretion cannot become a cover for failure to enforce the laws at all, thereby negating the "take care" clause duty. *See, e.g.*, *Texas v. United States*, 809 F.3d 134, 166–67 (5th Cir. 2015), *aff'd by equally divided court*, 577 U.S. 1101 (2016). Yet even foremost critics of executive impoundments admit that there are instances in which Congress cannot *require* expenditures because doing so would intrude on core executive powers reserved by the Constitution—including power over foreign affairs. *See, e.g.*, O.L.C. Mem. Op. to the Gen. Counsel, Bureau of the Budget at 310–11 (Dec. 1, 1969), https://perma.cc/768R-9NNG. This case falls firmly within that zone.

Amici States' interests lie with the vindication of executive discretion over

federal expenditures because exercises of that discretion can only shrink the amount of federal spending, and with it the size and power of the federal government. When the Executive Branch trims its own budget, the reduction of the federal Executive's power returns more autonomy to Amici States, to the benefit of their citizens. In that context, a strong and "energetic executive [is] essential to the …security of liberty." *Trump v. United States*, 603 U.S. 593, 610 (2024) (quotation omitted).

The constitutional design ultimately operates to ensure the liberty of the individual citizen. To protect the public fisc, the Constitution imposes several sluices to slow the flow of funds from the hands of individual taxpayers to the federal government, and from the federal government to its favored recipients. Congress's exclusive Article I powers ensure that the President cannot freely dip his hand into the public purse. In turn, the President's "Take Care" authority gives him discretion to spend less than Congress budgets if executive agencies can accomplish legislative goals more efficiently. Both limits inure to the benefit of the citizen-taxpayer and the security of the Nation at large.

## ARGUMENT

The Constitution splits the atom of political power vertically, through federalism, and horizontally, through the separation of powers. In that division of authority, the Supreme Court has long recognized that the "President is the sole organ of the

3

nation in its external relations, and its sole representative with foreign nations." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936) (quoting Annals, 6th Cong., col. 613). Congress recognized this, too, and expressly granted the President sweeping authority "to furnish assistance" to foreign nations "on such terms and conditions as he may determine." 22 U.S.C. §§2151(b)–(c)(1), 2291(a)(1)(G)(4), 2346(a), 2348; *see also* §2347(a). That statutory discretion under the Foreign Assistance Act respects both the President's authority over foreign policy and his constitutional role in executing federal law, including appropriations acts. *See below* at I.B and II.

The most straightforward path to resolve this case is thus to effectuate the Act's plain meaning. This Court should hold that Executive Branch authority to furnish aid on the President's "terms and conditions," 22 U.S.C. §§2151, *et seq.*, includes decisions on the timing of foreign aid disbursement and whether to expend the full amount Congress appropriated "to enable the President to carry out the provisions of the Foreign Assistance Act." Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 740. That has the virtue of aligning the best reading of the Act with the President's Article II powers over foreign policy and the disbursement of appropriations. It thus avoids significant constitutional questions that Plaintiffs' challenge otherwise implicates about the limits of Article II.

4

I.      **The President has broad discretion over the administration of foreign aid.**

      A.     **The Foreign Assistance Act grants the President authority to determine the terms and conditions of foreign aid.**

The Foreign Assistance Act of 1961 contemplates the exercise of executive discretion in disbursing foreign aid. 22 U.S.C. § 2151 *et seq.* There is no dispute that Congress expressly authorized the President to use his judgment to administer foreign assistance. *See* S. REP. 87-612, at 2506-07 (1961). The Act grants the President sweeping authority to "furnish assistance" to foreign countries and organizations "on such terms and conditions *as he may determine.*" *See, e.g.*, 22 U.S.C. §§ 2151b(c)(1), 2151t(a), 2291(a)(1)(G)(4), 2346(a), 2348 (emphasis added); see also §2347(a). Even the district court acknowledged that the statute "explicitly recognizes and authorizes the President's role in administering aid." *Aids Vaccine Advocacy Coal. v. U.S. Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 752378, at *2 (D.D.C. Mar. 10, 2025). The President's determinations of the timing, recipients, and amount of foreign aid (within the appropriations ceiling set by Congress) fit comfortably within the Act's parameters. Those decisions are part and parcel of the power to "determine" the "terms and conditions" of disbursing aid.

Nothing in the 2024 Appropriations Act "clearly express[es]" or "manifests" Congress's intent to displace the discretion Congress afforded the President over "furnish[ing]" foreign assistance by imposing a mandatory obligation to spend all

5

appropriated funds. *Epic Systs. Corp. v. Lewis*, 584 U.S. 497, 510 (2018); *see also* Appropriations Act of 2024, 138 Stat. at 740. Nor has Congress "specifically" addressed the issue of foreign aid disbursement elsewhere; thus "it can be strongly presumed" that it did not suspend the President's ability to discretionarily furnish foreign assistance with any other statute, whether by the passage of the 2024 Appropriations Act or of the Impoundment Control Act. *See United States v. Fausto*, 484 U.S. 439, 452 (1988) (presumption against implied repeal).

Despite acknowledging Congress's explicit grant of foreign aid spending discretion to the President, the district court nevertheless concluded that the President acted at the "lowest ebb" of his authority because his executive order directly conflicted with the congressional mandate imposed by a wholly different statute, the Impoundment Control Act (ICA). *Aids Vaccine Advocacy Coal.*, 2025 WL 752378, at \*15 (quotation omitted). That is wrong. To the extent that Congress purports to completely restrain presidential discretion to impound funds in the ICA, Congress arguably exceeds its power by intruding on the President's constitutional authority (a constitutional question the Court should avoid). *See below* at II. Constitutional questions aside, a statute curtailing executive discretion over disbursements *generally* should not be read to impliedly overrule a different statute's provisions granting executive discretion over a subset of disbursements (foreign aid)

*specifically*. "[A]bsent a specific limitation on the Executive's authority to condition dispersal of United States funds to foreign [organizations], it must be assumed that Congress has left intact the President's discretion to place conditions upon or refuse funding to such organizations." *Planned Parenthood Fed'n of Am., Inc. v. Agency for Int'l Dev.*, 838 F.2d 649, 655 (2d Cir. 1988) (quotation omitted). Since Congress's intent to preserve executive discretion under the Foreign Assistance Act is clear and not expressly contravened by later enactments, that should be the "end of the matter." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 233 (1986).

This Court recognized as much decades ago when it rejected a challenge to President Ronald Reagan's decision to withhold foreign aid funds appropriated for foreign and domestic nongovernmental organizations and foreign governments that performed or actively promoted abortion. *See DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 277–78 (D.C. Cir. 1989). In *DKT*—decided several years after the enactment of both the Foreign Assistance Act and ICA—this Court concluded that Congress imposed no restriction on the President's ability to discretionarily furnish foreign assistance. *Id.* at 280–81. Absent an express statutory limitation, this Court explained that the President retains authority to condition or withhold foreign aid as he sees fit. *See id.* The *DKT* decision points the way here.

The Supreme Court's precedent likewise signals the right outcome. Federal courts consider challenges to the President's authority under the tripartite rubric outlined by Justice Jackson's concurrence in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). *See Trump*, 603 U.S. at 607. Presidential power stems either from congressional authorization or the Constitution. *Youngstown*, 343 U.S. at 638 (Jackson, J., concurring). "When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Id.* at 635. In contrast, when the President acts contrary to Congress's express or implied will, "his power is at its lowest ebb," and he must rely for authority on his own constitutional powers. *Id.* at 637. Between those outer limits is a "zone of twilight" where Congress has not spoken, and the President and legislature might exercise concurrent authority. *Id.*

The district court erred in its application of the *Youngstown* framework by omitting any consideration of the Foreign Assistance Act or the President's constitutional role as the principal officer in American foreign affairs. Since the Act provides complementary authorization to the President's vested executive power over foreign affairs, *see below* at I.B, the President operates with "maximum"

authority when he furnishes (or decides not to furnish) American foreign aid. *Youngstown*, at 635 (Jackson, J., concurring).

Because the President's decision to withhold foreign assistance complies with the Foreign Assistance Act, it is "supported by the strongest of presumption" of authority. *Id.* at 637. And the Court should read that Act of Congress against the constitutional backdrop of the President's inherent foreign-affairs power.

### B.    The Foreign Assistance Act complements the Constitution, which vests the President with substantial power over foreign affairs.

The "primacy of the Executive in the conduct of foreign relations" has a lengthy historical pedigree in the United States. *Banco Nacional de Cuba*, 406 U.S. at 767. Indeed, the very first Executive Branch department Congress established was the Department of Foreign Affairs in 1789. *Edmond v. United States*, 520 U.S. 651, 663 (1997); *see also Marbury v. Madison*, 5 U.S. 137, 139–40 (1803) (the "secretary of the department of foreign affairs … shall conduct the business of the [] department in such manner as the President of the United States shall from time to time order or instruct." (quotation omitted)). True, the Constitution splits some foreign affairs responsibilities between Congress and the President. But that division of power reflects the roles best suited by each branch. Congress makes big-picture, strategic decisions of grave national import—declaring war, ratifying treaties, appropriating funds for national defense. U.S. Const. art. I, §§8, 10. The President, on the other

9

hand, is entrusted "with primary responsibility for the conduct of foreign affairs" and on-the-ground, tactical implementation of foreign policy. *Banco Nacional de Cuba*, 406 U.S. at 768; *see also Nixon*, 457 U.S. at 749–50. Just last year, the Supreme Court reaffirmed that the "President's duties [under Article II] are of unrivaled gravity and breadth," and encompass "important foreign relations responsibilities: making treaties, appointing ambassadors, recognizing foreign governments, meeting foreign leaders, overseeing international diplomacy and intelligence gathering, and managing matters related to terrorism, trade, and immigration." *Trump*, 603 U.S. at 607 (quotation omitted); *see also* U.S. Const. art II.

That was by design. *See Zivotofsky ex rel. Zivotofsky v. Kerry,* 576 U.S. 1, 34–35 (2015) (Thomas, J., concurring in the judgment in part and dissenting in part). The Framers "vested the President with supervisory and policy responsibilities of utmost discretion and sensitivity," *Trump*, 603 U.S. at 610 (quotation omitted), on the view that a unitary Executive, "not Congress, has the better opportunity of knowing the conditions which prevail in foreign countries" and reacting nimbly, *Curtis-Wright*, 299 U.S. at 320. Article II thus reflects the Founding-era view that an "energetic Executive" empowered to act with "[d]ecision, activity, secrecy, and d[i]spatch" is "essential to the protection of the community against foreign attacks." Federalist No. 70 (Hamilton), https://perma.cc/4WFG-4ASJ.

10

Congress likewise has recognized both the need for decisive executive action in foreign affairs and the impact that foreign aid has on foreign policy. To that end, Congress granted the President significant discretion over the furnishing of foreign aid when it enacted the Foreign Assistance Act. That discretion extends even to allowing the President leeway to "furnish assistance" to foreign countries based on his own policy determinations. Indeed, an original purpose of the President's statutory authority to "furnish assistance on such terms and conditions as he may determine" was to empower the President to curtail and "contain[] the spread of communism" during the Cold War. S. REP. 87-612, at 2493 (1961). This "special authority" was crucial to enable the President "to meet contingencies" that would arise from "unpredictable events." *Id.* at 2497; *accord* Federalist No. 23 (Hamilton), https://perma.cc/HNE8-7K58.

Early historical use of the U.S. Agency for International Development (USAID) and its predecessor programs reflect that presidents deployed foreign aid to diplomatic and strategic ends. *See, e.g.*, Andrew S. Natsios, *Foreign Aid in an Era of Great Power Competition*, 8 PRISM 101, 103–05 (2020), https://perma.cc/4VGZ-BYS4. Congress institutionalized U.S. foreign aid programs by creating USAID in September 1961, just one month after the Berlin crisis peaked with the erection of the Berlin Wall. *Id.* at 104. "USAID's foreign aid programs were products of the

Cold War as an instrument to prevent developing countries falling to communism" and "stabilize countries under pressure from the Communist bloc." *Id.* at 103–04. President Lyndon B. Johnson's actions provide another example; he "understood that food aid served diplomatic ends and bolstered U.S. strategic interests." *USAID and PL-480, 1961-1969*, U.S. Office of the Historian, https://perma.cc/3UGJ-LQLG. As a result, "Johnson authorized food aid shipments to nations in order to allow recipients to redirect spending for military equipment or security purposes"; "negotiated [aid] agreements" in an attempt to discourage countries "from accepting assistance from U.S. adversaries"; and even conditioned "critical famine aid to India" on assurances that India would "temper criticism of U.S. policy regarding Vietnam." *Id.*

Thus, constitutional, statutory, and historical context point toward far more Article III respect for the Executive's role than the district court offered here. As it is, federal courts' "customary policy" is "deference to the President in matters of foreign affairs." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 348 (2005) (internal quotation omitted). That is because foreign-policy decisions "implicate our relations with foreign powers and require consideration of changing political and economic circumstances"—considerations that an unelected judiciary is ill-suited to undertake. *Id.* And that deference should be at its height when the "Legislative and

Executive powers" over foreign affairs "are pooled" so that "strategic and diplomatic interests of the country may be coordinated and advanced without collision or deadlock." *Chi. & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 110 (1948). The district court should have read the statute in light of this constitutional backdrop; it erred by doing otherwise.

## II. The Constitution vests the President with authority to execute the laws, including appropriations laws.

Even if the statute, read in the light of presidential power over foreign affairs, were not enough, Article II provides yet another source of Executive power over foreign-aid expenditures: the President's discretion to enforce federal laws, including appropriations acts. While Congress has power to appropriate funds, this is best understood textually and historically as a *negative* power that restricts the Executive's access to public funds, not as a positive one to compel Executive disbursements in detail. Congress cannot intrude into the President's exercise of his exclusive authority to execute the laws by puppeteering his hand on expenditures, requiring expenditures of every last penny.

### A. Under the constitutional division of power over the public fisc, Congress appropriates and the President expends.

Part of the Constitution's genius is that it gives the two political branches a share in most of the federal government's political powers. Under "the distribution and

separation of Legislative and Executive powers…the same act, in many instances, instead of belonging exclusively to either [branch], falls under the discretionary and partial authority of both." 7 Annals of Cong. 1121–22 (1798) (Gallatin). Congress has power to make laws, but the President can veto them. Congress has power to declare war, but the President acts as commander in chief in the operation of America's warfighters. Congress enacts laws establishing federal crimes; the President prosecutes (or pardons) them. Congress levies taxes and appropriates funds, while the President disburses them.

The provisions demarcating Congress's power of the purse bear out this division. Article I gives Congress power over (1) taxes and (2) appropriations. The Taxing Clause empowers Congress "to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, §8, cl. 1. The Appropriations Clause provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." *Id.* art. I, §9, cl. 7. In sum, Congress has sole (and tremendous) power over the amount and purpose of funds *available* in the federal budget, but no constitutional authority at all to *expend* them. That is because expending funds is the *execution* of appropriations acts, and as such falls under Article II.

Article II obligates the President to "take Care that the Laws be faithfully executed." U.S. Const. art. II, §3. Prosecuting violations of federal statutes is one form of execution. Expending federal funds under an appropriations act is another. The "Take Care" authority to execute federal laws is exclusively executive. *See, e.g.*, *Trump*, 603 U.S. at 607. The "Legislature has no right to diminish or modify" any power the Constitution vests in the President. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 500 (2010) (quoting 1 Annals of Cong., at 463 (Madison)). So a congressional attempt to impose a blanket rule that eliminates *all* presidential discretion inherent in executing an appropriations law is an attempt to reduce the President from head of a co-equal branch to a mere clerk of Congress.

Nor may the Necessary and Proper Clause work an end-run around the Take Care Clause. It is never a "proper" exercise of legislative power to abridge authority entrusted to a co-equal branch. *Zivotofsky*, 576 U.S. at 48–50 (Thomas, J., concurring in the judgment in part and dissenting in part); Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to Execute the Laws*, 104 Yale L.J. 541, 586–87 (1994). Allowing Congress to micromanage the Executive's hand in expenditures turns President to puppet and aggregates power in one branch. To be sure, Congress has the lion's share of the "power of the purse." But that power is control over the purse strings—when to open them, and what conditions to attach

to federal funds.  Once Congress decides to appropriate Treasury funds, the baton passes to the President to execute the federal budget within congressionally established funding and purpose limits.

**B.    The President's duty to "faithfully execute" the laws entails discretion to disburse less than the full funds appropriated by Congress.**

The Take Care Clause entails significant discretion and judgment.  "The Constitution that makes the President accountable to the people for executing the laws also gives him the power to do so." *Free Enter. Fund*, 561 U.S. at 513.  This is by design.  "The Framers sought to encourage energetic, vigorous, decisive, and speedy execution of the laws by placing in the hands of a single, constitutionally indispensable, individual" all executive authority. *Trump*, 603 U.S. at 610 (quotation omitted).  While the President cannot abandon wholesale the enforcement of a law, *Texas*, 87 F.3d at 757–58, "[t]he vesting of all executive power in the President as well as his constitutional obligation to 'take Care that the Laws be faithfully executed,' has been understood to leave enforcement and nonenforcement decisions exclusively with the Executive Branch." *CREW v. FEC*, 993 F.3d 880, 887–88 (D.C. Cir. 2021) (emphasis added, quotation and citations omitted).

This concept is not novel.  Discretion is an inextricable feature of prosecution, one aspect of the President's "Take Care" authority.  "[T]he Executive Branch has

'exclusive authority and absolute discretion' to decide which crimes to investigate and prosecute." *Trump*, 603 U.S. at 620 (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021). Similarly, the President's discretion does not suddenly disappear when he expends federal funds. While the President cannot assume powers constitutionally dedicated to Congress—for instance, by appropriating money directly from the Treasury or using federal funds for unauthorized purposes—whether he expends *all* available funds naturally falls within his discretion to enforce appropriations laws.

As Albert Gallatin—who became one of the country's earliest Treasury secretaries—explained, it "is evident that where the Constitution has lodged the power, there exists the right of acting, and the right of discretion." 7 Annals of Cong. 1121–22 (1798) (Gallatin). Gallatin argued that Congress had no constitutional obligation to appropriate funds for a diplomatic measure President Adams thought necessary because "there is no clause which directs that Congress shall be bound to appropriate money in order to carry into effect any of the Executive powers." *Id.* Inversely, he explained that while Congress can appropriate necessary funding, by constitutional design it "cannot force the President" to disburse all funds that Congress appropriates. *Id.* at 1120–21. For example, Congress could "appropriate

17

a sum of money for the purpose of paying twenty public Ministers," but it could not force the President to appoint twenty public ministers. *Id.* at 1121.

Discretion is not only constitutionally sound, it is practically necessary. In the impoundment context, the Take Care Clause empowers the President to reconcile potentially conflicting laws, decline to enforce unconstitutional ones, and exercise judgment to achieve efficient and good government. Mark Paoletta & Daniel Shapiro, *The President's Constitutional Power of Impoundment*, Ctr. for Renewing Am. (Sept. 10, 2024), https://perma.cc/NUJ8-V3TC. Consider first statutory conflicts. The Take Care Clause requires faithful execution of all duly enacted and constitutional laws, which at times necessitates impoundment. The Anti-Deficiency Act, for example, bars the Executive Branch from spending without an appropriation or in a manner that might obligate the federal government. *See* 31 U.S.C. §§1512, 1513, 1341. But congressional appropriations sometimes purport to require the President to spend the entirety of an amount on a truncated timetable. "[E]xpending sums in such a manner creates a significant risk of spending beyond the specified appropriation," contra the Anti-Deficiency Act. Paoletta & Shapiro, *Constitutional Power of Impoundment*. Despite that, the ICA forbids pausing or declining any portion of expenditures except under narrow circumstances. *See* 2 U.S.C. §§684(a), (b); 683(b). As even critics of executive impoundment admit, this statutory bind

"catches the executive branch in a vise." Zachary Price, *A Primer on the Impoundment Control Act*, Lawfare (Jan. 28, 2025), https://perma.cc/L2XR-NBHH.

A similar quandary may arise if the President's obligation to uphold the "supreme law of the land" implicates spending less than a full appropriation. If Congress improperly uses its appropriations power to violate another constitutional provision, *see* David J. Barron & Martin S. Lederman, *The Commander in Chief at the Lowest Ebb—Framing the Problem, Doctrine, and Original Understanding*, 121 Harv. L. Rev. 689, 739 (2008), the President's Take Care obligation arguably extends to "refusing to enforce laws that violate the supreme law of the Constitution." Calabresi & Prakash, at 621–22; *see also* Frank H. Easterbrook, *Presidential Review*, 40 Case W. Res. L. Rev. 905, 921 (1989). Properly understood, the Take Care Clause enables the President to resolve statutory spending clashes or decline to expend unconstitutional appropriations.

More frequently, it enables the President to effectuate economical and efficient government. Faithful execution might require spending less than the full appropriation if programs can be accomplished more economically. It might also require a pause to determine if executive agencies are expending funds in an efficient manner. These scenarios are especially likely under the modern funding process. Presidents (and Congress) now operate primarily under budgetary amounts

approved in years past by prior governments.  Mandatory spending, required by existing laws rather than annual appropriations, accounts for nearly two-thirds of federal spending each year.  U.S. Treasury, *How much has the U.S. government spent this year?*, https://perma.cc/PTM3-TEBR.  Combined with so-called "back-door spending," which increased 88% from 1994 to 2015, nearly three-quarters of the federal budget is pre-set.  U.S. H. Comm. on Oversight, *Examining 'Backdoor' Spending by Federal Agencies* (Dec. 11, 2018), https://perma.cc/9885-BRSJ.  The President's veto power is largely irrelevant to spending issues because the vast majority of the federal budget is set by laws and processes that the sitting President did not sign into effect.  The Constitution does not tie the hands of the Executive by forever fixing past budgetary needs as present reality.

Modern federal budgeting "has effectively reversed the textbook notion that Congress through the legislative process affirmatively decides upon the amount and content of each year's expenditures."  Kenneth W. Dam, *The American Fiscal Constitution*, 44 U. Chi. L. R. 271, 280–81 (1977).  Changing circumstances often mean changing budgetary needs, which prior statutory mandates or backdoor spending did not and cannot consider.  For example, the "[c]essation of World War II left the Government with tens of billions of dollars in excess of military needs";

President Truman rescinded millions in response.  Louis Fischer, *Funds Impounded by the President: The Constitutional Issue*, 38 Geo. L. Rev. 124, 125 (1969).

The President is ideally positioned to account for the real-time budgetary needs of his agencies.  *See* Paoletta & Shapiro, *Constitutional Power of Impoundment*, n.14.. Indeed, the "President is the only officer who can 'command a view' of the entirety of the federal government and ensure that programs are being implemented in a reasonable, nonredundant manner that furthers the national interest."  Paoletta & Shapiro, *Constitutional Power of Impoundment* (quoting Jefferson's First Inaugural Address, 33 Papers of Thomas Jefferson 148–52 (Barbara B. Oberg, ed. 2007) (Mar. 4, 1801)).  As Ohio Senator Robert Taft III explained during a congressional hearing over President Truman's authority to impound $735 million in defense appropriations:  "The Appropriations Committee can reduce military funds to what it considers a point of safety, but it cannot feel sure about going further. It might be destroying a department's effective work.  Only the [executive] department itself can make the additional saving necessary over what Congress has done."  Christian I. Bale, Note, *Checking the Purse: The President's Limited Impoundment Power*, 70 Duke L.J. 607, 638–39 (2020) (brackets omitted) (quoting 95 Cong. Rec. 12388, 12410 (1949)).

Moreover, presidential decisions to spend less inherently reduce the amount of funding consumed by the President and executive agencies. "Money is the instrument of policy"; it is what fuels the federal government and executive functions. *Clinton v. City of New York*, 524 U.S. 417, 451 (1998) (Kennedy, J., concurring). The less funding, the less powerful the Executive Branch. And the Framers were not overly concerned with a government branch taking measures that shrink its own institutional power over the world.

In contrast, the consequences of holding that the President has zero discretion to spend less than the ceiling appropriated by Congress would be significant. First, reading the Constitution to obligate the President to spend all budgeted funds penalizes Executive Branch economy—even though the Founders viewed "economy in the public expense" as an "essential principle[] of our Government." *See* Thomas Jefferson's First Inaugural Address (Mar. 4, 1801), https://perma.cc/C8SY-MUEN. This approach means that if the Department of Transportation negotiates a good deal with a highway contractor, it still must waste the remainder of its budget rather than return excess funds to the Treasury (or go through a money filled, hat-in-hand negotiation with fractious majorities in Congress to try to give it back through "recission," *see* 2 U.S.C. §§683, 685(e), 688). Faithful execution of the laws does not require such excess. An everyday example illustrates

the absurdity: if a parent gives their child $20 to pay for lunch and the child buys a sandwich for $12, no one would say that the child failed to buy lunch and flouted the parent's instructions; rather, the child was frugal, or the parent gave him more money than needed.

Second, this approach ignores that it is virtually impossible to achieve Goldilocks expenditures—not a cent above or below appropriated funding—every time, within every congressional deadline. *See* Nile Stanton, *History and Practice of Executive Impoundment of Appropriated Funds*, 53 Neb. L. Rev. 1, 5 (1974) ("Every President from George Washington to Richard Nixon has almost certainly impounded appropriated funds.").

Finally, the ICA creates more problems than it solves. As an initial point, if impoundment authority exists purely as an act of congressional grace, then Congress can just as easily take it away. At any rate, "statutory impoundment is an ineffective tool for controlling federal spending." Bale, at 610. But the ICA itself even allows "programmatic delays"—spending delays allegedly caused by external factors—no matter how indefinite. U.S. Gov't Accountability Off., GAO-16-464SP, Principles of Federal Appropriations Law 2-50, 2-51 (4th ed. 2016), https://perma.cc/44XE-3JPL; *see* Price, *Primer on the Impoundment Control Act*. In practice, this allows the Executive to sidestep the ICA's prohibition on policy based deferrals and engage in

the precise conduct plaintiffs contend is unconstitutional.   Eloise Pasachoff, *Modernizing the Power of the Purse Statutes*, 92 Geo. Wash. L. Rev. 359, 394–96 (2024).   That is likely why "no president appears to have reported a deferral to Congress since fiscal year 2000, though they have surely delayed spending on programmatic grounds."  Price, *Primer on the Impoundment Control Act*.

### C. The President's enforcement discretion is at its height when executive discretion is statutorily authorized and an appropriation implicates the core executive power over foreign affairs.

Presidential power generally operates on a spectrum, not on a binary basis.   *See Youngstown*, 343 U.S. at 636–38 (Jackson, J., concurring). The President's discretion over expenditures is at its zenith when exercised pursuant to permissive statutory language or related to a core executive power (for example, foreign affairs), and at its nadir when he refuses to expend any portion of a mandatory appropriation for a purely domestic program—with significant room between those poles.  *Cf.* Bale, at 611–12.

Federal courts are poorly situated to police executive discretion in that vast middle ground.  Because Article II grants the President significant enforcement discretion, "courts generally lack meaningful standards for assessing the propriety of [the President's] enforcement choices."   *United States v. Texas*, 599 U.S. 670, 679 (2023); *cf. Rucho v. Common Cause*, 588 U.S. 684, 696, 706–08 (2019).  To the extent

there is any role for judicial intervention, it is as a fail-safe when the President clearly violates his "take care" obligation by refusing to enforce the law at all. *See Texas*, 599 U.S. at 682 (noting that discretion may not extend to "wholly abandon[ing]" enforcement). For instance, the President's obligation to faithfully execute the laws might not permit an outright refusal to disburse *any* portion of an appropriation for a domestic program, especially one that does not implicate a core executive power. In general, however, there is significant room for presidential discretion to execute appropriations laws, and little room for judicial supervision of the Executive's exercise of that discretion.

At any rate, whatever the outer bounds of presidential discretion, this presidential action does not touch them. This case falls on the high-end of the discretion spectrum because it both implicates the President's constitutional, foreign-affairs powers, and falls within a statutory grant of authority under the Foreign Assistance Act. *See above* at I.A–B.

And it fits well within a century-and-a-half old tradition of presidential impoundments of appropriations relating to foreign policy. "[E]arly practice" assumed that "expenditure is primarily an executive function, and conversely that the participation of the legislative branch is essentially for the purpose simply of setting bounds to executive discretion." Edward S. Corwin, *The President: Office and Powers 1787–*

*1957*, 127–128 (4th ed. 1957), https://perma.cc/62SV-HEC4.  As a result, "U.S. presidents have asserted an authority to impound federal funds" since the earliest days of the Republic, and have done so even when "statutory language [] seemed to make the spending mandatory."  Price, *Primer on the Impoundment Power*.  Presidential expenditures by the nation's earliest presidents are particularly probative, given the proximity to the Founding and fact that these presidents were among the Framers.  *CFPB*, 601 U.S. at 442 ("Long settled and established practice may have great weight in interpreting constitutional provisions about the operation of government." (Kagan, J., concurring) (quotation omitted)).

Start with President Washington, who first considered impoundment in the context of foreign expenditures.  In Washington's discussions with Secretary of State Thomas Jefferson regarding whether the U.S. should continue repaying its debts to the French, "neither…questioned whether the President lacked the power to withhold such funds."  Paoletta & Shapiro, *Constitutional Power of Impoundment*; *see also The Complete Annals of Thomas Jefferson* 101–02 (Franklin Sawvel, ed. 1903), https://perma.cc/M7JD-RN9Y.  Indeed, Washington's administration routinely underspent on appropriations, a fact that Hamilton "openly reported to Congress" through "detailed accountings of unexpended appropriations."  Mark Paoletta, Daniel Shapiro & Brandon Stras, *The History of Impoundments Before the Impoundment*

*Control Act of 1974*, Ctr. for Renewing Am., at 5, https://perma.cc/MQ36-TT9.
Congress reacted not with disapproval but by "creating a surplus fund for unexpended appropriations," and providing that any remaining funds automatically reverted to the Treasury after two years. *Id.* (citing An Act Making Further Provision for the Support of Public Credit and for the Redemption of the Public Debt, 1 Stat. 433, 437–38 §16 (1795)).

President Jefferson likewise "regularly returned [an] unexpended balance to the Treasury." Paoletta, et al., *History of Impoundments* at 8–9. Although a proponent of limited executive power over federal funds, Jefferson never suggested that Congress could obligate the President to spend *all* appropriated funds. To the contrary, Jefferson engaged in the most famous early example of impoundment when he declined to spend a $50,000 appropriation for gunboats to guard the Mississippi. Bale, at 615. Jefferson withheld the funds based on foreign diplomacy considerations, concerned that expending them would "provoke France" during negotiations for the Louisiana Purchase. Paoletta, *et al.*, *History of Impoundments* at 9; *see also* 13 Annals of Cong. 14 (1803) (explaining to Congress that "favorable and peaceable turn of affairs … rendered an immediate execution of that law unnecessary"). When Jefferson's successor, President James Madison—the father of the Constitution—impounded funds, he also offered Congress an explanation tied to diplomacy: a

27

"favorable change[] in our foreign relations" made some naval expenditures unnecessary. From James Madison to Congress (May 23, 1809), https://perma.cc/X35H-XK6X.

The practice of executive discretion over expenditures held true from ratification in 1789 until enactment of the ICA in 1974. Many of the historic examples of presidential impoundment involved spending less than appropriated in areas related to foreign policy. President Franklin Roosevelt, for instance, spent millions less than Congress appropriated during World War II. Stanton, at 10; Paoletta, et al., *History of Impoundments* at 14.

The list goes on. In the first 170 years after ratification, virtually all Presidents impounded some appropriated funds. *See, e.g.*, Paoletta, et al., *History of Impoundments* at 15–18. These impoundments did not always proceed without congressional discussion and push-back. But consensus generally favored executive discretion, and Congress often acquiesced in the impoundments. *Id.* at 16, 18; *see also* Bale, at 637–40 (detailing examples of congressional acquiescence to controversial impoundments by Truman and Kennedy).

Even then-Assistant Attorney General William Rehnquist, one of the earliest skeptics of constitutional impoundment authority, agreed that executive discretion over expenditures is constitutional in some instances. For instance, Rehnquist

acknowledged impoundment is permissible to reconcile "conflicting statutory demands" or when related to "an area confided by the Constitution to [the President's] substantive direction and control"—including "his authority over foreign affairs." O.L.C. Mem. Op. to the Gen. Counsel for Bureau of the Budget at 310–11 (Dec. 1, 1969), https://perma.cc/768R-9NNG.

This history is constitutionally significant. Congress's acquiescence in the face of Executive Branch practice also sheds some light on constitutional meaning. *See, e.g.*, William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1, 1 (2019). Here, the roughly 170 years of Executive impoundment offers powerful evidence of the meaning of the Constitution's carefully calibrated division of federal power over the public funds.

## CONCLUSION

The Court should reverse the district court's preliminary injunction order.

Dated: May 16, 2025

Respectfully submitted,

ALAN WILSON
Attorney General of
South Carolina

DAVE YOST
Ohio Attorney General

ROBERT COOK
Solicitor General
J. EMORY SMITH, JR.
Deputy Solicitor General
BEN MCGREY*
THOMAS T. HYDRICK
JOSEPH D. SPATE
Asst. Dep. Solicitors General
  *Counsel of Record
State of South Carolina
Office of the Attorney General
1000 Assembly St.
Columbia, SC 29201
803.734.3371
benmcgrey@scag.gov

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER*
Ohio Solicitor General
  *Counsel of Record
MATHURA J. SRIDHARAN
KATIE ROSE TALLEY
Deputy Solicitors General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
thomas.gaiser@ohioago.gov

*Counsel for State of Ohio*

*Counsel for State of South Carolina*

## ADDITIONAL COUNSEL

STEVE MARSHALL
Alabama Attorney General

TREG R. TAYLOR
Alaska Attorney General

TIM GRIFFIN
Arkansas Attorney General

JAMES UTHMEIER
Florida Attorney General

CHRISTOPHER M. CARR
Georgia Attorney General

THEODORE E. ROKITA
Indiana Attorney General

BRENNA BIRD
Iowa Attorney General

KRIS KOBACH
Kansas Attorney General

LIZ MURRILL
Louisiana Attorney General

LYNN FITCH
Mississippi Attorney General

MICHAEL T. HILGERS
Nebraska Attorney General

DREW H. WRIGLEY
North Dakota Attorney General

GENTNER DRUMMOND
Oklahoma Attorney General

MARTY JACKLEY
South Dakota Attorney General

JONATHAN SKRMETTI
Tennessee Attorney General
and Reporter

KEN PAXTON
Texas Attorney General

DEREK E. BROWN
Utah Attorney General

JOHN B. MCCUSKEY
West Virginia Attorney General

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, that this brief complies with the type-volume for an *amicus* brief supporting an appellant and contains 6,287 words.  *See* Fed. R. App. P. 32(a)(7)(B)(i), 29(a)(5).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER
*Counsel for State of Ohio*

32

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2025, I caused the foregoing to be electrically filed with the Clerk of the Court by using the Court's CM/ECF system. All registered counsel will be served by the Court's CM/ECF system.

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER
*Counsel for State of Ohio*
