**ORAL ARGUMENT SCHEDULED FOR JULY 7, 2025**

**Nos. 25-5097, 25-5098**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**GLOBAL HEALTH COUNCIL, et al.,**

**Plaintiffs-Appellees,**

**v.**

**DONALD J. TRUMP, et al.,**

**Defendants-Appellants.**

_____

**AIDS VACCINE ADVOCACY COALITION, et al,**

**Plaintiffs-Appellees,**

**v.**

**UNITED STATES DEPARTMENT OF STATE, et al.,**

**Defendants-Appellants.**
_____

On Appeal from the United States District Court
for the District of Columbia
_____

**BRIEF OF ALAN B. MORRISON AS AMICUS CURIAE
IN SUPPORT OF APPELLEES URGING AFFIRMANCE**
_____

Alan B. Morrison
2000 H Street NW
Washington D.C. 20052
(202) 994 7120
abmorrison@law.gwu.edu
Counsel for the Amicus

June 11. 2025

# CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

**Parties and Amici.**  All parties and amici known to amicus are set forth in the brief of the appellees.

**Rulings under Review.**  All rulings under review are set forth in the brief of the appellees.

**Related Cases.**  All related cases are set forth in the brief of the appellees.

*/s/ Alan B. Morrison*
Alan B. Morrison

**CERTIFICATE OF COUNSEL UNDER D.C. CIRCUIT RULE 32(d)**

Counsel for the parties have consented to the filing of this brief.  Counsel for the amicus certifies that he has conferred with counsel for appellees and counsel for the amicus Constitutional Accountability Center and states that the contents of this brief, which focus on the Impoundment Control Act, do not overlap with the briefs of the appellees or the Constitutional Accountability Center.   Eighteen states have indicated their attention to file an amicus brief, but that brief is not likely to focus on the Impoundment Control Act.

*/s/ Alan B. Morrison*
Alan B. Morrison

## TABLE OF CONTENTS

**CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES**...……i

**CERTIFICATE OF COUNSEL UNDER D.C. CIRCUIT RULE 32(d)**..……..ii

**TABLE OF AUTHORITIES**……………………………………………….iv

**INTEREST OF THE AMICUS**……………………………………………..1

**INTRODUCTION & SUMMARY OF ARGUMENT**…………………….…2

**ARGUMENT**…………………………………………………...………7

    **DEFENDANTS' ACTIONS CHALLENGED HERE**
      **VIOLATE THE IMPOUNDMENT CONTROL ACT**………..……….7

**CONCLUSION**……………..…………………………………………23

# TABLE OF AUTHORITIES

## Cases

*Bowsher v. Synar,* 478 U.S. 714 (1986)…………………………………………7

*Campaign Clean Water, Inc. v. Ruckelshaus*, 420 U.S. 126 (1975)………………..1

*City of New Haven v. United States,* 809 F.2d 900 (D.C. Cir. 1987)...…1, 13-14, 22

*Clinton v. City of New York,* 524 U.S. 417 (1998) …………………………5, 21-22

*In re Aiken County,* 725 F.3d 255 (D.C. Cir. 2013)…………………………..19, 22

*INS v. Chadha,* 462 U.S. 919 (1983)  …………………………………………....13

*Rocky Ford Housing Authority v. U.S. Department of Agriculture,*
    437 F. Supp. 118 (D. D.C. 1977)…………………………………………………11

*State Highway Comm'n of Mo. v. Volpe*, 479 F.2d 1099 (8th Cir. 1973)………..…1

*Train v. City of New York*, 420 U.S. 35 (1975)………………………………………1

## Statutes

Administrative Procedure Act, 5 U.S.C. § 706 …………………………………..24

American Relief Act, 2025, Pub. L. 118-158 (2024)…………………………  17

Full-Year Continuing Appropriations and Extensions Act, Pub. L. 119-4
    (2025)  ……………………………………………………………….…17

Impoundment Control Act of 1974, 2 U.S.C. § 681………. 1, 4-5, 11-12, 15, 19-22

    Section 682 …………………………………………………...7, 8, 10

    Section 683……………………………………………………….7-10, 12-13

    Section 684………………………………………………………...7, 12-14

Section 685 …………………………………………………………..11

Section 686………………………………………………………....11

Section 688………………………………………………………10

Line Item Veto Act, 110 Stat. …………………………………………..20-22

Pub. L. 100–119, 101 Stat 754 (1987)………………………………….…14

**Constitution**

Article I, section 9, clause 7…………………………..…………………………3

Article I, section 7 ………………………………………………………  22

**Other Authorities**

Exec. Order 14169, 90 Fed. Reg. 8619 (2025)……...……..………………………3

Exec. Order 12608, 52 Fed. Reg. 34617 (1987)…………………………………9

Exec. Order 11845, 40 Fed. Reg. 13299 (1975) ………………………………...9

Impoundment Control Act of 1974, Review of President's Special Rescission Messages of May 8, 2018,  B-330045 (2018)………………………………….15

Matter of Office of Management and Budget and U.S. Department of Homeland Security—Pause of Border Barrier Construction and Obligations, B-333110 (2021)…………………………………………………………...…17

Matter of Office of Management and Budget ⸺Withholding of Ukraine Assistance, B-331464 (2020)…………………………………………...…15

Matter of U.S. Department of Transportation, Federal Highway Administration, B-337137, May 22, 2025…………………………………12

Mark Paoletta, *The President's Constitutional Power of Impoundment* (2024)…………………………………………………………..19

Office of Legal Counsel Opinion, July 8, 1988…………………………….....…19

Proposed-Rescissions-of-Budgetary-Resources, May 28, 2025…………………..11

## INTEREST OF THE AMICUS[1]

This brief is submitted by Alan B. Morrison who is an associate dean at the George Washington University Law where he teaches constitutional law. This brief focuses on the Impoundment Control Act of 1974, 2 U.S.C. §§ 681 et seq, (ICA), which specifies how a President who wishes to impound money appropriated by Congress, whether motivated by a policy disagreement, a desire to shrink government spending, or for any other reason, may and may not accomplish that goal. Counsel for all parties have consented to the filing of this brief.

Amicus has considerable direct experience regarding impoundments both before and after that Act was passed. He was counsel for twenty-four Senators who filed an amicus brief (and invited to present oral argument) opposing the impoundment in *State Highway Comm'n of Mo. v. Volpe*, 479 F.2d 1099 (8th Cir. 1973). He was lead counsel or co-counsel in a number of other impoundment challenges both before and after the ICA was enacted, including *Train v. Campaign Clean Water, Inc. v. Ruckelshaus*, 420 U.S. 126 (1975) (the companion case to *Train v. City of New York*, 420 U.S. 35 (1975)), and *City of New Haven v. United States,* 809 F.2d 900 (D.C. Cir. 1987). He also testified before the Senate Judiciary Committee (with Ralph Nader) at the hearings that led to the passage of the ICA.

---

[1] No person other than amicus authored this brief in whole or in part or contributed money that was intended to support the preparation or submission of this brief.

This brief is submitted to underscore that it is Congress, not the President, that has the statutory and constitutional authority to decide not to spend funds that Congress has previously appropriated.

## INTRODUCTION & SUMMARY OF ARGUMENT

The central issue in this case is whether the President has the legal authority to refuse to spend the money that Congress has appropriated.  He does not.  Congress enacted the Impoundment Control Act in 1974 both to put an end to executive impoundments and to create a lawful path by which the President can obtain permission from Congress not to spend all the money that Congress has appropriated.  He has not followed that path in this case, and therefore the withholding of these funds is unlawful.

This case does not just involve an isolated instance of impoundment, but is part of a plan by President Donald J. Trump to shrink the size of the federal government.  The plan does not involve having Congress repeal the laws creating federal agencies and authorizing them to carry out various functions.  Rather, the President has acted unilaterally in various ways to achieve what he considers to be desirable policy goals, such as by directing the cancellation of federal contracts, the revoking of federal grants, the wholesale firing of federal employees with no plans to hire replacements, the offering of buy outs of federal employees without a

statutory basis for making such offers, and the shuttering of agencies by use of administrative leave and other practices that prevent the agencies from carrying on their statutorily assigned functions. Each of those actions has the effect of reducing federal spending, with the inevitable serious injuries to the intended beneficiaries of those programs, all without the approval of Congress. As a result, the actions challenged in this case and many others now pending against the Trump administration have a common unlawful impoundment flaw, which is the basis on which amicus asks the Court to sustain the challenges at issue here.

In this case, "the Executive has unilaterally deemed that funds Congress appropriated for foreign aid will not be spent." JA 36. In an executive order "Reevaluating and Realigning United States Foreign Aid." Exec. Order No. 14169, 90 Fed. Reg. 8619 (2025), President Trump disagreed with the priorities that Congress had set in the area of foreign aid. The disagreement was implemented first by a pause and then by "an immediate suspension of all congressionally appropriated foreign aid," by both the State Department and USAID. JA 39. These facts are undisputed and indeed are embraced by defendants because they believe that these impoundments are lawful.

The district court correctly saw through this unlawful attempt to dismantle USAID and held that the defendants, in effect, had the proper allocation of spending powers backwards. It is Congress, through the Appropriations Clause in Article I,

section 9, clause 7 of the Constitution, that has the exclusive power to spend money from the federal Treasury. Thus, when Congress appropriates funds, the Executive is required to spend those funds, unless Congress has specifically given the Executive permission not to spend them. That was the law when Congress enacted the Impoundment Control Act in 1974 which is premised on this constitutional division of authority. At the same time, that Act provides specific, but very limited, means by which the President may ask Congress to relieve the Executive Branch from spending appropriated funds, but which the President did not follow here.

The claim that the President has the power to decide whether to spend money that Congress has appropriated, is not a new one. As the amicus brief of the Constitutional Accountability Center shows, the courts have faced the question both before, during, and after the presidency of Richard Nixon, and they have rejected those presidential claims as inconsistent with the Appropriations Clause and basic principles of separation of powers. Those prior cases involved individual situations in which the issue presented was whether Congress had given the President discretion not to spend under a specific statute, but did not present the claim that the President had the inherent authority to refuse to spend money where Congress has been clear in limiting his discretion. Those cases all recognized that the Constitution lodges the appropriation power with Congress, acting with the President to enact

4

spending laws. Those laws then become the guiding force that determines how federal funds are to be spent or not spent.

Congress also recognized that requiring the federal courts to handle impoundment on a case by case, statute by statute, basis was not the best way to deal with impoundments. Instead, Congress enacted the Impoundment Control Act, which provides a framework for the President and Congress to deal with all efforts by the President to decline to spend funds that Congress has appropriated, no matter what the reason. This brief will focus on the ICA and demonstrate that the ICA directly and clearly supports the claims of plaintiffs that the withholding of spending here was unlawful from the moment that it took place. The brief will then show that the enactment of the Continuing Resolution for Fiscal Year 2025 confirms the illegality of these impoundments, by specifically lowering some spending limits for other agencies, but not this one, and by explicitly including 31 separate rescissions for other programs, just as the ICA contemplates. Finally, the brief will show that, even when Congress enacted a statute expressly allowing the President to exercise his discretion not to spend under certain circumstances, the Supreme Court held that the statute was unconstitutional in *Clinton v. City of New York,* 524 U.S. 417 (1998). If Congress cannot constitutionally confer the power *not* to spend on the President where it has specifically authorized him to do so, surely he cannot do it on his own.

In their brief to this Court, defendants rely almost exclusively on the Impoundment Control Act, not because they claim that they have complied with it—which they plainly have not.  Rather, appellants brief (at 2) presents the remarkable argument that, by passing the ICA, Congress created the exclusive means by which *any person* can challenge an allegedly unlawful impoundment:

> The Impoundment Control Act provides a framework for guiding inter-Branch engagement on certain decisions regarding the obligation of appropriated funds; it does not confer any judicially enforceable rights on third parties.

See also *id.* at 19: The "injunction [below] pretermits the political processes contemplated by the Impoundment Control Act."

However, under the ICA, Congress has no statutory authority to compel the President to do anything or to stop him from continuing to impound appropriated funds.  Thus, according to defendants, when Congress enacted the ICA to limit the President's authority to refuse to spend appropriated funds, it overturned all the prior cases in which President Nixon's impoundments were reversed in lawsuits by parties directly injured by them.  Put another way, these plaintiffs and countless others who have been injured by this President's impoundments lost their prior right to sue when Congress enacted the ICA, even though its purpose was to limit, not expand, the power of the President to refuse to spend money that Congress has appropriated.  If defendants are right, the ICA made it harder, not easier, to control presidential impoundments because injured parties would no longer be permitted to sue agencies

6

that refused to spend money approved by Congress. There is simply no basis for that "reversal of fortune" position.

## ARGUMENT

## DEFENDANTS' ACTIONS CHALLENGED HERE VIOLATE THE IMPOUNDMENT CONTROL ACT

**A.** The ICA applies to all actions by the executive branch not to spend funds that Congress has appropriated. To oversee the process, Congress has designated the Comptroller General, who is an agent of Congress, *Bowsher v. Synar,* 478 U.S. 714 (1986), to monitor the impoundment process in the executive branch, through reports and the institution of civil litigation in certain limited circumstances.  2 U.S.C. §§ 683 & 684.

Section 682 includes a definition that sets forth the coverage of the ICA (emphasis added):

> **(1)** "deferral of budget authority" includes--
>
> **(A)** withholding or delaying the obligation or expenditure of budget authority (whether by establishing reserves or otherwise) provided for projects or activities; or
>
> **(B)** *any other type of Executive action or inaction which effectively precludes the obligation or expenditure of budget authority*, including authority to obligate by contract in advance of appropriations as specifically authorized by law;

As discussed below, the Comptroller General has recognized a limited exception implied into this very broad prohibition in the ICA that allows for deferrals when

7

there are outside factors, such as complying with other legal requirements, that preclude an agency from immediately spending appropriated funds. In addition, the Comptroller General has concluded that the ICA allows agencies with lump sum annual appropriations for certain functions not to spend the whole amount immediately so that funds remain available throughout the fiscal year. There is no claim that either of those exceptions applies here or to any other impoundments by the Trump administration.

The ICA covers two different situations in which an agency, usually at the direction of the President (or the Director of the Office of Management & Budget), wishes not to spend appropriated funds. First, and the one that is applicable to this and all of the impoundments that are currently being litigated, is rescission. Section 683(a) applies whenever the

> President determines that all or part of any budget authority will not be required to carry out the full objectives or scope of programs for which it is provided or that such budget authority should be rescinded *for fiscal policy or other reasons* (including the termination of authorized projects or activities for which budget authority has been provided). (emphasis added).

The highlighted portion of this provision makes it clear that the President's policy choices—whether for fiscal policy or other reasons— and his decisions to terminate a project or activity —let alone an entire agency—are subject to this section. There can be no doubt that what the President (or his agents) mandated here falls within this provision.

Subsection (b) then allows the President to refrain from spending that money for 45 days of continuous session of Congress (as defined in section 682(4)) once he has sent a rescission message to Congress.   But unless Congress has affirmatively approved a proposed rescission within that time frame, the money must be spent as Congress has directed.  *Id.* To assure that resolutions seeking approval of proposed rescissions receive prompt consideration, section 688 provides for special procedures designed to assure that the supporters of such resolutions can obtain timely floor votes in both Houses.

To make this system work, Congress has imposed an immediate reporting requirement on the President under subsection 683(a) if he wishes to seek a rescission. [2]   He "shall transmit to both Houses of Congress a special message specifying" the following information:

> **(1)** the amount of budget authority which he proposes to be rescinded…;
>
> **(2)** … the specific project or governmental functions involved;
>
> **(3)** the reasons why the budget authority should be rescinded…;
>
> **(4)** to the maximum extent practicable, the estimated fiscal, economic, and budgetary effect of the proposed rescission…; and
>
> **(5)** all facts, circumstances, and considerations relating to or bearing upon the proposed rescission … and to the maximum extent practicable,

---

[2] By Executive Order 11845, 40 Fed. Reg. 13299 (1975), as amended by Executive Order 12608, 52 Fed. Reg. 34617 (1987), the authority to send special messages has been delegated by the President to the Director of OMB.

the estimated effect of the proposed rescission or the reservation upon the objects, purposes, and programs for which the budget authority is provided.

In other words, Congress has told the President, if you want a rescission, you have to explain fully how much it will be, why you want it, and what the impacts will be. Which is precisely the information that Congress needed to make the appropriation in the first place.

To assure that the Congress has all the inputs and advice that it needs, section 685 requires that a copy of these messages must be delivered to the Comptroller General and published in the Federal Register. And section 686 authorizes the Comptroller General to bring suit to enforce the reporting provisions, after giving the President an opportunity to explain his failure to do so. Notably, in light of defendants' claim that the ICA is the exclusive means of preventing impoundments, that law does not authorize the Comptroller General, or anyone else, to sue to reverse illegal withholdings by the President, but only to require the President to report either deferrals or proposed rescissions.[3]

---

[3] A district court has held that only the Comptroller General may sue to enforce the reporting provisions, while also ruling that the impoundments there were unlawful. *Rocky Ford Housing Authority v. U.S. Department of Agriculture,* 437 F. Supp. 118, 134 (D. D.C. 1977).

Until recently, President Trump had never sent a single rescission message to Congress in 2025 or provided any of the information needed by Congress to make a judgment to decide whether to agree to rescind the funds withheld for this or any other of his numerous impoundments. If he had provided this information, Congress and the American people would have learned how sweeping his actions are and how much he has disregarded the appropriations laws that Congress has passed. And they would also have provided significant evidence that would establish other violations of law beyond the ICA, as found in this case. Then on May 28, 2025, the President proposed very substantial rescissions for the current fiscal year.[4] Items 13-17 apply to USAID, but they do not apply to any of the withheld funds being challenged in this litigation. They are nonetheless relevant because they show the lawful way for the President to seek not to spend appropriated funds, not simply to do it as defendants did here.

The other impoundment option is deferral, which is covered by section 684. Deferrals are available only to allow an agency to postpone spending funds, and even then they must be spent in the current fiscal year (final sentence in subsection (a)). The President is also required to send a special message to Congress, similar in purpose to what is sent for rescissions, with the key difference being the requirement

---

[4] https://www.whitehouse.gov/wp-content/uploads/2025/03/Proposed-Rescissions-of-Budgetary-Resources.pdf.

under paragraph (3) that the message include "the period of time during which the budget authority is proposed to be deferred."   Furthermore, under subsection (b), deferrals must be consistent with legislative policy and may only be made

> **(1)** to provide for contingencies;
>
> **(2)** to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or
>
> **(3)** as specifically provided by law.

To remove any doubts, Congress added this sentence to this subsection: "No officer or employee of the United States may defer any budget authority for any other purpose."  Obviously, if a deferral, which still requires that the funds be expended, is permissible only for these limited purposes, the President cannot lawfully rescind money, permanently and on his own, without obtaining the approval of Congress pursuant to section 683.[5]

The ICA was written to provide Congress with the information needed to make its decisions about proposed deferrals and rescissions and the tools needed to make the changes in the law for those that it approves.  The fact that the ICA focuses on Congress and its role in the appropriations process should not cause the Court to

---

[5] The Trump administration has not sent any deferral messages to the Comptroller General, but that office discovered one and determined that it was unlawful. Matter of U.S. Department of Transportation, Federal Highway Administration— Application of the Impoundment Control Act to Memorandum Suspending Approval of State Electric Vehicle Infrastructure Deployment Plans, File: B-337137, May 22, 2025.

lose track of the real beneficiaries of the ICA. Those beneficiaries are not the members of Congress who appropriated the funds being withheld, but the American people and in this case the millions of individuals outside the United States for whom the Congress enacts laws that provide for the functioning of the federal government. Congress acts as their agent when it enacts a law, including its appropriations laws, and the ICA is there to protect the people and to assure that any changes in the law are made by Congress, not the President alone.

As enacted in the original ICA, all deferrals were subject to a veto by either House of Congress. Nine years later, the Supreme Court held in *INS v. Chadha,* 462 U.S. 919 (1983), that all legislative vetoes are unconstitutional. In *City of New Haven v. United States,* 809 F.2d 900 (D.C. Cir. 1987), the Court was faced with the question of what to do with the President's authority in light of *Chadha*: eliminate it entirely or allow the President to continue to utilize deferrals, including ones sought for policy reasons, with no check whatsoever. This Court had no trouble concluding that the deferral provision could not stand on its own, with no check, because section 684

> was designed specifically to provide Congress with a means for controlling presidential deferrals. As a consequence of the Supreme Court's decision in *Chadha,* however, that section has been transformed into a license to impound funds for policy reasons. This result is completely contrary to the will of Congress, which in amending the Anti-Deficiency Act sought to *remove* any colorable statutory basis for unchecked policy deferrals. We cannot imagine that Congress would

have acted in complete contravention of its intended purposes by
enacting section [684] without a legislative veto provision.

*Id.* at 909 (emphasis in original). Shortly after the *City of New Haven* decision,
Congress amended section 684 to its current version, which allows the President to
make limited non-policy deferrals, but does not alter the ban on rescissions absent
specific congressional approval. Pub. L. 100–119, 101 Stat 754, section 206 (1987).
As the *City of New Haven* court noted, the "critical distinction between
'programmatic' and "policy" deferrals [and rescissions] is that the former are
ordinarily intended to *advance* congressional budgetary policies by ensuring that
congressional programs are administered efficiently, while the latter are ordinarily
intended to *negate* the will of Congress by substituting the fiscal policies of the
Executive Branch for those established by the enactment of budget legislation." *Id.*
at 901 (emphasis in original). Given the title of the Executive Order that produced
these impoundments— Reevaluating and Realigning United States Foreign
Aid—there can be no doubt that they are policy-based and hence impermissible,
either as deferrals or rescissions.

President Trump could hardly claim lack of familiarity with the ICA as a
reason for not complying with it. During his prior term, he withheld foreign aid
funds from Ukraine in 2019, an action that became part of his first impeachment
trial. In that instance, as here, he never sent a message to Congress requesting

permission to rescind the appropriation, but simply acted on his own and directed that the aid to Ukraine be stopped. When the Comptroller General became aware of the Ukraine rescission, he issued a report concluding that it was a violation of the ICA:

> Faithful execution of the law does not permit the President to substitute his own policy priorities for those that Congress has enacted into law. OMB withheld funds for a policy reason, which is not permitted under the Impoundment Control Act. [6]

Moreover, the prior Trump administration did propose thirty-eight rescissions in 2018, but Congress declined to approve them,[7] which may explain why the current administration did not follow that path for this and other impoundments. However, even if a President disagrees with the policy behind a funded project, such as the border wall, the Comptroller General has concluded that, where the delays in funding it were caused by external circumstances, including legal requirements, the failure to spend the funds on schedule was consistent with the ICA and not unlawful.[8]  No

---

[6] Matter of Office of Management and Budget —Withholding of Ukraine Assistance, No. B-331464 (2020). Pages 5-6 explain why the withholding of those funds was not authorized because they were inconsistent with the ICA.

[7] Impoundment Control Act of 1974, Review of President's Special Rescission Messages of May 8, 2018,  B-330045 (2018).

[8] Matter of Office of Management and Budget and U.S. Department of Homeland Security—Pause of Border Barrier Construction and Obligations, B-333110 (2021).

such claim is made here or in any other impoundment cases against the Trump administration.

**B.**   Recent legislation passed by Congress and signed by President Trump confirms that the requirements of the ICA still hold.  The law is the Full-Year Continuing Appropriations and Extensions Act, 2025, H.R. 1968, Public Law 119-4 (2025). Until it became law, the federal government was operating under a short term extension of the fiscal 2024 budget that was approved in the final days of the presidency of Joseph Biden.  American Relief Act, 2025, 138 Stat. 1722, Public Law No. 118-158 (2024).   Although the March 2025 law is labeled a "Continuing" resolution, the new law contains scores of modest and large changes in spending for fiscal 2025, some increases, but mostly reductions in spending.

What is most significant for these purposes is that it contains five sections that include actions specifically designated as "rescissions."  The affected department, the section of the law, and the number of separate rescissions in that section are as follows:

Department of Defense, section 1416 – 18 rescissions

Department of Homeland Security, section 1706 — 10 rescissions

Department of Homeland Security, section 1707 —1 rescission

Department of Labor, section 1903 – 1 rescission

Department of State, section 11207 —1 rescission

Section 11207 (page 75), which is part of Title XII that covers the Department of State, Foreign Operations, and Related Programs (including those at issue in this case), shows how clear Congress is when it agrees to enact a rescission:

> (3) in lieu of subsection (f), the following new subsection:
>
> ''(f) DEBT RESTRUCTURING.—Of the unobligated balances from amounts made available under the heading 'Debt Restructuring' from prior Acts making appropriations for the Department of State, foreign operations, and related programs, $111,000,000 are rescinded.''

Moreover, as the ICA makes clear, the baseline rule is that the amounts enacted in appropriations bills are mandatory, not discretionary. However, Congress can change that assumption, and it did so explicitly in one provisions in H.R. 1968, section 11202, covering the Department of State:

> Notwithstanding section 1101, the matter under the heading ''Office of Inspector General'' in title I of division F of Public Law 118–47 shall be applied to funds appropriated by this Act by inserting ''up to'' before ''$24,835,000''.

President Trump and Congress had an opportunity to change the law in this continuing resolution and thereby authorize the President, in his discretion, not to spend funds appropriated during the Biden administration. Congress did so by enacting thirty-one rescissions and making numerous other adjustments in spending levels. But it did not do what the President needed to have done in order to make lawful the many unauthorized impoundments that he has undertaken in this and other cases: specifically approve this and other impoundments. It is the combination of

what Congress did and did not do in terms of rescissions  in the Continuing Resolution that speaks volumes about the illegality of President Trump's impoundments under the ICA.

**C.** Various individuals associated with the Trump administration have argued that the ICA is an unconstitutional restraint on the President's power to exercise his discretion and not to spend all of the money that Congress has appropriated, although defendants have chosen not to make that argument in this appeal.[9]   In some situations, a limited version of that argument has merit.  For example, if Congress appropriated funds to carry troops to Asia to fight a specific war, and that was suddenly ended, no one would suggest that the President would have to spend that money even if Congress did not formally rescind the appropriation.  But as the courts, the ICA, and the Comptroller General have concluded, the  President could not refuse to spend that money for policy reasons.  Yet that is exactly what the President did here and in so many other of his executive orders, presumably on the theory that the President has the constitutional right to impound funds to the degree that he considers appropriate.   In any event, if defendants should raise that constitutional argument here, it should be rejected,

---

[9] M. Paoletta, *The President's Constitutional Power of Impoundment* (2024) https://americarenewing.com/the-presidents-constitutional-power-of-impoundment.

President Nixon never raised a constitutional argument in his many impoundment cases, perhaps because William H. Rehnquist, who was Nixon's Assistant Attorney General in charge of the Office of Legal Counsel (and subsequently a Justice and then Chief Justice of the Supreme Court), took the contrary view in 1969:

> With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent.

Quoted in, *In re Aiken County,* 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). That position was reaffirmed in an Office of Legal Counsel Opinion of July 8, 1988, 166-68 (The President's Veto Power), in which OLC concluded that there is no inherent power to impound in the Constitution.

All of the Nixon impoundment cases, as well as this and all of the current Trump cases, involve refusals to spend appropriated funds when the Congress has been clear that it did not give the President the authority to withhold spending. But even when Congress enacted a statute expressly allowing the President to refuse to spend specific items in an appropriations law under certain conditions, the Supreme Court held that the statute seeking to give the President that power was unconstitutional. *Clinton v. City of New York,* 524 U.S. 417 (1998). The statute at issue there —the Line Item Veto—allowed a President, within five calendar days

19

(excluding Sundays) of signing a bill into law, to send a message to Congress selecting specific spending items in an appropriations law that he wished to "cancel," *i.e.,* decline to spend. The law allowed the President to do that for essentially any reason the President wanted, which included policy disagreements with Congress, as well as to stop what he considered to be wasteful spending. Unlike under the ICA, the President did not have to give his reasons or provide any other information, but like the ICA, there were provisions that provided reasonable assurances that Congress would be able to vote to reject or approve each item that the President proposed to be canceled. Under that Act, the failure of Congress to enact a law to override the President's cancellation, or the failure of Congress to override a veto of a law that Congress did enact, would result in the cancellation being upheld. By contrast, under the ICA, the failure of Congress to support a President's proposed rescission results in the rescission being denied.

The Court in *Clinton* struck down the Line Item Veto as inconsistent with Article I, section 7, which requires that all laws, including laws that alter or repeal existing laws, must be approved by both Houses of Congress and signed into law by the President (or have his veto overridden by two-thirds of both Houses). The Court ruled that once the President signed the original appropriations bill into law, any cancellations of items in that bill must go through the same law-making steps.

Because the cancellation process in the Line Item Veto Act did not provide for the affirmative approval of Congress, it violated Article I, section 7.

Under the Line Item Veto Act, Congress agreed with the President that the cancellation process was constitutional, but the Court held otherwise. Here, under the ICA, Congress has precluded the President from doing essentially what the Court said that the President could not do in *City of New York*, even with the agreement of Congress. Indeed, the Line Item Veto Act had three limitations that are not part of a claim that the President has a constitutional right to impound. *Id.* at 436. Cancellations were only permitted for entire items, whereas a constitutional right to impound would not be limited to cancelling entire items, but could also include reducing the amount spent, for any reason. Second (and only a modest limitation), in making a cancellation under the Line Item Veto Act, the President was required to consider the legislative history, the purposes, and other relevant information of the provision proposed for cancellation. And third, under the Act, the President had only five days to make a cancellation, whereas a constitutional right to impound could be exercised at any time. In other words, if a limited line item veto, supported by Congress, violated the Constitution, a broader claim of a constitutional right to impound, which is directly forbidden by Congress in the ICA, has no chance of being upheld.

**D.**  Turning now to the principal claim made on this appeal, both the text of the ICA and its history before and after its passage in 1974, there is simply no basis for the claim that this law actually made it easier for the President to impound appropriate funds than it was before the law was enacted.  According to defendants, the effect of the ICA was to eradicate the right of private parties to sue the federal government for illegally withholding funds, as had been done before Congress enacted the ICA.

There is, of course, not a word to that effect in the statute or in any legislative history of which amicus is aware.  Nor does the ICA provide a remedy to anyone, including the Comptroller General, for the claims that defendants say may no longer be brought.  Since the ICA was enacted, the courts have rarely been asked to review claims of allegedly wrongful impoundments. In one case, which defendants failed to cite, the Nuclear Regulatory Commission refused to spend funds that Congress had directed it to spend, and this Court issued a writ of mandamus against the agency, observing that "the President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." *In re Aiken County,* 725 F.3d at 260 (Kavanaugh).

 But if defendants are correct, there is nothing that any party adversely affected by that refusal would have been precluded from suing the because the ICA overrides (preempts) the Administrative Procedure Act, 5 U.S.C. § 706,

and all the pre-ICA cases as well.    Indeed, defendants' position would also mean that this Court's post-ICA decisions in *Aiken* and *City of New Haven v. United States, supra*, would have to be overruled because the Government and this Court failed to recognize the preemptive effect of the ICA.  As a participant in pre- and post-ICA litigation, as well as the development of the ICA itself, the claim that the ICA took away the ability of everyone to sue for any wrongful impoundment borders on the preposterous.  The only reason why the defendants are making this preemption argument is that they have no other claim on the merits.

## CONCLUSION

For the foregoing reasons and those set forth in the briefs of the plaintiffs and other amici supporting plaintiffs, the order granting the preliminary injunction should be affirmed because these impoundments also violate the Impoundment Control Act.

Respectfully Submitted,

Alan B. Morrison
2000 H Street NW
Washington D.C. 20052
(202) 994 7120
abmorrison@law.gwu.edu
Counsel for the Amicus

June 11. 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 5467 words, less than one half of the 13,000 words allowed by FRAP 32(a)(7)(B). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.


*/s/ Alan B. Morrison*
Alan B. Morrison