[ORAL ARGUMENT SCHEDULED FOR JULY 7, 2025]

Nos. 25-5097, 25-5098

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

GLOBAL HEALTH COUNCIL, et al.,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, et al.,

*Defendants-Appellants*.

---

AIDS VACCINE ADVOCACY COALITION, et al.,

*Plaintiffs-Appellees*,

v.

UNITED STATES DEPARTMENT OF STATE, et al.,

*Defendants-Appellants*.

---

*On Appeal from the United States District Court
for the District of Columbia*

---

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS
## *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES

---

Elizabeth B. Wydra
Brianne J. Gorod
Miriam Becker-Cohen
Smita Ghosh
Nina G. Henry
CONSTITUTIONAL
  ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## STATEMENT REGARDING CONSENT TO FILE
## AND SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for *amicus curiae* Constitutional Accountability Center (CAC) represents that counsel for all parties have consented to the filing of this brief.[1]

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *amicus curiae* certifies that a separate brief is necessary. *Amicus* is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and to protect the rights, freedoms, and structural safeguards that our nation's charter guarantees. CAC has filed *amicus* briefs in federal courts in multiple cases about the constitutional separation of powers, including on the merits in these cases in the District Court, and has accordingly developed expertise in the relevant constitutional text and history.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus curiae* or its counsel made a monetary contribution to its preparation or submission.

i

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* Constitutional Accountability Center states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

**CERTIFICATE AS TO PARTIES, RULINGS,**
**AND RELATED CASES**

I.     PARTIES AND *AMICI*

Except for *amicus* Constitutional Accountability Center and any other

*amici* who had not yet entered an appearance in this case as of the filing of

Appellees' brief, all parties, intervenors, and *amici* appearing in this Court

are listed in Appellees' brief.

II.    RULINGS UNDER REVIEW

Reference to the ruling under review appears in Appellees' brief.

III.   RELATED CASES

Reference to any related cases pending before this Court appears in

Appellees' brief.


Dated:  June 13, 2025                              /s/ Brianne J. Gorod
                                                   Brianne J. Gorod

                                                   *Counsel for Amicus Curiae*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... v

GLOSSARY.......................................................................... xii

INTEREST OF *AMICUS CURIAE* ..................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT ........................................................................ 6

    I.    To Guard Against the Risk of a Tyrannical President, the Framers Vested Control of Appropriations and Spending in Congress, Ensuring the Structural Separation of the Sword and the Purse ......... 6

    II.    For Over Two Hundred Years, Congress Has Jealously Guarded Its Control Over the Purse Through Federal Legislation Governing Spending and Impoundments ............................................. 13

    III.    Neither the ICA—a Law Enacted to "Control" Rather than Facilitate Unconstitutional Impoundments—nor the President's Foreign Affairs Powers Authorize Him to Defy the Will of Congress by Refusing to Execute Duly Enacted Appropriations Laws.................................................................... 18

    IV.    Courts and High-Ranking Executive Attorneys Have Consistently Rejected Presidential Assertions of Impoundment Authority............. 21

CONCLUSION ..................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Campaign Clean Water, Inc. v. Ruckelshaus*,
    361 F. Supp. 689 (E.D. Va. 1973)................................................ 25

*CFPB v. Cmty. Fin. Servs. Ass'n of Am.*,
    601 U.S. 416 (2024)................................................................. 2, 8

*Citizens for Resp. & Ethics in Wash. v. OMB*,
    No. 25-cv-1051 (D.D.C. filed Apr. 8, 2025)............................ 17

*City of New Haven v. United States*,
    809 F.2d 900 (D.C. Cir. 1987) ................................................ 15

*Clinton v. City of New York*,
    524 U.S. 417 (1998)........................................................... 4, 13, 23

*Guadamuz v. Ash*,
    368 F. Supp. 1233 (D.D.C. 1973) ......................................... 24, 25

*Harrington v. Bush*,
    553 F.2d 190 (D.C. Cir. 1977) ................................................ 13

*In re Aiken County*,
    725 F.3d 255 (D.C. Cir. 2013) ............................................... 12, 21

*INS v. Chadha*,
    462 U.S. 919 (1983) ................................................................ 13

*Kendall v. United States ex rel. Stokes*,
    37 U.S. 524 (1838)........................................................... 4, 12, 21, 22

*Loc. 2677, Am. Fed'n of Gov't Emps. v. Phillips*,
    358 F. Supp. 60 (D.D.C. 1973) .............................................. 25

*Louisiana ex rel. Guste v. Brinegar*,
    388 F. Supp. 1319 (D.D.C. 1975) .......................................... 4, 25

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Maine v. Fri*,
    486 F.2d 713 (1st Cir. 1973) ..................................................................... 24

*Medellín v. Texas*,
    552 U.S. 491 (2008) ................................................................................... 19-21

*Nat'l Council of Cmty. Mental Health Ctrs., Inc. v. Weinberger*,
    361 F. Supp. 897 (D.D.C. 1973) ............................................................... 24, 25

*Nat'l Treasury Employees Union v. Nixon*,
    492 F.2d 587 (D.C. Cir. 1974) .................................................................. 23, 24

*OPM v. Richmond*,
    496 U.S. 414 (1990) ................................................................................... 19

*Protect Democracy Project v. OMB*,
    No. 25-cv-1111 (D.D.C. filed Apr. 14, 2025) ......................................... 17

*Rochester Pure Waters Dist. v. EPA*,
    960 F.2d 180 (D.C. Cir. 1992) .................................................................. 1

*Sioux Valley Empire Elec. Ass'n v. Butz*,
    504 F.2d 168 (8th Cir. 1974) ..................................................................... 24

*State Highway Comm'n of Mo. v. Volpe*,
    479 F.2d 1099 (8th Cir. 1973) ................................................................... 5, 24

*Train v. City of New York*,
    420 U.S. 35 (1975) ..................................................................................... 5, 23

*United States v. Butler*,
    297 U.S. 1 (1936) ....................................................................................... 10

*United States v. MacCollom*,
    426 U.S. 317 (1976) ................................................................................... 12

*United States v. Midwest Oil Co.*,
    236 U.S. 459 (1915) ................................................................................... 13

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
   665 F.3d 1339 (D.C. Cir. 2012) ................................................. 1, 8, 14

*U.S. House of Representatives v. Mnuchin*,
   976 F.3d 1 (D.C. Cir. 2020) ......................................................... 12

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) .................................................................. 13, 21

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
   576 U.S. 1 (2015) .................................................................. 4, 19, 20

Constitutional Provisions, Statutes, and Legislative Materials

Act of Mar. 3, 1809, ch. 28, 2 Stat. 535 ...................................... 14

Act of Feb. 12, 1868, ch. 8, 15 Stat. 35 ....................................... 14

Act of July 12, 1870, ch. 251, 16 Stat. 25 ................................... 14

An Act Declaring the Rights and Liberties of the Subject and Settling the
   Succession of the Crown (Bill of Rights), 1689, 1 W. & M., c.2,
   (Eng.) ............................................................................................. 7

Articles of Confederation of 1781, art. IX, para. 6 ..................... 8

119 Cong. Rec. (1973) .................................................................. 19

120 Cong. Rec. (1974) .................................................................. 16

Del. Const. of 1776, art. VII ......................................................... 7

Financial Services and General Government Appropriations Act,
   Pub. L. No. 117-103, 136 Stat. 239 (2022)............................... 17

## TABLE OF AUTHORITIES – cont'd

Page(s)

Financial Services and General Government Appropriations Act,
Pub. L. No. 117-328, 136 Stat. 4650 (2022) ............................................ 17

General Appropriations Act of 1951,
Pub. L. No. 81-759, 64 Stat. 595 (1950) ................................................. 15

H.R. Rep. No. 117-393 (2022) ..................................................................... 17

Mass. Const. of 1780, ch. 2, § 1, art. XI ...................................................... 7

Pub. L. No. 93-344, 88 Stat. 297 (1974) ..................................................... 15

Pub. L. No. 100-119, 101 Stat. 754 (1987) ................................................. 16

Pub. L. No. 118-47, 138 Stat. 460 (2024) ................................................... 18

S. Rep. No. 93-688 (1974) ............................................................... 15, 16, 19

2 U.S.C. § 683 ........................................................................................ 3, 16

2 U.S.C. § 684 ........................................................................................ 3, 16

2 U.S.C. § 684(b) ................................................................................... 3, 16

31 U.S.C. § 1301(a) ............................................................................... 3, 13

31 U.S.C. § 1341 ........................................................................................ 14

31 U.S.C. § 1341(a)(1)(A) ........................................................................... 3

31 U.S.C. § 1342 ........................................................................................ 14

31 U.S.C. § 1349 ........................................................................................ 14

31 U.S.C. § 1350 ........................................................................................ 14

31 U.S.C. § 1512 ........................................................................................ 14

## TABLE OF AUTHORITIES – cont'd

Page(s)

31 U.S.C. § 1513 ......................................................... 14

31 U.S.C. § 1517(a) ..................................................... 14

31 U.S.C. § 1518 ......................................................... 14

U.S. Const. art. I, § 8, cl. 1 ........................................ 3, 8

U.S. Const. art. I, § 9, cl. 7 ................................... 3, 10, 12

U.S. Const. art. II, § 3 .............................................. 13


Books, Articles, and Other Authorities

Bruce Ackerman, *Taxation and the Constitution*,
   99 Colum. L. Rev. 1 (1999) ....................................... 9

Brutus, Va. J. (Dec. 6, 1787), *reprinted in* 8 *The Documentary History of the*
   *Ratification of the Constitution by the States: Virginia*
   (John P. Kaminski et al. eds., 1988) ......................... 11

Gerhard Casper, *Appropriations of Power*,
   13 U. Ark. Little Rock L.J. 1 (1990) ......................... 6

Josh Chafetz, *Congress's Constitution: Legislative Authority and the*
   *Separation of Powers* (2017) .................................. 10

*The Debates in the Several State Conventions on the Adoption of the*
   *Federal Constitution* (Jonathan Elliot ed., 1836) ........ 10-11

Ralph E. Erickson, Acting Assistant Attorney General, OLC,
   *Memorandum Re: Constitutional Power of Congress to Compel*
   *Spending of Impounded Funds* (Jan. 7, 1972) ................... 27

*The Federalist No. 30* (Clinton Rossiter ed., 1961) ............. 3, 9

*The Federalist No. 31* (Clinton Rossiter ed., 1961) ............... 9

## TABLE OF AUTHORITIES – cont'd

Page(s)

*The Federalist No. 58* (Clinton Rossiter ed., 1961)................................... 9

*The Federalist No. 78* (Clinton Rossiter ed., 1961)................................... 10

Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and
Sovereign Immunity*,
107 Mich. L. Rev. 1207 (2009)................................................................ 7

Louis Fisher, *Cong. Rsch. Serv., Court Cases on Impoundment of Funds:
A Public Policy Analysis* (1974) ............................................................. 25, 26

Alexander Hamilton, *Report on the Subject of Manufactures* (1791)........ 10

Louis Henkin, *Foreign Affairs and the United States Constitution*
(2d ed. 1996) ......................................................................................... 20

An Impartial Citizen, Petersburg Va. Gazette (Jan. 10, 1788), *reprinted in*
8 *The Documentary History of the Ratification of the Constitution by
the States: Virginia* (John P. Kaminski et al. eds., 1988) ....................... 11

Paul Krawzak, *White House Scraps Public Spending Database*, Roll Call
(Mar. 24, 2025), https://rollcall.com/2025/03/24/white-house-scraps-
public-spending-database/....................................................................... 17

Letter to Joseph Jones (May 31, 1780), *in* 18 *The Writings of George
Washington from the Original Manuscript Sources 1745-1799*
(John C. Fitzpatrick ed., 1931)................................................................ 9

F.W. Maitland, *The Constitutional History of England* (1908)................. 7

*The President's Veto Power*, 12 Op. O.L.C. 128 (1988)........................... 27

Zachary S. Price, *Funding Restrictions and Separation of Powers*,
71 Vand. L. Rev. 357 (2018) .................................................................. 20

Michael D. Ramsey, *The Constitution's Text in Foreign Affairs* (2009) ... 20

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*The Records of the Federal Convention of 1787*
 (Max Farrand ed., 1911) ........................................................... 2, 8, 10

William H. Rehnquist, Acting Assistant Attorney General, OLC,
 *Memorandum Re: Presidential Authority to Impound Funds*
 *Appropriated for Assistance to Federally Impacted Schools*
 (Dec. 1, 1969) ........................................................................... 5, 26

Robert J. Reinstein, *The Limits of Executive Power*,
 59 Am. U. L. Rev. 259, (2009) ................................................. 6, 7

John G. Roberts, Jr., *Memorandum for Fred F. Fielding Re: Impoundment*
 *Authority* (Aug. 15, 1985) ........................................................ 5, 27

Neil M. Soltman, *The Limits of Executive Power: Impoundment of Funds*,
 23 Cath. U. L. Rev. 359 (1973) ................................................. 15

Joseph Story, *Commentaries on the Constitution of the United States*
 (1833) ........................................................................................ 12

Ralph W. Tarr, Acting Assistant Attorney General, OLC, *Memorandum Re:*
 *Legal Authority to Take Action to Forestall a Default*
 (Oct. 21, 1985) .......................................................................... 28

# GLOSSARY

| | |
|---|---|
| CAC | Constitutional Accountability Center |
| CFPB | Consumer Financial Protection Bureau |
| ICA | Impoundment Control Act of 1974 |
| INS | Immigration and Naturalization Service |
| OLC | Office of Legal Counsel |
| OMB | Office of Management and Budget |
| OPM | Office of Personnel Management |

## INTEREST OF *AMICUS CURIAE*

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and preserve the rights, freedoms, and structural safeguards that it guarantees, and accordingly has an interest in this case.

## INTRODUCTION
## AND SUMMARY OF ARGUMENT

The Framers of our Constitution drew a critical line separating the powers of the sword and the purse. Appellants attempt to blur that line, overstating the "substantive overlap between the constitutional authorities of the Legislative and Executive Branches" in the realms of appropriations and spending, Appellants Br. 46, while ignoring this Court's repeated admonition that "Congress's control over federal expenditures is 'absolute,'" *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (Kavanaugh, J.) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)). To be sure, the President has a role in the lawmaking process, as well as authority over discrete foreign affairs functions, but those powers do not come close to authorizing Appellants' brazen usurpation of Congress's power of the purse in this case.

1

Constitutional text and history make that clear.  While the choice to vest Congress with control over appropriations and spending was "uncontroversial" by the time of the Founding, *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 431 (2024), that consensus marked the culmination of centuries of struggle in England.  Historically, British kings had used their royal prerogatives both to legislate and to tax and spend without the approval of Parliament.  The result was a muddying of the distinction between the monarch's pocket money and the national treasury, leading kings to spend public funds however they pleased.  Only after the Glorious Revolution were royal attempts to seize the purse finally squelched.

In "defining the . . . powers" of the new nation, the American Founders firmly rejected the historic "Prerogatives of the British Monarch."  1 *The Records of the Federal Convention of 1787*, at 65 (Max Farrand ed., 1911) ["*Farrand's Records*"] (James Wilson).  Indeed, almost every post-Revolution state constitution vested the spending and appropriations authorities in a legislative body.  Even the Articles of Confederation, despite leaving the federal government without the power to raise revenue through taxation, granted the appropriations power to the Confederation Congress.

Against that backdrop, when the Framers drafted the new Constitution, there was no question that Congress would be granted the exclusive powers to tax, spend, and appropriate funds.  The authority "to pay the Debts and provide for the

2

common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, was deemed "indispensable" to the ability of the federal government to do its job, *The Federalist No. 30*, at 188 (Clinton Rossiter ed., 1961) (Alexander Hamilton). At the same time, the Appropriations Clause evinced a clear limitation on executive authority: "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

Consistent with this rule, Congress has jealously guarded its control over the purse strings since the Founding. The Tenth Congress passed the precursor to what is now called the Purpose Statute, providing that "[a]ppropriations shall be applied only to the objects for which [they] were made." 31 U.S.C. § 1301(a). Congress then passed the Antideficiency Act in 1870, explicitly prohibiting the executive branch from spending more than Congress appropriates. *Id.* § 1341(a)(1)(A). And with the Impoundment Control Act of 1974 (ICA), Congress prohibited the President from deferring or rescinding funds without sending a "special message" to Congress justifying the decision. 2 U.S.C. §§ 683-84. Deferrals may not be made for policy reasons, *id.* § 684(b), and rescissions must be approved by Congress, *id.* § 683.

To be sure, Congress may *expressly* delegate discretion to the President and his agencies with respect to federal spending. And the President may *ask* Congress to rescind funding—as long as he follows the ICA's procedures. But the ICA does

3

not authorize the sort of end-run concocted by Appellants, whereby the President need not spend *any* appropriated funds until he initiates the ICA's rescission process. The ICA was enacted to codify the constitutional rule against executive impoundments and rein them in, not facilitate impoundments or otherwise immunize them from judicial review. This is no less true in the international aid context. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015).

In recognition of these structural separation-of-powers principles, courts across the nation, including the Supreme Court, as well as high ranking executive branch attorneys, have consistently recognized that the President enjoys no constitutional power to impound funds appropriated by Congress. The Supreme Court first made this clear in 1838, unanimously rejecting the authority of a newly appointed Postmaster General to withhold funding appropriated by Congress for a contract that he claimed was tainted by political favoritism. *Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 525 (1838).

The issue came to a head again during the 1970s when "President Nixon, the Mahatma Gandhi of all impounders, asserted . . . that his constitutional right to impound appropriated funds was absolutely clear." *Clinton v. City of New York*, 524 U.S. 417, 468 (1998) (Scalia, J., concurring in part and dissenting in part) (quotation marks omitted). A slew of decisions "proved him wrong," *id.*, sometimes explicitly, *e.g.*, *Louisiana ex rel. Guste v. Brinegar*, 388 F. Supp. 1319,

1324-25 (D.D.C. 1975) ("the President's express or implied constitutional powers [do not] justify holding back authorized funds"), and other times implicitly, by scrutinizing the relevant statutory language to ascertain whether it granted express discretion to spend less than the full amount of appropriated funds, *e.g.*, *State Highway Comm'n of Mo. v. Volpe*, 479 F.2d 1099, 1114 (8th Cir. 1973). One of these cases made it all the way to the Supreme Court, which unanimously rejected Nixon's attempt to withhold appropriated funds. *See Train v. City of New York*, 420 U.S. 35, 42-47 (1975).

High-ranking executive attorneys have taken the same view. Nixon's own head of the Office of Legal Counsel (OLC), future-Chief Justice William Rehnquist, made clear his view that "the President does not have a constitutional right to impound . . . funds notwithstanding a congressional direction that they be spent." OLC, *Memorandum Re: Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools* 6 (Dec. 1, 1969) ["Rehnquist Memo"]. And over a decade later, future-Chief Justice John Roberts, in his role as legal advisor to President Reagan, echoed Rehnquist's views: "I think it clear that [the President] has [no impoundment authority] in normal situations, and we should discourage [the use of] impoundment as a viable budget planning option." John G. Roberts, Jr., *Memorandum for Fred F. Fielding Re: Impoundment Authority* 1 (Aug. 15, 1985) ["Roberts Memo"].

This unbroken line of authority refutes Appellants' claim of discretion to withhold appropriated foreign aid funds in the absence of express statutory language authorizing them to do so.  Appellants' efforts may be brazen, but they are not novel—they have been consistently rejected as contrary to foundational constitutional principles for over a century.

## ARGUMENT

I.     **To Guard Against the Risk of a Tyrannical President, the Framers Vested Control of Appropriations and Spending in Congress, Ensuring the Structural Separation of the Sword and the Purse.**

**A.**  When the Framers wrote the Constitution, they took pains to deny the President the kind of sweeping powers the King of England had enjoyed.  In the sixteenth and seventeenth centuries, English kings had used their royal prerogatives both to legislate, and to tax and spend, without the approval of Parliament.  *See, e.g.*, Robert J. Reinstein, *The Limits of Executive Power*, 59 Am. U. L. Rev. 259, 272-77 (2009).  "[U]nconstrained by the need to consult the representatives of the people," Gerhard Casper, *Appropriations of Power*, 13 U. Ark. Little Rock L.J. 1, 4 (1990) (quotation marks omitted), monarchs generally spent public money on whatever they pleased.  For many kings, that meant war with other European nations.

After centuries of struggle, Parliament finally succeeded in curtailing the king's abuses of power attendant to his sweeping authority over the purse.

6

Following the Glorious Revolution, "in granting money to the crown," Parliament always "appropriated the supply to particular purposes more or less narrowly defined."  F.W. Maitland, *The Constitutional History of England* 433 (1908).  At the same time, the Bill of Rights of 1689 prohibited the various devices the King had used to raise money on his own, providing that "levying money for or to the use of the Crown by pretence of prerogative, without grant of Parliament, for longer time, or in other manner than the same is or shall be granted, is illegal."  An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown (Bill of Rights), 1689, 1 W. & M., c.2, § 4 (Eng.).  Finally, in 1782, Parliament eliminated the King's prerogative to determine how the "civil list"—the domestic budget—would be spent.  Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and Sovereign Immunity*, 107 Mich. L. Rev. 1207, 1229 (2009).

    **B.**  In drafting the Constitution, "the prerogatives that had been discredited in England were naturally rejected by the Framers."  Reinstein, *supra*, at 307.  After the American Revolution, most state governments required legislative authorization for the withdrawal of any funds from a state treasury.  *See, e.g.*, Del. Const. of 1776, art. VII; Mass. Const. of 1780, ch. 2, § 1, art. XI.  The Articles of Confederation similarly granted the Confederation Congress exclusive authority to "ascertain the necessary sums of Money to be raised for the service of the united

7

states, and to appropriate and apply the same for defraying the public expenses,"

although they failed to give the central government the power to levy taxes, instead

relying on the states for raising revenue. Articles of Confederation of 1781, art.

IX, para. 6.

Still, "[b]y the time of the Constitutional Convention, the principle of

legislative supremacy over fiscal matters engendered little debate and created no

disagreement." *CFPB*, 601 U.S. at 431. It was "uncontroversial" that the authority

to raise and spend public funds should "reside in the Legislative Branch" rather

than with the chief executive. *Id.*; *see* 2 *Farrand's Records* 131, 274 (debate

limited to whether power of the purse should be further confined to the direct

representatives of the people in the House of Representatives). The Framers thus

gave Congress, not the President, "exclusive power over the federal purse." *Dep't

of Navy*, 665 F.3d at 1346 (quotation marks omitted).

In the Taxing and Spending Clause, the Framers granted Congress the

affirmative power to raise revenue and to spend funds. Wholly ignored by

Appellants, the Clause is the first and one of the most sweeping enumerated

powers the Constitution confers upon Congress, providing the power "[t]o lay and

collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the

common Defence and general Welfare of the United States." U.S. Const. art. I,

§ 8, cl. 1. This Clause reacted to the failure of the Articles of Confederation to

8

grant Congress the authority to tax and spend for the defense and general interests
of the union, creating such an ineffectual central government that, according to
George Washington, it nearly cost Americans victory in the Revolutionary War.
*See* Letter to Joseph Jones (May 31, 1780), *in* 18 *The Writings of George
Washington from the Original Manuscript Sources 1745-1799*, at 453 (John C.
Fitzpatrick ed., 1931).

Indeed, it was the need "to provide adequate fiscal powers for the national
government" that motivated the Framers to write a new Constitution.  Bruce
Ackerman, *Taxation and the Constitution*, 99 Colum. L. Rev. 1, 6 (1999).
Alexander Hamilton called the power to raise and spend funds "an indispensable
ingredient in every constitution," *The Federalist No. 30*, *supra*, at 188, deeming
"revenue" "the essential engine by which the means of answering the national
exigencies must be procured," *The Federalist No. 31*, *supra*, at 195.  James
Madison similarly explained that "[t]his power over the purse may, in fact, be
regarded as the most complete and effectual weapon . . . for obtaining a redress of
every grievance, and for carrying into effect every just and salutary measure."  *The
Federalist No. 58*, *supra*, at 359.

The Framers thus adopted Governor Edmund Randolph's recommendation
that Congress should have the power to "provide for the common defence and
general welfare of the United States" in the Taxing and Spending Clause, 2

*Farrand's Records* 493, 497, choosing a phrase that was as "comprehensive as any that could have been used," Alexander Hamilton, *Report on the Subject of Manufactures* 54 (1791); *see also United States v. Butler*, 297 U.S. 1, 66 (1936) (adopting Hamilton's view that "the power of Congress to authorize expenditure of public moneys for public purposes is not limited by the direct grants of legislative power found in the Constitution"). There was no question that such sweeping power should be granted to the people's representatives in Congress—the branch that "not only commands the purse but prescribes the rules by which the duties and rights of every citizen are to be regulated," *The Federalist No. 78*, *supra*, at 465 (Alexander Hamilton).

While the Framers crafted the Taxing and Spending Clause as a sweeping grant of authority to Congress, they framed the Appropriations Clause as a *limitation* on the executive: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. The Clause's simple and uncontroversial command was repeatedly invoked during the ratification debates to assuage "Anti-Federalist fears of a tyrannical president." Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* 57 (2017). Alexander Hamilton explained that "where the purse is lodged in one branch, and the sword in another, there can be no danger." 2 *The Debates in the Several State Conventions on the Adoption of the Federal*

10

*Constitution* 349 (Jonathan Elliot ed., 1836). George Nicholas emphasized that "[a]ny branch of government that depends on the will of another for supplies of money, must be in a state of subordinate dependence, let it have what other powers it may." 3 *id.* at 17; *see*, *e.g.*, 3 *id.* at 201 (Edmund Randolph) ("[The President] can handle no part of the public money except what is given him by law."); 4 *id.* at 330 (Charles Pinckney) ("With this powerful influence of the purse, [Congress] will be always able to restrain the usurpations of the other departments.").

Popular writings and treatises similarly conveyed that because the President could not "appropriate the public money to any use, but what is expressly provided by law," the President's powers would leave "dignity enough for the execution" of the office "without the possibility of making a bad use of it." An Impartial Citizen, Petersburg Va. Gazette (Jan. 10, 1788), *reprinted in* 8 *The Documentary History of the Ratification of the Constitution by the States: Virginia* 295 (John P. Kaminski et al. eds., 1988); *see, e.g.*, Brutus, Va. J. (Dec. 6, 1787), *reprinted in* 8 *The Documentary History of the Ratification of the Constitution by the States: Virginia* 215 (John P. Kaminski et al. eds., 1988) ("[A]ny evils which may arise from an improper application of the public money must either originate with, or have the assent of the immediate Representatives of the people."). As Joseph Story put it, the Appropriations Clause prevents the executive from "apply[ing] all [the United

11

States'] monied resources at his pleasure."  3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213-14 (1833).

These historical sources align with the text and syntactical structure of the Appropriations Clause.  Because "the clause is phrased as a limitation, it means that 'the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress.'"  *U.S. House of Representatives v. Mnuchin*, 976 F.3d 1, 8 (D.C. Cir. 2020) (quoting *United States v. MacCollom*, 426 U.S. 317, 321 (1976) (plurality opinion)).  The flip side of this rule is that the President has no discretion "to spend less than the full amount appropriated by Congress for a particular project or program" in the absence of an express statutory delegation of discretion to do so.  *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.).  As the Supreme Court has put it, the President has no "dispensing power," so "[t]o contend that the obligations imposed on the President to see the laws faithfully executed[] implies a power to forbid their execution" would be a "novel" and "inadmissible" "construction of the [C]onstitution" in general, and the Appropriations Clause in particular.  *Kendall*, 37 U.S. at 525.

The President's role in appropriating, spending, and withholding funds is accordingly circumscribed.  Because appropriations must be "made by Law," U.S. Const. art. I, § 9, cl. 7, the Clause demands that spending be authorized by the

"single, finely wrought and exhaustively considered, procedure" for enacting legislation set forth in the Constitution. *Clinton*, 524 U.S. at 439-40 (quoting *INS v. Chadha*, 462 U.S. 919, 951 (1983)). Under that procedure, "except for recommendation and veto, [the President] has no legislative power," *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 655 (1952) (Jackson, J., concurring), for the Constitution simply "does not confer upon him any power to enact laws or to suspend or repeal such as the Congress enacts," *United States v. Midwest Oil Co.*, 236 U.S. 459, 505 (1915). Rather, the President must make appropriated funds available for obligation under his duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

## II. For Over Two Hundred Years, Congress Has Jealously Guarded Its Control Over the Purse Through Federal Legislation Governing Spending and Impoundments.

Since the earliest days of the Republic, Congress has exercised its "plenary power to give meaning to the [Appropriations Clause]" through federal laws. *Harrington v. Bush*, 553 F.2d 190, 194-95 (D.C. Cir. 1977).

The story begins in the Tenth Congress with the predecessor of what is known today as the Purpose Statute. *See* 31 U.S.C. § 1301(a) (current version). By passing that law, Congress commanded that "the sums appropriated by law for each branch of expenditure in the several departments shall be solely applied to the objects for which they are respectively appropriated, and to no other." Act of Mar.

13

3, 1809, ch. 28, 2 Stat. 535, 535.  As originally enacted, the law included a narrow exception for instances when Congress was on recess and the secretary of a department petitioned the President for funds "necessary for the public service," *id.*, but even this limited exception was later repealed by Congress, *see* Act of Feb. 12, 1868, ch. 8, 15 Stat. 35, 36.  The foundational principle that appropriations must be carried out as authorized by Congress has been a "core tenet of appropriations law" ever since.  *Dep't of Navy*, 665 F.3d at 1348.

A few decades later, Congress passed the first version of the Antideficiency Act, making it unlawful "for any department of the government to expend . . . any sum in excess of appropriations made by Congress for that fiscal year."  Act of July 12, 1870, ch. 251, §7, 16 Stat. 251.  Congress subsequently amended the law to strengthen it, including by authorizing administrative and criminal penalties for certain violations, *see* 31 U.S.C. §§ 1349-50, 1518.  The law's core provisions establish an apportionment process, *id.* §§ 1512-13, prohibit accepting voluntary services, *id.* § 1342, and prohibit obligating funds in advance or in excess of an appropriation, *id.* §§ 1341, 1517(a).

Notably, in 1950, Congress amended the Antideficiency Act to clarify that "reserves may be established to provide for contingencies, or to effect savings whenever savings are made possible by or through changes in requirements, greater efficiency of operations, or *other developments* subsequent to the date on

14

which such appropriation was made available."  General Appropriations Act of

1951, ch. 896, § 1211(a)-(c)(2), Pub. L. No. 81-759, 64 Stat. 595, 765-66 (1950)

(emphasis added).  Although the full text and structure of the 1950 amendment

made clear that it modernized and reaffirmed the central requirements of existing

law, President Nixon abused the Act's new provision permitting reserves for "other

developments" to unilaterally cut billions of dollars from federal programs.  *See*

Neil M. Soltman, *The Limits of Executive Power: Impoundment of Funds*, 23 Cath.

U. L. Rev. 359, 369 (1973).

Nixon's impoundments resulted in congressional "furor," *City of New Haven*

*v. United States*, 809 F.2d 900, 906 (D.C. Cir. 1987), and an explosion of litigation,

*see infra* part IV.A, leading to the passage of the ICA as a "reassert[ion]" of

congressional "control over the budgetary process," *City of New Haven*, 809 F.2d

at 906.  To avoid presidential subversion of congressional policy, the ICA deleted

the Antideficiency Act's provision that had authorized the establishment of a

reserve for "other developments," *see* Pub. L. No. 93-344, tit. X, § 1002, 88 Stat.

297, 332 (1974), mandating that "[t]he apportionment process is to be used only

for routine administrative purposes such as to avoid deficiencies in Executive

branch accounts, not for the making of policy or the setting of priorities," S. Rep.

No. 93-688, at 72 (1974).  Congress also expressly prohibited the President from

deferring or proposing to rescind funds without sending a "special message" to

15

Congress justifying the decision.  2 U.S.C. §§ 683-84.  Congress subsequently amended the ICA to make explicit the rule that deferrals may not be made for policy reasons.  Pub. L. No. 100-119, tit. II, § 206, 101 Stat. 754, 785-86 (1987).

Accordingly, under current law, deferrals must be "consisten[t] with legislative policy" and are "permissible only [when] . . . specifically provided by law," 2 U.S.C. § 684(b), and rescissions are subject to congressional approval, *id.* § 683.  Through these provisions, the ICA makes clear that in the absence of express statutory discretion to withhold funds, the executive branch must spend funds appropriated by Congress.  Congress now legislates with the ICA in the backdrop, but the idea that appropriations statutes—like all laws—are mandatory as a default rule is grounded in longstanding constitutional principles that the ICA merely codified.  *See, e.g.*, S. Rep. No. 93-688, at 73-74 (cataloging pre-ICA cases rejecting impoundments as unconstitutional, and explaining that the ICA is "consistent" with them in its rejection of the idea that federal funds can be withheld "for fiscal policy purposes"); 120 Cong. Rec. 19668 (1974) (Rep. Albert Ullman) ("We are returning to the Congress the basic powers of budgeting that were originally intended by the Founding Fathers in the Constitution."); *id.* at 20464 (Sen. Samuel Ervin, Jr.) (The bill "is based on the assumption that the President has no power under the Constitution to impound lawfully appropriated funds in the absence of a delegation of such authority by the Congress.").

16

Finally, in the wake of President Trump's unlawful spending deferrals during his first term, Congress passed new laws to further secure its power of the purse. Legislation enacted in early 2022 required public reporting of apportionment decisions for that fiscal year and required all executive agencies to report unlawful delays or conditions on appropriations. Financial Services and General Government Appropriations Act, Pub. L. No. 117-103, §§ 204(a)-(d), 748, 136 Stat. 239, 256-57, 306 (2022). Later that same year, Congress made these accountability measures permanent and added new protections against unlawful impoundments, such as new reporting requirements for violations of the ICA. Financial Services and General Government Appropriations Act, Pub. L. No. 117-328, §§ 204, 748-49, 136 Stat. 4650, 4667, 4718 (2022); *see* H.R. Rep. No. 117-393, at 12 (2022) ("Appropriations are laws like any other and can be rescinded only through the bicameralism and presentment procedures that the Constitution prescribes.").[2] These transparency and reporting requirements have been enacted in appropriations laws passed since then, *e.g.*, Pub. L. No. 118-47, div. B. tit. VII, §§ 748-49, 138 Stat. 460, 586-87 (2024), reaffirming Congress's plenary power of

---

[2] In March 2025, the Office of Management and Budget ceased complying with the requirement to make apportionments public, *see, e.g.*, Paul Krawzak, *White House Scraps Public Spending Database*, Roll Call (Mar. 24, 2025), https://rollcall.com/2025/03/24/white-house-scraps-public-spending-database/, leading to multiple lawsuits that are currently pending, *see, e.g.*, *Citizens for Resp. & Ethics in Wash. v. OMB*, No. 25-cv-1051 (D.D.C. filed Apr. 8, 2025); *Protect Democracy Project v. OMB*, No. 25-cv-1111 (D.D.C. filed Apr. 14, 2025).

the purse and pushing back against unauthorized executive attempts to usurp that power.

**III. Neither the ICA—a Law Enacted to "Control" Rather than Facilitate Unconstitutional Impoundments—nor the President's Foreign Affairs Powers Authorize Him to Defy the Will of Congress by Refusing to Execute Duly Enacted Appropriations Laws.**

**A.** Because the Framers gave the appropriation and spending powers to Congress, and because they strictly limited the President's lawmaking powers, the executive branch has no power to impound appropriated funds based on policy disagreement. The Constitution establishes that rule, and the ICA underscores it. As a law enacted to "control" unconstitutional impoundments, the ICA plainly does not authorize the sort of end-run concocted by Appellants, whereby the President need not spend *any* appropriated funds until he initiates the ICA's rescission process.

Nor does any aspect of the ICA's text or history support Appellants' assertion that the law limits judicial review of executive impoundments that violate the Constitution's separation of powers. The ICA aimed to reduce litigation over impoundments by creating an exclusive procedure for the President to ask Congress to rescind appropriations, but it did not leave harmed parties in a worse position than before its enactment—*i.e.*, without a remedy if the President violates the Constitution by unilaterally impounding funds. *See, e.g.*, S. Rep. No. 93-688, at 73 (ICA is "consistent with recent decisions by federal courts"); 119 Cong. Rec.

18

19334-35 (1973) (Rep. Thomas O'Neill, Jr.) (while "courts have ruled overwhelmingly against impoundments," "it should not take litigation on top of legislation to assure that the congressional mandate is carried out").

To be sure, Congress may choose to delegate to the President and agencies discretion regarding *how* to implement the programs for which it appropriates money. Congress even sometimes expressly delegates discretion to the executive to spend less than an appropriated amount. But executive discretion is not the default rule, even in the realm of foreign aid spending.

**B.** In a similar vein, the Appropriations Clause makes clear that "[a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *OPM v. Richmond*, 496 U.S. 414, 425 (1990). Thus, despite the President's "compelling" interest in "resolv[ing] . . . sensitive foreign policy decisions," *Medellín v. Texas*, 552 U.S. 491, 523-24 (2008), he is "not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue," *Zivotofsky*, 576 U.S. at 21.

Indeed, Appellants do not point to a single authority suggesting the President's foreign affairs powers—powers largely shared with Congress, *id.*—authorize him to override Congress's exclusive authority over federal spending. Nor could they: while courts have held that the President possesses chief authority

19

over *discrete* foreign affairs functions, none come close to authorizing the unilateral impoundment of appropriated foreign aid. *Cf., e.g.*, *Medellín*, 552 U.S. at 532 (holding the "Executive's narrow and strictly limited authority to settle international claims disputes pursuant to an executive agreement" did not authorize him to usurp congressional authority to enact a treaty into U.S. law); *Zivotovsky*, 576 U.S. at 12, 32 (recognizing the exclusive executive "power to recognize other nations," while acknowledging "the substantial powers of Congress over foreign affairs in general").

This principle is consistent with the original meaning of the Constitution. After all, "when the drafters and ratifiers spoke of the appropriations system, they saw it as checking the President's power" and did not "not[e] exceptions for foreign affairs power." Michael D. Ramsey, *The Constitution's Text in Foreign Affairs* 112 (2009); *see* Zachary S. Price, *Funding Restrictions and Separation of Powers*, 71 Vand. L. Rev. 357, 453 (2018) ("[S]pending in service of national foreign policy goals falls squarely within the ultimate authority over public resource allocation that the Appropriations Clause guarantees to Congress."); *cf.* Louis Henkin, *Foreign Affairs and the United States Constitution* 114 (2d ed. 1996) ("foreign assistance" is "justified as within the 'spending power', the power to provide for the general welfare of the United States," and "expressly conferred upon Congress").

Thus, "as with the exercise of any governmental power," the President's authority to act in this context "'must stem either from an act of Congress or from the Constitution itself.'"  *Medellín*, 552 U.S. at 524 (quoting *Youngstown*, 343 U.S. at 585).  That authority is at its "lowest ebb" when the President acts contrary to the will of Congress, as expressed by the ICA and appropriations statutes. *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).  Indeed, that is particularly true in a realm like appropriations and spending where the President enjoys none of "his own constitutional powers."  *Id.*  Simply put, the President and federal agencies "may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress," *Aiken Cnty.*, 725 F.3d at 260, even where that disagreement touches on foreign affairs.

## IV.    Courts and High-Ranking Executive Attorneys Have Consistently Rejected Presidential Assertions of Impoundment Authority.

In recognition of these separation-of-powers principles, courts across the nation, including the Supreme Court, as well as high ranking executive branch attorneys, have consistently recognized that the President enjoys no constitutional power to impound appropriated funds.

**A.**  In *Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838), the Court unanimously rejected newly appointed Postmaster General Amos Kendall's claim that he could withhold money that Congress had required him to spend.  The Justices balked at the Attorney General's assertion that Kendall possessed some

inherent constitutional authority to rescind appropriated funds, remarking that "[t]o contend that the obligations imposed on the President to see the laws faithfully executed, implies a power to forbid their execution; is a novel construction of the constitution, and is entirely inadmissible." *Id.* at 525. Sanctioning such a theory would be, according to the Court, "vesting in the President a dispensing power, which has no countenance for its support in any part of the constitution." *Id.* The Court refused to "assert[] a principle, which if carried out in its results to all cases falling within it, would be clothing the President with a power to control the legislation of congress." *Id.*

Critically, it was irrelevant to the Court that Kendall claimed the rescission was necessary because his predecessor had negotiated a contract tainted by political favoritism. As the Court put it: "The act required by the law to be done by the postmaster general is, simply to credit S. & S. with the full amount of the award of the solicitor of the treasury. This is a precise, definite act . . . about which the postmaster general has no discretion whatever." *Id.* In other words, the Executive's policy justifications for withholding funds—however sound they might be—were irrelevant because the Executive lacked discretion to withhold the funds in the first place.

In *Train v. City of New York*, 420 U.S. 35 (1975), the Supreme Court again unanimously rejected the principle that the President possesses inherent

22

impound power. President Nixon, through his Environmental Protection Agency Secretary Russell Train, claimed authority to withhold funding allocated by Congress to subsidize municipal sewer and water projects under the Federal Water Pollution Control Act Amendments of 1972. *Id.* at 37-41. The Court held that Nixon had no such authority because the relevant statute did not delegate any discretion to rescind environmental protection funds under the given circumstances. *Id.* at 42-49. Implicit in that conclusion was the premise that any presidential discretion to withhold appropriated funds must be expressly granted by Congress as a matter of legislative grace. As Justice Scalia later succinctly summarized it, "our decision . . . in *Train v. City of New York*, 420 U.S. 35 (1975), proved [President Nixon] wrong" in his claim to a "constitutional right to impound appropriated funds." *Clinton*, 524 U.S. at 468 (Scalia, J., concurring in part and dissenting in part) (quotation marks omitted).

Courts of appeals across the country—even before the ICA was enacted— similarly held that only Congress may authorize the President to spend less than the total amount of appropriated funds. In *National Treasury Employees Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974), this Court held that mandatory statutory language required the President to put into effect a pay raise for members of the plaintiff union. *Id.* at 601; *see id.* at 604 ("[N]othing in the Constitution commits to the President the ultimate authority to construe federal statutes," and the

23

President's duty to "take Care the Laws be faithfully executed" "does not permit the President to refrain from executing laws duly enacted by the Congress as those laws are construed by the judiciary."). In *State Highway Commission of Missouri v. Volpe*, 479 F.2d 1099 (8th Cir. 1973), the Eighth Circuit held that the Secretary of Transportation could not impound highway funds for reasons beyond those Congress had supplied. *Id.* at 1114. Other appellate courts have reached similar conclusions compelling the executive branch to disburse funds in accordance with statutory commands, *e.g.*, *Sioux Valley Empire Elec. Ass'n v. Butz*, 504 F.2d 168, 178 (8th Cir. 1974), or upholding preliminary injunctions to that effect, *e.g.*, *Maine v. Fri*, 486 F.2d 713, 716 (1st Cir. 1973).

District courts also squarely rejected the notion that the President may impound funds. For instance, when President Nixon attempted to withhold appropriated funds for community mental health centers, the District Court for the District of Columbia held that there was "no basis for [his] assertion of inherent constitutional power in the Executive to decline to spend." *Nat'l Council of Cmty. Mental Health Ctrs., Inc. v. Weinberger*, 361 F. Supp. 897, 901 (D.D.C. 1973) (citing, inter alia, *Kendall* and *Youngstown*). In *Guadamuz v. Ash*, 368 F. Supp. 1233 (D.D.C. 1973), the same court held that where "[m]oney has been appropriated by the Congress to achieve the purposes of [a] program[,] . . . the Executive has no residual constitutional power to refuse to spend these

24

appropriations." *Id.* at 1244. The executive branch's policy justifications for the impoundment were irrelevant in the court's view, just as they had been in *Kendall*: "nowhere does our Constitution extol the virtue of efficiency and nowhere does it command that all our laws be fiscally wise. It does most clearly, however, state that laws, good or bad, be enacted by the Congress and enforced by the President." *Id.* at 1243.

These cases are not outliers. Rather, they are part of a long and unbroken line of district court decisions, largely reached during the Nixon years, which soundly rejected President Nixon's claim that he had constitutional authority to withhold appropriated funds. *See, e.g.*, *Brinegar*, 388 F. Supp. at 1324-25 (rejecting the "argument . . . that the President's express or implied constitutional powers justify holding back authorized funds"); *Loc. 2677, Am. Fed'n of Gov't Emps. v. Phillips*, 358 F. Supp. 60, 77-78 (D.D.C. 1973) ("An administrator's responsibility to carry out the Congressional objectives of a program does not give him the power to discontinue that program, especially in the face of a Congressional mandate that it shall go on."); *Campaign Clean Water, Inc. v. Ruckelshaus*, 361 F. Supp. 689, 696 (E.D. Va. 1973) ("More than a century ago the United States Supreme Court laid to rest any contention that the President has the power [of impoundment] suggested."); *see also* Louis Fisher, *Cong. Rsch. Serv., Court Cases on Impoundment of Funds: A Public Policy Analysis* (1974)

(cataloging cases rejecting attempts at impoundment). Many of these decisions were never appealed; rather, perhaps in recognition of the weakness of its legal arguments, the Nixon administration paid out the mandated funds in accordance with district court orders effectuating the will of Congress. *See id.* at 80-90.

**B.** High-ranking executive branch attorneys, including some who went on to become Supreme Court justices, have also consistently rejected theories of an inherent presidential authority to withhold funds appropriated by Congress. Future-Chief Justice William Rehnquist, writing in 1969 as the head of the Justice Department's OLC, explained that "[w]ith respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent." Rehnquist Memo 7. Rehnquist then doubled down, declaring it "*extremely difficult* to formulate a constitutional theory to justify a refusal by the President to comply with a congressional directive to spend." *Id.* (emphasis added). Though "[i]t may be argued that the spending of money is inherently an executive function, . . . the execution of any law is, by definition, an executive function, and it seems an anomalous proposition that because the Executive branch is bound to execute the laws, it is free to decline to execute them." *Id.*

Fifteen years later, future-Chief Justice John Roberts reached a similar conclusion for the Reagan administration Office of White House Counsel. He

26

wrote a memo seeking to "dampen any hopes that inherent constitutional impoundment authority may be invoked to achieve budget goals," warning that "[o]ur institutional vigilance with respect to the constitutional prerogatives of the presidency requires appropriate deference to the constitutional prerogatives of the other branches, and no area seems more clearly the province of Congress than the power of the purse." Roberts Memo 1.

The Reagan administration OLC later adopted Roberts's position in a formal advisory opinion, declaring that "[t]here is no textual source in the Constitution for any inherent authority to impound" in "the face of an express congressional directive to spend." *The President's Veto Power*, 12 Op. O.L.C. 128, 166-67 (1988). Citing Rehnquist's earlier memorandum, the Office explained that "reliance upon the President's obligation to 'take Care that the Laws be faithfully executed' . . . to give the President the authority to impound funds in order to protect the national fisc, creates the anomalous result that the President would be declining to execute the laws under the claim of faithfully executing them." *Id.* at 167. Many other OLC memoranda reached the same conclusion. *See, e.g.*, Ralph E. Erickson, Acting Assistant Attorney General, OLC, *Memorandum Re: Constitutional Power of Congress to Compel Spending of Impounded Funds* (Jan. 7, 1972); Ralph W. Tarr, Acting Assistant Attorney General, OLC, *Memorandum Re: Legal Authority to Take Action to Forestall a Default* (Oct. 21, 1985).

In sum, there is no shortage of authority rejecting executive encroachment on Congress's power of the purse, whether under the guise of inherent presidential power, policy disagreement, or budget austerity.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

Respectfully submitted,

/s/ Brianne J. Gorod
Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Miriam Becker-Cohen (DC Bar No. 1616670)
Smita Ghosh (DC Bar No. 1767180)
Nina G. Henry (DC Bar No. 90017399)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: June 13, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,484 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 13th day of June, 2025.

/s/ Brianne J. Gorod
Brianne J. Gorod

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of June, 2025, I electronically filed the

foregoing document using the Court's CM/ECF system, causing a notice of filing

to be served upon all counsel of record.

Dated: June 13, 2025

/s/ Brianne J. Gorod
Brianne J. Gorod