SCHEDULED FOR ORAL ARGUMENT ON JULY 7, 2025

————————————

Nos. 25-5097, 25-5098

————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

GLOBAL HEALTH COUNCIL, *et al.*,
PLAINTIFFS-APPELLEES,

v.

DONALD J. TRUMP, *et al.*,
DEFENDANTS-APPELLANTS.

————————————

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

————————————

**BRIEF OF THE DISTRICT OF COLUMBIA, ARIZONA, CALIFORNIA, COLORADO, CONNECTICUT,  DELAWARE, HAWAII, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OREGON, RHODE ISLAND, VERMONT, WASHINGTON, AND WISCONSIN AS AMICI CURIAE IN SUPPORT OF APPELLEES**

————————————

BRIAN L. SCHWALB
Attorney General for the
 District of Columbia

EMMA P. SIMSON
Senior Counsel to the
 Attorney General

RYAN WILSON
Senior Counsel for
 Federal Initiatives

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

CARA SPENCER
MARK A. RUCCI
Assistant Attorneys General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned certifies as follows:

A. *Parties and amici*.—All parties and amici appearing before the district court and in this Court are listed in the Brief for Appellants and the Brief for Appellees, with the exception of the Amici States: the District of Columbia, Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, and Wisconsin, as well as potential other amici in support of Appellees.

B. *Rulings under review*.—References to the rulings under review appear in the Brief for Appellants and the Brief for Appellees.

C. *Related cases*.—Related cases are listed in the Brief for Appellants and the Brief for Appellees.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE
*Counsel for Amici Curiae*

i

## TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF AMICI CURIAE ...................................1

ARGUMENT ...........................................................................................4

    I.    The Executive Branch Is Constitutionally Obligated To Spend Funds Appropriated By Congress ..........................................................4

    II.    The Unlawful Impoundment Of Foreign Assistance Funds Has Harmed The States And Their Residents And Is Against The Public Interest .....................................................................................14

CONCLUSION ......................................................................................21

# TABLE OF AUTHORITIES*

*Cases*

*Cincinnati Soap Co. v. United States*, 301 U.S. 308 (1937)......................................5

*\*City & Cnty. of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ................................................................ 9, 10, 11

*City & Cnty. of San Francisco v. Trump*,
  No. 25-cv-1350, 2025 WL 1282637 (N.D. Cal. May 3, 2025) ..........................12

*City of New Haven v. United States*, 809 F.2d 900 (D.C. Cir. 1987) .......................7

*Clinton v. City of New York*, 524 U.S. 417 (1998) ...................................................5

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am.*,
  601 U.S. 416 (2024)..........................................................................................4, 5

*Harrington v. Bush*, 553 F.2d 190 (D.C. Cir. 1977)......................................... 2, 6, 9

*\*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013) ......................................... 2, 6, 9

*Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838) ..................................10

*Maryland v. U.S. Dep't of Agric.*,
  No. 1:25-cv-748, 2025 WL 973159 (D. Md. Apr. 1, 2025) ...............................20

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
  763 F. Supp. 3d 36 (D.D.C. 2025).....................................................................12

*Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974)....................9

*New York v. Trump*, 133 F.4th 51 (1st Cir. 2025) ..................................................12

*New York v. Trump*,
  No. 25-cv-39, 2025 WL 715621 (D.R.I. Mar. 6, 2025).....................................11

---

\*      Authorities upon which Amici States chiefly rely are marked with asterisks.

*Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414 (1990)........................................4, 5

*Pursuing America's Greatness v. Fed. Election Comm'n*,
    831 F.3d 500 (D.C. Cir. 2016) ...................................................................14

*Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180 (D.C. Cir. 1992)..................2, 4

*Train v. City of New York*, 420 U.S. 35 (1975) .............................................7

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
    665 F.3d 1339 (D.C. Cir. 2012) ...............................................................4, 5


### Constitutional Provisions

*U.S. Const. art. I, § 9, cl. 7................................................................ 1, 4, 9

U.S. Const. art. II, § 3 .........................................................................9


### Statutes

2 U.S.C. § 683 ................................................................................ 6, 8, 9

2 U.S.C. § 684 ................................................................................ 6, 8, 9

Congressional Budget and Impoundment Control Act of 1974,
    Pub. L. No. 93-344, 88 Stat. 297
    (codified as amended at 2 U.S.C. § 682 *et seq.*)......................................6


### Executive and Legislative Materials

Dep't of Just., Off. of Legal Couns.,
    Presidential Authority to Impound Funds Appropriated for Assistance
    to Federally Impacted Schools, 1 Op. O.L.C. Supp. 303 (Dec. 1, 1969) ........9, 11

H.R. Rep. No. 93-658 (1974)...................................................................7

S. Rep. No. 93-688 (1974) ....................................................................7

*Other Authorities*

Sarah Atwood, *Food Research Halted at MSU After Trump's
    USAID Stop Work Order*, Lansing State J. (Feb. 25, 2025) ................................15

Scott Bordow, *ASU's USAID projects provided economic
    benefits to US*, ASU News (Mar. 5, 2025) .............................................16

Decl. of Leslie Anne Brunelli, *New Mexico v. Musk*,
    No. 1:25-cv-429 (D.D.C. Feb. 14, 2025), Dkt. No. 6-8 ......................... 15, 16, 17

Josh Chafetz, Congress's Constitution: Legislative Authority
    and the Separation of Powers (2017) ....................................................5

Meredith Cohn & Jasmine Vaughn-Hall,
    *Another Baltimore-based Global Aid Group Faces Cuts:
    Catholic Relief Services*, Balt. Banner (Feb. 6, 2025) ........................................18

Tom Crann & Gretchen Brown, *USAID cuts will impact
    Minnesota farmers*, MPR News (Feb. 27, 2025) ..................................21

Zachery Eanes, *USAID funding freeze could disrupt large
    employers in the Triangle*, Axios (Feb. 5. 2025) ..................................19

Feed the Future Innovation Lab Network ...............................................15

FHI 360, *2024 Financial Summary* (Mar. 17, 2024) ..............................19

Alex Fitzpatrick, *How much federal money your state gets*,
    Axios (Apr. 19, 2025) ........................................................13

Haajrah Gilani, *Trump's Cuts to USAID Threaten UNR's
    Global Partnerships and Research*, Las Vegas Sun (Feb. 13, 2025).................16

Elizabeth Hernandez, *USAID gutting hits Colorado
    as organizations, small businesses struggle to survive*,
    Denver Post (Feb. 14, 2025) ...............................................20

*The Impoundment Control Act of 1974: What Is It? Why Does It Matter?*,
    House Comm. on the Budget (Oct. 23, 2019) .......................................7

Rusty Jacobs, *Trump's cuts to funding for scientific research pose grave risks for RTP and global health*, WUNC (May 5, 2025)..................19

Avery Lotz, *Budget head Vought floats impoundment to sidestep Congress on DOGE cuts*, Axios (June 1, 2025) ....................................12

Peter G. Peterson Foundation, *How Much Funding Do State and Local Governments Receive From Federal Government?* (Apr. 11, 2024)........13

Press Release, *FHI 360 announces reductions in force* (Apr. 10, 2025) ...............20

Press Release, Marc Parlange, President, Univ. of Rhode Island, *Update on USAID Programs and Positions* (Feb. 27, 2025) .............................16

Press Release, *RTI International announces workforce realignment* (Mar. 25, 2025) .........................................................................................20

Lauren Quinn, *$1M gift to keep Soybean Innovation Lab operational after USAID closure*, ACES News (Apr. 28, 2025) .......................17

Greg Rosalsky, *Can President Trump ignore Congress' spending laws? The debate over 'impoundment'*, NPR (Feb. 18, 2025).....................................12

Stephanie Saul, *Johns Hopkins to Cut More Than 2,000 Workers Funded by Federal Aid*, N.Y. Times (Mar. 13, 2025) .........................................18

Melody Schreiber, *Trump's 'stop-work' order for PEPFAR cuts off anti-HIV drugs for patients*, NPR (Jan. 28, 2025)...............................................19

Joseph Story, Commentaries on the Constitution of the United States (1st ed. 1833)...................................................................................1, 5

Fatma Tanis & Frank Langfitt, *The Trump Administration Kills Nearly All USAID Programs*, NPR (Feb. 26, 2025)...............................................8

Graciela Tiu, *UC Davis research funding impacted by executive actions*, Cal. Aggie (May 6, 2025) ....................................................................18

The Federalist No. 51 (James Madison) (Clinton Rossiter ed., 1961) .....................4

The Federalist No. 58 (James Madison) (Clinton Rossiter ed., 1961) ......................5

Christopher Vondracek, *Shuttering of USAID could mean the end of millions in income for Midwest farm operations,* Minn. Star Tribune (Feb. 6, 2025) .......................................................................21

Caren R. Weintraub, *UC Davis to Close Feed the Future Innovation Labs Amid Loss in USAID Funding*, U.C. Davis Coll. of Agric. & Env't Sci. (Apr. 3, 2025)...........................................................................................15

## INTRODUCTION AND INTEREST OF AMICI CURIAE

The Constitution gives Congress, not the President, the authority to appropriate funds.  U.S. Const. art. I, § 9, cl. 7.  As Justice Story explained, the Appropriations Clause reflects the Founders' judgment "that [C]ongress should possess the power to decide, how and when any money should be applied for [public] purposes."  3 Joseph Story, Commentaries on the Constitution of the United States § 1342, at 213 (1st ed. 1833).  Thus, the Appropriations Clause functions as "a limitation . . . upon the acts of the executive, and other public officers, in regard to the public monies in the treasury." 2 *id.* § 922, at 388.  Since the Founding, Congress has exercised its constitutional authority to structure appropriations to solve a wide array of challenges facing the United States both at home and abroad.

In this case, the President and other Executive Branch officials assert an extraordinary view of the power to impound congressionally appropriated funds: that they can unilaterally withhold billions of dollars of appropriated funds based merely on the current Administration's policy judgments.  A group of states led by Ohio and South Carolina ("Ohio Amici") has echoed this staggering view of executive power in this appeal.  *See* Brief of Ohio, South Carolina, and 18 Other States as Amici Curiae in Support of Appellants ("Ohio Amici Br.").

But neither the President's nor his subordinates' policy preferences can override Congress's "absolute control of the moneys of the United States" and

"exclusive power over the federal purse." *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992) (quoting *Harrington v. Bush*, 553 F.2d 190, 194 n.7 (D.C. Cir. 1977)). The District of Columbia, Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, and Wisconsin (collectively, "Amici States") file this brief as amici curiae in support of Appellees and urge this Court to reject an unbridled view of executive power that would result in a diminution of Congress's constitutional authority and risk substantial harm to the states.

Amici States have a strong interest in the longstanding constitutional principle that, absent congressional authorization, no Executive Branch official may withhold lawfully appropriated federal funds simply to effectuate the President's preferred policy goals. Where Congress has appropriated specific funds for specific purposes, under "settled, bedrock principles of constitutional law," "the President does not have unilateral authority to refuse to spend th[ose] funds." *In re Aiken Cnty.*, 725 F.3d 255, 259, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.). Ohio Amici are thus wrong to characterize congressional appropriations "as a hard budgetary ceiling, not a floor" and to argue that the Constitution gives the President vast discretion whether to spend the funds as Congress intended. Ohio Amici Br. 2, 13 (emphasis omitted).

2

Equally important, adopting Ohio Amici's position would have significant ramifications for state and local governments, which receive more than a *trillion* dollars each year in congressionally appropriated funds to deliver healthcare to Medicaid recipients, improve aging infrastructure, respond to natural disasters, and enhance the quality of public education, among many other vital programs and services.  This case presents a prime example.  In halting the flow of billions of dollars of funding for foreign assistance programs at the United States Agency for International Development ("USAID") and the State Department, the President and other Executive Branch officials have inflicted substantial harms on universities, farmers, nonprofits, and small businesses located in the Amici States.  To date, hundreds of domestic workers have been terminated, substantial amounts of American crops intended for international distribution have been unallocated, and hundreds of millions of dollars of cutting-edge research projects at some of the nation's premier public universities have been halted as a result of the withholding of congressionally appropriated funds.  These harms bolster the district court's determination that, in addition to Appellees' likelihood of success on the merits, the equities also strongly support granting a preliminary injunction.

# ARGUMENT

## I. The Executive Branch Is Constitutionally Obligated To Spend Funds Appropriated By Congress.

1.  The Constitution gives Congress, not the President, "control over the public fisc." *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am.* ("*CFSA*"), 601 U.S. 416, 420 (2024) (Thomas, J.).   This foundational separation-of-powers principle is reflected in the "straightforward and explicit command" of the Appropriations Clause, *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990), which provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law," U.S. Const. art. I, § 9, cl. 7.

The command of the Appropriations Clause is "unmistakable," *CFSA*, 601 U.S. at 425; it serves as both a source of authority and protection for Congress's "*exclusive* power over the federal purse," *Rochester Pure Waters Dist.*, 960 F.2d at 185 (emphasis added).  As then-Judge Kavanaugh explained, "[t]he power over the purse was one of the most important authorities allocated to Congress in the Constitution's 'necessary partition of power among the several departments.'" *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346-47 (D.C. Cir. 2012) (Kavanaugh, J.) (quoting The Federalist No. 51, at 320 (James Madison) (Clinton Rossiter ed., 1961)).  In fact, at the time of the Founding, "the principle of legislative supremacy over fiscal matters engendered little debate and created no disagreement." *CFSA*, 601 U.S. at 431 (Thomas, J.); Josh Chafetz, Congress's

Constitution: Legislative Authority and the Separation of Powers 56 (2017) (explaining that the Appropriations Clause was "wholly uncontroversial at the Constitutional Convention"). And "[f]or over 200 years now, Congress has exercised broad discretion in crafting appropriations." *CFSA*, 601 U.S. at 442 (Kagan, J., concurring); *see* Appellees' Br. 30-32.

Structurally, Congress's exclusive control over appropriations serves "as a restraint on Executive Branch officers." *U.S. Dep't of Navy*, 665 F.3d at 1347. Without it, "the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure." 3 Story, *supra* § 1342, at 213-14; *see Richmond*, 496 U.S. at 425 (emphasizing the importance of "a valid reservation of congressional control over funds in the Treasury"); *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937) (similar); *Clinton v. City of New York*, 524 U.S. 417, 451 (1998) (Kennedy, J., concurring) (explaining that "liberty is threatened" when "the decision to spend [is] determined by the Executive alone, without adequate control by the citizen's Representatives in Congress"); The Federalist No. 58, at 359 (James Madison) (Clinton Rossiter ed., 1961) ("This power over the purse may . . . be regarded as the most complete and effectual weapon with which any constitution can arm the [] representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure.").

As relevant here, Congress has exercised its "plenary" appropriations authority, *Harrington*, 553 F.2d at 194, to enact the Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93-344, 88 Stat. 297 (codified as amended at 2 U.S.C. § 682 *et seq.*). Through the Impoundment Control Act, Congress has provided a mechanism for the President to propose spending less than what Congress has appropriated for a particular project or program, including when such a proposal stems from a diverging policy judgment about the best use of the funds. *See* 2 U.S.C. § 683(b) (stating that all funds appropriated by Congress "shall be made available for obligation" unless Congress itself has rescinded the appropriation in response to a request from the President); *id.* § 684(b) (similar with respect to deferrals of appropriations); *see also* Appellees' Br. 36-37. Absent Congress's assent, however, the President and other Executive Branch officials are obligated by the Appropriations Clause, separation-of-powers principles, and appropriations statutes to fully spend the funds that Congress has appropriated. *See In re Aiken Cnty.*, 725 F.3d at 261 n.1; Appellees' Br. 21.

The Impoundment Control Act reinforced the constitutional limitation on the President's ability to impound funds in response to what the House Committee on the Budget has described as "President Nixon's executive overreach"—specifically, his "refus[al] to release [c]ongressionally appropriated funds for certain programs he opposed." *The Impoundment Control Act of 1974: What Is It? Why Does It*

*Matter?*, House Comm. on the Budget (Oct. 23, 2019), tinyurl.com/amyxtwv5; *accord Train v. City of New York*, 420 U.S. 35 (1975). Indeed, "Congress was united in its furor over presidential impoundments and intent on reasserting its control over the budgetary process." *City of New Haven v. United States*, 809 F.2d 900, 906 (D.C. Cir. 1987). Congress sought "to assure that the practice of reserving funds does not become a vehicle for furthering Administration policies and priorities at the expense of those decided by Congress." S. Rep. No. 93-688, at 75 (1974); *see* H.R. Rep. No. 93-658, at 16 (1974) (seeking "to restore responsibility for the spending policy of the United States to the legislative branch," because "[n]o matter how prudently Congress discharges its appropriations responsibility, legislative decisions have no meaning if they can be unilaterally abrogated by executive impoundments"); J.A. 67 n.15 (explaining that even before the enactment of the Impoundment Control Act the Supreme Court recognized "that the Executive was not free to override Congress's spending power by making the unilateral decision to allot 'less than the entire amounts authorized to be appropriated'" (quoting *Train*, 420 U.S. at 41)).

2. Here, the district court concluded that the President and other Executive Branch agencies and officials are likely "acting in violation of the separation of powers" by refusing to spend funds appropriated by Congress, which has the "exclusive power over spending." J.A. 63, 65-66. The district court also found that these same agencies and officials lacked any authority to do so because they have

not undertaken the specified recission or deferral procedures required for the impoundment of congressionally appropriated funds as prescribed in the Impoundment Control Act.   J.A. 66 (referring to 2 U.S.C. §§ 683(a), 684(a)). Rather, the President and other Executive Branch officials appear to have unilaterally frozen the funding simply because they have decided that there are better uses for this taxpayer money than those prescribed in duly enacted appropriations laws.  *See, e.g.*, Fatma Tanis & Frank Langfitt, *The Trump Administration Kills Nearly All USAID Programs*, NPR (Feb. 26, 2025), tinyurl.com/3ch6jj3w (federal official stating that the ceasing of funding is designed "to ensure taxpayer dollars were used to make America stronger, safer, and more prosperous"); Appellees' Br. 11-12 (detailing other policy-based rationales offered by the Executive Branch to cease funding to USAID and the State Department).

Ohio Amici defend this extraordinary assertion of executive power, arguing that "[c]ongressional appropriations [] act as a hard budgetary ceiling, not a floor." Ohio Amici Br. 1-2 (emphasis omitted).  In their view, as a constitutional matter, the President has the "inherent power" and "discretion" whether to fully enforce appropriations laws, and Congress may not "micromanag[e] the President's expenditures of the funds Congress appropriates."  Ohio Amici Br. 2.

That is wrong.  The President does not have unilateral authority to "spend less than the full amount appropriated by Congress for a particular project or program."

8

*In re Aiken Cnty.*, 725 F.3d at 261 n.1 (Kavanaugh, J.).  Nor can he or his subordinates independently freeze, delay, or reallocate those funds "to effectuate [their] own policy goals."  *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018).  Rather, when the President—as a matter of policy—disagrees with a congressional appropriation and wishes to spend less than the full amount appropriated, he "must propose the recission of funds, and Congress then may decide whether to approve a recission bill."  *In re Aiken Cnty.*, 725 F.3d at 261 n.1 (citing 2 U.S.C. § 683(a)); *see* 2 U.S.C. § 684(a); *see also* Dep't of Just., Off. of Legal Couns., Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools, 1 Op. O.L.C. Supp. 303, 309 (Dec. 1, 1969) [hereinafter "Rehnquist Memo"], tinyurl.com/2pnw6t6j  ("With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent.").

      This conclusion is rooted in several sources.  For one, and perhaps the most obvious, Congress has plenary authority over appropriations.  U.S. Const. art. I, § 9, cl. 7; *Harrington*, 553 F.2d at 194.  Moreover, the President has a corresponding obligation to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3; *see Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 604 (D.C. Cir. 1974) ("That constitutional duty does not permit the President to refrain from executing

laws duly enacted by the Congress."). So, each time Congress enacts an appropriation into law, it prescribes the budget authority that the Executive Branch must obligate. *See* Appellees' Br. 32. Of course, the President can lobby Congress to consider his own policy preferences and objectives as those appropriations are crafted (something normally accomplished through the President's submission of his proposed budget). But once enacted, it is the text of the appropriation—not the President's policy preferences—that provides the directives for the Executive Branch agencies and officials; faithful execution of the law does not permit the President to substitute his preferences for those achieved through bicameralism and presentment. *See City & Cnty. of San Francisco*, 897 F.3d at 1232 ("Aside from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress."); *Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 613 (1838).

Ohio Amici propound a different constitutional relationship between Congress and the President where the President can simply ignore some congressional appropriations. *See* Ohio Amici Br. 13 (claiming that Congress cannot "puppeteer[]" the President's "hand on expenditures, [and] requir[e] expenditures of every last penny"). Curiously, Ohio Amici do not even attempt to delineate where they believe the constitutionally acceptable line is between the full and faithful execution of congressional appropriations laws—or, in their words, the

10

"hard budgetary ceiling," Ohio Amici Br. 2 (emphasis omitted)—and the impermissible "intru[sion] and "puppeteering" that would permit the President to spend some lesser amount than Congress prescribed, Ohio Amici Br. 13—again, in their words, the budgetary "floor," Ohio Amici Br. 2 (emphasis omitted).

That omission is likely because it is "extremely difficult to formulate a constitutional theory to justify a refusal by the President to comply with a congressional directive to spend." Rehnquist Memo at 310. Framing the spending of money as an inherently executive function does not rehabilitate Ohio Amici's theory either, for "the execution of any law is, by definition, an executive function, and it seems an anomalous proposition that because the Executive Branch is bound to execute the laws, it is free to decline to execute them." *Id.*; *see City & Cnty. of San Francisco*, 897 F.3d at 1234 ("Because Congress's legislative power is inextricable from its spending power, the President's duty to enforce the laws necessarily extends to appropriations.").

3. In recent months, several federal courts—including the court below—have been confronted with challenges to Congress's primacy over appropriations. Repeatedly, they have reaffirmed the Executive's obligation to spend money appropriated by Congress. *See, e.g.*, *New York v. Trump*, No. 25-cv-39, 2025 WL 715621, at *1 (D.R.I. Mar. 6, 2025) (holding that the "Executive's categorical freeze of appropriated and obligated funds fundamentally undermines the distinct

11

constitutional roles of each branch of our government"), *stay pending appeal denied*, 133 F.4th 51 (1st Cir. 2025); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 55-56 (D.D.C. 2025) ("Congress has exercised its plenary power to give meaning to the Appropriations Clause and reinforce its control over appropriated funds." (cleaned up)); *City & Cnty. of San Francisco v. Trump*, No. 25-cv-1350, 2025 WL 1282637 (N.D. Cal. May 3, 2025) (finding that the federal government failed to comply with the procedures of the Impoundment Control Act).

These cases are part of a pattern by the current Administration to usurp Congress's constitutional authority over appropriations and assert unprecedented presidential power over the nation's purse—all in furtherance of the President's preferred policy objectives. *See, e.g.*, Greg Rosalsky, *Can President Trump ignore Congress' spending laws? The debate over 'impoundment'*, NPR (Feb. 18, 2025), tinyurl.com/vbahdetf ("Giving the president the power of impoundment, [Office of Management and Budget Director Russell] Vought said, would help him balance the budget, 'drain the swamp' and 'obliterate the deep state.'"); Avery Lotz, *Budget head Vought floats impoundment to sidestep Congress on DOGE cuts*, Axios (June 1, 2025), tinyurl.com/348b9puf ("Vought said, 'We're certainly not taking impoundment off the table.'").

This ongoing threat of presidential impoundment of congressionally appropriated funds poses substantial risks to the states. State and local governments

12

rely on federal funds for a significant portion of their total annual revenues. In 2023, federal outlays to state and local governments totaled more than $1.1 trillion—nearly one-fifth of all federal expenditures. Peter G. Peterson Foundation, *How Much Funding Do State and Local Governments Receive From Federal Government?* (Apr. 11, 2024), tinyurl.com/yc3v746z. And in nearly half of the states, federal funding makes up more than 40% of overall annual revenue. Alex Fitzpatrick, *How much federal money your state gets*, Axios (Apr. 19, 2025), tinyurl.com/y822r6ze. Without these federal funds, states would likely be unable to maintain the same level of programs and services that, among many other things, deliver healthcare to Medicaid recipients, upgrade critical transportation infrastructure, improve the quality of public education, respond to catastrophic natural disasters, and supplement income for those in the most precarious financial positions.

Adopting Ohio Amici's theory would allow the President's infinitely-changeable policy preferences to justify the withholding of millions or billions of congressionally appropriated dollars for state-run programs, throwing into chaos the ability of states to anticipate annual revenues and execute on critical programs and services. This Court should reject such an enlarged theory of presidential power, which goes far beyond what the Framers envisioned and adopted.

**II.     The Unlawful Impoundment Of Foreign Assistance Funds Has Harmed The States And Their Residents And Is Against The Public Interest.**

This case is a prime example of how the President's unilateral impoundment of funds can have significant adverse consequences for state and local governments. Here, the unlawful withholding of billions of dollars of foreign assistance funds has inflicted substantial harms on universities, farmers, nonprofits, and small businesses in the Amici States. These harms bolster the district court's determination that the public interest supports granting a preliminary injunction. *See* J.A. 77 (finding that the unlawful impoundment of foreign assistance funds "has had dire humanitarian consequences and has devastated businesses and programs across the country"); *accord Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511-12 (D.C. Cir. 2016) (considering the impact of a preliminary injunction on non-parties when evaluating the public interest).

1. As a result of the President's unlawful impoundment, universities in the Amici States have been deprived of more than $550 million in congressionally appropriated research grants and contracts that flow through USAID. Each year, these institutions conduct critical research on agriculture, fisheries, livestock, and public health programs that support humanitarian and foreign assistance around the globe. Specifically, this research combats global hunger and food insecurity by studying domestic commodities and crop management to identify emerging threats to the health of fisheries, livestock, and agricultural exports.

14

So far, USAID has frozen funding, for example, at more than a half-dozen Feed the Future Innovation Labs at universities in the Amici States, including California, Illinois, Michigan, Massachusetts, New York, and Washington. *See* Feed the Future Innovation Lab Network, tinyurl.com/5hys5ucr.  As a result of the agency's refusal to disperse at least $175 million in awarded funds to these labs, some have had to suspend operations, shed staff, and halt critical research and support to combat global hunger and food insecurity. *See, e.g.*, Decl. of Leslie Anne Brunelli at 3 (¶¶ 8-10), *New Mexico v. Musk*, No. 1:25-cv-429 (D.D.C. Feb. 14, 2025), Dkt. No. 6-8 ("Brunelli Decl."); Sarah Atwood, *Food Research Halted at MSU After Trump's USAID Stop Work Order*, Lansing State J. (Feb. 25, 2025), tinyurl.com/r8sdzpwu (explaining that cuts to Michigan State University's Feed the Future Innovation Lab will negatively impact Michigan farmers and the success of domestic crops); Caren R. Weintraub, *UC Davis to Close Feed the Future Innovation Labs Amid Loss in USAID Funding*, U.C. Davis Coll. of Agric. & Env't Sci. (Apr. 3, 2025), tinyurl.com/bdz9enp2 ("Our network of researchers, farmers, students and partners were in the middle of generating solutions that will continue to benefit both global and domestic agriculture.").

Similarly, the appropriations freeze has stopped the flow of millions of dollars of federal funding to universities in Arizona, California, Maryland, Michigan, Nevada, New York, and Rhode Island that are working to develop tools to support

vaccine development, violence prevention, disaster preparedness, and global public health initiatives across the world, among other critical programs. *See, e.g.*, Press Release, Marc Parlange, President, Univ. of Rhode Island, *Update on USAID Programs and Positions* (Feb. 27, 2025), tinyurl.com/22z4stnp; Haajrah Gilani, *Trump's Cuts to USAID Threaten UNR's Global Partnerships and Research*, Las Vegas Sun (Feb. 13, 2025), tinyurl.com/mvysuc4b. For instance, USAID has withheld more than $100 million in grants to public universities in Arizona to support violence prevention and youth leadership in developing nations. *See* Scott Bordow, *ASU's USAID projects provided economic benefits to US*, ASU News (Mar. 5, 2025), tinyurl.com/398dmkvp.

The negative fallout from the universities' shuttering of critical research agendas as a result of the withholding of congressionally appropriated funds has been swift, resulting in three distinct harms to the Amici States and their residents.

*First*, although these research projects certainly benefit the United States's foreign assistance mission abroad, they also provide substantial positive economic impacts domestically given that the "resources are being directly spent in the United States." Brunelli Decl. at 3 (¶ 9). For example, many of the programs whose funding has been impounded protect United States farmers from emerging threats to their crops—for example, by developing techniques to remediate the catastrophic harms wrought by unfamiliar pests and undetectable diseases—which then allows those

16

farmers to more reliably sell their products to suppliers in growing markets around the world. *See* Brunelli Decl. at 3 (¶ 9). Moreover, these university-spearheaded research and development investments in livestock- and fishery-health are critical for global food security and help protect against disease spillover to the United States. *See* Brunelli Decl. at 4 (¶ 11) (discussing how researchers at Washington State University "focus on combating deadly livestock diseases through vaccine development, rapid diagnostics, and capacity building in low-resource settings").

*Second*, without these funds, many of the universities' labs and research programs will either be forced to terminate grant- and contract-supported research faculty and staff, causing upticks in unemployment and applications for state-supported benefits programs, or they will have to turn to state governments to fill in the financial gaps—resulting in considerable resource strains on the states. Some of the universities in the Amici States have already begun to see these terminations take effect. For instance, the University of Illinois Urbana-Champaign's Soybean Innovation Lab was forced to cut 30 expert staff and reduce lab operations after losing substantial USAID funding. *See* Lauren Quinn, *$1M gift to keep Soybean Innovation Lab operational after USAID closure*, ACES News (Apr. 28, 2025), tinyurl.com/a66aymxt.

*Third*, this funding freeze has impeded the universities' charitable missions of educating state residents and contributing to the local economy through a robust

research agenda. As Amici States know, abrupt funding cuts have interrupted students' research plans and delayed the completion of time-sensitive research projects that have been months or years in the making. *See, e.g.*, Graciela Tiu, *UC Davis research funding impacted by executive actions*, Cal. Aggie (May 6, 2025), tinyurl.com/y6tva6fm.

2. Farmers, nonprofits, and other private businesses located in the Amici States have also faced harm as a result of the unlawful impoundment of congressionally appropriated funds—to the tune of hundreds of millions of dollars. In Maryland, for example, JHpiego, a nonprofit partner of Johns Hopkins University that works to improve health outcomes globally, "will lose $800 million in funding over several years from [USAID]," causing the termination of nearly 250 employees in Baltimore and another 1,975 abroad. *See* Stephanie Saul, *Johns Hopkins to Cut More Than 2,000 Workers Funded by Federal Aid*, N.Y. Times (Mar. 13, 2025), tinyurl.com/bdjsbx6y. Another Maryland-based nonprofit, Catholic Relief Services, has lost up to 50% of its funding and had to lay off hundreds of employees domestically and abroad. *See* Meredith Cohn & Jasmine Vaughn-Hall, *Another Baltimore-based Global Aid Group Faces Cuts: Catholic Relief Services*, Balt. Banner (Feb. 6, 2025), tinyurl.com/czk86yhp.

The withholding of these appropriations has also significantly impacted one of North Carolina's most vital economic engines—the Research Triangle, home to

the largest research park in North America, hundreds of businesses and nonprofits, and three premier research universities. *See* Zachery Eanes, *USAID funding freeze could disrupt large employers in the Triangle*, Axios (Feb. 5. 2025), tinyurl.com/3ttscjaf. As one economic historian explained, the $3 billion in USAID funds being withheld from recipients in North Carolina will "trigger economic repercussions for everything from local economies to [the Research Triangle]'s long-term plans to become a tech startup engine like Silicon Valley." Rusty Jacobs, *Trump's cuts to funding for scientific research pose grave risks for RTP and global health*, WUNC (May 5, 2025), tinyurl.com/yxuame5f.

One Research Triangle organization is Family Health International, a North Carolina nonprofit that has historically received more than two-thirds of its funding from USAID to address, among other things, the HIV/AIDS, tuberculosis, and malaria epidemics in Africa and the Asia-Pacific. *See* FHI 360, *2024 Financial Summary* (Mar. 17, 2024), tinyurl.com/bdnyzxmy. In January, however, the nonprofit was ordered to "cease implementation immediately and not resume work" because of the decision to withhold foreign assistance funds. Melody Schreiber, *Trump's 'stop-work' order for PEPFAR cuts off anti-HIV drugs for patients*, NPR (Jan. 28, 2025), tinyurl.com/zr4suesr (internal quotation marks omitted). And in April, Family Health International announced that it was terminating 483 of its employees in the United States, 144 of whom work in North Carolina, as a result of

19

the funding freeze. *See* Press Release, *FHI 360 announces reductions in force* (Apr. 10, 2025), tinyurl.com/2wdztn5d. Similarly, in March, RTI International, the Research Triangle's largest nonprofit, announced it was terminating 340 domestic employees—177 of whom work in North Carolina—due to the freezing of funds from USAID. *See* Press Release, *RTI International announces workforce realignment* (Mar. 25, 2025), tinyurl.com/hvzkpnph.

In Colorado, small businesses that received millions of dollars of USAID grants and contracts to evaluate the effectiveness of life-saving food programs lost the majority of their funds and were forced to lay off employees. *See* Elizabeth Hernandez, *USAID gutting hits Colorado as organizations, small businesses struggle to survive*, Denver Post (Feb. 14, 2025), tinyurl.com/y8xv93n6. Leaders in the state expect "Colorado farmers and agricultural workers . . . to take a hit, . . . likely passing costs to consumers" and "negatively impact[ing]" local small businesses. *Id.* Taken together, all of these layoffs increase the burden on state unemployment benefit programs and reduce state income and sales tax revenues. *See, e.g. Maryland v. U.S. Dep't of Agric.*, No. 1:25-cv-748, 2025 WL 973159, at *6-8 (D. Md. Apr. 1, 2025) (detailing evidence of harm to states when many of their residents suddenly lose their jobs).

Additionally, the refusal to spend appropriated funds has affected farmers who sell their United States-grown crops to USAID for distribution as food aid around

20

the world.  Farmers in Minnesota, Wisconsin, and Iowa stand to lose up to $2 billion annually; those crops range from corn and soybeans to wheat, sorghum, vegetable oil, and peas.  *See* Christopher Vondracek, *Shuttering of USAID could mean the end of millions in income for Midwest farm operations,* Minn. Star Tribune (Feb. 6, 2025), tinyurl.com/mr29c59r.  The refusal to expend the appropriated funds for this food aid program—merely because the President disagrees with the policy underlying Congress's choice—puts downward pressure on the market for these crops and harms domestic farmers.  *See* Tom Crann & Gretchen Brown, *USAID cuts will impact Minnesota farmers*, MPR News (Feb. 27, 2025), tinyurl.com/bdffj3yp.

All of these many harms in the Amici States lend further support for the district court's conclusion that, in addition to Appellees' likelihood of success on the merits, the public interest favors granting a preliminary injunction.

## CONCLUSION

This Court should affirm the district court's preliminary injunction order.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the
  District of Columbia

EMMA P. SIMSON
Senior Counsel to the
  Attorney General

RYAN WILSON
Senior Counsel for
  Federal Initiatives

June 2025

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE
Bar Number 1017942
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

CARA SPENCER
MARK A. RUCCI
Assistant Attorneys General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
(202) 741-0649 (fax)
caroline.vanzile@dc.gov

On behalf of:

KRIS MAYES
*Attorney General of Arizona*

ROB BONTA
*Attorney General of California*

PHILIP J. WEISER
*Attorney General of Colorado*

WILLIAM TONG
*Attorney General of Connecticut*

KATHLEEN JENNINGS
*Attorney General of Delaware*

ANNE E. LOPEZ
*Attorney General of Hawaii*

KWAME RAOUL
*Attorney General of Illinois*

AARON M. FREY
*Attorney General of Maine*

ANTHONY G. BROWN
*Attorney General of Maryland*

ANDREA JOY CAMPBELL
*Attorney General of Massachusetts*

DANA NESSEL
*Attorney General of Michigan*

KEITH ELLISON
*Attorney General of Minnesota*

AARON D. FORD
*Attorney General of Nevada*

MATTHEW J. PLATKIN
*Attorney General of New Jersey*

RAÚL TORREZ
*Attorney General of New Mexico*

LETITIA JAMES
*Attorney General of New York*

JEFF JACKSON
*Attorney General of North Carolina*

DAN RAYFIELD
*Attorney General of Oregon*

PETER F. NERONHA
*Attorney General of Rhode Island*

CHARITY R. CLARK
*Attorney General of Vermont*

NICHOLAS W. BROWN
*Attorney General of Washington*

JOSHUA L. KAUL
*Attorney General of Wisconsin*

**CERTIFICATE OF SERVICE**

I certify that on June 13, 2025, this brief was electronically filed with the Clerk of the Court using the CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished using the CM/ECF system.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 29(a) because the brief contains 4,730 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE