ORAL ARGUMENT SCHEDULED FOR JULY 7, 2025
Nos. 25-5097(L); 25-5098 (consol.)

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

GLOBAL HEALTH COUNCIL, *et al.*,

*Plaintiffs- Appellees*,

v.

DONALD J. TRUMP, *et al.*,

*Defendant-Appellants*.

AIDS VACCINE ADVOCACY COALITION, *et al.*,

*Plaintiffs-Appellees*,

v.

UNITED STATES DEPARTMENT OF STATE, et al.,

*Defendants-Appellants*.

On Appeal from the United States District Court for the District of Columbia

## BRIEF FOR PROTECT DEMOCRACY PROJECT AS AMICUS CURIAE
## IN SUPPORT OF PLAINTIFFS-APPELLEES URGING AFFIRMANCE

Cerin M. Lindgrensavage
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite # 163
Washington DC 20006
(202) 579-4582
cerin.lindgrensavage@protectdemocracy.org

*Counsel for Amicus Curiae*
*Protect Democracy Project*

## STATEMENT REGARDING CONSENT TO FILE
## AND SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for amicus curiae Protect Democracy states that counsel for all parties have consented to the filing of this brief.[1]

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for amicus curiae states that a separate brief is necessary. Counsel for amicus curiae certifies that she has conferred with counsels for appellees, amicus curiae Constitutional Accountability Center, and the amici law professors, and states that the content of this brief, which concerns the history of impoundments since the founding, does not overlap with the content of the brief for appellees; the brief of amicus curiae Alan B. Morrisson, which focuses on the Impoundment Control Act; the brief of amicus curiae Constitutional Accountability Center, which focuses on constitutional text and history; the brief of amici District of Columbia and 22 other States, which concerns state interests; or the brief of the amici law professors.

Dated: June 13, 2025

*/s/ Cerin M. Lindgrensavage*
Cerin M. Lindgrensavage
*Counsel for Amicus Curiae*

---

[1] Pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure, amicus curiae states that no counsel for a party authored this brief in whole or in part, and no person other than amicus curiae made a monetary contribution to its preparation or submission.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amicus curiae states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**I.    Parties and Amici**

Except for amicus curiae Protect Democracy; amicus curiae Alan B. Morrison; amicus curiae Constitutional Accountability Center; amici District of Columbia and 22 other States; and the amici Professors Buzbee, Rosenblum, and Short, all parties, intervenors, and amici appearing before the district court and in this Court are listed in the brief for appellees.

**II.    Rulings Under Review**

References to the ruling at issue in this case appear in the brief for appellees.

**III.    Related Cases**

Related cases are listed in the brief for appellees.

Dated: June 13, 2025                         */s/ Cerin M. Lindgrensavage*
                                             Cerin M. Lindgrensavage

                                             *Counsel for Amicus Curiae*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................iv

GLOSSARY ............................................................................................ix

PERTINENT STATUTES AND REGULATIONS ................................ix

INTEREST OF AMICUS CURIAE .........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT.........................1

ARGUMENT ...........................................................................................4

I.  Past Impoundments Pursuant to Congressional Authorization Cannot
    Support the Impoundments in Defiance of Congress Here.............................4

    A.  Congress Has Authorized Some Presidents to Spend Less Than the
        Full Amount Appropriated or to Spend Sums Over Longer Periods
        of Time.........................................................................................5

    B.  Congress Has Explicitly Directed Some Presidents to Impound
        Funds...........................................................................................11

II.  When Presidents Have Impounded Funds in Defiance of Law,
     Congress and the Courts Have Pushed Back. .................................14

    A.  Congress Took Action to Limit Founding-Era Impoundments. ..............15

    B.  Congress Pushed Back Against Grant, Roosevelt, and
        Eisenhower's Impoundments....................................................19

    C.  Congress and the Courts Forcefully Opposed Nixon's
        Impoundments...........................................................................24

III.  Since 1974, Presidents of Both Parties Have Complied with the
      Impoundment Control Act. .........................................................26

CONCLUSION ......................................................................................29

CERTIFICATE OF COMPLIANCE .....................................................30

CERTIFICATE OF SERVICE...............................................................31

## TABLE OF AUTHORITIES

**Cases**                                                                           **Page(s)**

*City of New York v. Train*,
  494 F.2d 1033 (D.C. Cir. 1974) ...........................................................25

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ..............................................................................6

*Guadamuz v. Ash*,
  368 F. Supp. 1233 (D.D.C. 1973) .......................................................25

*In re Aiken County*,
  725 F.3d 255 (D.C. Cir. 2013) .............................................................27

*Life Techs. Corp. v. Promega Corp.*,
  580 U.S. 140 (2017) ..............................................................................4

*Louisiana. v. Weinberger*,
  369 F. Supp. 856 (E.D. La. 1973) .......................................................25

*Myers v. United States*,
  272 U.S. 52 (1926) ..............................................................................23

*Nat'l Council of Cmty. Mental Health Ctrs. v. Weinberger*,
  361 F. Supp. 897 (D.D.C. 1973) .........................................................25

*NLRB v. Canning*,
  573 U.S. 513 (2014) ..............................................................................2

*State Highway Comm'n v. Volpe*,
  479 F.2d 1099 (8th Cir. 1973) ............................................................25

*The Pocket Veto Case*,
  279 U. S. 655 (1929) .............................................................................2

*Train v. City of New York*,
  420 U.S. 35 (1975) ..............................................................................25

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) .........................................................2, 3, 4, 14, 19, 26, 27

## Cases (Cont'd)           Page(s)

*Zivotofsky v. Kerry*,
  576 U.S. 1 (2015) ........................................................................2

## Statutes

2 U.S.C. §§ 681–88 ...............................................................14, 26

Act of Sept. 29, 1789, 1 Stat. 95 ..................................................16

Act of Mar. 3, 1795, § 16, 1 Stat. 433 ..........................................18

Act of June 1, 1796, 1 Stat. 493–94 .........................................16, 17

Act of Mar. 3, 1797, ch. VIII, 1 Stat. 498–99 ...............................17

Act of Mar. 3, 1797, ch. XVII, 1 Stat. 508–09..........................16, 17

Act of Feb. 28, 1803, ch. XI, § 3, 2 Stat. 206............................5–6

Act of Jan. 31, 1809, § 2, 2 Stat. 514 ..........................................6

Act of Aug. 14, 1876, 19 Stat. 132................................................20

Pub. L. No. 72-212, §§ 101–10, 47 Stat. 382 (1932) ...................12

Pub. L. No. 72-428, § 4, 47 Stat. 1489 (1933) ............................12

Pub. L. No. 72-441, § 4, 47 Stat. 1571 (1933) ............................12

Pub. L. No. 77-228, § 3, 55 Stat. 638 (1941) ..............................22

Pub. L. No. 77-644, 56 Stat. 468 (1942) ......................................22

Pub. L. No. 78-146, § 9, 57 Stat. 560 (1943) ..............................23

Pub. L. No. 78-358, 58 Stat. 361 (1944) ......................................23

Pub. L. No. 78-375, § 303, 58 Stat. 597 (1944) ..........................23

Pub. L. No. 79-132, 59 Stat. 412 (1945) ......................................23

Pub. L. No. 79-301, 60 Stat. 6 (1946) ..........................................13

**Statutes (Cont'd)**                                                     **Page(s)**

Pub. L. No. 80-753, 62 Stat. 584 (1948) ................................................................8

Pub. L. No. 81-434, 63 Stat. 987 (1949) ................................................................7

Pub. L. No. 81-759, § 1211, 64 Stat. 595 (1950) ................................................24

Pub. L. No. 85-724, 72 Stat. 710 (1958) ................................................................9

Pub. L. No. 86-166, 73 Stat. 366 (1959) ................................................................9

Pub. L. No. 87-144, 75 Stat. 365 (1961) ..............................................................10

Impoundment Control Act of 1974,
  Pub. L. No. 93-344, tit. X, 88 Stat. 297 (1974) ................................................25

Pub. L. No. 118-47, div. A, tit. VIII, § 8006(a), 138 Stat. 460 (2024) ..................10

**Executive Branch Materials**

1 Pub. Papers 586–87 (July 12, 1974) ..................................................................26

38 Fed. Reg. 19,584 (July 20, 1973) ....................................................................25

Bureau of the Budget & Gen. Accounting Off., B-66949, *Report and
  Recommendations by the Director of the Bureau of the Budget and the
  Comptroller General of the United States* 14 (June 5, 1947),
  https://www.gao.gov/assets/b-66949.pdf ..........................................................24

Letter from Secretary Cameron to President Grant (Jan. 11, 1877), *in
  Executive Documents of the House of Representatives*, 44th Cong.,
  2d Sess., Exec. Doc. No. 23 (1877), https://tinyurl.com/5dfuawdk ..............19, 20

Letter to the Speaker of the House Transmitting Proposed Reductions in
  Appropriations, 1 Pub. Papers 17 (Jan. 11, 1946) ..............................................13

Memorandum of Disapproval of Bill Reducing Certain Appropriations and
  Contract Authorizations, 1 Pub. Papers 579–80 (Dec. 23, 1945) ........................13

President Jefferson, Fourth Annual Message (Nov. 8, 1804) ..................................6

The President's News Conference of January 31, 1973,
  1 Pub. Papers 62 (Jan. 31, 1973) ......................................................................25

**Executive Branch Materials (Cont'd)**                                     **Page(s)**

U.S. Off. of Mgmt. & Budget, Circular No. A-11 (2024),
  § 20.................................................................................................28
  § 112.2.............................................................................................28

**Legislative Materials**

6 Annals of Cong. 2321 (1797) (Joseph Gales ed., 1849) ................16, 17

4 Cong. Rec. H5628 (Aug. 14, 1876)..................................................19

5 Cong. Rec. H374 (Dec. 23, 1876) ...................................................20

88 Cong. Rec. H3296–98 (Apr. 2, 1942) ............................................22

92 Cong. Rec. S1153 (Feb. 8, 1946) ..................................................13

*All Actions: H.R.7130 — 93rd Congress (1973-1974)*,
  https://tinyurl.com/yc6tpejj ...........................................................26

*Department of the Navy Appropriations for 1957: Hearings Before a
  Subcomm. of the H. Comm. on Appropriations*, 84th Cong. (1956)...................21

*Departments of State, Justice, and Commerce Appropriation Bill for 1944:
  Hearings Before the Subcomm. of the S. Comm. on Appropriations*, 78th
  Cong. (1943)...............................................................................22, 23

*Executive Impoundment of Appropriated Funds: Hearings Before the
  Subcomm. on Separation of Powers of the S. Comm. on the Judiciary*,
  92d Cong. (1971)..................................................................22, 23, 25

*Expedited Rescission Authority: Hearing before a Subcomm. of the S.
  Comm. on Homeland Security & Governmental Affairs*, 111th Cong.
  (2009) .........................................................................................27

*First Supplemental National Defense Appropriation Bill for 1944:
  Hearings Before a Subcomm. of the S. Comm. on Appropriations*,
  78th Cong. (1943) ......................................................................22, 23

H.R. Rep. No. 84-2104 (1956) ...........................................................21

H.R. Rep. No. 87-873 (1961) (Conf. Rep.)..........................................10

**Legislative Materials (Cont'd)** **Page(s)**

U.S. Gov't Accountability Off.,
   B-330330, *Impoundment Control Act—Withholding of Funds Through
   Their Date of Expiration* 3 (Dec. 10, 2018) ..........................................28

   B-331564, *Office of Management and Budget—Withholding of Ukraine
   Security Assistance* (Jan. 16, 2020)...................................................28

   GAO-04-261SP, *Principles of Federal Appropriations Law, Chapter 5*
   (3d ed. 2004) ...............................................................................7

*Impoundment of Appropriated Funds by the President: Joint Hearings
   Before the Subcomm. of the S. Comm. on Government Operations & the
   Subcomm. on Separation of Powers of the S. Comm. on the Judiciary*,
   93d Cong. (1973)...........................................................................25

**Miscellaneous Authorities**

Christian Bale, Note, *Checking the Purse: The President's Limited
   Impoundment Power*, 70 Duke L.J. 607 (2020) ....................................7

Josh Chafetz, *Congress's Constitution* (2017) ......................................27

Louis Fisher, *Funds Impounded by the President: The Constitutional Issue*,
   38 Geo. Wash. L. Rev. 124 (1969)...............................................12, 13

Lucius Wilmerding, *The Spending Power* (1943)...............................15, 17

Nile Stanton, *History and Practice of Executive Impoundment of
   Appropriated Funds*, 53 Neb. L. Rev. 1 (1974) ...........7, 8, 9, 10, 11, 20

Patricia Zengerle, *Trump administration reinstates military aid for Ukraine*,
   Reuters (Sept. 12, 2019), https://tinyurl.com/yhh3x68e ......................28

Protect Democracy, *The Myth of Presidential Impoundment Power* (Mar.
   2025), protectdemocracy.org/impoundment-myth.........1, 6, 7, 8, 9, 10, 15, 20, 21

*River and Harbor Improvements*, N.Y. Times, Apr. 29, 1877, at A1 ....................20

Zachary Price, *Funding Restrictions and Separation of Powers*,
   71 Vand. L. Rev. 357 (2018)...............................................................27

## GLOSSARY

A-11                        Office of Management and Budget Circular No. A-11

GAO                        Government Accountability Office

ICA                        Impoundment Control Act

OMB                        Office of Management and Budget


## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in an addendum to the brief for appellants.

## INTEREST OF AMICUS CURIAE

Protect Democracy is a nonpartisan, nonprofit organization whose mission is to prevent American democracy from declining into a more authoritarian form of government. Protect Democracy advances this mission through research, analysis, and litigation, including efforts to support Congress's power of the purse as a critical check against abuses of executive authority. As part of this work, Protect Democracy recently published an extensive report on the history of presidential impoundments. *See* Protect Democracy, *The Myth of Presidential Impoundment Power* (Mar. 2025) ("*Myth*"), protectdemocracy.org/impoundment-myth. Protect Democracy files this brief to address misconceptions about and mischaracterizations of that history cited in support of appellants' assertion that presidents since the founding have routinely impounded funds.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case concerns whether three executive branch agencies can violate the Constitution's separation of powers by impounding foreign assistance funds in defiance of the underlying appropriations laws and the Impoundment Control Act of 1974 ("ICA"). The district court correctly held that they cannot and that plaintiffs are likely to prevail on their claim that the government's action violates the separation of powers. Joint App'x 35–82.

Appellants and their amici nevertheless argue that "roughly 170 years" of history and practice prior to 1974 support the notion that the president can—unilaterally—spend less than the full amount Congress has appropriated. *See* Appellants Br. at 52–54; States Br. at 20–29. The amici States claim "consensus generally favored executive discretion, and Congress often acquiesced in the impoundments." Br. at 28. And appellants argue that "[d]ating back to at least the early 1800s, there are numerous instances where the Executive Branch has declined to spend the full amount of funds appropriated by Congress, especially (although not only) in the context of foreign affairs." Br. at 52. Appellants and their amici marshal this history to suggest that Congress cannot require the executive branch to spend in full the foreign assistance appropriations at issue here.

Although courts often consider evidence of historical practice in separation-of-powers cases, *see, e.g.*, *Zivotofsky v. Kerry*, 576 U.S. 1 (2015); *NLRB v. Canning*, 573 U.S. 513 (2014); *The Pocket Veto Case*, 279 U. S. 655 (1929), for such practice to be treated as a "gloss" on the text of the Constitution, it must be "systematic" and "unbroken," "long pursued to the knowledge of the Congress and never before questioned." *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring). Accordingly, to prevail on their claim that historical practice supports presidential impoundment even where, as here, the underlying statutes require the expenditure of those funds, appellants and

their amici must show that presidents have "systematically" impounded funds without congressional permission, in a practice both "unbroken" and unquestioned by Congress.

As detailed below, careful review of the historical examples appellants and their amici either reference or rely upon through secondary sources shows that they fail to clear this high bar. Part I demonstrates that many of these historical examples—from the Jefferson, Madison, Hoover, Roosevelt, Truman, Eisenhower, and Kennedy administrations—are not relevant to the practice of unilateral impoundment appellants and their amici seek to establish. These examples show presidents impounding funds *pursuant* to congressional authorization, not in defiance of Congress. Part II assesses the few historical examples appellants and their amici reference—from the Washington, Grant, Roosevelt, and Eisenhower administrations—where presidents impounded funds in defiance of Congress. In each of these examples, Congress "questioned" the impoundments, *cf. Youngstown*, 343 U.S. at 610–11, including by enacting legislation and exerting political pressure to compel the expenditure of funds. And when President Nixon took unilateral impoundments further, he faced pushback not just from Congress in the bipartisan enactment of the ICA, but from the courts as well. Part III shows that in the wake of this unified congressional and judicial response, there has been no "systematic" practice of presidents impounding funds in defiance of Congress. *Cf.*

3

*id.* Rather, in the half century since 1974, presidents of both parties largely complied with the ICA when seeking to spend less than Congress appropriated.

This sparse record of presidential impoundments in defiance of Congress, which both Congress and the courts countermanded, provides no basis to set aside the district court's order. This Court should therefore affirm.

## ARGUMENT

### I.   Past Impoundments Pursuant to Congressional Authorization Cannot Support the Impoundments in Defiance of Congress Here.

Among the historical examples of impoundment that appellants and their amici reference are fifteen examples across the Jefferson, Madison, Hoover, Roosevelt, Truman, Eisenhower, and Kennedy administrations where presidents acted with authorization from Congress, not in defiance of it. When looking to the text of the statutes at issue in those examples, as the Court must, *Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 146 (2017) ("We look first to the text of the statute."), one sees Congress giving presidents either discretion to impound funds or explicit direction to cut spending. As shown below, in examples across the Jefferson, Madison, Truman, Eisenhower, and Kennedy administrations, Congress granted discretion in the text of the underlying appropriations laws to spend less than the full amount appropriated or spend an appropriation for a broad purpose across an unlimited (or "indefinite") number of fiscal years. Additional examples

4

across the Hoover, Roosevelt, and Truman administrations show Congress

enacting laws *directing* presidents to impound funds. Rather than supporting an

"unbroken" historical record of presidential impoundment in defiance of Congress,

these examples show presidents operating within the bounds Congress set by

statute. Amicus addresses these examples in turn.

### A. Congress Has Authorized Some Presidents to Spend Less Than the Full Amount Appropriated or to Spend Sums Over Longer Periods of Time.

In three examples offered by appellants and their amici, Congress granted

Presidents Jefferson, Madison, and Truman discretion in the text of an

appropriations statute to spend less than the full amount appropriated. In another

eight examples, Congress granted Presidents Truman, Eisenhower, and Kennedy

authority to spend funds for a broad array of purposes across an unlimited (or

"indefinite") number of fiscal years. Neither of these types of examples supports a

presidential power to impound funds unilaterally.

Appellants and their amici cite President Jefferson's decision not to spend

$50,000 Congress appropriated for the construction of gun boats. Appellants Br. at

52; States Br. at 27. Jefferson's decision to spend less than Congress appropriated,

however, was an exercise of discretion Congress granted in the statute, which

"authorized and empowered" the construction of "a number not exceeding fifteen

gun boats" using "a sum not exceeding fifty thousand dollars." Act of Feb. 28,

1803, ch. XI, § 3, 2 Stat. 206; *see Myth* at 15, A5. Those parts of the statutory text explicitly permitted the president to determine how much to spend and how many boats to build. *See Clinton v. City of New York*, 524 U.S. 417, 466–67 (1998) (Scalia, J., concurring in part and dissenting in part) (describing the gun boat appropriation as "permissive," leaving "the decision to spend the money to the President's unfettered discretion"). And notably, while Jefferson used the discretion granted under the statute to delay the expenditure of funds, he ultimately spent them, sharing in his fourth annual message to Congress that "[t]he act of Congress of 1803 February 28, for building and employing a number of gun boats, is now in a course of execution to the extent there provided for." President Jefferson, Fourth Annual Message (Nov. 8, 1804).

The amici States next point to President Madison's decision to save money by reducing the crews for gun boats in New Orleans. States Br. at 27–28. However, this was no unilateral impoundment. The relevant law appropriated "a sum not exceeding four hundred thousand dollars" and allowed Madison to discharge the crews "if in his judgment their service may be dispensed with," providing Madison with explicit discretion to spend less than the full amount. Act of Jan. 31, 1809, § 2, 2 Stat. 514; *see Myth* at 20, A6.

Appellants and their amici also argue that Truman "declined to spend congressionally appropriated funds for various defense projects," relying upon

sources that characterize Truman's decision to maintain 48 rather than 58 Air

Force groups as an impoundment of "$735 million in defense appropriations."

Appellants Br. at 53 (citing Nile Stanton, *History and Practice of Executive*

*Impoundment of Appropriated Funds*, 53 Neb. L. Rev. 1, 10–13 (1974)); States Br.

at 20–21 (citing Christian Bale, Note, *Checking the Purse: The President's Limited*

*Impoundment Power*, 70 Duke L.J. 607, 638–39 (2020) (quoting Senator Robert

Taft III's floor remarks on an amendment to an appropriations bill, rejected by the

Senate, that would have granted the president discretion to cut additional funds)).

The text of the relevant appropriations statute, however, explicitly permitted the

president to spend less on fewer Air Force groups, the product of a compromise

between a House that supported more funding and a Senate that preferred less.

Pub. L. No. 81-434, 63 Stat. 987, 1013 (1949) (providing "an amount not to exceed

$1,992,755,0000" for construction of aircraft)*; see Myth* at 29–30.

In addition to the type of statutory discretion Congress granted to Jefferson,

Madison, and Truman to spend less, Congress can also provide presidents with

flexibility to spend over longer periods of time by making appropriations available

for multiple years or indefinitely. U.S. Gov't Accountability Off. ("GAO"), GAO-

04-261SP, *Principles of Federal Appropriations Law, Chapter 5*, at 5-7–5-9 (3d

ed. 2004). Several examples to which appellants and their amici point from the

Truman, Eisenhower, and Kennedy administrations are in fact exercises of such

discretion granted by Congress's appropriating funds for broad purposes, to remain available over longer time periods.

For example, appellants suggest President Truman impounded funds for a defense project, the *U.S.S. United States* aircraft carrier, in the course of canceling the carrier's construction. Appellants Br. at 53 (citing Stanton, *supra*, at 10–13). The text of the law, however, disproves the claim that any funds were impounded. The 1949 Department of the Navy Appropriation Act provided funds broadly for the "[c]onstruction of ships . . . to remain available until expended." Pub. L. No. 80-753, 62 Stat. 584, 592 (1948). Neither the text of the statute nor the committee reports reference a specific amount of funding for construction of the *U.S.S. United States*. Moreover, the decision to cancel further construction can hardly support a record of presidential action contrary to Congress's expressed will, as Truman's defense secretary sought and received the approval of the chairs of the House and Senate Armed Services Committees before canceling the carrier. *Myth* at A29–A30.

Appellants also claim Eisenhower impounded "congressionally appropriated funds for various defense projects." Br. at 53 (citing Stanton, *supra*, at 10–13). Though appellants declined to enumerate any examples, the source they cite lists six defense projects: the Hound-Dog and Minuteman missile programs, KC-135 jet tankers, strategic airlift aircraft, Nike-Zeus antimissile system, and a nuclear

powered carrier. Stanton, *supra*, at 12 n.74.[1] The text of the two appropriations laws that funded these projects shows that each project was funded as part of a lump sum appropriated for a broad category of spending, which left to the president's discretion how to allocate the funds within the category. *Myth* at A34–A40; *see* Pub. L. No. 85-724, 72 Stat. 710, 720–21 (1958) (providing funds generally for "construction, procurement, and modification of aircraft, missiles, and equipment"; "procurement and modification of equipment . . . for aircraft and missiles"; and "scientific research and development"); Pub. L. No. 86-166, 73 Stat. 366, 374 (1959) (providing funds for the Nike-Zeus through the Army's "Procurement of Equipment and Missiles" appropriation and for the nuclear powered carrier through the Navy's "Shipbuilding and Conversion" appropriation). Neither appropriation required, or even mentioned, the expenditure of a particular amount on any of those projects. *Myth* at A34–A40. And both appropriations acts made the relevant funds available "until expended," meaning the Defense Department did not have to spend the full amount in the first fiscal year in which the funds were available. *See* Pub. L. No. 85-724, 72 Stat. at 720–21; Pub. L. No. 86-166, 73 Stat. at 374. The Eisenhower administration's decisions to spend less in

---

[1] Stanton mentions a seventh Eisenhower impoundment of Marine Corps personnel funds, which amicus addresses below. See *infra* at 20–21.

a particular year on those projects was thus merely an exercise of congressionally granted discretion.

Appellants rely upon a similarly inapposite example from the Kennedy administration, alleging the president impounded an additional $180 million Congress provided for the B-70 strategic bomber above the administration's $220 million request. Appellants Br. at 53 (citing Stanton, *supra*); *Myth* at A41. As with the Eisenhower defense projects above, Congress provided funds for the B-70 as part of a broader appropriation for Air Force "Research, Development, Test, and Evaluation," which did not specify an amount that must be spent on the bomber itself. Pub. L. No. 87-144, 75 Stat. 365, 374 (1961). While the conference committee did provide guidance that $400 million of this appropriation "shall be available for the B-70 program," such language was not included in the text of the appropriations law, nor was the conference committee report incorporated by reference into the statute, as explanatory statements now are. *Id.*; H.R. Rep. No. 87-873, at 7 (1961) (Conf. Rep.); *Myth* at A40–A41; *see, e.g.*, Pub. L. No. 118-47, div. A, tit. VIII, § 8006(a), 138 Stat. 460, 482 (2024) (incorporating explanatory statement into defense appropriation act). The Kennedy administration was therefore free to apply the additional funds to other purposes listed in the relevant appropriation.

**B. Congress Has Explicitly Directed Some Presidents to Impound Funds.**

Appellants' amici argue that "[m]odern federal budgeting" places the president in the position of having to "account for the real-time budgetary needs of his agencies" by declining to spend appropriations, as "[c]hanging circumstances often mean changing budgetary needs" that previously enacted appropriations laws could not adequately consider. States Br. at 20–21. As a reflection of the paucity of historical examples supporting this view of presidential authority, four of the examples across the Hoover, Roosevelt, and Truman administrations that appellants and their amici cite are acts in which Congress explicitly *directed* presidents to cut funds. *Id.*; Appellants Br. at 53 (citing Stanton, *supra*).

Appellants claim "Presidents Hoover and Roosevelt withheld large sums of appropriated funds during the Great Depression," but fail to identify a specific cut or act. Appellants Br. at 53 (citing Stanton, *supra*, at 10–13). The source upon which appellants rely, however, cites "the Economy Acts of 1932 and 1933 [as having] authorized the President to reduce the compensation of federal employees, make layoffs and economize by reorganizing executive departments." Stanton, *supra*, at 9–10 & n. 55. Similarly, the source states that the "1933–34 War Appropriation Act expressly authorized the impoundment of funds determined unneeded pursuant to an economy survey ordered by the President." *Id*. These laws—passed in the last year and last day of the Hoover administration and the

11

first day of Roosevelt's administration—are examples of Congress directing presidents to impound funds in the course of implementing the relevant acts. *See* Economy Act of 1932, Pub. L. No. 72-212, §§ 101–10, 47 Stat. 382, 399–403 (1932) (authorizing the president to furlough and reduce the compensation of federal employees, and providing that "appropriations or portions of appropriations unexpended by reason of the operation of this title shall not be used for any purpose, but shall be impounded and returned to the Treasury"); Economy Act of 1933, Pub. L. No. 72-428, § 4, 47 Stat. 1489, 1513–15 (1933) (similar); 1934 War Dep't Appropriations Act, Pub. L. No. 72-441, § 4, 47 Stat. 1571, 1602 (1933) ("Any sums appropriated in this Act. . . that may not be needed for the purposes for which appropriated as the result of an economic survey ordered by the President shall be impounded and returned to the Treasury.").

The amici States claim President Truman rescinded millions of dollars when the end of World War II "'left the Government with tens of billions of dollars in excess of military needs.'" States Br. at 20–21 (quoting Louis Fisher, *Funds Impounded by the President: The Constitutional Issue*, 38 Geo. Wash. L. Rev. 124, 125 (1969)). Rather than supporting the States' characterization of history, Truman's post-war rescissions are another example of a president cutting funds at the direction of Congress. The States rely upon a source, Fisher, who claims Truman rescinded funds and placed them in nonexpendable status. Fisher, *supra*, at

125 & n.5. Fisher cites Truman's message on December 23, 1945, in which the president agreed with rescissions Congress proposed as part of H.R.4407, but felt obligated to veto because of an unrelated policy provision included in the bill. *Id.*; Memorandum of Disapproval of Bill Reducing Certain Appropriations and Contract Authorizations, 1 Pub. Papers 579–80 (Dec. 23, 1945).

If the story of post-war rescissions ended there, with a president using a vetoed bill as an excuse to permanently withhold funds, amici States may have some support for their contention—but it did not. President Truman sent a letter to Congress just 19 days later making clear he continued to seek action from Congress, proposing additional cuts, and placing those proposed rescissions "together with those set forth in the enrolled bill, H.R. 4407 . . . in a nonexpendable status, *pending the enactment of legislation*." Letter to the Speaker of the House Transmitting Proposed Reductions in Appropriations, 1 Pub. Papers 17 (Jan. 11, 1946) (emphasis added). Congress responded by passing a new bill in February making the same rescissions that the president vetoed just two months before. 92 Cong. Rec. S1153 (Feb. 8, 1946) (statement of Sen. McKellar) (describing the First Supplemental Appropriation Rescission Act, 1946, as "precisely the same in form and content as the similarly entitled bill—H.R.4407," except for the employment services provision to which Truman previously objected); *see* Pub. L. No. 79-301, 60 Stat. 6 (1946).

Rather than a unilateral exercise of presidential authority, as amici States suggest, the actions Truman took are similar to those now mandated under the ICA, 2 U.S.C. §§ 681–88, in which the president sends a message to Congress seeking legislation rescinding previously appropriated funds, withholding the funds identified in the message while awaiting congressional action on the proposal. In these examples across the Hoover, Roosevelt, and Truman administrations, Congress asked the president to cut funds. No such direction from Congress applies in the case before this Court, nor can Congress's past grants of authority for presidents to make cuts within a specific time frame or purpose be read as a broad surrender of Congress's constitutionally granted power of the purse.

## II. When Presidents Have Impounded Funds in Defiance of Law, Congress and the Courts Have Pushed Back.

While presidents largely have impounded funds pursuant to statutory authorization, as outlined above, appellants and their amici reference a handful of examples from the Washington, Grant, Roosevelt, and Eisenhower administrations when presidents did impound funds in defiance of law. Appellants Br. at 52–53; States Br. at 26–27. These examples fail to establish a "gloss" on the Constitution because in each instance, Congress "questioned" the president's impoundments, *cf. Youngstown*, 343 U.S. at 610–11, including by enacting legislation and exerting political pressure to compel the release of impounded funds and prevent future

impoundments. When President Nixon sought to impound funds unilaterally at a scale that dwarfed his predecessors, he faced pushback not just from Congress but from the courts as well. *Myth* at 8–9. This record of consistent opposition to unilateral presidential impoundments undercuts appellants' claim that history and practice support an executive authority to impound funds in defiance of law. And it dispels any notion that Congress acquiesced to presidents' sporadic efforts to impound funds unilaterally.

## A. Congress Took Action to Limit Founding-Era Impoundments.

The amici States begin their historical argument by claiming that "Washington's administration routinely underspent on appropriations" and that Congress accepted that practice by establishing a "surplus fund for unexpended appropriations." Br. at 26–27 (quotation marks omitted). These claims sweep too broadly. Because the amici States fail to specify which appropriations the administration allegedly impounded, it is unclear whether Washington did so pursuant to or in defiance of the underlying law. *See id.* In working to meet the needs of a newly forming government, however, early Congresses made several changes to the way they drafted appropriations laws. *See, e.g.*, Lucius Wilmerding, *The Spending Power* 20–49 (1943). Four changes highlighted here were aimed at subjecting executive expenditure to congressional control, including by preventing or limiting impoundments.

15

The first such change Congress made was to begin appropriating funds for specific purposes. Initially, Congress appropriated funds in lump sums "not exceeding" certain amounts. *See, e.g.*, Act of Sept. 29, 1789, 1 Stat. 95 (appropriating "a sum not exceeding" $137,000 "for defraying the expenses of the department of war"). But in subsequent years, to cabin executive discretion, Congress started to list the specific items on which the executive branch must spend funds. *See, e.g.*, Act of June 1, 1796, 1 Stat. 493–94 (appropriating amounts to the military for specific purposes); Act of Mar. 3, 1797, ch. XVII, 1 Stat. 508–09 (same). The Washington administration at times resisted the constraint this specificity placed on its discretion. In 1796, for example, Congress appropriated $30,000 for the military's "hospital department," 1 Stat. 494, but the military spent only $6,905 and "appl[ied] the surplus to other purposes," 6 Annals of Cong. 2321 (1797) (Joseph Gales ed., 1849). This action violated the law appropriating those funds specifically for the hospital. 1 Stat. 494. Rep. Albert Gallatin, who went on to serve as treasury secretary to Presidents Jefferson and Madison, decried the administration's inclination to treat such appropriations as "general grant[s] of money," stating that this "was making the law a mere farce." 6 Annals of Cong. 2321. Gallatin then led Congress's response both to this specific impoundment and that general practice—the second and third changes Congress made to assert legislative control over executive expenditures. Gallatin persuaded Congress to

16

reduce the hospital department appropriation from $30,000 in 1796 to $10,000 in 1797. *See* 1 Stat. 508; 6 Annals of Cong. 2321. To limit the Washington administration's broader misuse of appropriations, Gallatin urged Congress to change the text at the start of appropriations acts. *See* Wilmerding, *supra*, at 39–41.

In 1796, that introductory text tended to specify that the act provided an overall sum "not exceeding" a certain amount before listing sub-amounts appropriated for particular purposes. *See, e.g.*, 1 Stat. 493 (That "there be appropriated for the military and naval establishments, a sum not exceeding one million, three hundred and eighteen thousand, eight hundred and seventy-three dollars; that is to say: [list of items and amounts]."). In 1797, at Gallatin's urging, Congress changed the introductory text in its civil and military appropriations acts, striking any reference to an overall "sum not exceeding" a certain amount and replacing it with narrower language: "the following sums be respectively appropriated." *See* Wilmerding, *supra*, at 39–40; Act of Mar. 3, 1797, ch. VIII, 1 Stat. 498–99 ("That for the expenditure of the civil list. . . , the following sums be respectively appropriated; that is to say: [list of items and amounts].); 1 Stat. 508 (same for "the military and naval establishments"). With this change, Congress reinforced that item-level appropriations governed how the executive branch could, or could not, use the appropriated funds.

Although the amici States cast Congress's creation in 1795 of a surplus fund for unexpended appropriations as evidence that Congress accepted an alleged practice of executive impoundments, Br. at 26–27, the law establishing that fund was in fact a fourth effort Congress made to control spending. *See* Act of Mar. 3, 1795, § 16, 1 Stat. 433, 437–38. Through this law, Congress established several limitations on impoundments. First, by exempting certain appropriations—"for the payment of interest on the funded debt; for the payment of interest upon, and reimbursement, according to contract, of any loan or loans made on account of the United States; [and] for the purposes of the sinking fund"—from being carried into the surplus fund, Congress reinforced that Washington was required to spend those appropriations in full. *Id.* Second, Congress required the treasury secretary to find the "object" of an appropriation "hath been fully satisfied" before any "unexpended residue" of the appropriation could be carried into the surplus fund. *Id.* This prohibited Washington from impounding funds in a manner that thwarted Congress's will. Rather than illustrating congressional acquiescence to unilateral impoundments, this law shows Congress acting to limit—and in the case of the exempted appropriations, prevent—impoundments through certain statutory restrictions. As these four changes to early appropriations laws show, Congress acted repeatedly during the founding era to make its control of the public fisc not just a paper promise, but a reality.

18

**B. Congress Pushed Back Against Grant, Roosevelt, and Eisenhower's Impoundments.**

Appellants reference several other impoundments in defiance of law: Grant's impound of river and harbor funds, Eisenhower's impoundment of Marine Corps personnel funds, and an array of impoundments from Roosevelt's presidency. Br. at 52–53 (citing Stanton, *supra*, at 10–13). In each example, however, Congress sharply "questioned" the president's actions. *Cf. Youngstown*, 343 U.S. at 610–11. This active opposition to unilateral impoundments across multiple presidential administrations, detailed further below, undercuts any notion of congressional acquiescence.

In 1876, after signing a river and harbor appropriations bill into law, Grant told Congress that "no public money shall be expended" upon "works of purely private or local interest." 4 Cong. Rec. H5628 (Aug. 14, 1876). Grant's secretary of war accordingly withheld several million dollars Congress had appropriated. Letter from Secretary Cameron to President Grant (Jan. 11, 1877), in *Executive Documents of the House of Representatives*, 44th Cong., 2d Sess., Exec. Doc. No. 23, at 2 (1877), https://tinyurl.com/5dfuawdk. While the underlying law allowed the secretary of war to spend less than the full amount appropriated "when specific estimates cannot be made for particular work, or where . . . the work cannot be contracted at prices advantageous to the Government," it did not authorize Grant's

19

blanket refusal to execute certain projects. *See* Act of Aug. 14, 1876, 19 Stat. 132, 138.

In the twilight of Grant's presidential term, the House passed a resolution asking Grant to "state under what law or authority" the administration was impounding the river and harbor funds. 5 Cong. Rec. H374 (Dec. 23, 1876). In January, Secretary Cameron provided a legal defense of the administration's action. *See* Letter from Secretary Cameron, *supra*. But further congressional effort to counter Grant's impoundment was rendered unnecessary by President Rutherford Hayes's inauguration. By April 1877, Hayes had authorized the expenditure of the remaining river and harbor funds, reversing Grant's unlawful impoundment. *River and Harbor Improvements*, N.Y. Times, Apr. 29, 1877, at A1. Appellants and their amici omit this crucial history.

Appellants also note that President Eisenhower "declined to spend congressionally appropriated funds" to expand the size of the Marine Corps. Br. at 53 (citing Stanton, *supra*, at 10–13 (noting Marine Corps personnel impoundment at 12 n.74)). But of the seven Eisenhower impoundments to which appellants and their sources point, this example was the only one undertaken in defiance of law. *See Myth* at A32–A33; see *supra* at 8–10 (showing Eisenhower exercising statutory discretion). Congress admonished the administration in a subcommittee hearing and a subsequent full-committee report for unlawfully impounding the

Marine Corps funds. "In fiscal year 1956," Rep. Harry Sheppard asked the Corps's commandant, "your appropriation was based on an end strength of 215,000 men. You implemented a personnel plan with an end strength of only 201,000. . . . What was the reason for disregarding the special desire of Congress?" *Department of the Navy Appropriations for 1957: Hearings Before a Subcomm. of the H. Comm. on Appropriations*, 84th Cong. 104 (1956). In response, the commandant did not reference any supposed executive power to impound the funds. Rather, he testified that the defense secretary had barred an increase in the size of the Corps, and that this "lower personnel plan," coupled with the "rates of pay and allowances prescribed by law," caused the Corps to spend less than Congress appropriated. *Id.* at 103–04. In a subsequent report, the full House Appropriations Committee condemned the administration's defiance of its appropriation: "The failure of the Marine Corps to implement the strength figures approved by Congress rests solely upon the Executive Branch of our Government. It is regrettable that it did not see fit to carry out the expressed desires of the Congress in this respect." H.R. Rep. No. 84-2104, at 34 (1956).

During the Roosevelt administration—which appellants note withheld "large sums of appropriated funds," Br. at 53—Congress took even stronger, more sustained action in response. *See Myth* at 24–28, A14–A25. Roosevelt's impoundments, which occurred largely during World War II, affected an array of

21

programs, from the construction of a levee near Tulsa, Oklahoma, which Congress had directed "shall be prosecuted," Pub. L. No. 77-228, § 3, 55 Stat. 638, 639, 645–46 (1941), to the construction of airports in Nevada, for which Congress had provided that "not to exceed" $800,000 "shall be available," Pub. L. No. 77-644, 56 Stat. 468, 492 (1942). *See* J.D. Williams, *The Impounding of Funds by the Bureau of the Budget* (1955), *in Executive Impoundment of Appropriated Funds: Hearings Before the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary*, 92d Cong. 378–94 (1971) ("1971 Hearings").

Lawmakers were outraged by the administration's refusal to spend funds on these and other projects. They repeatedly challenged such impoundments in floor speeches, hearings, and legislation. *See, e.g.*, 88 Cong. Rec. H3296–98 (Apr. 2, 1942) (remarks of Rep. Voorhis) (alleging the administration was acting "in a seemingly illegal manner"); *First Supplemental National Defense Appropriation Bill for 1944: Hearings Before a Subcomm. of the S. Comm. on Appropriations*, 78th Cong. 336–42 (1943) ("1943 Hearings") (remarks of Sen. Overton) ("Now, where is the law that authorizes either the Executive or the Bureau of the Budget to impound funds that have been appropriated by Congress?"); *Departments of State, Justice, and Commerce Appropriation Bill for 1944: Hearings Before the Subcomm. of the S. Comm. on Appropriations*, 78th Cong. 56–61 (1943) (remarks of Sen. McCarran) ("Will you tell this committee where you get the right to evade

22

the law?"); Pub. L. No. 78-146, § 9, 57 Stat. 560, 563 (1943) (prohibiting impoundment of highway construction funds absent finding that such construction "would impede the conduct of the war"); Pub. L. No. 78-358, 58 Stat. 361, 371 (1944) (directing the release of impounded funds for construction of public roads); Pub. L. No. 78-375, § 303, 58 Stat. 597, 623 (1944) (requiring submission to Congress of recommendations for the repeal of funds "deemed no longer required"); Pub. L. No. 79-132, 59 Stat. 412, 416 (1945) (same).

This drumbeat of congressional pressure forced a number of concessions from the Roosevelt administration. One senator's threat to introduce an amendment requiring the expenditure of frozen funds for the Tulsa levee project helped secure their release. *See* 1943 Hearings at 340; 1971 Hearings at 385–86. And when the Senate Appropriations Committee pressed the Budget Bureau to specify the legal basis for the administration's impoundments, the Bureau conceded that no "express enactment" allowed the president to block funding for projects that "have been authorized and appropriated for if he does not consider them of important value to the military." 1943 Hearings at 739–40. While the Bureau suggested in passing that *Myers v. United States*, 272 U.S. 52 (1926), provided authority for its actions, it abandoned this position after the war. *See* 1943 Hearings at 740. Indeed, in a 1947 report to Congress, the Bureau admitted "there is no general statutory authority under which appropriated moneys can be reserved or impounded so that

23

they may be returned to the Treasury." Bureau of the Budget & Gen. Accounting Off., B-66949, *Report and Recommendations by the Director of the Bureau of the Budget and the Comptroller General of the United States* 14 (June 5, 1947), https://www.gao.gov/assets/b-66949.pdf. The Bureau then requested that Congress create express authority to spend less than the full amount appropriated in certain circumstances. *Id.* at 16–17, 20–21.

Three years later, Congress took action on that request, crafting the law in a manner that prevented the president from withholding funds for entire projects, as Roosevelt had done during the war. In the 1951 General Appropriations Act, Congress permitted the establishment of reserves against appropriations "to provide for contingencies, or to effect savings whenever savings are made possible by or through changes in requirements, greater efficiency of operations, or other developments subsequent to the date on which the appropriation was made available." Pub. L. No. 81-759, § 1211, 64 Stat. 595, 765–66 (1950). In clarifying exactly when the Bureau might withhold appropriated funds, Congress also limited the executive branch's discretion.

## C. Congress and the Courts Forcefully Opposed Nixon's Impoundments.

Until President Trump's second term, President Nixon was the only president other than Roosevelt to undertake wide-ranging impoundments in defiance of Congress. Nixon did so at a scale that dwarfed his predecessors,

24

withholding billions of dollars and claiming a "constitutional right" to do so. *See* The President's News Conference of January 31, 1973, 1 Pub. Papers 62 (Jan. 31, 1973); *Impoundment of Appropriated Funds by the President: Joint Hearings Before the Subcomm. of the S. Comm. on Government Operations & the Subcomm. on Separation of Powers of the S. Comm. on the Judiciary*, 93d Cong. 877–79 (1973) ("1973 Hearings") (Office of Management and Budget ("OMB") table showing $12.8 billion withheld as of February 1971); 38 Fed. Reg. 19,584 (July 20, 1973) (OMB table showing $7.7 billion withheld as of June 1973). When the Nixon administration pressed these and other arguments for impoundment in court, it resoundingly lost. *See, e.g.*, *Guadamuz v. Ash*, 368 F. Supp. 1233 (D.D.C. 1973); *Louisiana. v. Weinberger*, 369 F. Supp. 856 (E.D. La. 1973); *Nat'l Council of Cmty. Mental Health Ctrs. v. Weinberger*, 361 F. Supp. 897 (D.D.C. 1973); *State Highway Comm'n v. Volpe*, 479 F.2d 1099 (8th Cir. 1973); *City of New York v. Train*, 494 F.2d 1033 (D.C. Cir. 1974); *Train v. City of New York*, 420 U.S. 35 (1975).

In Congress, Nixon's impoundments fared no better. In 1971 and 1973, Congress held days-long hearings where the administration faced bipartisan pushback. *See, e.g.,* 1971 Hearings; 1973 Hearings. And in 1974, Congress enacted the ICA by margins of 401-6 in the House and 75-0 in the Senate. Pub. L. No. 93-344, tit. X, 88 Stat. 297, 332-39 (1974); *All Actions: H.R.7130 — 93rd Congress*

*(1973-1974)*, https://tinyurl.com/yc6tpejj (last accessed June 11, 2025). Nixon

himself signed the bill into law. 1 Pub. Papers 586–87 (July 12, 1974). To this day,

the ICA limits the president's authority to impound to only two circumstances —

deferrals and rescissions — and reinforces that the president must otherwise spend

the funds Congress appropriates. 2 U.S.C. §§ 681–88.

In sum, in the sweep of American history, the record of presidents

impounding funds in defiance of Congress is sparse. And when presidents have

done so, Congress and the courts have vigorously pushed back. Even if the Court

takes a different view of some of the examples explicated *supra* in Parts I or II, the

practice that emerges is still not one of "systematic," "unbroken," and "never

before questioned" presidential impoundment in defiance of Congress. *Cf.*

*Youngstown*, 343 U.S. at 610–11. It is rather one in which presidents have

unilaterally impounded funds only sporadically, and in which Congress and the

courts have fought, in response, to ensure appropriations laws are executed as

Congress wrote them.

### III.    Since 1974, Presidents of Both Parties Have Complied with the Impoundment Control Act.

To read appellants and their amici, one might think that the history and

practice relevant to this case ended in 1974. It did not. From 1974 to 2024, there

was no "systematic" practice of presidents impounding funds in defiance of

Congress. *Cf. Youngstown*, 343 U.S. at 610–11. Rather, Congress drafted and enacted appropriations laws against the backdrop of the ICA and presidents of both parties largely complied with its strictures. *See* Zachary Price, *Funding Restrictions and Separation of Powers*, 71 Vand. L. Rev. 357, 435 n.281 (2018) (collecting sources on executive's "substantial compliance" with the ICA). When presidents have sought to spend less than the full amount Congress appropriated, they have largely followed the ICA's procedures to propose either a deferral or a rescission. *See* Josh Chafetz, *Congress's Constitution* 65 (2017) (noting "studies finding that presidents have largely adhered to the [ICA's] requirement to report impoundments and that presidents have released funds when required to"); *Expedited Rescission Authority: Hearing before a Subcomm. of the S. Comm. on Homeland Security & Governmental Affairs*, 111th Cong. 56–70 (2009) (GAO statement documenting presidential use of ICA rescission procedures). Presidents have done this in acknowledgement of a fundamental principle, which then-Judge Kavanaugh articulated: "a President sometimes has policy reasons. . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds." *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). And in the rare instance, prior to this administration, that the president directed the withholding of funds outside the ICA's framework, he

ultimately caved to congressional pressure to release the funds. *See* GAO, B-331564, *Office of Management and Budget—Withholding of Ukraine Security Assistance* (Jan. 16, 2020); Patricia Zengerle, *Trump administration reinstates military aid for Ukraine*, Reuters (Sept. 12, 2019), https://tinyurl.com/yhh3x68e.

Appellants' claim that the ICA "does not direct the Executive Branch to make funds available for obligation until after it has notified Congress of a proposed rescission and Congress has failed to act," Br. at 26, misstates and misunderstands not only the law, but the administration's own implementation of it. OMB, Circular No. A-11, § 20, at 8 (2024) ("A-11") ("Impoundment means any Executive Branch action or inaction that temporarily or permanently withholds, delays, or precludes the obligation or expenditure of budgetary resources."). The ICA explicitly prevents the president from withholding funds from obligation unless and until he has sent a special message to Congress. *See* GAO, B-330330, *Impoundment Control Act—Withholding of Funds Through Their Date of Expiration* 3 (Dec. 10, 2018) ("The President has no unilateral authority to withhold funds from obligation."); *cf.* A-11 § 112.2 (noting "amounts proposed for cancellation," which exist outside the ICA's framework, "are not to be withheld from obligation").

As this record shows, presidents since 1974 have largely followed the ICA, spending the amount Congress appropriated unless they received approval from Congress to do otherwise.

## CONCLUSION

History and practice provide no basis to question the district court's order. This Court should accordingly affirm.

Dated: June 13, 2025            Respectfully submitted,

*/s/ Cerin M. Lindgrensavage*
CERIN M. LINDGRENSAVAGE
D.C. Bar No. 1741602
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Avenue NW, #163
Washington, D.C. 20006
Telephone: (202) 579-4582
Facsimile: (929) 777-8428
cerin.lindgrensavage@protectdemocracy.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(g), that the attached amicus brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,495 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

I further certify, pursuant to Federal Rule of Appellate Procedure 32(g), that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Times New Roman font.

Dated: June 13, 2025                    */s/ Cerin M. Lindgrensavage*
                                        Cerin M. Lindgrensavage

                                        *Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2025, I caused the foregoing document to be electronically filed using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Court's CM/ECF system.

Dated: June 13, 2025                         */s/ Cerin M. Lindgrensavage*
                                             Cerin M. Lindgrensavage

                                             *Counsel for Amicus Curiae*