**ORAL ARGUMENT SCHEDULED FOR JULY 7, 2025**

**Nos. 25-5097, 25-5098**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

GLOBAL HEALTH COUNCIL, et al.,
                              *Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, et al.,
                              *Defendants-Appellants.*

---

AIDS VACCINE ADVOCACY COALITION, et al.,
                              *Plaintiffs-Appellees,*

v.

UNITED STATES DEPARTMENT OF STATE, et al.,
                              *Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Columbia

---

### REPLY BRIEF FOR APPELLANTS

---

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*

# TABLE OF CONTENTS

**<u>Page</u>**

GLOSSARY

SUMMARY OF ARGUMENT ............................................................. 1

ARGUMENT ...................................................................................... 2

I.      Plaintiffs Are Unlikely to Succeed on the Merits .................................... 2

    A.      Plaintiffs Cannot Enforce the Asserted Obligation to
    Expend Appropriated Funds ............................................................ 2

    B.      Plaintiffs Have Not Identified Any Applicable, Clear
    Statutory Requirement that the Executive Branch Expend
    All of the Appropriated Funds Here ............................................. 10

II.     Equitable Considerations Do Not Support the District Court's
    Preliminary Injunction ................................................................... 24

CONCLUSION .................................................................................. 31

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*AGMA Sec. Serv., Inc. v. United States,*
   152 Fed. Cl. 706 (2021) ........................................................................ 26

*Aiken County, In re,*
   725 F.3d 255 (D.C. Cir. 2013) ............................................................. 22

*Clinton v. City of New York,*
   524 U.S. 417 (1998) ....................................................................... 23, 24

*Collins v. Yellen,*
   594 U.S. 220 (2021) ............................................................................ 6

*Dalton v. Specter,*
   511 U.S. 462 (1994) ......................................................................... 4, 5

*Entergy Corp. v. Riverkeeper, Inc.,*
   556 U.S. 208 (2009) .......................................................................... 18

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.,*
   561 U.S. 477 (2010) ............................................................................ 5

*General Land Office v. Biden,*
   722 F. Supp. 3d 710 (S.D. Tex. 2024) ............................................... 20

*Haitian Refugee Ctr. v. Gracey,*
   809 F.2d 794 (D.C. Cir. 1987) ........................................................ 9, 10

*Kaplan v. Central Bank of the Islamic Republic of Iran,*
   896 F.3d 501 (D.C. Cir. 2018) ........................................................... 27

*Kendall v. United States ex rel. Stokes,*
   37 U.S. (12 Pet.) 524 (1838) ......................................................... 22, 23

*Nebraska Dep't of Health & Human Servs. v. Department of Health & Human Servs.,*
   435 F.3d 326 (D.C. Cir. 2006) ........................................................... 27

*Norton v. Southern Utah Wilderness All.,*
   542 U.S. 55 (2004) ....................................................................... 12-13

*Nuclear Regulatory Comm'n v. Texas,*
No. 23-1300, slip op. (U.S. June 18, 2025) ........................................5

*Public Citizen v. Stockman,*
528 F. Supp. 824 (D.D.C. 1981) ...................................... 20

*Rocky Ford Hous. Auth. v. U.S. Dep't of Agric.,*
427 F. Supp. 118 (D.D.C. 1977) ...................................... 20

*Sierra Club v. Trump,*
929 F.3d 670 (9th Cir. 2019) ...................................... 9

*Trump v. Sierra Club,*
140 S. Ct. 1 (2019) ...................................... 9

*Youngstown Sheet & Tube Co. v. Sawyer,*
343 U.S. 579 (1952) ...................................... 5

**U.S. Constitution:**

Art. I, § 9, cl. 7 ...................................... 20

**Statutes:**

Further Consolidated Appropriations Act of 2024,
Pub. L. No. 118-47, div. F, 138 Stat. 460 ...........................13, 13-14, 16, 18, 28

2 U.S.C. § 683 ...................................... 22

22 U.S.C. § 2151a(a)(1) ...................................... 15

22 U.S.C. § 2151b(c)(1) ...................................... 15

22 U.S.C. § 2151c(a) ...................................... 15

22 U.S.C. § 2151d(b)(1) ...................................... 15

22 U.S.C. § 2151d(b)(2) ...................................... 28

22 U.S.C. § 2174(a) ...................................... 15

iii

22 U.S.C. § 2211a(a) ................................................................. 28

22 U.S.C. § 2291(a)(4) .............................................................. 15

22 U.S.C. § 2346(a) ................................................................... 15

22 U.S.C. § 2347(a) ................................................................... 15

22 U.S.C. § 2348 ....................................................................... 15

22 U.S.C. § 2349aa ................................................................... 15

22 U.S.C. § 2395(a) ................................................................... 15

## Other Authorities:

2 GAO, *Principles of Federal Appropriations Law* (3d ed. 2006) ........... 14, 17

The President's Veto Power,
   12 Op. O.L.C. 128 (1988) ...................................................... 24

## GLOSSARY

APA                     Administrative Procedure Act

GAO                     Government Accountability Office

J.A.                    Joint Appendix

## SUMMARY OF ARGUMENT

Plaintiffs do not dispute that they lack a cause of action under the Administrative Procedure Act (APA) or that they cannot enforce the Impoundment Control Act. Instead, they insist that they need not rely on those statutes because they can bring a freestanding cause of action to enforce the Constitution. But their only constitutional claim is a so-called "separation-of-powers" claim that is entirely premised on an argument that the Executive Branch has failed to comply with various statutes. The Supreme Court has expressly rejected the proposition that run-of-the-mill statutory claims can be constitutionalized by invoking separation of powers. That holding, together with plaintiffs' express disclaimer of any statutory right to bring this action, alone provides an adequate basis to reverse the district court's injunction.

But in any event, plaintiffs' merits arguments fare no better. They urge this Court to ignore the foreign-affairs context and the express conferral of discretion in the underlying authorizing statutes to, instead, adopt an unrelenting view that the Executive Branch must expend every dollar of appropriated funds unless Congress uses certain magic words that plaintiffs have identified. They promote an atextual understanding of the

Constitution—converting a negative restriction on spending funds that have not been appropriated into an affirmative requirement to spend appropriated funds—without engaging with the government's historical evidence that the Founders' phrasing was not accidental.  And they provide no explanation for why it was appropriate for the district court to pretermit the inter-Branch dialogue contemplated by the Impoundment Control Act.

The district court improperly inserted itself into that dialogue, interfering with the ability of the political branches to work out how and whether to expend taxpayer dollars.  Its injunction should be reversed.

## ARGUMENT

### I.    Plaintiffs Are Unlikely to Succeed on the Merits

#### A.    Plaintiffs Cannot Enforce the Asserted Obligation to Expend Appropriated Funds

1.  Plaintiffs sought and obtained an injunction requiring the government to make available for obligation foreign-assistance funds that Congress has appropriated.  As explained in the government's brief, plaintiffs have no entitlement to pursue or obtain that relief under the APA or any other statute.  Congress's reticulated scheme governing Legislative and Executive Branch interaction over the obligation, expenditure, and rescission of appropriated funds leaves no place for private enforcement of

2

an asserted statutory requirement to expend funds. To the contrary, permitting private enforcement would disrupt the strict control that Congress retained over any response to the President's determinations in this area and thus would undermine Congress's scheme. *See* Gov't Br. 27-35.

Rather than contest any of this, plaintiffs contend that it is all "beside the point." Pls. Br. 27. They fault the government for "bas[ing] [its] arguments on the premise that the district court's holding was tied to *APA* claims alleging *statutory* violations based on the Impoundment Control Act, not a constitutional claim rooted in the separation of powers." *Id.* at 25-26 (emphases in original). According to plaintiffs, the "district court's opinion belies [the government's] characterization" of their claims as statutory, because "the court repeatedly underscored that its holding on impoundments was based on the constitutional claims." *Id.* at 26.

Having expressly disclaimed any statutory claim, plaintiffs rest their entire case on their view that they have a nonstatutory cause of action "to seek to enjoin government officials from violating the Constitution." Pls. Br. 27. The only respect in which they allege that the Executive Branch has violated the Constitution is through a "separation-of-powers violatio[n]." *Id.* (quotation omitted). And that asserted violation arises because, in plaintiffs'

3

view, the Executive Branch is not following appropriations statutes, and "an appropriations act is a law like any other." *Id.* at 32; *see also* J.A. 63 (concluding that plaintiffs are likely to succeed on their claim that the agency defendants acted in violation of "the expression of [Congress's] powers through statutes that constrain the Executive's authority in relation to foreign aid spending and the impoundment of appropriated funds").

Plaintiffs' case thus hinges on the proposition that they have a freestanding right, independent of any statutory cause of action, to seek an injunction to require federal officials to comply with federal statutes. But the Supreme Court has expressly rejected the notion that "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). The Court rejected, in particular, an effort to evade a limitation on review under the APA on the theory that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471. That is precisely what plaintiffs attempt to do here.

Rather than converting every statutory case to a constitutional one, the Supreme Court has carefully "distinguished between claims of constitutional

4

violations and claims that an official has acted in excess of his statutory authority." *Dalton*, 511 U.S. at 472 (collecting cases). The Constitution may be implicated for example if—as is not true here—executive officers rely on it as an independent source of authority to act, as in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), or if—as is also not true here—the officers rely on a statute that itself violates the Constitution, *see Dalton*, 511 U.S. at 473 & n.5. But claims alleging simply that an official has "exceeded his statutory authority are not 'constitutional' claims" that can be asserted through a direct cause of action. *Id.* at 473; *see also Nuclear Regulatory Comm'n v. Texas*, No. 23-1300, slip op. at 14-15 (U.S. June 18, 2025) (rejecting an attempt to "dress up a typical statutory-authority argument as an ultra vires claim" and explaining that ultra vires review must be "strictly limited" lest it "become an easy end-run around the limitations" of "judicial-review statutes"). This is just such a case.

The cases on which plaintiffs rely for the proposition that they may advance freestanding separation-of-powers claims further illustrate the point by highlighting the distinction between a true separation-of-powers claim and a statutory claim dressed up as one. Pls. Br. 27. In *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477, 487 (2010),

5

the plaintiffs contended that provisions of the Sarbanes-Oxley Act violated the Constitution by "conferring wide-ranging executive power on" members of the Public Company Accounting Oversight Board "without subjecting them to Presidential control." That claim turned not on whether the Board was violating any statute, but on whether the statutory basis for the Board's independence violated Article II of the Constitution. The same was true in *Collins v. Yellen*, 594 U.S. 220, 235 (2021), where the plaintiffs claimed that the statute providing the Director of the Federal Housing Finance Agency for-cause removal protection violated Article II of the Constitution. Again, the plaintiffs' claim in that case did not rest on whether the defendant officials had violated a statute but instead on whether the statutory framework violated the Constitution.

2. The merits section of plaintiffs' brief makes clear that their claims are statutory. Right out of the gate, plaintiffs admit that this case hinges on "statutory indication[s]." Pls. Br. 33. They elsewhere describe the issue presented as an "interpretive question" that is informed by statutes like "the Impoundment Control Act." *Id.* at 35; *see also id.* at 43 (arguing that the Impoundment Control Act has "conclusively settled" the "governing rule of construction" (quotation omitted)). They look to the "language" that "the

6

relevant appropriations contai[n]." *Id.* at 38. And their brief is replete with references to canons of statutory construction. *See, e.g.*, *id.* at 37 (invoking canon that "Congress is aware of existing law when it passes legislation" (quotation omitted)); *id.* at 38-39 (invoking canon that "Congress acts intentionally and purposely" when it "includes particular language in one section of a statute but omits it in another section" (emphasis and quotation omitted)); *id.* at 41 (invoking canon that courts "should not lightly conclude that Congress enacted a self-defeating statute" (quotation omitted)). Plaintiffs all but recognize that their claims turn on the statutes, not on the Constitution.

Plaintiffs also make clear the limitations to their argument about the constitutional provisions specific to the expenditure of funds. Plaintiffs emphasize that appropriations statutes that provide the Executive Branch with statutory discretion to spend less than the full appropriation "abound in our history," with examples "[d]ating back to the Founding." Pls. Br. 33 (quotation omitted). They further assert that Congress included over 200 such provisions in the very appropriations statute at issue in this case. *Id.* at 38. Plaintiffs thus make abundantly clear, despite their rhetoric, that they perceive no constitutional obligation for the Executive Branch to expend

7

every dollar that Congress appropriates, but instead merely contend that the particular provisions at issue here impose requirements that federal officials have not satisfied.  That is a statutory claim, and it does not give rise to a freestanding constitutional cause of action.

3.  Plaintiffs' express disclaimer of any APA cause of action, together with the absence of any other cause of action, suffices to resolve this appeal. But in any event, their efforts to establish that they are the proper parties to bring a case of this kind merely underscore why they have properly disclaimed any ability to seek relief under the APA.  Standing entirely on their assertion that "the order on appeal did not rest on Plaintiffs' APA claims for violation of the Impoundment Control Act," they provide no response whatsoever to the argument that they are not entitled to enforce the Impoundment Control Act.  Pls. Br. 28.  The government's arguments in that regard are thus entirely unrebutted, and they are dispositive.

Plaintiffs also fail to demonstrate that they are the proper parties to bring a lawsuit of this kind.  Plaintiffs do not urge that any statute required the government to provide a grant specifically to them, or even that every aspect of the appropriations statutes on which they rely is relevant to their activities.  Article III does not permit a blunderbuss approach in which

8

plaintiffs identify a general concern with expenditures that might affect their activities and obtain a sweeping injunction requiring the federal government to obligate a wide swath of appropriated funds with no inquiry into individual injury.

Plaintiffs' brief response to the government's zone-of-interests argument is likewise unavailing. Although plaintiffs argue that the government forfeited the point, the government argued in district court that the Impoundment Control Act is "not enforceable" by private parties "through an APA suit" because the statute is about "enforc[ing] Congress's power over the purse in relation to the Executive." *See* Dkt. 1:25-cv-400, ECF No. 33, at 34-35 (citing *Trump v. Sierra Club*, 140 S. Ct. 1 (2019), which involved zone-of-interests requirements, *see Sierra Club v. Trump*, 929 F.3d 670, 703-04 (9th Cir. 2019)). The briefing more than sufficed to put plaintiffs and the district court on notice that the government was challenging plaintiffs' ability to come within the zone of interests of the Impoundment Control Act. And this Court did not hold in *Haitian Refugee Center v. Gracey*, 809 F.2d 794 (D.C. Cir. 1987), that the test does not apply to ultra vires challenges. Instead, the footnote on which plaintiffs rely addressed third-party standing, *see id.* at 808 n.11, and a separate portion of *Gracey*

9

rejects the plaintiffs' claims on the ground that the "interests asserted by the" plaintiffs "do not fall within the zones of interests to be protected or regulated by the laws under which they seek to challenge" the defendants' conduct—with no apparent distinction between the plaintiffs' ultra vires claims and the plaintiffs' other claims. *See id.* at 811-16.

### B. Plaintiffs Have Not Identified Any Applicable, Clear Statutory Requirement that the Executive Branch Expend All of the Appropriated Funds Here

As discussed above, this appeal can be resolved on the ground that plaintiffs have identified no basis on which they can enforce the various statutes at issue in this case. But their claims are in any event flawed on the merits. Plaintiffs' merits argument is largely premised on the extraordinary assertion that, at the time of the issuance of the injunction less than halfway through the fiscal year, the government had already violated appropriations statutes that, according to plaintiffs, require the Executive Branch to expend every dollar that Congress appropriated. This assertion fails at every level.

1. As an initial matter, the only agency actions on which plaintiffs premise their claim are 90-day pauses of foreign-assistance funding and subsequent terminations of certain contracts, grants, and other awards. *See generally* Pls. Br. 9-12. Those actions do not, of course, preclude the

10

government from subsequently obligating and expending those funds on the purposes directed, and within the time period afforded, by Congress in a manner more consistent with the President's priorities. Nor do they preclude the government from requesting through the process outlined in the Impoundment Control Act that Congress rescind the funds.

Thus, even on plaintiffs' terms, the district court's injunction requiring the government to obligate and expend funds was, at a minimum, premature. That was why the government's brief emphasized that the Impoundment Control Act's provision directing the government to make unrescinded funds available for obligation does not kick in unless and until 45 days have passed without congressional action on a rescission package—an observation that plaintiffs do not refute and instead caricature as asking the Court to hold that the President may "impound funds freely, as long as he does not make the mistake of unsuccessfully requesting rescission." Pls. Br. 41.

Neither plaintiffs nor the district court has pointed to any determination by the government that it may decline to obligate or expend the funds at issue in this case without sending a special message to Congress pursuant to the Impoundment Control Act. Plaintiffs' reference to some

11

statements about a general desire to reduce foreign-assistance spending are no substitute for such a determination. *See* Pls. Br. 11. The Executive Branch and Congress will work out which appropriations must be obligated and expended, which appropriations should be rescinded, and any other budgetary issues.

Thus, it is plaintiffs, and not the government, who have taken an extreme position in this case, reading virtually every appropriations statute, regardless of context, as an inexorable command to expend all of the funds. But every relevant principle of interpretation refutes plaintiffs' assertion that the fact of a congressional appropriation—"standing alone," Pls. Br. 35—requires the Executive Branch to expend all appropriated funds. Rather, each appropriation must be analyzed individually—and considered together with the underlying authorizing statute, the Impoundment Control Act, and background constitutional principles—in order for the Executive Branch and Congress to work out which funds should be expended and in what fashion. As discussed above, that process does not involve private plaintiffs.

At a minimum, the statutes at issue here do not provide the sort of "specific, unequivocal command," *Norton v. Southern Utah Wilderness All.*,

542 U.S. 55, 63 (2004) (quotation omitted), that plaintiffs do not dispute would be necessary to justify an affirmative injunction. *See* Gov't Br. 35-36. By and large, the Further Consolidated Appropriations Act of 2024 appropriates sums of money for broad purposes. Among other things, Congress appropriated billions of dollars "[f]or necessary expenses to carry out" provisions of the Foreign Assistance Act "for global health activities"; "for international disaster relief, rehabilitation, and reconstruction assistance"; and for development assistance. Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, 138 Stat. 460, 740, 742. On their own, those appropriations lack any mandatory language directing the obligation and expenditure of funds.

Although plaintiffs' brief failed to point to any more specific language in the statute, in a subsequent letter to the Court, plaintiffs for the first time purport to "identif[y] additional provisions" of the statute that supposedly require the Executive Branch to obligate and expend all of the appropriated funds. Pls. Ltr. 1-2 (June 16, 2025). Plaintiffs' letter relies on language in the statute that provides that foreign-assistance appropriations "shall be made available in amounts specifically designated" by a set of tables referenced in the appropriations statute. *See id.* (quoting Further

13

Consolidated Appropriations Act of 2024, div. F, § 7019, 138 Stat. at 771).

Even assuming plaintiffs have not forfeited reliance on those provisions by

failing to identify them previously, plaintiffs fail to understand their import.

As an initial matter, the provisions in question simply address a

different question than the one confronted by this Court. Those provisions

reflect Congress's desire to designate different portions of the top-line

foreign-assistance appropriations for particular purposes. *See* 2 GAO,

*Principles of Federal Appropriations Law* 6-26 to 6-30 (3d ed. 2006) (GAO

Red Book). They are thus aimed at giving direction to the Executive Branch

about how to allocate portions of the lump-sum appropriations to certain

uses, not at directing the Executive Branch to spend all of the appropriated

funds. Consistent with that understanding, and as GAO has made clear, the

use of such "shall be available" language "to earmark a portion of a lump-

sum appropriation" does not necessarily reflect a congressional command to

make the full sum available for obligation. *See id.* at 6-30 to 6-31. Instead,

the use of such language "contain[s] an element of ambiguity," and the

question whether the language reflects a floor or a ceiling or both on the

amount that may be obligated for the relevant purpose "depends on the

underlying congressional intent." *Id.* at 6-31.

14

Here, the relevant context—which plaintiffs incorrectly ask this Court to ignore—makes clear that Congress intended the Executive Branch to exercise discretion over how to expend these appropriations. In accord with the President's primary role in the conduct of foreign affairs, Congress recognized that the President may furnish foreign assistance "on such terms and conditions as he may determine." *See, e.g.*, 22 U.S.C. §§ 2151a(a)(1), 2151b(c)(1), 2151c(a), 2151d(b)(1), 2174(a), 2291(a)(4), 2346(a), 2347(a), 2348, 2349aa; *see also id.* § 2395(a) (providing that "assistance under this chapter may be furnished on a grant basis or on such terms . . . as may be determined to be best suited to the achievement of the purposes of this chapter"). That recognition supports the conclusion that any ambiguous language in the appropriations acts must be understood to retain the Executive Branch's programmatic discretion, and plaintiffs have no response. Rather than construing related statutes together, plaintiffs insist that "whatever discretion Congress granted in an *underlying* authorizing statute does not alter the meaning of the foreign-assistance appropriations that Congress has since enacted." Pls. Br. 44. Plaintiffs provide no citation to support their apparent view that appropriations statutes, unlike every other type of statute, must be read in isolation.

15

Plaintiffs further demand that this Court ignore the broader context. The appropriations at issue here touch on the sensitive subject of foreign affairs, where the President enjoys considerable authority under the Constitution and under the Foreign Assistance Act. The risk of impinging on a core executive power provides a powerful basis to sustain, not override, the Executive Branch's discretion in this area. *See* Gov't Br. 47-49, 54-57.

Indeed, that relevant discretion is only reinforced by the statutory language identified by plaintiffs in their late-breaking letter, which also provides that the Executive Branch may deviate "up to 10 percent from the amounts specified" for most of the earmarked appropriations and may deviate further than that limit if particular determinations are made by the Executive Branch and reported to Congress. Further Consolidated Appropriations Act of 2024, div. F, § 7019(b), 138 Stat. at 772. That discretion and the reporting process underscore that Congress intended the earmarks to function as part of the inter-Branch dialogue generally contemplated by the appropriations statutes and Impoundment Control Act, rather than to generate obligations enforceable judicially by third parties.[1]

---

[1] Although plaintiffs note (at Pls. Ltr. 1) that this additional discretion-conferring language does not apply to one set of appropriations covered by

*Continued on next page.*

Finally, rather than focus on the language in the appropriations at issue, plaintiffs note that Congress sometimes "appropriates sums 'up to' or 'not to exceed' a specified amount."  Pls. Br. 34.  According to plaintiffs, the existence of this more permissive language must mean that the language here leaves no room for discretion to obligate less than the amount made available for a particular purpose.  *See id.* at 33-35.  That conclusion does not follow.  This language generally imposes a cap on the use of a lump-sum appropriation for particular purposes.  *See* GAO Red Book 6-27 to 6-29.  Like the "shall be made available" language discussed in plaintiffs' letter, it thus provides Congress's views on the question of how to divide up a broader appropriation among potential objects; it has no relevance to the separate question whether some or all of the appropriation must be spent in the first place.

Regardless, even on its own terms, plaintiffs' contextual argument fails.  In many circumstances, Congress uses language that appears more

---

the district court's injunction, it indisputably applies to the bulk of the foreign-assistance funds at issue.  And any argument that plaintiffs might advance about the exempted appropriations they identify would falter in any event on the previously explained obstacles to interpreting the appropriation as reflecting a requirement to expend the funds—much less a judicially enforceable one.

mandatory—providing, for example, that the relevant agency must obligate "not less than" a particular amount for an identified activity. *See, e.g.*, Further Consolidated Appropriations Act of 2024, div. F, § 7032(a)(2), 138 Stat. at 786 (requiring that "not less than $117,040,000 shall be made available to the Bureau of Democracy, Human Rights, and Labor, Department of State"); *id.* § 7036(a), 138 Stat. at 798 (requiring "not less than $125,000,000" from certain accounts to be made available "for programs to counter the flow of fentanyl, fentanyl precursors, and other synthetic drugs into the United States"). While plaintiffs insist that there must be a difference between appropriations statutes that say "up to" or "not to exceed" and statutes that omit that language, they do not explain why the same principle would not require a difference between statutes that say "not less than" and statutes that omit that language.

Moreover, there is nothing inconsistent about Congress conferring discretion with different formulations. *See Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 222 (2009) (declining to draw negative inference based on differences in statutory language). Differences in language and context may have significance in the proper interpretation of the statute and in the inter-Branch dialogue about appropriations, but plaintiffs' simplistic statutory

18

interpretation provides no basis for the injunction issued by the district court.

2. Although plaintiffs advance no argument that they are entitled to enforce the Impoundment Control Act, plaintiffs say that that statute transforms the appropriations at issue into mandatory obligations to spend. *See* Pls. Br. 35-37. Their need to draw on the Impoundment Control Act highlights that the appropriations statute does not contain the requisite enforceable obligation—much less any indication that the Executive Branch has somehow violated the separation of powers. In any event, plaintiffs' arguments about the Impoundment Control Act are unavailing.

Plaintiffs set out the procedures established by the Impoundment Control Act under which the President notifies Congress when the Executive Branch has made a determination to defer or rescind budget authority. Pls. Br. 36-37. But they have no meaningful response to the point that the Act by its own terms does not require the Executive Branch to make funds available for obligation until the end of the inter-Branch process contemplated by that statute. *See* Gov't Br. 39-40. The Act thus imposes no present obligation on the Executive Branch that could support the district court's injunction.

Plaintiffs' argument produces other anomalies.  In their telling, private parties can rely on the Impoundment Control Act to enforce appropriations statutes even before the time has run for Congress to consider a rescission package.  Similarly, parties like plaintiffs who hope to receive appropriated funds can bring suit immediately, while the Comptroller General who is the Legislative official statutorily authorized to bring suit can do so only after observing the various procedural and timing requirements imposed by the statute.  *See* Gov't Br. 29-31.  These features of the Impoundment Control Act have led courts to conclude that litigants must identify a statute separate and apart from the Impoundment Control Act that is enforceable on its own terms.  *See General Land Office v. Biden*, 722 F. Supp. 3d 710, 733-35 (S.D. Tex. 2024); *Public Citizen v. Stockman*, 528 F. Supp. 824, 827-31 (D.D.C. 1981); *Rocky Ford Hous. Auth. v. U.S. Dep't of Agric.*, 427 F. Supp. 118, 134 (D.D.C. 1977).

3.  Although plaintiffs try to ground their extreme mode of statutory interpretation in the Constitution's Appropriations Clause, they ignore that provision's text and history.  Start with the text: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.  Plaintiffs do not contend that the Executive

20

Branch has drawn money from the Treasury without an authorizing appropriation; rather, they seek to force the Executive Branch to expend additional money appropriated by Congress.

As the government pointed out, *see* Gov't Br. 50-54, and plaintiffs do not refute, this phrasing was not accidental. At their inception, appropriations served as a mechanism for Parliament to check the spending of the King. The same concept carried forward to the American colonies and was adopted in the Appropriations Clause, under which the President cannot expend more funds than Congress has appropriated. Although plaintiffs discount a couple of the historical instances where the Executive Branch has declined to spend the full amount of appropriated funds, *see* Pls. Br. 34 n.5, they do not rebut the established norm that a mere appropriation unaccompanied by more specific legislation leaves the Executive Branch with discretion to make decisions about expending funds. Indeed, in discussing the government's examples, plaintiffs point out that "President Grant . . . justified his decision not to spend funds . . . in statutory, not Constitutional, terms," *id.*, without explaining why the Executive Branch is not entitled to do the same here.

21

Plaintiffs lack support for their assertion that it has been "long settled" that the Executive Branch has a constitutional duty to spend "the full amount appropriated by Congress for a particular project or program."  Pls. Br. 33 (quotation omitted).  The lone case that plaintiffs cite for this principle locates the relevant statutory obligation in the Impoundment Control Act—not in the appropriations statutes themselves.  *See In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (citing 2 U.S.C. § 683).  For the reasons already discussed, plaintiffs accept that they cannot enforce the Impoundment Control Act, *see supra* pp. 2-10, and their understanding of how that statute applies in this case is misguided, *see supra* pp. 10-12, 19-20. And although plaintiffs gesture at the Take Care Clause, *see* Pls. Br. 31, that constitutional provision sheds no light on how to interpret the underlying statutory obligations and does not provide plaintiffs an independent avenue to enforce the Impoundment Control Act.

Nor do plaintiffs advance their position by citing *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 612-13 (1838).  Pls. Br. 32.  In that case, Congress had enacted a "special act for the relief" of specific parties who had claims against the United States; that statute "direct[ed] the postmaster general to credit the [claimants] with whatever sum, if any, the

22

solicitor [of the treasury] shall decide to be due to them." *Id.* at 611. After

the Solicitor determined that the claimants were owed a specific sum, the

Postmaster General refused to pay them the full sum. *Id.* The Supreme

Court held that the statute required the Postmaster General to carry out a

"mere ministerial" duty to complete payment of the sum determined by the

Solicitor and that this duty was judicially enforceable. *Id.* at 610-12. Nothing

about that decision speaks to the question of how to construe appropriations

statutes like those at issue in this case.

Plaintiffs fare no better in seeking to analogize to the constitutional

challenge to the Line Item Veto Act of 1996. *See* Pls. Br. 42. The Supreme

Court held that the Line Item Veto Act violated the Constitution's

Presentment Clause by allowing the President to cancel portions of statutes

enacted by Congress. *Clinton v. City of New York*, 524 U.S. 417, 436-41

(1998). This case, by contrast, does not involve "unilateral Presidential action

that either repeals or amends parts of duly enacted statutes." *Id.* at 439.

Rather, as explained, the question presented here concerns the President's

authority to determine how and whether to expend appropriated funds in

consultation with Congress and within the confines of the applicable statutes.

23

Plaintiffs expressly acknowledge that some statutes authorize the President to determine how and whether to expend appropriated funds, and they thus cannot plausibly contend that such statutes are unconstitutional. The question whether the appropriations at issue here fall in that category has nothing to do with the Line Item Veto Act. Furthermore, whereas no President had ever asserted or exercised inherent item veto power, *see Clinton*, 524 U.S. at 440, there is a long history of the Executive Branch declining to spend the full amount of appropriated funds in various contexts, particularly in the realm of foreign affairs, *see* The President's Veto Power, 12 Op. O.L.C. 128, 168 & n.56 (1988). That historical tradition and settled practice form the backdrop against which the relevant statutes were enacted and must be understood.

## II. Equitable Considerations Do Not Support the District Court's Preliminary Injunction

The district court's preliminary injunction does not serve to remedy plaintiffs' asserted harms. As plaintiffs admit, the government is free to "spend the funds" subject to the injunction "on other entities." Pls. Br. 51; *see id.* at 57 (acknowledging that the government can "compl[y] with the injunction by recompeting the funds, rather than [restoring] the grants and other awards"). The district court was equally clear on this point, explaining

24

that the government is under no obligation to "continue to contract with" plaintiffs.  J.A. 80-81.  Giving the funds to someone other than plaintiffs or their members over the coming months would do nothing to address the financial shortfalls that plaintiffs purportedly face now.  *See* Gov't Br. 57-60.

Plaintiffs' response brief only highlights this fundamental disconnect between the injury and the relief.  Every single harm that plaintiffs identify as irreparable derives from the government's alleged failure to pay money to them specifically.  *See* Pls. Br. 49-50.  Plaintiffs contend that, "[w]ithout the foreign assistance funding opportunities," they will have to "cut down on staff or otherwise reduce core operations" because such funding makes up a substantial portion of their "revenues" and "operating budget."  *Id.* at 49 (quotation omitted).  But plaintiffs would face those same reductions if the government obligates the funds at a later date or selects a different recipient for the funds, as the preliminary injunction allows.  Nor can plaintiffs bridge that gap through mere speculation that the government might "elect to restore terminated programs," Pls. Br. 52, particularly when there is still adequate time to make decisions about how to obligate the funds at issue.

Perhaps recognizing this mismatch, plaintiffs switch to discussing a different form of injury—namely, a lost "*opportunity* to pursue federal

25

funds." Pls. Br. 51 (emphasis in original). That conditional harm is neither irreparable nor threatened in this case. Where the Executive Branch ultimately determines to implement foreign-assistance programs through grants or other awards, plaintiffs and their members will have a full chance to compete for any funds made available. The nonbinding Court of Federal Claims decisions that plaintiffs reference do not support the proposition that they can force the government to conduct a competitive bidding process because they would like to participate in that process. *See* Pls. Br. 52. Rather, the challengers in those bid protest cases alleged an inability to "compete fairly" when the government issued a public solicitation for contracts to procure goods or services. *AGMA Sec. Serv., Inc. v. United States*, 152 Fed. Cl. 706, 740 (2021) (quotation omitted).

In a related vein, plaintiffs failed to establish that they can compete for all of the programs or funds in the relevant appropriations statute. *See* Gov't Br. 62-64. At the outset, plaintiffs contend that this limitation on any proper injunction "was not presented to the district court." Pls. Br. 57. But the government explained at length to the district court that any preliminary injunction had to be narrowly tailored to "address only the contract-specific decisions concerning each Plaintiffs' funding awards." Dkt. 1:25-cv-400, ECF

26

No. 33, at 45-47. The government's opposition focused on the need to restrict relief to awards that the plaintiffs had already received—rather than to awards that plaintiffs could compete for—because plaintiffs requested that the district court reinstate the specific awards that the government had previously made. *See* J.A. 80; *see also* Dkt. 1:25-cv-400, ECF No. 13-6, at 1-2; Dkt. 1-25-cv-402, ECF No. 4, at 1-2. By fashioning relief that no party had requested, the district court introduced the problem of ordering the government to make available for obligation funds that plaintiffs would never be in a position to obtain. If anything, that deviation from plaintiffs' requested relief is another reason to vacate the injunction—not a reason to reject the government's arguments about its overbreadth. Moreover, the need to limit the district court's injunction rests on bedrock Article III and equitable principles, which dictate that "an injunction must be narrowly tailored to remedy the specific harm shown." *Nebraska Dep't of Health & Human Servs. v. Department of Health & Human Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (alteration and quotation omitted). Such arguments that speak to the district court's jurisdiction may not, in any event, be forfeited. *Kaplan v. Central Bank of the Islamic Republic of Iran*, 896 F.3d 501, 511 (D.C. Cir. 2018).

27

On the merits, plaintiffs' cursory attempt to overcome this deficiency, *see* Pls. Br. 59-61, is insufficient on its own terms. For example, they do not explain how the mosquito-control efforts by one of plaintiff Global Health Council's members, *see* J.A. 249-50, show that plaintiffs are equipped to participate in programs related to promoting "energy production and conservation," 22 U.S.C. § 2151d(b)(2), or to expanding "the availability of credit," *id.* § 2211a(a). Likewise, plaintiff American Bar Association's initiatives to combat money laundering, *see* J.A. 361-62, do not demonstrate that plaintiffs could apply for funds to advance nuclear "nonproliferation, disarmament, and weapons destruction," 138 Stat. at 748.

On the other side of the balance, the district court's mandate that the government make "the full amount of" foreign-assistance funds available for obligation, J.A. 82, inflicts a direct harm on the government and the public. The Executive Branch engages in a dialogue with Congress over the obligation and expenditure of federal funds, and having the threat of contempt looming in the background threatens the ability of the political branches to resolve spending issues that are textually committed to them. Plaintiffs may have different views about the best ways to spend the money, *see* Pls. Br. 52-53, but those decisions belong to politically accountable

28

government actors.  The injunction is especially problematic because it pretermits the dialogue between the political branches in the delicate context of foreign affairs.  *See* Gov't Br. 60-62.

Plaintiffs do not advance their argument by pointing out that earlier in this case a divided Supreme Court denied emergency relief with respect to "the district court's order directing payment for past work performed" that the government had no objection to paying where the claims were legitimate and substantiated.  Pls. Br. 54-55.  This appeal, by contrast, concerns the obligation and expenditure of funds on a prospective basis and the insertion of a federal district court into a political determination about the use of funds in the context of foreign affairs.

Plaintiffs' other arguments about the equities presuppose that their position on the merits is correct.  For example, plaintiffs incorrectly state that the government does "not meaningfully dispute" that it is "currently impounding" foreign-assistance funds, Pls. Br. 56, even though the government's brief refuted this very point and detailed the government's compliance with the statutes, *see* Gov't Br. 41-42.  Plaintiffs broadly proclaim that "there is no public interest in unlawful Executive action."  Pls. Br. 54 (quotation omitted).  And they further contend that "[n]o harm redounds to

[the government] from spending money that Congress has directed it to spend." *Id.* at 55. The harms discussed above accrue to the government irrespective of this Court's view of the merits, but in all events, plaintiffs' erroneous contentions seeking to restrict the Executive Branch's discretion in implementing foreign aid provide an additional reason to reverse the preliminary injunction.

## CONCLUSION

For the foregoing reasons and those in the government's opening brief, the challenged portion of the district court's preliminary injunction should be reversed or vacated.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY

 /s/ Sean R. Janda
SEAN R. JANDA
BRIAN J. SPRINGER
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*
*sean.r.janda@usdoj.gov*

June 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6112 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

 */s/ Sean R. Janda*
Sean R. Janda
