

**U.S. Department of Justice**

Civil Division, Appellate Staff

950 Pennsylvania Ave. NW, Rm. 7260

Washington, DC 20530

Tel: (202) 514-3388

August 26, 2025

VIA CM/ECF

Clifton Cislak, Clerk of Court

U.S. Court of Appeals for the D.C. Circuit

333 Constitution Avenue, NW

Washington, DC 20001

RE:      *Global Health Council v. Trump*;
          *AIDS Vaccine Advocacy Coalition v. Department of State*,
          Nos. 25-5097, 25-5098 (D.C. Cir.)

Dear Mr. Cislak:

I write to inform the Court that the government has this evening filed an application with the Supreme Court to stay the district court's preliminary injunction in these cases. The application is attached to this letter.

Sincerely,

*/s/ Sean R. Janda*
Sean R. Janda

cc:    Counsel of Record (via CM/ECF)

No. 25A

# In the Supreme Court of the United States

———————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., APPLICANTS

*v.*

GLOBAL HEALTH COUNCIL, ET AL.

———————

UNITED STATES DEPARTMENT OF STATE, ET AL., APPLICANTS

*v.*

AIDS VACCINE ADVOCACY COALITION, ET AL.

———————

**APPLICATION TO STAY THE INJUNCTION ISSUED
BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
AND REQUEST FOR AN IMMEDIATE ADMINISTRATIVE STAY**

———————

D. JOHN SAUER
  *Solicitor General*
    *Counsel of Record*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

## TABLE OF CONTENTS

Statement ........................................................................................................... 7

    A.    Legal background ............................................................. 7

    B.    Factual and procedural background ...................................... 11

Argument ........................................................................................................ 21

    A.    The government is likely to succeed on the merits ............................ 21

        1.    Respondents lack a cause of action to assert a
            freestanding constitutional claim ................................ 22

        2.    The APA does not provide a cause of action for
            respondents' impoundment claims ................................. 25

        3.    Respondents cannot bring an ultra vires claim ....................... 28

    B.    The other factors support a stay ........................................... 30

        1.    The issues in this case warrant the Court's review .................. 30

        2.    The district court's order causes irreparable harm to the
            Executive Branch ................................................. 32

        3.    The balance of equities strongly favors the government ........... 35

    C.    This Court should issue an administrative stay ................................ 35

Conclusion ....................................................................................................... 36

(i)

### PARTIES TO THE PROCEEDING

Applicants (defendants-appellants below) in *Trump* v. *Global Health Council* are Donald J. Trump, in his official capacity as President of the United States; Marco Rubio, in his official capacity as Secretary of State and Acting Administrator of the United States Agency for International Development (USAID); Russell T. Vought, in his official capacity as Director of the Office of Management and Budget; Jeremy Lewin in his official capacity as Under Secretary of Foreign Assistance, Humanitarian Affairs and Religious Freedom at the Department of State and in his official capacity performing the duties of Deputy Administrator and Chief Operating Officer of USAID; the United States Department of State; USAID; and the Office of Management and Budget.*

Applicants (defendants-appellants below) in *United States Department of State* v. *AIDS Vaccine Advocacy Coalition* are the United States Department of State; USAID; the Office of Management and Budget; Marco Rubio, in his official capacity as Secretary of State and Acting Administrator of USAID; Russell T. Vought, in his official capacity as Director of the Office of Management and Budget; and Donald J. Trump, in his official capacity as President of the United States.

Respondents (plaintiffs-appellees below) in *Trump* v. *Global Health Council* are Global Health Council; Small Business Association for International Companies; HIAS; Management Sciences for Health, Inc.; Chemonics International, Inc.; DAI Global LLC; Democracy International, Inc.; and the American Bar Association.

---

\* The complaint named as a defendant Peter Marocco, in his official capacity as then-Acting Deputy Administrator for Policy and Planning of USAID, then-Acting Deputy Administrator for Management and Resources of USAID, and then-Director of Foreign Assistance of the Department of State. In their amended complaint, *Global Health Council* respondents dropped Mr. Marocco as a defendant and substituted Acting Under Secretary Lewin pursuant to Federal Rule of Civil Procedure 25(d). See 25-cv-402 Am. Compl. at 7 & n.2 (Apr. 22, 2025).

iii

Respondents (plaintiffs-appellees below) in *United States Department of State* v. *AIDS Vaccine Advocacy Coalition* are AIDS Vaccine Advocacy Coalition; and Journalism Development Network, Inc.

## RELATED PROCEEDINGS

United States District Court (D.D.C.):

> *AIDS Vaccine Advocacy Coalition* v. *United States Department of State*, No. 25-cv-400 (Feb. 13, 2025) (granting temporary restraining order)

> *Global Health Council* v. *Trump*, No. 25-cv-402 (Feb. 13, 2025) (granting temporary restraining order)

> *AIDS Vaccine Advocacy Coalition* v. *United States Department of State*, No. 25-cv-400 (Mar. 10, 2025) (granting preliminary injunction)

> *Global Health Council* v. *Trump*, No. 25-cv-402 (Mar. 10, 2025) (granting preliminary injunction)

> *AIDS Vaccine Advocacy Coalition* v. *United States Department of State*, No. 25-cv-400 (Aug. 26, 2025) (denying stay of preliminary injunction)

> *Global Health Council* v. *Trump*, No. 25-cv-402 (Aug. 26, 2025) (denying stay of preliminary injunction)

United States Court of Appeals (D.C. Cir.):

> *AIDS Vaccine Advocacy Coalition* v. *United States Department of State*, No. 25-5046 (Feb. 26, 2025) (dismissing appeal for lack of jurisdiction)

> *Global Health Council* v. *Trump*, No. 25-5047 (Feb. 26, 2025) (dismissing appeal for lack of jurisdiction)

> *Global Health Council* v. *Trump*, No. 25-5097 (Aug. 13, 2025) (vacating preliminary injunction)

> *AIDS Vaccine Advocacy Coalition* v. *United States Department of State*, No. 25-5098 (Aug. 13, 2025) (vacating preliminary injunction)

Supreme Court of the United States:

> *Department of State* v. *AIDS Vaccine Advocacy Coalition*, No. 24A831 (Mar. 5, 2025) (denying motion to vacate order)

# In the Supreme Court of the United States

——————————

No. _____

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES OF AMERICA, ET AL., APPLICANTS

*v.*

GLOBAL HEALTH COUNCIL, ET AL.

——————————

UNITED STATES DEPARTMENT OF STATE, ET AL., APPLICANTS

*v.*

AIDS VACCINE ADVOCACY COALITION, ET AL.

——————————

**APPLICATION TO STAY THE INJUNCTION ISSUED
BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
AND REQUEST FOR AN IMMEDIATE ADMINISTRATIVE STAY**

——————————

Pursuant to Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Solicitor General—on behalf of applicants President Donald J. Trump, et al.—respectfully files this application for a stay of the injunction issued by the United States District Court for the District of Columbia (App., *infra*, 1a-48a), pending the consideration and disposition of any en banc proceedings in the United States Court of Appeals for the District of Columbia and, if that court affirms, pending the timely filing and disposition of a petition for a writ of certiorari and any further proceedings in this Court. In addition, the Solicitor General respectfully requests an immediate administrative stay pending the Court's consideration of this application. Finally, the Solicitor General respectfully requests a decision by September 2, 2025, due to

(1)

the additional irreparable harms the government would incur past that point.

This case began as an emergency over whether a district court had jurisdiction to order the government to pay $2 billion for contractual work completed under foreign-aid grants within 36 hours. 145 S. Ct. 753, 754. Now, that district court has installed itself as supervisor-in-chief of further spending and rescissions proposals, issuing a preliminary injunction ordering the government to make available for obligation tens of billions of dollars in appropriated foreign aid funds and to spend many billions of dollars by September 30, before those appropriations expire. Instead of seeking emergency relief in March, the government proposed a schedule that would allow the D.C. Circuit to rule on the preliminary injunction's legality before irrevocable compliance steps became necessary to meet the September 30 deadline. On August 13, the D.C. Circuit panel agreed that the preliminary injunction should be vacated in its entirety. But the en banc court, without granting review, has refused either to stay the injunction or to issue the mandate, leaving the government subject to an injunction that the panel held to be deeply erroneous. The government is thus forced to ask this Court to give effect to the D.C. Circuit's decision, which correctly held that private parties cannot enlist Article III courts to supplant the interbranch dialogue regarding the expenditure of appropriated funds.

Since the Founding, Congress and the President have occasionally clashed over the use of appropriated funds. Congress, with the power of the purse, appropriates money for specific programs; the President, vested with exclusive authority to enforce the laws, has often disagreed about whether and how much of those funds should be spent. See Louis Fisher, *Presidential Spending Power* 147-152 (1975) (*Presidential Spending Power*) (collecting examples). President Jefferson, for example, famously withheld $50,000 appropriated for gunboats on the Mississippi during negotiations

over the Louisiana purchase. *Presidential Spending Power* 150. And President Lyndon Johnson (among other instances) impounded funds for small watershed projects and for the construction of a national aquarium. *Id.* at 166.

Congress and the President have long resolved disagreements through the political process. For instance, when President Grant informed Congress that he would not spend funds appropriated for harbor and river improvements based on his view of the national interest, some members of Congress expressed objections. See Nile Stanton, *History and Practice of Executive Impoundment of Appropriated Funds*, 53 Neb. L. Rev. 1, 5-7 (1974). But Congress ultimately dropped the issue and "no efforts were made to restrict presidential discretion over the appropriated money." *Id.* at 7.

For most of the Nation's history, such give-and-take involved informal interbranch negotiations. In response to President Nixon's impoundments, however, Congress enacted Impoundment Control Act of 1974 (ICA), 2 U.S.C. 681 *et seq.*, which codified mechanisms for the political branches to work through such interbranch disputes. Under the ICA, the Executive Branch initiates negotiations: if the Executive Branch determines that specific appropriated funds should not be obligated, the Executive Branch shall notify Congress. Then Congress may consider rescinding all or a portion of the appropriated funds. 2 U.S.C. 683(b). The ICA does not set any deadline within a fiscal year by which the Executive Branch must propose rescissions, nor does it specify what happens if the funds expire while Congress is considering a rescission proposal. Presidents have proposed rescissions shortly before the end of the fiscal year, and funds have not been spent when Congress failed to act on proposed rescissions before funding lapsed. See *Impoundment Control Act—Withholding of Funds through Their Date of Expiration*, B-330330.1, 2018 WL 6445177, at *9 (Comp. Gen. Dec. 10, 2018) (recounting lapses after proposed rescissions in 1975).

The ICA involves the Judiciary in those interbranch disputes only as a last resort. The ICA authorizes suits to challenge alleged executive-branch noncompliance with the ICA. But the Act contemplates such suits only if the Comptroller General—the head of the General Accounting Office (GAO) within the Legislative Branch—concludes that the Executive Branch failed to "ma[k]e available for obligation" some appropriated funds that are "required to be made available for obligation." 2 U.S.C. 687. Even then, Congress authorized the Comptroller General to sue the Executive Branch only after notifying Congress of the proposed suit and its rationale and allowing "25 calendar days of continuous session of the Congress" to elapse. *Ibid.* Regardless of whether such suits would be justiciable, they make plain that Congress intended to strictly limit federal courts' involvement in those interbranch disputes.

Yet, in March 2025, a single district court supplanted that process. The court held that, notwithstanding the ICA's specific, calibrated enforcement mechanism via Comptroller General suits, all sorts of private parties—in fact, anyone who might receive appropriated funds but fears their impoundment—can sue to preemptively challenge putative impoundments. App., *infra*, 29a-38a. As relief, the court further held, those private parties can obtain preliminary injunctions from federal district court forcing the Executive Branch to expend the appropriated funds absent "lawful rescissions," as judged by the district court. *Id*. at 48a. The district court thus displaced the process that the political branches agreed upon to resolve such disputes with a dysfunctional process of the court's own devising. Private parties could leapfrog the ICA's processes via that novel cause of action, and district courts could dispense with the political branches' views in favor of judicial supervision—on pain of contempt—until all the money goes out the door.

Thus, here, respondents—organizations that intended to compete (or have mem-

bers that intended to compete) for appropriated foreign-assistance funds—objected that the President's Executive Order on foreign aid and accompanying executive-branch memoranda and notices amounted to de facto impoundments that unlawfully bypassed the ICA's procedures.  The district court in March granted a preliminary injunction requiring petitioners to "make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs in the Further Consolidated Appropriations Act of 2024," App., *infra*, 48a.  The funds subject to the injunction comprise tens of billions of dollars, some $12 billion of which would have to be spent before those appropriations expire on September 30.  The government obtained an expedited appeal, seeking a decision from the D.C. Circuit by August 15 to avoid incurring irreparable costs in obligating billions of dollars that the Executive Branch would otherwise seek to avoid spending through the interbranch dialogue the ICA contemplates.

The D.C. Circuit correctly vacated the preliminary injunction.  The panel recognized that this Court's decision in *Dalton* v. *Specter*, 511 U.S. 462 (1994), forecloses respondents' cause of action.  *Dalton* held that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review."  *Id.* at 473.  That is all respondents have alleged—that, six months before the end of the fiscal year, the government purportedly acted without statutory authority by not yet obligating the appropriated funds or notifying Congress of an intent to rescind or defer the funds.  The panel also held that respondents cannot bring their claims under the Administrative Procedure Act (APA), 5 U.S.C. 701 *et seq.*  The APA does not supply a cause of action when another statute "preclude[s] judicial review" either through its text or structure, 5 U.S.C. 701(a)(1)—as the ICA does here.  Finally, the panel held, respondents cannot meet the high bar for an ultra vires claim;

they cannot point to any specific statutory command that the government has violated. See *Nuclear Regulatory Comm'n* v. *Texas*, 605 U.S. 665, 681-682 (2025).

Now, with September 30 fast approaching, the en banc D.C. Circuit has effectively maintained the district court's preliminary injunction without explanation—notwithstanding the panel opinion, issued after full briefing and argument on the merits—and exacerbated its destabilizing consequences. Absent this Court's intervention, the D.C. Circuit's inaction will preclude the government from proposing rescissions and allowing funds to expire if Congress's fails to act before September 30. In other words, it will effectively force the government to rapidly obligate some $12 billion in foreign-aid funds that would expire September 30 and to continue obligating tens of billions of dollars more—overriding the Executive Branch's foreign-policy judgments regarding whether to pursue rescissions and thwarting interbranch dialogue. That alone is irreparable harm. See, *e.g.*, *National Inst. of Health* v. *American Public Health Ass'n*, No. 25A103, 2025 WL 2415669 (Aug. 21, 2025); *Department of Education* v. *California*, 145 S. Ct. 966 (2025). And unless this Court grants relief by September 2, the Executive Branch must also take extensive preliminary steps that themselves inflict irreparable harm on the United States—for instance, negotiating with foreign countries about the scope and conditions of potential assistance programs. Even if the government were to prevail, backtracking on those commitments and proposing rescissions after September 2 would inflict irreparable diplomatic costs and generate needless interbranch friction. App., *infra*, 133a.

Worse still, by recognizing a novel cause of action for private parties to preemptively challenge perceived impoundments, the district court has issued a blueprint for virtually any prospective recipient of federal funds to circumvent the ICA's procedures and enlist district courts to preempt and thwart negotiations between the po-

litical branches over the expenditure of appropriated funds. Regardless of when (or whether) those funds expire, and regardless of whether the Executive Branch has valid reasons to seek to rescind the funds that Congress would accept, those parties could persuade district courts to superintend the Executive Branch's disbursement of funding streams and second-guess the political branches' views of the ICA.

That result would be alarming enough even if respondents faced countervailing irreparable harm. But, as the panel recognized, respondents face no such injury. They cannot claim irreparable harm from the unavailability of certain funding streams when they have no entitlement to those funds anyway. They simply want to compete for foreign-aid awards. But even under the injunction, they have no guarantee of getting a penny, making it all the more incongruous for them to effectively commandeer the spending of billions of dollars. Further, a stay would still allow the ordinary appellate process to unfold for funds that do not expire September 30. The government respectfully requests relief as soon as possible, and no later than September 2, 2025.

## STATEMENT

### A.    Legal Background

1.    Congress has long authorized foreign-assistance programs through the Foreign Assistance Act of 1961, 22 U.S.C. 2151 *et seq*., and other legislation. Consistent with the Executive Branch's broad authority over the conduct of foreign affairs, that Act confers on the President and his subordinates significant discretion to manage foreign aid. Congress repeatedly authorized the President to provide assistance for various foreign-assistance programs "on such terms and conditions as the President may determine." 22 U.S.C. 2151b-2(c)(1) (treating and preventing HIV/AIDS); see, *e.g.*, 22 U.S.C. 2151b(c)(1) (health programs); 22 U.S.C. 2291(a)(4)

(antinarcotic and other anticrime programs); 22 U.S.C. 2346(a) (economic and political stability assistance); 22 U.S.C. 2347(a) (military education and training assistance); 22 U.S.C. 2348 (peacekeeping operations); 22 U.S.C. 2349aa (antiterrorism assistance). And Congress has given the Secretary of State, "[u]nder the direction of the President," the responsibility for the "continuous supervision and general direction of economic assistance," to ensure that "the foreign policy of the United States is best served thereby." 22 U.S.C. 2382(c); see 22 U.S.C. 2346(b) ("The Secretary of State shall be responsible for policy decisions and justifications for economic support programs under this part.").

2.    Congress regularly appropriates funds to allow the Executive Branch to implement the foreign-assistance programs set out in the Foreign Assistance Act. The funds at issue here were appropriated in Titles III and IV of Division F of the Further Consolidated Appropriations Act of 2024 (2024 Appropriations Act), Pub. L. No. 118-47, 138 Stat. 740-750. As to those funds, Congress sometimes appropriated large sums without imposing specific requirements regarding their obligation. See, *e.g.*, Tit. III, 138 Stat. 742 (appropriating nearly $4 billion "[f]or necessary expenses to carry out the provisions of" certain sections of the Foreign Assistance Act concerning development assistance). In some cases, Congress restricted how some funds could be used. See, *e.g.*, Tit. III, 138 Stat. 740-741 (prohibiting the use of funds "to pay for the performance of abortion" or "to lobby for or against abortion"). And in other cases, Congress appropriated funds for more specific purposes or specific recipients. See, *e.g.*, Tit. III, 138 Stat. 742 (appropriating $1.65 billion "for a United States contribution to the Global Fund to Fight AIDS, Tuberculosis and Malaria"). Congress also included an allocation table for certain lump-sum appropriations, in which it designated amounts that "shall be made available" subject to specified procedures to

deviate from those amounts.  Tit. VII, § 7019(a), 138 Stat. 771, 772.

The date the relevant appropriated funds expire also varies.  Some funds (roughly $16 billion) remain available until September 30, 2025, see, *e.g.*, 2024 Appropriations Act, Tit. III, 138 Stat. 740 (Economic Support Fund), whereas others remain available until 2027 (roughly $41 million) or 2028 (roughly $6 billion), see, *e.g.*, Tit. III, 138 Stat. 742 (Global Health Programs); 138 Stat. 747 (Debt Restructuring); and still others (roughly $16 billion) are available "until expended," and without expiration, see, *e.g.*, Tit. III, 138 Stat. 742 (International Disaster Assistance).

3.    In the ICA, Congress recognized that the President might not wish to spend all of an appropriation, and so it prescribed various notification procedures and mechanisms for resolving interbranch disagreements.  First, whenever the President "determines that all or part of any budget authority will not be required to carry out the full objectives or scope of programs for which it is provided or that such budget authority should be rescinded for fiscal policy or other reasons," or "whenever all or part of budget authority provided for only one fiscal year is to be reserved from obligation for such fiscal year," the President must "transmit to both Houses of Congress a special message."  2 U.S.C. 683(a).  The message must contain information about the proposed rescission, including the "amount of budget authority" involved and the "reasons why the budget authority should be rescinded."  2 U.S.C. 683(a)(1) and (3); see 2 U.S.C. 683(a)(1)-(5).  Upon receiving the message, Congress may consider a bill to rescind some or all of the funds covered.  See 2 U.S.C. 688 (providing procedures ensuring timely consideration of such rescission bill).  If Congress does not "complete[] action on a rescission bill rescinding all or part of the amount proposed to be rescinded" within 45 days of continuous session after receiving the message, the ICA provides that the amount proposed to be rescinded "shall be made available for obli-

gation." 2 U.S.C. 683(b); see 2 U.S.C. 682(3).

Second, whenever the Executive Branch "proposes to defer any budget authority provided for a specific purpose or project," the President must also submit a special message. 2 U.S.C. 684(a). That message must contain information including "the amount of the budget authority proposed to be deferred"; the "period of time during which the budget authority is proposed to be deferred"; and the "reasons for the proposed deferral." 2 U.S.C. 684(a)(1), (3) and (4); see 2 U.S.C. 684(a)(1)-(6). The ICA restricts the grounds for deferrals as well as their duration. 2 U.S.C. 684(a)-(b). Either the House or the Senate may "express[] its disapproval of a proposed deferral of budget authority" by adopting an "impoundment resolution." 2 U.S.C. 682(4).

The ICA does not set any deadline within a fiscal year by which the President must send a special message proposing a rescission or deferral. And, after the ICA's enactment, Presidents proposed rescinding funds that would expire before the end of the 45-day period during which Congress would consider a rescission bill. The year after the ICA was enacted, President Ford sent a special message proposing to rescind funds that would lapse "nearly a month before expiration of the 45 days of continuous session the Congress normally has to review proposed rescissions." GAO B-115398 (ACG-76-5), Enclosure II (Aug. 12, 1975), https://www.gao.gov/assets/acg-76-5.pdf. President Carter similarly sent proposed rescissions for funds that would expire before the end of the 45-day period. See GAO B-115398 (OGC-76-2), at 2 (Oct. 26, 1977), https://www.gao.gov/assets/ogc-78-2.pdf. In both cases, the funds lapsed during the 45-day period without being obligated. In response, the Comptroller General proposed that Congress consider "changing the [ICA] to prevent funds from lapsing where the 45-day period has not expired." *Ibid*. Congress did not do so.

The ICA also sets out its own enforcement mechanisms for challenging presi-

dential impoundments, rescissions, and deferrals. As relevant here, if the Comptrol-
ler General concludes that "budget authority is required to be made available for ob-
ligation and such budget authority is not made available for obligation," the Act states
that Comptroller General may "bring a civil action" in district court. 2 U.S.C. 687.
But the Act provides that such a suit may be brought only after the Comptroller Gen-
eral files with Congress an "explanatory statement" detailing the "circumstances giv-
ing rise to the action contemplated" and waits for "the expiration of 25 calendar days
of continuous session of the Congress" after that filing. *Ibid*; see 2. U.S.C. 686(a)
(providing for other enforcement procedures through Comptroller General reports to
Congress if the President fails to transmit requisite special messages).[1]

**B.   Factual and Procedural Background**

1.     On January 20, 2025, the President issued Executive Order No. 14,169,
titled *Reevaluating and Realigning United States Foreign Aid*. 90 Fed. Reg. 8619
(Jan. 30, 2025). That order stated that "[i]t is the policy of the United States that no
further United States foreign assistance shall be disbursed in a manner that is not
fully aligned with the foreign policy of the President of the United States." *Ibid*. To
provide time to review programs "for programmatic efficiency and consistency with
United States foreign policy," the order directed agencies to "immediately pause new
obligations and disbursements of development assistance funds to foreign countries,"

---

[1] The Executive Branch has long raised concerns about the lawfulness of limits
on impoundment. See, e.g., Nile Stanton, *History and Practice of Executive Impound-
ment of Appropriated Funds*, 53 Neb. L. Rev. 1, 6-7 (1974). The Office of Legal Coun-
sel has previously reasoned that, should Congress direct spending so as to "interfere
with the President's authority in an area confided by the Constitution to his substan-
tive direction and control, such as his authority as Commander in Chief of the Armed
Forces and his authority over foreign affairs," that may violate Article II. Memoran-
dum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel,
*Presidential Authority to Impound Funds Appropriated for Assistance to Federally
Impacted Schools*, 1 Supp. Op. O.L.C. 303, 310-311 (Dec. 1, 1969). See App., *infra*,
35a n. 16. Those contentions, however, are not at issue in this application.

implementing organizations and contractors. *Ibid.* (emphasis omitted). Agencies were directed to conduct a review "within 90 days" and determine "whether to continue, modify, or cease each foreign assistance program" in consultation with the Director of the Office of Management and Budget and with the concurrence of the Secretary of State. *Ibid.*

The Secretary of State then issued a memorandum directing a pause on foreign-assistance programs funded by or through the State Department and the United States Agency for International Development (USAID). The Secretary approved various waivers of the funding pause pending review, including for foreign military financing for Israel and Egypt, emergency food assistance, and certain other humanitarian assistance. C.A. App. 135. After the review, the State Department and USAID decided to retain hundreds of USAID awards and thousands of State Department awards, but terminated the remaining preexisting awards. *Id.* at 43.

The State Department and USAID notified Congress on March 28, 2025, "of their intent to (1) undertake a reorganization that would involve realigning certain USAID functions to State by July 1, 2025, and (2) discontinue the remaining USAID functions that do not align with Administration priorities." C.A. App. 236. The State Department also "informed Congress of its intent to restructure certain State bureaus and offices that would implement programs and functions realigned from USAID." *Ibid.*

2. Respondents are organizations that have (or whose members have) previously competed for and received federal funds for foreign-assistance projects, and that would compete for the funds at issue if they remain available. App., *infra*, 57a. They brought suit in the United States District Court for the District of Columbia, seeking to enjoin the relevant federal agencies and the President from implementing

the Executive Order.  The *AIDS Vaccine Advocacy Coalition* respondents brought "two constitutional and four APA claims."  *Ibid.*; see *id.* at 57a n.3.  They asserted that by pausing foreign-assistance funds, the government had violated the separation of powers, the Take Care Clause, and the APA.  Respondents deemed those actions arbitrary and capricious and contended that suspending the payments for review for consistency with U.S. foreign policy without transmitting a special message to Congress "constitute[d] the unlawful impoundment of appropriated funds."  25-cv-400 D. Ct. Doc. 1, at 19 (Feb. 10, 2025); see *id.* at 15-20.  The *Global Health Council* respondents brought four claims:  "arbitrary and capricious action in violation of the APA"; "action contrary to statutory and constitutional law in violation of the APA"; "violation of the separation of powers"; and "ultra vires action."  App., *infra*, 57a-58a.  They likewise alleged that the funding pause was arbitrary and capricious and that "[b]y refusing to spend funds that Congress has allocated for foreign-assistance programs, without following the procedural paths set by Congress," the government had "violated the [ICA], the Anti-Deficiency Act, and relevant appropriations statutes."  25-cv-402 D. Ct. Doc. 30, at 36 (Feb. 21, 2025); see *id.* at 35-39.

On February 13, 2025, the district court granted in part and denied in part a temporary restraining order that enjoined applicants (other than the President) from "suspending, pausing, or otherwise preventing the obligation or disbursement of appropriated foreign-assistance funds" or "issuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders" in connection with foreign-assistance awards in existence as of January 19, 2025.  766 F. Supp. 3d 74, 85; see *id.* at 84-85.  The court allowed the agencies to "tak[e] action to enforce the terms of particular contracts, including with respect to expirations, modifications, or terminations pursuant to contractual provisions."  *Id.* at 85.

14

Following entry of the temporary restraining order, the parties engaged in various disputes regarding compliance with that order as it related to payments for pre-existing awards. On February 25, the district court ordered that the agencies must pay respondents and other funding recipients nearly $2 billion for contractual work they completed prior to the temporary restraining order within 36 hours of the court's order. 25-cv-402 D. Ct. Doc. 37, at 57-58. The court of appeals dismissed the government's appeal of this order for lack of appellate jurisdiction. 2025 WL 621396, at *1. The government filed an emergency application in this Court to vacate the February 25 order, arguing that the district court lacked jurisdiction because respondents' claims seeking payment for work completed under various contracts belonged in the Court of Federal Claims. After issuing an administrative stay, this Court denied the application to vacate. 145 S. Ct. 753 (No. 24A831). Because the deadline imposed by the district court had passed, this Court instructed the district court to "clarify what obligations the Government must fulfill to ensure compliance with the temporary restraining order, with due regard for the feasibility of any compliance timelines." *Ibid*.

Following this Court's order, the district court required the parties to propose timetables for payments to respondents and non-party recipients of funding for the work they had completed. 25-cv-402 Docket entry (Mar. 7, 2025). The court ordered the government to begin making payments "within a four-day period." App., *infra*, 10a. The government has completed nearly all of those payments and continues to update the district court on that process through regular status reports. See, *e.g.*, 25-cv-402 D. Ct. Doc. 122 (Aug. 21, 2025). Payments for that past work are not at issue.

3.    Shortly after remand, the district court granted in part and denied in part respondents' motion for a preliminary injunction on issues related to both past payments and future use of appropriated funds. App., *infra*, 1a-47a. After finding

that respondents have standing, the court addressed respondents' APA claims related to the terminations and suspensions of previous funding instruments. The court held that respondents would likely succeed on their APA claims as to the initial pause in payments pending the government's review of the foreign-assistance programs, but not the subsequent termination of contracts. *Id*. at 15a-29a. The court thus enjoined respondents from "withhold[ing] payments or letter of credit drawdowns for work completed prior to February 13, 2025." *Id*. at 48a.

As to respondents' claims that the Executive Order and implementing agency actions constituted an unlawful impoundment, the court held that respondents were likely to succeed on those claims. App., *infra*, 29a-38a. The court viewed the record as showing that the government is "acting to rescind or defer the funds Congress has appropriated and [has] no intent to spend them," citing statements by government officials expressing a desire to shut down USAID and save taxpayer money. *Id*. at 31a. The court concluded that by making such statements without yet "undertak[ing] the procedures required for the impoundment of congressionally appropriated aid," the government was unlawfully "engaging in a unilateral rescission or deferral of congressionally appropriated funds in violation of Congress's spending power." *Id*. at 29a, 32a. The court reasoned that Congress had "appropriated foreign aid funds for specified purposes" in the 2024 Appropriations Act, including funds apportioned to USAID that would expire September 30, 2025, and that the ICA "explicitly prohibits the President from impounding appropriated funds without following certain procedures." *Id*. at 30a-31a. The court stated that the President's power is at its "lowest ebb" when he "takes measures incompatible with the expressed or implied will of Congress." *Id*. at 30a (quoting *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)).

Because the district court concluded that the government had not complied with the procedures the ICA required, the court reasoned that the government's actions likely constituted a statutory and constitutional violation. App., *infra*, 32a-38a; see *id*. at 32a n.14, 38a n.18. The court separately concluded in a footnote that respondents could bring an APA suit against the alleged impoundments and rejected the government's argument that the ICA precludes such suits. *Id*. at 37a n.17. In another footnote, the court deemed respondents likely to succeed on their claim that the government acted ultra vires because the government had not "identif[ied] any authority, statutory or otherwise, that would authorize" the "vast cancelation of congressionally appropriated aid." *Id*. at 38a n.18.

After finding that respondents were likely to suffer irreparable harm in the form of financial injuries and that the equities and public interest weighed in favor of an injunction, the court enjoined the government "from unlawfully impounding congressionally appropriated foreign aid funds" and ordered the applicants to "make available for obligation the full amount of funds" appropriated in the 2024 Appropriations Act. *Id*. at 48a; see *id*. at 38a-48a.

4.    The government appealed and moved to expedite the appeal. C.A. Doc. 2113162 (Apr. 28, 2025). The government explained that the district court's injunction required it to obligate covered funds before they expire. *Id*. at 3. For funds expiring on September 30, 2025, the government explained that it would be required to "begin obligating and expending funds, potentially irretrievably, before that deadline." *Ibid*. The government requested a decision by August 15, 2025, to ensure that it could receive effective relief, if it were to prevail on appeal. *Ibid*. That deadline was likewise critical to allow the government to seek further review in this Court, if necessary. The court of appeals granted expedition. C.A. Doc. 2114642 (May 6, 2025).

5.  While the appeal was pending, respondents filed a motion to enforce the preliminary injunction, asking the district court to, *inter alia*, "require [the government] both to submit a detailed plan outlining how they intend to obligate all the expiring appropriated funds and to immediately begin obligating expiring funds" and to "state that [respondents] cannot avoid obligating funds" by proposing to rescind funds that would expire during the 45-day review period.  25-cv-402 D. Ct. Doc. 107, at 2 (July 21, 2025).  The court declined to grant that relief at the time, noting that the government had represented that "[it] can and will obligate the funds" if it lost on appeal.  *Id*. at 5.  As to a proposed rescission fewer than 45 days before the funds expire, the district court stated that "[i]t would be quite a thing" for the government to represent that it had a plan to obligate the funds, then propose a rescission that "would circumvent precisely what they are representing to the courts that they are prepared to do."  *Id*. at 6.

6.  On August 13, 2025, the court of appeals vacated the district court's preliminary injunction in relevant part.  App., *infra*, 49a-128a.[2]  The court held that respondents had standing to challenge putative impoundments because, if certain appropriated funds were unavailable, respondents would lose the "opportunity to compete for a pool of funds."  *Id*. at 61a-62a.  But the court held that respondents could not challenge the putative impoundments via an equitable cause of action to enforce constitutional claims, the APA, or an ultra vires claim.  *Id*. at 62a-79a.

As to the constitutional claim, the court of appeals held that *Dalton* v. *Specter*, 511 U.S. 462 (1994), forecloses respondents' "constitutional claim that the government violated separation-of-powers principles."  App., *infra*, 63a.  *Dalton* "rejected

_____

[2] The government did not appeal the district court's holding as to the initial funding freeze for work completed before the temporary restraining order.  Payments for that work are nearly complete.  See 25-cv-402 D. Ct. Doc. 122.

[the plaintiffs'] effort to recast statutory claims as constitutional ones" and emphasized the distinction "'between claims of constitutional violations and claims that an official has acted in excess of his statutory authority.'" *Id*. at 66a (quoting *Dalton*, 411 U.S. at 472). Here, the court held that respondents' separation-of-powers claim necessarily turns on "alleged statutory violations" of the ICA, and thus qualifies as a statutory claim that must adhere to statutory limits. *Id*. at 68a n.11.

The court of appeals further rejected respondents' alternative attempt to sue under the APA to enforce the ICA provisions governing when the Executive Branch must make funds available for obligation. App., *infra*, 73a-77a. The court explained that the APA withdraws its cause of action "to the extent the relevant statute 'precludes judicial review.'" *Id*. at 73a (quoting *Block* v. *Community Nutrition Inst.*, 467 U.S. 340, 345 (1984)). *Block* held that where Congress establishes a "complex and delicate" scheme that provides for judicial review for only some parties, "judicial review of those issues at the behest of other persons may be found to be impliedly precluded." *Id*. at 74a (quoting *Block*, 467 U.S. at 349). The court of appeals concluded that the ICA created such a scheme by detailing complex requirements for notification, potential congressional action, and "suit by a specified legislative branch official"—the Comptroller General—only after notifying Congress. *Id*. at 75a. The court reasoned that "it does not make sense that Congress would craft a complex scheme of interbranch dialogue but *sub silentio* also provide a backdoor for citizen suits at any time and without notice to the Congress of the alleged violation." *Ibid*. The court thus concluded that respondents "have no cause of action to undergird their APA contrary-to-law claim." *Id*. at 77a.

The court of appeals then rejected respondents' ultra vires claim, emphasizing the exceedingly high bar for such claims. App., *infra*, 78a-79a. The court held that

such a claim requires, *inter alia*, a showing that the challenged government action is "plainly in excess of the agency's delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Id*. at 78a (brackets, citation, and internal quotation marks omitted). Respondents asserted that all relevant provisions of the 2024 Appropriations Act imposed both a ceiling and floor on foreign-assistance spending. See, *e.g.*, Resp. C.A. Br. 33-35. But the court reasoned that "[t]he ICA provides that the Executive may carry out lawful impoundments subject to certain procedures and restrictions and [respondents] can point to no specific prohibition the defendants have violated to an extreme and nearly jurisdictional degree." App., *infra*, 78a.

Finally, the court of appeals held that the remaining factors do not warrant an injunction compelling the Executive Branch to expend all of the appropriated funds. App., *infra*, 79a-81a. As to irreparable injury, the court held that respondents would inevitably suffer some injury from the terminated contracts that the district court upheld as lawful. But respondents failed to develop a record that differentiated that harm from whatever hardship they might suffer should the government choose not to expend appropriated funds, for which respondents could compete but which they were not guaranteed to receive. *Id*. at 80a. And the court concluded that the public interest does not weigh in favor of injunctive relief, because respondents lack a cause of action and "it is not clear how to balance a public interest asserted on behalf of the Congress against the public interest asserted by the Executive." *Id*. at 81a.

Judge Pan dissented. App., *infra*, 82a-128a. In her view, respondents could assert a freestanding constitutional claim because the government had withheld appropriated funds without complying with the ICA and thus "acted without statutory or constitutional authority." *Id*. at 111a-112a; see *id*. at 100a-124a. Judge Pan also

would have affirmed the district court's findings regarding irreparable harm and the public interest and would have affirmed the preliminary injunction to the extent it is no broader than necessary to grant complete relief to respondents.  *Id.* at 124a-127a.

7.    On August 15, respondents filed a petition for rehearing en banc and an emergency motion for an administrative stay and for a stay of the panel opinion and judgment pending en banc review.  C.A. Doc. 2130281 (Aug. 15, 2025); C.A. Doc. 2130328 (Aug. 15, 2025).  Respondents asserted that emergency relief was warranted because of the funds expiring on September 30, which the government imminently would need to begin to obligate.  See C.A. Doc. 2130281, at 1.  The court of appeals denied an administrative stay on the ground that "[b]ecause this court's mandate has not yet issued, the preliminary injunction that requires the government to obligate the appropriated funds remains in effect."  C.A. Doc. 2130995, at 1 (Aug. 20, 2025).

The government opposed rehearing en banc and the stay motion, and cross-moved to stay the preliminary injunction or to issue the mandate expeditiously.  C.A. Doc. 2131124 (Aug. 20, 2025); C.A. Doc. 2131127 (Aug. 20, 2025).  The government explained that staying the injunction or issuing the mandate is necessary because the preliminary injunction requiring it to obligate funds prevents the government from taking lawful actions, including following statutory procedures for rescission set out in the ICA.  C.A. Doc. 2131124, at 8-9.  And the government requested resolution of the motions and issuance of the mandate by Tuesday, August 26, at 10 a.m., to facilitate this Court's review.  The government also filed a declaration detailing steps that it would need to take to obligate funds expiring on September 30, 2025, including "close to irrevocable" steps which would need to begin no later than September 2.  App., *infra*, 133a; see *id.* at 129a-134a.

The government also filed a motion in the district court, seeking a stay of the

preliminary injunction in light of the court of appeals' opinion.  25-cv-402 D. Ct. Doc. 117 (Aug. 15, 2025).  On August 25, the district court denied that motion.  App., *infra*, 135a-139a.  The court reasoned that the government "cannot now claim to be preju- diced by the appellate process continuing to play out while the[] obligation to comply with the injunction remains in effect."  *Id*. at 138a.  As of now, the D.C. Circuit has not yet ruled and the preliminary injunction remains in effect despite the panel opin- ion vacating it.

## ARGUMENT

Under Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Court may stay a preliminary injunction entered by a federal district court.  See, *e.g.*, *Trump* v. *International Refugee Assistance Project*, 582 U.S. 571 (2017) (per cu- riam); *Brewer* v. *Landrigan*, 562 U.S. 996 (2010); *Brunner* v. *Ohio Republican Party*, 555 U.S. 5 (2008) (per curiam).  To obtain such relief, an applicant must show a like- lihood of success on the merits, a reasonable probability of obtaining certiorari, and a likelihood of irreparable harm.  See *Hollingsworth* v. *Perry*, 558 U.S. 183, 190 (2010) (per curiam).  In "close cases," "the Court will balance the equities and weigh the relative harms."  *Ibid*.  Those factors strongly support a stay here.

### A.    The Government Is Likely To Succeed On The Merits

The district court ordered the government to "make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs" in the 2024 Appropriations Act.  App., *infra*, 48a.  In imposing that order, the district court upended the carefully calibrated process that the ICA sets out for the political branches to resolve disputes over the obligation and expenditure of appropriations and to seek judicial intervention only after exhausting the alternatives.  In its place, the court would authorize countless private parties to bypass the ICA's processes and

intrude to assert Congress's putative interests.  After the government began to limit foreign-assistance spending but failed to propose rescissions soon enough for the district court's liking, the court issued a preliminary injunction that effectively appoints itself as judicial superintendent of all spending decisions for the relevant appropriations.

That order defies the ICA's framework and this Court's precedents.  The ICA does not contemplate a judicial role in the interbranch engagement unless and until the Comptroller General has both (1) determined that the Executive Branch has violated the ICA; and (2) provided Congress with time to consider the appropriate response.  Plaintiffs have asserted that they may bypass the ICA's structural limits by advancing a freestanding constitutional claim premised on the government's asserted failure to comply with statutory obligations.  But, as the panel of the court of appeals recognized, this Court's precedent forecloses plaintiffs from repackaging statutory violations into constitutional claims.  Nor can respondents' claim be pursued under the APA or through an ultra vires action.  Given the vast sums involved and the significance of the case to the separation of powers and U.S. foreign policy, the district court's holdings, if allowed to stand, would clearly warrant this Court's attention, and those holdings would not survive review.  The district court's reasoning would open the floodgates to suits by private parties who compete for appropriated funds and who seek to impose judicial oversight on executive spending decisions at odds with the process Congress prescribed.

### 1. Respondents lack a cause of action to assert a freestanding constitutional claim

Respondents' attempted freestanding constitutional claim asserts that by ostensibly violating the ICA, the Executive Branch violated the separation of powers.

23

As the panel correctly held, this Court's decision in *Dalton* v. *Specter*, 511 U.S. 462 (1994), forecloses that theory. In *Dalton*, the plaintiffs "sought to enjoin the Secretary of Defense * * * from carrying out a decision by the President to close the Philadelphia Naval Shipyard" pursuant to a statute. *Id*. at 464. The plaintiffs argued that the Secretary of Defense and others had violated the statutory requirements for recommending such closures. *Id*. at 466. After acknowledging that APA review was unavailable, the court of appeals nonetheless held that the plaintiffs could pursue their claims under the Constitution. *Id*. at 468, 471. Relying on *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579 (1952), the court of appeals reasoned that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Dalton*, 511 U.S. at 471.

This Court unanimously rejected that theory, explaining that not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton*, 511 U.S. at 472. Instead, this Court has carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Ibid*. (collecting cases). If the two claims were not distinct, the Court explained, there would be "little need" for the separate category of ultra vires conduct. *Ibid*. And recognizing constitutional claims based on alleged statutory violations would "eviscerat[e]" existing statutory limitations on review. *Id*. at 474.

The Court distinguished *Youngstown*, because there, "no statutory authority was claimed" for the President's seizures, so "the case necessarily turned on whether the Constitution authorized the President's actions." *Dalton*, 511 U.S. at 473. The Court also distinguished cases where the President purported to act pursuant to an unconstitutional statute. *Id*. at 473 n.5 (citing *Panama Refining Co.* v. *Ryan*, 293

U.S. 388 (1935)). Like *Youngstown*, such cases do not address whether "the President had acted beyond his statutory authority." *Ibid*.

As the court of appeals recognized, respondents' claims here are a redux of *Dalton*. As in *Dalton*, respondents allege that the government failed to adhere to statutory requirements to take certain actions—here, the ICA's requirements for rescinding or deferring funds. As in *Dalton*, respondents contend that such statutory violations strip the Executive Branch's actions of legality and thereby violated the separation of powers by intruding on Congress's domain. And, as in *Dalton*, permitting respondents to raise such freestanding constitutional claims would evade the specific limitations on judicial review in the relevant statute. Here, the ICA provides that the Comptroller General may bring suit, but only after alerting Congress and waiting "until the expiration of 25 calendar days of continuous session of the Congress," giving Congress time to assess the appropriate response. 2 U.S.C. 687. Regardless of whether such a claim would be cognizable, that calibrated process leaves no room for private parties to jump the gun, bypass the requisite determinations and waiting period, and bring suits that Congress itself might not want to pursue.

The district court rejected the government's reliance on *Dalton* in a single footnote that cabined *Dalton* only to cases where "a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority." App., *infra*, 37a n.17 (citation omitted). But as the court of appeals explained, *Dalton* had multiple holdings; the district court focused on the wrong one, relating to the scope of judicial review for claims that the President has violated the discretion conferred on him by statute. *Id*. at 70a-71a; see *Dalton*, 511 U.S. 474-476. *Dalton*'s separate holding—that a "claim that the President has exceeded his [statutory] authority * * * is not a constitutional claim"—controls here. 511 U.S. at 476-477.

Respondents and the panel dissent attempted to avoid *Dalton*'s result by citing other separation-of-powers cases. See App., *infra*, 66a-69a, 110a. None is analogous. In *Free Enterprise Fund* v. *Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), and *Collins* v. *Yellen*, 594 U.S. 220 (2021), for example, the plaintiffs challenged the constitutionality of statutory restrictions on the President's removal power, *i.e.*, "the constitutionality of the statute itself," App., *infra*, 67a—a circumstance that *Dalton* distinguished, 511 U.S. at 473 n.5. Unlike here, permitting challenges to the constitutionality of the statute in those circumstances would not evade statutory limitations on judicial review. Cf. *Axon Enterprise, Inc.* v. *FTC*, 598 U.S. 175, 187-188 (2023) (explaining that the constitutional claim in *Free Enterprise Fund* "landed *outside* [the] statutory review scheme").[3]

### 2. The APA does not provide a cause of action for respondents' impoundment claims

Respondents cannot bring their impoundment claims under the APA, either, because the ICA precludes such review, as the panel correctly held. The APA provides a cause of action for persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. 702—but not if another relevant statute "preclude[s] judicial review," 5 U.S.C. 701(a)(1). Such preclusion can arise through "express language" in another statute, or through "the structure of the statutory

---

[3] The panel dissent's remaining objections to the majority's analysis fare no better. The dissent disputed whether the government had forfeited reliance on *Dalton*, App., *infra*, 104a-109a, but the court of appeals properly recognized that the government's "entire opening brief proceeds from the premise that this dispute raises a statutory claim" and not a constitutional claim, *id*. at 64a. Regardless, the court had an obligation to "identify and apply the proper construction of governing law." *Id*. at 65a (citation omitted). The dissent also portrayed respondents' claims as non-statutory because the government had invoked its Article II powers in the Executive Order and before the district court. *Id*. at 120a-124a. But, as the court of appeals explained, the government also invoked its statutory authority, and no constitutional challenge to the relevant statutes was before the courts. *Id*. at 67a n.9.

scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block* v. *Community Nutrition Inst.*, 467 U.S. 340, 345 (1984). And Congress may "preclude[] all judicial review" or may instead limit judicial review to a particular channel or type of case. *Ibid.* (citation omitted).

In *Block*, this Court held that Congress had precluded an APA action brought by consumers seeking judicial review of milk market orders issued by the Secretary of Agriculture. 467 U.S. at 341. The relevant other statute provided a mechanism for dairy handlers to seek judicial review after administrative exhaustion, and allowed for "[h]andlers and producers—but not consumers" to "participate in the adoption and retention of market orders." *Id.* at 346. By omitting consumers from those processes, the Court held that Congress similarly intended to foreclose them from seeking judicial review of market orders. *Id.* at 347. Otherwise, allowing consumers to sue would "effectively nullify" the administrative exhaustion that Congress had expressly required. *Id.* at 348.

So too here. Congress in the ICA set out a detailed scheme to govern interbranch disputes regarding the expenditure of appropriated funds. After Congress enacts an appropriation, the statute directs the President to notify Congress when he proposes to defer or rescind the appropriated funds. 2 U.S.C. 683(a), 684(a). Congress may then determine how to respond given the circumstances of the proposal: further discussion and negotiation could ensue; Congress could disapprove the rescission or deferral; Congress could legislate further; or Congress could decline to respond at all. See 2 U.S.C. 688. Further, the ICA contemplates an express enforcement mechanism, providing that the Comptroller General can sue, but only 25 days after providing Congress with a statement explaining the "circumstances giving rise to the action contemplated," so that Congress has a chance to avoid litigation. 2 U.S.C. 687.

That reticulated scheme of give-and-take between the political branches and congressional notification before suit necessarily forecloses private parties from seeking judicial review, supplanting interbranch negotiations, and leapfrogging the Comptroller General. See App., *infra*, 75a. Allowing private parties to bring suit "would severely disrupt th[e] complex and delicate" scheme that Congress adopted. *Block*, 467 U.S. at 348; cf. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians* v. *Patchak*, 567 U.S. 209, 215 (2012) (explaining that the APA's carveout to its waiver of sovereign immunity "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes"). By requiring the government to "make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs," App., *infra*, 48a, the district court interfered with the process that Congress adopted. The preliminary injunction took effect before the government had proposed any rescissions and more than six months before any of the appropriations would expire. The Comptroller General had not made any determination that the Executive Branch had engaged in a deferral or rescission. And Congress had not considered whether to address any such deferral or rescission through the political process or through litigation. Yet the district court jumped ahead, appointing itself as overseer of spending decisions and allowing private parties to bring suits without regard to the Comptroller General or Congress's views.

In arguing that the ICA does not preclude APA suits, respondents point to a provision of the ICA stating that nothing in it "shall be construed" as "affecting in any way the claims or defenses of any party to litigation concerning any impoundment." 2 U.S.C. 681(3). But as the court of appeals explained, that provision simply "disclaims any effect on the claims or defenses of any party *that may bring litigation*," while also clarifying that the "ICA had no retroactive effect." App., *infra*, 75a-76a.

This Court recognized the latter effect of that provision in holding that the ICA did not moot a suit concerning the allotment of certain appropriated funds that was pending at the time the ICA was enacted.  See *Train* v. *City of New York*, 420 U.S. 35, 41 n.8 (1975).  Nothing about that provision overcomes the plain implication from the ICA's structure that Congress did not upset the delicate interbranch balance by allowing for unlimited, unconstrained private suits.

### 3.    Respondents cannot bring an ultra vires claim

Finally, respondents' nonstatutory ultra vires claim cannot possibly sustain their suit.  As this Court recently observed, such a claim is "essentially a Hail Mary pass" that "rarely succeeds."  *Nuclear Regulatory Comm'n* v. *Texas*, 605 U.S. 665, 681-682 (2025) (citation omitted).  This is not that rare case.

Courts have recognized a right to equitable relief when an executive action is "unauthorized by any law and . . . in violation of the rights of the individual."  *Nuclear Regulatory Comm'n*, 605 U.S. at 680 (citation omitted).  But because such an ultra vires claim "could become an easy end-run around the limitations of  * * *  judicial-review statutes," this Court has "strictly limited nonstatutory ultra vires review to the 'painstakingly delineated procedural boundaries of [*Leedom* v. *Kyne*, 358 U.S. 184 (1958)].'"  *Id.* at 681 (citation omitted).  Under *Kyne*, ultra vires review is available "only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute."  *Ibid.* (citation omitted).  Such review is not available if the statute provides "'a meaningful and adequate opportunity for judicial review,'" or if the statute "forecloses all other forms of judicial review."  *Ibid.* (citation omitted).

As the court of appeals recognized, respondents cannot show that the government has taken any action entirely in excess of its powers and contrary to a specific

statutory prohibition.  App., *infra*, 78a-79a.  Instead, this is the common case where respondents "basically dress up a typical statutory-authority argument as an ultra vires claim," and that claim necessarily fails.  See *Id*. at 79a (quoting *Nuclear Regulatory Comm'n*, 605 U.S. at 682).  Respondents "point to no specific prohibition the [government] ha[s] violated" to the degree required to state an ultra vires claim.  *Id*. at 78a.

With respect to the appropriations statutes themselves, respondents assert that the language of the relevant appropriations provisions requires the Executive Branch to spend the full amount appropriated.  See Resp. C.A. Br. 33-35.  But in many instances the statutes simply provide that large undifferentiated sums are appropriated for various activities.  See p. 8, *supra*.  Such provisions supply no specific command to provide specific funds on a specific timetable.  Even where appropriations provisions state that amounts "'shall be made available,'" such language "contain[s] an element of ambiguity" as to whether Congress intended the amount to serve as a floor or ceiling or both.  2 GAO, *Principles of Federal Appropriations Law* 6-31 (3d ed. 2006).  That ambiguity by definition cannot support an ultra vires claim—especially since these appropriations were adopted against the backdrop of the ICA, which expressly contemplates that the Executive Branch may obligate less than the amounts that Congress has appropriated.

Nor could the ICA itself support an ultra vires claim.  By its own terms, the ICA does not require the Executive Branch to make funds available until the end of the interbranch process contemplated.  Yet the district court compelled the funds to be spent and appointed itself as overseer, substituting its own judgments and procedures for those the ICA leaves to the political branches.  Nor has the Comptroller General found that the President improperly failed to send a special message or made

a report in lieu of the special message.  See 2 U.S.C. 686(a).  As the court of appeals explained, respondents' suit interfered with the ICA's statutory processes before they had "run their course," App., *infra*, 79a, *i.e.*, before the Comptroller General—the statutorily authorized actor—could assess putative violations, before Congress could evaluate any contemplated suit, and before respondents could plausibly allege any violation.

The district court erred in holding otherwise—again, in a single footnote.  App., *infra*, 38a n.18.  Instead of identifying a specific statutory prohibition that the government had violated, the court held that there was no "clear congressional authorization" for the impoundments that it erroneously viewed as already having taken place.  *Ibid.* (citation omitted).  Rather than treating ultra vires claims as presumptively suspect, the court ignored the guardrails that doom this claim.

**B.     The Other Factors Support A Stay**

In deciding whether to grant emergency relief, this Court also considers whether the underlying issues warrant its review, whether the applicant likely faces irreparable harm, and, in close cases, the balance of equities.  See *Hollingsworth*, 558 U.S. at 190.  Each of those factors overwhelmingly supports relief here.

**1.     The issues in this case warrant the Court's review**

The district court's order directs the government to "make available for obligation the full amount of funds that Congress appropriated for foreign assistance programs" in the 2024 Appropriations Act, App., *infra*, 48a, and the court's later enforcement order indicates that the court will not recognize the validity of a proposed rescission that allows funds to expire during the 45-day review period, 25-cv-402 D. Ct. Doc. 107, at 6.  Together, those orders mean that the government must expend tens of billions of dollars of funds—some $12 billion of which must be obligated by Sep-

tember 30, 2025—no matter whether the Executive Branch views that spending as detrimental to U.S. foreign-policy interests, no matter whether the political branches might disagree with the district court's view of what rescissions and processes are permissible and appropriate, and no matter that the ICA envisions no role for judicial intervention at this stage. This Court routinely intervenes in cases in which lower courts have attempted to direct the functioning of the Executive Branch. See, *e.g.*, *National Inst. of Health* v. *American Public Health Ass'n*, No. 25A103, 2025 WL 2415669 (Aug. 21, 2025) (granting stay of district court's order enjoining the government from terminating millions of dollars in research-related grants); *Department of Education* v. *California*, 145 S. Ct. 966 (2025) (granting stay of district court order enjoining the government from terminating millions of dollars in education grants); *Trump* v. *Sierra Club*, 140 S. Ct. 1 (2019) (granting stay of district court order enjoining the Department of Defense from undertaking any border-wall construction using funding the Acting Secretary transferred pursuant to statutory authority). The same course is warranted here, especially since obligating the funds at issue implicates sensitive foreign-policy concerns.

And as in *Sierra Club*, the government has made a strong showing "that the plaintiffs have no cause of action to obtain review" of the government's compliance with the relevant statutes. 140 S. Ct. at 1; see also *ibid.* (Breyer, J., concurring in part and dissenting in part) ("This case raises novel and important questions about the ability of private parties to enforce Congress' appropriation power."). Indeed, as the court of appeals noted, the Ninth Circuit in *Sierra Club* embraced the same incorrect understanding of *Dalton* that respondents assert here. App., *infra*, 72a n.15. This Court granted review of the Ninth Circuit's holding that the plaintiffs there could assert "both a constitutional and an *ultra vires* cause of action" to obtain judicial

review of the use of appropriated funds. *Sierra Club* v. *Trump*, 963 F.3d 874, 887 (9th Cir. 2020); see *Trump* v. *Sierra Club*, 141 S. Ct. 618 (2020) (granting certiorari). After a change in administration, the Court eventually vacated the Ninth Circuit's judgment and remanded the case without resolving the question. *Biden* v. *Sierra Club*, 142 S. Ct. 46 (2021). If the en banc court of appeals were to repeat the Ninth Circuit's error, that decision would warrant this Court's review, just as it did in *Sierra Club*.

### 2.    The injunction irreparably harms the Executive Branch

The district court's order irreparably harms the government. Most urgently, certain funds subject to the district court's injunction are set to expire on September 30, 2025. The district court has made clear that, under its preliminary injunction, pursuing the rescission of those funds and allowing the appropriations to expire during the 45-day period would not be permissible. See 25-cv-402 D. Ct. Doc. 107, at 6-7. That means that absent this Court's intervention, the government will be required to obligate $12 billion in foreign-assistance funds that will likely be impossible to recover once disbursed. That is textbook irreparable harm, as this Court has recognized. See *National Inst. of Health*, 2025 WL 2415669, at *1; *California*, 145 S. Ct. at 969. And as explained in the declaration filed with the court of appeals, there are "close to irrevocable" steps the government must take in advance of the September 30 deadline to obligate those funds. App., *infra*, 133a. The government would likely be required to engage in "direct negotiation with foreign states or international organizations" to enter into bilateral agreements with respect to the funds, or at least "consult[] with foreign states to ensure diplomatic alignment" for the spending of the expiring funds. *Id*. at 132a. The government must also notify Congress of the planned obligation at least 15 days in advance, which provides Congress an oppor-

tunity to provide feedback on "proposed programming and foreign policy and budget-ary implications," potentially leading to "modifi[cation] [of the] planned programs or obligations." *Id.* at 131a-132a. The negotiation or consultation with foreign entities and congressional notification would need to begin no later than September 2. *Id.* at 133a. Once those steps take place, the government could not reverse course without "damag[ing] both diplomatic and inter-branch relations." *Ibid.*

Absent the injunction, the President would be able to propose rescissions for the funds that are set to expire on September 30, 2025, and allow those funds to ex-pire without obligation if Congress does not act before that date. As GAO explained shortly after the ICA was enacted, if the President transmits a special message "con-cerning amounts that [a]re near the date of expiration," the "President may withhold the budget authority from obligation for the duration of the 45-day period" contem-plated in the statute, even if that means that the funds expire during that period. *Impoundment Control Act—Withholding of Funds through Their Date of Expiration*, B-330330.1, 2018 WL 6445177, at *9 (Comp. Gen. Dec. 10, 2018) (recounting various GAO opinions from 1975 and 1976). If Congress wishes for the funds to remain avail-able, it "must take affirmative action to prevent the withheld funds from expiring." *Ibid.* Although GAO has more recently repudiated its contemporaneous understand-ing of the ICA, *ibid.*, any lingering dispute about the proper disposition of funds that the President seeks to rescind shortly before they expire should be left to the political branches, not effectively prejudged by the district court.

Even aside from the expiring funds, the district court's injunction covers funds that expire in 2027, 2028, and funds that are available until expended. See pp. 8-9, *supra.* For those billions of dollars of funds, the injunction ensures that the court will continue to oversee the process for obligation of the appropriations, reviewing the

government's spending timelines and any proposed rescissions to assess whether the government has complied with the district court's view of what the ICA requires. The court has demanded status reports on compliance with the injunction and has already entertained motions to enforce the injunction, setting up the specter of contempt. See 25-cv-402 D. Ct. Doc. 107 (granting in part motion to enforce). Indeed, earlier this week the court noted that it "remains open[] to extending the relevant expiration date" for funds expiring on September 30 to ensure that they could all be spent. App., *infra*, 139a. The court has thus expressed a willingness to interfere directly with Congress's power of the purse and the operation of its appropriations as enacted.

The ICA rejects such judicial monitorship. It provides for an interbranch process in which the courts are involved—if at all—only after the Comptroller General has concluded that there has been a violation, has alerted Congress to the situation, and has given Congress an opportunity to decide how best to respond. The district court erred by injecting itself into a process Congress designed for the political branches, and it did so in the context of sensitive foreign-policy decisions that have "long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Chicago & S. Air Lines, Inc.* v. *Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948). The injunction threatens to override the public interest in ensuring that tax dollars are not spent on foreign aid projects that "are not aligned with American interests and in many cases [are] antithetical to American values" and have "serve[d] to destabilize world peace." Exec. Order No. 14,169, § 1, 90 Fed. Reg. at 8619. It was improper for the district court to superintend the Executive Branch's ongoing efforts to faithfully execute the relevant statutes and the President's foreign policy, and its continued judicial monitorship is itself an irreparable harm.

### 3.    The balance of equities strongly favors the government

The balance of the equities also supports a stay. Respondents' claims for violations of the ICA are an attempt to assert an interest that is not their own. Instead, they are effectively litigating prematurely "on behalf of the Congress," in support of interests Congress itself has not seen fit to pursue. App., *infra*, 81a. By contrast, the Executive Branch has an overriding interest in ensuring that the obligation and expenditure of foreign-aid funds aligns with foreign policy and the national interest.

As for their own harms, respondents failed to adequately develop the record as to what harms would actually flow to them if the preliminary injunction were lifted. App., *infra*, 80a. Respondents asserted "existential financial harm" from losing funds—but as the court of appeals explained, the district court did not enjoin the "large-scale contract terminations" with respondents, so any "existential financial harm" that they fear may "already have taken place by the time that the grantees would finally receive unobligated funds for which they first had to compete." *Ibid*. Conversely, if respondents could continue to operate until the funds they wish to compete for were made available, they would not have shown irreparable harm. *Ibid*. Indeed, it is hard to imagine how respondents could suffer any irreparable financial harm, since they have no entitlement to receive the funds even if they remain available. They seek to compete for the funds, but the government may choose a different recipient, which would equally deprive respondents of the funds. Respondents cannot show they are likely to suffer irreparable injury "in the absence of" the preliminary injunction when they may well not receive any funds regardless. See *Winter* v. *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

### C.    This Court Should Issue An Administrative Stay

The Solicitor General respectfully requests that this Court grant an adminis-

trative stay while it considers this application, and that the Court in all events either grant an administrative stay or stay the preliminary injunction in full by September 2, 2025. The government successfully sought to expedite the proceedings on appeal to obtain a decision from the court of appeals by August 15 in recognition of the preparatory steps necessary to feasibly obligate the funds expiring on September 30, 2025, and to ensure adequate time for any further review. App., *infra*, 131a. But, as explained, as of September 2, the government must take further steps towards obligating certain funds that would be exceedingly difficult to undo without severe costs from reversing course on diplomatic engagements. Should the Court require time beyond September 2 to consider the application, the Court should enter an administrative stay to ensure that the irreparable harm that the preliminary injunction threatens does not occur during the Court's deliberations.

## CONCLUSION

This Court should stay the district court's preliminary injunction requiring the government to make available for obligation the full amount of the funds Congress appropriated in the 2024 Appropriations Act. In addition, the Solicitor General respectfully requests an administrative stay of the district court's order pending the Court's consideration of this application and respectfully requests either an administrative stay or a decision on this application by September 2, 2025.

Respectfully submitted.

D. JOHN SAUER
*Solicitor General*

AUGUST 2025